# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JUICE ENTERTAINMENT, LLC,** ) <br> **THOMAS DORFMAN, AND** ) <br> **CHRIS BARRETT,** ) <br> ) <br> **Plaintiffs,** ) <br> ) <br> **vs.** ) <br> ) <br> **LIVE NATION ENTERTAINMENT, INC.,** ) <br> ) <br> **Defendant.** ) <br> ) | **Civil Action No.** _____ <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Juice Entertainment, LLC ("Juice Entertainment"), Thomas Dorfman, and Chris Barrett (collectively "Plaintiffs"), based upon personal knowledge as to facts pertaining to them, and otherwise upon information and belief, hereby assert the following claims against Live Nation Entertainment, Inc. ("Live Nation").

## NATURE OF ACTION

1.    Plaintiff Juice Entertainment is a New Jersey Limited Liability Company.  In 2011, Juice Entertainment was awarded a contract to produce live entertainment for the 2011 New Jersey State Fair ("State Fair").

2.    Defendant Live Nation is the world's largest promoter of live popular music concerts.  Live Nation also dominates the business of providing venues to host live concerts.  Unhappy that Juice Entertainment won the contract to serve the State Fair, Live Nation proceeded to interfere with the contract by making threats and false statements about Plaintiffs and by coercing artists not to perform at the State Fair.  Live Nation repeatedly made defamatory

statements to State Fair Event Management ("SFEM") and others designed to cause SFEM not to perform its contract with Plaintiffs and to prevent Juice Entertainment from being able to perform.  Live Nation attempted to coerce SFEM and Juice Entertainment into allowing Live Nation to participate in producing the entertainment at the State Fair.  Among other illegal tactics, Live Nation threatened to deny ticketing to the venue if it were not permitted to share in the contract.

3.     As a result of Live Nation's tortious conduct, SFEM cancelled its contract with Juice Entertainment.   Plaintiffs assert claims for tortious interference with a contractual relationship, unlawful interference with a contractual relationship, tortious interference with business relations, defamation, and unfair competition arising out of these events.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand ($75,000), exclusive of interest and costs.

5.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391, because Live Nation has transacted business within the State of New Jersey and many of the acts and events giving rise to this action occurred within this District.

## THE PARTIES

6.     Juice Entertainment LLC is a corporation organized and existing under the laws of the State of New Jersey and maintains its principal place of business at 471 N. Midland Ave., Saddle Brook, New Jersey 07663.  The principals of Juice Entertainment LLC are Thomas Dorfman, an individual who resides in and is a citizen of New Jersey, and Chris Barrett, an individual who resides in and is a citizen of New Jersey.

7.      Thomas Dorfman is an individual who resides in and is a citizen of New Jersey, and is a principal of Juice Entertainment, LLC.

8.      Chris Barrett is an individual who resides in and is a citizen of New Jersey, and is a principal of Juice Entertainment, LLC.

9.      Live Nation Entertainment, Inc. is a corporation organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation can be served with process by serving its registered agent Charles Zhi at 122 2nd Avenue, Suite 218, San Mateo, California 94401.

## INTERSTATE TRADE AND COMMERCE

10.     Live Nation is involved in interstate trade and commerce and its activities substantially and adversely affect interstate commerce.  Live Nation promotes concerts throughout the nation and owns, operates and/or has exclusive booking rights at numerous venues throughout the United States.

11.     Live Nation, directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the unlawful acts and communications alleged herein, including but not limited to, the United States postal system and nationwide telephone system, through and by means of which a substantial amount of the nation's communications, information exchanges and transportation take place.  Live Nation uses all of these instrumentalities of interstate commerce to sell tickets and advertise performances, and to contact and book performers at venues in New Jersey and throughout the nation.

## LIVE NATION DOMINATES THE MARKET FOR PROMOTION OF LIVE MUSIC CONCERTS

12.     Live Nation was established in 2005 when Clear Channel Communications, Inc. ("Clear Channel") spun off its promotion subsidiary Clear Channel Entertainment. At the time it

was spun-off from Clear Channel, Live Nation was the largest promoter of live popular music concerts in the United States, responsible for approximately 70% of the live music tickets sold nationwide in 2005. This dominance was created in the first instance through Clear Channel's policies designed to limit access to its airwaves by acts that did not use Clear Channel's own promotion services. Artists were thus compelled to use Live Nation as its promoter for fear that their music would not receive radio play and that their concerts would not be adequately marketed and advertised.

13.    Spun off from Clear Channel, and without the direct benefit of its control of the radio station market, Live Nation devised its own methods for dominating the market for the promotion of live popular music concerts. Live Nation began to offer artists super-competitive shares of concert revenues, often guaranteeing artists more than the expected gross ticket sales. Live Nation also threatened to reduce the artists' share of gross revenues if the artists failed to agree to allow Live Nation to promote entire seasonal tours, used the services of other promoters, or agreed to appear at concert venues which Live Nation did not control. Live Nation also embarked on a concerted plan to acquire concert venues. Once it established control of the most prestigious, or the sole, venue in a given metropolitan area, it threatened to deny popular artists access to those key venues if the artist rejected Live Nation's tour offer or promotional services.

14.    Live Nation makes no secret of its willingness to exercise its market influence on both artists and owners of competing venues. For example, when Live Nation lost the contract to promote concerts at the New York State Fair for the 2009 season, a Live Nation representative was quoted as saying that "it will not allow any of the acts it promotes to appear at the Syracuse-based fair." Jim Koplik, Northeast Regional Chairman of Live Nation, furthermore stated that "I am very disappointed in the decision made by New York State, and I believe the real loser is the

people who attend the fair as the talent package that will be offered to the fans will be less attractive. I worked with AEG in holding a Kenney Chesney date at the fair but will obviously not assist putting any more shows at the fair." (Jane Cohen & Bob Grossweiner, *Live Nation Out as New York State Fair Promoter in 2009*, available at http://www.ticketnews.com/Live-Nation-out-as-New-York-State-Fair-promoter128293 (Dec. 29, 2008)). In other words, if a venue owner or show promoter does not accede to Live Nation's demands, Live Nation does not hesitate to use its considerable market power to punish the other party.

## DEFENDANT'S INTERFERENCE WITH JUICE ENTERTAINMENT'S CONTRACT

15.     Juice Entertainment, its principals Mr. Dorfman and Mr. Barrett, and its predecessors Base Production Inc. and Deluna Inc. all had a successful record producing live music shows. Mr. Dorfman operated Bliss Night Club from 2007-2010 and routinely grossed more than $1 million a year in revenues.  Mr. Dorfman and Mr. Barrett have worked together in promoting and staging shows at various New Jersey venues for years, routinely producing concerts with average attendance of thousands of people. Plaintiffs, through their diligence and proven track records, secured a contract with SFEM to produce concert events in the designated special events area of the New Jersey State Fair during the 2011 State Fair, which was to run from June 24, 2011 to July 20, 2011.

