**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| JUICE ENTERTAINMENT, LLC, | ) | |
| THOMAS DORFMAN, AND | ) | Civil Action No. 11-7318-WHW-MCA |
| CHRIS BARRETT, | ) | |
| | ) | |
| Plaintiffs, | ) | FIRST AMENDED COMPLAINT |
| | ) | |
| vs. | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| LIVE NATION ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiffs Juice Entertainment, LLC ("Juice Entertainment"), Thomas Dorfman, and Chris Barrett (collectively "Plaintiffs"), based upon personal knowledge as to facts pertaining to them, and otherwise upon information and belief, hereby assert the following claims against Live Nation Entertainment, Inc. ("Live Nation").

## PRELIMINARY STATEMENT

1.     Live Nation, the biggest, most powerful live music promoter in the world, has grown to become the most influential player in the entertainment industry.  With its enormous size and revenue, Live Nation has exercised its dominion over artists, agencies, and venues by seizing control of the most lucrative aspect of the music business – live performance.

2.     Live Nation has corralled this extensive influence through years of carefully orchestrated attacks on its competitors, stamping out any opportunity to gain even a small share of the market while continuing to grow into a global, mega-promoter.

3.     Live Nation's  sweeping, effective campaign to dominate the music industry has consequently destroyed the chances of small promoters to advance in the industry.  The instant

1

Live Nation perceives a threat to its market dominance from smaller promotion companies, it swoops in and engages in an all out assault to undercut their efforts leaving no stone unturned.

4.     In 2010, Plaintiffs, veteran promoters in the New Jersey club and small live concert scene, had bigger dreams and seized upon an opportunity to advance in the cut throat live concert promotion industry.   Based on their observations of the club scene's tremendous response to electronic dance music, Plaintiffs recognized that electronic dance music was about to explode on the live music scene and that the Meadowlands would be the ideal venue to produce such a show.

5.     Following the successful promotion of a Latin Music Festival in 2010, Plaintiffs persuaded Al Dorso, President of State Fair Event Management ("SFEM"), to allow them to produce a live electronic music concert for the 2011 New Jersey State Fair ("State Fair"). The agreement between the parties gave Plaintiffs exclusive rights to produce and promote the event at the Meadowlands, and similar events for the next 5-10 years at the State Fair, provided Plaintiffs could secure sufficient funding and talent for the show contemplated by the contract.

6.     Plaintiffs immediately began reaching out to their contacts at agencies and with artists, to garner support for the event.  Plaintiffs successfully acquired substantial funding from investors and made firm offers to artists based on extensive communications with the artists' agents and managers.   In total, Plaintiffs sent out over 50 offers to DJs of varying skill and popularity, including young aspiring local DJs and hugely popular, established headliners.

7.     Among these artists were three of the most popular DJs in the world at that time, Tiesto, David Guetta, and Steve Angello.  Each one of these headliners expressed interest in performing at the event, and gave every indication that  he would perform at the show.

8.     Based upon Plaintiffs' experience in the industry, the productive correspondence with the artists and their teams strongly suggested that Plaintiffs' event would be a huge success.

9.     When Live Nation learned of Plaintiffs' plans, however, and recognized the value of such an event at the Meadowlands, having produced similar events there in the past, it began an all-out, multi-pronged attack on Plaintiffs' business, their character, and on the event itself.

10.     Live Nation set its sights on the agencies, using its control of the venues and future opportunities for the agents' artists by threatening to remove certain opportunities if the agencies booked their artists for Plaintiffs' show.

11.     Live Nation also targeted the artists themselves, directly and through their agents and managers, again threatening to withhold opportunities from them that provided lucrative shares of ticket and merchandise sales at the live events.

12.     And, Live Nation directly interfered with Plaintiffs' contract with SFEM and Plaintiffs' relationship with the New Jersey Sports and Exposition Authority (the "Authority") by spreading lies and defamatory statements about Plaintiffs and their ability to produce and promote the electronic dance event for the State Fair and through retaliatory conduct directed at SFEM for entering into the contract.  Live Nation, which handled ticketing for the State Fair and the Authority, further threatened that it would withhold ticketing to the event if Plaintiffs did not partner with them.

13.     As it had been in the past for Live Nation, this series of calculated, offensive advances on Plaintiffs' contract, their business relations, and their character were highly effective.

14.     First, agents virtually ceased all communications with Plaintiffs about the event, and revoked all assurances that they would produce their artists for the event.

15.     Next, each and every artist that had been sent an offer and had orally agreed to perform, customarily a firm commitment in the industry, had disappeared, some offering senseless excuses, others offering no excuse at all for their backing out of the event.

16.     When it became clear that Live Nation eliminated any way for Plaintiffs to perform their contract, Al Dorso and SFEM exercised the provisions of the contract that allowed them terminate the contract in the event that certain conditions were not met and ended the relationship with Plaintiffs.

17.     Live Nation's interference with Plaintiffs' contracts and business relations and its defamatory statements about Plaintiffs have not only resulted in the destruction of a highly lucrative business endeavor for Plaintiffs, but have also caused reputational damage to Plaintiffs that has adversely impacted their careers and future business opportunities in the entertainment industry.  Based upon these facts, and those discussed  herein, Plaintiffs assert claims for tortious interference with a contractual relationship, tortious interference with business relations, and defamation arising out of these events.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand ($75,000), exclusive of interest and costs.

19.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391, because Live Nation has transacted business within the State of New Jersey and many of the acts and events giving rise to this action occurred within this District.

