# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>                    Defendant. | Civil Action No. 11-07318 (WHW) (MCA)<br><br><br>***Oral Argument Requested*** |

---

## DEFENDANT LIVE NATION ENTERTAINMENT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**GREENBERG TRAURIG, LLP**
Philip R. Sellinger (PS 9369)
Ian S. Marx (IM 1704)
500 Campus Drive, Suite 400
Florham Park, N.J. 07932
(973) 360-7917 (Telephone)
(973) 301-8410 (Facsimile)
*Attorneys for Defendant*
*Live Nation Entertainment, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

PRELIMINARY STATEMENT .........................................................1

PROCEDURAL HISTORY.................................................................4

STATEMENT OF FACTS ..................................................................5

   A. Plaintiffs Had No Experience with Large Music Festivals ...........5

   B. The Timing of the Event Conflicted with Established Electronic
      Dance Festivals Being Held Elsewhere .......................................7

   C. Knowledgeable Promoters Tell Plaintiffs What Needs to Be Done
      and Urge Them to Get Moving.....................................................8

   D. SFEM Issues Plaintiffs an Engagement Letter ...........................11

   E. Plaintiffs Add Two More Members to Their Team ....................12

   F. Plaintiffs Attempt to Obtain Funding ........................................13

      1. Bruno agrees to provide $300,000 based on Plaintiffs' assurance
         that they had the rest of the financing already in place....................14

      2. Plaintiffs obtain $300,000 from another investor but lose it
         almost immediately ..........................................................14

   G. DiMatteo Makes Offers to Artists on Behalf of Plaintiffs .........18

      1. DiMatteo makes offers to three potential headliners .........18

      2. DiMatteo also makes offers to other artists.......................19

   H. DiMatteo's Offers Were Not Accepted .......................................19

   I. Uncontroverted Evidence Shows That None of the Three Potential
     Headliners Ever Agreed to Perform at the Event and That Live Nation
     Never Pressured Agencies to Withhold Talent ............................21

   J. SFEM and Plaintiffs Enter into a Contract for the Event.............23

i

K. Plaintiffs Fail to Meet Their April 1 Deadline; SFEM Cancels Contract ....24

L. Uncontroverted Evidence Shows That Live Nation Said Nothing That Adversely Affected Plaintiffs' Contract with SFEM or That Damaged Their Reputations .........................................................................25

ARGUMENT ..........................................................................................................28

I.     SUMMARY JUDGMENT STANDARD ...............................................28

II.    LIVE NATION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .........................................................................................................29

   A.  Live Nation Should Be Granted Summary Judgment on Counts I and II (Tortious Interference with Contract and Business Relations) ..........................................................................29

   B.  Live Nation Should Be Granted Summary Judgment on Count III (Defamation)..............................................................34

III.   Plaintiffs' Lost Profits Claimed are Barred as a Matter of Law ............36

CONCLUSION.............................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).........................................................................................28

*Bell Atlantic Network Svcs., Inc. v. P.M. Video Corp., d/b/a Avius*,
    322 N.J. Super. 74 (App. Div. 1999) ..............................................................37

*Bounanno Revocable Trust v. Franklin Universal Bldg. Corp.*,
    2006 WL 2947689 (N.J. Super. Ct. Ch. Div. Oct. 13, 2006) ...........................38

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).........................................................................................28

*Deangelis v. Hill*,
    180 N.J. 1 (2004) .......................................................................................34, 35

*Essex Cnty. Vocational Sch. Bd. of Educ. v. New United Corp.*,
    2014 WL 1356603 (App. Div. Apr. 8, 2014) ...............................................37, 38

*Gorjuice Wrap, Inc. v. Okin, Hollander & De Luca, LLP*,
    2011 WL 92957 (App. Div. Jan. 12, 2011) ..................................38, 39, 40, 41

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F. 3d 1153 (3d Cir. 1993) .......................................................................30, 31

*Ortiz v. Yale Materials Handling Corp.*,
    2005 WL 2044923 (D.N.J. Aug. 24, 2005) .................................................28, 29

*RSB Lab. Svcs., Inc. v. BSI, Corp.*,
    368 N.J. Super. 540 (App. Div. 2004)..............................................................37

*Seaman v. U.S. Steel Corp.*,
    166 N.J. Super. 467 (App. Div. 1979)........................................................38, 39

*Stanley Co. of Amer. V. Hercules Powder Co.*,
    16 N.J. 295 (1954) ......................................................................................38, 39

*Ward v. Zelikovsky*,
    136 N.J. 516 (1994) .........................................................................................36

*Weiss v. Revenue B. & L. Ass'n,*
  116 N.J.L. 208 (1936) ................................................................................38, 39

*Windsor Sec., Inc. v. Hartford Life Ins. Co.,*
  986 F. 2d 655 (3d Cir. 1993) ..............................................................................30

**Other Authorities**

Fed. R. Civ. P. 56 ..............................................................................................1, 28

Restatement (Second) of Torts ..............................................................................30

Pursuant to Fed. R. Civ. P. 56, defendant Live Nation Entertainment, Inc. ("Live Nation") respectfully submits this brief in support of its motion for summary judgment, with prejudice, on all claims asserted by Plaintiffs in the First Amended Complaint.

## PRELIMINARY STATEMENT

This case is about two music festival producer wannabes who, having failed to bring off the ambitious event they were planning, are now looking for another way to have a big payday.

In Fall 2010, Plaintiffs' music business experience consisted of deejaying at weddings and bar mitzvahs and planning small night club events.  Their sole attempt at producing a music festival of any size had been a spectacular failure. Plaintiffs, however, saw a different reality.  The warped mirror into which they were gazing reflected two hip impresarios who could succeed at anything.  Their immediate dream was to produce a two-day electronic dance music ("EDM") festival featuring world-renowned headline artists as part of the 2011 New Jersey State Fair.

Of course, Plaintiffs were hopelessly out of their depth, and the event they dreamed about never got off the ground.  But like many disappointed dreamers, Plaintiffs refused to accept responsibility for their failure.  Plaintiffs wanted a scapegoat, preferably one around which a David-and-Goliath story could be

1

woven.  As the biggest concert promoter in the world, Live Nation was an obvious target.

Plaintiffs claim that Live Nation used its clout to persuade talent agencies to prevent their artists from playing at the State Fair EDM event, thereby tortiously interfering with Plaintiffs' prospective business relations and their contract with State Fair Event Management ("SFEM").  Plaintiffs further claim that Live Nation defamed them to SFEM, causing "the dissolution" of their SFEM contract and "reputational damage."  Plaintiffs are claiming damages for profits lost as a result of SFEM's cancellation of their contract to stage events during the State Fair.

Plaintiffs' interference-based claims are based on the premise that they failed to attract headline and supporting acts to perform at their EDM event because Live Nation applied "pressure" to three main talent agencies.  But the undisputed facts of record are to the contrary.  In fact, the evidence shows that Plaintiffs' event was doomed from the start.  Among Plaintiffs' many mistakes, miscalculations and missteps is the fact that the State Fair event conflicted with two well-established annual electronic music festivals.  That meant artists had to choose between playing at an event that was being produced by two no-names and events that, in the electronic music industry, were household words.

Plaintiffs were also late to the party.  By the time they finally got around to contacting talent, their prospective event was only a few short months away, and

artists (especially the headliners Plaintiffs were hoping to book) generally plan their schedules far in advance. Experienced promoters warned Plaintiffs that they had better get moving, but that advice went unheeded.

Nor did Plaintiffs have the funds necessary to put on an event of the size they were contemplating. Plaintiffs (who had virtually no money themselves) needed at least a certain minimum upfront amount, with the remainder to come from the proceeds of a successful event. Plaintiffs never came close to obtaining the necessary upfront money. And most of what they did get, they lost in a scam so improbable that it is hard to believe anyone would have fallen for it.

As for Plaintiffs' defamation claim, it is based on the premise that someone from Live Nation made negative comments about them to SFEM, causing SFEM to terminate its contract with Plaintiffs to produce the Event. As an initial matter, the person at SFEM to whom the alleged comments were supposedly made denies ever hearing such comments. In addition, the undisputed evidence shows that SFEM's President cancelled Plaintiffs' contract, not because of any negative comments by Live Nation, but because Plaintiffs had failed to timely book talent for the proposed EDM event. Thus, judgment should be granted on Plaintiffs' defamation claim as a matter of law.

