# EXHIBIT 1

# In The Matter Of:

*Juice Entertainment v.*
*Live Nation Entertainment*

*Christopher Barrett*
*Vol. II*
*March 28, 2016*

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*
*reporters@rizmanrappaport.com*

**Min-U-Script® with Word Index**

1

```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW JERSEY
2              CIVIL NO. 11-07518 (WHW) (SCM)

3
       ----------------------------
4         JUICE ENTERTAINMENT,          :
          LLC, THOMAS DORFMAN           :
5         and CHRIS BARRETT,            :
                                        :        DEPOSITION UPON
6             Plaintiffs,               :        ORAL EXAMINATION
                                        :               OF
7             v.                        :         CHRISTOPHER J.
                                        :            BARRETT
8         LIVE NATION                   :
          ENTERTAINMENT, INC.,          :
9                                       :
              Defendant.                :
10     ----------------------------

11

12

13              T R A N S C R I P T  of the

14     stenographic notes of HOWARD A. RAPPAPORT, a

15     Certified Court Reporter of the State of

16     New Jersey, Certificate No. XI00416, taken at

17     the offices of STONE & MAGNANINI, 150

18     JFK Parkway, Short Hills, New Jersey, on

19     Thursday, November 14, 2013, commencing at

20     10:05 a.m.

21

22

23

24

25
```

Barrett - direct

22

1    Q    And when was that?
2    A    Back in February.
3    Q    February of what year?
4    A    2011.
5    Q    Do you know whether Juice
6  Entertainment existed before February of 2011?
7    A    I believe it did.
8    Q    Did you know that at the time?
9    A    Tom said he had -- he had that
10  corporation set up.
11    Q    What discussion did you have in
12  February of 2011 about you becoming a partner in
13  Juice Entertainment?
14    A    Tom and I would be partners.
15    Q    Was that your suggestion or was
16  it his suggestion?
17    A    It was mutually agreed upon.
18    Q    Did you have an understanding of
19  what that meant, to be partners in Juice
20  Entertainment?
21    A    That we would share in the
22  profits and loss.
23    Q    And did you discuss the
24  percentage of shares that you would have?
25    A    No.

23

1    Q    Did you have an understanding as
2  to what percentage you would have?
3    A    Tom and I had worked together for
4  a long time. At the end of the day after every
5  event, usually we would square up and we had no
6  problems. We had a good trust issue.
7         2010 I had the contract with the
8  Meadowlands with my corporation, and --
9    Q    Is that called Base Productions?
10    A    Yes.
11    Q    Okay.
12    A    An unwritten rule, kind of like a
13  silent partnership.
14    Q    How did you split -- did Base
15  Products recognize a profit in connection with
16  the 2010 Latin festival that was put on at the
17  State Fair?
18    A    No.
19    Q    Did it have a loss?
20    A    Yes.
21    Q    What was the amount of the loss?
22    A    Couldn't recall today.
23    Q    Was it more than $5,000?
24    A    Yes.
25    Q    Was it more than $10,000?

24

1    A    Not to my recollection.
2    Q    Did you share equally in that
3  loss?
4    A    I believe so.
5    Q    And did you have an expectation
6  as to what percentage of profits you would share
7  in any event that Juice Entertainment put on at
8  the State Fair in 2011 and beyond?
9    A    It all depends on the outcome,
10  how much everyone put forward, you know, how
11  much money was raised and what would happen. I
12  did expect a profit.
13         At the end of the day me and Tom
14  would split a dollar when it was left over.
15    Q    What does that mean, you would
16  split a dollar?
17    A    Well, you know, if there is $10
18  in gross, $9 in expenses, Tom would have 50
19  cents, I would have 50 cents.
20    Q    Your understanding was that you
21  would split 50/50 in the net profits that Juice
22  Entertainment would derive from events at the
23  State Fair?
24    A    Yes.
25    Q    Do you know whether Mr. Dorfman

25

1  shared that view?
2    A    It was never really discussed in
3  detail. We always, you know, like I said,
4  worked everything out.
5         Him and I had a trust thing, and,
6  you know, at the end of the day, you know, we
7  would go over everything. If he laid out more
8  money or anything, we would just break it down.
9    Q    Did it ever occur to you that it
10  would be prudent to reduce your agreement to
11  obtain an interest in Juice Entertainment in
12  writing?
13    A    Yes, it did.
14    Q    When did that occur to you?
15    A    Well, it was discussed, you know,
16  it was going to happen.
17         Then I guess the reason why it
18  didn't happen is everything, you know, after
19  your client interfered, went to shit.
20         Excuse my language.
21    Q    So you and Mr. Dorfman discussed
22  reducing your agreement with him to obtain an
23  interest in Juice Entertainment. You discussed
24  that with Mr. Dorfman and it was contemplated
25  that you would reduce your agreement to writing?

Barrett - direct

12 (Pages 42 to 45)

```
                                                     42
1    A    Correct.
2    Q    Do you think that you and
3  Mr. Dorfman had the same knowledge of the events
4  concerning the State Fair?
5    A    Yes.
6    Q    I'm not asking you to read his
7  mind, obviously. But to the best of your
8  knowledge, did you yourself share with
9  Mr. Dorfman everything that you were doing and
10 that you were learning concerning the event?
11   A    Yes.
12   Q    Was it your expectation that
13 Mr. Dorfman was doing the same with you?
14   A    Yes.
15   Q    Would you have any reason to
16 believe that Mr. Dorfman did share everything
17 with you and that you had learned with you?
18   A    That would be my belief.
19   Q    As I understand it, and based on
20 your testimony, I believe it to be true, that
21 Mr. DiMatteo was the one responsible for booking
22 talent. Did I understand that correctly?
23   A    Yes.
24   Q    Am I correct --
25   A    In respect, John DiMatteo was
```

```
                                                     43
1  booking talent for the electronic dance music.
2  That's the event that we are talking about here,
3  not the full contract with Juice Entertainment.
4    Q    Okay. I appreciate that.
5    A    I wanted to clarify that for you.
6    Q    I appreciate the clarification.
7         Were there other people on the
8  team who were responsible for booking talent
9  with respect to any other nonelectronic dance
10 aspects of the State Fair contract?
11   A    I was working on that,
12 Mr. Dorfman worked on that, Mr. Sachs,
13 Mr. Potter and John Sandberg all had made
14 attempts to book talent outside of the
15 electronic dance event first. Subsequent events
16 followed.
17   Q    And just can you tell me what
18 those events were? We'll talk more about them
19 later.
20   A    There was a planned hip hop
21 concert, a Latin festival, a rock festival, a
22 pop concert. Teen events were discussed. A
23 wrestling/mixed martial arts event and a college
24 fair.
25   Q    Now, with respect to the
```

```
                                                     44
1  electronic dance event, am I correct in
2  understanding that John DiMatteo was the one who
3  was making the offers to the talent to appear at
4  that event?
5    A    Yes, the majority.
6    Q    And thus, as to those artists to
7  whom he had made the offer on Juice's behalf, he
8  was the one getting the responses from those
9  agents?
10   A    Correct.
11   Q    Why did you qualify your answer
12 as to the majority? Were there artists to whom
13 offers were made by Juice Entertainment to
14 appear at the electronic dance event that were
15 not made by Mr. DiMatteo?
16   A    As I stated earlier, Alan Sachs,
17 towards the end of our contract, made offers.
18   Q    Okay.
19        What do you mean by towards the
20 end?
21   A    The preliminary offers for the
22 heavy hitting electronic dance music event we
23 were producing, John DiMatteo made those offers.
24 In a last ditch attempt to save our contract,
25 Alan Dorso reached out to smaller agencies to
```

```
                                                     45
1  book talent.
2    Q    Do you mean Alan Sachs?
3    A    Yes.
4    Q    Okay.
5         So this would have been towards
6  April 2011?
7    A    Correct.
8    Q    Okay.
9    A    There may have been an offer or
10 two sent out by Paul Potter. There may have
11 been an offer sent out by Mr. Dorfman. I can't
12 say for certain.
13   Q    Have you ever been a buyer of
14 talent?
15   A    Yes.
16   Q    In what capacity? When? Can you
17 tell me about that?
18   A    I have booked deejays to perform
19 events.
20   Q    Have you ever bought talent
21 through William Morris endeavors?
22   A    No.
23   Q    Have you ever bought talent
24 through AM Only?
25   A    No.
```

