# EXHIBIT 2

# In The Matter Of:

*Juice Entertainment, LLC v.*
*Live Nation Entertainment*

---

*Alan Sacks*
*July 18, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

**Min-U-Script® with Word Index**

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 13

1  and told you that they had done the event that they
2  had done the prior year -- you know what, let me ask
3  a different question.
4  A.  Sure.
5  Q.  I don't know if you told me this and
6  if you did I apologize.  You were talking about
7  June 25th, 26th and 27th?
8  A.  Yes.
9  Q.  What year was that?
10  A.  I believe it was three years ago, not
11  this summer but the previous summer.
12  Q.  2011?
13  A.  2010.  Sorry.
14  Q.  2010 it was?
15  A.  The summer of 2010.  It was two years
16  ago, correct?  Am I getting my year right?
17  Q.  I can show you some documents if it
18  will help.
19  A.  If you need to know the exact --
20  Q.  If it will refresh your memory.
21  A.  It wasn't this summer.  It was the
22  previous summer.
23  Q.  Why don't we help him with that?
24  A.  Give me a calendar.
25  Q.  I am going to hand to you and ask you

Page 14

1  to look at two documents that were provided to us by
2  another party in this case in the discovery process.
3  The first one I will mark as Sacks-1.
4
5    (Exhibit Sacks-1 was marked for
6  identification.)
7
8  Q.  This is a one-page document that has
9  Bates 1450.  And the second document we will mark as
10  Sacks-2.
11
12    (Exhibit Sacks-2 was marked for
13  identification.)
14
15  Q.  This is Sacks-2.  It has Bates Numbers
16  Juice 106 through 111.  The way this will work is
17  you should take as much time as you reasonably need
18  to look at the documents and then I am going to ask
19  you some questions about them.  Have you ever seen
20  these documents before?
21  A.  I have.
22  Q.  What are they?
23  A.  This is a joint venture agreement.
24  Q.  And "this" is Sacks-2 that you are
25  holding?

Page 15

1  A.  I'm sorry.  Yes.
2  Q.  It is a draft joint venture agreement?
3  A.  Correct.
4  Q.  And what is Sacks-1?
5  A.  The same, just a shorter -- I guess
6  more of a Letter of Intent.  It is like a shortened
7  version of this document I guess.  I'm not really
8  sure.
9  Q.  All right.
10  A.  The dates don't jive though.
11  Q.  The first document, Sacks-1, if you
12  look half way, maybe two-thirds of the way down the
13  document, the document first identifies a number of
14  individuals and then describes that these
15  individuals will be staging and promoting a two-day
16  electronic dance music festival to be held at the
17  State Fair Meadowlands.  The dates will be June
18  25th, 2011 and June 26th, 2011.  Did I read that
19  correctly?
20  A.  Yes.
21  Q.  Does that help you remember the date
22  of the event that you were involved in?
23  A.  Well, I remember the date.  The thing
24  was, this was not actually set in stone.  It was
25  tentatively the 25th and 26th, but the 27th was also

Page 16

1  a possibility.  That's why I mentioned that, based
2  upon availability of talent.
3  Q.  The year was 2011?
4  A.  Correct.
5  Q.  And when Mr. Dorfman initially
6  approached you he was talking about an event that he
7  and Mr. Barrett had done the prior year?
8  A.  The prior year, yeah.
9  Q.  That would have been 2010?
10  A.  Correct.
11  Q.  What did he tell you about that event
12  from 2010?
13  A.  That it didn't go very well.  It was a
14  style of music that they weren't accustomed usually
15  to promoting and, you know, that they did the right
16  thing and paid everybody what they owed them.  And
17  the owner of the venue, Al, would be happy to do
18  another event and they really wanted to kind of step
19  their promotion and their production of the event up
20  and book some bigger talent and extend that to two
21  days or three days, depending on availability of
22  talents.
23  Q.  When do you recall being approached to
24  participate?
25  A.  Probably the first call some time it

Juice Entertainment, LLC v.
Live Nation Entertainment

---

Page 17

1  was probably a year before this. It took some time
2  for us to kind of get to a point where we could
3  actually talk about doing a deal. I guess they were
4  talking with the Meadowlands -- with Al Dorso, so
5  probably, you know, 11 to 12 months before the
6  actual date of the event.
7  Q. So you think it is possible it was
8  June 2010?
9  A. Around there when we first started
10  talking about it.
11  Q. How soon after the 2000 event do you
12  think you were contacted?
13  A. I'm sorry. Say that again.
14  Q. Right. So Mr. Dorfman and Mr. Barrett
15  were involved in an event in 2010 that, according to
16  them, was not successful and they wanted to step up
17  their game --
18  A. Correct.
19  Q. -- for the next event?
20  A. Right.
21  Q. Do you know how soon after the 2010
22  event they reached out to you to try to plan for the
23  2011 event?
24  A. Maybe a month, a month or two.
25  Q. I don't want you to guess. If there's

