# EXHIBIT 4

# In The Matter Of:

*Juice Entertainment, LLC, et al v.*
*Live Nation Entertainment, Inc.*

*Al Dorso*
*July 16, 2013*

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

**Min-U-Script® with Word Index**

Case 2:11-cv-07318-CCC-CLW   Document 73-7   Filed 10/17/16   Page 3 of 19 PageID: 624

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

Dorso - direct — Page 9

1 was recorded in any way?
2 A  I don't believe so.
3 Q  Did you take notes during the
4 meeting?
5 A  No.
6 Q  Do you know whether the other
7 people took notes?
8 A  I don't recall. I assume, but I
9 don't recall that.
10 Q  What do you recall discussing
11 with them?
12 A  I think they asked me and my
13 lawyers what I thought transpired between the
14 parties, and I told them.
15 Q  Were there any other subjects
16 that you discussed?
17 A  No.
18 Q  Did they ask whether you would
19 sign a statement or anything of that nature?
20 A  No.
21 Q  Did you offer to do so?
22 A  No.
23 Q  Did you discuss whether you would
24 be a witness in this case?
25 A  I don't believe so.

Dorso - direct — Page 10

1 Q  You told me that they asked you
2 what you thought happened in this matter and
3 that you told them?
4 A  Um-hum.
5 Q  What did you tell them?
6 A  Well, the boys at Juice had a
7 contract and they had set certain goals at
8 certain times, and they were way past those
9 goals and they were at the edge of not -- I
10 actually kept giving them the benefit of the
11 doubt. They are young guys. I thought that
12 they needed a break and they were trying hard,
13 so I kept extending the -- you know, they were
14 at the edge of those goals.
15     They weren't performing to the
16 contract. So at one point I heard from Live
17 Nation -- actually, not from Live Nation, from
18 John D, who was producing Bamboozle there, and
19 we were providing some fencing, or supposed to
20 be providing some fencing and some other
21 equipment at the Bamboozle concert.
22     He said, why weren't we offered
23 this, this event? And I said, to be honest, you
24 were, but you yawned.
25     These guys came along and, you

Dorso - direct — Page 11

1 know, out of the blue, and I gave them a shot at
2 it.
3     So they said, well, we would like
4 to have a chance. I said, they have a contract.
5 Why don't you talk to them? They talked. I
6 don't know what about. I just know that they
7 talked.
8     The boys from Juice said they
9 couldn't come to any agreement, and Johnny D
10 said that they weren't going to agree to
11 anything, and he was a little irritated that,
12 you know, there was a concert that was going to
13 happen and he thought it should be his because
14 we had some sort of relationship, which was not
15 really a great relationship to begin with.
16     And, you know, honestly, I said
17 to the guys, I don't know why you don't take
18 what you get, I said, they are the 800 pound
19 gorilla in the room. You should talk to them
20 and you should negotiate and make this thing
21 happen, because if they don't want it to happen,
22 it won't happen.
23     They said no, no, no, we have
24 contracts in place, we have everything in place.
25     Within a matter of months the

Dorso - direct — Page 12

1 whole thing fell apart, and they were way
2 outside their contract agreement anyway, and in
3 my mind they couldn't put it together at that
4 time, so it didn't -- almost they couldn't get
5 it together from the time they started talking
6 to Live Nation.
7     My feeling was if they connected
8 with somebody like Live Nation they would be
9 able to put it together and get it done, because
10 I don't think they had the tools that were
11 necessary to get it done at that point.
12     So, I mean, that was basically
13 what I said.
14 Q  Do you recall saying anything
15 else to the lawyers for the plaintiffs at that
16 time?
17 A  No, no, I don't recall.
18 Q  Did the lawyers ask you follow-up
19 questions in response to what you told them?
20 A  Obviously I didn't remember what
21 they looked like, so I got to be honest, I'm
22 telling you now not what I told them, what I
23 think I told them, because that's what's in my
24 mind. I repeated that story a number of times.
25     MR. SIEGAL: I want to state an

