# EXHIBIT 11

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

---

*John DiMatteo*
*July 17, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

**Min-U-Script® with Word Index**

Juice Entertainment, et al v.
Live Nation Entertainment

| | Page 13 |
|---|---|

1  events. I don't remember which ones. I really
2  didn't deal with him directly. He made a couple
3  events of ours around that time period.
4  Q.  How are you involved in the event that
5  gives rise to this lawsuit?
6  A.  They approached my partner at the time
7  about doing something at the Meadowlands Fair, the
8  festival. We agreed to go in as a partnership to do
9  it.
10  Q.  And what were you doing?
11  A.  We were booking talent and marketing
12  as well.
13  Q.  Who is the partner that you made
14  reference to?
15  A.  Vito Bruno.
16  Q.  Did you and Mr. Bruno do business
17  through a corporate entity?
18  A.  Yes.
19  Q.  What's the name of that?
20  A.  Area Event LLC.
21  Q.  Do you have a general sense of the
22  timeframe that you and Mr. Bruno were involved in
23  this venture with the plaintiffs?
24  A.  It was -- I don't remember the year.
25  I think it was 2010. It might have been -- 2010. I

| | Page 14 |
|---|---|

1  think it was 2010. No, it was 2011. It was 2011.
2  I'm pretty sure it was 2011, earlier in the year,
3  January, February, first quarter.
4  Q.  Do you have any documents, and I use
5  "documents" to mean not just paper documents but
6  electronic documents like e-mails, texts, anything
7  concerning your work on this event from the first
8  quarter of 2011?
9  A.  I'm not sure because I changed e-mail
10  servers so I don't know if we have stuff backed up
11  from then. I may or may not.
12  Q.  Do you recall being served with a
13  Subpoena in this case that brings you here today?
14  A.  Yes.
15  Q.  And the Subpoena contains a list of
16  documents that we requested that you provide?
17  A.  Okay.
18  Q.  Do you recall that?
19  A.  No.
20  MR. MARX: Why don't we mark the first
21  deposition exhibit as Dimatteo-1. It is a multiple
22  page document bearing the title Deposition Subpoena.
23  (Exhibit Dimatteo-1 was marked for
24  identification.)
25  Q.  I'm handing you the document because

| | Page 15 |
|---|---|

1  that's the way we are supposed to do it.
2  A.  I'm sorry.
3  MR. SIEGEL: I'm sorry to interrupt.
4  (There was a discussion off the
5  record.)
6  (Amy Walker Wagner, Esq. enters the
7  deposition via telephone conference.)
8  MR. SIEGEL: The court reporter is
9  going to note your telephonic appearance.
10  Q.  I'm not sure where we left off, but I
11  handed you Deposition Exhibit 1 which is the
12  Subpoena that brings you here today?
13  A.  Right.
14  Q.  My first question is do you recall
15  seeing this?
16  A.  Yes.
17  Q.  If you turn to pages nine and ten of
18  the document.
19  A.  Okay.
20  Q.  There's a list of 12 categories of
21  documents that we requested you produce, to the
22  extent that you have them.
23  A.  Okay.
24  Q.  Do you see that list?
25  A.  Yes.

| | Page 16 |
|---|---|

1  Q.  You have not given us any documents
2  prior to today and I don't think you have any with
3  you.
4  A.  No.
5  Q.  My primary question at this point is
6  whether you believe any documents that are
7  identified on the list exist and that you can
8  preserve for us. I guess that's a compound
9  question, for which I apologize.
10  A.  That's all right.
11  Q.  So first do you think you have any
12  documents responsive to the requests?
13  A.  I may.
14  Q.  Okay.
15  A.  I may.
16  Q.  Which categories of documents do you
17  think you might have?
18  A.  E-mails, I'm hoping.
19  Q.  Do you have any -- would you have any
20  hard documents relating to The Event?
21  A.  No.
22  Q.  If you had anything it would be
23  e-mails?
24  A.  It would be electronic.
25  Q.  What would those e-mails be about?

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Page 29**

1  will say "offer is confirmed.  Contract is on the
2  way," something along those lines.
3  Q.  Okay.  And then because it is the
4  agent that prepares the contract the next thing that
5  happens is that the contract is sent --
6  A.  The contract is then sent from the
7  agent to the buyer.
8  Q.  What happens next?
9  A.  The buyer marks up the contract, sends
10  it back, signs it, gives a deposit.
11  Q.  And when is the act, the artist,
12  considered booked by the purchaser?
13  A.  Once you get the confirmation e-mail
14  and says "this artist is confirmed."  It is safe to
15  say you won't have the written, but the general
16  industry standard is once you get a confirmation
17  e-mail you can start moving ahead with the show.
18  Q.  Does it ever happen that following
19  receiving the confirmation e-mail from the agent
20  that the party cannot reach terms on the written
21  contract?
22  A.  It has happened.  It happens.  It does
23  happen.  It is rare, but it happens.
24  Q.  Going back to The Event.  In the
25  summer of 2011 you mentioned electronic dance music.

---

**Page 30**

1  Do you know whether Mr. Barrett and Mr. Dorfman were
2  intending to or hoping to put on events other than
3  electronic dance events?
4  A.  I think a Latin event.
5  Q.  Were you involved in the Latin event?
6  A.  No.
7  Q.  Do you know who was?
8  A.  No, but I heard them mentioning it.
9  Q.  Do you know whether they had any other
10  plans for events other than the electronic dance
11  moves and the Latin event?
12  A.  I don't know for sure.
13  Q.  Are you able to describe for me in a
14  summary way the nature of your involvement in the
15  project from the time you started working with
16  Mr. Barrett, Mr. Dorfman and Mr. Bruno and
17  Mr. Arteca until you stopped working on it?
18  A.  We were sourcing out talent and
19  touching on production ideas, but mainly we were
20  sourcing out talent.
21  Q.  What does that mean, sourcing out
22  talent?
23  A.  We were putting a list of artists
24  together that we potentially wanted to book and I
25  had planned to send offers out.  I believe we sent a