16.     In June 2010, Base Production Inc., entered into an agreement with SFEM to produce a one-day show for a Latin Music Festival on July 4, 2010.  Chris Barrett, a principal of Juice Entertainment, was also a principal in Base Production Inc.  Thomas Dorfman, also a principal in Juice Entertainment, assisted Mr. Barrett in the production of this event.  The Latin Music Festival was produced on relatively short notice and was successful, particularly given the

short lead-in time for production.  Mr. Dorfman and Mr. Barrett secured headliner acts and the concert's success led SPEM to want to work with Plaintiffs again.

17.     Building on the success of the 2010 Latin Music Festival, Mr. Barrett and Mr. Dorfman began discussions with SFEM with the goal of entering into a long term agreement for the production of concerts at the State Fair.

18.     On December 1, 2010 Al Dorso, President of SFEM, verbally granted Mr. Barrett and Mr. Dorfman exclusive rights to produce an electronic dance event, as well as any and all concerts in the designated special events area of the State Fair, for the next five years.  In addition to these verbal promises, Mr. Dorso sent a written engagement letter, dated December 1, 2010, granting Deluna Inc. "the right to broker, stage and promote musical and dance events in the designated special event area of the fair, held yearly between mid June and mid July."  (The "Engagement Letter").  At that time, Mr. Barrett and Mr. Dorfman were operating under the corporate entity known as Deluna, Inc.  The Engagement Letter further stated that "the terms and conditions of this agreement will be set forth in a formal contract at a later date as more information is forthcoming.

19.     Acting in reliance on the Engagement Letter, as well as on Mr. Dorso's verbal guarantees and on his subsequent direction that they should "begin booking talent," Mr. Dorfman and Mr. Barrett began working to produce the electronic dance event for the 2011 State Fair. They also worked to produce the other concerts that would be held in the designated special events area at the State Fair.  Mr. Dorfman and Mr. Barrett began contacting talent agencies and artists to perform at the State Fair in January and early February 2011.  Initially it appeared that their efforts would be well received.  In late January or early February of 2011, a representative of the William Morris Talent Agency, Mr. Zimmerman, informed Vito Bruno and John

- 6 -

Dimatteo, agents for Juice Entertainment, that William Morris wanted to be "the wind behind your sails."

20.     Live Nation's campaign to block the agreement between Mr. Dorfman and Mr. Barrett with SFEM began in earnest almost immediately.  As early as February 18, 2011, Mr. Dorso informed Plaintiffs about the heavy-handed tactics employed by Live Nation to prevent Mr. Dorfman and Mr. Barrett from being able to perform under the Engagement Letter.

21.     On March 7, 2011, Mr. Dorso reported to Juice Entertainment that representatives of Live Nation had told him that Mr. Dorfman and Mr. Barrett were "broke" and could not afford the necessary talent to stage the State Fair concerts.  Representatives of Live Nation further said to Mr. Dorso that Mr. Dorfman and Mr. Barrett lacked the expertise needed to produce concerts of the size contemplated in the Engagement Letter.  These statements by Live Nation were false and defamatory.

22.     Notwithstanding this interference, SFEM finalized a formal contract with Juice Entertainment on March 7, 2011 (the "Agreement") (*see* Exhibit A).  Under the Agreement Plaintiffs were given the exclusive right to broker, stage and promote an electric dance event, including DJs and live acts, on the first weekend of the State Fair for 4 years beginning in 2011, with an additional 5 year option.  Plaintiffs were also given the exclusive right to broker, stage and promote concerts in the designated special event area of the Fair for the duration of the Fair beyond the first weekend.

23.     The Agreement served only to further antagonize Live Nation.  Live Nation stepped up its efforts to kill the relationship between Plaintiff and SFEM.  Representatives from Live Nation told Mr. Dorso that Juice Entertainment would not succeed in signing one of its intended main attractions for the State Fair concerts, the top Electronic DJ in the world -- Tiesto.

On or before February 18, 2011 Live Nation representatives told Mr. Dorso that they were "blocking" Tiesto from performing at the State Fair under the Juice Entertainment's contract, by threatening him that he would not be permitted to play at other venues controlled by Live Nation if he appeared at the State Fair.

24.     Juice Entertainment sent out over $1 million in offers to artists for contracts to perform at the 2011 New Jersey State Fair.  Juice Entertainment approached the majority of such acts through their talent agents, as is standard in the music business.  In early March 2011, after the majority of Juice Entertainment's offers to talent agents had been made, representatives of Live Nation stated to Mr. Dorso, and ultimately directly to Mr. Dorfman and Mr. Barrett, that the William Morris talent agency belonged "exclusively" to Live Nation and that no artists represented by William Morris would be permitted to sign contracts with Juice Entertainment to appear at the State Fair.

25.     The State Fair takes place at the Meadowlands, a stadium owned by the New Jersey Sports and Exposition Authority (the "Authority"), pursuant to a contract between SFEM and the Authority.  Upon information and belief Live Nation has an exclusive contract with the Meadowlands and the Authority to provide ticketing services for events held at the Meadowlands, including musical concerts, sporting events, and special events such as the State Fair. Mr. Dorso reported to Juice Entertainment that on or before February 18, 2011 Live Nation applied pressure on the Authority to pressure, in turn, SFEM and/or Juice Entertainment to allow Live Nation to have part of the contract for the State Fair concerts.

26.     Sometime before February 18, 2011, when Mr. Dorso relayed the message to Plaintiffs, Live Nation falsely stated to the Authority that Plaintiffs associated with "thieves" and could not be trusted.

27.     According to Mr. Dorso, Live Nation representatives threatened that unless they were given part of the contract for producing concerts at the State Fair, they would make ticketing services unavailable for the State Fair at the Meadowlands.

28.     Live Nation insisted to Mr. Dorso that they should be given a portion of the contractual right to produce concerts at the State Fair.  Live Nation was so adamant and threatening on this point that Mr. Dorso suggested to Mr. Dorfman and Mr. Barrett that they attend a meeting with Live Nation to address the situation.

29.     Mr. Dorfman and Mr. Barrett followed this advice and did attend such a meeting with representatives of Live Nation in New York, on or about March 3, 2011.  Jason Miller, who was at the time Senior Vice President of Bookings, and John Desposito, who is Vice President of Talent, were the Live Nation representatives present at the meeting. It immediately became clear at this meeting that Live Nation had no intention of doing anything other than dictating terms to Juice Entertainment.  Mr. Miller and Mr. Desposito attempted to coerce Juice Entertainment into making Live Nation its partner in the State Fair business by repeating the same threats they had made directly to Mr. Dorso.  They insisted that Juice Entertainment needed to break existing contacts and associations with influential members of the team, specifically Vito Bruno and John Diametto.