## THE PARTIES

20.    Juice Entertainment, LLC is a New Jersey Limited Liability Company organized and existing under the laws of the State of New Jersey and maintains its principal place of business at 471 N. Midland Ave., Saddle Brook, New Jersey 07663.  The principals of Juice Entertainment  are Thomas Dorfman, an individual who resides in and is a citizen of New Jersey, and Chris Barrett, an individual who resides in and is a citizen of New Jersey.

21.    Thomas Dorfman is an individual who resides in and is a citizen of New Jersey, and is a principal of Juice Entertainment.

22.    Chris Barrett is an individual who resides in and is a citizen of New Jersey, and is a principal of Juice Entertainment..

23.    Live Nation Entertainment, Inc. is a corporation organized and existing under the laws of the State of Delaware, and maintains its principal place of business at 9348 Civic Center Drive, Beverly Hills, California 90210.  Live Nation can be served with process by serving its registered agent Charles Zhi at 122 2nd Avenue, Suite 218, San Mateo, California 94401.

## INTERSTATE TRADE AND COMMERCE

24.    Live Nation is involved in interstate trade and commerce and its activities substantially and adversely affect interstate commerce.   Live Nation promotes concerts throughout the nation and owns, operates and/or has exclusive booking rights at numerous venues throughout the United States.

25.    Live Nation, directly or indirectly, has used and uses the means and instrumentalities of interstate commerce in furtherance of the unlawful acts and communications alleged herein, including but not limited to, the United States postal system and nationwide telephone system, through and by means of which a substantial amount of the nation's

communications, information exchanges and transportation take place.  Live Nation uses all of these instrumentalities of interstate commerce to sell tickets and advertise performances, and to contact and book performers at venues in New Jersey and throughout the nation.

## FACTUAL ALLEGATIONS

### Live Nation's Domination of the Market For Promotion of Live Music Concerts

26.     Live Nation was established in 2005 when Clear Channel Communications, Inc. ("Clear Channel") spun off its promotion subsidiary Clear Channel Entertainment.  At the time, Live Nation was the largest promoter of live popular music concerts in the United States, responsible for approximately 70% of the live music tickets sold nationwide in 2005. This dominance was created in the first instance through Clear Channel's policies designed to limit access to its airwaves by acts that did not use Clear Channel's own promotion services. Artists were thus compelled to use Live Nation as its promoter for fear that their music would not receive radio play and that their concerts would not be adequately marketed and advertised.

27.     Spun off from Clear Channel, and without the direct benefit of its control of the radio station market, Live Nation devised its own methods for dominating the market for the promotion of live popular music concerts.  Live Nation began to offer artists super-competitive shares of concert revenues, often guaranteeing artists more than the expected gross ticket sales.

28.     Live Nation also threatened to reduce the artists' share of gross revenues if the artists failed to agree to allow Live Nation to promote entire seasonal tours, used the services of other promoters, or agreed to appear at concert venues which Live Nation did not control.

29.     Additionally, Live Nation embarked on a concerted plan to acquire concert venues.  Once it established control of the most prestigious or, in some cases, the only venue in a

given metropolitan area, it threatened to deny popular artists access to those key venues if the artist rejected Live Nation's tour offers or promotional services.

30.     Live Nation makes no secret of its willingness to impose its market influence on both artists and owners of competing venues.  For example, when Live Nation lost the contract to promote concerts at the New York State Fair for the 2009 season, a Live Nation representative was quoted as saying that "it will not allow any of the acts it promotes to appear at the Syracuse-based fair."  Jim Koplik, Northeast Regional Chairman of Live Nation, furthermore stated that "I am very disappointed in the decision made by New York State, and I believe the real loser is the people who attend the fair as the talent package that will be offered to the fans will be less attractive.  I worked with AEG in holding a Kenney Chesney date at the fair but will obviously not assist putting any more shows at the fair."  Jane Cohen & Bob Grossweiner, *Live Nation Out as New York State Fair Promoter in 2009*, TICKET NEWS (Dec. 29, 2008, 6:40 PM), http://www.ticketnews.com/Live-Nation-out-as-New-York-State-Fair-promoter128293.  In other words, if a venue owner or show promoter does not accede to Live Nation's demands, Live Nation does not hesitate to use its considerable market power to punish the other party.

31.     Live Nation's hardnosed tactics have repeatedly been the subject of litigation over the last several years for conduct strikingly similar to that alleged in this case.  For example, in a case brought in the Northern District of Illinois in 2005, a $90 million jury verdict was awarded against Live Nation's predecessor, Clear Channel, for the wrongful interference with the negotiation of a contract between a production company and a motorcycle racing sanctioning body by applying pressure and influence to the parties, conduct Clear Channel admitted to at trial. *See Jamsports and Entertainment, LLC. v. Paradama Productions, Inc. et. al.*, 382 F. Supp. 2d 1056 (N.D. Ill. 2005).  Upon information and belief this case settled after the jury verdict.

32.     Similarly, Live Nation is currently involved in litigation in a case where a small regional concert promoter has alleged that Live Nation violated federal and state antitrust laws by unlawfully controlling the market of concert promotion by threatening  artists over access to Live Nation's promotional services and its network of venues if they did not play certain venues Live Nation controls.  *See It's My Party, Inc. v. Live Nation, Inc.,* No. 09-547(JFM) (D. Md. 2009).

33.     This pattern of destructive, anticompetitive behavior by Live Nation has transformed the music industry and destroyed the opportunity for smaller, entrepreneurial promoters like Plaintiffs to succeed.