Finally, based on the undisputed facts of record, the "lost profits" that Plaintiffs allege are too speculative and remote to meet the standard of reasonable

certainty for recovery.  The evidence shows that Plaintiff Juice Entertainment, LLC ("Juice"), was an unproven new enterprise that -- up to the point SFEM cancelled its contract -- had done nothing but lose money on the EDM event.  In addition, Plaintiffs had no experience with large scale outdoor EDM festivals.  Accordingly, Plaintiffs have no relevant track record that could serve as a basis for computing damages, i.e., lost profits.  Thus, Plaintiffs' lost profits claim is barred as a matter of law under the "new business rule."

With discovery now complete, it is clear that Plaintiffs have no evidence to support any of their claims.  To the contrary, the undisputed material facts show that their case is a fabrication, start to finish.  Accordingly, Live Nation should be granted judgment as a matter of law.

## PROCEDURAL HISTORY

On December 16, 2011, Plaintiffs filed suit against Live Nation alleging tortious interference with contract, unlawful interference with contract, tortious interference with business relations, defamation and unfair competition.  (Dkt. 1).  On March 16, 2012, Live Nation moved to dismiss the Complaint.  (Dkt. 13-1).  On July 3, 2012, Live Nation's motion was granted in part and denied in part.  (Dkt. 21).  Specifically, Plaintiffs' unlawful interference with contract and unfair competition claims were dismissed with prejudice; Plaintiffs' tortious interference with contract and defamation claims were dismissed without prejudice; and Live

Nation's motion to dismiss Plaintiffs' tortious interference with business relations claim was denied.   On September 4, 2012, Plaintiffs filed a First Amended Complaint alleging three claims: tortious interference with contract (Count I); tortious interference with business relations (Count II); and defamation (Count III). (Dkt. 24).   Now that discovery has concluded, Live Nation moves for summary judgment.

## STATEMENT OF FACTS[1]

### A.   Plaintiffs Had No Experience with Large Music Festivals

In Fall 2010, Plaintiffs Dorfman and Barrett began toying with the notion of putting on an electronic music festival at the Meadowlands during the State Fair in June 2011.   ***Neither had any experience with music festivals of the size they were contemplating.   SUMF ¶ 27,*** citing Marx Cert. Ex. 1 (Barrett Dep. at 273:9-12, testifying that his only previous experience with outdoor music festivals had been as a performer); Marx Cert. Ex. 3 (Dorfman Dep. at 29:9-30:10; 35:1-6, testifying that he was not involved with any large scale event festivals prior to 2010 and that his club events had, at most, 5,000 attendees); Marx Cert. Ex. 2 (Sacks Dep. at 36:6-9, testifying that, when he met Plaintiffs to explore collaborating with them

---

[1] Although all of the facts below are undisputed (or undisputable), some facts are provided simply for background and context and are not "material" in the sense that they must be accepted in order to grant Live Nation summary judgment.  The material facts upon which Live Nation's motion is based (a much narrower subset) are shown in **bolded italics** herein and are set forth in the accompanying Statement of Undisputed Material Facts ("SUMF").

on the Event, his "concern was they had not really done a festival of that size …");
*id.* at 46:23-47:1 ("If you look at [Plaintiffs'] history as far as events, they've done
a lot of nightclub stuff and booked some artists, but the level of talent we were
talking about was a couple of steps above them."); *id.* at 36:6-9 (testifying that,
when he met Plaintiffs, his "concern was they had not really done a festival of that
size and maybe didn't understand what the financial repercussions were of doing
an event of that size").

In fact, ***the only music festival of any size in which Dorfman and Barrett
had had any previous involvement was a Latin festival at the Meadowlands in
2010. SUMF ¶ 28,*** citing Marx Cert. Ex. 1 (Barrett Dep. at 23:7-8); Marx Cert.
Ex. 3 (Dorfman Dep. at 30:4-10, 70:25-71:8).   However, ***that event lost money.
SUMF ¶ 28,*** citing Marx Cert. Ex. 1 (Barrett Dep. at 23:14-24:1, testifying that
Plaintiffs lost between $5,000 and $10,000 on the Latin festival); Marx Cert. Ex. 3
(Dorfman Dep. at 81:14-83:8, testifying that "[w]e lost money" and that 10,000
attendees had been anticipated but only about 1,500 to 2,000 showed up); *id.* at
73:1-5 ("We rushed the event and we actually didn't land an anchor."); Marx Cert.
Ex. 2 (Sacks Dep. at 16:11-13, 17:14-20, testifying that Plaintiffs told him their
2010 Latin festival hadn't gone well and that they wanted to step up their game for
their next event); Marx Cert. Ex. 4 (Dorso Dep. at 21:15-22:11) ("[W]as
[Plaintiffs' 2010 Latin festival] successful?   No, it was not. … It was poorly

attended, and I think it was poorly marketed.").[2]

**B.    The Timing of the Event Conflicted with Established Electronic Dance Festivals Being Held Elsewhere**

*The Event was slated to take place in the Meadowlands parking lot on June 25 and 26, 2011, during the New Jersey State Fair.  SUMF ¶¶ 1-2,* citing Marx Cert. Ex. 5 (Mar. 7, 2011 Agreement).  *However, those were the exact days that the well-established Electric Daisy Carnival ("EDC") would be held in Las Vegas.  SUMF ¶ 21,* citing Marx Cert. Ex. 6 (Electric Daisy Carnival 2011 schedule); Marx Cert. Ex. 3 (Dorfman Dep. at 117:5-9, testifying that he knew Electric Daisy Carnival was putting on the same kind of event on the same days in Las Vegas).  *Plaintiffs acknowledge that there was considerable overlap between the artists they had wanted for the Event and those who went on to perform instead at EDC in Las Vegas.  SUMF ¶ 21,* citing Marx Cert. Ex. 3 (Dorfman Dep. at 119:4-124:5).

The Event also conflicted with Electric Zoo, which is held every Labor Day on Randall's Island, New York.  Like Electric Daisy Carnival, Electric Zoo is a

---

[2] This testimony from Sacks (who had collaborated with Plaintiffs on the Event), from SFEM President Dorso (with whom Plaintiffs contracted for the Event) and from Plaintiffs themselves conflicts markedly with the allegations in the Amended Complaint.  *See, e.g.,* Compl. ¶ 38 (alleging that the 2010 Latin festival had been "successful" and that "the concert's success led SFEM to want to work with Plaintiffs again") (emphasis added); *see also id.* ¶ 39 ("Building on the success of the 2010 Latin Music Festival, Mr. Barrett and Mr. Dorfman began discussions with SFEM [about producing] … concerts at the State Fair.") (emphasis added).

well-established festival.  Although the dates for the Event and Electric Zoo did not overlap, given the standard industry "90-day exclusivity within a 150-mile radius" term,[3] artists who had, in 2011, received offers to appear at both the Event and Electric Zoo had to pick which one they preferred.  *See* Marx Cert. Ex. 3 (Dorfman Dep. at 133:17-134:3, testifying that he understood Plaintiffs would be competing with Electric Zoo for talent).

## C.   Knowledgeable Promoters Tell Plaintiffs What Needs to Be Done and Urge Them to Get Moving

Given their own lack of experience with large festivals, in Fall 2010 Plaintiffs began talking to Paul Potter and Alan Sacks about the Event.  Compl. ¶ 43.  Plaintiffs describe Potter as having "extensive experience in concert promotion and marketing," and they describe Sacks as being an "experienced producer and promoter in the electronic dance market." *Id.*  Potter, who claimed to have a good connection with William Morris Entertainment ("WME") President and CEO David Levy, advised Plaintiffs about what they needed to do immediately in order to get WME's attention.  *See* Marx Cert. Ex 8 (e-mail chain Oct. 11-15, 2010 among Potter, Dorfman, Barrett and Sacks) (Potter Oct. 11 e-mail: "The key factors at this point are that we have the exclusive opportunity to even stage such an event of this nature at the venue and the potential required … funding in place

---

[3] *See, e.g.,* Marx Cert. Ex. 7 (February 3, 2011 e-mail from DiMatteo to Plaintiffs and Sacks, listing, as one of the "Special terms" for artist offers: "Exclusive performance 90 days prior and after show date/150 mile radius of show location").

before we approach David [Levy] at [WME].").   Potter outlined nine separate categories of information that would have to be put into "presentation format" for Levy in order "to introduce the William Morris Agency to the team and the venue professionally." *Id.*  (Potter Oct. 11 e-mail).