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC

Barrett - direct

13 (Pages 46 to 49)

46

1  Q  Have you ever bought talent
2  through the Wind Dish agency?
3  A  No.
4  Q  Have you ever had any direct
5  communications with anybody from any of those
6  three agencies?
7  A  Not to my recollection.
8  Q  Who is Melissa Francis?
9  A  She was the secretary for Wagner
10 Mateo.
11 Q  And what is Wagner Mateo?
12 A  Wagner is the owner of the
13 company that produced the concert with us in
14 2010.
15 Q  And are you aware of where Wagner
16 Mateo is located?
17 A  In Belleville.
18 Q  What is Wagner Mateo?
19 A  A person.
20 Q  Oh, Wagner Mateo -- I thought it
21 was a company called Wagner/Mateo or Wagner
22 hyphen Mateo. It sounded like a law firm.
23 A  Oh.
24 Q  Wagner Mateo is a person who
25 lives in Belleville. Okay.

47

1  Is it a he?
2  A  It's a he.
3  Q  He's involved in the music
4  industry in some fashion?
5  A  Yes, he is.
6  Q  How so?
7  A  He produces events.
8  Q  What kinds of events?
9  A  Latin.
10 Q  Melissa Francis works for
11 Mr. Mateo?
12 A  Correct.
13 Q  Do you have an office address or
14 any other contact information for Wagner Mateo?
15 A  Not off the top of my head.
16 Q  Do you think you have it in some
17 kind -- either in your phone or -- I would like
18 to have that if you have it.
19 A  If possible.
20 Q  Would you agree to look for that
21 in a break and give it to me?
22 MR. SIEGAL: He'll agree to look.
23 A  I'll agree to look.
24 Q  Have you worked with Melissa
25 Francis in connection with that Latin event in

48

1  2010?
2  A  Yes.
3  Q  Have you work with Melissa
4  Francis other than that event?
5  A  No.
6  Q  Have you worked with Melissa
7  Francis since the 2010 Latin event?
8  A  No.
9  Q  Have you spoken to her since
10 then?
11 A  No.
12 Q  Who is Evan Karfinkle?
13 A  The owner of EK Productions.
14 Q  What is EK Productions?
15 A  An event company.
16 Q  Have you and/or Juice
17 Entertainment worked with EK Productions?
18 A  I've worked with EK Productions.
19 Q  What capacity and when?
20 A  As an independent contractor on
21 and off since 2003.
22 Q  Where is EK Productions located?
23 A  Staten Island.
24 Q  And have you worked with EK
25 Products since the beginning of 2011?

49

1  A  Yes.
2  Q  What have you done with EK
3  Productions since then?
4  A  Deejay.
5  Q  When was the last time that you
6  did anything with EK Productions?
7  A  Last month.
8  Q  So, again, do you think you have
9  contact information on where I can find EK
10 Productions?
11 A  I think I have contact
12 information.
13 Q  I'm going to make the same
14 request. You can talk to Mr. Siegal, but I
15 would like to have that contact information.
16 You don't have to tell me now if you don't want
17 to.
18 A  All right.
19 Q  Who is Eric Ortenz?
20 A  Eric Ortenz is a business
21 associate of Mr. Dorfman.
22 Q  Do you know what kind of business
23 they have done?
24 A  Electronic music production.
25 Q  Does he do business through a

Barrett - direct

21 (Pages 78 to 81)

78

1  that?
2      A    It was pretty obvious, you know,
3  gold is the most valuable asset.  If you come to
4  me with it I won't take it, because that was
5  going to happen.
6      Q    Did you interpret that as meaning
7  he wouldn't do business with you in the future?
8      A    Absolutely.
9      Q    Did you interpret that as being
10 the consequence of what Live Nation told him on
11 February 18th?
12     A    That's my best information.
13     Q    Did he ever tell you that he did
14 not wish to do business with you in the future
15 because of what Live Nation told him?
16     A    No, those words exactly, no.
17     Q    Do you know whether Mr. Dorso
18 ever told that to Tom Dorfman?
19     A    Best of my recollection.
20     Q    Mr. Dorso told that to
21 Mr. Dorfman, Mr. Dorfman would have told you?
22     A    Yes.
23     Q    So the danger in going back in
24 time to have that dialogue about Al Dorso is
25 that I don't think I remembered your response to

79

1  my question about William Morris, for which I
2  apologize.
3          Is it your contention that Live
4  Nation interfered with your relationship with
5  William Morris?
6      A    Correct.
7      Q    How so?
8      A    They told Mr. Dorso that William
9  Morris belonged exclusively to Live Nation, and
10 nobody is getting any talent, to my face Jason
11 Miller and John D'Esposito said that they spoke
12 to the agents, they don't have any talent and we
13 are not getting any.
14         That will cover William Morris.
15 It will cover them and the Wind Dish agency as
16 well, those statements they were making to us.
17         In that conversation they were
18 discussing artists and respective agencies they
19 belonged to, and they said, you know, in
20 particular you don't have this one, you don't
21 have that one, you're not getting it.
22     Q    Did Mr. Miller or Mr. D'Esposito
23 say that they, Live Nation, was instructing
24 William Morris, AM Only or Wind Dish, to
25 withhold talent from you?

80

1      A    They didn't specifically say
2  that, no.
3      Q    Do you believe that that's what
4  happened?
5      A    Yes.
6      Q    What is the basis for your
7  belief?
8      A    When somebody threatens you to
9  your face, telling you they are calling the
10 agents, and to counterpart, you know, I came to
11 the conclusion that they were contacting the
12 agencies telling them not to work with us, not
13 to release talent.
14         In fact, after the March 3rd
15 meeting, the effects of their threat --
16 actually, after February 18th, back further, it
17 was felt immediately.  All the offers that we
18 had out were, you know, lingering, nothing was
19 coming back.
20         They made the threat, and it's my
21 position they went through with it.
22     Q    During the meeting that you had
23 with Mr. Miller and Mr. D'Esposito, did they
24 tell you that they had spoken with agents who
25 told them that there were no firm dates in place

81

1  and that Live Nation was instructing agents not
2  to provide dates to you?  Or was it just the
3  first part?
4          MR. SIEGAL:  Objection, form.
5      Q    Did you understand the question?
6      A    I understand the first part, not
7  the second.
8      Q    Okay.
9          Did Mr. Miller or Mr. D'Esposito
10 say they made calls to agents to find out
11 whether you had dates?
12     A    What they said was -- this is the
13 best of my recollection -- Jason Miller
14 specifically said, I spoke to the agents.  You
15 do not have talent and you are not going to get
16 any.
17         They told us -- I remember now.
18 They told us to kick out John and Vito, and if
19 we didn't kick out our partners we weren't going
20 to get talent.  And further, we wouldn't get
21 ticketing.
22         Those were specifics.  It was
23 very hostile.
24     Q    Okay.
25         So tell me if I'm right or wrong