---

Page 18

1  a way you can --
2  A. I would probably say a month after
3  that event. The first conversation happened at that
4  point.
5  Q. Okay. And what happened next with
6  respect to your involvement in this project?
7  A. I think Tommy reached out to me about
8  getting involved with the event. 1 had obviously
9  had a lot of questions about what had happened the
10  previous year, just to make sure I wasn't walking
11  into a situation.
12     Yeah, we started talking about
13  tentative lineups, what my relationships were to
14  certain artists that they were interested in and how
15  we could go about that. Then obviously we started
16  talking about funding sources. Somebody has to pay
17  for all of this, you know.
18  Q. I am going to have a bunch of follow-
19  up questions about those subjects.
20  A. Sure.
21  Q. The first subject you described was
22  that you had a lot of questions about the 2010 event
23  because you didn't want to walk into something
24  unaware?
25  A. Correct.

---

Page 19

1  Q. So can you summarize your discussions
2  about that prior event?
3  A. Yes. It was pretty simple. It was
4  actually -- I believe that conversation was with
5  Chris. I believe Chris actually produced that event
6  and brought Tommy in to help at the end of it. I
7  think it was Chris's event. I spoke with him about
8  it. He said that it was a style of music that they
9  weren't really accustomed to promoting.
10  Q. What was that style?
11  A. It is called Regaetone. It is kind of
12  a cross between Latin music and pop, reggae if you
13  will, it is kind of a new genre. A lot of promoters
14  do well with that genre of music. They sell a lot
15  of tickets for some of those events.
16     I had never worked with Chris before.
17  He said "I'm a good guy. I paid everyone." That's
18  why we lost -- he thought the venue wanted to work
19  with him again because they were standup guys in
20  regard to that. They wanted to produce this event
21  next summer. The state fair typically happens the
22  last week of June, first week of July every year.
23  It was kind of easier to hone in on talent but we
24  needed to get that processing sooner than later.
25  Q. I think the second thing you said you

---

Page 20

1  were discussing, the second subject, was who knew
2  what in the industry as far as talent goes. Did I
3  recall that correctly?
4  A. Yes. They asked me.
5  Q. What did you discuss on that subject?
6  A. Just possibilities of talent that I
7  had either booked before or just, you know, certain
8  artists that I thought would work in that area, New
9  Jersey region, and maybe none of us had worked with
10  before but we could definitely approach because of
11  the venue.
12  Q. Do you recall anything specific about
13  those discussions?
14  A. In regards to?
15  Q. Talent.
16  A. The type of talent?
17  Q. Yes, the type of talent.
18  A. Yes, we talked about Tiesto. I mean,
19  do you want to know the names of some of the
20  artists?
21  Q. Anything you can remember.
22  A. Sure. Some of the artists I've worked
23  with in the past, Danny Tenaglia, Jeff Mills. I am
24  giving you a list. There's probably 100 artists
25  there. They range from what we like to call C level

---

Juice Entertainment, LLC v.
Live Nation Entertainment

**Page 21**

1 artists all the way up to A list artists.
2 Q.  Did you talk about what kind of mix
3 between A, B and C list artists you would want to
4 have for the event?
5 A.  Yes.  Well, of course, that's based on
6 funding, right.  You can ask to book someone that's
7 $1 million but you have to have the funds in place
8 to pay for that artist.  My conversation always
9 starts with how much do we have to work with, you
10 know, and ticket pricing and various things go into
11 an offer for an artist, right.
12      So these are the questions I was
13 asking them initially, how much do we have to work
14 with.  What's the budget.
15 Q.  And, in fact, that leads me into the
16 third subject that you told me -- that I recall you
17 telling me you discussed with them during this
18 initial phase, which was funding.
19 A.  Correct.
20 Q.  What did they tell you about funding
21 for the event?
22 A.  That they had another gentleman that
23 they were working with named John Sandburg that was
24 going to provide $300,000 in financing, kind of like
25 startup money or seed money for the event.  They

**Page 22**

1 would be engaging with some other investors to kind
2 of go the rest of the way, if you will, with the
3 budget.
4 Q.  What did you discuss what the overall
5 budget would be for talent?
6 A.  Yes, of course.
7 Q.  What was discussed?
8 A.  It was somewhere between -- well,
9 again, it depended on how many days that we ended up
10 doing and availability of talent, right, because
11 some of these guys are not so available on Fridays
12 and Saturdays as they are on a Sunday, per say.
13 Even those fees on Sundays may change because it is
14 not like what we call a prime day.
15      The budgets were somewhere between
16 $1,600,000 and $3 million depending, again, on what
17 type of lineup we were able to solidify.
18 Q.  How specific did you ever get in terms
19 of where the remaining $1.3 million to $2.7 million
20 would be coming from, other than Mr. Sandburg's
21 initial $300,000?
22 A.  Tommy and Chris had a relationship
23 with a club owner here in New Jersey that seemed
24 very interested in funding the rest of the project.
25 Q.  Who is that?