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

### Dorso - direct — Page 21

1  A  Um-hum, yes.
2  Q  Was there any live music event
3  within an event concert from 2004 until the
4  Latin Music Festival?
5  A  Well, what happened is we were
6  notified that the stadium was going to be torn
7  down, I believe in 2004, and didn't know where
8  we were going to be or what was going to happen.
9  So, really, it was a hunkering down until we got
10  a new fairground and we made a deal, and we did.
11      There were a few things that we
12  discontinued and tried to bring the budget in
13  until we had a new fairground.  So music was one
14  of the things that we stopped.
15  Q  How did the Latin Music Festival
16  come into being?
17  A  The boys from Juice presented,
18  you know, the event to us, and in a very short
19  time frame, and I suggested that they wait until
20  the next year when we had our special event
21  area.
22      They said they really want to get
23  their foot in the door, and they felt they would
24  be able to promote it with a Latin radio station
25  and they would make it successful so that they

### Dorso - direct — Page 22

1  had their foot in the door for the next -- you
2  know, for when we had the special event area.
3      The next question is going to be,
4  was it successful?  No, it was not.
5  Q  Okay, thank you for anticipating
6  my question.  It was an excellent question.
7      By way of follow-up to your
8  excellent question, what makes you say that it
9  was unsuccessful?
10  A  It was poorly attended, and I
11  think it was poorly marketed.
12  Q  Anything else?
13  A  No.  I mean, they managed it
14  fairly well, acts that they said were coming
15  came.  I'm sure they lost a few dollars on it.
16  I don't know exactly, but I'm sure they did.
17  Q  Now, you referred a couple of
18  times to the boys from Juice.
19      Who are the boys from Juice?
20  A  You tell me, what's their names?
21  Q  Actually, we need your
22  recollection.
23  A  You have a 56-year old guy who
24  runs 11 companies.  I don't have a recollection.
25      What is their names?  I'll tell

### Dorso - direct — Page 23

1  you yes or no.  If you say their names, I'll say
2  yes or no.
3  Q  Sitting here today, you don't
4  have a recollection?
5  A  I can tell you if they walked in
6  today, I can tell you what they look like, but I
7  don't remember their names, to be honest with
8  you.
9  Q  Do you remember how they came to
10  present to you the idea to use the Latin Music
11  Festival?
12  A  You know, I think they somehow
13  knew the car show promoter.  You're going to ask
14  me his name, and I don't remember that either.
15      I believe that's how they were
16  introduced to me, through him.
17  Q  Why don't we do something we'll
18  do a little bit of today, mark a document as an
19  exhibit, show it to you and ask some questions.
20      MR. MARX:  The first document we
21  are going to mark as an exhibit is a
22  multiple-page document bearing the title
23  "Deposition subpoena."
24      (Exhibit marked for
25  identification Dorso-1, Deposition subpoena.)

### Dorso - direct — Page 24

1      (Exhibit handed to the witness.)
2  Q  I'm going to hand you what has
3  been marked as deposition exhibit Dorso-1.
4      (Exhibit handed to the witness.)
5  Q  I'm going to ask you a couple of
6  questions.  You can look through it.  I'll give
7  you a preview, the first question is going to be
8  whether you have seen this document before.
9      (Pause.)
10  A  I assume I have.  It was sent to
11  me, I guess.
12  Q  Is this the deposition subpoena
13  that we served you with, which is the reason
14  that we are here today?
15  A  I guess it is.  I have no clue, I
16  got to be honest with you.  And I wouldn't have
17  read it if I got it.  I don't recall reading it.
18      When would I have been served
19  with this, if I might ask a question?
20  Q  I believe it would have been at
21  some point in the latter half of the month of
22  June.
23  A  Of this --
24  Q  No, I'm incorrect.  It would have
25  been -- I don't know when it was.  At some point

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

---

Dorso - direct                                                    Page 37

1  somebody at SFEM?
2  A  Yes.
3  Q  Who provided the terms that were
4  put into Dorso-2?
5  A  I'm assuming it's us that did it,
6  our office.
7  Q  And it looks like the second
8  substantive paragraph of Dorso-2 is the part
9  that contains the description of what Juice is
10 going to do.
11    Do I understand that correctly?
12 A  Yes.
13 Q  And actually references to
14 Deluna, Inc.?
15 A  I have no idea.  That was the
16 first name they came with, and that changed by
17 the time this contract was done.  As a matter of
18 fact, I think I saw some changes in the contract
19 when it originally went out as Deluna.
20 Q  You are talking about Dorso-3?
21 A  Dorso-3, yeah.  I just noticed
22 that it changed to Juice here, but they didn't
23 catch all the changes.  Somewhere else, when I
24 was reviewing the contract earlier, it referred
25 to Deluna, and it was crossed out and initialed.