---

**Page 31**

1  couple offers out, a few offers out, not too many.
2  Q.  What happened next?
3  A.  We sent out offers and none of them
4  were accepted.
5  Q.  What happened next?
6  A.  We aborted once we couldn't get the
7  headliner.
8  Q.  What do you mean by "couldn't get the
9  headliner?"
10  A.  We couldn't secure a headlining artist
11  or anyone from my efforts.  None of the offers I
12  sent out were accepted and then eventually we were
13  running out of lead time and we walked away from the
14  project.
15  Q.  Do you know whether the state fair
16  terminated the contract with Mr. Dorfman and
17  Mr. Barrett --
18  A.  I don't know.
19  Q.  -- or whether that decision was made
20  by your partnership?
21  A.  When it got to a certain point and
22  lead time is out and offers had not been accepted,
23  my team left.  What the plaintiff continued doing I
24  have no idea.
25  Q.  How much lead time did you believe

---

**Page 32**

1  there needed to be prior to an event such as was
2  being contemplated here?
3  A.  Over a year.
4  Q.  Why do you say that?
5  A.  Due to the nature and scope of a large
6  scale music festival and the nature of the lead time
7  needed to, you know, A, book talent, you know, B,
8  market the show and put it together logistically you
9  need -- especially a first-year festival you need
10  over a year.
11  Q.  When you became involved in the
12  project was it your understanding that you would
13  have a year of lead time prior to the --
14  A.  We did not have a year of lead time
15  and I went against my better judgment and got
16  involved anyway because the deal seemed financially
17  good so I went ahead with it.
18  Q.  You mentioned two reasons why lead
19  time was important in advance of a festival like
20  this.  One was you needed time to book talent.  Two
21  is you needed time to market the show.  Did I recall
22  those correctly?
23  A.  Yes, you did.
24  Q.  Are there other reasons you need lead
25  time prior to a festival?

---

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 33

1 A. Yes, to secure sponsorship, to secure
2 staff, negotiate all the terms of the venue. There
3 is a lot of other things.
4 Q. You mentioned the concept of having a
5 headliner. Did I recall that correctly?
6 A. Yes, you did.
7 Q. Can you tell me the need to have a
8 headliner at an event that was being contemplated?
9 A. Can you be more specific?
10 Q. Sure. Why did this event need a
11 headliner?
12 A. You need an artist to anchor The
13 Event, an artist that's capable of selling at least
14 50 percent of the capacity of the venue on their
15 own. The headliner is typically to anchor for the
16 event and it is supported with other talent.
17 Q. Who were the headliners that were
18 being discussed in connection with this event?
19 A. Tiesto.
20 Q. Any others?
21 A. Steve Angelo, at a certain point, and
22 I don't remember if there were others.
23 Q. And Tiesto and Angelo would be
24 sufficiently important as players in the industry
25 that they could be headliners for an event like

---

Page 34

1 this?
2 A. Yes.
3 Q. Did you make offers to Tiesto and
4 Steve Angelo?
5 A. Yes.
6 Q. Were they accepted?
7 A. No.
8 Q. Do you know why they were not
9 accepted?
10 A. Tiesto -- Tiesto's offer was not
11 accepted because he played for -- he was going to
12 Electric Zoo. And Steve Angelo, for some reason,
13 just didn't want to do it. I don't know why.
14 Q. Do you know whether the fact that
15 Mr. Steve Angelo and Tiesto declining offers had an
16 impact on whether other artists were accepting or
17 not accepting offers to appear at The Event?
18 A. For sure. Having or not having an
19 artist of Tiesto's caliber will dictate, to a
20 certain extent, whether the support artists and
21 other talent on the show confirm. It is the first
22 thing they will say is "who else is playing." When
23 you say Tiesto is playing it gives The Event instant
24 credibility. When you have a headliner and you are
25 launching a new event it becomes difficult to secure

---

Page 35

1 the rest of the talent.
2 Q. Now, I believe your testimony was that
3 Tiesto declined the offer because he went to
4 Electric Zoo. Did I recall that correctly?
5 A. Yes.
6 Q. What is Electric Zoo?
7 A. Electric Zoo is a music festival that
8 was launched in 2009. It takes place annually on
9 Labor Day weekend on Randall's Island and it is
10 produced by a company called Main Event.
11 Q. How do you know that Tiesto declined
12 the offer to appear at this event, so that he could
13 appear at the Electric Zoo event?
14 A. The agent told me.
15 Q. Who is the agent?
16 A. Paul Morris.
17 Q. Did Mr. Morris tell you that orally or
18 in writing?
19 A. Orally.
20 Q. Do you recall when he told you that?
21 A. No.
22 Q. Did you tell anybody else what
23 Mr. Morris had told you about the reason why Tiesto
24 was declining the offer to appear at this event?
25 A. Repeat that, please.

---

Page 36

1 Q. Sure. Mr. Morris told you that Tiesto
2 was declining the offer to appear at this event?
3 A. Right.
4 Q. Because he was going to appear at
5 Electric Zoo?
6 A. Right.
7 Q. Did you tell anybody what Mr. Morris
8 had told you?
9 A. I probably told -- I don't remember
10 exactly. I really can't give a definitive answer.
11 I'm assuming I told the people that we were working
12 with, the plaintiff.
13 Q. Do you know whether you told them in
14 writing or --
15 A. No, no, no, definitely not in writing.
16 Q. Okay.
17 A. Not to my knowledge anyway.
18 Q. Okay.
19 A. I should just say not to my knowledge.
20 Q. Did you speak about the reasons why
21 Tiesto was declining the offer at this event with
22 anyone else associated with Tiesto?
23 A. I don't remember.
24 Q. Now, you've been describing for me
25 what the partners you identified to me were doing in

---

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 53

1  A.  Yes.
2  Q.  And the subject is "DJ's from WME."
3  Did I read that correctly?
4  A.  Yes, you did.
5  Q.  What is Exhibit 5?
6  A.  You are asking me?
7  Q.  Yes.  What is it?
8  A.  It is a list of the artists that were
9  potentially available to play The Event.
10  Q.  Did you send this e-mail out?
11  A.  Yes.
12  Q.  What was the purpose of the e-mail?
13  A.  To show everyone what was available to
14  us.
15  Q.  And where did you get the list from?
16  A.  From William Morris agents.
17  Q.  Did you send this before or after the
18  meeting at William Morris that you were describing
19  earlier?
20  A.  I don't recall.  I don't remember.
21  Q.  Did you have any discussions with the
22  recipient of the e-mail about it at or around the
23  time you sent it?
24  A.  I believe so.
25  Q.  Do you remember those discussions?