30.     Mr. Dorfman and Mr. Barrett were explicitly told that Live Nation would use its influence with talent agents to prevent Juice Entertainment from signing artists if Live Nation was not permitted to become a partner in the business.  They were told that Live Nation would use its relationship with the Authority to pressure SFEM to kick Juice Entertainment out of its contract with SFEM. Desposito also threatened that if Plaintiffs did not accept Live Nation's terms: "I know your contract, there are loopholes, I can kick you guys out of the contract at

anytime." As a result of Live Nation's interference with their attempt to secure talent, Plaintiffs were required to seek a 30 day extension of the Agreement's requirement to provide contracts with artists to SFEM (the "Extension") (*see* Exhibit B).

31.     Plaintiffs did not consent to the shotgun marriage "proposal" from Live Nation, and as a result, Live Nation carried out its threats and blocked Plaintiffs from signing artists in time to meet the requirements of the Agreement.  As a result, Juice Entertainment was not able to sign artists sufficient to stage the shows at the State Fair.  On April 26, 2011 SFEM, through Mr. Dorso, informed Juice Entertainment that the Agreement was terminated pursuant to Section 3(c) of the Agreement which required Juice Entertainment to furnish copies of contracts with the artists who would perform at the State Fair.  Through a combination of defamatory statements made to representatives of SFEM, pressure applied to artists and their agents, and pressure applied to SFEM and the Authority, Juice Entertainment's Agreement with SFEM was terminated.  As a result, Juice Entertainment has been deprived of the expected benefits of the Agreement, which granted Juice Entertainment an exclusive right to stage concerts at the State Fair for 4 years, with an option for an additional 5 years thereafter dependent upon the status of SFEM's contract with the Authority.

## CAUSES OF ACTION

### COUNT I
### Tortious Interference with Contract

32.     Juice Entertainment incorporates by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

33.     Live Nation intentionally and improperly interfered with the performance of the Agreement between Juice Entertainment and SFEM.

34.     Live Nation dishonestly induced or otherwise caused SFEM to terminate the Agreement with Juice Entertainment.  Live Nation exerted pressure on SFEM directly and through the Authority with the design and intent to obtain a portion of the business represented by the Agreement for itself.

35.     When that strategy proved unsuccessful, Live Nation made performance by Juice Entertainment impossible by blocking access to the artists Juice Entertainment needed to stage concerts.  This inability to secure artists was the direct cause of SFEM's termination of the Agreement.

36.     Live Nation acted intentionally and without any justification in interfering with the Agreement.  Live Nation's actions were intentional because Live Nation either desired to bring about the result that the Agreement be terminated, or because Live Nation knew that termination was certain or substantially certain to occur as a result of its actions.  It is clear that Live Nation desired to terminate the Agreement between SFEM and Juice Entertainment, and to replace it with a new arrangement in which it either completely ousted Juice Entertainment, or at the very least became its partner.  It is also clear that Live Nation knew that its actions would result in precisely this interference.  Indeed, when Live Nation boasted that it could block all the talent necessary to stage the concerts contemplated under the Agreement, it knew that it did in fact have the power to do so.

37.     Live Nation lacked any justification for its actions.  Live Nation had no existing economic interest in the Agreement.  While fair competition may in some cases constitute a justification for a competitor's actions, those actions must comport with generally accepted standards of fair competition, morality and law.  Live Nation's dishonest abuse of its market power to cause SFEM to terminate the Agreement failed to adhere to those standards of fairness.

38.     As a direct, intended, and proximate result of Live Nation's wrongful conduct, Juice Entertainment has sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

39.     The foregoing acts and conduct of Live Nation have caused Juice Entertainment to suffer a loss of goodwill and other irreparable harm which will continue unabated unless enjoined by this Court.

40.     Live Nation has acted willfully, maliciously, and/or with the specific intent to harm Juice Entertainment, or with callous disregard as to the potential foreseeable harm to Juice Entertainment.   Live Nation was well aware of the likelihood that serious economic harm to Juice Entertainment would arise from its egregious conduct and/or actions.   As alleged herein, Juice Entertainment is entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

### COUNT II
### Unlawful Interference with Contract

41.     Juice Entertainment incorporates by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

42.     Live Nation wrongfully and actually, and without justification, interfered with the performance of the Agreement between Juice Entertainment and SFEM.

43.     Live Nation dishonestly induced or otherwise caused SFEM to terminate the Agreement with Juice Entertainment.  Live Nation engaged in sharp dealing, and conduct below the behavior of fair men similarly situated, by exerting pressure on SFEM directly and through the Authority with the design and intent to obtain a portion of the business represented by the Agreement for itself.

44.      When that strategy proved unsuccessful, Live Nation made performance by Juice Entertainment impossible by blocking access to the artists Juice Entertainment needed to stage concerts.  This inability to secure artists was the direct cause of SFEM's termination of the Agreement.

45.      Live Nation acted unlawfully and without any legitimate justification in interfering with the Agreement.  Live Nation's actions were intended to bring about the result that the Agreement be terminated, or make sure that it was substantially certain to be terminated as a result of Live Nation's actions.  It is clear that Live Nation desired to terminate the Agreement between SFEM and Juice Entertainment, and to replace it with a new arrangement in which it either completely ousted Juice Entertainment, or at the very least became its partner.  It is also clear that Live Nation knew that its actions would result in precisely this interference. Indeed, when Live Nation boasted that it could block all the talent necessary to stage the concerts contemplated under the Agreement, it knew that it did in fact have the power to do so.

46.      Live Nation lacked any justification for its actions.  Live Nation had no existing economic interest in the Agreement.  While fair competition may in some cases constitute a justification for a competitor's actions, those actions must comport with generally accepted standards of fair competition, morality and law.  Live Nation's abuse of its market power to cause SFEM to terminate the Agreement failed to adhere to those standards of fairness.

47.      As a direct, intended, and proximate result of Live Nation's wrongful conduct, Juice Entertainment has sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

48.    The foregoing acts and conduct of Live Nation have caused Juice Entertainment to suffer a loss of goodwill and other irreparable harm which will continue unabated unless enjoined by this Court.

49.    Live Nation has acted willfully, maliciously, and/or with specific intent to harm Juice Entertainment, or with callous disregard to the potential foreseeable harm to Juice Entertainment.   Live Nation was well aware of the likelihood that serious economic harm to Juice Entertainment would arise from its egregious conduct and/or actions.   As alleged herein, Juice Entertainment is entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

## COUNT III
### Tortious Interference with Business Relations

50.    Juice Entertainment incorporates by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

51.    Live Nation intentionally and improperly interfered with the business relations between Juice Entertainment and SFEM, the various recording artists, William Morris, and/or the Authority.

52.    Live Nation interfered with Juice Entertainment's business relations with SFEM, the various recording artists, William Morris, and/or the Authority.  Live Nation exerted pressure on SFEM, the various recording artists, William Morris, and/or the Authority with the design and intent to prevent them from doing business with Juice Entertainment.