<u>**Plaintiffs Acquire Contract to Produce the Electronic Dance
Event at the Meadowlands For the State Fair**</u>

34.     With over 25 years of combined experience promoting shows in clubs and venues of various sizes, Plaintiffs had their fingers on the pulse of the trends of the east coast music scene in 2010.  In fact, Mr. Dorfman had been consistently named a top promoter in New Jersey.

35.     At the time, Plaintiffs recognized an upswing in popularity of electronic dance music at the grassroots, club level and saw an opportunity.

36.     Plaintiffs determined that the time was ripe for a live, electronic dance event on a massive scale.  Events such as were growing in popularity in other parts of the U.S. as well as internationally.   With expansive knowledge of the area and the various venues New Jersey offers, Plaintiffs set their sights on the Meadowlands.

37.     The Meadowlands proved to be fertile ground for Plaintiffs' endeavor because it offered  the flexibility to sell as many tickets as people would buy, unlike most venues which had a finite amount of space to fit concert goers.  To do this, the Meadowlands could shift fencing in various ways in order to increase capacity and accommodate as many people as would buy a

ticket to the show.   Accordingly, Plaintiffs aggressively pursued the opportunity to produce shows there.

38.     In June 2010, Base Production Inc. ("Base"), entered into an agreement with SFEM to produce a one-day show for a Latin Music Festival on July 4, 2010.  Chris Barrett, a principal of Juice Entertainment, was also a principal in Base.  Thomas Dorfman, also a principal in Juice Entertainment, assisted Mr. Barrett in the production of this event.  The Latin Music Festival was produced on relatively short notice and was successful, particularly given the short lead-in time for production.  Mr. Dorfman and Mr. Barrett secured headliner acts and the concert's success led SFEM to want to work with Plaintiffs again. On relatively short notice Base was able to sign up at least ten acts to perform at this festival, thus demonstrating their ability to secure talent for festival-type shows.

39.     Building on the success of the 2010 Latin Music Festival, Mr. Barrett and Mr. Dorfman began discussions with SFEM with the goal of entering into a long term agreement for the production of concerts at the State Fair.

40.     On December 1, 2010 Al Dorso, President of SFEM, verbally granted Mr. Barrett and Mr. Dorfman exclusive rights to produce an electronic dance event, as well as any and all concerts in the designated special events area of the State Fair, for the next five years.  This also gave Plaintiffs the opportunity to coordinate the production and marketing for various events with SFEM, and gave Plaintiffs the opportunity to reach an audience of over 500,000 State Fair patrons a year.

41.     In addition to these verbal promises, Mr. Dorso sent a written engagement letter, dated December 1, 2010, (the "Engagement Letter"), granting Deluna Inc. "the right to broker, stage and promote musical and dance events in the designated special event area of the fair, held

yearly between mid June and mid July."   At that time, Plaintiffs were operating under the corporate entity known as Deluna, Inc.  The Engagement Letter further stated that "the terms and conditions of this agreement will be set forth in a formal contract at a later date as more information is forthcoming."

42.    Plaintiffs worked with associates Vito Bruno and John Dimatteo, partners in another promotion company Area Events LLC to produce the shows contemplated by the Engagement Letter.  Mr. Bruno and Mr. Dimatteo have extensive experience in the concert promotion business to complement that of Plaintiffs.  Mr. Dimatteo and Mr. Bruno were responsible for negotiating offers with acts to perform at the shows, and for organizing the details of the actual staging of shows, including stage layout, lighting, and sound, among other things.

43.    Plaintiffs also worked with Paul Potter and Alan Sacks who acted as agents for Plaintiffs in acquiring talent and setting up the event.  Mr. Potter has extensive experience in concert promotion and marketing and had close ties to radio stations and brand name sponsors. Mr. Sacks is an experienced producer and promoter in the electronic dance market.

44.    Acting in reliance on the Engagement Letter, as well as on Mr. Dorso's verbal guarantees and on his subsequent direction that they should "begin booking talent," Mr. Dorfman and Mr. Barrett began working to produce the electronic dance event for the 2011 State Fair. They also worked to produce the other concerts that would be held in the designated special events area at the State Fair.

45.    In the concert promotion business, the negotiation process of booking talent for an event is almost exclusively conducted informally and deals are often struck based on an oral agreement or a handshake.  In the course of discussions concerning the availability of an artist

and their fee, it is generally understood that an artist has been secured for a show when the date is verbally confirmed and the parties are in the final stages of negotiating the fee.  Thus, the creation, issuance, and signing of a written offer is considered a mere formality and sometimes not even necessary.

46.     Promoters, agents, and artists all understand that agreements are made long before the formalization of a final, written offer.  For this reason, promoters and venues often begin preparing for a show in reliance on the informal agreements, as Plaintiffs did here.

### Live Nation's Targeted Attack on Plaintiffs Through a Concerted, Multi-Pronged Effort to Destroy the Event

47.     Like Plaintiffs, Live Nation recognized the value of producing an electronic dance event at the Meadowlands.

48.     Live Nation's knowledge of the concert business allowed it to perceive the rising popularity of the electronic dance genre and its having put on previous shows at the site, the Bamboozle Festival for one, in previous years made Live Nation keenly aware of the enormous profitability of a marketable event at the Meadowlands.

49.     Although Plaintiffs had already signed a contract with the venue and had already begun promising discussions with talent, being late to the party never prevented Live Nation from the predatory seizure of a lucrative opportunity.

50.     Thus, Live Nation effectively orchestrated a targeted attack through interference and defamatory statements on the three principal components that could ensure a successful event for Plaintiffs: the agencies, the artists, and the venue.

51.     Central to the interference and defamation claims are Live Nation representatives Jason Miller and John D'Esposito.