Barrett subsequently provided Potter with what he called "P&L" estimates "to get the ball moving."  *Id.* (Barrett Oct. 14 e-mail).  Potter thanked him for his "rough calculations" but listed several more items of information that were still missing and asked pointedly "do you have an investor … at present?"  *Id.* (Potter Oct. 14 e-mail).   Barrett responded vaguely, claiming to "have some investors interest over here."  *Id.* (Barrett Oct. 15 e-mail).

Potter continued to press Plaintiffs for the information that would be needed in order to present the Event to potential sponsors, investors and agents.  *See* Marx Cert. Ex. 9 (Potter e-mails Nov. 24 and 26, 2010, the Nov. 24 e-mail listing information to be added to presentation and suggesting that it be "designed a little better to make it presentable to a financial backer" and the Nov. 26 e-mail stating "Guys we need to get the rest of the info together [as] time is ticking!!!!!"); *see also* Marx Cert. Ex. 1 (Barrett Dep. at 187:16-23, confirming that Potter "was urging us to get moving and to start making offers to these agents").   The information that Potter said was urgently needed was never provided.

Even Plaintiffs realized that time was of the essence, though, particularly

with respect to booking talent.  *See* Marx Cert. Ex. 8 (October 15, 2010 e-mail from Barrett to Dorso, stating: "The premier artists are setting their June schedules now so time is of the essence."); Marx Cert. Ex. 1 (Barrett Dep. at 175:10-25, testifying that he understood that, by October 2010, premier artists were already confirming their June 2011 schedules); *cf. id.* at 176:11-17 (recognizing that the Event needed premier artists in order to be successful: "You need an anchor each day and then supporting acts."); Marx Cert. Ex. 3 (Dorfman Dep. at 79:14-20, testifying that, to be successful, outdoor festivals need an anchor with a "massive reputation where they can draw a very large crowd").

Nevertheless, Plaintiffs continued to drag their heels.  By mid-December 2010, Potter was alarmed, telling Barrett "We need to move fast" and "We could be booking this thing right now!"  *See* Marx Cert. Ex. 10 (December 17, 2010 Barrett/Potter e-mail chat).  Barrett responded by saying Plaintiffs were "wrapping up finance" and had "one more in the hot seat."  *Id.*  Asked at deposition who that potential investor "in the hot seat" might have been, Barrett testifies that he seems to recall two people, whose names might have been "Izzy" and "Mike," who might have expressed some interest in funding the Event.  Marx Cert. Ex. 1 (Barrett Dep. at 198:25-200:6).[4]

---

[4] Until very late in the process, Plaintiffs had not even come up with a name for the Event.  *See* Marx Cert. Ex. 11 (DiMatteo Dep.  at 67:24-25 ("We changed the name like 20 -- like several times."); and at 68:21-22  ("Everyone involved had a

D.   **SFEM Issues Plaintiffs an Engagement Letter**

One reason Plaintiffs waited so long to get started was that they had nothing in writing that would show talent agencies or potential investors that they even had a venue.  *See* Marx Cert. Ex. 8 (Oct. 11, 2010 e-mail from Potter to Plaintiffs and Sacks, advising Plaintiffs that, in addition to having "potential funding in place," before WME could be approached they also needed to obtain "a letter of consent explaining that we have the exclusive rights to the venue for a dance event for the next 5 years with an opinion to renew"); Marx Cert. Ex. 2 (Sacks Dep. at 26:14-17, 27:7-8, testifying that "one of the issues we kept running into … was they couldn't produce the land lease agreement with the Meadowlands." … "It was a bit of a brick wall…."); *see also* Marx Cert. Ex. 1 (Barrett Dep. at 188:1-20, testifying that Dorfman in particular was insistent that no talent be booked until they had an engagement letter with SFEM in place).

Plaintiffs had repeatedly asked SFEM's Al Dorso to give them an engagement letter.  Marx Cert. Ex. 1 (Barrett Dep. at 189:6-22, testifying that Dorfman had asked "over and over again"); *see also* Marx Cert. Ex. 3 (Dorfman

---

hard time agreeing on the name [of the Event].")).  According to DiMatteo, having a name for the Event was crucial.  *Id.* at 68:7-8 ("The brand is everything so it is of the utmost importance.").  "[I]deally, you would want to have the name and brand in place even before the offer process begins. … [T]he sooner you have it the better." *Id.* at 68:12-17.  DiMatteo agreed that lack of a name could "[p]otentially" have implications for the success of the show because, "when you go to agents … and they ask what the name is, and you don't have one, it is a strike against you in my opinion." *Id.* at 68:23-69:7.

Dep. at 106:5-24, testifying that, in October 2010, Plaintiffs tried to get something in writing from Dorso but he kept putting them off).  SFEM finally issued an engagement letter on December 1, 2010.  *See* Marx Cert. Ex. 12 (Dec. 1, 2010 engagement letter).  The engagement letter stated that SFEM granted Plaintiffs the exclusive right to stage an event sometime during the 2011 State Fair (which would run from June 23 to July 10) and that terms and conditions would "be set forth in a formal contract at a later date."  *Id.; see also* Marx Cert. Ex. 4 (Dorso Dep. at 38:4-7, testifying that, as of December 1, 2010, no agreement about finances had been reached; the purpose of the engagement letter was simply to allow Plaintiffs to "get investors and book acts").

### E.   **Plaintiffs Add Two More Members to Their Team**

With proof of venue now in hand, Plaintiffs were finally, albeit belatedly, ready to start trying to book artists for the Event and obtain the necessary funding. To that end, in early 2011 Plaintiffs sought help from John DiMatteo and Vito Bruno, who were business partners.  Marx Cert. Ex. 3 (Dorfman Dep. at 141:19-23); Marx Cert. Ex. 11 (DiMatteo Dep. at 13:6-14:3, testifying that he and Bruno "agreed to go in as a partnership" to work on the Event).

By this time, however, the Event was just a few short months away. Although DiMatteo agreed to handle artist booking, he was clearly worried, as he knew that an event of the size Plaintiffs were contemplating generally required

"[o]ver a year" in lead time.  *Id.* at 31:25-32:3.  DiMatteo continued: "We did not have a year of lead time and I went against my better judgment and got involved anyway…."  *Id.* at 32:14-16; *see also id.* at 106:9-15 (testifying that he had never been involved in an event similar in size where there was less than a year's lead time).

Although Bruno, too, agreed to help, he also had timing concerns.  Marx Cert. Ex. 13 (Bruno Dep. at 55:14-21, testifying that "[t]his was already pushing the envelope for a major event. … You have to go months and months out for a big production."); *see also id.* at 56:1-2 ("I knew from the beginning we were under the gun, definitely under the gun.").

**F.** **Plaintiffs Attempt to Obtain Funding**

Putting on the Event would require Plaintiffs to buy talent, rent staging, light and sound equipment and bear all of the other costs associated with a music festival of the size they were contemplating.  In other words, money was paramount, and Plaintiffs themselves had none.  Bruno, who was experienced in financing events such as the one Plaintiffs were planning, estimated that the entire Event would cost about $2 million.  Bruno believed, however, that, with careful planning and by making down-payments only (with balances to be paid post-Event), the Event might be produced for an upfront cost of $600,000.  Marx Cert. Ex. 13 (Bruno Dep. at 113:7-25); *see also id.* at 114:1-4 ("Q: So could you have

done the event with $600,000 in financing if the expenses were $2 million?   A: Yes, probably, yes.").

### 1.   Bruno agrees to provide $300,000 based on Plaintiffs' assurance that they had the rest of the financing already in place

On or around January 21, 2011, Bruno verbally agreed to put up $300,000 provided that Plaintiffs would also put up $300,000.  Marx Cert. Ex. 13 (Bruno Dep. at 71:22-72:1); *id.* at 58:14-16 ("They [Plaintiffs] asked me for $300,000 to put up."); *id.* at 59:4-8 (testifying that Plaintiffs told him "[t]hey had other financing in place from other people").  Plaintiffs never asked Bruno whether he would be willing to provide more than $300,000, and he never agreed to do so.  *Id.* at 59:9-15; *see also id.* at 59:16-21 (categorically denying that he had ever agreed to finance the entire Event).  Plaintiffs never obtained any written agreement from Bruno regarding financing.  Marx Cert. Ex. 1 (Barrett Dep. at 217:14-19).

### 2.   Plaintiffs obtain $300,000 from another investor but lose it almost immediately

Subsequent to obtaining Bruno's agreement to provide $300,000 (which, as noted, was premised on Plaintiffs' assurances that they already had the rest of the funding in place), one of Plaintiffs' collaborators on the Event, John Sandberg,[5] obtained $300,000 for the Event from a couple from Hackensack, John and

---

[5] John Sandberg is the registered agent of Plaintiff Juice Entertainment.  *See* Marx Cert., Ex. 15 (May 4, 2009 N.J. Dept. of Treasury, Div. of Revenue, Certificate of Formation).