Barrett - direct

22 (Pages 82 to 85)

82

1  here. I'm not trying to mischaracterize
2  anything that you said.
3          My question is, what evidence do
4  you have that Live Nation interfered with
5  William Morris, AM Only and Wind Dish by
6  blocking your ability to get talent from those
7  agencies?
8          My question is, what evidence do
9  you have? My understanding of your testimony is
10  that you heard Live Nation made threats.
11      A    Yes.
12      Q    You have no direct evidence --
13      A    I want to just ask, direct
14  evidence as in direct knowledge or material? I
15  want you to be specific.
16      Q    That's a very fair question.
17          Do you have any direct evidence?
18  Do you have any firsthand knowledge that Live
19  Nation carried through on the threat that you
20  believe Live Nation made?
21      A    I don't have any direct evidence
22  that they carried through with the threat.
23      Q    By direct evidence, I mean did
24  anybody from any of the agencies tell you, or
25  anybody else to your knowledge, that Live Nation

83

1  had blocked the talent?
2      A    None of the agents exercised that
3  information to me.
4      Q    Did anybody from Live Nation ever
5  tell you that Live Nation had carried through on
6  the threat?
7      A    Not to my recollection.
8      Q    Have you seen any documents that
9  would corroborate your belief that Live Nation
10  carried through on a threat to block talent from
11  the three agencies?
12      A    Have I seen any documents?
13      Q    Yes, did you ever see any
14  documents?
15      A    No.
16      Q    So that is what I would consider
17  direct evidence, either you hearing somebody say
18  something, witnessing it or seeing documents.
19  We can quarrel whether documents would even
20  constitute direct evidence.
21          But have you seen any of the
22  evidence that I just described?
23      A    There has been communication that
24  Live Nation carried through on its threats.
25      Q    What communication are you

84

1  talking about?
2      A    Communication between Kelly Cobb
3  and Tiesto that was transmitted to me through
4  John DiMatteo.
5      Q    I'll let you tell me all about
6  that, but I just want to make sure, is there any
7  other evidence that you are aware of that would
8  corroborate your belief that Live Nation carried
9  through on a threat to block talent from being
10  obtained through the three agencies?
11      A    No.
12      Q    Okay.
13          The evidence you are talking
14  about with Kelly Cobb, who does that relate to?
15      A    Tiesto.
16      Q    What is your belief that there is
17  some evidence there that corroborates that the
18  threat had been carried out?
19      A    Communication that both Vito and
20  John had told me, a conversation they shared,
21  that Kelly Cobb spoke with --
22      Q    Who is Kelly Cobb?
23      A    Kelly Cobb is Tiesto's road
24  manager.
25      Q    Okay.

85

1      A    The story he carried out, he told
2  Tiesto something about Kelly being aggravated
3  with Tiesto because he had, and I quote, excuse
4  the language, fucked John DiMatteo and himself
5  by not doing our festival.
6          Kelly specifically asked Tiesto
7  if it was because of Live Nation.
8          And Tiesto nodded his head up and
9  down signifying yes.
10      Q    Okay.
11          Who told you that story, John and
12  Vito?
13      A    John and Vito.
14      Q    Were John or Vito present during
15  this interchange between Kelly Cobb and Tiesto?
16      A    No.
17      Q    So how did John and Vito get that
18  version of the story?
19      A    It was communicated to them
20  through Kelly Cobb.
21      Q    Okay.
22          Did you ever speak to Kelly Cobb
23  about this incident?
24      A    Yes.
25      Q    When?

Barrett - direct

42 (Pages 162 to 165)

162

1    Q    And what would be the maximum?
2    A    The maximum number of gigs you
3  can take in a year? I really can't answer that
4  question.
5    Q    What is the most you ever heard
6  somebody do in a year?
7    A    The most I ever heard? Some guys
8  will work, you know, two, three days, four days
9  a week. Back in 2003 you could see five days a
10  week.
11    Q    Why do you keep referencing 2003?
12  Is that sort of like the golden age of something
13  or other?
14    A    Like -- the circuit pops off,
15  goes underground, pops off, you know, it goes in
16  a circuit constantly. There is a wave that you
17  have to catch, you know. And in those years,
18  the late '90s into 2003, 2004 you had a really
19  good run, so you can pick up -- a deejay can
20  pick up five electronic dance musics in a week.
21       That waive has recession. In my
22  opinion, like that 2005, 2006, me and Tom took a
23  stab and we created an electronic dance music
24  party at a time when it was at its low, and it
25  seemed to be an extreme success.

163

1       Then it went into a little bit of
2  a lull again, and we saw the rise coming, a big
3  interest in festivals, and this electronic dance
4  craze was coming back. That's what led us to
5  get involved in the venture in the first place.
6       So if you want to have that, you
7  want me to compare when something is at its
8  peak? 2003, that era, was there -- 2011 --
9  maybe not '11, we are working our way up that
10  boom, and it hit, you know, 2012, '13.
11       So if you jump on that wave, you
12  can ride that.
13    Q    In your experience is the
14  phenomenon you just described, where there is
15  like a peak and a trough, or like a wave,
16  correlated to anything in the economy or
17  anything that you can put your finger on as to
18  when dance music is going to be hot and when
19  it's not going to be hot?
20    A    I don't think there is any sort
21  of -- anything economically. Maybe now, today I
22  can, because of all the people that are trading
23  on the stock market. You can make a calculated
24  guess today.
25    Q    I wasn't trying to pin it to the

164

1  stock market.
2    A    I'm giving you an example.
3    Q    Right.
4    A    So economically, the point to
5  it --
6    Q    Is there anything you can point
7  to that would be an indicator of whether the
8  dance music market is going to be hot or cold?
9    A    The rise in attendance at the
10  dance music festivals, you know, you have these
11  big ones going down in Florida, Ultra is
12  growing, and just everybody was talking about
13  EDM.
14       I guess we are back to seeing
15  what's going on in front of your face. You
16  can't find an economical document that
17  electronic dance music is in a scene. When you
18  are in the scene, you are communicating with
19  people, you know the music. It is a whole
20  culture in and of itself. You have to live it
21  to really experience it. You have to be
22  involved.
23       Electronic dance music is my
24  passion, it was my joy, and I was involved with
25  the people and we saw the wave.

165

1       Just watching what was going on
2  in Europe, people I met in school, you know, to
3  always talk about how big the electronic dance
4  music is in Europe.
5       You look at Electric Daisy over
6  on the West Coast, you look at Ultra down in
7  Miami. You see the Electric Zoo pop up on
8  Randall's Island, people take boats there and
9  they have a huge turnout.
10       The signs are there. The writing
11  is kind of on the wall. To point to people and
12  economic data, I really can't pinpoint something
13  for you and say this is it, this is the end all
14  and be all.
15    Q    I get it.
16       Turning back to the 2011 event, I
17  want to talk for a minute about the financing
18  that your team had in place to put on the event.
19    A    Yes.
20    Q    So can you tell me about the
21  financing that was available for the electronic
22  dance aspect of it?
23    A    The electronic dance music event,
24  we had Vito Bruno going to fund up to
25  $2 million.