**Page 23**

1 A.  I don't recall his name.  They weren't
2 very open about who this investor would be.  It
3 wound up not coming through.  I immediately started
4 to talk to people that I knew about investing in the
5 event.  Vito Bruno obviously is named in this, I
6 thought would be a great funding source for that.
7 Q.  Do you recall anything else about the
8 initial discussions concerning funding, other than
9 what we've discussed?
10 A.  Yes.  Well, one of the problems with
11 that initial $300,000 was they had -- I guess John
12 Sandburg had a relationship with somebody through
13 his -- he coaches basketball at Rutgers, children,
14 and one of the fathers had a relationship with one
15 of the major recording artists, supposedly Drake,
16 who is a hip hop artists.
17      One of the things they said to us at
18 the Meadowlands is one of the things I wanted to
19 stay away from, was that genre of music.  They have
20 a big hip hop event that they do every summer called
21 Summer Jam which does, like, 60,000, urban style
22 music performers.  That was the one genre we
23 couldn't touch.
24      When they called me Friday late
25 afternoon from the bank saying they were going to

**Page 24**

1 wire this half, this $300,000 to somebody who we had
2 not looked at their contract or vetted, who they
3 were, as an agent or as an affiliate or not, they
4 wired half the seed money to a gentleman in Atlanta.
5 I believe it wound up being a fraudulent contract.
6 He didn't represent the artist.
7      So within, I don't know, two weeks of
8 having possession of the seed money in less than
9 14 days they had lost half of it.  It was a major
10 concern obviously.
11      One of my roles here was talent
12 acquisition, to look and vet these contracts and
13 engage with the agents to see if these people are
14 real, you know.
15 Q.  What role was Drake going to even play
16 in this event?
17 A.  I think John Sandburg took that
18 initiative with Tommy and Chris on their own.  I
19 think they were very anxious about getting somebody
20 booked.  He's one of the biggest recording artists
21 that year, won best new artist that year.  He would
22 have sold a lot of tickets.  It was against what was
23 advised to us from the venue.  I didn't really
24 understand why.  I mean, I get the ticket sales, why
25 it would be a successful event, but it went against

Juice Entertainment, LLC v.
Live Nation Entertainment

---

**Page 25**

1  everything that we do.  I don't really do those
2  types of shows.  My shows are more dance music, DJ
3  driven dance music events.  For me, it didn't make
4  sense, the genres like that crossing.
5  Q.  Do you know whether efforts were made
6  to recover the $150,000 that was wired to the agent
7  who claimed to be the booker for Drake but who
8  actually wasn't?
9  A.  Yes, I actually helped him with that,
10  a gentleman by the name of John Lebrowski.  He's a
11  private investigator.  I believe John Sandburg paid
12  him a deposit to, you know, find out -- o track down
13  what had happened with this money and who these
14  individuals were.  He just kind of disappeared on
15  him.
16  Q.  Do you know whether the money was ever
17  recovered?
18  A.  No.
19  Q.  You don't know or it wasn't recovered?
20  A.  It wasn't -- well, they told me it
21  wasn't recovered.  Do I know if it was recovered for
22  sure, no, I'm not really sure.
23  Q.  Okay.
24  A.  I know Mr. Lebrowski had not turned up
25  anything other than that it had gone through a

---

**Page 26**

1  couple of different state lines.  And he advised
2  Tommy and Chris and John to talk to the FBI.
3  Q.  Do you know whether they did that?
4  A.  I believe Chris told me they did.  I
5  guess he was saying the FBI was saying it was an
6  insignificant amount of money and they had other
7  fish to fry.  It just didn't go anywhere.
8  Q.  Now, after your initial discussions
9  with Mr. Barrett and Mr. Dorfman about becoming
10  involved in the event, did you enter into any
11  agreement with them and perhaps others to pursue the
12  event?
13  A.  Yes.  It was a verbal agreement at
14  first because one of the issues we kept running into
15  or that I kept running into was they couldn't
16  produce the land lease agreement with the
17  Meadowlands.  So what would happen was when I would
18  start to engage with agents they would say to me,
19  you know, this event sounds great.  We would like to
20  see your lease if you are going to book an artist
21  that is $500,000 for the day for a two, three-hour
22  performance, you know, these agents want to know
23  that you are dealing some place and it is real and
24  if I am claiming that we are going to be able to
25  repeat years with these agents that were going to be