---

Dorso - direct                                                    Page 38

1  Page six, section four, last paragraph, Deluna
2  instead of Juice.  So that was missed when the
3  contracts was changed to Juice.
4  Q  What was the purpose of Dorso-2,
5  the initial engagement letter?
6  A  It was so they can get investors
7  and book acts.
8  Q  And what were they looking to get
9  investors for and book acts for in terms of the
10 event that they were going to put on in 2011?
11 A  Say that again.
12 Q  What were they trying to do for
13 2011?
14 A  So obviously it says techno,
15 trance, sub genre and electric dance.  That says
16 what they were going to do, DJ and live acts.
17 Q  As of the time of Dorso-2, the
18 December 1st, 2010 engagement letter, had you
19 come to financial understanding with Juice about
20 the business relationship concerning the 2011
21 event?
22 A  You know, I don't think it was
23 formalized at that time.  I told them what they
24 could expect in a contract.
25 Q  What did you tell them they could

---

Dorso - direct                                                    Page 39

1  expect?
2  A  I would have to read the contract
3  to tell you, but I know we had nothing on paper
4  at this time other than they needed to get more
5  together.  They needed to get their act together
6  at this time.
7     So I think this is the way we did
8  it.  We decided to put a letter out saying,
9  okay, go see if you can get your investors, go
10 see if you can book the acts and come back and
11 we'll do a formal contract.  This is what
12 happened.
13 Q  Okay.
14 A  I think the contract -- I think
15 this started -- this went back and forth
16 starting in January sometime, I believe.  It
17 went all the way to March before it got signed.
18    MR. MARX:  We'll mark the next
19 exhibit as Dorso-5, a multiple-page document
20 bearing Bates numbers Juice 1398 through 1413.
21    (Exhibit marked for
22 identification Dorso-5, Multiple-page document
23 Bates numbered 1398 through 1413.)
24 Q  I'm going to ask you to look at
25 what we marked as Dorso-5.

---

Dorso - direct                                                    Page 40

1     (Exhibit handed to the witness.)
2  Q  As I said, a multiple-page
3  document.  The top document looks to be an
4  e-mail from Chris at Yahoo dotcom which forwards
5  a document bearing the subject, "Agreement from
6  Al Dorso, Junior to Chris."
7     My question to you is going to be
8  whether you --
9  A  That's the Dorso-3 agreement?
10 Q  That's my question to you.  Is
11 it?  And does this help you set the context for
12 when the agreement between Juice and SFEM was
13 being discussed and progressed?
14 A  It appears to be the same
15 agreement.  It appears to be the same agreement,
16 but I'm sure that prior to this there must have
17 been other -- you know, this looks like possibly
18 the final draft.  So that would be the 15th of
19 February.  There must have been something prior
20 to that.
21 Q  Do you know who prepared the
22 document Dorso-3?
23 A  I did.
24 Q  Did you prepare that in-house
25 yourself or did you have a lawyer do it?

---

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

---

**Dorso - direct**  Page 45

1  Q  Do you remember any discussion
2  with the guys from Juice as to whether it was
3  going to be a one year deal or whether it would
4  include future years?
5  A  I know they were interested in,
6  you know, locking up the event that they were
7  planning to produce.
8      By the way, you know, no one was
9  really familiar with what they were going to
10 produce, the dance and, you know, electric
11 dance.
12     Now that we know what it is, we
13 would never allow it at the fair.  It would have
14 been a one-year contract.  I mean, they could
15 have come with another event, but they wouldn't
16 bring that event.  Too many drugs and too many
17 problems, and that's not the kind of fair we
18 have.  It is a family event.
19     They said that this is a teen
20 event and that's the music that they are
21 listening to now, and so that's what they told
22 us and that's where we were going.
23     No one knew anything about music.
24 They knew what was happening on the West Coast,
25 happening in Europe, it hadn't happened here,