---

Page 54

1  A.  No.
2  Q.  What is Dimatteo-6?
3  A.  Those are offer terms on the front
4  page.
5  Q.  Is it an e-mail that you sent to the
6  same recipients of Exhibit 5?
7  A.  Yes.
8  Q.  The subject says WME artists offer?
9  A.  Yes.
10  Q.  Is there an excel spread sheet
11  attached to the e-mail?
12  A.  It appears that there is.
13  Q.  Did you prepare that spread sheet?
14  A.  I did.
15  Q.  Is that spread sheet a proposed offer
16  list for William Morris artists?
17  A.  Yes.
18  Q.  What was the purpose of preparing the
19  spread sheet?
20  A.  To make offers for the talent that we
21  desired.
22  Q.  Your message to the others was "check
23  this out before I send it."
24  A.  Yes.
25  Q.  Why did you want them to do that?

---

Page 55

1  A.  I wanted them to do that because I was
2  in partnership with others and I want to be a good
3  partner and show everyone before I do something.
4  Q.  Can you turn to Exhibit 7, please?
5  A.  Okay.
6  Q.  Exhibit 7 appears to be a series of
7  e-mails between you and participants from William
8  Morris Agency.  Is that correct?
9  A.  Yes.
10  Q.  Including an e-mail from you to them
11  on February 3rd which makes reference to offers to
12  William Morris artists.  Did I read that correctly?
13  A.  Yes.
14  Q.  Did you send the offer list to William
15  Morris on or about February 3rd?
16  A.  I did.
17  Q.  Included in your e-mail to William
18  Morris is the statement that "Please note that all
19  offers expire on February 12th, 2011."  Did I read
20  that correctly?
21  A.  Yes.
22  Q.  What is the purpose behind putting an
23  expiration identifier in an e-mail like this to an
24  agent?
25  A.  You want to illustrate a point that

---

Page 56

1  you want the offer accepted or confirmed --
2  confirmed or rejected by a certain date.
3  Q.  All right.
4  A.  Once the offer expires -- once the
5  offer expires you can then pull it back as the
6  buyer.  It is an unwritten rule in the industry that
7  when you send an offer and prior to the expiration
8  date, once you send the offer you can't pull it back
9  until the offer expires.  If you offer somebody
10  $100,000 to play a show and then you send an e-mail
11  and then you decide the next day you don't want to
12  do it, it kind of puts you in a bad situation with
13  the agent.
14  Q.  I got it.  I take it from the fact
15  that you sent out the offer list to William Morris
16  on or about February 3rd that your other partners
17  approved you to do that?
18  A.  I believe so.
19  Q.  In response to the questions you had
20  posed to them earlier?
21  A.  I believe so, yes.
22  Q.  Do you know whether these offers were
23  accepted prior to the expiration of the offers?
24  A.  One thing I want to add.
25  Q.  Sure.

---

Juice Entertainment, et al v.
Live Nation Entertainment

Page 57

1  A.  I forgot to mention before.  One offer
2  that was sent out was accepted that I made.  That
3  was to Matthew Deer the Windish Agency.  That offer
4  was accepted.
5  Q.  Okay.
6  A.  These were not accepted.
7     MR. MARX: Dimatteo-8.
8     (Whereupon, Exhibit Dimatteo-8 was
9  marked for identification.)
10  Q.  I'm handing the witness what we are
11  marking bearing bates number Juice 2676.  It is a
12  one-page e-mail from John Dimatteo to others with a
13  date of February 25th, 2011 and the subject is WMP
14  Artists?
15     I will ask you to take a look at it
16  and I will have a question or two.
17  A.  Okay.
18  Q.  What is Dimatteo-8?  Is it an e-mail
19  that you sent?
20  A.  Yes.
21  Q.  And what was the purpose behind
22  sending the e-mail?
23  A.  I was letting everyone know that we
24  didn't get to -- the offers weren't being accepted
25  and it appears that we needed to raise the offers

Page 58

1  from what was originally sent.
2  Q.  Do you recall why you sent this
3  e-mail?
4  A.  I think I had a phone call with
5  someone at William Morris and we discussed these
6  prices over the phone.
7  Q.  Do you know what the other partners in
8  connection with The Event did in response to your
9  e-mail?
10  A.  I don't remember.
11     MR. MARX: Diamatteo-9.
12     (Exhibit Dimatteo-9 was marked for
13  identification.)
14  Q.  I hand the witness Diamatteo-9.  It is
15  a multiple page document that bears bates number
16  2609 to 2610.  I'm going to ask you to look at it
17  and I will have a question or two.
18  A.  Okay.
19  Q.  Exhibit 9 looks to me like -- the top
20  document appears to be an e-mail dialogue between
21  you and the other partners in connection with The
22  Event.
23  A.  I'm looking at this and the first
24  e-mails have nothing to do with The Event.
25  Q.  Right.  The first e-mails are a

Page 59

1  dialogue between you and Mr. Wiederlight from
2  William Morris?
3  A.  Right.
4  Q.  That concerns issues unrelated to The
5  Event?
6  A.  Right.
7  Q.  At some point Mr. Wiederlight raises
8  the subject of --
9  A.  I see.
10  Q.  -- the subject of N.E.R.D.  What is
11  that?
12  A.  It is an act.
13  Q.  Is that an act that was being
14  considered in connection to our event?
15  A.  This event.
16  Q.  I didn't mean "ours" as if I was one
17  of your partners.
18     MR. SIEGEL: You are not a plaintiff.
19  Go on.
20  Q.  What did you understand
21  Mr. Wiederlight to be writing to you on March 3rd
22  concerning N.E.R.D.?
23  A.  He was telling me how much it would
24  take to get it down.
25  Q.  Did you convey that information to the

Page 60

1  other partners in the event?
2  A.  Yes.
3  Q.  Do you know what their response was?
4  A.  It says "does it include Ferrell."
5  Q.  And who is Ferrell?
6  A.  He is the front man of the band.
7  Q.  In other words --
8  A.  Yes.
9  Q.  Do you know what happened with respect
10  to any offer to N.E.R.D.?
11  A.  I don't think we made it.
12  Q.  Did any William Morris artist accept
13  offers that you conveyed to appear at The Event?
14  A.  No.
15  Q.  Do you know why?
16  A.  I don't remember why.
17  Q.  Do you know whether Live Nation used
18  its influence in the industry to put pressure on
19  William Morris to require its artists to decline
20  offers to appear at this event?
21  A.  I don't know first hand, but I was
22  told by others that something along those lines was
23  going on.
24  Q.  Who told you that?
25  A.  The plaintiffs.