53.    Live Nation made Juice Entertainment's performance of the Agreement impossible by blocking access to the artists Juice Entertainment needed to stage concerts.  This inability to secure artists was the direct cause of SFEM's termination of the Agreement.

54.     Live Nation acted intentionally and without any justification in interfering with SFEM, the various recording artists, William Morris, and/or the Authority.   Live Nation's actions were intentional because Live Nation either desired to bring about the result that the Agreement be terminated, or because Live Nation knew that termination was certain or substantially certain to occur as a result of its actions.   It is clear that Live Nation desired to terminate the Agreement between SFEM and Juice Entertainment, and to replace it with a new arrangement in which it either completely ousted Juice Entertainment, or at the very least became its partner.   It is also clear that Live Nation knew that its actions would result in precisely this interference.   Indeed, when Live Nation boasted that it could block all the talent necessary to stage the concerts contemplated under the Agreement, it knew that it did in fact have the power to do so.

55.     Live Nation lacked any justification for its actions.   Live Nation had no existing economic interest in the Agreement between SFEM and Juice Entertainment.   While fair competition may in some cases constitute a justification for a competitor's actions, those actions must comport with generally accepted standards of fair competition, morality and law.   Live Nation's abuse of its market power to prevent SFEM, the various recording artists, William Morris, and/or the Authority from doing business with Juice Entertainment.

56.     As a direct, intended, and proximate result of Live Nation's wrongful conduct, Juice Entertainment has sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

57.     The foregoing acts and conduct of Live Nation have caused Juice Entertainment to suffer a loss of goodwill and other irreparable harm which will continue unabated unless enjoined by this Court.

58.     Live Nation has acted willfully, maliciously, and/or with specific intent to harm Juice Entertainment, or with callous disregard to the potential foreseeable harm to Juice Entertainment.   Live Nation was well aware of the likelihood that serious economic harm to Juice Entertainment would arise from its egregious conduct and/or actions.   As alleged herein, Juice Entertainment is entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

## COUNT IV
### Defamation

59.     Plaintiffs Juice Entertainment, Mr. Dorfman, and Mr. Barrett incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

60.     Live Nation made false and defamatory statements concerning Plaintiffs.  These statements were communicated to various third parties including representatives of SFEM, representatives of the Authority, artists, and talent agents.

61.     Live Nation acted negligently or with actual malice in making these false and defamatory statements.

62.     Specifically, in its campaign to prevent Plaintiffs from securing their contract with SFEM and to prevent performance under the executed Agreement, Live Nation told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM.  In meetings with members of SFEM and the Authority, Live Nation falsely stated that Plaintiffs associated with "thieves" and could not be trusted.  All of these statements were untrue, defamatory, and made negligently or with actual malice.

63.     As a direct, intended and proximate result of Live Nation's wrongful conduct, Plaintiffs have sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

64.     The foregoing defamatory statements made by Live Nation have caused Plaintiffs to suffer a loss of goodwill, damage to their business reputation and other irreparable harm which will continue unabated unless enjoined by this Court.

65.     Live Nation has acted willfully, maliciously, and/or with specific intent to harm Plaintiffs, or with callous disregard to the potential foreseeable harm to Plaintiffs. Live Nation was well aware of the likelihood that serious economic harm to Plaintiffs would arise from its egregious conduct and/or actions. As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

<u>COUNT V</u>
**Unfair Competition**

66.     Juice Entertainment incorporates by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

67.     Live Nation's acts and conduct complained of herein constitute unlawful, unfair, or fraudulent business practices.

68.     Juice Entertainment invested substantial time, effort, resources and money into procuring and working to perform the contract with SFEM.

69.     Live Nation had no pre-existing contract with SFEM to produce concerts at the New Jersey State Fair.

70.     By interfering with Juice Entertainment's ability to procure talent for the State Fair and otherwise perform the Agreement, Live Nation has wrongfully destroyed the value of Juice Entertainment's contract with SFEM.

71.     Live Nation's actions were willful and intentional and undertaken for the sole purpose of eliminating Juice Entertainment as a potential competitor and securing the State Fair as an opportunity for itself.

72.     Juice Entertainment has been irreparably harmed by such acts, through the loss of what was intended to be a long-term relationship with SFEM.

73.     As a result of Live Nation's actions, Juice Entertainment has suffered, and will continue to suffer, money damages in excess of $75,000 as a result of, inter alia, Juice Entertainment's loss of the SFEM contract.

74.     Live Nation has acted willfully, maliciously, and/or with specific intent to harm Juice Entertainment, or with callous disregard to the potential foreseeable harm to Juice Entertainment.  Live Nation was well aware of the likelihood that serious economic harm to Juice Entertainment would arise from its egregious conduct and/or actions.   As alleged herein, Juice Entertainment is entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor and against Live Nation for an award of the following relief:

       a.     A permanent injunction prohibiting Live Nation from continuing to make defamatory statements against Plaintiffs;

b.   An award of damages in an amount consistent with the proof submitted at trial for the losses Plaintiffs have incurred due to Live Nation's wrongful conduct;

c.   An award of legal fees and costs;

d.   An award of punitive damages; and

e.   An award of such other legal and equitable relief as is appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Respectfully submitted,

By:   /s/ David S. Stone
        David S. Stone
        Amy Walker Wagner
        Jason C. Spiro
        STONE & MAGNANINI LLP
        150 JFK Parkway, 4th Floor
        Short Hills, NJ 07078
        Tel:  (973) 218-1111
        Fax: (973) 218-1106

        Thomas R. Ajamie (*pro hac vice to be filed*)
        David S. Siegel (*pro hac vice to be filed*)
        AJAMIE LLP
        Pennzoil Place – South Tower
        711 Louisiana Street, Suite 2150
        Houston, Texas 77002
        Tel:  (713) 860-1600
        Fax: (713) 860-1699

        *Attorneys for Plaintiffs Juice Entertainment,*
        *LLC, Thomas Dorfman, and Chris Barrett*

Dated: December 16, 2011

# EXHIBIT A

# AGREEMENT

This Agreement (the "Agreement") is made and entered into as of _7_ day of _March_ 2011, by and between the State Fair Event Management (SFEM), a New Jersey corporation having executive offices located at 229 Main Street, Belleville, New Jersey 07109 (State Fair) and Juice Entertainment, LLC a New Jersey Corp with offices at 471 N. Midland Ave Saddle Brook, NJ 07663. (Juice)

# WITNESSETH:

Whereas State Fair conducts an event known as State Fair at the Meadowlands Fair Grounds, East Rutherford, New Jersey by reason of an exclusive contract with the New Jersey Sports and Exposition Authority(The Authority); and

Whereas, State Fair sought proposals from third parties for the production of concert events in the designated special event area of the fair; and

Whereas Juice and Entity with experience in producing such events; and submitted a proposal to State Fair for the production of such concert event.