52.     At the time, Miller was Live Nation's Senior Vice President of New York. According to Billboard, in his capacity as SVP of New York, Miller "booked a wide range of successful shows across the spectrum of Live Nation New York area venues, including the Roseland Ballroom, Irving Plaza, the Nikon Theater at Jones Beach, PNC Bank Arts Center, and others."  Ray Waddell, *Live Nation Revamps New York Office*, Billboard.biz (Dec. 1, 2011), http://www.billboard.biz/bbbiz/industry/touring/live-nation-revamps-new-york-office-1005587352.story#Yz2ZOmA6ChiTVk8k.99.  Since then, Miller was promoted to the position of President, New York, for Live Nation and runs Live Nation's New York office.  *Id.*

53.     D'Esposito was Live Nation's Vice President of Talent and worked closely with Miller.  D'Esposito is also the founder of the Bamboozle Festival, which he sold to Live Nation in 2007.  In January 2012, D'Esposito "abruptly left Live Nation after what he called 'creative differences' with his employers over the [Bamboozle] festival's direction."  *See* James C. McKinley Jr., *To Dubstep or Headbang in New Jersey*, NY Times (May 17, 2012), http://www.nytimes.com/2012/05/18/arts/music/to-dubstep-or-headbang-in-new-jersey.html?pagewanted=all.

54.     This is not the first time that D'Esposito's concerted actions with Live Nation have been called into question.  In 2008, though worried about the retribution from Live Nation that would come from his editorial, a writer recounted D'Esposito's history of strong-arm business practices and abuse of power in the Asbury Park, New Jersey music promotion industry. *See* Gary Wein, *Dear John: You're the Problem, Why Live Nation and Madison Marquette Need to Run John D'Esposito out of Town to Prevent a Bloodbath Among the Local Music Community*, New Jersey Stage (Nov. 27, 2008), http://www.newjerseystage.com/articles/getarticle.php?ID=613 (*see* Exhibit A). D'Esposito and

Live Nation clearly have a history of coercing artists not to play events and using their power to crush competing events and events that they could not control.  *Id*.

**Live Nation's Coordinated Efforts to Destroy
Plaintiffs' Relationships with the Talent Agencies**

55.     Plaintiffs and their agents began working their contacts with talent agencies  in January and early February 2011 through a series of promising communications with booking agents that suggested that the event would be a huge success.

56.     On January 25, 2011, Joel Zimmerman of the William Morris Talent Agency ("William Morris") met with Plaintiffs' agent John Dimatteo. At that meeting, Mr. Zimmerman gave Mr. Dimatteo a list of artists to be sent formal offers by Plaintiffs and later enthusiastically told Mr. Bruno and Mr. Dimatteo that William Morris wanted to be "the wind behind your sails" for the electronic dance event.

57.     William Morris is  the most powerful talent agency in the country, particularly in the music industry.  With dozens of hugely popular artists in the electronic music genre, this endorsement and assurance that William Morris would deliver the acts was an integral component of the success of the event.  Thus, Plaintiffs reasonably believed that with William Morris enthusiastically behind them they would have a successful event with plenty of artists to choose.

58.     Plaintiffs also had similar discussions with other agencies who showed interest and embraced the project, such as AM Only and the Windish Agency.  Specifically, Mr. Dimatteo had communications with Paul Morris, CEO of AM Only and Steve Goodgold of the Windish Agency about their interest in booking acts for Plaintiffs' event.

59.     Plaintiffs' promising correspondence with these agencies about their desire to have their artists perform at the event all but ensured a successful show.

60.     When Live Nation learned of Plaintiffs' dealings with the biggest agencies in the music business, however, it began to interfere with these relationships in a calculated effort to destroy the event.  Specifically, Live Nation began to threaten the agencies that if they allowed their artists to perform at the event, Live Nation would withhold future opportunities from them.

61.     Indeed, in early March 2011, after the majority of Juice Entertainment's offers to talent agents had been made, representatives of Live Nation stated to Mr. Dorso, and ultimately directly to Plaintiffs, that the William Morris talent agency belonged "exclusively" to Live Nation and that no artists represented by William Morris would be permitted to sign contracts with Juice Entertainment to appear at the State Fair.

62.     Despite months of extensive communications with William Morris and the other agencies, Plaintiffs stopped receiving any communications from them.  Not only did Live Nation carry out its threat to block William Morris and its artists, but AM Only and the Windish Agency also stopped supporting the event.  Thus, by exerting this pressure on the agencies, most notably William Morris, Live Nation was able to prevent approximately 50 individual acts from appearing at the State Fair.

63.     This was further confirmed at an April 22, 2011 meeting with Miller.  Miller confirmed that his partner John D'Esposito used Live Nation's influence and power to force William Morris to back out of the event.

64.     Accordingly, because of Live Nation's interference with Plaintiffs' business relationships with these agencies, Plaintiffs were unable to produce an electronic event for the State Fair and lost their contract with SFEM.

## Live Nation's Coordinated Efforts to Destroy
## Plaintiffs' Ability to Sign the Artists

65.     As a result of the relationships fostered with the talent agencies, Plaintiffs began substantial discussions with the agents and management teams of the artists about performing for the show.

66.     Plaintiffs discussed with the artists, through their respective teams, dates for their performances, travel arrangements, special requests, the expected line-ups, certain logistical issues like lighting and video equipment, as well as the amount of money that would be required to secure their performance.

67.     Plaintiffs came to informal agreements with many of these artists and as a result began sending out formal offers simply to finalize the deal.