Georgianne Chiusolo.  *See* Marx Cert. Ex. 14 (February 16, 2011 Promissory Note between John Sandberg, Dorfman, Barrett, Juice Entertainment and the Chiusolos); *see also* Marx Cert. Ex. 3 (Dorfman Dep. at 151:23-152:15, testifying that Sandberg had obtained $300,000 from John Chiusolo); *id.* at 224:23-225:9, testifying that the Chiusolos were to receive 25% of Juice Entertainment's net profit from Event in addition to the return of the $300,000 investment).

Plaintiffs lost about half of the Chiusolo money almost immediately.  As Sandberg explained it, on or around March 1, 2011, he had been put in contact with someone named Jasmine Adams (a.k.a. "Bella Chanel"), who purported to be an agent for some prominent hip-hop artists.  *See* Marx Cert. Ex. 16 (March 27, 2011 e-mail from Sandberg to Barrett and Dorfman).  According to Sandberg, Ms. Adams/Chanel asked him to wire her $131,750, which he did.  Realizing he had been scammed, Sandberg asked for the money back, but to no avail.  *Id.; see also* Marx Cert. Ex. 3 (Dorfman Dep. at 232:5-11, testifying that "we lost the vast majority of the [$300,000] … in a scam."); Marx Cert., Ex. 1 (Barrett Dep. at 239:22-240:6:  Q: "That money was just lost?" A: "To the best of my knowledge, lost, yes."  Q: "And whoever it was wired to took the money?"  A:  "Yes.").[6]

---

[6] Plaintiffs only have Sandberg's account of what happened to the $131,750.  It is worth noting that other, documented actions by Sandberg show a disturbing willingness to play fast and loose with other people's money.  For example, at a meeting with Al Dorso of SFEM on March 7, 2011, Plaintiffs provided Dorso with a letter from Provident Bank stating that Juice Entertainment's account had a

Although the Chiusolos' investment had been specifically earmarked for the Event, Plaintiffs used what remained of it after the Adams/Chanel incident for "business expenses."   Marx Cert. Ex. 3 (Dorfman Dep. at 235:1-4).   Those included putting on "an event right down the road [from the Meadowlands] in the swamp in Carlstadt" featuring Charlie Sheen.   *Id.* at 235:4-13.[7]   Plaintiffs paid Sheen $55,000 out of the Chiusolo money.   Marx Cert. Ex. 1 (Barrett Dep. at 241:4-5, confirming that part of the Chiusolo money was used to pay Sheen).[8]

---

balance of $300,000 (i.e., it contained the Chiusolo money that was within days of being lost).  *See* Marx Cert. Ex 17 (Provident Bank letter).  Sandberg, however, had wanted to show Dorso a forged Provident Bank letter showing an account balance of $900,000 in order to make Juice appear to be more financially solvent than it really was.  *See* Marx Cert. Ex. 18 (forged Provident Bank letter); Marx Cert. Ex. 3 (Dorfman Dep. at 260:16-261:1).  Plaintiffs claim that they did not use the forged letter.  Marx Cert. Ex 1. (Barrett Dep.at 230:7-10).  More recently, state prosecutors investigated Sandberg in connection with hundreds of thousands of dollars that an organization he founded had collected for Hurricane Sandy victims but had never distributed.  *See* Marx Cert. Ex. 19 (newspaper article found at *http://www.app.com/article/20131213/NJNEWS2003/312130107/sandy-charities* ("Seized Illegal Sandy Charity Money Still in Limbo: Sparta couple who started the charity spent summer in Costa Rica").  Civil charges were filed against Sandberg, and a settlement was later reached. *See also* Marx Cert. Ex 3 (Dorfman Dep at 244:17-20) (testifying that Sandberg "had received a lot of money from Hurricane Sandy" that he hadn't "disburse[d]").

[7] Dorfman testified that the reason Plaintiffs selected the Carlstadt venue for the Sheen event (a club called "Dragonfly") was "to stir up interest for the Meadowlands, showing that we can book literally right across the street.  I can book the number one celebrity in the world at the time, here in the swamp…." Marx Cert. Ex. 3 (Dorfman Dep. at 236:16-20).

[8] Plaintiffs also had to obtain "tents … with some heaters," as the Sheen event was held outdoors in the middle of winter.  Marx Cert. Ex. 3 (Dorfman Dep. at 237:4-6).

The Chiusolos never got their $300,000 back.  Marx Cert. Ex. 3 (Dorfman Dep. at 238:16-20, testifying that the Chiusolos were never repaid "because the event never took place.  We didn't have the money to repay them."); Marx Cert. Ex. 1(Barrett Dep. at 243:15-21, testifying that, by May 31, 2011, only $242.36 was left from the Chiusolos' money).  The Chiusolos ultimately sued Plaintiffs for the $300,000.  Marx Cert. Ex. 3 (Dorfman Dep. at 54:22-55:11, testifying that John Chiusolo has sued him over the money he loaned for the Event and never got back); *id.* at 238:25-239:9, acknowledging that the Chiusolos had caused legal papers to be delivered to his house regarding the $300,000).

Not surprisingly, Plaintiffs' other collaborators were shaken by the Adams/Chanel incident.  *See* Marx Cert. Ex. 2 (Sacks Dep. at 23:24-24:10, describing how Plaintiffs "wired half the seed money" to someone who didn't actually represent the artist they were trying to hire.  "So within, I don't know, two weeks of having possession of the seed money … they had lost half of it.  It was a major concern obviously.").

**G.**      **DiMatteo Makes Offers to Artists on Behalf of Plaintiffs**

   ***DiMatteo was the person responsible for booking talent for the Event. SUMF ¶ 7,*** *citing* Marx Cert. Ex. 1 (Barrett Dep. at 42:21-23).  ***All communications with the three talent agencies at issue here (WME, AM Only and The Windish Agemcy) went through DiMatteo.  SUMF ¶ 7,*** *citing* Marx

17

Cert., Ex. 3 (Dorfman Dep. at 121:1-5, confirming that "John DiMatteo made all of the offers … and received all of the responses from the agents to whom the offers had been made"); Marx Cert. Ex. 13 (Bruno Dep. at 36:1-20, testifying that DiMatteo was in charge of talent and received all responses to offers).

### 1. DiMatteo makes offers to three potential headliners

*Plaintiffs believed at least one of the following three artists had to play at the Event if it was to be successful:  Tiesto, David Guetta or Steve Angello. SUMF ¶ 8,* citing Amended Compl. ¶ 7 (alleging that "Tiesto, David Guetta, and Steve Angello" were important to Event's success); *id.* at ¶ 76 (identifying "[t]hree artists, in particular … Tiesto, Steve Angello, and David Guetta").

*On January 26, 2011, DiMatteo sent Paul Morris at AM Only an offer for Tiesto to play at the Event.  SUMF ¶ 9,* citing Marx Cert. Ex. 20 (Jan. 26, 2011 e-mail from DiMatteo to Morris).  *DiMatteo also expressed an interest in 20 other AM Only artists, including potential headliner David Guetta, and, on February 16, 2011, DiMatteo sent Morris an offer for Guetta.  SUMF ¶ 12,* citing Marx Cert. Ex. 21(Feb. 16, 2011 e-mail from DiMatteo to Morris ).  *On or around February 21, 2011, DiMatteo sent Steve Goodgold at Windish an offer for Steve Angello.  SUMF ¶ 15,* citing Marx Cert. Ex. 22 (Feb. 21-22, 2011 e-mail exchange between DiMatteo and Goodgold).

### 2. DiMatteo also makes offers to other artists

18

In addition to the three potential headliners, DiMatteo also made offers to many lesser-known artists. ***On February 3, 2011, DiMatteo sent WME offers for about 30 of its artists. All of these WME offers expired on February 12, 2011.*** SUMF ¶¶ 17, 18, citing Marx Cert. Ex. 23 (Feb. 3, 2011 e-mail from DiMatteo to Joel Zimmerman, *et al,* at WME); Marx Cert. Ex. 11(DiMatteo Dep. at 55:17-21, confirming that all WME offers expired February 12, 2011).