Barrett - direct

174

1    A    Yes, I have.
2    Q    What is it?
3    A    It's an e-mail from Al Dorso.
4    Q    Did you send this to Al Dorso on
5    that date?
6    A    Yes.
7    Q    And why?
8    A    Yes, what was --
9    Q    What was purpose of this e-mail?
10    A    Yes.
11    Q    The subject was Cream Fields. Do
12    you know why you used that as a subject?
13    A    Yes.
14    Q    Why did you use that?
15    A    Because Paul Potter had told us
16    that Cream Fields had expressed an interest in
17    our venue and wanted information on it.
18    Q    And you are asking Mr. Dorso to
19    provide that information so you can provide it
20    to Mr. Potter?
21    A    Yes.
22    Q    Okay.
23    A    That's the essence of the e-mail.
24    Q    Right.
25        You tell Mr. Dorso -- I'm reading

175

1    here from the end of the sentence on the second
2    line of your e-mail.
3        "The sooner we have this
4    information the better position we will be in to
5    lock in the talent needed to insure the success
6    from year one. The premier artists are being
7    scheduled now. The time is of the essence."
8        Did I read that correctly?
9    A    Yes, you did.
10    Q    Was it your understanding that
11    premier artists were setting their schedules for
12    June of 2011 when you wrote this e-mail to
13    Mr. Dorso on October 15, 2010?
14    A    From what Paul Potter had
15    reported to me, it was his belief that during
16    that time frame major artists would be setting
17    up their calendar. He said if we can get
18    something firmed up before the holidays, that
19    it -- that that would be the best case scenario.
20    Q    And you believed what Mr. Potter
21    told you?
22    A    Yes, I did.
23    Q    Which is why you sent the e-mail
24    to Mr. Dorso, correct?
25    A    Correct.

176

1    Q    You mentioned premier artists.
2    What did you mean by that?
3    A    Premier artists, deejays.
4    Q    What was the relevance of the
5    deejay to your event?
6    A    The deejay is to bring in the
7    crowds.
8    Q    You were planning to put on a
9    two-day event in June 2011, correct?
10    A    Correct.
11    Q    How many premier artists did you
12    think you needed to have in order to make the
13    event successful?
14    A    A handful.
15    Q    Can you be more specific?
16    A    You need an anchor each day and
17    then supporting acts. You would have your A
18    list artist and then you have B, C and D. You
19    need an anchor each day.
20    Q    I'm going to give you a list that
21    might help us have this discussion a little bit
22    more concretely.
23        (Exhibit marked for
24    identification CB-4, E-Mail with attachments.)
25    Q    I've handed you what we marked as

177

1    exhibit CB-4, a four-page document that we
2    received from your lawyers in discovery in this
3    case.
4        (Exhibit handed to the witness.)
5    Q    It looks to me to be an e-mail
6    from you to Paul Potter dated November 27, 2010
7    with a subject, "Re suggested line up,
8    Meadowlands."
9        Is this an e-mail that you sent
10    to Paul Potter on that date?
11    A    Let's see, from Chris to Paul
12    Potter, yeah, yes. It is just on the face, it
13    seems like an e-mail from him to me and from me
14    to him. It's confusing. From Potter to me, and
15    the bottom me to him.
16    Q    And after the cover page there is
17    a list of artists broken into several tiers, and
18    would looking at this list help us in our
19    discussion about headliners?
20    A    Yes.
21    Q    And anchors?
22    A    Yes, as I call it.
23    Q    Did you prepare this list?
24    A    Yes.
25    Q    When did you prepare it?

Barrett - direct

48 (Pages 186 to 189)

---

186

1  out December 2nd, or I could have met with him
2  on November 24th or 25th.
3      Q   Mr. Potter, on the top of the
4  page, on November 26th sends what I take to be a
5  reminder, tell me if I'm wrong. A couple of
6  days later he says, "Guys, we need to get the
7  rest of these together. Time is ticking." He
8  includes five exclamation points.
9          Did I read that and describe that
10 correctly?
11     A   I can say you described it
12 correctly -- you read it correctly.
13         How did you describe it? Can you
14 say that again?
15     Q   I just described the five
16 exclamation points.
17     A   I can confirm that the words that
18 you spoke and the exclamation points are on the
19 paper.
20     Q   Was Mr. Potter expressing to you
21 the need to act urgently during the time frame
22 to get things lined up?
23     A   Yes.
24     Q   Okay.
25         Did he explain to you why he

---

187

1  thought it was so urgent that things get squared
2  away at that time frame?
3      A   As he told me, he believed that
4  people went on holiday.
5      Q   Do you know what he meant by
6  that?
7      A   I guess on vacation.
8      Q   Did he say when he thought the
9  holiday would start?
10     A   December.
11     Q   Did he explain to you what he
12 thought would happen if talent wasn't booked by
13 December?
14     A   He never confirmed or denied the
15 availability of the talent beyond any set date.
16     Q   Well, did he indicate to you that
17 he thought if you didn't book the talent by some
18 point before Christmastime, it would not likely
19 be that you were going to be able to book the
20 talent that you wanted to appear at your event
21 in New Jersey in July?
22     A   He was urging us to get moving
23 and to start making offers to these agents.
24     Q   How did your team react to
25 Mr. Potter's sense of urgency?

---

188

1      A   Tom wanted to get the engagement
2  letter, get something in writing before he put
3  the project out there.
4      Q   What do you mean by the
5  engagement letter?
6      A   What do I mean by the engagement
7  letter? Can you be more specific?
8      Q   Is that the letter that Al Dorso
9  signed on December 1st, 2010?
10     A   Yes.
11     Q   Or is it something else?
12     A   That was that letter.
13     Q   Did Tom believe that until you
14 had that letter, you couldn't do what?
15     A   Tom and I shared the belief, but
16 not to the extent, was afraid of soliciting
17 business until we had the deal locked in place,
18 at least an engagement letter. He's fearful
19 that a company would come along and take it
20 right from underneath us.
21     Q   So your view, Tom's view --
22     A   I shared it.
23     Q   -- that you somewhat shared,
24 despite the fact that Mr. Potter believed the
25 clock was ticking, you needed to get moving, you

---

189

1  needed to make offers, you needed to line up
2  financing, you couldn't do anything public along
3  those lines until after you got something in
4  writing from Al Dorso?
5      A   Correct.
6      Q   You didn't get something from Al
7  Dorso until December 1st, 2010?
8      A   Correct.
9      Q   Were you trying to get that from
10 Al Dorso before December 1st, 2010?
11     A   Yes.
12     Q   When did you start trying to get
13 something in writing from him?
14     A   We met with Al Dorso at some
15 point in time in October face to face and we
16 discussed the project, and we told him what we
17 were doing, what our intentions were and what we
18 would like to do.
19         Tom explained over and over
20 again, repeating himself, that once this gets
21 out there, people are going to come through with
22 money bags.
23         Mr. Dorso said, my word is gold.
24 You can have my signature on the contract. You
25 can go out and book the talent. This deal is

---

Barrett - direct

198

1  I can tell you Tom had somebody
2  interested right around there.
3  Q  As of the time that you sent this
4  text chat, the Google chat with Mr. Potter, was
5  anybody lined up, actually, who had committed to
6  financing?
7  A  I can't say because I don't
8  remember, you know, what the outcome exactly
9  was.
10  Q  There is only two groups who ever
11  did commit, correct?  That is the Chiasullos and
12  Mr. Bruno?
13  A  Three, Aventura, specifically two
14  members and their manager, not the whole band,
15  committed to provide funding for our event.
16  Q  Okay.
17  With respect to the electronic
18  music there were only two, the Chiasullos and
19  Mr. Bruno?
20  A  Correct.
21  Q  And they had not committed as of
22  December 17th?
23  A  Correct.
24  Q  Right.
25  Who is the one that was in the

199

1  hot seat?  Was that either Chiasullo, Bruno or
2  someone else?
3  A  It was someone else.
4  Q  Who is that?
5  A  As I told you, I don't remember.
6  There were several people, but it was a contact,
7  again, that Tom had previous relationships with,
8  that he was interested in funding a nightclub,
9  concert event.
10  Q  Do you know that person's name?
11  A  I don't remember.
12  Q  Do you know the name of anybody
13  who, as of December 17th, would have been in
14  discussions, who were close to committing to
15  provide financing?
16  A  I can't say on December 17th that
17  I remember the names, but I know names of people
18  who were interested in funding.  I can't say
19  this is the one that I'm referring to here.
20  Q  What are the names of some of the
21  people who were interested in funding?
22  A  There is a guy named Izzy --
23  Q  Okay.
24  A  -- who Tom had done business
25  with.