---

**Page 27**

1  there for a long-term project they wanted to see
2  that in writing.
3  One of the problems I kept coming into
4  with them was they couldn't produce the land lease
5  agreement with the Meadowlands, including my name on
6  that lease with them, that would bring me along with
7  them for the years to follow.  It was a bit of a
8  brick wall, you know.
9  Q.  How was that overcome if at all?
10  A.  What was going to happen was I figured
11  I would bring Vito Bruno into the mix.  He would
12  help with financing and had great credibility with
13  other agents that I don't work with.  Vito has been
14  doing this for probably 30 plus years.  He would add
15  a lot of credibility, I thought, to the other side
16  of what we were trying to do.  And it never
17  happened.  We never got the land lease.  I never saw
18  it.
19  Q.  Now, looking at the documents that we
20  marked as Sacks-1 and Sacks-2, to me they look like
21  they are drafts of agreements that include
22  Mr. Barrett, Mr. Dorfman, you, Vito Bruno, John
23  Dimatteo and Brian Arteca.
24  The question is did you ever enter
25  into any written agreement along the lines of

---

**Page 28**

1  Sacks-1 and Sacks-2 with these gentlemen?
2  A.  Well, I couldn't.  One of the things
3  that we had talked about was I needed for them,
4  before we.even got to this, to the joint venture
5  agreement, was to produce the land lease.  What are
6  we agreeing on if we don't have a deal to do an
7  event.  What are we agreeing on.  That was my thing.
8  I think Vito felt the same way.  Let's
9  see the lease that you guys have a deal in place and
10  we can talk about doing a joint venture and things
11  like that.
12  Q.  These are drafts?
13  A.  Correct.
14  Q.  You never signed any final agreement
15  in connection with this event?
16  A.  Correct.
17  Q.  Did you have a verbal agreement with
18  Mr. Dorfman, Mr. Barrett, Mr. Bruno, Mr. Dimatteo
19  and Mr. Arteca concerning this event?  And by "this
20  event" I don't want there to be any confusion.  So
21  if I refer shorthanded to "this event" will you
22  understand me to mean the electronic dance music
23  event to be held at the State Fair Meadowlands June
24  25th, 26th and/or possibly the 27th in 2011?
25  A.  Yes.

---

Juice Entertainment, LLC v.
Live Nation Entertainment

---

**Page 33**

1 A.   The exact date?
2 Q.   Well, if you knew the exact date I
3 would appreciate it.
4 A.   I don't know the exact date.  I think
5 there was a lot of ideas of we will be able to do
6 this next year, so that exact date is very foggy to
7 me at the moment.  I would probably say two months
8 before the event was supposed to happen.  I mean,
9 there reaches a certain point where you know you are
10 marketing and promotions and bookings aren't going
11 to happen.  There's not enough time.  The people are
12 booked and the marketing is the process, right, so
13 that's why we talk about it a year in advance.
14 Q.   So roughly April 2011 you were no
15 longer --
16 A.   Pretty much there's no way you can
17 pull the event off at that point anyway.
18 Q.   So can you -- I am going to ask a
19 broad two-part question.
20 A.   Okay.
21 Q.   If it is too broad and I have to break
22 it down, let me know.  I'm not trying to be
23 difficult.  I'm trying to get the information from
24 you.
25      (Whereupon, there was a brief recess

**Page 34**

1 taken.)
2      MR. MARX: Back on the record.
3 Q.   Let me know if the question is too
4 broad and we can break it down.
5      What I would like you to explain to us
6 is a summary of what happened in connection with the
7 event from the time you became involved until the
8 time you stopped working on it, at some point in
9 April of 2011.  The second part would be if you are
10 able to identify who was doing what during the
11 process.  Did you understand that question?
12 A.   So you want me to tell you how things
13 transpire from when I first was engaged with Tommy
14 and Chris until the event and when we decided that
15 the event was a no go?
16 Q.   Yes.
17 A.   Yes.
18 Q.   Yes.
19 A.   That's not that broad of a question.
20 What time is it?  Oh, boy.  Well, okay.  So like I
21 said before, I got contacted by Tommy to help them
22 produce this event at the Meadowlands.  They
23 informed me that they had done a previous year that
24 had not met with great success but they had good
25 standing with the venue and wanted to produce a two

**Page 35**

1 or three-day event the following summer and if I can
2 get involved with them and help them acquire talent
3 and help out producing the event and be a part of
4 the process.
5      I immediately agreed to do that
6 because I knew Tommy to be someone of good stature,
7 a good promoter especially in New Jersey.  He had
8 done some pretty good nightclub events that were
9 very successful and that I had worked with him in the
10 past and he had a good reputation in New Jersey for
11 doing these type of nightclub shows.
12      I met up with them and we talked about
13 how we would work together, what the deal was, what
14 they were offering me, you know, was I coming in as
15 a consultant, did they want to hire me, did they
16 have funding, like I talked to you before about.
17 And they didn't have funding at that point but they
18 had someone, another person they were going to bring
19 in, another person named John Sandburg that was
20 going to be involved with them on their side, either
21 as a consultant or partner.  I didn't know at that
22 point.  It was all new -- as a consultant.
23      But I met with John and Chris again
24 another time and John had said that he would be able
25 to provide seed money, startup money for the event