---

**Dorso - direct**  Page 46

1  really, so, you know, linking us to a fair, so
2  we were a little bit naive.
3      After seeing the Electric Daisy
4  debacle at the stadium last year, you know, this
5  would never have been an event that would have
6  continued there just because of the drug element
7  and everything else.
8  Q  Okay.
9  A  It says here, A, section three,
10 that 2011, it expressly says, 2011, 100 percent
11 net proceeds, 2012, 93 percent, 2013 and '14, 90
12 percent, ten percent.
13     So it obviously was a multi-year
14 contract if they did all the right things the
15 first year.
16 Q  And what was it that Juice was
17 going to promote in 2011?  What sort of event or
18 events were they attempting to put on?
19 A  So the event that's listed
20 here --
21 Q  You are holding Dorso-2?
22 A  Two.  It says, "Electric dance
23 including DJ and live act performances with
24 musical genre to include house, techno, trance,
25 and any sub genre of electric dance."  I can't

---

**Dorso - direct**  Page 47

1  tell you what they were going to do, even today.
2      Does anybody know what techno
3  trance is here?
4  Q  So the State Fair in 2011, and in
5  every year, a 17-day event, correct?
6  A  Yes.
7  Q  Was it your understanding that in
8  2011 Juice was going to put on an event during
9  one of the weeks --
10 A  One day, one weekend day, I think
11 it was a Saturday.  A Friday or Saturday, but I
12 think it was a Saturday.
13 Q  Do you recall what those days
14 were?
15 A  No, it would be in the contract.
16 June 25th and 26th, a two-day event.  So that
17 would be Friday and Saturday.
18 Q  You are looking on page two of
19 Dorso-3?
20 A  Yes.
21 Q  Section one, subparagraph A talks
22 about --
23 A  Oh, Saturday and Sunday.
24 Q  A talks about a two-day event on
25 Saturday and Sunday, an electric dance event?

---

**Dorso - direct**  Page 48

1  A  Um-hum.
2  Q  Correct?
3  A  Yes.
4  Q  And subparagraph B identifies the
5  proposed dates for the electric dance event?
6  A  Um-hum, yes.
7  Q  That's during the first weekend
8  of the fair?
9  A  Yes.
10 Q  And then subparagraph C of
11 section one talks about promoting other concerts
12 or events in the special event area?
13 A  Yes.
14 Q  Did I read that correctly?
15 A  Um-hum.
16 Q  All of this -- and by all of this
17 I mean the three subparagraphs of section one
18 that we have just gone over --- help you refresh
19 your memory about what it was that Juice was
20 going to do for 2011?
21 A  Only what I'm reading.  The
22 memory is blank.
23 Q  Looking at this does not help you
24 with your memory?
25 A  No.

---

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

---

Dorso - direct — Page 57

1 dates.
2 Q  Did you sign both Dorso-3 and
3 Dorso-4?
4 A  Yes.
5 Q  And do you recall whether you
6 signed it on -- whether you signed those
7 documents on March 7, 2011?
8 A  This says March 7 -- yeah, I
9 believe I handwrote that there.
10 Q  Do you recall whether you signed
11 Dorso-3 and Dorso-4 in the same location that
12 Mr. Barrett and Mr. Dorfman and Mr. Sandberg
13 signed it?
14 A  I think we did, yeah, I believe
15 we did.
16 Q  Do you recall where that
17 occurred?
18 A  Probably in this room.
19 Q  Did you have a meeting with them
20 on March 7th?
21 A  I don't recall.  I would assume
22 we did.  We signed a contract, so I only assume.
23 Q  Do you have a recollection one
24 way or another?
25 A  No.