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 61

1  Q.  Mr. Barrett and Mr. Dorfman?
2  A.  Yes.
3  Q.  What did they tell you?
4  A.  They told me that they spoke with
5  someone, I don't know who, and that Live Nation was
6  using their influence to prevent artists from
7  playing this event.
8  Q.  When did he tell you that?
9  A.  I don't remember, that year, during
10  this timeframe.
11  Q.  Was it during the timeframe that you
12  were making offers to William Morris clients?
13  A.  I don't remember when. I really don't
14  remember.
15  Q.  Did Mr. Dorfman and/or Mr. Barrett
16  tell you who told them that Live Nation had used its
17  influence that way?
18  A.  I don't remember.
19  Q.  Do you remember them saying that they
20  used the influence with respect to William Morris or
21  any other agencies?
22  A.  They mentioned William Morris and
23  Tiesto. I don't know.
24  Q.  Did they show you any documents
25  concerning that allegation?

---

Page 62

1  A.  No.
2  Q.  Do you believe the allegation?
3  A.  Did I believe the allegation? I guess
4  to a certain extent, but obviously not hearing it
5  first hand it sounded plausible. It sounded
6  realistic.
7  Q.  Did you ever discuss the allegation
8  with anybody?
9  A.  Not to my knowledge.
10  Q.  Did you ever discuss with anybody from
11  William Morris, whether William Morris had been
12  pressured by Live Nation?
13  A.  No.
14  Q.  Did you ever discuss with any talent
15  agent whether he or she had been pressured by Live
16  Nation?
17  A.  No.
18  Q.  Did you ever ask anybody at William
19  Morris why none of its artists accepted the offers
20  that you had made in connection with this event?
21  A.  I don't remember.
22  Q.  Did you ever discuss with anybody from
23  William Morris the reasons why none of the William
24  Morris artists accepted offers to appear at this
25  event?

---

Page 63

1  A.  I don't remember exactly.
2  Q.  Do you remember generally?
3  A.  Generally I'm assuming that obviously
4  there was discussion as to why but I don't remember
5  when, where, or what was discussed. Obviously,
6  knowing myself, I'm assuming I did have some sort of
7  discussion but I have no recollection of exactly
8  what was said or when it was said. That's an
9  assumption.
10  Q.  Understood. I am going to change
11  subjects slightly.
12  A.  Sure.
13  Q.  Same general subject but we are going
14  to change agencies.
15  A.  Okay.
16  Q.  What is A.M. Only?
17  A.  A.M. Only is an electronic music
18  booking agency based in North America.
19  Q.  Have you had dealings with A.M. Only?
20  A.  Yes.
21  Q.  Both prior and after?
22  A.  Before, during and after.
23  Q.  Okay. Who do you deal with at A.M.
24  Only?
25  A.  Everyone in the company pretty much,

---

Page 64

1  all the agents in the company I should say.
2  Q.  And which agents did you deal with, if
3  any, in connection with this event?
4  A.  Paul Morris primarily.
5  Q.  Do you recall dealing with any other
6  agents?
7  A.  Yes, I know I did. I'm assuming I
8  spoke with everybody. I specifically was talking to
9  Paul in the interest of confirming the headliner,
10  Tiesto. That was really the main -- my main
11  objective in dealing with that agency.
12      MR. MARX: Off the record.
13      (There was a discussion off the
14  record.)
15      MR. MARX: Back on the record.
16      Exhibits Dimatteo-10, 11, 12 and 13.
17      (Exhibits Dimatteo-10 through
18  Dimatteo-13 were marked for identification.)
19  Q.  I am going to hand the witness four
20  documents that I marked as Dimatteo-10, Dimatteo-11,
21  Dimatteo-12 and Dimatteo-13. While they are being
22  handed out, I will identify them for the record.
23      Exhibit 10 is a multiple page document
24  bates 2216 through 2218. It has the subject
25  "Forward Tiesto June 25th festival offer."

---

Juice Entertainment, et al v.
Live Nation Entertainment

Page 65

1  Dimatteo-11 is a multiple page
2  document with bates number Juice 2088 through 89.
3  It has a title Forward Avails.
4  Dimatteo-12 is a one-page document
5  with bates number Juice 2090. It has a title
6  subject Forward Roster.
7  Dimatteo-13 is a one-page document
8  bearing bates number Juice 4117 with a subject of
9  "Re: David Guetta festival offer."
10  Having done that, I'll ask the witness
11  to take a look through them and then I will have
12  some questions.
13 A. Okay.
14 Q. First off, have you seen those
15  documents before?
16 A. Yes.
17 Q. What are they?
18 A. Do you want me to go one at a time?
19 Q. Sure. Start with the first one, which
20  is chronologically first I guess, the e-mail dated
21  January 26th, 2011.
22 A. Got it.
23 Q. Okay. What is this document?
24 A. It is an offer to Tiesto and it is
25  also asking for other artists availabilities.

Page 66

1 Q. Where do I find the offer on this?
2 A. (Witness indicating.)
3 Q. So that's the page where the stamp is
4  2218 on the bottom right?
5 A. Yes.
6 Q. Can you tell me what kind of
7  information is contained in this offer?
8 A. Yes. Starting at the top the artist
9  requested is Tiesto. It has the date, number of --
10 Q. First off, where did you get this form
11  that contains the offer?
12 A. It is a template that we made.
13 Q. Do you use this template for all the
14  offers that you make?
15 A. There's three different templates that
16  we use. This is a flat fee offer template. There
17  are other offer templates where the artist is
18  involved in the expenses and that's a much more
19  detailed offer list sheet. That lists all the other
20  expenses.
21 Q. What's the third kind of template?
22 A. A more simplified version of that
23  list.
24 Q. What templates do you use in
25  connection with this one?

Page 67

1 A. This one.
2 Q. The one that you pointed at?
3 A. This the type of template that you
4  would use.
5 Q. It is the flat.
6 A. Flat guarantee.
7 Q. Flat guarantee template?
8 A. Yes.
9 Q. Did you prepare the template in the
10  same way for each of the offers that you made?
11 A. I think so.
12 Q. If I asked you to describe the
13  template for the Tiesto offer would your answers
14  apply to other templates that were prepared the same
15  way for this event?
16 A. I don't know.
17 Q. Fair enough. Tell me how you prepared
18  this offer.
19 A. At the top is the general event
20  information, agency, times, dates, agency, who it is
21  made out to, then the next heading is --
22 Q. It says "event" and it is name The
23  Outland Festival. What is that?
24 A. That was the working time. We changed
25  the name like 20 -- like several times.