Whereas State Fair accepted Juice's proposal for the production of such events, subject to the execution of a definitive agreement by the parties setting forth mutually acceptable terms and conditions upon which Juice will produce such events; and

Whereas the State Fair and Juice desire to enter into this Agreement which sets forth the mutually acceptable terms and conditions upon which Juice will produce such events

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1

Section 1.     Grant of the right to produce concerts

(a)     Subject to the terms and conditions of this agreement State Fair grants Juice the exclusive
right to broker stage and promote an electric dance event to include DJ and live acts with
musical genre to include House, Techno, Trance, and any sub genre of electric dance. In the
designated special event area of the fair. For 2 days on the first Saturday and Sunday of the
fair for 4 consecutive years commencing in 2011 with an additional 5 year option (provided
State Fairs contract is renewed with The Authority).

(b)     The Fair for 2011 shall commence on June 24th and end of July 10, 2011.
The Electric Dance Event for 2011 shall be held June 25 and June 26, 2011.
The hours of operation for these days shall be 2pm to 2am. Entertainment shall not
commence prior to 2pm and must end no later than 1:30 am.

(c)     State Fair also grants Juice     the exclusive right to broker, stage and promote concerts
events in the designated special event area of the fair and will diligently work towards
producing top talent for the duration of the fair.                                    C.B

(d) State Fair shall supply designated concert space to hold at least 30,000 [24,000] attendees per day

(e) The admission fee for such event shall be at the sole discretion of Juice. This fee may be
increased or decreased at the sole discretion of Juice.

All acts are subject to the approval of State Fair.

Section 2.     Permitted Occupation of Special Event Area. The State Fair acknowledges that a
minimum of seventy –two (72) hours is required for (i) the installation of equipment and
preparation of the Licensed Area for the event in any particular year and (ii) the dismantling
and removal of equipment and clean-up of the Licensed Area upon completion of the Event in
any particular year. Accordingly, for each year in which Juice is producing the Event pursuant
to this Agreement and subject to the reasonable approval of State Fair, Juice and its
subcontractors, shall be entitled to occupy the Licensed Area for a period commencing seventy-
two (72) hours prior to the commencement of the Event in such year and ending seventy-two
(72) hours following the completion fo the Event in such year; provided that, the occupation of
the Licensed Area is solely for purposes related to the production of the event (including the
preparation for and clean-up of the Event).

Section 3.     Financial Terms.

(a)    For purposes of the Agreement, the term (i) "Electric Dance Net Revenue s" shall mean, with respect to the Event for a particular year, all revenue generated by Juice from Revenue Generating Activities ) less the applicable New Jersey sales tax
for all ticket and other sales (which sales tax is currently seven percent (7%)) and all reasonable and verifiable out-of-pocket costs (the Event Expenses) (including, without limitation, to cost of paying artists, bands and other acts to perform and "State Fair Reimbursable Expenses" with respect to all Revenue Generating Activities, (ii) The "Revenue Sharing Formula" shall be defined as the balance remaining (the "Net Proceeds") after deducting Juice Expenses and State     Fair Reimbursable Expenses from the Event Net Revenues; Net Proceeds shall be split as follows: 2011- 100% of net proceeds to Juice, 2012- 93% to Juice 7% State Fair, 2013-2014 90%
Juice ard 10% to State Fair(iii) " Minimum Payment" shall mean 9.00 per ticket sold for the Event: the Minimum Payment for any Event is in addition to the payment of the State Fair Reimbursable Expenses for such Event, (iv) State Fair Reimbursable Expenses" shall mean all of State Fair costs for labor, security, box office services, materials, supplies, rentals, contract services, management personnel services, State Police services, permits, fees, taxes, utilities, capital improvements agreed upon by State Fair and Juice and other costs incurred by Sate Fair in connection with providing services or supplies deemed necessary for the Event to by Juice during the term of this Agreement.

(b)
On the terms and condition set forth herein, Juice shall reimburse the State Fair for State Fair Reimbursable Expenses. Subject to the Authority's presentation of appropriate vouchers documenting the Authority Expenses for a particular Event, Juice shall reimburse State Fair for State Fair Reimbursable Expenses out of the Event net Revenues following the Preliminary Accounting (as defined in Section 3(f) below) for such Event. State Fair shall provide a detailed accounting of State Fair Reimbursable Expenses incurred by it with respect to a particular year's Event within three (3) business days following the completion of such Event. (i) If ticket sales for the Event exceed 30,000 patrons over 2 days- State Fair will deduct up to $30,000 from reimbursable expenses.

(c) Juice must provide by February 20 of each year a budget estimate as well as attendance estimates and ticket pricing. Juice must provide by March 1st of each year a copy of

3

talent/acts/entertainment, a list of all interested parties, a list of equipment, copies of all  CB
contracts. ~~This shall provision shall be waived for 2011.~~ CB ꞮꝒ TꝒ

(d) Juice must deliver 70% of attendance estimates in each year of the Event.

(e) State Fair shall be responsible for running the box office and for admission ticket sales and concert ticket sales. Juice shall be responsible for all other Revenue Generating Activities. Fair shall hold all of the proceeds from concert ticket sales in its possession until the Preliminary Accounting for such Event, at which time the proceeds all be distributed in accordance with Section 3(a) hereof. Except as set forth below, Juice shall hold all of the proceeds from all other Revenue Generation Activities in its possession until the Preliminary Accounting for such Event, at which time the proceeds shall be distributed in accordance with Section 3 (a) hereof. Not withstanding anything to the contrary contained herein, Juice shall be entitled to use, at any time (including prior to the Preliminary Accounting), the proceeds from all other Revenue Generating Activities to cover its costs and expenses related to the production of the Event and any and all Revenue Generating Activities. Juice shall provide State Fair with a monthly statement of the use of such proceeds prior to Preliminary Accounting.

 (i) With Respect to concert ticket sales for each day of operation of the Event, State Fair shall provide Juice with a daily accounting statement detailing the amounts collected from concert ticket sales for such day of operation of the Event to be provided to Juice by 4:00 p.m. on the next following day.

 (ii) With respect to vendor and concession rental charges and sponsorship income, Juice shall provide State Fair an accounting statement detailing all income collected by Juice or due and owing to Juice on the first Wednesday prior to the Event.