68.     Plaintiffs' experience and industry custom indicated that once it got to this phase, where travel plans, hotel accommodations, dates, and financial terms were being discussed, the artists could be considered confirmed.  It was highly unusual for an artist to back out once they were sent a final offer, because payment was generally the last, and often most negotiated factor in securing an artist.   Once this was negotiated and agreed upon the artist was considered booked.

69.     Thus, based upon conversations with several agencies and particular artists' booking agents, Plaintiffs sent out offers to more than 50 artists with the understanding that they had solid commitments from most of them.   These artists are represented primarily by three agencies:  William Morris, AM Only, and the Windish Agency.

70.     Plaintiffs and their associates sent offers ranging from $3,500 to $100,000 to approximately 40 artists represented by William Morris including such prominent acts as

Prodigy, Sebastian Ingrosso, Soulwax, Paul Van Dyk, Afrojack, Axwell, N.E.R.D., Fatboy Slim and Thievery Corporation.

71.     Through AM Only, Plaintiffs sent offers to the following artists:  Tiesto, Riva Starr, David Guetta, Benny Benassi, Ferry Corsten, MSTRKRFT, Richie Hawtin, Martin Solveig, Laidback Luke, Boris, Avicii, Cedric Gervais, Joachim Garraud, John Dahlback, Sander Van Doorn, Wolfgang Gartner, Robbie Rivera, and  The Martinez Brothers.

72.     And, Plaintiffs and their associates sent offers to artists through the Windish Agency, including Steve Angello, Caspa, Matthew Dear, Mike Snow, Tensnake, Simian Mobile Disco, and Z-Trip.

73.     These written offers were all sent to the respective talent agencies between January and early March of 2011, well in advance of the proposed concerts at the State Fair so that there would be ample time for artists to determine their availability to appear.

74.     At a March 3, 2011 meeting between Plaintiffs and Miller and D'Esposito of Live Nation, Miller told Plaintiffs that he was aware, based on conversations with William Morris, AM Only, and the Windish Agency, that Plaintiffs did not have any signed contracts and thus, still could not fulfill the Agreement with SFEM.  Miller also stated that Plaintiffs were not going to get any of the artists from these agencies unless Plaintiffs partnered with Live Nation.

75.     Though the possibility always existed that an artist or two could back out, Plaintiffs reasonably considered the artists to be booked based upon their conversations with their agents and managers.

76.     Three artists, in particular, which Plaintiffs considered either to be confirmed, or in the process of being confirmed, for the event based on informal discussions and agreements with agencies, who are superstars in the world of electronic dance music were Tiesto, Steve

16

Angelo, and David Guetta.  Each of these artists is a proven headliner, and any one of them alone would have ensured the success of Plaintiffs' show.

77.    Tiesto is one of the highest earning and most popular electronic dance DJs in the world.  He routinely commands fees in the six-figure range to appear at large shows, and routinely plays to crowds of tens of thousands of fans.

78.    In January 2011, Plaintiffs made an offer to Tiesto, through his manager, to play a set for one of the two nights of their event.  This offer was made by Plaintiffs with the intention of starting a dialogue with the popular artist in the hopes that fruitful negotiations would follow. The first offer was for $210,000, by far the most Plaintiffs had offered any other artist.  Plaintiffs were told that the initial offer would not be enough to engage Tiesto because he already had an offer to perform at another event that was in excess of $300,000.

79.    However, Plaintiffs, through Mr. Dimatteo, were told, by Tiesto's agents, that they could secure Tiesto if they raised their offer to $400,000.  Plaintiffs, understanding that securing Tiesto for the event would virtually guarantee its success, brought their offer up to $400,000 as requested.  Thus, the only remaining open term of an agreement with Tiesto had been met.  Plaintiffs, therefore, had every reason to believe he would perform at their show.

80.    The negotiations were largely conducted by Mr. Dimatteo who had a close relationship with Tiesto and regularly booked him for electronic music events.  Mr. Dimatteo's relationship with Tiesto developed because Mr. Dimatteo was the former manager of Tiesto's road manager.  Based on this relationship as well as the communications between the parties, Mr. Dimatteo and Plaintiffs were certain that the deal with Tiesto was firm.  And, by late-February, 2011, Plaintiffs had a verbal agreement from Tiesto to perform.

81.     Shortly thereafter, however, without explanation, Tiesto declined the offer which contained all of the terms he had requested.

82.     Plaintiffs confirmed that Live Nation was directly responsible for causing Tiesto to back out of his performance for Plaintiffs' event.   First, in a meeting with Al Dorso on February 18, 2011, Live Nation representatives Jason Miller and John D'Esposito told him they blocked Tiesto from playing at the State Fair and from signing any contracts to perform for Plaintiffs. Second, this was confirmed by Tiesto's road manager, a former business associate of Mr. Dimatteo, who told Mr. Dimatteo that Tiesto acknowledged that Live Nation had instructed him not to play the State Fair.

83.     Plaintiffs were also in negotiations with AM Only artist David Guetta, also one of the top grossing DJs of the last several years, to perform at the event.   Specifically, Guetta's manager, Caroline Prothero of Prohibition DJ, began discussions with Plaintiffs to arrange for Guetta to perform at the event, including the dates and performance options.

84.     Pursuant to these discussions, Plaintiffs sent a formal offer to Guetta in the amount he requested.   Although his manager had given every indication of his willingness to perform, Plaintiffs did not hear back from Guetta or his management.   It is Plaintiffs' understanding that Guetta's change of heart was due to Live Nation's influence.