In addition, ***on February 22, 2011, DiMatteo sent Windish offers for five of its artists. All of these Windish offers expired on March 1, 2011. SUMF ¶ 19,*** citing Marx Cert. Ex. 24 (Feb. 22, 2011 e-mail from DiMatteo to Plaintiffs and others attaching copies of Windish offers)***.***

### H. <u>DiMatteo's Offers Were Not Accepted</u>

***Of the approximately 57 offers made by DiMatteo to artists represented by AM Only, Windish and WME, to play at the Event only one was accepted; the rest of the offers expired or were rejected. The one acceptance was from Windish artist Matthew Dear. No contract was signed with Dear, however, "because [Plaintiffs] didn't have headliners." SUMF ¶ 12,*** citing Marx Cert. Ex. 11 (DiMatteo Dep. at 86:20-87:21). A major reason for this lack of response was the fact that the Event conflicted with well-established festivals. *See* Statement of Facts ("SOF"), Sect. B, *supra.* For example, ***Tiesto decided to play at Electric Zoo over Labor Day 2011. SUMF ¶ 10,*** citing Marx Cert. Ex. 2 (Sacks Dep. at 86:17-

87:6); Marx Cert. Ex. 11 (DiMatteo Dep. at 34:10-12, testifying that "Tiesto's offer was not accepted because … he was going to Electric Zoo."); *id.* at 108:3-109:2 (finding it reasonable that Tiesto's agreement with Electric Zoo prohibited him from playing at Event: "It happens all the time.").[9]

Likewise, ***many of the artists to whom DiMatteo had made offers (including potential headliners Tiesto, Steve Angello and David Guetta) decided to play at Electric Daisy Carnival in Las Vegas, which, as noted, fell on the same days as the Event.***[10] **SUMF ¶ 21,** citing Marx Cert. Ex. 6 (schedule obtained from EDC 2011 Las Vegas website); Marx Cert. Ex. 3 (Dorfman Dep. at 121:22-124:5, confirming that Tiesto, Angello, Guetta and many others to whom DiMatteo had made offers ended up playing at EDC).

## I. Uncontroverted Evidence Shows That None of the Three Potential Headliners Ever Agreed to Perform at the Event and That Live Nation Never Pressured Agencies to Withhold Talent

Plaintiffs allege that virtually all of the artists to whom DiMatteo sent offers had verbally agreed to perform at the Event but that, due to pressure from Live Nation, the artists "pulled out of the show, one by one." Amended Compl. ¶ 86.

---

[9] *Cf.* Marx Cert. Ex. 3 (Dorfman Dep. at 124:6-126:2, testifying that he knew Electric Zoo's Labor Day festival could impact the ability to get talent for the Event "depend[ing] on the artist's contract" and acknowledging that headline artists like Tiesto would likely be contractually prohibited from playing at both events).

[10] Attendance at the three-day 2011 Las Vegas Electric Daisy Carnival was estimated at 230,000. http://en.wikipedia.org/wiki/Electric_Daisy_Carnival

The uncontroverted evidence shows that this allegation is completely false.

As an initial matter, no artist "pulled out of the show" because no artist had ever been in it.  With respect to Tiesto, DiMatteo testifies that he raised his initial $207,000 offer to $400,000 "[b]ecause it appeared that we were going to lose [him] to Electric Zoo".  Marx Cert. Ex. 11 (DiMatteo Dep. at 76:17-77:2).  However, it is undisputed that ***Tiesto's agent, Paul Morris, never agreed that Tiesto would appear at the Event for $400,000.  SUMF ¶ 11,*** citing Marx Cert. Ex. 11 (DiMatteo Dep. at 77:3-19); *id.* at 77:20-22 (reiterating that Morris never agreed that Tiesto would appear at the Event).[11]

Likewise, with respect to AM Only artist David Guetta, ***David Guetta never accepted this offer,*** and ***David Guetta's agent Paul Morris never agreed that Guetta would appear at the Event***.  ***SUMF ¶¶ 13-14,*** citing Marx Cert. Ex. 11 (Dimatteo Dep. at 78:2-15).

***Nor did Windish artist Steve Angello ever agree to perform at the Event.***

---

[11] Bruno was able to provide further insight into the Tiesto refusal.  Although DiMatteo handled all talent offers, Bruno recalls going with DiMatteo to a meeting at AM Only at which Tiesto's offer was discussed.  Marx Cert. Ex. 13 (Bruno Dep. at 37:10-38:2) .  According to Bruno, Tiesto's agent was demanding $400,000 for Tiesto, plus part ownership of the Event.  *Id.* at 39:24-40:2.  No one on the team was willing to make Tiesto a part-owner.  *Id.* at 40:11-13 ("The money we could work on, but the giving them part ownership of the festival was not something we were looking to do."); *see also id.* at 44:22-45:4 ("I believe everybody was in agreement that that was not real.  Q:  Meaning not something that you wanted to pursue?  A:  Yes, correct.").

***SUMF ¶ 16,*** citing Marx Cert. Ex. 11 (DiMatteo Dep. at 82:19-83:2, 83:22-84:14, testifying that DiMatteo's discussions with Angello's agent never got beyond "a back and forth dialogue about the Event" and that Angello was declining the offer).

As for the allegation that Live Nation pressured the talent agencies to withhold their artists from the Event, Plaintiffs acknowledge that they have no evidence to support that. *See* Marx Cert. Ex. 1 (Barrett Dep. at 79:22-80:5 and 82:17-83:15) (agreeing that he has no evidence that Live Nation instructed agencies to withhold talent; that's just what he believes happened). In fact, the undisputed evidence is to the contrary. According to John DiMatteo, the only member of the "team" who interacted with the talent agencies in connection with the Event, and thus the only one with first-hand knowledge, ***Live Nation did not pressure anyone at WME, AM Only or Windish to withhold their artists from the Event. SUMF ¶ 22,*** citing Marx Cert. Ex. 11 (DiMatteo Dep. at 85:6-14)***.*** Plaintiffs' collaborator on the Event, Alan Sacks, also testifies that he has no knowledge that Live Nation ever blocked talent from the Event. Marx Cert. Ex. 2 (Sacks Dep. at 52:8-11); *see also id.* at 90:2-6 (confirming that he is unaware of any instance where a performer refused an offer to play at the Event due to pressure from Live Nation); *cf.* Marx Cert. Ex. 13 (Bruno Dep. at 108:17-19, testifying that DiMatteo and Sacks are the only ones "in the position to know exactly what happened with each act or each offer").

**J.**   **SFEM and Plaintiffs Enter into a Contract for the Event**

*On March 7, 2011, Plaintiffs and SFEM entered into a contract for the Event.  SUMF ¶ 1,* citing Marx Cert. Ex. 5 (Mar. 7, 2011 contract between Juice Entertainment and SFEM).  *The contract specified that the Event would be held on June 25 and 26 in 2011 and, for the next four years "on the first Saturday and Sunday of the fair" with an additional five-year option.  See id.* (Mar. 7, 2011 contract at Sect. 1(a), (b)).  *The contract required Plaintiffs to provide, by March 1, 2011, "a copy of talent/acts/entertainment" and "copies of all contracts."  See id.* (Mar. 7, 2011 contract at Sect. 3(c)).  Given that it was already March 7 and Plaintiffs still had no "talent/acts/entertainment" or contracts,[12] *SFEM agreed to give Plaintiffs a 30-day extension (i.e., to April 1) to meet that requirement.  SUMF ¶ 4,* citing Marx Cert. Ex. 25 (March 7, 2011 Request for Extension, granting Juice Entertainment's request for 30-day extension "pertaining to section 3 item (c)).

**K.**   **Plaintiffs Fail to Meet Their April 1 Deadline; SFEM Cancels Contract**

Despite their 30-day extension, *when Plaintiffs did not meet their April 1, 2011 deadline to produce signed contracts with artists, SFEM canceled Plaintiffs' contract.  SUMF ¶ 23,* citing Marx Cert. Ex. 4 (Dorso Dep. at 10:6-16);

---

[12] Indeed, Plaintiffs' offers to the 30 WME artists and the five Windish artists had already expired as of February 12 and March 1, respectively.  *See* this SOF, Sect. G(2), *supra.*

*id.* at 85:15-86:1, testifying that "[m]y decisions were made based on a contract, and they [i.e., Plaintiffs] couldn't perform.") (emphasis added).   As Dorso explains:

> To be honest, [by March 7, 2011] we were already outside the dates. … [but t]hey said, just let us … the contracts are coming.  Give us some more time. … I said, all right, all right, we'll do that.  Get your act together, and you have 30 days to do it.  I shouldn't have believed any of it, because it obviously wasn't true.