200

1  The other gentleman's name was, I
2  think it's Mike.  There are several others that
3  I just don't recall.
4  Q  Do you know the last name of Izzy
5  or Mike?
6  A  I don't know.  These are Tom's
7  contacts.
8  Q  And do you know where they live?
9  A  I would guess New Jersey.
10  Q  Anything more specific than that?
11  A  No.  I didn't meet them.  I
12  wasn't privileged.
13  I guess I'll step back.  I can
14  tell you people I met with.  I wish I remembered
15  the guy's name, but he's -- he plays with the
16  Philadelphia Eagles.  There were other athletes
17  that Tom dealt with on a regular basis.  They
18  would go to all his parties and clubs.  He kept
19  those relationships real tight, and I wasn't
20  privied to any meetings that he had with any of
21  them.  I just remember him mentioning that in
22  the interim.
23  MR. MARX:  Mark the next exhibit.
24  (Exhibit marked for
25  identification CB-8, String of e-mails dated

201

1  January 26, 2011.)
2  (Exhibit handed to the witness.)
3  Q  Mr. Barrett, I'm going to ask you
4  to continue reading what we marked as exhibit
5  CB-8, a one-page document provided to us by your
6  attorneys in connection with discovery in this
7  case.
8  It looks like it's a couple of
9  e-mails.  The one on the top looks like it's
10  from Mr. Sandberg to you dated 1-26-2011, and
11  the subject is "Re conservative."
12  Have you seen this before?
13  (Pause.)
14  A  I believe so.
15  Q  Starting down at the bottom it
16  looks like earlier in afternoon on January 26th
17  Mr. Sandberg writes you an e-mail talking about
18  being with his partner, going over the numbers,
19  telling Tom he will free himself in the
20  afternoon to meet in his office.  Then
21  Mr. Sandberg is telling you, "Very important,
22  let's get this done now.  I have a bar in
23  Boonton.  I talked my partner to letting him run
24  it."
25  Do you know what he's talking

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC

Barrett - direct

206

1  A    Okay.
2  Q    My first question is, have you
3  seen this document before?
4  A    Yes, I have.
5  Q    Okay.
6  And I think that it may help you
7  place the date of the -- strike that.
8  Why was Vito Bruno sending this
9  e-mail to you with the subject, "Red line
10 agreement. Please approve and review. Thanks."
11 Capital V.
12 A    The day after we met with him I
13 sent Vito an agreement, another version of this
14 joint venture.
15 He went through it, or his
16 attorney went through it, red lined it and sent
17 it back.
18 Q    What is the meeting that you are
19 referring to now?
20 A    The meeting that we had at the
21 Grand Lux cafe when we agreed to partner.
22 Q    And this is a meeting attended by
23 who?
24 A    It was myself, John DiMatteo,
25 Bruno and Vito, Brian Ortega, Thomas Dorfman and

207

1  Alan Sachs. Yeah, Brian was there actually.
2  Q    Who is Brian?
3  A    Brian works with John.
4  Q    John DiMatteo?
5  A    John DiMatteo.
6  Q    Okay.
7  When did the meeting take place?
8  A    Like I said, on or about
9  June 26th, somewhere in that time.
10 Q    January 26th?
11 A    Yes.
12 Q    Where was this, the Cafe Lux?
13 A    Yes.
14 Q    Where is that?
15 A    The Grand Lux in Paramus.
16 Q    Was that the first time that you
17 discussed the potential of partnering with Vito
18 and John?
19 A    No.
20 Q    When did you guys first start
21 talking about that?
22 A    Alan had presented it several
23 times to myself and Tom. He said, these guys
24 are planning it. We can go ahead and sit down
25 and talk with them and join them together or

208

1  not.
2  Tom had, I guess, an existing --
3  I call it a bad taste in his mouth from doing
4  business with John DiMatteo. Tom had approached
5  John at an event. I believe Tom believes he had
6  a deal with, a ton of pictures, you know, kind
7  of put him on to it, then John DiMatteo went and
8  produced the event and didn't include Tom.
9  There was a bit of, I'll call it
10 a bad taste.
11 I spoke with Tom about it for
12 some time. I said, John is the guy if you want
13 Tiesto, you know, let's sit down and talk to
14 him.
15 That was the previous time. And
16 then I think what really pushed it is when Pasha
17 called Alan and said, hey, we are here with
18 Electric Daisy.
19 We said, hey, let's sit down and
20 meet face to face tonight.
21 Q    And the purpose of the
22 face-to-face meeting was to do what?
23 A    To discuss the plans each party
24 had.
25 Q    And did you reach an agreement at

209

1  that meeting at the Grand Lux?
2  A    We did.
3  Q    What are the terms of that
4  agreement?
5  A    That we would partner 50/50 in
6  profits and losses.
7  Vito said he had $2 million to
8  fund the project. He would fund the entire
9  event. He would do it however we wanted to.
10 Q    Was there more to the agreement
11 than that, or was that it?
12 A    More to the agreement?
13 Q    Yes.
14 A    I can discuss the meeting in
15 detail.
16 Q    I just want to know, end of the
17 day --
18 A    At the end of the day Vito
19 offered to fund the whole event.
20 Q    Why was Vito offering to fund the
21 entire event, but allowed you to have 50 percent
22 of the profits?
23 A    I mean, if you want his opinion
24 you have to ask him. If you want what he told
25 me, it was -- he said that he would fund the

Barrett - direct

54 (Pages 210 to 213)

**210**

1  event, and whatever expenses he had, the money
2  he laid out would have to be reimbursed to him
3  off the top. He would get paid his money back
4  first and, you know, if we wanted to invest
5  money, that's fine, you know, whoever invested,
6  whatever their portion of the money was, it's a
7  business deal, the expenses would be returned
8  first and the profit would be split at the end
9  of the day.
10     Q     So I have an understanding,
11  Vito's initial money, to the extent he provided
12  any for the financing of this event, would be
13  first paid out of proceeds as an expense, right?
14     A     No. It would be returned to him
15  first before the 50/50 or anything.
16     Vito lays out $2 million for the
17  event, you know, event cost $2 million. He lays
18  out that money. Four million dollars is laid
19  out.
20     So you got $4 million sitting in
21  the pot. Before anything, Vito gets his
22  $2 million back, one million goes to Vito and
23  John, a million goes to our part. That was the
24  understanding.
25     Q     That was the agreement that you

**211**

1  reached?
2     A     Yes. He said if you want to do
3  it that way. He said, I'm doing this event
4  somewhere else and it costs a heck of a lot more
5  money. They didn't have a fence line, they
6  didn't have any logistics set up.
7     We had a turnkey operation as the
8  project that we were doing. They were ecstatic
9  over this. They asked us so many times, you
10  know, how did you get such a turnkey operation,
11  such a good deal?
12     Q     So did Vito commit to providing
13  $2 million? Or was it up to $2 million? Or was
14  it something else?
15     A     He said, I have $2 million. I
16  can fund the whole thing.
17     Q     Okay.
18     The day after that meeting you
19  sent Vito a document --
20     A     A document, most likely the day
21  after. If we are getting technical, it could be
22  a day or two, but it was in that realistic time
23  frame.
24     Q     Was it your intention that that
25  document would capture the terms of the