**Page 36**

1 and that they had another investor interested in
2 working with them that owned a nightclub here in New
3 Jersey.  I'm not sure of the gentleman's name, but
4 he would be able to provide the rest of the
5 financing up to whatever we needed basically to do
6 this event because, again, my concern was they had
7 not really done a festival of that size and maybe
8 didn't understand what the financial repercussions
9 were of doing an event of that size.
10      Immediately I said this could be a $3
11 million event.  It was not a problem.  It seemed
12 like the funding wouldn't be hard for them to
13 obtain.
14      So based on that meeting we decided
15 that we would work together, that there would be a
16 partnership between us to do this because my
17 billable hours they probably wouldn't be able to
18 afford that based on nine months or a year of work
19 that would have to be done.  It made sense for us to
20 kind of work together.  At the end of it I saw the
21 potential earning of the festival and of course I
22 wanted to be part of that.  It made sense to me.  It
23 is kind of where I wanted to be anyway in that
24 industry, if you will.  So maybe about a month later
25 John was able to come up with $300,000 investment

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 45

1  savvy in the entertainment business, but when he
2  sees a good deal he likes to be involved. There's a
3  lot of money involved on these days. For him to put
4  up proof of funds I don't think was a big deal but
5  to pull the trigger and give us $2 million, that's a
6  conversation that probably would never have taken
7  place. It would have a quick phone call "I'm not
8  doing that."
9      Again, John Sandburg had went and met
10 with this gentleman without my knowledge. God knows
11 what was said at that meeting, what promises or
12 whatever.
13     Again, nothing happened. So even with
14 the proof of funds being brought to the Meadowlands
15 the lease was -- there was never a lease produced.
16 Do you know what I mean? It is the problem that
17 kept coming up, you know. We can get to a point
18 with an agent. We would get on the phone with an
19 agent. They were interested. They would say "Where
20 is the lease. What is your lease looking like. How
21 long are you there for."
22 Q.  Well, you and Mr. Bruno and
23 Mr. Dimatteo and Mr. Potter were involved at some
24 point in trying to acquire talent for the project,
25 correct?

Page 46

1  A.  Correct, sure.
2  Q.  Did you split up areas of
3  responsibility for acquiring talent in any way, or
4  was it a coordinated effort, or were you each on
5  your own as far as who to reach out to?
6  A.  There was some coordinated effort.
7  Primarily that effort came between myself, Paul
8  Potter and Vito and John. Chris and Tommy, you
9  know, I would tell them I think it would be best if
10 you guys didn't interface with our -- well, artist,
11 yes, that's one thing. If you know a particular
12 artist and he's your friend, feel free to call that
13 person up.
14     Like I told you, one of the things
15 that we don't like to do is, you know, engage with
16 an agency where five or six offers are coming on
17 from the same group. It just looks very unorganized
18 and sometimes those offers -- some are lower. Some
19 higher. It is kind of a chess game when you do
20 bookings and you acquire talent acquisition, right.
21     So I told Tommy and Chris let us
22 handle that because we have the history with that.
23 If you look at Tommy and Chris' history as far as
24 events, they've done a lot of nightclub stuff and
25 booked some artists, but the level of talent we were

Page 47

1  talking about was a couple steps above them. I
2  think they were okay with that, you know.
3      I know there was some meetings at Live
4  Nation that had happened with Tommy and Chris. They
5  took that initiative on their own to do that, which
6  was fine with me. It didn't hurt what we were
7  trying to do. I think at that point they were maybe
8  a little nervous about even Vito coming through with
9  the money. I think maybe they were looking to do
10 this joint venture -- would have been written a
11 little differently. I think it may have said Live
12 Nation on it.
13     My opinion, I think they were talking
14 to them about maybe producing or co-producing this
15 event with them and concerns that, you know, the
16 lease was hanging over our heads. They needed
17 somebody to come in and sign a check to get this
18 lease executed.
19 Q.  In terms of talent acquisition, was
20 there a particular area that you were responsible
21 for, that Mr. Dimatteo was responsible for, that
22 Mr. Bruno was responsible for and Mr. Potter
23 responsible for?
24 A.  No. I think that was a collective
25 effort but it was more based on relationships. We