---

Dorso - direct — Page 58

1 Q  Who prepared Dorso-4, the
2 document that says "Request for extension"?
3 A  That looks like Juice did.
4 Q  Do you recall that one way or the
5 other?
6 A  No.
7 Q  Did you ever read the document?
8 It says, "Juice Entertainment, LLC is formally
9 requesting a 30-day extension pertaining to
10 section three, item C located on page three and
11 four, 'items provided to State Fair and
12 financial terms' in the agreement between State
13 Fair Management and Juice Entertainment.  The
14 request of extension is for the season beginning
15 June 24, ending July 10, 2011."
16    Did I read that correctly?
17 A  Yes.
18 Q  Okay.
19    Is it your understanding that
20 Dorso-4 was not only a request for an extension,
21 but it was SFEM's agreement to give the
22 extension that had been requested?
23 A  No.
24 Q  And earlier you referred to
25 yourself as having been a nice guy for having

---

Dorso - direct — Page 59

1 agreed to the extension on the same day that you
2 signed the contract.
3 A  Uh-huh.
4 Q  I didn't ask you to follow up
5 then, but I would like to follow up now.
6    What did you mean by that?
7 A  Well, I know now that you have to
8 hold these guys to what it is.  To be honest, we
9 were already outside the dates.  They needed to
10 provide on the day this was signed with all that
11 information that was due on February 20th, and
12 they, for whatever reason, you know, they said
13 we got it all together.
14    I actually remember them bringing
15 a pile of stuff with a list of acts and quotes
16 that they got from the acts, and agreements,
17 e-mailed agreements from the acts to perform.
18    They said, just let us -- we got
19 to get -- the contracts are coming.  Give us
20 some more time.  It was that kind of thing.
21    I said, all right, all right,
22 we'll do that.  Get your act together, and you
23 have 30 days to do it.
24    I shouldn't have believed any of
25 it, because it obviously wasn't true, you know,

---

Dorso - direct — Page 60

1 at that time.
2 Q  I want to follow up on your
3 answer concerning the pile of agreements.
4    Am I correct in understanding
5 that those were not signed agreements?
6 A  They were not signed agreements.
7 They were offers.  I don't know the verbiage
8 that they used, but they were offers to the
9 acts, and the acts' response to their
10 availability and counteroffers or whatever they
11 were.
12    There were a number of them, and
13 a number saying the deposits were opening the
14 way and prepare the contracts and that kind of
15 thing.  That I recall, not in detail, I have no
16 clue what the acts were, but I know that's what
17 they showed me to get me to do this.
18 Q  This is the 30-day extension?
19 A  The 30-day extension at that
20 time.
21 Q  Which would have brought you to
22 roughly April 7th or so?
23 A  Yes.
24 Q  Did you receive copies of any
25 signed contracts prior to April 7?

---

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

### Dorso - direct — Page 81

1  A  Yes.
2  Q  And that after you made that
3  suggestion, Barrett and/or Dorfman reported back
4  to you that an agreement could not be reached?
5  A  Yes.
6  Q  Correct?
7  A  Yes.
8  Q  Now what I'm trying to find out
9  is whether you had a subsequent discussion with
10 John D'Esposito after he was unable to reach a
11 deal with Dorfman and Barrett. Do you
12 understand my question?
13 A  Yes, I do, and I honestly don't
14 recall whether I did or not. And in my best
15 recollection, I think it was John who told me
16 about Tiesto not being able to do it because of
17 contractual obligations in New York.
18    That's in the back of my head,
19 and I don't know who told me that. And I know
20 that, as I said before, that Tom or Chris told
21 me that they blocked Tiesto. And that's one of
22 the things, you know, that was a big act and
23 that's what they were banking on. You know, in
24 their minds they had been screwed out of this
25 act. That was their cornerstone of the concert.

### Dorso - direct — Page 82

1  Q  So I would like your best -- see,
2  I want to know from you everything that you
3  remember John D'Esposito saying to you about the
4  Juice event, about anybody from Juice, Dorfman,
5  Barrett, Sandberg, the event for 2011.
6  A  Unfortunately, I don't have that
7  kind of a recollection. You are talking about
8  three plus years ago. I just don't have it.
9  Q  And so I understand you, you
10 recall the March meeting that you had in person
11 here.
12 A  I do.
13 Q  In Belleville?
14 A  Yes.
15 Q  And you don't recall any other
16 discussions that you had with Mr. D'Esposito?
17 A  I honestly don't. They may have
18 been phone. They may have been in person. I
19 honestly don't know after that.
20 Q  Okay. Have you told me your best
21 recollection as to whether Mr. D'Esposito told
22 you that Live Nation blocked Tiesto from
23 performing at the 2011 New Jersey State Fair
24 event?
25 A  Say that again.