Page 68

1 Q. What were some of the names?
2 A. Under One Sky, The Outland Festival,
3  Futronica. Those are the ones that stick out.
4  There were many others.
5 Q. What is the importance in establishing
6  a name for a festival like this, if any?
7 A. The brand is everything so it is of
8  the utmost importance.
9 Q. How far before The Event do you have
10  to arrive at a name in order for The Event to be
11  successful?
12 A. You know, ideally, you would want to
13  have the name and brand in place even before the
14  offer process begins. However as long as, you know,
15  when you go to market to the public you need --
16  obviously need to have your name, but the sooner you
17  have it the better.
18 Q. Were there any challenges that you
19  encountered in connection with attempting to put on
20  this event associated with the name?
21 A. Yes. Everyone involved had a hard
22  time agreeing on the name.
23 Q. Did that difficulty in agreeing on a
24  name have any implications for the success or lack
25  of success of the show?

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Page 73**

1 interested in bringing to The Event.
2 Q. Okay. A.M. Only artists?
3 A. Correct.
4 Q. So the next document I believe would
5 be a series of e-mails between you and Emma H.?
6 A. Emma Hoser.
7 Q. Who is Emma Hoser?
8 A. She's an agent at A.M. Only.
9 Q. Did you interact with her in
10 connection with this event?
11 A. Yes.
12 Q. These are e-mails that start
13 February 9th and continue through February 23rd?
14 A. Yup.
15 Q. And what was the purpose of these
16 e-mails?
17 A. I was inquiring about artists that I
18 wanted to book on the show, The Event.
19 Q. Why were you doing that?
20 A. The same reason, for all the artists.
21 We are looking at artists that we want to
22 potentially book, see if they are available and if
23 they are and we want them and we then make an offer.
24 Q. The next document I believe is the
25 February 23rd, 2011 e-mail from you to the other

---

**Page 74**

1 participants in the partnership which forwards
2 something from Matthew Rodriguez?
3 A. Yes.
4 Q. Who is Matthew Rodriguez?
5 A. He's an agent at A.M. Only.
6 Q. Did you interact with him in
7 connection with The Event?
8 A. Yes.
9 Q. In what way?
10 A. Same reason as Emma.
11 Q. What information were you passing
12 along from Mr. Rodriguez?
13 A. I was passing on the artists that were
14 potentially available to play at The Event which are
15 listed here, Emma and A.M. Only.
16 Q. Finally, we have a March 1st, 2011
17 e-mail from Paul Morris to you.
18 A. Right.
19 Q. And what is this?
20 A. He's asking who is locked in for the
21 event thus far. Is the offer for David Guetta still
22 valid.
23 Q. Is he referring to the e-mail that
24 follows below from you to Mr. Morris dated
25 February 16th, 2011 wherein you appear to be

---

**Page 75**

1 conveying an offer?
2 A. That was a different offer.
3 Q. What offer were you conveying there.
4 A. Are you referring to this?
5 Q. No, Exhibit 13. If you look down
6 Exhibit 13?
7 A. There was an offer sent for David
8 Guetta, correct.
9 Q. Do you recall sending an offer to A.M.
10 Only for David Guetta?
11 A. Now I do.
12 Q. What was that?
13 A. What was what?
14 Q. What was your offer?
15 A. How much? I don't remember.
16 Q. Okay. Does the e-mail that says the
17 offer for June 26th at $175,000 is attached, does
18 that refresh your memory?
19 A. Yes, it does.
20 Q. Do you also remember containing within
21 that the indication that the offer would expire on
22 February 23rd?
23 A. Yes. That's why he's asking is it
24 still valid.
25 Q. Do you remember a discussion with

---

**Page 76**

1 Mr. Morris about David Guetta?
2 A. Brief, vague. I remember.
3     My memory is starting to come back to
4 me, but do I remember exactly what was said, no.
5 Obviously it was discussed.
6 Q. Let's go back and recap now.
7     Did you make offers to A.M. Only
8 artists?
9 A. Yes.
10 Q. What artists?
11 A. David Guetta, Tiesto, possibly others.
12 I don't remember.
13 Q. You remember Tiesto and --
14 A. Yes.
15 Q. And David Guetta?
16 A. Yes.
17 Q. Now, the initial offer that we were
18 looking at for Tiesto was for $207,000?
19 A. Yes.
20 Q. Do you recall increasing that offer?
21 A. Yes.
22 Q. Do you recall what it was increased
23 to?
24 A. $400,000.
25 Q. Why was it increased to $400,000?

---

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 77

1 A. Because it appeared that we were going
2 to lose it to Electric Zoo or something else.
3 Q. Did Mr. Morris tell you that if you
4 increased your offer to $400,000 that Tiesto would
5 appear?
6 A. No.
7 Q. Did you ever tell anybody that
8 Mr. Morris had told you that?
9 A. Not to my knowledge. He obviously
10 told me that it needed to come up. I don't remember
11 what the specific number was.
12 Q. Same question with respect to anyone
13 else from A.M. Only concerning Tiesto?
14 A. Concerning Tiesto I only spoke with
15 Paul Morris.
16 Q. So if you had any discussions
17 concerning Tiesto it would have been with Paul
18 Morris?
19 A. And only with Paul Morris.
20 Q. Did Paul Morris ever give you a verbal
21 agreement that Tiesto would appear at this event?
22 A. No.
23 Q. Did you ever tell anybody that
24 Mr. Morris had given you a verbal agreement that
25 Tiesto would appear at The Event?

---

Page 78

1 A. I don't think so.
2 Q. Who did you deal with at A.M. Only
3 concerning David Guetta?
4 A. Paul Morris as well.
5 Q. Paul Morris also?
6 A. Yes.
7 Q. Anybody else at A.M. Only --
8 A. No.
9 Q. -- about David Guetta?
10 A. No.
11 Q. Only Paul Morris?
12 A. Right.
13 Q. Did Paul Morris ever tell you that
14 David Guetta had agreed to appear at this event?
15 A. No.
16 Q. I am going to change subjects and also
17 mark exhibits in bulk. The subject I am going to
18 change to is the Windish Agency.
19 A. Yes.
20 Q. Before we go there did you deal with
21 the Windish Agency in working with these events?
22 A. Yes.
23 Q. Who?
24 A. Steve and Bretton (phonetic).
25 Q. Did you deal with anybody named Amy?