(f) Within three (3) business days following the conclusion of the Event of any particular year, Juice shall provide a detailed breakdown to State Fair of (i) the Event Net Revenues Event (which calculation shall be based upon the accounting statements provided in accordance with this Section 3 less the applicable New Jersey sales tax for all ticket and other sales (which sales tax is currently seven percent (7%)) and all out-of-pocket cost and expenses of Juice with respect to all Revenue Generation Activities) and (ii) State Fair's share of the Event Net Revenues ( the "Preliminary Accounting"). State Fair shall have three (3) business days from receipt of the Preliminary Accounting to review the Preliminary Accounting and to notify Juice of any errors in its calculation. If State Fair does not notify Juice of any errors in its calculation of the Preliminary Accounting within three (3) business days after receipt thereof, State Fair shall be deemed to have accepted the Preliminary Accounting. In the event State Fair notifies Juice of any errors in its calculation with in such three (3) business-day period, the parties shall work together in good faith to resolve any such dispute, and in the event the parties are still unable to

4

resolve such dispute, the resolution of such dispute shall be referred for decision by arbitration in the State of New Jersey by a neutral arbitrator mutually selected by State Fair and Juice. Any arbitration proceeding shall be governed by the Rules of American Arbitration Association then in effect and the decision of the arbitrator shall be final, conclusive and binding on State Fair and Juice. Juice and State Fair shall each bear their own costs (including the fees and disbursements of counsel) incurred in connection with any such arbitration and shall each pay one-half of the costs of such arbitrator. At the conclusion of the arbitration, the prevailing party shall have all of its cost reimbursed by losing party. Within forty-eight (48) hours following the earlier of Juice's acceptance of Preliminary Accounting or the resolution of disagreement the Preliminary Accounting (the Preliminary Accountings as accepted by State Fair or amended pursuant to the resolution of any disagreement between the parties is referred to as, the "Preliminary Accounting") , State Fair and Juice shall disburse the proceeds from the Event. State Fair shall retain at least $35,000 or some other sum as State Fair shall deem necessary for payment of late submitted invoices. The amount so retained, or the remainder thereof after payment of late submitted invoices, shall be released to Juice within thirty (30) days of conclusion of the Event for any given year.

(g) During the term of this Agreement, and for a 24-month period following its conclusion, State Fair and its representatives shall have the right, for the primary purpose of confirming the Event Net Revenues, to inspect the relevant books, records (including tax returns), documents and vouchers relating to the business and affairs of Juice  and to make extracts and copies of such books, records, documents and vouchers. Any such inspection shall be conducted during regular business hours of Juice. Claims, if any must be made within two years of the conclusion of fair for any given year.

 During the term of this Agreement, and for a 24-month period following its conclusion, Juice and its representatives shall have the right, solely for the purpose of confirming the concert ticket sales and State Fair Reimbursable Expenses for the Event, to inspect the relevant books, records (including tax returns), documents and vouchers relating to the business and affairs of State Fair and to make extracts and copies of such books, records, documents and vouchers. Any such inspection shall be conducted during regular business hours of State Fair.

Section 4. Letter of Credit. By the later of (i) March 1st of each year in which Juice is required to produce and Event pursuant to the terms of this Agreement or (ii) one hundred and twenty (120) days prior to the commencement of the Event for such year, Juice shall submit to State Fair an irrevocable, unconditional letter of credit of its benefit in the amount of $250,000 to guarantee "State Fair Reimbursable Expenses" and "Minimum Payment " due to State Fair under this Agreement for such particular year. The Letter of Credit shall be issued by New Jersey financial institution approved by State Fair.

In the event Juice    does not produce the Event in a particular year during the term of this Agreement (other than as a result of an Event of Occupation (as defined in Section 21), a Force Majeure Event (as defined in Section 27), or due to a breach by State Fair of its obligation under this Agreement), State Fair shall have the right to obtain a third party to produce such Event. State Fair may draw upon the letter of credit to the extent the Minimum Guaranteed Revenue for such particular year exceeds the amount received by State Fair for the production of the Event by such third party. The letter of credit for each particular year of the Event shall expir upon the disbursement of proceeds for such Event pursuant to the Preliminary Accounting.

The rights granted under this Section 4 shall be in addition to and shall not limited any other rights granted to State Fair pursuant to the terms of this Agreement, including, but not limited to , (i) termination rights; (ii) the right to sue for specific performance;(iii) State Fair's right to recover damages.

Notwithstanding anything to the contrary in this Section, State Fair, in its sole discretion, may waive this provision for any contract year providing written notice to ~~Deluna~~ of its intention to do so.                                                                                    JUICE CB

Section 5. Box Office Facilities and Admissions Control. The Authority shall generate tickets for the concert event through the Ticketmaster system or such other ticketing agent selected by the Authority. The cost of producing such tickets shall be a State Fair Reimbursable Expense. The Authority shall be responsible for advance and day of event concert tickets sales and for certain related services including, without limitation, setting up the event on the Ticketmaster system. The Authority will handle over the counter, advance and day of event sales for State Fair at IZOD center ticket offices and at ticket booths as furnished by State Fair. If the Authority  State Fair and Juice agree that  the Authority shall consign ticket sal es to outside agencies, State Fair shall pay the sales fee, commission charge, refund fee or any other fee of the outside agency which sells admission tickets to the Event. The sales fees, commission charges, refund fees or any other fees of the aforementioned outside agency are reimbursable expenses of State Fair .for purposes depositing all monies from admission ticket sales and holding such amounts pending the Preliminary Accounting and preparing accounting statement detailing all admission ticket sales and State Fair Reimbursable Expenses related thereto and such other reports as are necessary and required.

Section 6. Lien on Admission Ticket Sales. State Fair shall have a first lien against admission ticket office receipts and all property of Juice located upon the premises of the Licensed Area, to the extent not subject to a prior lien for all amounts due and owing to State

Fair under this Agreement including, without limitation, its share of the Event Net Revenues. State Fair is authorized to withhold the proceeds from admission ticket sales in an amount equal to the total due and owing State Fair under this Agreement.

Section 7. <u>Licenses and Permits</u>.   Juice     shall promptly pay all taxes excise or license fees, including music licensing fees to ASCAP, BMI and SESAC and obtain all licenses or permits necessary for the use of the Licensed Area and the production of the Event as required by Federal, State or Local laws or ordinances; and Juice,     shall provide evidence of such requisite licenses or permits or payment of such taxes, excise or license fees upon request from State Fair Juice shall advise all vendors, concessionaries and other exhibitors offering goods for sale that applicable sales tax numbers must be filed prior to the commencement of the Event and sales taxes must be filed designating sales made in East Rutherford, New Jersey. State Fair shall deduct New Jersey State sales tax out of revenue collected from the sale of tickets and shall be responsible for the remittance of New Jersey State sales tax relating to admission ticket sales on behalf of Juice.

Section 8. <u>Compliance with Laws and Regulations</u>. Juice and its employees shall, use its commercially reasonable efforts to cause any of its subcontractors and the vendors and concessionaries to, conform to and comply with all laws of the United State and the State of New Jersey and the written rules and regulations of the New Jersey regulatory agencies, together with all rules and regulations of the New Jersey State Police and Meadowlands Fire Department. If the Authority notifies State Fair of a violation of any such laws, rules or regulations by any of the aforementioned parties, Juice shall, in the case of any violation Juice or its employees, immediately desist from and correct such violation and, use its commercially reasonable efforts to cause such party to immediately desist from and correct such violation.