85.     The immensely popular Windish Agency artist Steve Angello also showed strong interest in performing for the event at the outset through his management team.   Between February 18, 2011 and March 1, 2011, Plaintiffs and their associates had various discussions with Angello's team regarding his performance.   These discussions even advanced to topics such as dates and flight plans, normally reserved for the final stages of the negotiation process. Despite these promising discussions, sometime in early April 2011, Mr. Dimatteo was

18

unexpectedly told by Angello's agent simply that Angello would not play at the Meadowlands because it did not "resonate" with him.  This explanation is surprising since one year later, in May 2012, Angello played at the Meadowlands for the Electronic Daisy Carnival festival.

86.     In a similar fashion to these three artists, as a result of Live Nation's interference, the other 50 artists who were sent firm offers by Plaintiffs pulled out of the show, one by one. These artists correctly understood that if Live Nation refused to book them for future events, their careers in the industry would be ruined.

87.     Accordingly, Live Nation's interference with Plaintiffs' relationships with the impressive artists they were booking achieved Live Nation's desired result, *i.e.*, it prevented Plaintiffs from producing the event.

### Live Nation's Coordinated Efforts to Destroy Plaintiffs' Relationship and Contract with SFEM and the Venue

88.     Around the same time, Live Nation began its assault on the final front of the three-pronged attack on the event and on Plaintiffs' reputation.

89.     On February 18, 2011, Mr. Dorso informed Plaintiffs that Live Nation had begun a campaign to block Plaintiffs' agreement with SFEM through heavy handed tactics designed to prevent Plaintiffs from performing under the Engagement Letter.

90.     Among these tactics reported to Plaintiffs by Mr. Dorso, were the false and defamatory statements by Jason Miller and John D'Esposito that Plaintiffs associated with known "thieves" and that they could not be trusted.  Live Nation knew that Mr. Dorso's ability to trust Plaintiffs was central to the fulfillment of the contract and the promotion of a successful event as the contract was conditional and required Mr. Dorso to have faith that Plaintiffs would get it done.

91.     Next, Miller and D'Esposito used Live Nation's control of ticketing to pressure Mr. Dorso.  Live Nation has an exclusive contract with the Meadowlands and the Authority to provide ticketing services for events held at the Meadowlands, including musical concerts, sporting events, and special events such as the State Fair. Mr. Dorso reported to Plaintiffs that Live Nation applied pressure on the Authority to pressure, in turn, SFEM and/or Plaintiffs to allow Live Nation to have part of the contract for the State Fair concerts.

92.     Specifically, Live Nation representatives threatened that unless they were given part of the contract for producing concerts at the State Fair, they would make ticketing services unavailable for the State Fair at the Meadowlands.

93.     On March 7, 2011, Mr. Dorso reported to Plaintiffs that Live Nation had ramped up their efforts, doubling down on destroying Plaintiffs' reputation.  Miller and D'Esposito made false and defamatory statements to Mr. Dorso regarding Plaintiffs' ability to fulfill their commitment to SFEM.  In particular, Miller and D'Esposito stated that Plaintiffs were "broke" and could not afford the necessary talent to stage the State Fair concerts.  They also said that Plaintiffs lacked the expertise needed to produce concerts of the size contemplated in the Engagement Letter.  Those statements were false because Plaintiffs' team not only had the experience but also had acquired ample funding.

94.     Live Nation's false and defamatory statements were intended to undermine SFEM's business relationship with Plaintiffs.  D'Esposito made clear to Mr. Dorso that he had expected that SFEM would have given him and Live Nation an opportunity at this business since they already had a working relationship through the Bamboozle Festival.  Mr. Dorso was falsely presented with a picture that his promotion with Plaintiffs was doomed, which unfortunately became a self-fulfilling prophecy due to Live Nation's improper interference.

20

95.     Despite having planted the seed, Live Nation failed to completely destroy SFEM's desire to do business with Plaintiffs as of March 7, 2011.  SFEM finalized a formal contract with Juice Entertainment on March 7, 2011 (the "Agreement") (*see* Exhibit B) which gave them the exclusive right to broker, stage and promote an electric dance event, including DJs and live acts, on the first weekend of the State Fair for 4 years beginning in 2011, with an additional 5 year option.  Plaintiffs were also given the exclusive right to broker, stage and promote concerts in the designated special event area of the State Fair for the duration of the State Fair beyond the first weekend.

96.     Live Nation, however, continued to insist that Mr. Dorso give Live Nation a portion of the contractual right to produce concerts at the State Fair.  Again, Live Nation perceived both a threat to their own business as a well as the loss of a huge opportunity that Plaintiffs were able to take advantage of before the mega-promoter.

97.     Under heavy pressure from Live Nation, Mr. Dorso suggested that Plaintiffs attend a meeting with Live Nation to address the situation.  Because Mr. Dorso was so insistent, Plaintiffs reluctantly agreed.

98.     On March 3, 2011, Plaintiffs met with Miller and D'Esposito of Live Nation. However, it quickly became clear that Live Nation wished to meet with Plaintiffs for the sole purpose of coercing them into allowing Live Nation to control the most valuable parts of the State Fair agreement while at the same time threatening to derail Plaintiffs to perform under the contract.

99.     At the meeting, Miller and D'Esposito attempted to coerce Plaintiffs into making Live Nation its partner in the State Fair business using the same threats they had made directly to Mr. Dorso, including the threat of withholding ticketing services if Plaintiffs did not give them a

piece of the business, a threat that would have violated the Final Judgment entered in *United States, et. al. v. Ticketmaster Entertainment, Inc. and Live Nation, Inc.*, No. 10-cv-00139, 2010 U.S. Dist. LEXIS 88626 (D.D.C. July 30, 2010), which prohibited the merging companies from conditioning or threatening to condition the use of their ticketing services to venue owners on a requirement that venue owners grant Live Nation access to their venues for concerts.