Marx Cert. Ex. 4 (Dorso Dep. at 59:8-25).  Asked why he thinks Plaintiffs were unable to perform under the contract, Dorso testifies:

> Well, you know, I don't think they signed any acts because they were looking for the big act.  When the big act couldn't get signed, they didn't want to have deposits out and lose their money on the other acts. … So I think it was really a snowballing thing, [they] just started to lose control of the whole thing.

*Id.* at 87:23-88:10.[13]

---

[13] Notably, ***Dorso testifies that, even if Plaintiffs had been able to meet their contractual obligations, they would never have been permitted to put on the Event for more than one year (SUMF ¶ 26)***:

> By the way, … no one was really familiar with what they were going to produce … electric dance.  Now that we know what it is, we would never allow it at the fair.  It would have been a one-year contract. … Too many drugs and too many problems, and that's not the kind of fair we have.  It is a family event. … [T]hey said that this is a teen event. … [W]e were a little bit naïve.

Dorso Dep. at 45:8-46:2 (emphasis added).  In fact, Dorso says that Plaintiffs might not even have been allowed to come back for a second night in 2011.  *Id.* at 91:6-8 (after observing what happened at "the Electric Daisy event … last year at MetLife Stadium … [d]rug-wise and crowd control and hundreds and hundreds of

**L.  Uncontroverted Evidence Shows That Live Nation Said Nothing That Adversely Affected Plaintiffs' Contract with SFEM or That Damaged Their Reputations**

Plaintiffs allege that Live Nation made two defamatory statements about them.  Plaintiffs allege that Live Nation: (1) "[i]n meetings with members of SFEM and the [New Jersey Sports and Exposition] Authority, … falsely stated that Plaintiffs associated with 'thieves' and could not be trusted"; and (2) "told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM." Amended Compl. ¶ 133.  Plaintiffs allege that statements (1) and (2) were made to Dorso on February 18, 2011 and March 7, 2011, respectively.  *Id.* at ¶¶ 89-90, 93.[14]

According to Plaintiffs, these two statements caused "the dissolution of [Plaintiffs' SFEM] contract" and "reputational damage" to Plaintiffs.  *See id.* at ¶ 134

---

kids going to the hospital ….  "I don't know if [Plaintiffs] would have went the second night if I sold out the first night, to be honest with you. … [K]nowing what I know now…, it's not something that we would want there."); *cf.* Marx Cert. Ex. 3 (Dorfman Dep. at 190:13-20) (agreeing that SFEM had the right to reject any act that Plaintiffs proposed).

[14] Although Count III (Defamation) conclusorily alleges that statement (2) was made to "third parties" (defined as "representatives of SFEM, representatives of the Authority, artists, and talent agents" (*see id.* at ¶131)), the "fact" section of the Amended Complaint alleges that statement (2) was made solely to Dorso.  *See id.* at ¶93 (alleging that, "[o]n March 7, 2011, … Miller and D'Esposito made … statements <u>to Mr. Dorso</u> regarding Plaintiffs' ability to fulfill their commitment to SFEM.  In particular, Miller and D'Esposito stated that Plaintiffs were 'broke' and could not afford the necessary talent to stage the State Fair concerts.  They also said that Plaintiffs lacked the expertise needed to produce concerts of the size contemplated in the Engagement Letter.") (emphasis added).

(claiming that the alleged statements "adversely impacted the business relationship between SFEM, the Authority and others, which led to the dissolution of the contract and, further, caused reputational damage"); *see also id.* at ¶ 136 (with respect to "reputational damage," claiming that the alleged statements have "adversely impacted [Plaintiffs'] careers and future business opportunities in the entertainment industry.").

Only one person can credibly testify concerning Plaintiffs' SFEM contract and the reason(s) it was canceled:  SFEM President Al Dorso.  And Dorso has done so.  It is Dorso's sworn testimony that:

> ***[T]he boys at Juice [i.e., Plaintiffs] had a contract and they had set certain goals at certain times, and they were way past those goals. …. I actually kept giving them the benefit of the doubt.  They are young guys.  I thought that they needed a break and they were trying hard, so I kept extending the … goals.  They weren't performing to the contract.***

*SUMF ¶ 23,* citing Marx Cert. Ex. 4 (Dorso Dep. at 10:6-16) (emphasis added). Based on undisputed sworn testimony, Dorso recalls ***no one from Live Nation ever telling him that Plaintiffs "associated with thieves," "lacked funding" or "lacked the experience necessary to put on a show of the type [they were contemplating]." SUMF ¶ 24,*** citing Marx Cert. Ex. 4 (Dorso Dep. at 84:12-16; 86:19-87:3).  Moreover, Dorso testifies that, ***even if such statements had been made, "it wouldn't have mattered.  I mean, there is a contract in place, and why***

***would any of that matter?***"  ***SUMF ¶ 25,*** citing Marx Cert. Ex. 4 (Dorso Dep. at 85:2-7).  Asked about D'Esposito in particular, Dorso testifies that he does not recall D'Esposito ever saying anything negative about Plaintiffs.  *Id.* at 85:8-19.[15] And even if he had, Dorso testifies that it would have had no impact on the relationship between SFEM and Plaintiffs.  As Dorso explained: "<u>My decisions were made based on a contract, and they [i.e., Plaintiffs] couldn't perform</u>."  *Id.* at 85:15-86:1(emphasis added).

In addition, the allegedly defamatory statements pre-dated the SFEM contract, which was signed on March 7, 2011.  *Id.* at ¶ 95.  That was the very reason why this Court, in July 2012, dismissed Plaintiff's defamation claim without prejudice:

> All of the alleged defamatory statements made to SFEM and the venue predated the finalization of Plaintiffs' contract.  No defamatory statements to SFEM or a third party, such as the venue, are alleged after contract finalization.  The Court cannot reasonably infer that SFEM cancelled Plaintiffs' contract as a result of defamation that predated signing the contract.

July 3, 2012 Opinion, p. 8 (Dkt. 20).  The only thing that has changed since then is that the person to whom Plaintiffs claim the defamatory statements were made has now testified under oath that he never heard such statements and that, even if he had heard them, they would have had no impact.

---

[15] According to Dorso, "[e]verybody knows John D['Esposito is a bull in a china closet and they don't listen to half of what he says."  *Id.*

## ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c ), summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A nonmoving party, however, may not rest upon mere allegations, general denials or vague statements in opposing a summary judgment motion. *Ortiz v. Yale Materials Handling Corp.,* 2005 WL 2044923, at *2 (D.N.J. Aug. 24, 2005) (citing *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F. 2d 884, 890-91 (3d Cir. 1992)).  Instead, the nonmoving party must set forth specific facts "by means of affidavits, depositions, answers to interrogatories, or admissions … that show there is a genuine issue for the trier of fact to resolve."  *Id.* (quoting *Cooper v. Cape May Cty. Bd. of Soc. Servs.,* 175 F. Supp. 2d 732, 741 (D.N.J. 2001)).  Conclusory allegations do not meet the non-moving party's duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor.  *Id.* (citing *Ridgewood Bd. of Ed. v. Stokley,* 172 F. 3d 238, 252 (3d Cir. 1999)).

### II.    LIVE NATION IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

Despite engaging in extensive discovery, Plaintiffs have no competent record evidence to support any of the three remaining claims they assert against Live Nation.

## A. Live Nation Should Be Granted Summary Judgment on Counts I and II (Tortious Interference with Contract and Business Relations)

Plaintiffs' allegations in Counts I and II are closely related.  In Count I, Plaintiffs allege that Live Nation interfered with their SFEM contract "by blocking access to the agencies and the artists that [Plaintiffs' company] Juice Entertainment needed to stage concerts."  Amended Compl. ¶ 111.  In Count II, Plaintiffs allege that Live Nation interfered with their business relations with the three talent agencies (WME, AM Only and Windish), the artists, SFEM and the Authority by "exert[ing] pressure on those parties with the design and intent to prevent them from doing business with Plaintiffs."  *Id.* at ¶¶ 120-21.[16]  Summary judgment should be granted on these claims because the undisputed facts of record show no evidence of interference.

Under New Jersey law, a claim that defendant has prevented or impeded the plaintiff's performance of a contract is governed by § 766A of the Restatement (Second) of Torts.  *See Windsor Sec., Inc. v. Hartford Life Ins. Co.,* 986 F. 2d 655,

---

[16] As the Court has noted, this claim is improperly alleged against SFEM as "Plaintiffs had an existing contract with SFEM, not a potential business relationship."  July 3, 2012 Opinion at 7 (Dkt. 21).