**212**

1  agreement that you reached at the Grand Lux?
2     A     No. Actually, I just told him
3  that I had an agreement already typed up. My
4  attorney had given me documents in the past, I
5  said, I can send it over to you as joint
6  venture.
7     I guess we were discussing maybe
8  opening up one corporation just for that event,
9  you know, for that specific purpose, you know,
10  or doing a joint venture between the two.
11     After that it wasn't -- I can't
12  really remember, but I remember those types of
13  things. What I sent to him wasn't exactly a
14  hundred percent of the reflection of the
15  relationship, you know, because it was just a
16  draft, sort of a document a lawyer created, and
17  we were going to work on it and go back and
18  forth.
19     Q     Well, what was the most important
20  part of the relationship, the agreement that you
21  reached with Vito and John at the Grand Lux that
22  day from your perspective?
23     A     The most important part --
24     Q     Yes, the thing that you came away
25  from that meeting pleased to having obtained

**213**

1  from Vito and John.
2     A     Tiesto.
3     Q     So for you the best part of that
4  meeting was I'm collaborating with Vito and
5  John, that means I can get Tiesto?
6     A     You asked me one specific thing.
7  The best thing that came out of that meeting was
8  that when we sat across from them, they said we
9  are doing this thing. We have Tiesto and David
10  Guetta ready for Raceway Park, they are both
11  available. And Paul Morris was -- I want to use
12  the word seasoned, primed, something like that,
13  for us doing this big festival on June 25th and
14  26th. This big head liner and all these guys
15  are available.
16     But if you ask me the one most
17  important thing that came out of that meeting
18  was Tiesto. You want to talk about the second?
19  Vito's funding.
20     Q     Okay.
21     A     From there the list goes on. You
22  had Vito Bruno, who is the premium, I mean, the
23  guy has been doing this forever, this electronic
24  dance stuff, the experience he had, and we are
25  going to work beside him with John DiMatteo, who

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC

Barrett - direct

214

1  was booking, you know, heavy hitting deejays on
2  a regular basis. He has a data base, he's got
3  everything.
4              I have to tell you everything
5  about that meeting was great.
6        Q    So you have a great meeting at
7  the Grand Lux. You come away, two things, you
8  are excited about everything. If I force you,
9  gun to your head, you say the top two, the most
10  important thing was by collaborating with Vito
11  and John, you had the ability to get Tiesto and
12  David Guetta to appear at your event, because
13  Vito and John had already, according to them,
14  lined them up to play a festival at Raceway
15  Park, and they could deliver Tiesto and David
16  Guetto to your event at the Meadowlands?
17       A    Yes.
18       Q    That's first?
19       A    Yes.
20       Q    Then you have Vito's promise to
21  provide up to $2 million in funding, correct?
22       A    Yes.
23       Q    And there were many other things
24  that you liked about it?
25       A    Oh yes.

215

1        Q    So you leave the Grand Lux to go
2  back to the office. A day or two later you take
3  a draft joint venture agreement that your
4  lawyer -- a lawyer had given you one?
5        A    Yes.
6        Q    And then you sent it to Vito,
7  saying here's a document that we can use to put
8  our agreement in writing?
9        A    Can I have more water, please?
10  I'm parched.
11       Q    Did I get all of that correct?
12       A    Yes.
13       Q    Vito then sends you back a
14  revised version of the document that contains
15  some provisions that he wanted, right?
16       A    Right.
17       Q    That's what we are looking at
18  here, CB-9?
19       A    That's right.
20       Q    So in CB-9 we see the net result
21  of your document that you sent to Vito Bruno and
22  the document he sent back with the additions he
23  wanted, right?
24       A    Okay.
25       Q    So my first question to you is,

216

1  where in this agreement that you prepared right
2  after the great meeting at the Grand Lux, where
3  in this does it provide for the most important
4  thing to you, which was that John and Vito were
5  going to produce Tiesto and David Guetta at this
6  festival that we are talking about now?
7        A    This agreement has no mention of
8  Tiesto.
9        Q    Nor of David Guetta?
10       A    No.
11       Q    Nor of John and Vito producing
12  them for your event?
13       A    Correct.
14       Q    Okay. Okay.
15              Now, the second most important
16  thing that you got out of the meeting at the
17  Grand Lux when you struck your agreement with
18  John and Vito was Vito's funding, correct?
19       A    Correct.
20       Q    And now where in the agreement
21  that you provided does it obligate Vito to
22  provide that funding?
23       A    It doesn't say it from what I can
24  see in the financial discussion. Talking about
25  the profit, it states, "In the event that any

217

1  partner at any time satisfies a disproportionate
2  share of the financial obligations of X, that
3  partner shall be entitled to reimbursement
4  thereof before the calculation and distribution
5  of any profit."
6              I believe that's what I said
7  before.
8              I don't believe that -- I don't
9  see it.
10       Q    Was this document ever finalized?
11       A    No.
12       Q    Was the document ever signed?
13       A    No.
14       Q    Do you have anything in writing
15  from Vito Bruno wherein he promises to provide
16  you financing for this event?
17       A    Anything in writing?
18       Q    Yes.
19       A    No.
20       Q    Didn't what had just happened
21  with Al Dorso with the engagement letter, and by
22  that I mean Al Dorso telling you that, you know,
23  even though you wanted that in writing, his word
24  was solid, better than in writing, he delayed
25  the process. You finally got it in December.

Barrett - direct

59 (Pages 230 to 233)

230

1    sending it to you?
2        A    No.
3        Q    Did you ever have a discussion
4    with him about the document?
5        A    Yes, I did.
6        Q    What was that discussion?
7        A    I told him that creating a
8    document that says $900,000 was not acceptable.
9    I also told him such actions and that letter
10   will go nowhere.
11       Q    What did he say to you?
12       A    To the best of my recollection he
13   was apologetic, wasn't serious.
14       Q    Did you tell Mr. Dorfman about
15   that interchange?
16       A    Yes, sir.
17       Q    What did you tell him?
18       A    I told him that Mr. Sandberg had
19   messed around with something, changed it from
20   300 to 900.
21            He called him an idiot, something
22   to that effect, and we carried on.
23       Q    And did you ever provide the
24   version of the letter with the $900,000 amount
25   to anybody?

231

1        A    I never sent that to anyone.
2        Q    Do you know whether anybody else
3    did?
4        A    As far as I know the document was
5    not communicated to anyone.
6        Q    Did that episode change your
7    impression about Mr. Sandberg in any way?
8        A    It did. Actually, when I told
9    him I didn't condone his behavior, I kind of put
10   him on notice that he would have a short leash.
11       Q    And what do you mean by that?
12       A    Well, in my opinion, after the
13   meeting we had with Jason Miller and John
14   D'Esposito, John Sandberg had become different.
15       Q    Is that the meeting on March 3rd?
16       A    Yeah, the meeting on March 3rd.
17   He was more anxious. It really took a toll on
18   him. At times I believed him to be a little
19   irrational, like angry and, you know, that
20   affected definitely my opinion of him, if I must
21   say so. He just raised it from $300,000.
22            Sure, something like this isn't
23   going anywhere. In fact, at the meeting with
24   Mr. Dorso, you know, I made sure I told
25   Mr. Dorso, Tom said this is what we have and