Page 48

1  talked about -- you know, John and I talked about,
2  all right, so you know someone at William Morris. I
3  know someone at A.M. Only. I know this particular
4  artist or DJ.
5      I know he had certain relationships,
6  John Dimatteo, and I asked him to engage with those
7  people to see what the level of interest was.
8  Again, we could only go so far because of two very
9  important factors; the funding, obviously, and then
10 the lease agreement which was my biggest concern.
11     I kind of felt like if the lease was
12 in place I could take that to an investor and say
13 look, we have a five-year deal here with a potential
14 of a five-year option and engage with investors like
15 that. I even offered that to them. We were
16 never -- they were never able to produce that
17 document to me. It just kind of stopped after
18 awhile. I just kind of stopped after awhile.
19 Q.  Have you finished telling me
20 everything you can recall from the beginning to when
21 you stopped working?
22 A.  Well, I will tell you this. I had a
23 15-year relationship with Paul Potter that was
24 completely ruined over this whole situation. His
25 interaction with Tommy and Chris cost me a 15-year

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 49

1  industry relationship that I valued way beyond
2  almost anyone on this document, excluding Vito.
3      I've known Vito since I'm 20 years
4  old.  They just kind of gave Paul a lot of
5  misdirection as far as where the event was and where
6  we really were at the end of the day.  So there was
7  a lot of conversations that happened between Tommy
8  and Chris and Paul via a phone call and then I would
9  get a phone call the next day saying these guys are
10  telling me one thing.  Is the funding in place.
11  Where are we with the money.  He was getting
12  pressure on his side to produce the lease for this
13  event.  He would call certain agents in Europe that
14  he may know worldwide exclusively on certain artists
15  or DJ's.  I would put that to Paul.  He would come
16  back to me and say I think I can get this done for
17  you, but I'm not really feeling comfortable with
18  this.  We need some funding in place and, more
19  importantly, we need this lease.  Paul also knew
20  that I had people that I could talk to potentially
21  about investing in this.
22      I haven't spoken to Paul probably now
23  for two and-a-half years now, two and change, two
24  years since this event, since this happened.
25  Q.  Why did Paul hold things against you?

Page 50

1  A.  There was a lot of time put on this, a
2  lot of effort on Paul's behalf where at the end of
3  the day I don't know if you work with people from
4  the U.K. a lot.  There is a slang word.  Anyway, he
5  basically said I wasted his time and a lot of his
6  connections were used in conjunction with this event
7  and then nothing, just nothing happened.  It was an
8  insult to him as a professional.  I asked him to do
9  a lot of favors for us, for the group, you know, to
10  get this thing done.  It never happened.  I think
11  some of the dialogue that happened even with John
12  Sandburg again and him there was a little bit of
13  lying going on between them.
14      I just don't have the time for that,
15  you know.  I was busy doing what I do to survive and
16  also in conjunction, you know, pulling this event
17  offer with a consideration as a partner but not
18  receiving any hourly rate or anything like that.  I
19  dedicated a lot of time to this project and so did
20  all of my resources, Paul being one of them.
21  Q.  Why was the project unsuccessful?
22  A.  Well, it was underfunded.  And, in my
23  opinion, there was no lease to be produced.  Without
24  a proper lease and without funding, that's just my
25  opinion, you know.  I know there was definitely some

Page 51

1  dialogue between Chris and Tommy and the folks over
2  at Live Nation.  I wasn't there for those meetings.
3  I don't know what was discussed there.  I think at
4  the end of the day for them maybe that was the last
5  kind of the Hail Mary, if you will, if we can get
6  these guys involved maybe we can actually pull this
7  event off.
8      I think Vito got to a point with them
9  where, you know, he didn't see a lease.  How are you
10  going to invest in something if there's no
11  exclusive.  Somebody could have just came in and did
12  this next year, even if we agreed to a one-time
13  event there.  I don't think it was something they
14  were interested in.
15  Q.  Did you ever meet with anybody from
16  Live Nation in connection with this event?
17  A.  No.
18  Q.  Did you ever speak with anybody at
19  Live Nation with respect to this event?
20  A.  No.  Why would I?  They do what I do.
21  Q.  Do you have an understanding as to
22  what was discussed between Mr. Dorfman and
23  Mr. Barrett and anybody from Live Nation concerning
24  this event?
25  A.  Well, Tommy and Chris had told me that

Page 52

1  they felt that some of the complications we were
2  having with booking talent had come from Live Nation
3  maybe putting the brakes on or offering different
4  dates for artists that we were going after.  Again,
5  I don't know who or what artist they were discussing
6  with them because I wasn't there.  They didn't talk
7  to me about that.
8  Q.  Do you have any knowledge of any
9  actions that Live Nation took that prevented talent
10  from being acquired in connection with this event?
11  A.  No.
12      MR. MARX: Sacks-3.
13
14      (Exhibit Sacks-3 was marked for
15  identification.)
16
17  Q.  Sacks-3 is a multiple-page document
18  bearing Bates Juice 2901 through 2905.  I am going
19  to ask you to take a look through it and I will have
20  some questions.  The document appears to be
21  comprised of a couple of e-mails.  My questions are
22  going to be on the first e-mail which looks like it
23  is dated October 11th, 2010, subject; Meadowlands NJ
24  U.S.A. from Paul Potter, Paul to Alan Sacks.
25  A.  Okay.