### Dorso - direct — Page 83

1  Q  Yes, okay. I apologize. I will
2  say it in a different way.
3    Did John D'Esposito tell you that
4  Live Nation had blocked Tiesto from performing
5  at the 2011 New Jersey State Fair?
6  A  Not to my recollection.
7  Q  Did anybody else from Live Nation
8  tell you that?
9  A  No.
10 Q  Did Mr. D'Esposito tell you that
11 Live Nation had blocked any other artist from
12 appearing at the 2011 New Jersey State Fair?
13 A  Not to my recollection.
14 Q  Did anybody from -- anybody else
15 from Live Nation ever tell you that?
16 A  No.
17 Q  Did anybody from Live Nation ever
18 tell you -- strike that.
19    Are you familiar with the William
20 Morris talent agency?
21 A  I am.
22 Q  What is William Morris?
23 A  A big talent agency out in
24 California, and that's all I can tell you. They
25 book acts. They manage acts. That's all I

### Dorso - direct — Page 84

1  know.
2  Q  Did anybody from Live Nation ever
3  tell you that the William Morris agency belonged
4  exclusively to Live Nation?
5  A  I don't recall that.
6  Q  Did anybody from Live Nation ever
7  tell you that no William Morris artists would be
8  allowed to play at the New Jersey State Fair?
9  A  I don't recall that.
10 Q  Did anybody ever -- strike that.
11 I'll start the question again.
12    Did anybody from Live Nation ever
13 tell you that Juice Entertainment, Mr. Barrett,
14 Mr. Dorfman, Mr. Sandberg, that they associated
15 with thieves?
16 A  I don't recall. You know,
17 somebody told me about -- it may have been
18 John -- about some production that Chris or Tom
19 was involved with in the winter, didn't pay
20 their bills. I don't remember where that came
21 from. I think it came from John.
22 Q  And by John, you mean John D?
23 A  John D, yeah.
24 Q  And do you think that was during
25 the March meeting that you had here in

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

Dorso - direct — Page 85

1 Belleville?
2 A  I don't know, but it wouldn't
3 have mattered. I mean, there is a contract in
4 place, and why would any of that matter? And
5 it's sour grapes when a competitor talks about
6 another competitor, if they considered him a
7 competitor.
8     Everybody knows that John D is a
9 bull in a china closet and they don't listen to
10 half of what he says. So, I mean, honestly, if
11 he's saying any of the things that you just
12 asked, a dozen things, if he said any of those
13 things, would they be -- would I consider them
14 real? Probably not, because he just talks.
15 Q  Do you recall Mr. D'Esposito
16 saying anything negative at any time about
17 Mr. Barrett, Mr. Dorfman, Mr. Sandberg, or
18 anybody associated or affiliated with Juice?
19 A  I can't recall that.
20 Q  And if Mr. D'Esposito had made
21 negative contacts, would they have had any
22 impact upon the relationship between State Fair,
23 SFEM and Juice?
24 A  No, not at that point. My
25 decisions were made based on a contract, and

Dorso - direct — Page 86

1 they couldn't perform.
2     The reality is that they knew at
3 the time the contract was canceled that they
4 couldn't perform and they knew they could be
5 also out of the contract.
6     It was pretty mutual by the time
7 we were done. It was done.
8     And I never -- you know, like I
9 said, that wouldn't have mattered. Whatever
10 John said, you know, the reason I say no to
11 anybody else at Live Nation, because everybody
12 at Live Nation is professional. They would
13 never say those kinds of things. Whether they
14 do them or act on them is another story, but
15 they would never say them.
16     John D is the kind of person who
17 says everything on his mind, because he's crazy,
18 and so that's why we couldn't work together.
19 Q  Did anybody from Live Nation ever
20 tell you that Juice Entertainment, Barrett,
21 Dorfman and Sandberg lacked funding?
22 A  I don't recall.
23 Q  Did anybody from Live Nation ever
24 tell you that Juice Entertainment and its
25 principals lacked the experience necessary to