---

Page 79

1 A. Amy?
2 Q. Yes.
3 A. No. Are you referring to Amy
4 Thompson?
5 Q. I don't know. Is there an Amy
6 involved in connection with this event?
7 A. No. There's an Amy that's a manager
8 of one of the artists we made offers to.
9 Q. Is that Steve Angelo?
10 A. Correct.
11 Q. What's her name?
12 A. Amy Thompson.
13 Q. Amy Thompson?
14 A. Okay.
15 Q. Generically speaking, what were your
16 interactions with Windish?
17 A. We sent an offer and confirmed Matthew
18 Deer through Bretton. Steve Goodgold we had
19 discussed doing Steve Angelo. We sent an offer and
20 it was not accepted.
21 Q. Do you recall what the offer to Steve
22 Angelo was?
23 A. No.
24 Q. Was Steve Angelo one of the potential
25 headliners?

---

Page 80

1 A. At a certain point he was.
2 Q. Was David Guetta one of the potential
3 headliners?
4 A. At a certain point he was.
5 Q. And Tiesto was a potential headliner?
6 A. Yes.
7 Q. Were there any other potential
8 headliners?
9 A. I don't remember.
10 Q. What about Dead Mouse?
11 A. No, not that I remember.
12 MR. MARX: There was a discussion off
13 the record.
14 (There was a discussion off the
15 record.)
16 MR. MARX: Back on the record.
17 (Exhibits Dimatteo-14 through
18 Dimatteo-19 were marked for identification.)
19 Q. I am going to hand the witness what
20 we've marked as Exhibits Dimatteo-14 through
21 Dimatteo-19. While he's looking at them I will
22 identify them for the record.
23 Exhibit Dimatteo-14 is a multiple page
24 document with bates number Juice 4139 through 4040.
25 Exhibit Dimatteo-15 is a multiple page document with

---

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Page 81**

1    bates number Juice 2105 through 2107.
2    Exhibit Dimatteo-16 is a multiple page document with
3    bates number Juice 2098 through 2103.
4    Exhibit Dimatteo-17 is a multiple page document with
5    bates number Juice 2644 through 2657.
6    Exhibit Dimatteo-18 is a multiple page document
7    bates number Juice 2621 through 2622.
8    Exhibit Dimatteo-19 is a one-page document.
9        MR. MARX: I am going to mark as
10   Exhibit 20 a multiple page document with bates
11   number Juice 1494 through 1496.
12       (Exhibit Dimatteo-20 was marked for
13   identification.)
14   Q.  I am going to ask the witness to, for
15   a moment, set aside Dimatteo-19 which is fascinating
16   reading but it doesn't relate to the subject that we
17   are going to talk about in this next group.  Feel
18   free to read it now or later.  I promise we will
19   talk about it.
20       Have you had a chance to look at the
21   exhibits that I've handed you?
22   A.  I'm sorry?
23   Q.  Have you had a chance to look at
24   Exhibits Dimatteo 14 through 18 and 20, excluding 19
25   for now?

---

**Page 82**

1    A.  I'm still going through 20.
2    Q.  Okay.  Take your time.
3    A.  Okay.
4    Q.  So these documents relate to offers to
5    Windish Agency clients.  Is that correct?
6    A.  Yes.
7    Q.  Turning to 14, which is a series of
8    e-mails between you and Steve Goodgold regarding
9    Steve Angelo --
10   A.  Correct.
11   Q.  -- can you tell me what these e-mails
12   are?
13   A.  We are basically going back and forth
14   about the production of The Event, the size and
15   scope of The Event, the status, how everything is
16   working, mostly I see a lot of it is about the
17   production.  That's pretty much it.
18   Q.  What about Exhibit 15?  Exhibit 15 --
19   A.  I forwarded that correspondence to the
20   group saying "STEVE is looking great.  We are almost
21   there."
22   Q.  What did you mean by that?
23   A.  I meant that it looks like Steve
24   Angelo is a real possibility and I say that because
25   the agent and I were engaged in a back and forth

---

**Page 83**

1    dialogue about The Event, which is typically a good
2    sign.  So I conveyed that to the group.
3    Q.  Can you look at Exhibit 18, please.
4    Exhibit 18 looks like to me contains a dialogue
5    between you and Steve Goodgold on March 1st?
6    A.  Right.
7    Q.  2011?
8    A.  Right.
9    Q.  Which looks like it might be following
10   up on the e-mails that you were sending earlier, the
11   month before?
12   A.  Right, yes, correct.
13   Q.  Correct?
14   A.  Yes.
15   Q.  What's happening March 1st, according
16   to these e-mails?
17   A.  I'm trying to find out what's going on
18   and he doesn't have any answers.
19   Q.  Is this consistent with your memory of
20   what was happening with Steven Angelo?
21   A.  I think so.
22   Q.  Did there come a time when Steve
23   Goodgold declined the offer?
24   A.  Yes.
25   Q.  When did that happen?

---

**Page 84**

1    A.  I believe it was over the phone.  I
2    don't know when.
3    Q.  Over the phone, you don't know when,
4    but do you remember any of the details concerning
5    the phone call?
6    A.  No, just letting me know that it
7    wasn't happening.
8    Q.  Did he tell you the reasons why?
9    A.  I believe he said he wasn't feeling
10   it.
11   Q.  Who is the "he?"
12   A.  Steve Goodgold.
13   Q.  Steve wasn't feeling it?
14   A.  Yes.
15   Q.  Did you ask him what he meant by that?
16   A.  I don't remember.  I don't remember.
17   I remember he said he wasn't feeling it or "we are
18   not feeling it."  Somebody wasn't feeling it.
19   Q.  Somebody wasn't feeling something?
20   A.  Right.
21   Q.  Okay.  Did Steve Goodgold tell you
22   that the reason he or Steve Angelo or somebody
23   wasn't feeling something was because of pressure
24   from Live Nation that led Steven Angelo to reject the
25   offer?