Section 9. <u>Insurance</u>.

(a) Juice its subcontractors and all vendors shall provide evidence of workers' compensation insurance for those employees working on Licensed Area premises; and such workers' compensation insurance policies shall insure the obligations of such entity under the New Jersey Workers Compensation and Occupational Disease

Laws with respect to the performance of the services to be provided by such entity at the Event. Evidence of such insurance coverage shall be provided to State Fair at least 30 days prior to the commencement of the Event in any given year.

(b)   Juice   shall provide or shall have another entity provide on its behalf, at Juice's own cost and expense, commercial general liability insurance to insure Juice's use of the Licensed Area premises and all operations of Juice and State Fair contemplated by this Agreement and any contractual assumptions of legality reflected by this Agreement. Both State Fair and the Authority shall be listed as named insured under such commercial general liability policy shall have a limit of $5,000,000 per occurrence for bodily and property damage liability, personal injury liability and product liability claims.   Coverage may be provided under one policy naming both State Fair and the Authority as named insured or under separate policies. Evidence of such insurance coverage shall be provided to State Fair at least 30 days prior to the commencement of the Event in any given year.

(c)   Juice   shall obtain evidence of commercial general liability insurance from all subcontractors, & vendors in an amount equal to at least $1,000,000 per occurrence (combined single limit) including personal injury and product liability coverage. Each policy shall name State Fair and the Authority as additional insured with respect to all operations associated with the Event to be held on the Licensed Area premises.   Juice     shall   provide evidence of such insurance coverage to State Fair prior to commencement of Event in any given year.

Section 10. Indemnification Agreement from Subcontractors, & Vendors.

(a) Juice        shall not permit any subcontractor, or vendor to provide any services relating to the Event unless appropriate evidence of insurance coverage with respect to such subcontractor, or vendor has been provided to State Fair.

(b) Juice      shall obtain a signed Indemnification Agreement from each subcontractor or vendor which contains an agreement from such subcontractor, vendor or concessionaire to indemnify State Fair and the Authority with regard to any claims that arise out of such subcontractor's or vendors operation relating to the Event to the extent not otherwise covered by the insurance referenced in Section 9 hereof.

Section 11. Public Safety. Juice     shall, at all times during any Event being produced by it pursuant to the terms of this Agreement, conduct its activities with full regard to public safety and observe and abide by all applicable regulations and request by duly authorized governmental agencies responsible for public safety.

Section 12. Broadcast Rights. The Authority expressly reserves all rights and privileges for outgoing radio, television or simulcast broadcast originating from Licensed Area

8

during the operation of the amusement fair. In the event the Authority grants such rights and  privileges to State Fair, the terms and conditions of such grant shall be evidenced by separate written agreement between the Authority and State Fair which shall provide for among other things, the indemnification of the Authority, its officers, representatives, agents and employees from and against any and all claims, damages, liabilities, cost and expenses, including reasonable attorney's fees, arising from any radio, television  or simulcast broadcasting (including ad---lib remarks of announcers, including, but not limited to responsibility or liability for any violation of any rights of others by such broadcasting) to the extent Juice    is responsible for the origination of such broadcasting.

Section 13. Copyright. Juice    shall assume all cost arising from the use of patented, trademarked, franchised or copyrighted music material, devices, process or dramatic rights ("Copyright Materials") used on or incorporated into the event. State Fair and  the Authority and its officers, representatives, agents and employees from and against any and all claims, damages, liabilities, costs and expenses, including reasonable attorney's fees, arising from the unauthorized use of such Copyright Materials by Juice.

Section 14. Utilites.

> (a) Juice    shall be responsible, at its sole cost and expense, for all necessary equipment required to operate the Event in any given year of this Agreement including, but not limited to staging, generators, lighting, tenting, electrical wiring, and any other equipment Juice    deems necessary to operate the Event. State Fair shall supply Juice    with Toilettes and waste removal for a fee of $500.

Section 15. Electricity. In the event extra lights, such as spotlights, television lights of other special lights, shall be required by Juice    shall use a approved electrical contractor for installation of any extraordinary electrical connections or other services relating to such lights.

Section 16. Staffing. Juice    shall  reimburse State Fair in accordance with Section 3 hereof for all necessary staffing relating to the services, including security, to be provided by State Fair under this agreement. The cost of such staffing shall be as set forth in accordance with the Authority's prevailing collective bargaining agreements. The Authority and State Fair shall consult upon the appropriate number of security and other staff personnel to properly serve and protect the public during the operation of the Event. However, it is understood the determination of security and other department staffing is solely the Authority's decision. All special services that the Authority is requested to provide, including, without limitation, decorations, erection of

9

platform stands, staging and props and any employee overtime resulting from such special services,  shall be deemed to be State Fair Reimbursable Expenses.

Section 17. Signs and Posters. Juice    shall not post or allow to be posted any signs, cards, advertising, banners or posters(collectively "Signs") on the licensed Area premises without the express written permission of State Fair. The content of any Signs shall be subject to approval by State Fair.

Section 18.  Advertising. Juice    acknowledges that all advertising of the Event fair shall be honest and true and shall include accurate information regarding the hours of operation and ticket prices for the Event.

All advertising space located outside of the Licensed Area premises but on the Meadowlands Sports Complex shall be the exclusive property of the Authority or NMSCO as their interests appear.

Juice acknowledges      that State Fair the Authority and NMSCO have exclusive relationships in particular advertising categories, which may not be encroached upon without express consent.

Section 19.  Occupancy Interruption. If, as a result of any action or activity undertaken or authorized by the Authority, (a) the Licensed Area or any part thereof becomes unavailable for use by Juice    or (b) the maximum days and hours of operation as determined pursuant to Section 1 hereof are materially reduced, or (c) access or means of ingress to the Licensed Area is materially restricted or impeded (an "Event of Occupation") and such Event of Occupation shall Juice's      reasonable judgement, adversely impact its ability to conduct and/or maximize Revenue Generating Activities, Juice       hereby waives any claims for damages or compensation should this Agreemen be suspended by an Event of Occupation.

Section 20. Objectionable Persons. State Fair reserves the right to eject or cause to be ejected for the Licensed Area premises any objectionable person or persons; provided that,  any such  ejection is handled in accordance with Authority policy and does not violate any person's civil or other rights. Neither State Fair the Authority nor any of its officers, agents or employees shall be liable to Juice    for any damages that may be sustained by it through the exercise by State Fair or the Authority of such right accordance with preceding sentence.