100.    Miller and D'Esposito simultaneously demanded that Plaintiffs terminate their relationships with key members of their team – apparently based on some earlier dispute between Live Nation, John Dimatteo, and Vito Bruno that had nothing to do with the State Fair event.

101.    Miller and D'Esposito told Plaintiffs that Live Nation would use its influence with talent agents to prevent Plaintiffs from signing artists if Live Nation was not permitted to become a partner in the business, which it did in fact carry out, as discussed above.

102.    Miller and D'Esposito also stated that Live Nation would use its relationship with the Authority to pressure SFEM to terminate its contract with Plaintiffs if they did not agree to Live Nation's demands.  D'Esposito further threatened that if Plaintiffs did not accept Live Nation's terms:  "I know your contract, there are loopholes, I can kick you guys out of the contract at anytime."  As a result of Live Nation's interference with their attempt to secure talent, Plaintiffs were required to seek a 30 day extension of the Agreement's requirement to provide contracts with artists to SFEM (the "Extension") (*see* Exhibit C).

103.    On April 15, 2011, Plaintiffs met with Mr. Dorso and his son, Al Dorso, Jr. of SFEM to discuss the status of their promotion.  Plaintiffs disclosed that Live Nation was succeeding in blocking Tiesto and other artists just as Mr. Dorso had anticipated.  Mr. Dorso gave Plaintiffs an extension of one week to bring him contracts for artists to perform at the event.

104.    Thus, in a Hail Mary attempt to salvage their reputation and stop Live Nation's continued meddling, on April 22, 2011, Plaintiffs met with Miller at Live Nation.   At the meeting, Miller admitted that his partner D'Esposito was angry that SFEM had not asked him first to utilize the venue and that D'Esposito felt that competition from Plaintiffs' events would threaten his Bamboozle show at the Meadowlands.   Miller also admitted that Plaintiffs were "ambushed, for no particular reason" and that he would speak with D'Esposito after Bamboozle passed when he would be in a better frame of mind and they could all "break bread."

105.    In trying to distance himself from D'Esposito's tactics, Miller acknowledged that D'Esposito is grimy and aggressive -- a loose canon that nobody can control -- and that he was aware of D'Esposito's interference with William Morris Agency. Miller further stated that he wouldn't put it past D'Esposito to have talked to Plaintiffs' talent directly and that he himself had talked to William Morris, referring to it as "doing my homework".   Nevertheless, Miller stated that "business is business" and that Live Nation had wanted to be involved in the opportunity.   Since D'Esposito's Bamboozle show was held there, they thought that Live Nation should have been involved.

106.    Plaintiffs did not consent to the shotgun marriage "proposal" from Live Nation, and as a result, Live Nation carried out its threats and blocked Plaintiffs from signing artists in time to meet the requirements of the Agreement.   As a result, Juice Entertainment was not able to sign artists sufficient to stage the shows at the State Fair.   On April 26, 2011, SFEM, through Mr. Dorso, informed Plaintiffs that the Agreement was terminated pursuant to Section 3(c) of the Agreement which required Plaintiffs to furnish copies of contracts with the artists who would perform at the State Fair.

107.     Through a combination of defamatory statements made to representatives of SFEM and the Authority, pressure applied to artists and their agents, and pressure applied to SFEM and the Authority, Juice Entertainment's Agreement with SFEM was terminated.  As a result, not only have Plaintiffs been deprived of the expected benefits of the Agreement with SFEM, which granted Juice Entertainment an exclusive right to stage concerts at the State Fair for 4 years, with an option for an additional 5 years thereafter dependent upon the status of SFEM's contract with the Authority, but Plaintiffs have also had their reputations in the music entertainment industry destroyed.  Although Mr. Dorfman had previously been recognized as a top concert promoter in New Jersey, in 2011 he was told that because of the actions surrounding this event he was removed from consideration.   The actions of Live Nation have left Mr. Dorfman and Mr. Barrett without any future business opportunities in the entertainment industry.

## CAUSES OF ACTION

### COUNT I
### Tortious Interference with Contract

108.     Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

109.     Live Nation intentionally and improperly interfered with the performance of the Agreement between Plaintiffs and SFEM.

110.     Live Nation dishonestly induced or otherwise caused SFEM to terminate the Agreement with Juice Entertainment.  Live Nation exerted pressure on SFEM directly and through the Authority with the design and intent to obtain for itself a portion of the business represented by the Agreement.

111.    When that strategy proved unsuccessful, Live Nation made performance by Juice Entertainment impossible by blocking access to the agencies and the artists that Juice Entertainment needed to stage concerts.

112.    The breakdown in the relationship with SFEM and the Authority, and the inability to work with agents and secure artists were the direct cause of SFEM's termination of the Agreement.

113.    Live Nation acted intentionally and without any justification in interfering with the Agreement.  Live Nation's actions, including pressuring the agencies to pull their support from the event and threatening the artists, were intended to cause Plaintiffs to fail to meet their obligations under the Agreement.

114.    Live Nation knew that its actions would interfere with the Agreement and would likely result in its termination.  Indeed, when Live Nation boasted that it could block all the talent necessary to stage the concerts contemplated under the Agreement, it knew that it did in fact have the power to do so.

115.    Live Nation lacked any justification for its actions.  Live Nation had no existing economic interest in the Agreement.  Live Nation's dishonest abuse of its market power to cause SFEM to terminate the Agreement failed to adhere to those common standards of fairness and to the law.