660 (3d Cir. 1993).  Section 766A states:

> One who intentionally and improperly interferes with the performance of a contract … between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Where a defendant is alleged to have tortiously interfered with a plaintiff's prospective or existing economic relationship:

> [… the plaintiff must show] (1) [the] plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference.

*Lightning Lube, Inc. v. Witco Corp.,* 4 F. 3d 1153, 1167 (3d Cir. 1993) (internal citations omitted).

With respect to both Counts I and II, the undisputed evidence of record contradicts Plaintiffs' allegation that Live Nation "block[ed] access to the agencies and the artists" or "pressure[d] those parties … to prevent them from doing business with Plaintiffs."   *See* SOF, Sect. I, *supra* (citing evidence showing that Live Nation never pressured agencies to withhold talent).   In fact, Plaintiffs acknowledged at deposition that they had no evidence to support that allegation. *Id.*   With respect to Count II, contrary to the allegations in the Amended

Complaint, Plaintiffs had no "existing or reasonable expectation" that any of the artists to whom they had made offers would actually perform at the Event. *See* SOF, Sects. H, I, *supra* (citing evidence showing that none of the three potential headline artists had ever agreed to perform at the Event and the reasons for their refusals).[17]

The Amended Complaint alleges that Plaintiffs were unable to procure talent for the Event from AM Only, Windish and WME because the approximately 56 offers they made to artists represented by those agencies were not accepted due to Live Nation's interference and that the headliners "pulled out of the show" after verbally committing to appear.

Evidence produced in discovery, however, shows that this lack of acceptance was due to the fact that the Event conflicted with well-established festivals. For example, most of the artists to whom offers were made, including the three proposed headliners, all performed at the well-established Electric Daisy Carnival in Las Vegas on the same days that Plaintiffs hoped to put on their Event in New Jersey. ***SUMF ¶ 21,*** citing Marx Cert. Ex. 6 (EDC 2011 schedule); Marx Cert., Ex. 3 (Dorfman Dep. at 117:5-9, testifying that he knew EDC was putting on

---

[17] *Cf.* Amended Compl. ¶ 7 (alleging that Tiesto, David Guetta and Steve Angello all "gave every indication that he would perform at the show"); *id.* at ¶ 76 (claiming that Plaintiffs considered the aforementioned three artists "confirmed or in the process of being confirmed"); *id.* at ¶ 80 (claiming that "Plaintiffs had a verbal agreement from Tiesto to perform").

the same kind of event on the same days in Las Vegas).[18]

Plaintiffs themselves had no interactions with AM Only, Windish or WME with respect to the procurement of the headlining and supporting talent for the Event; rather, they relied exclusively on John DiMatteo.  According to Mr. DiMatteo, the three headliners all declined to appear at Plaintiffs' Event for reasons that did not include any alleged "interference" by Live Nation.  Tiesto, for example, decided to play at Electric Zoo over Labor Day 2011.  *See* Marx Cert. Ex. 11 (DiMatteo Dep. at 34:10-12, testifying that "Tiesto's offer was not accepted because … he was going to Electric Zoo."); *id.* at 108:3-109:2 (finding it reasonable that Tiesto's agreement with Electric Zoo prohibited him from playing at Event:  "It happens all the time.").

Similarly, the undisputed facts of record do not support Plaintiffs' contention that the proposed headliners "pulled out of the show" after making initial verbal commitments to appear.  Tiesto's agent, Paul Morris, never agreed that Tiesto would appear at the Event for $400,000.  ***SUMF ¶ 11,*** citing Marx Cert. Ex. 11 (DiMatteo Dep. at 77:3-19, 77:20-22, reiterating that Morris never agreed that Tiesto would appear at the Event).  Likewise, AM Only artist, David Guetta, never accepted Plaintiffs' offer, and his agent, Paul Morris, never agreed that he would

---

[18] Plaintiffs themselves acknowledged that there was considerable overlap between the artists they had wanted for the Event and those who went on to perform instead at EDC in Las Vegas.  ***SUMF ¶ 21,*** citing Marx Cert. Ex. 3 (Dorfman Dep. at 119:4-124:5).

appear at the Event.  *SUMF ¶¶ 13-14,* citing Marx Cert. Ex. 11 (DiMatteo Dep. at 78:2-15).  Nor did Windish artist Steve Angello ever agree to perform at the Event.  *SUMF ¶ 16,* citing Marx Cert. Ex. 11 (DiMatteo Dep. at 82:19-83:2, 83:22-84:14, testifying that his discussions with Angello's agent never got beyond "a back and forth dialogue about the Event" and that Angello was declining the offer).

Plaintiffs acknowledge that they themselves have no evidence to support the allegations of interference.  *See* Marx Cert. Ex. 1 (Barrett Dep. at 79:22-80:5; 82:17-83:15) (agreeing that he has no evidence that Live Nation instructed agencies to withhold talent; that's just what he believes happened).  John DiMatteo, the only member of the "team" who interacted with the talent agencies in connection with the Event (and, thus, the only one with first-hand knowledge) provided no evidence that Live Nation pressured anyone at WME, AM Only or Windish to withhold their artists from the Event.  *SUMF ¶ 22,* citing Marx Cert. Ex. 11 (DiMatteo Dep. at 85:6-14)*.*  Finally, and perhaps most tellingly of all, after serving WME AM Only and Windish with deposition subpoenas, Plaintiffs abandoned that effort, knowing that, if deposed, these entities -- the "targets" of the supposed interference -- would corroborate DiMatteo's admission that Live Nation said or did nothing to cause Plaintiffs' offers to appear at the Event to be rejected.

Thus, the undisputed facts of record demonstrate that, while there are many reasons why the headlining and supporting artists who Plaintiffs needed to appear

at their proposed EDM event did not accept Plaintiffs' offers, these reasons did not include alleged pressure from Live Nation.   Plaintiffs cannot, therefore, show either the "expectation" or the "interference" that their tortious interference with contract and business relations claims require.   Accordingly, Live Nation should be granted judgment on those claims as a matter of law.

### B.   Live Nation Should Be Granted Summary Judgment on Count III (Defamation)

To prove defamation, plaintiff must show, "in addition to damages, … (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting to at least negligence by the publisher."   *Deangelis v. Hill,* 180 N.J. 1, 12-13 (2004).  Here, Plaintiffs can show none of these elements.

Plaintiffs allege that Live Nation: (1) "[i]n meetings with members of SFEM and the [New Jersey Sports and Exposition] Authority, … falsely stated that Plaintiffs associated with 'thieves' and could not be trusted" and (2) "told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM."   *See* SOF, Sect. L, *supra*.  Plaintiffs allege that statements (1) and (2) were made to Dorso on February 18, 2011 and March 7, 2011, respectively.   *Id.*  Plaintiffs allege that these statements caused "the dissolution of [Plaintiffs' SFEM] contract" and also caused them "reputational damage."   *Id.*

34

Plaintiffs have no evidence whatsoever that Live Nation made either of these statements. *See id.*, Sect. L(1), *supra.*

As an initial matter, Dorso denies that anyone from Live Nation ever made the allegedly defamatory statements to him. ***SUMF ¶ 24,*** citing Marx Cert. Ex. 4 (Dorso Dep. at 84:12-16; 86:19-87:3). Even more significantly, the undisputed facts of record establish that, even if Live Nation had made such statements, they would have had no effect on SFEM's decision to terminate Plaintiffs' contract. That decision was made because Plaintiffs failed to comply with the April 1, 2011 deadline to supply a talent roster, not because of any alleged defamatory statements. ***SUMF ¶ 25,*** citing Marx Cert. Ex. 4 (Dorso Dep. at 85:2-7, testifying that "it wouldn't have mattered. I mean, there is a contract in place, and why would any of that matter?").

Plaintiffs' defamation claim also fails because they cannot show damages. *Ward v. Zelikovsky,* 136 N.J. 516, 541 (1994) (declaring that, for a defamation claim, "special damages," defined as "'the loss of something having economic or pecuniary value,'" is "a prerequisite to any recovery") (citation omitted). First, the statements that were allegedly made pre-dated the very contract whose "dissolution" they supposedly caused. *See* SOF, Sect. L (1), *supra.* Given that timing, even if the offending statements were made, the required cause-and-effect relationship between statements and "harm" is lacking. And even if made, the

35

alleged defamatory statements caused Plaintiffs no damages because, as Mr. Dorso explained, they were not the reason that SFEM terminated the Contract. Nor is Plaintiffs' claim of "reputational damage" relevant to this analysis, as "'lowered social standing and its purely social consequences are not sufficient'" to establish special damages. *See Ward,* 136 N.J. at 542 (citation omitted).