232

1    Mr. Sandberg confirmed it.
2        Q    There was a meeting on March 7th
3    with Mr. Dorso when you signed the contract?
4        A    Yes.
5        Q    You gave Mr. Dorso the Provident
6    Bank letter?
7        A    This letter right here stating
8    $300,000?
9        Q    Right.
10            And you -- did you give him any
11   other information concerning Juice
12   Entertainment's ability to satisfy its funding
13   operation?
14       A    Yes.
15       Q    What did you give him?
16       A    Gave him a bank statement from
17   Vito Bruno.
18            MR. MARX:  Why don't we mark the
19   next exhibit.
20            (Exhibit marked for
21   identification CB-11, Document from Chase Bank.)
22       Q    I'm going to ask you to continue
23   reading what we marked as exhibit CB-11.
24            (Exhibit handed to the witness.)
25       A    It is a multiple-page document

233

1    provided to us by your attorneys in the
2    discovery process in this case.
3            Is this the bank account
4    statement that you described in your prior
5    response?
6            (Pause.)
7        A    Yes.
8        Q    And where did you get this?
9        A    From Vito Bruno.
10       Q    When?
11       A    On February 18th.
12       Q    And how did you get it?
13       A    Vito made a copy of it and handed
14   it to me.
15       Q    Did he tell you what -- did he
16   tell you what you were allowed to do with it?
17       A    Well, Vito's understanding was
18   that I needed this document to bring to Al Dorso
19   to show that Vito wasn't broke.
20       Q    Okay.
21            You say that is Vito's
22   understanding?
23       A    What I told Vito, yet again, the
24   February 18th phone call that we discussed
25   earlier when Al Dorso told us that we were broke

Barrett - direct

61 (Pages 238 to 241)

238

1   that would be the money from the Chiasullos?
2       A   Yes.
3       Q   What was this account opened up
4   for the purpose of doing?
5       A   To put Tiesto into the festival.
6       Q   Was it for operations in general,
7   or was it for the operations of the electric
8   music festival?
9       A   I believe it was for the
10  operations of Juice Entertainment.
11      Q   If I wanted to know what this
12  money was used for, would I look at the note
13  agreement between you and the Chiasullos?
14      A   Yes.
15      Q   Let's turn to page one on the
16  next statement, which is March 31, 2011
17  statement.
18      A   Okay.
19      Q   Okay.
20          Looking down there, we have on
21  March 14th a deposit -- we have several
22  transactions on March 14th.  Do you see those?
23      A   Yes.
24      Q   On the one hand we have a deposit
25  of $120,000.  Then we have two withdrawals -- we

239

1   have several withdrawals, and two of them are in
2   the amounts of $40,000 and $80,000, which even
3   with my bad math comes to $120,000.
4           Do you know anything about the
5   deposit and withdrawal of $120,000 on
6   March 14th?
7       A   I think it's credited in the
8   error, between the 80 and 40, if you look at
9   those two numbers together.  It looks like a
10  bank error.
11      Q   Okay, maybe so.
12          Do you know anything about that?
13      A   The bank error?  No.
14      Q   There is a wire transfer of
15  $131,750 on March 14th.  Do you know what that
16  was for?
17      A   That was for a deposit for a hip
18  hop act that John Sandberg was booking.
19      Q   Is that with respect to Drake and
20  Nicki Minage?
21      A   Yes.
22      Q   That money was just lost?
23      A   To the best of my knowledge,
24  lost, yes.
25      Q   As far as you know the money was

240

1   wired to secure the engagement of two hip hop
2   artists?
3       A   Yes.
4       Q   And whoever it was wired to took
5   the money?
6       A   Yes.
7       Q   Didn't produce contracts?
8       A   They produced contracts.  They
9   did produce contracts.
10      Q   Okay.
11          Then what happened?
12      A   We didn't get signed contracts.
13      Q   You didn't get signed contracts.
14  Okay.
15          That money has never been
16  recovered?
17      A   No.
18      Q   Turning then to page two of that
19  same statement, if you look down about halfway
20  down the page, on March 28th there is two wire
21  transfers, one in the amount of $30,000 and the
22  other in the amount of $3,550.
23          Do you see those?
24      A   I see the $30,000 wire, but I
25  don't see a $3500 wire.  I see a withdrawal.

241

1       Q   Withdrawal, okay, correct.
2           Do you know what those
3   transactions were?
4       A   I believe the $30,000 was for
5   Charlie Sheen.
6       Q   And Juice Entertainment did an
7   event at Dragonfly?
8       A   With Charlie Sheen.
9       Q   This was to pay Charlie Sheen?
10      A   That was for Charlie Sheen.
11      Q   Do you know about the $3500?
12      A   I'm not really sure.  Could have
13  been something towards producing the event.  I
14  can't say for certain.
15      Q   Turn to the next statement, which
16  is a statement dated April 29th.
17      A   Okay.  It says 09 on top in the
18  corner.
19      Q   It does indeed.
20          On April 1st there is a
21  transaction, 500 -- description, TD Bank, loan
22  payment.
23          Do you see that?
24      A   Yes.
25      Q   Do you know anything about that?

Barrett - direct

62 (Pages 242 to 245)

242

1     A    I don't.
2     Q    Turn to page four of that
3  statement. On April 20th it looks like there is
4  a wire transfer of $117,000. Did I say that
5  correctly?
6     A    You did.
7     Q    Do you know what that was?
8     A    That was money we transferred
9  into a different bank.
10    Q    What bank was it transferred
11  into?
12    A    Either TD or Chase.
13    Q    And why was that money being
14  transferred to that account?
15    A    To keep that money away from John
16  Sandberg.
17    Q    Why did you feel it was necessary
18  to keep money away from John Sandberg?
19    A    Well, actually, twofold. The
20  money away from John Sandberg was because he
21  just put us through the hip hop scam, as we'll
22  call it, and the relationship had gone to shit.
23  This particular Provident Bank was nowhere near
24  my house or Tom's house.
25    Q    Fair enough.

243

1          If you go through the statement,
2  there is a lot of purchases made using a debit
3  card. Who had debit cards on this day?
4     A    I had one, job sand had one and
5  Tom Dorfman had one.
6     Q    Do you know who was doing the
7  majority of the spending on the debit card?
8     A    I have to go through each one.
9     Q    I'm not asking you to do that
10  now.
11    A    Okay.
12    Q    If you knew --
13    A    Couldn't tell you.
14    Q    Fair enough.
15         Going ahead to what I believe is
16  the last statement, three pages from the back, a
17  statement dated May 31, 2011.
18    A    Okay.
19    Q    Looks like the bank account was
20  closed out. The balance by that time was down
21  to $242.36.
22    A    Yes.
23    Q    Why was the bank account closed?
24    A    Because we no longer used it.
25    Q    Sounds like a good reason.

244

1          MR. MARX:  Mark the next exhibit,
2  please.
3          (Exhibit marked for
4  identification CB-13, Mobile phone examiner
5  plus, quick print.)
6     Q    Mr. Barrett, I'm going to ask you
7  to continue looking through the document we
8  marked as exhibit CB-13.
9          (Exhibit handed to the witness.)
10    Q    It appears to be another
11  collection of text messages sent to or from your
12  cell phone --
13    A    Um-hum.
14    Q    -- on February 5th, 2011.
15    A    Yeah.
16    Q    And then on -- continuing to
17  February 7th.
18         The first question concerns the
19  first text message sent to you from the number
20  (646) 773-7700.
21    A    Okay.
22    Q    Do you know whose number that is?
23    A    John DiMatteo.
24    Q    Mr. DiMatteo says to you, "Any
25  news on the contract?"