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 85

1  myself to head that up. When John Dimatteo and Vito
2  came on board it was very clear to me that John had
3  a much better relationship, you know. This isn't
4  about I booked everybody. This is my thing.
5  There's a job that needs to get done. Who is the
6  best person for that. Who has the relationship.
7  John clearly had a better working relationship and a
8  personal relationship with Tiesto and his manager
9  and his tour manager. John picked up from there
10 when he came on.
11 Q.  In order to engage Tiesto, who did you
12 have to deal with? Who would one have to deal with?
13 A.  Paul Morris.
14 Q.  Paul Morris?
15 A.  For sure.
16 Q.  Were you involved in any discussions
17 with Paul Morris about hiring Tiesto for this event?
18 A.  I engaged with him once about it and
19 obviously once John came on board it made perfect
20 sense for him to do that. John has booked him
21 numerous times.
22 Q.  What was the extent of your
23 involvement with Mr. Morris concerning Tiesto?
24 A.  I think it was just the initial
25 conversation or phone call to him just talking to

Page 86

1  him about the event, where it was going to be when
2  we were looking to do it. And that was pretty much
3  it. I would get back to him on an off. It was very
4  early on so we didn't have ticket scaling quite in
5  place yet. We knew how many people we could put
6  there but not sure exactly how much it was going to
7  cost.
8      It is very tricky because your ticket
9  scaling is based on what type of artist you have and
10 your artists wanted to know the ticket scaling. At
11 a certain point you have to put your foot down and
12 say this is what we are charging for general
13 admission, the VIP, and we put the offer in. John
14 definitely spearheaded that right away. As soon as
15 he got on board that's the first thing he talked
16 about.
17 Q.  Do you know whether an offer was made
18 to Tiesto to perform?
19 A.  Yes.
20 Q.  Do you know the terms of that offer?
21 A.  Yes. I believe it was $250,000 for
22 the Friday or the Saturday based on -- they didn't
23 nail a date down in particular but, you know, you
24 put the two dates up and whichever one he is
25 available you take that pretty much. He's the

Page 87

1  number one DJ in the world.
2  Q.  Do you know whether that offer was
3  ever increased?
4  A.  I think there was a counter offer.
5  That year he didn't play for us obviously. He wound
6  up playing at Electric Zoo that following September.
7  We lost the booking somehow or maybe he wasn't
8  available. John kind of dealt with that at that
9  point.
10 Q.  Do you know whether Tiesto, through
11 Mr. Morris, rejected the offer that was made to play
12 this Meadowlands event?
13 A.  You mean himself, the artist himself?
14 Q.  Would the artist make the rejection
15 himself or would he operate through Mr. Morris?
16 A.  Sometimes if he knows the promoter he
17 may say "I want to work with this guy" sometimes.
18 Q.  Do you know what happened in this --
19 do you know what happened in this particular case?
20 A.  I believe he just wasn't available
21 that weekend. He's the most in demand DJ in the
22 world probably even still today, if not the first or
23 the second most in demand.
24 Q.  Did you speak with Paul Morris about
25 the reasons given, if any, why Tiesto did not accept

Page 88

1  the offer?
2  A.  No.
3  Q.  Did you speak with Tiesto?
4  A.  No.
5  Q.  Do you know who amongst your team did
6  speak with Mr. Morris?
7  A.  John.
8  Q.  Did John tell you what if anything
9  Mr. Morris told him about Tiesto's rejection of the
10 offer?
11 A.  I think he said to me -- John's words
12 were "It is not looking good." Immediately that
13 says to me offer more money, see what happens then.
14 I believe the offer did increase. I think it went
15 up to maybe it was another $300,000 or $350,000.
16 Still nothing happened. I'm assuming he just wasn't
17 available.
18 Q.  But that's your assumption?
19 A.  It is my assumption for sure.
20 Q.  Did Mr. Dimatteo tell you anything
21 about what Mr. Morris told him about Tiesto?
22 A.  He actually said the dates -- if I
23 recall, he said "The dates won't work." I said to
24 him "What about the Sunday? Maybe we can add
25 another day on. This artist could actually do a