Dorso - direct — Page 87

1 put on a show of the type that was being
2 contemplated for the State Fair in 2011?
3 A  I don't recall that.
4 Q  Did anybody from Live Nation ever
5 tell you that Live Nation would withhold
6 ticketing for the 2011 Juice event that was
7 being contemplated?
8 A  How would they withhold
9 ticketing? In what way?
10 Q  I'm just asking whether anybody
11 from Live Nation ever said that to you.
12 A  No. That would have me involved
13 in a lawsuit then with them if they said that.
14 I mean, that's crazy.
15 Q  Now, you described for us the
16 timing and the reason why SFEM terminated the
17 contract with Juice. And I believe your
18 testimony is, and you correct me if I'm wrong,
19 is that the contract was terminated because the
20 obligations under the contract had not been
21 satisfied.
22 A  Right.
23 Q  Do you know why Juice was unable
24 to perform under the contract?
25 A  Well, you know, I don't think

Dorso - direct — Page 88

1 they signed any acts because they were looking
2 for the big act. When the big act couldn't get
3 signed, they didn't want to have deposits out
4 and lose their money on the other acts.
5     They were trying to resolve that
6 issue. Other acts that they thought they had
7 leads on were obviously jumping off and taking
8 other work. So I think it was really a
9 snowballing thing, just started to lose control
10 of the whole thing.
11     I have no knowledge of this, but
12 my, you know, my senses told me that probably
13 the guys that were going to finance them, fund
14 this whole thing, started to get shaky, and so,
15 you know, the whole thing blew up at some point.
16     As an investor you have to start
17 to worry, the same as, you know, the event
18 manager has to worry, that it's too late and
19 things aren't under control and they are not
20 being managed properly.
21     I'm assuming they had those same
22 worries that I did, you know.
23 Q  Do you have any other thought as
24 to why Juice was unable to perform?
25 A  They could be inexperienced.

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

---

Dorso - direct                                                          Page 89

 1  They seemed to have the drive and the will to do
 2  it. And, you know, they sort of reminded me of
 3  me when I was young and aggressive and wanted to
 4  do things that were out of my capabilities, but
 5  I did them anyway to prove people wrong.
 6      That's what made me go in and,
 7  you know, kept giving them extensions and
 8  allowing them to do things, and obviously they
 9  couldn't come up with it, put it all together.
10      Do I believe that if Live Nation
11  wanted to block this concert they could have?
12  Without a doubt, with three phone calls.
13      Do I think that Live Nation did?
14  I can't answer that. What can I tell you?
15  Q  Why not?
16  A  I have no knowledge, so I can't
17  say. I mean, I --
18  Q  Did you ever have any discussions
19  with anybody at the New Jersey Sports and
20  Exposition Authority about the contemplated
21  Juice concert at the 2011 event?
22  A  Just that we were preparing a
23  concert within a concert -- I mean an event
24  within an event, and it would be a concert
25  event, and, you know, I think in our contract it

---

Dorso - direct                                                          Page 90

 1  says that they have the right to deny or accept
 2  whatever happens there.
 3      That's why I say this wouldn't
 4  have gone on for another year, not only wouldn't
 5  I have wanted it, but they wouldn't want it
 6  there either.
 7  Q  Why would you believe that?
 8  A  There are too many problems with
 9  those events. Obviously the Electric Daisy
10  event that went on last year at MetLife Stadium
11  was a disaster.
12  Q  Can you explain that to me?
13  A  Drug-wise and crowd control and
14  hundreds and hundreds of kids going to the
15  hospital. You can't -- you know, you just
16  can't -- again, the 11 years that I had this
17  event, I turned it into a family friendly event.
18      And I'm thinking we are going to
19  bring teenagers to the event and it's going to
20  be, you know, a predominantly teen thing that is
21  happening. The parents would be at the
22  fairground with the smaller children, the teens
23  would be at the concert, it's a win-win for
24  State Fair, when in reality the event is, you
25  know, a drug fest. It's not good. Who would