---

Juice Entertainment, et al v.
Live Nation Entertainment

Page 85

1  A.  No.
2  Q.  Did anybody from Windish ever tell you
3  that Live Nation had applied pressure to Windish
4  with respect to this event?
5  A.  Not to my knowledge.
6  Q.  Do you know if any Windish artists
7  declined appearing at The Event because of pressure
8  from Live Nation?
9  A.  Not to my knowledge.
10  Q.  Is your testimony the same with
11  respect to A.M. Only?
12  A.  With everyone.
13  Q.  And William Morris?
14  A.  Yes.
15  Q.  That's what I thought it was.  I just
16  wanted to make sure we were on the same page.
17     Did you ever tell anybody that Windish
18  artists declined offers to appear at this event
19  because of pressure from Live Nation?
20  A.  Not to my knowledge.
21  Q.  Can you look at Exhibit 16, please?
22  A.  Sure.
23  Q.  Which looks like it is an e-mail sent
24  from you to the other partners with the subject
25  "Offers sent."

Page 86

1  A.  Yes.
2  Q.  What is Exhibit 16?
3  A.  It is a bunch of offers all sent to
4  artists that are on the Windish Agency.
5  Q.  Mike Snow?
6  A.  Right.  Mike Snow, Matthew Deer who
7  accepted, Trip C, Kaspa, Simian Mobile Disco.
8  Q.  If you look at Exhibit 17.
9  A.  Okay.  It is the Matthew Deer offer
10  being accepted.
11  Q.  Right.  It is your e-mail to the team
12  February 28, 2011, regarding the first contract.
13  What is this exactly?
14  A.  This an artist contract for the
15  acceptance of the offer sent to Matthew Deer by Brad
16  Owen from the Windish Agency.
17  Q.  What did the fact that the Windish
18  Agency was sending you this contract signify to you?
19  A.  That Matthew Deer was confirmed.
20  Q.  What if anything needed to be done
21  next to ensure that Mr. Deer would appear at The
22  Event on June 25th?
23  A.  I'm sorry.
24  Q.  What did you need to do next, if
25  anything, in order to make sure that Matthew Deer

Page 87

1  was going to appear at The Event?
2  A.  Sign the contract and send a deposit.
3  Q.  And did you sign the contract and send
4  a deposit?
5  A.  No.
6  Q.  Why not?
7  A.  I don't know.  I think because we
8  didn't have headliners.
9  Q.  Right.  So at the time the Windish
10  agency sent you the contract were you obligates to
11  sign it and send it back with a deposit?
12  A.  That's what you are supposed to do.
13  Q.  And why are you supposed to do that?
14  A.  Because that's what you had asked for.
15  You offered.  They accepted.  You have to fulfill
16  your end of the deal.
17  Q.  Was this the only instance where you
18  had sent an offer for an artist to appear at The
19  Event and the agent sent you back a contract like
20  this?
21  A.  To my knowledge, yes.
22  Q.  Can you look at Exhibit 19, please?
23  A.  19.
24  Q.  Okay.  I'm sorry.  I meant to say
25  Exhibit 20.  I'm steering you in the wrong

Page 88

1  direction.  I apologize.
2  A.  Okay.
3  Q.  My Exhibit 20 is an e-mail -- includes
4  an e-mail from you to Paul at Sonicvogue.com and
5  others on Thursday March 10th, 2011.  Is that the
6  Exhibit 20 that you have?
7  A.  Yes, it is.
8  Q.  If you go to the first e-mail which
9  starts on the second page of the document it looks
10  like there's an e-mail from Paul Potter to Steve
11  Goodgold on March 10th, 2011?
12  A.  Right.
13  Q.  Did you see that before?
14  A.  I remember this.
15  Q.  You remember this.  So tell me what
16  happened here.
17  A.  After I had sent an offer and the
18  offer being declined, they arbitrarily decided to
19  contact the agent and ask about the same event and
20  inquired about the same event.
21  Q.  Who is the "they?"
22  A.  Alan Sacks and Paul Potter.
23  Q.  So Alan Sacks and Paul Potter decided
24  to call Steve Goodgold to inquire about Steve
25  Angelo?

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 105

1  CROSS-EXAMINATION
2     BY MR. SIEGEL:
3
4  Q.  Mr. Dimatteo, I'm David Siegel.  I
5  represent the plaintiffs in this case.  I just have
6  some follow-up questions.  I want to touch on some
7  of the topics that you've already testified about.
8  I will try to be brief.
9     Mr. Marx was asking you about the
10  importance of lead time in producing an event like
11  the one that was contemplated for the state fair.  I
12  believe you said that you would need a year and that
13  it was against your better judgment that you agreed
14  to become involved in this event.
15     My question is, is it really the case
16  that you always have the luxury of a year lead time
17  before putting on an event like this?
18  A.  Not always.
19  Q.  Would you always -- well, let me put
20  it this way.  Is this the only occasion that you can
21  remember agreeing to become involved in a project
22  with less than a year lead time?
23  A.  You have to specify the nature of the
24  project.  I have projects that are small.
25  Q.  Right.

---

Page 106

1  A.  A large scale music festival.
2  Q.  Let me back up and ask you that.  This
3  event was supposed to be a two-day event?
4  A.  Two-day multi-stage, 20,000 plus
5  people per day.
6  Q.  That qualifies as a large scale music
7  festival?
8  A.  Yes.
9  Q.  Can you recall other instances of
10  similar events like the one involved in this case
11  where you became involved with less than a year's
12  lead time?
13  A.  Events similar in size?
14  Q.  Yes.
15  A.  No.
16  Q.  I think you told Mr. Marx that you
17  agreed to do this one because you thought it seemed
18  promising from a financial standpoint?
19  A.  Yes.
20  Q.  Could you elaborate on what you meant
21  by that?
22  A.  I thought the deal with the venue was
23  very good.
24  Q.  And you mean the financial terms?
25  A.  The financial terms, right, with the

---

Page 107

1  state fair.
2  Q.  By that do you mean the amount of
3  money that Juice, the partnership, was going to have
4  to pay the state fair to have access to the venue?
5  A.  Yes.
6  Q.  And I suppose you also mean the
7  percentage cut of revenue that was going to go to
8  Juice and what amount was going to go to the state
9  fair.  That was favorable as well?
10  A.  Yes, but the main selling point to me
11  was the $8 or $10 per head for the venue and what
12  came with that.
13  Q.  Did you have any expectations of, at
14  that time, of what kind of revenue you thought could
15  be generated by the event?
16  A.  Well, I made that budget sheet so
17  those are my expectations, provided that the talents
18  were confirmed.
19  Q.  And were you -- did it also seem
20  attractive to you because it was a multi-year
21  contract?
22  A.  Yes.
23  Q.  What was your understanding of what
24  had to happen for the contract to be performed over
25  subsequent years or for it to be extended?