Section 21. Refund of Ticket Revenue. The Authority and State Fair reserve the right to make admission ticket refunds for cause in keeping with the State Fair policy of retaining go od faith. This shall include, without limitation, the failure of any act to show or to go

on stage within a reasonable time of its scheduled appearance or the failure of Juice to produce or deliver the performance, product or service that has been advertised to the public.

Section 22.  Announcements. The State Fair reserves the right, from time to time, to make announcements during the hours of operation of the Event relating to public safety. Juice      shall, and shall cause its employees and agent to, cooperate with the instructions concerning public safety including, but not limited to, announcements requiring patrons to exit the licensed Area.

Section 23.  Agreement to Quit the Licensed Area Premises.  Juice      shall leave the licensed Area premises in a condition equal to that at the commencement of the Event for such year, ordinary wear and tear excepted. Failure of Juice      to use its commercially reasonable efforts to leave the Licensed Area Premises within the time permitted by this Agreement may make Juice      liable for additional payments to State Fair.

Section 24.  Lost Articles.  The Authority shall have the sole right to collect and have the custody of articles left on or in the proximity of the License Area premises by persons attending the Event. Juice shall not interfere with the Authority's collection or custody of such articles and shall turn over to the Authority any articles collected by it.

Section 25.  Civil Rights. Juice      shall not discriminate against any employee or any applicant for employment because of race, religion, national origin or any other reason prohibited by law nor shall Juice      discriminate against any customers of the Event on the basis of race, religion, national origin or any other reason prohibited by law.

Section 26.  No Joint Venture. This Agreement does not create a partnership, joint venture, agency or other similar relationship or business arrangement between the parties. Neither party is authorized to make any warranties, guarantees, and contracts or other commitments or to incur any obligation on behalf of the other party.

Section 27.  Force Majeure.  In the event that all or any portion of the amusement fair in any particular year cannot take place because of Force Majeure Event, neither party shall have any obligation or liability whatsoever to the other party during the occurrence of such Force Majeure Event as a result of the failure to  fulfill its obligations under this Agreement. For purposes of this Agreement, a " Force Majeure Event"  shall mean an occurrence of any of the following events  which is a contributing factor in precluding or impairing the ability  of either party to perform its obligations under this Agreement: Act of God, war or other hostility (including acts of terrorism), national emergency, actual or threatened dissemination of chemical or biological weapons or substances (including

11

the actual or threatened dissemination of a disease, such as anthrax or smallpox, through any form or medium), fire, storm, flood, rebellion, riot, explosion, labor disturbances, sabotage, disaster, civil unrest or any other cause not within the reasonable control of Juice or State Fair, as the case may be.

Section 28.  Term. The term of this Agreement shall commence on the date hereof and shall continue in full force and effect until the completion of the 2014 Fair and the distribution of the Event Net Revenues for 2014 in accordance with the Preliminary Accounting.

Section 29.  Binding Agreement; No Assignment; Amendment. This Agreement shall be binding upon and inure to benefit of the parties and their respective successors and assigns. This Agreement may not be assigned without the prior written consent of the other party. This Agreement may not be amended except by an instrument in writing executed by both parties.

Section 30.  Notices. All notices, request, demands and other communications required or permitted under this Agreement shall be given in writing and, unless otherwise provided herein, shall be deemed duly given if delivered personally, by facsimile transmission (receipt of which is confirmed) or upon receipt by the receiving party of any notice sent by registered or certified mail (first-class mail, postage pre-paid, return receipt requested) or by overnight courier or similar courier service, addressed as follows:

| | |
|---|---|
| If to State Fair: | State Fair, Inc. |
| | 229 Main Street |
| | Belleville, New Jersey 07109 |
| | Facsimile: (973) 751-7397 |
| | Attention: Al Dorso |
| | |
| If Juice Entertainment. | Juice Entertertainment, LLC. |
| | 471 N. Midland Ave |
| | Saddle Brook, New Jersey,    07663 |

12

Or at such other address as such party may designate by notifying the other party in writing in accordance with this Section 30. Delivery of notice to a party's legal counsel shall not constitute the delivery of notice to such party.

Section 31.  Non-Discrimination. Both Sate Fair and Juice agree that in the performance of the Agreement there will be no discrimination against any employee or applicant for employment because of any reason prohibited by law.

Section 32.  Governing Law; Jurisdiction; Venue. This Agreement, and all matters arising directly or indirectly hereunder, shall be governed by, and construed in accordance with, the laws of the State of New Jersey, without regard to the choice of conflicts of law provisions thereof. Each of the parties hereby (i) irrevocably consents and submits to the exclusive jurisdiction of the state and federal courts located in the Sate of New Jersey in connection with any suit, action or other proceeding directly or indirectly arising out of or relating to this Agreement, the (ii) irrevocably waives, to the fullest extent permitted by law, any objection that any of them may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

The prevailing party of any such suit, action or proceeding shall have its counsel fees and cost reimbursed by the losing party.

Section 33.  Severability. The invalidity of any portion of this Agreement shall not affect the validity, force or effect of the remaining portions of this Agreement, which shall in such event be interpreted to give effect, as nearly as possible, to the original intent of the parties with respect to this Agreement as a whole, if it is ever held that any provision hereunder is too broad to permit enforcement of such provision it its fullest extent, such provision shall be enforced to the maximum extent permitted by law.

Section 34.  Headings. The headings in this Agreement are for convenience and reference only and shall not limit or otherwise affect the meaning hereof.

Section 34.  Counterparts. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

13

Section 35.  <u>Confidentiality</u>. The parties agree that all financial terms, personal and proprietary information, shall be held strictly confidential, and shall not be released to a third-party without the prior written consent of the non-releasing party, which consent may be withheld in the sole discretion of the non-releasing party ('Confidential Information"). Notwithstanding the foregoing, either party may disclose the Confidential Information to its Board of Trustees and to their officer's agents or employees who may be involved in analyses and decision making with respect to these discussions, provided that each such recipient of the Confidential Information is first advised of the contents of this Agreement.

[Execution Page Follows]

IN WITNESS WHEREOF, this Agreement has been duly executed by each of the parties hereto as of the date first written above.

STATE FAIR, INC.

By: _____

Name: AL DORSO

Title: PRES.

Juice Entertainment, LLC

By: _____

Name: JOHN SANDBERG          THOMAS DOLEMAN

Title: PARTNER                PARTNER

Christopher Barrett
Partner

15

# EXHIBIT B



**1121 Main Ave   Clifton, NJ 9701**
phone 201.632.3072 fax.201.654.6191

**Request For Extension**

Juice Entertainment LLC is formally requesting a 30 day extension pertaining to section 3 item (c) located on page 3 and 4 "items provided to state fair in financial terms" in the agreement between State Fair Management and Juice Entertainment. The request of extension is for the season beginning June24th ending July 10th 2011.

Accepted By:

X _____   Date: _____

Juice Entertainment, LLC

X _____   Date: 3/7/11

Al Dorso President State Fair