116.    As a direct, intended, and proximate result of Live Nation's wrongful conduct, Plaintiffs have sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

117.    The foregoing acts and conduct of Live Nation have caused Plaintiffs to suffer further loss of goodwill and other irreparable harm which will continue unabated unless enjoined by this Court.

118.    Live Nation has acted willfully, maliciously, and/or with the specific intent to harm Plaintiffs, or with callous disregard as to the potential foreseeable harm to Plaintiffs.  Live Nation was well aware of the likelihood that serious economic harm to Plaintiffs would arise from its egregious conduct and/or actions.  As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

## COUNT II
### Tortious Interference with Business Relations

119.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

120.    Live Nation intentionally and improperly interfered with the business relations between Plaintiffs and all the talent agencies (including William Morris, AM Only, and the Windish Agency), all of the aforementioned artists, and SFEM and the Authority.

121.    Live Nation exerted pressure on these parties with the design and intent to prevent them from doing business with Plaintiffs.

122.    Live Nation made Plaintiffs' performance of the Agreement impossible by blocking access to the artists Plaintiffs needed to stage concerts.  This inability to secure artists was the direct cause of SFEM's termination of the Agreement.

123.    Live Nation acted intentionally and without any justification in interfering with the talent agencies, the artists, and SFEM and the Authority.  Live Nation's actions were acutely

designed to bring about a desired result – the dissolution of the Agreement and a cancelation of the event.

124.   Live Nation's intent was demonstrated by   its own admissions and acknowledgements, as well as its threats and false and defamatory statements made to those parties critical to bringing about a successful event.

125.   Live Nation directly caused the talent agencies, the artists, and SFEM and the Authority to back out of their relationships with Plaintiffs.

126.   Live Nation lacked any justification for its actions.  Live Nation had no existing economic interest in the Agreement between SFEM and Plaintiffs, nor in the business relations between Plaintiffs and the talent agencies and the artists.  While fair competition may in some cases constitute a justification for a competitor's actions, those actions must comport with generally accepted standards of fair competition, morality and law.  Live Nation abused  its market power to prevent the talent agencies, the various artists, and SFEM and the Authority from doing business with Juice Entertainment.

127.   As a direct, intended, and proximate result of Live Nation's wrongful conduct, Plaintiffs have sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

128.   The foregoing acts and conduct of Live Nation have caused Plaintiffs to suffer further loss of goodwill and other irreparable harm which will continue unabated unless enjoined by this Court.

129.   Live Nation has acted willfully, maliciously, and/or with specific intent to harm Juice Entertainment, or with callous disregard to the potential foreseeable harm to Juice Entertainment.  Live Nation was well aware of the likelihood that serious economic harm to

Juice Entertainment would arise from its egregious conduct and/or actions.  As alleged herein, Juice Entertainment is entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

**COUNT III**
**Defamation**

130.    Plaintiffs incorporate by reference, as if fully set forth herein, the allegations in the preceding paragraphs of this Complaint.

131.    Live Nation made false and defamatory statements concerning Plaintiffs.  These statements were communicated to various third parties including representatives of SFEM, representatives of the Authority, artists, and talent agents.

132.    Live Nation acted negligently or with actual malice in making these false and defamatory statements.

133.    Specifically, in its campaign to prevent Plaintiffs from securing their contract with SFEM and to prevent performance under the executed Agreement, Live Nation told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM.  In meetings with members of SFEM and the Authority, Live Nation falsely stated that Plaintiffs associated with "thieves" and could not be trusted.  All of these statements were untrue, defamatory, and made negligently or with actual malice.

134.    The defamatory statements adversely impacted the business relationship between SFEM, the Authority and others, which led to the dissolution of the contract and, further, caused reputational damage to Plaintiffs.

135.   As a direct, intended and proximate result of Live Nation's wrongful conduct, Plaintiffs have sustained damages in excess of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

136.   The foregoing defamatory statements made by Live Nation have caused Plaintiffs to suffer a loss of goodwill, damage to their business reputation, which has adversely impacted their careers and future business opportunities in the entertainment industry, and other irreparable harm which will continue unabated unless enjoined by this Court.

137.   Live Nation has acted willfully, maliciously, and/or with specific intent to harm Plaintiffs, or with callous disregard to the potential foreseeable harm to Plaintiffs.  Live Nation was well aware of the likelihood that serious economic harm to Plaintiffs would arise from its egregious conduct and/or actions.  As alleged herein, Plaintiffs are entitled to punitive damages, in an amount to be determined at trial, because Live Nation should be punished for its egregious misconduct and to deter it and others from acting the same way in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Live Nation for an award of the following relief:

a.   A permanent injunction prohibiting Live Nation from continuing to make defamatory statements against Plaintiffs;

b.   An award of damages in an amount consistent with the proof submitted at trial for the losses Plaintiffs have incurred due to Live Nation's wrongful conduct;

c.   An award of legal fees and costs;

d.   An award of punitive damages; and

e.   An award of such other legal and equitable relief as is appropriate.

29

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

Respectfully submitted,

By:   /s/ David S. Stone
    David S. Stone
    Amy Walker Wagner
    Jason C. Spiro
    David B. Harrison
    STONE & MAGNANINI LLP
    150 JFK Parkway, 4th Floor
    Short Hills, NJ 07078
    Tel:  (973) 218-1111
    Fax: (973) 218-1106

    Thomas R. Ajamie
    David S. Siegel
    AJAMIE LLP
    Pennzoil Place – South Tower
    711 Louisiana Street, Suite 2150
    Houston, Texas 77002
    Tel:  (713) 860-1600
    Fax: (713) 860-1699

    *Attorneys for Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett*

Dated: September 4, 2012