Plaintiffs' defamation claim is, thus, completely baseless. Live Nation should be granted judgment on that ill-conceived claim as a matter of law.

## III.   Plaintiffs' Lost Profits Claimed are Barred as a Matter of Law[19]

Even if some or all of Plaintiffs' claims were to survive this motion, well-settled law precludes Plaintiffs from recovering speculative lost profits for a new venture that did not, and would never, turn any profit. Accordingly, to the extent summary judgment is not granted on all of Plaintiffs' claims, the Court should enter an order barring Plaintiffs from attempting to introduce any lost profit evidence.

New Jersey courts adhere to the "new business rule" and do not award lost income damages calculated on the "present value of a future pie-in-the sky" business venture. *Essex Cnty. Vocational Sch. Bd. of Educ. v. New United Corp.,*

---

[19] Plaintiffs have produced an expert report that purports to quantify their alleged lost profits. This motion does not address that report but, rather, is based on legal principles relevant to Plaintiffs' lost profit claim. Should any portion of Plaintiffs' claims survive this motion, Live Nation reserves its right to attack Plaintiffs' expert report on *Daubert* grounds.

36

No. A-1873-12T2, 2014 WL 1356603, at *9 (App. Div. Apr. 8, 2014) (finding trial court correctly refused to award lost income for "present value of a future pie-in-the sky" for real estate development that did not happen); *see also RSB Lab. Svcs., Inc. v. BSI, Corp.,* 368 N.J. Super. 540, 559-60 (App. Div. 2004) ("[U]ntil the Supreme Court says otherwise, the new business rule remains the law in this State."). Simply put, the "prospective profits of a new business are considered too remote and speculative to meet the legal standard of reasonable certainty" necessary to substantiate a claim for lost profits. *Essex Cnty.*, 2014 WL 1356603, at *9 (quoting *Seaman v. U.S. Steel Corp.,* 166 N.J. Super. 467, 468–75 (App. Div. 1979)).[20]

---

[20] *See also Bell Atlantic Network Svcs., Inc. v. P.M. Video Corp., d/b/a Avius,* 322 N.J. Super. 74, 101 (App. Div. 1999) ("Profits which are largely speculative, as from an activity dependent on … on chancy business opportunities, … untested products or entry into unknown or unviable markets, or the success of a new and unproved enterprise, cannot be recovered [; as that] which make[s] a business venture risky in prospect preclude[s] recovery of lost profits in retrospect."); *Gorjuice Wrap, Inc. v. Okin, Hollander & De Luca, LLP*, No. A-4782-08T2, 2011 WL 92957, at *14 (App. Div. Jan. 12, 2011) (dismissing a claim for lost profits as too remote and speculative to satisfy a "reasonable certainty" standard where the plaintiff's "new and unproved enterprise" was a two-year old joint venture that never progressed beyond execution of the contract, had no "operational history," failed to deliver on its contractual obligations, and never earned any profits under the agreement); *cf. Bounanno Revocable Trust v. Franklin Universal Bldg. Corp.*, No. BER-C-394-05, 2006 WL 2947689, at *5 (N.J. Super. Ct. Ch. Div. Oct. 13, 2006) (finding claim for lost profits precluded where there was no showing that the relevant authorities would have approved regulatory filings that were a prerequisite to the proposed improvements giving rise to the claimed lost profits). In addition, courts routinely reject evidence of the profits plaintiffs earned in operating similar businesses, finding such evidence too fact-specific to provide an alternative basis

In short, lost profits are recoverable only "where it is certain that damages have resulted and the evidence affords a basis for estimating the damages with some degree of certainty." *Id.* Here, Plaintiffs' guess as to what Juice Entertainment might have earned had circumstances been different are either too speculative or are irrelevant to estimating recoverable damages.

Plaintiffs cannot demonstrate that they earned, much less lost, any profits, nor have they supplied any evidence that "affords a basis for estimating … [their alleged unearned] damages with some degree of certainty." *Seaman* at 482. Formed in 2009, Juice did not conduct any business prior to obtaining the contract with SFEM. **SUMF ¶ 29**, citing Marx Cert. Ex. 3 (Dorfman Dep. at 176:2-9; 232:8-11; 235:1-236-2). As "a new and unproved enterprise," Juice never produced a profit that could have been lost. *Gorjuice*, 2011 WL 92957, at *14.

---

for calculating the profits a new venture might have earned. *See Weiss v. Revenue B. & L. Ass'n,* 116 N.J.L. 208, 212-13 (1936) (rejecting evidence of operation of similar business in the same city during the same period as a basis for computing lost profits, finding that, because business success "usually depends upon a variety of circumstances," "outcome [for new businesses] is … too uncertain to provide a tangible basis for [lost profits] computation."); *Stanley Co. of Amer. V. Hercules Powder Co.,* 16 N.J. 295, 315(1954) (approving trial court's exclusion of evidence of plaintiff's operation of similar business to determine lost profits, as "other factors (management, cost operation) rendered such evidence irrelevant"); *cf. Seaman v. U.S. Steel Corp.,* 166 N.J. Super. at 482 (because plaintiffs had never operated or rented out the exact type of crane at issue, the Court considered the crane rental "to be a new operation in their business, [for which plaintiffs had no] prior experience [upon which to base] … the floating crane's potential as profit-producing equipment.").

Moreover, Plaintiffs' other professional earnings (or that of any of their collaborators) are too remote and speculative to serve as a basis for computing lost profits. *See Stanley Co. of Amer.* at 315; *Weiss* at 212-15.

Even if such earnings comparisons were an acceptable basis for estimating lost profits, Plaintiffs have produced no evidence to show that they made a profit in any of their other professional ventures. In any event, Plaintiffs cannot show that profits earned in connection with other ventures are at all relevant to estimating unearned Event profits. It is undisputed that:

- The only festival Plaintiffs produced, the Latin Festival, was by all accounts disappointing and Dorfman and Barrett lost money. **SUMF ¶ 28**, citing Marx Cert. Ex. 1 (Barrett Dep. at 23:7-8; 23:14-24:1, testifying that Plaintiffs lost between $5,000 and $10,000 on the Latin festival); Marx Cert. Ex 3 (Dorfman Dep. at 30:4-10; 70:25-71.8; 73:1-5, testifying that "[w]e rushed the event and we actually didn't land an anchor."); *id.* at 81:14-83.8, testifying that "[w]e lost money" and that, of the anticipated 10,000 attendees, only about 1,500 to 2,000 showed up).

- Plaintiffs have no competent evidence of having produced festivals of the magnitude and scale contemplated by the contract with SFEM. **SUMF ¶ 27**, citing Marx Cert. Ex. 1(Barrett Dep. at 273:9-12, testifying that his only previous experience with outdoor music festivals had been as a performer); Marx Cert. Ex. 3 (Dorfman Dep. at 29:9-30:10, testifying that he was not involved with any large scale event festivals prior to 2010); *id.* at 35:1-6, testifying that Dorfman's club events had, at most, 5,000 attendees).

- And, Plaintiffs had no experience contracting with EDM artists -- particularly anchor talent, such as Tiesto, David Guetta or Steve Angello, capable of attracting the kind of attendance they contemplated. **SUMF ¶ 27**, citing Marx Cert. Ex. 1 (Barrett Dep. at 45:20-46:7, testifying that he never had direct communication with, nor did he buy talent through, the three agencies); Marx Cert. Ex. 3 (Dorfman Dep. at 38:16-39:1, testifying that his largest talent contract was $150,000 for Jonathan Peters).

39

In view of these undisputed facts of record, the Court should apply the new business rule and enter an order barring Plaintiffs from attempting to offer any "lost profits" evidence at trial.

## CONCLUSION

For all of the foregoing reasons, Live Nation respectfully requests that its motion for summary judgment be granted and that Plaintiffs' Complaint be dismissed in its entirety and with prejudice.  Alternatively, if the Court denies Defendants' motion for summary judgment, in whole or in part, Live Nation respectfully requests that the Court enter an Order granting partial summary judgment, barring Plaintiffs from offering, at trial, any documentary or testimonial evidence of any supposed lost profits.

Respectfully submitted,

GREENBERG TRAURIG, LLP


By:    /s/ Ian S. Marx
          Philip R. Sellinger
          Ian S. Marx
          GREENBERG TRAURIG, LLP
          500 Campus Drive, Suite 400
          Florham Park, New Jersey 07953
          Attorneys for Defendant
          Live Nation Entertainment, Inc.

Dated:  October 17, 2016