245

1          Do you recall what he was talking
2  about at that time?
3     A    The contract with Al Dorso.
4     Q    Okay.
5          So this is the contract that was
6  formalized -- formalized the arrangements that
7  you had discussed with him, and that was
8  reflected to some extent in the December 1st,
9  2010 engagement letter?
10    A    Correct.
11    Q    Later that day you respond to
12  Mr. DiMatteo, "Yesterday you said we should have
13  it over the weekend. I'm expecting Monday."
14         Did I read that correctly?
15    A    Yes.
16    Q    Do you know when you finally did
17  receive the contract?
18    A    I would have to check my e-mail.
19    Q    Okay. Fair enough.
20         Turn to the next page. There is
21  an e-mail sent from you to Mr. DiMatteo, and it
22  says, "The third call was Ultra."
23         Do you remember what that means?
24    A    I think on this particular day I
25  must have had communication with either Al Dorso

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC

Barrett - direct

270

1   what point on? My whole life?
2        Q    If you can summarize it briefly
3   starting in 2001.
4        A    2001 I graduated. I worked at --
5   I think it's safe to say I worked as a deejay, I
6   would say, multiple nightclubs, bars, private
7   entertainment company, going back, it's a long
8   time ago, I couldn't tell you every single one.
9        Q    You've been involved in that
10  industry basically from 2001?
11       A    1998.
12       Q    1998.
13       A    I started in high school.
14       Q    Understood.
15            To some extent I think you
16  described some of that experience up until 2010.
17       A    Yes.
18       Q    Did you have any experience with
19  live music festivals prior to 2010?
20       A    What do you mean by live music
21  festival? What would you consider a live music
22  festival?
23       Q    We talked most of the day about
24  electronic music festivals that you were going
25  to put on in 2011.

271

1        A    Okay, yes.
2        Q    We talked about a Latin music
3   festival that you put on in 2010.
4        A    Yes.
5        Q    What does a live festival mean to
6   you?
7        A    An outdoor event.
8        Q    Involving how many artists?
9        A    Significant amount. More than
10  10.
11       Q    Okay.
12            How about the attendance? Does
13  the attendance have to be a certain number
14  before we consider an outdoor event with more
15  than 10 artists to be a festival?
16       A    Either a festival or one artist,
17  now that I think about it. I was trying to
18  pinpoint --
19       Q    I want to know what you think a
20  festival is.
21       A    I think a festival is an outdoor
22  event with live music, where people come and
23  attend. It could be any number of musicians and
24  or deejays.
25            Like I was saying before, you can

272

1   book one or two deejays and call it a festival.
2            Off the top of my head, Paul
3   VanDyke does a festival or has previously done
4   festivals, just him, maybe a couple other guys.
5   That's the definition of a festival.
6        Q    Using your definition of a
7   festival, tell me your experience in outdoor
8   music festivals prior to 2010.
9        A    I had performed at a Gemini
10  festival in Fort Lauderdale, I believe, I could
11  be wrong about the location. Offhand that would
12  be the only one that is before 2010, I believe,
13  probably. There could be more. I would have to
14  go through my collection of fliers.
15       Q    When was that genesis festival?
16       A    Gemini.
17       Q    I apologize. My writing is bad
18  enough.
19       A    When was it? I want to say 2010.
20       Q    And given the name, I assume it
21  was either in late May or early June, right?
22       A    Yeah.
23       Q    And you were participating in
24  that event as a performer, correct?
25       A    I was a performer.

273

1        Q    Have you had any experience prior
2   to 2010 in participating in outdoor music
3   festivals as a buyer of talent?
4        A    Yes.
5        Q    How about involvement in the
6   production as distinguished from the performance
7   acts at an outdoor festival prior to 2010?
8        A    How many I produced?
9        Q    Your only involvement prior to
10  2010 in an outdoor music festival that you
11  appeared in one?
12       A    Correct.
13       Q    Have you ever been involved in
14  producing an entertainment event with more than
15  10,000 people in attendance?
16       A    No.
17       Q    How about more than 5,000 people?
18       A    Have I ever produced it myself?
19       A    Or with others.
20       Q    Or with others?
21       A    Yes.
22       Q    An outdoor music festival?
23       Q    Any kind of event with more than
24  5,000 people there.
25       A    Yes.

RIZMAN, RAPPAPORT, DILLON & ROSE, LLC

Juice Entertainment v.
Live Nation Entertainment

Page 337

1  that you collectively were discussing financing with?
2  A.  You say me collectively --
3  Q.  You, Mr. Dorfman --
4  A.  Mr. Dorfman you would have to speak to.
5  Q.  Okay.
6  A.  And confirm with him because he met with
7  people on his own.
8  Q.  Okay.  We have already talked about Vito
9  and John and the Chiasulo family, we have already
10  talked about Mr. Hason, Aventura.  Do you know what
11  component of the event Mr. LaVecchia was considering
12  providing financing for?
13  A.  I don't know.
14  Q.  What about the Eagle football player,
15  same question?
16  A.  Subsequent events.
17  Q.  What does that mean?
18  A.  We wanted to do other events at the
19  State Fair.
20  Q.  Other than the EDM show?
21  A.  Yes.
22  Q.  Other than the Latin music festival?
23  A.  Yes.
24  Q.  Are you talking about the rock show?
25  A.  It could be rock.  It could have been a

Page 338

1  teen event.
2  Q.  Or I believe you were talking about a
3  college fair or event?
4  A.  A college fair.
5  Q.  Okay.  Do you recall which of the Eagle
6  football player was being discussed?
7  A.  I don't recall.
8  Q.  What about the others whose identities
9  you don't recall, what events were you talking to
10  them about?
11  A.  It could be any of the ones we just
12  discussed.
13  Q.  Including the EDM?
14  A.  Not the EDM.  The EDM we had funding.
15  Q.  The EDM you had funding through Vito and
16  John and the Chiasulo family, correct?
17  A.  Correct.
18  Q.  The others we are talking about --
19  A.  Subsequent, subsequent events.
20  Q.  Okay.  And do you know where I can find
21  Mr. LaVecchia now if I want to serve him with a
22  deposition subpoena?
23  A.  I don't know.
24  Q.  You don't have his contact information?
25  A.  Don't have his contact information.

Page 339

1  Q.  Do you know, do you know why the
2  supplemental interrogatory answers were provided last
3  week, rather than back in 2013?
4  A.  You would have to ask Mr. Dorfman that.
5  Q.  You were not involved?
6  A.  I was not involved.
7  Q.  At this point I am going to check with
8  my co-counsel and check my notes, after a short break
9  I may have no further questions; is that acceptable?
10  A.  Acceptable.
11  (Recess)
12  MR. MARX: We have no further
13  questions.  Thank you for your time.
14  MS. WAGNER: I have no questions.
15  (Deposition concluded at 1:50 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 340

1  C E R T I F I C A T E
2
3  I,  PATRICIA LEE PAGE, a Certified Court
4  Reporter of the State of New Jersey, do hereby
5  certify that the foregoing is a true and accurate
6  transcript of the testimony as taken stenographically
7  by and before me at the time, place, and on the date
8  hereinbefore set forth.
9  I DO FURTHER CERTIFY that I am neither a
10  relative nor employee nor attorney nor counsel of any
11  of the parties to this action, and that I am neither
12  a relative nor employee of such attorney or counsel,
13  and that I am not financially interested in the
14  action.
15
16
17
18
19
20  PATRICIA LEE PAGE, C.C.R.
   Certificate No. XI01377
21
22
23
24
25

C E R T I F I C A T E

I CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken by and before me stenographically at the time and place aforementioned.

I FURTHER CERTIFY that I am neither attorney for nor counsel to any of the parties; parties of any of the attorneys in this action; and that I am not financially interested in the outcome of this case.

HOWARD A. RAPPAPORT, C.C.R
Certificate No. XI00416