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 89

1  standalone event. We were looking at the Friday and
2  Saturday but if this particular artist wanted to do
3  the Sunday we could very well just do him and maybe
4  one other, you know, lower caliber artist and still
5  sell a lot of tickets," and still nothing, not
6  available.
7  Q. Did Mr. Dimatteo tell you that the
8  reason Tiesto rejected the offer was due to pressure
9  applied by Live Nation?
10 A. No.
11 Q. Have you ever heard anybody say that?
12 A. Yes.
13 Q. Who did you hear say that?
14 A. Tommy and Chris.
15 Q. When did they say that?
16 A. I believe it wasn't even -- it was in
17 regards to Steve Angelo. It was not in regards to
18 Tiesto. You asked me if I ever heard anybody say
19 that before, yes.
20 Q. Yes?
21 A. Yes.
22 Q. Okay.
23 A. Not pertaining particularly to this
24 artist, but I have heard somebody say that before in
25 our group.

Page 90

1  Q. Let's pull back one level of focus
2  here. Are you aware of any instance where a
3  performer refused an offer to play at the
4  Meadowlands event because of pressure from Live
5  Nation?
6  A. No.
7  Q. Did Mr. Dimatteo ever tell you that an
8  artist to whom he had made an offer had rejected the
9  offer because of interference or pressure from Live
10 Nation?
11 A. John Dimatteo, no, but Vito did.
12 Q. We'll get to that.
13 A. Okay.
14 Q. Tell me everybody who, if any, who
15 have told you that offers to artists in connection
16 with this event were rejected because of pressure
17 from Live Nation.
18 A. Vito Bruno did. He was implying that
19 that was what had happened.
20 Q. Okay. Now I want you to identify the
21 artists that Mr. Bruno or anybody else was
22 discussing when they said that the offer had been
23 rejected because of interference or pressure from
24 Live Nation?
25 A. There was only one that was discussed

Page 91

1  and that was Steve Angelo.
2  Q. I believe you said that Mr. Dorfman
3  and Mr. Barrett had said that Live Nation's pressure
4  or interference caused artists to decline offers to
5  appear at this event?
6  A. Correct.
7  Q. What artists were they discussing?
8  A. They weren't particular. They were
9  just saying pretty much that all the artist were
10 blocked by Live Nation, no one in particular. The
11 only one that was mentioned, a name in particular,
12 was Vito Bruno.
13 Q. How many times did Mr. Bruno discuss
14 interference or pressure by Live Nation that led an
15 artist to decline appearing at this event?
16 A. What Vito said exactly was that Steve
17 Angelo's either agent or manager said that we could
18 book Steve Angelo on that date anywhere but at the
19 Meadowlands. That's exactly what was said. So he
20 could play anywhere in the state, in the tri-state,
21 on that date but not there.
22 Q. When did Mr. Bruno say this?
23 A. I'm not sure of the exact date but I
24 know it was right around the time that we had
25 interfaced with Steve Goodgold about Steve Angelo.

Page 92

1  What I didn't understand was there seemed to be --
2  one of the e-mails that I sent you there seemed to
3  be some good dialogue between Steve Goodgold and
4  John Dimatteo in regards to that booking. From my
5  eyes, the way I read it, it look like we were pretty
6  much a go. They were discussing production, staging
7  and lighting, you know. An agent doesn't engage
8  with you like that unless something is going to come
9  to fruition. I didn't really understand that.
10 Q. Who was involved in the discussion
11 with Mr. Bruno, where he discussed what Mr. Angelo's
12 agent told him?
13 A. I'm assuming this happened at a
14 meeting that I wasn't at. He mentioned someone
15 named Miller -- I forget the gentleman's name,
16 Mr. Miller from Live Nation. I guess there was a
17 John Dee, D-E-E and a Jason Miller. Vito had either
18 with Thomas or had his own. Tommy and Chris did
19 some meetings on his own and Vito went up to talk to
20 them as well.
21 Q. You are talking about a meeting?
22 A. At Live Nation.
23 Q. Between Vito Bruno?
24 A. And Jason Miller and John Dee, D-E-E.
25 from Live Nation.

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 173

```
 1              CERTIFICATE    OF    OFFICER
 2
 3
 4              I, DONNA KELLS, a Certified Court
 5    Reporter and a Notary Public of the State of New
 6    Jersey, do hereby certify that prior to the
 7    commencement of the examination the witness was duly
 8    sworn by me.
 9              I DO FURTHER CERTIFY that the
10    following is a true and accurate transcript of the
11    testimony as taken stenographically by and before me
12    at the date, time and place aforementioned.
13              I DO FURTHER CERTIFY that I am neither
14    a relative nor employee, nor attorney or counsel to
15    any parties involved; that I am neither related to
16    nor employed by any such attorney or counsel, and
17    that I am not financially interested in the action.
18
19
20
21    A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
      C.S.R. License No. 1207
22
23
24
25
```