---

Dorso - direct                                                          Page 91

 1  want that? You know, the press would be so bad.
 2      Here you are presenting a family
 3  event, and you got drugged out naked girls, 17
 4  and 18 years old, right next door in your event,
 5  basically.
 6      I don't know if they would have
 7  went the second night if I sold out the first
 8  night, to be honest with you. I don't know.
 9      And so that has no bearing on
10  what the contract was, because I even went into
11  it, but knowing what I know now and seeing an
12  event firsthand, it's not something that we
13  would want there.
14  Q  And who at NJSEA would be
15  responsible for making the decision as to
16  whether to approve a proposed concert under the
17  Juice/SFEM agreement?
18  A  It would be Jim Minish.
19  Q  Can you spell that for us?
20  A  M-i-n-i-s-h.
21  Q  And what is his position?
22  A  He's executive vice president.
23  Q  And how would SFEM obtain
24  Mr. Minish's approval or lack of approval with
25  respect to a proposed event at the State Fair?

---

Dorso - direct                                                          Page 92

 1  A  Once they had the list of talent,
 2  we would send the list of talent to Mr. Minish.
 3  He would say yea or nay based on all kinds of
 4  things, you know, like crowd control, proper
 5  State Police and security, all those things have
 6  to come in.
 7      He would say, okay, based on the
 8  acts that you are bringing in, this is how much
 9  support you need. Do you have support? Yes, we
10  do. Then we approve the event. That's
11  basically how it goes.
12      I would say if we presented the
13  event this year after their experience last year
14  with the Electric Daisy, it would be a no as
15  soon as we said dance, technically.
16      As a matter of fact, we were
17  looking at some events, bringing in top names,
18  and they wanted -- the promoters wanted to bring
19  in some dance, you know, DJs in addition. And
20  one of the reasons we stopped early is they kept
21  sending us -- they were giving us names of acts,
22  big acts that were booked already, we knew they
23  were booked somewhere else in those weeks of the
24  dates of events, and they were sending us DJs
25  that were available that were booked.

---

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

Dorso - cross                                              Page 117

1  guys, show me. They are not showing me
2  anything. Show me your production. Show me
3  your list. Where is your stuff?
4     That's more of that -- you know,
5  I can't even go back, I wish I had a good memory
6  of it, but I can't, but it sounds like time and
7  time again when you get the guy that's not
8  producing, or not doing what he says he's going
9  to do, to try to be a little motivational,
10 saying, look, you dopes, you should have gone
11 down the right road.
12    I told you when we met the right
13 road would have been to make a deal with Live
14 Nation no matter what it was because they
15 control the market. That's my opinion, not
16 reality, perception, and perception is reality,
17 you know, to the person that believes it.
18 Q  Earlier in response to the
19 questioning by Mr. Marx you said you have no
20 firsthand knowledge that Live Nation actually
21 blocked any of these things.
22 A  Right.
23 Q  You also said it could happen
24 with three phone calls.
25 A  Yeah, I think that they could

Page 118

1  have, you know, at their size and with what they
2  do and the power that they wield, they can do
3  anything they want in the concert marketplace
4  without a doubt.
5     MR. SIEGAL: All right, let me
6  have one or two minutes off the record and we
7  may be done here.
8     (Recess.)
9     MR. SIEGAL: I have no more
10 questions at this time. Thank you for your
11 time.
12    THE WITNESS: Thank you.
13    (Deposition adjourned at
14 1:20 p.m.)
15    (Exhibits retained by the
16 attorneys.)
17    - - -

Page 119

4     I have read the foregoing
5  transcript and do hereby certify that it is a
6  true and accurate transcript of my testimony.

11    ----------------------------------
12                AL DORSO

15 Sworn and subscribed to before me
   this         day of         , 2013

20 Notary Public

Page 120

1           C E R T I F I C A T E

3     I CERTIFY that the foregoing is a
4  true and accurate transcript of the testimony as
5  taken by and before me stenographically at the
6  time and place aforementioned.
7     I FURTHER CERTIFY that I am
8  neither attorney for nor counsel to any of the
9  parties; parties of any of the attorneys in this
10 action; and that I am not financially interested
11 in the outcome of this case.

16           HOWARD A. RAPPAPORT, C.C.R
              Certificate No. XI00416