---

Page 108

1  A.  One event had to be confirmed, one
2  show, one show had to happen.
3  Q.  You testified earlier about Tiesto.  I
4  believe you said that the agent, Paul Morris, told
5  you that Tiesto couldn't do The Event that was
6  contemplated here at the Meadowlands because he was
7  going to play Electric Zoo.  Is that accurate?
8  A.  I believe so.
9  Q.  When did the Electric Zoo concert take
10  place?
11  A.  Labor Day weekend.
12  Q.  So that would have been five months
13  after this event was scheduled to take place?
14  A.  No, this was scheduled to take place
15  in June.  That was the last day of August,
16  September, so that's about two months, three months.
17  Q.  Okay.  Did he elaborate -- did
18  Mr. Morris elaborate on the connection between the
19  Electric Zoo event and this event?  Did he tell you
20  there's a contractual prohibition against Tiesto
21  appearing at this event?
22  A.  No.
23  Q.  Did that seem plausible to you?  Did
24  it seem like a reasonable explanation?
25  A.  Yes.

---

Juice Entertainment, et al v.
Live Nation Entertainment

---

Page 109

1 Q. Why was that?
2 A. It happens all of the time. You make
3 offers. Some get rejected. Some get accepted. I
4 was a little taken back because I had a good
5 relationship with Tiesto, but the reality is that's
6 the nature of the business.
7 Q. But specifically in reference to the
8 explanation that it had something to do with
9 Electric Zoo, did that seem to ring true?
10 A. Did it seem true?
11 Q. Yes.
12 A. It did seem true.
13 Q. Does Live Nation have any connection
14 to the Electric Zoo event?
15 A. No.
16 Q. Who produces that?
17 A. Main Event.
18 Q. That's a completely separate company?
19 A. Yes.
20 Q. At one point you were talking to
21 Mr. Marx about some of the offers that had gone out.
22 I believe this was in connection with the William
23 Morris Agency. You got word back from the agency
24 that the dollar amounts needed to be increased. My
25 question to you is would that have been affordable

---

Page 110

1 for Juice and people that it was working with?
2 A. I don't know.
3 Q. You testified earlier that Vito Bruno
4 had what you thought was $1 million in funds
5 available to fund this?
6 A. Right.
7 Q. Presumably to use that money to make
8 deposits, if necessary?
9 A. Right.
10 Q. So was it your impression that
11 increasing the offers to those artists for William
12 Morris would not have been a problem?
13 A. I did not think it was at the time.
14 Q. Okay.
15 A. To the best of my knowledge.
16 Q. I believe in connection with those
17 same offers there was one and I don't remember
18 exactly which one it was, but there was one that we
19 looked at earlier where the expiration date appeared
20 to be eight days after you sent the offer via
21 e-mail. Would that have been unusual?
22 A. No.
23 Q. What would a typical time period be
24 between sending an offer out and having it expire?
25 A. Seven to ten days. I'm sorry, seven

---

Page 111

1 to fourteen days.
2 Q. Seven to fourteen days?
3 A. Right.
4 Q. So in connection with this idea that a
5 year might be required for lead time, how would that
6 work in terms of sending offers out? If you were
7 going to produce a festival like this and you had an
8 ideal scenario to do it exactly how you wanted to do
9 it, would you confirm an offer today for an event
10 for a year from now?
11 A. Yes. I've done it before.
12 Q. And so in that case the artist just
13 puts that on his calendar and he's unavailable for
14 that week?
15 A. Yes.
16 Q. And you find that they are able to do
17 that that far in advance? Do they like doing it
18 that way?
19 A. It depends on each artists's
20 individual situation. So to make a general
21 statement would be -- you can say that but for
22 bigger shows the talent typically plans out the
23 bigger shows and festivals very far out, very far
24 out because you are competing with the globe, the
25 markets around the world.

---

Page 112

1 Q. Right.
2 A. Yes, for bigger shows, yes, they
3 confirm sometimes even months out.
4 Q. Now, with respect to the offer that
5 was made to Tiesto do you recall traveling to Las
6 Vegas to meet with Tiesto in connection with the
7 offer for this event?
8 A. Yes.
9 Q. Were you going to meet with his agent
10 or just to meet with him?
11 A. Just to see him.
12 Q. Tell me how that came about.
13 A. He was performing somewhere, I don't
14 remember where. I went to the show. We saw each
15 other. I don't remember what we spoke about but.
16 Q. I have something that I am going to
17 use in a minute to refresh your recollection, but
18 what you are telling me now is you don't remember
19 what you talked about with him?
20 A. I don't remember.
21 Q. Did you talk about the offer for this
22 event at all?
23 A. I don't remember.
24 Q. Who is Kelly Cobb?
25 A. Kelly Cobb is -- at the time was an

---

**Juice Entertainment, et al v.**
**Live Nation Entertainment**

Page 137

1  A.   Well, it is realistic that a promoter
2  of that size can influence talent from playing with
3  competitive competition, competitive buyers,
4  promoters.
5      MR. SIEGEL: I don't think I have any
6  more questions.
7      MR. MERINGOLO: I have no cross.
8      Thank you.
9
10     (The Deposition of JOHN DIMATTEO was
11  concluded at 3:54 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 138

1            CERTIFICATE    OF    OFFICER
2
3
4            I, DONNA KELLS, a Certified Court
5  Reporter and a Notary Public of the State of New
6  Jersey, do hereby certify that prior to the
7  commencement of the examination the witness was duly
8  sworn by me.
9            I DO FURTHER CERTIFY that the
10 following is a true and accurate transcript of the
11 testimony as taken stenographically by and before me
12 at the date, time and place aforementioned.
13            I DO FURTHER CERTIFY that I am neither
14 a relative nor employee, nor attorney or counsel to
15 any parties involved; that I am neither related to
16 nor employed by any such attorney or counsel, and
17 that I am not financially interested in the action.
18
19
20
21 A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
   C.S.R. License No. 1207
22
23
24
25