# EXHIBIT 13

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

---

*Vito Bruno*
*February 4, 2014*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

ORIGINAL

Min-U-Script® with Word Index

Juice Entertainment, et al v.
Live Nation Entertainment

**Bruno - Direct** — Page 33

1  Q. What did you do in connection with the
2  event? What was your role?
3     First off, how did you become involved
4  in the event?
5     MS. WALKER WAGNER: What question is
6  on the table?
7     MR. MARX: Fair enough.
8  Q. You know what it was, I asked you such
9  a broad question in my mind I said "let me break
10 it down for Mr. Bruno."
11 A. One question at a time so I can answer
12 you correctly.
13 Q. Sure. Are you able to summarize
14 generally what you did from the time you became
15 involved in the event until the time you were no
16 longer involved?
17 A. Oh, basically as having somebody who
18 had produced festivals since '97 I was like, I
19 guess, the senior guy advisor who could pull off
20 -- actually pull off the show.
21    And we had -- my partner at the time
22 was John Dimatteo, who was tied into all the
23 agents for the EDM stuff.
24    I knew how to produce an event or a
25 show. I had all the contacts to roll out

**Bruno - Direct** — Page 34

1  equipment. I think one of the e-mails you have
2  there, we got the guys who actually did a
3  festival, Ultrafest in Miami, they got the costs
4  for me and so we could design an event, market an
5  event, we had the ability through John to book
6  parts of the event, and everything from the basic
7  concept to clean-up I could have advised --
8  actually completed myself.
9     There was also financing on my part
10 that they were looking for, so I think that
11 covers the whole thing basically.
12 Q. Okay. And were you involved in
13 connection with all of those areas that you just
14 described from the time you started in, you know,
15 December through March?
16 A. Pretty much.
17 Q. Okay. Was there anything that you
18 described that you were not involved with?
19 A. No.
20 Q. Now, between you and Mr. Dimatteo I
21 think you identified things that you would be
22 doing and things that Mr. Dimatteo would be
23 doing, correct?
24 A. Yes.
25 Q. I think you mentioned Mr. Dimatteo was

**Bruno - Direct** — Page 35

1  the one who had the connections with the talent
2  involving that.
3  A. And he understood -- he had a good
4  handle on the acts that were relevant.
5  Q. Were you involved in booking any of
6  the talent for this event?
7  A. Did I do it, no, but I was involved on
8  the fringes, yes.
9  Q. Did you have direct communications
10 with any talent agents concerning their clients'
11 participation in this event?
12 A. Yes.
13 Q. Which talent agents did you have
14 contact with?
15 A. I sat in a meeting with Paul Morris
16 and AM Only, I sat in a meeting with Sam Kirby of
17 William Morris, and I was copied on a lot of the
18 e-mail back and forth.
19    Alan and John were the two guys
20 connected to the agents.
21    Alan had much more respect, in old
22 school, you know, he had more years experience
23 doing it, John is the new kid on the block, so
24 the two of them, getting the talent was their
25 job.

**Bruno - Direct** — Page 36

1  Q. Did you personally make any offers to
2  any talent in connection with this event?
3  A. That particular event details I don't
4  recall if they wanted me to reach out to any of
5  the top talent or not. I don't think so.
6  Q. Did you receive any responses from any
7  of the talent agents to whom offers had been
8  made?
9  A. From John or from Alan?
10 Q. From the agents directly.
11 A. From the agents directly?
12 Q. Yes.
13 A. Yes.
14 Q. Which agents directly responded to you
15 in regards to offers?
16 A. Not to me, to John. I was there --
17 not to me, John.
18 Q. John is the one who received responses
19 from the agents?
20 A. Yes.
21 Q. You did not?
22 A. No, but I was in the room when there
23 was a discussion.
24 Q. Okay. Were those discussions during
25 meetings with Paul Morris or Sam Kirby that you

**Bruno - Direct** — Page 53

so they could roll out -- roll everybody out so
2  they feel comfortable, but he never asked me ever
3  in 35 years I'm working with him to do so,
4  30 years.
5  Q. What about Mountain, what would the
6  arrangements be if Mountain was providing it?
7  A. Mountain would have asked for
8  something upfront, a deposit.
9     I have not used Mountain in more than
10 a decade. I don't remember what the deal was,
11 but they were fairly reasonable. They understand
12 payment.
13    A lot of these companies will bill you
14 30 days after because they know.
15    If you have a good relationship with
16 the companies they'll bill you 30 days after.
17 Q. And if you were going to obtain this
18 staging production from any combination of
19 Mr. Viera and/or Mountain, would they have a
20 written contract in place before they provided
21 this service?
22 A. Would they? Mountain, yes. Abe,
23 probably not. He would send me an estimate of,
24 you know, "This is what it's going to cost."
25 Q. Okay. Now, if you look down on the

**Bruno - Direct** — Page 54

1  e-mail on Bruno-9 he asks a couple of questions.
2     First, he says, "Is this event still
3  being negotiated or is it a definite show?"
4     Did I read that correctly?
5  A. Yes.
6  Q. Do you recall what, if anything, you
7  told him in response to that question?
8  A. It's -- we're trying to make it a
9  definite show, but it's still -- you know, I'll
10 be straight with Abe, you know, it's still no
11 headliner talent yet, it's still, you know, in
12 its developmental stages.
13 Q. And even in fact in the next sentence
14 he says "Despite what stage you're in, are you
15 hiring me as the production manager for the
16 entire event or just on the audio side?"
17    Did I read that correctly?
18 A. That's correct.
19 Q. Do you know what he was referring to
20 when he said "Despite what stage you're in"?
21 A. What stage -- whether we are
22 negotiating or a definite show, that's what he
23 meant, not physical stage.
   Q. Okay, right, but it's ironic, because
   he put up stages.

**Bruno - Direct** — Page 55

1  A. Right.
2  Q. So he's talking --
3  A. Whether we're negotiating or definite,
4  what stage of negotiations we were in.
5  Q. And did you hire Mr. Viera as a
6  production manager?
7  A. We hired nobody.
8  Q. Why not?
9  A. We didn't have a show.
10 Q. Okay. How far in advance -- if you're
11 going to put on a show in June of -- June 25th
12 and 26th of 2011, when would you have to have
13 production details like this lined up?
14 A. This was already pushing the envelope
15 for a major event.
16 Q. By "this" you mean February 14th?
17 A. You have to go months and months out
18 for a big production.
19 Q. How many months?
20 A. Me, I would say at least like six
21 months out.
22 Q. Okay. So assuming you got involved in
23 December of 2010 for this event that was going to
24 take place in June of 2011, did you think there
25 was sufficient time when you first got involved?

**Bruno - Direct** — Page 56

1  A. I knew from the beginning we were
2  under the gun, definitely under the gun.
3  Q. But when did you think you needed to
4  have talent booked in order to be successful?
5  A. In that world you could go -- you
6  could announce it as late as two months in
7  advance of a show, but the way the business has
8  -- well, back then it wasn't as competitive as it
9  is now.
10    Right now you need to book talent a
11 year in advance because there's so many festivals
12 at this point.
13    Back then there was a lot of avails
14 three to six months out, nine months out.
15    Now the window is, you know, you look
16 at talent for a year and a half now or a year
17 because it's much hotter now than it was then.
18 Q. And when did production need to be
19 lined up in advance of an event like this?
20 A. I was doing it February 14th. I was
21 on it. And the hardest part is, you know, you
22 could get the stage sound and the lights, but
23 there are some specific requirements that require
24 specific equipment, so you need to be doing it
25 right about then, too. If you don't have the

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Bruno - Direct** — Page 57

1 talent rider, you can't get the equipment.
2 Q. The talent rider is something that's
3 attached to the contract when --
4 A. Correct.
5 Q. -- when the owner of the show
6 contracts with the talent?
7 A. Correct. So there would be additional
8 production elements that need to be added in.
9 Q. And I think you said before that those
10 production elements could add significantly to
11 the cost of production?
12 A. Yes, sir.
13 Q. How so?
14 A. Well, if somebody wants video screens
15 of a certain DPI, if somebody wants a certain
16 speaker, certain equipment, certain configuration
17 of the stage, certain risers.
18   A lot of times you could get people to
19 share stuff. You know, you say "This is what the
20 festival setup is. This is what the program is,"
21 but your headliner you try to accommodate and
22 then have everybody else work off that, work
23 backwards.
24 Q. And were there any further
25 communications between you and Mr. Viera about

---

**Bruno - Direct** — Page 58

1 productions relating to this event other than --
2 A. Not happening.
3 Q. When did you tell him that?
4 A. I don't remember, but sorry, it's not
5 happening.
6 Q. Now, I think you told me that you were
7 -- your role in connection with this event
8 involved production and equipment, which I think
9 we've already covered --
10 A. Yes, sir.
11 Q. -- and financing?
12   Did I recall financing correctly?
13 A. Yes.
14 Q. What exactly were you going to do as
15 far as financing this event?
16 A. They asked me for $300,000 to put up.
17 I had to show -- I had to actually show proof of
18 funds at the point when Johnny D from Live Nation
19 went into Al over at the Meadowlands Fair and
20 told him that nobody had any money, so he had to
21 show proof of funds that Chris and Tommy came to
22 my office and printed out proof of funds and they
23 went back to Al Dorso, is that his name,
24 Meadowlands --
25 Q. Okay.

---

**Bruno - Direct** — Page 59

1 A. -- with a piece of -- a document
2 showing that there was $300,000 at that point
3 available for that.
4 Q. Okay. Did you have any other role
5 related to financing other than providing the
6 $300,000 that they asked for from you?
7 A. No. They had other financing in place
8 from other people.
9 Q. Did they ever ask whether you would be
10 willing to provide more than $300,000 in
11 financing?
12 A. No.
13 Q. Did you ever agree to provide more
14 than $300,000 in financing?
15 A. No, but I could have.
16 Q. Did you ever agree with Barrett,
17 Dorfman, and Sacks that you would provide
18 financing sufficient to put on the entire event?
19 A. The entire event?
20 Q. Yes.
21 A. No.
22 Q. Did you ever agree to provide up to
23 $2 million in financing this event?
24 A. No.
25 Q. Would you ever have made such an

---

**Bruno - Direct** — Page 60

1 agreement?
2 A. Two million in advance, no, but Abe
3 would have rolled out 2 million in equipment for
4 me.
5 Q. Okay. Would you -- would you have
6 provided any -- strike that.
7   Did you come out-of-pocket by way of
8 providing any monetary contribution to this
9 event?
10 A. Besides meetings and dinners and other
11 than that, no.
12 Q. Would you have provided any financial
13 contribution toward this event without having a
14 signed agreement relating to your participation
15 in the event?
16 A. I would have. I do it all the time.
17 Q. But you didn't do that in this case?
18 A. There was no -- no ask for money.
19 There was no contract that needed to be funded.
20 There was nothing that needed to be funded.
21 Q. Were you considering doing an event in
22 Englishtown, New Jersey in the summer of 2011?
23 A. I looked at that space, yes, with
24 John.
25 Q. John Dimatteo?

**Bruno - Direct** — Page 37

just described earlier?
2 A. Yes, sir.
3 Q. Were there any other occasions when an
4 agent responded to John Dimatteo about an offer
5 that had been made during a meeting that you
6 participated in or were present for?
7 A. That I was present for?
8 Q. Yes.
9 A. No.
10 Q. How many meetings were you present for
11 concerning this event with Paul Morris?
12 A. One.
13 Q. How many meetings were you present
14 concerning this event with Sam Kirby?
15 A. One.
16 Q. When was the meeting with Paul Morris?
17 A. I'm not sure.
18 Q. Where was the location of the meeting?
19 A. A.M. Only's offices. I believe
20 they're in Dunbar. I think Washington Street.
21 Q. That's in Brooklyn?
22 A. Yes, I believe that's where --
23 Washington Street? Does that sound familiar?
24 Q. I don't know.
25    What artists were discussed during

**Bruno - Direct** — Page 38

1 that meeting?
2 A. Tiesto.
3 Q. Had an offer been made for Tiesto to
4 perform at the event?
5 A. Yes. It's in the e-mails I just gave
6 you?
7    MR. MARX: I'm going to mark as the
8 next been exhibit another one of the e-mails
9 that you gave to us today as Bruno-8.
10    It's a -- it looks to me like it's an
11 e-mail from John Dimatteo sent on
12 January 26th.
13    The subject is "Forward Tiesto
14 June 25th festival offer."
15    (E-Mail is received and marked as
16 Exhibit Bruno-8 for Identification.)
17 Q. Take as much time as you want to look
18 at it, but is that the e-mail that you were
19 referring to?
20 A. Yes, it is.
21 Q. Okay. So tell me about the meeting
22 that you were present for between -- who was at
23 the meeting?
24 A. Me, John, Paul Morris, and I think in
25 Paul's office his partner has a desk in there.

**Bruno - Direct** — Page 39

1 He was like sitting in the meeting at his desk.
2 Q. And the "John" is John Dimatteo?
3 A. Yes, sir.
4 Q. Okay. And how long was the meeting?
5 A. Probably a half hour.
6 Q. And did you talk about artists other
7 than Tiesto?
8 A. I don't recall, but I'm sure they were
9 talking about other artists. Tiesto was the main
10 one, the headliner.
11 Q. And did you talk about subjects other
12 than this event?
13 A. We spoke about a few other shows
14 possibly, but the main -- the main thing was this
15 festival. They wanted to get Paul on board for
16 this festival.
17 Q. And did the meeting take place after
18 or before the offer had been made?
19 A. I'm not sure. That's a good question.
20 Q. And tell me --
21 A. It was probably before.
22 Q. Tell me what you recall about the
23 conversation.
24 A. We went in there to try to have Tiesto
25 headline -- we were there together the next day,

**Bruno - Direct** — Page 40

1 and Paul wanted $400,000 and part ownership of
2 the festival.
3 Q. Do you recall anything else that Paul
4 Morris said concerning Tiesto's potential
5 appearance at the event?
6 A. No. They would do it if they got what
7 they wanted, basically.
8 Q. And what did Mr. Dimatteo and/or you
9 say at the meeting concerning Mr. Morris's
10 proposal?
11 A. The money we could work on, but the
12 giving them part ownership of the festival was
13 not something we were looking to do.
14 Q. And how did that meeting conclude as
15 far as next steps, if any?
16 A. Everybody was supposed to get back to
17 each other.
18 Q. Do you know what happened next with
19 respect to getting back to Paul Morris or Paul
20 Morris getting back to you?
21 A. That would be a John thing, but there
22 was no Tiesto show. There was no more Tiesto.
23 A week or so later there was no more Tiesto.
24 I don't know what happened. You know,
25 I guess Tommy and Chris are alleging Live Nation

Juice Entertainment, et al v.
Live Nation Entertainment

---

Bruno - Direct  Page 41

1  got involved. I don't know if Paul's greed got
2  involved, but they almost doubled the offer and
3  money and we went for it.
4  Q. Do you have any knowledge as to why
5  Tiesto did not accept an offer to appear at this
6  event?
7  A. I do not. I just loved to be in a
8  position to turn down $400,000 to push some
9  buttons and stand there for two hours.
10 Q. The other meeting you mentioned was
11 with Sam Kirby of William Morris.
12    Did I recall that correctly?
13 A. Yes.
14 Q. Do you know when that took place?
15    And was it at or around the same time
16 as the meeting with Paul Morris?
17 A. Yes, at the same time.
18 Q. And where was that meeting?
19 A. At the William Morris offices.
20 Q. And who participated?
21 A. It was me, John, I want to say there
22 was another young agent in there or two.
23 Q. How long was that meeting?
24 A. About the same, a half hour.
25 Q. Did you discuss anything other than

---

Bruno - Direct  Page 42

1  this event?
2  A. No, just this event.
3  Q. Do you recall any specific artists
4  that you discussed?
5  A. There was a list of artists that John
6  had put offers in there for.
7  Q. Do you recall whether the meeting was
8  after the offers had been put in or before?
9  A. Probably usually maybe after to try to
10 make it happen and convince them.
11 Q. Okay. Do you recall what Sam Kirby or
12 anyone else from William Morris said in that
13 meeting?
14 A. Yeah, they wanted us to be partners
15 with Live Nation.
16 Q. How was that subject raised?
17 A. They raised it.
18 Q. What did they say?
19 A. Something to the effect of, you know,
20 would you like -- "It would be more comfortable
21 if you were partners with Live Nation on this.
22 Do you have any interest in being partners with
23 Live Nation", something to that effect.
24 Q. Do you recall anything else they said
25 on that subject, the partnering with Live Nation?

---

Bruno - Direct  Page 43

1  A. No, sir.
2  Q. Did you respond to that suggestion
3  during that meeting?
4  A. I said "Probably not, but we'll give
5  it a thought."
6  Q. Do you recall anything else that you
7  or Mr. Dimatteo said during that meeting?
8  A. No.
9  Q. How did you leave things with Sam
10 Kirby as far as next steps?
11 A. John was going to get back to, I
12 think, one of the agents that works for her. I
13 want to say the guy's name is either Alex Jenkins
14 or Pete Wiederlight. Those are the two agents
15 that John was dealing mostly up there, and Joel
16 Zimmerman from the West Coast.
17 Q. And do you know whether anybody from
18 William Morris got back to John?
19 A. I do not.
20 Q. Do you know whether John got back to
21 anybody at William Morris?
22 A. I do not, other than what e-mails are
23 here that I was copied on.
24    Most of the talent was between Alan
25 and John working on the talent.

---

Bruno - Direct  Page 44

1  Q. Now, following your meeting with Paul
2  Morris, did you report about your meeting to the
3  other members of the team; that is to say
4  Mr. Dorfman, Mr. Barrett and Mr. Sacks?
5  A. That would be John's thing, not me.
6  Q. You did not?
7  A. I'm sure we had the discussion about
8  it, about Tiesto. We went there and had the
9  discussion about the money.
10 Q. And about Mr. Morris's proposal that
11 Tiesto be --
12 A. Part-owner of the festival.
13 Q. -- part-owner of the festival?
14    Did you share that information?
15 A. I'm sure we did.
16 Q. Do you recall whether you did that in
17 a meeting or in a writing?
18 A. I don't know.
19 Q. If you had done it in a writing --
20 A. You would have it.
21 Q. We would have it.
22    Do you recall whether there was a
23 discussion about whether Tiesto ought to be
24 considered as an ownership partner in the event?
25 A. I believe everybody was in agreement

---

**Bruno - Direct** — Page 45

    that that was not real.
2  Q.  Meaning not something that you wanted
3  to pursue?
4  A.  Yeah, correct.
5  Q.  And the same question with respect to
6  reporting back to your team following the meeting
7  with Sam Kirby, did you report back to the team
8  about Sam Kirby's proposal that your team partner
9  with Live Nation in connection with this event?
10  A.  Yes.
11  Q.  Did you personally do that or did
12  Mr. Dimatteo do it?
13  A.  I don't remember. I don't recall, but
14  I was pushing. If you're going to have a
15  partner, Live Nation would be the partner you
16  would want to have.
17  Q.  So your recollection is that you
18  reported back to the team and you were advocating
19  that if the team wanted a partner Live Nation
20  would be a good partner?
21  A.  Yes.
22  Q.  What did the rest of the team do in
23  response to your position?
24  A.  I think they kind of agreed.
25  Q.  How do you know that?

**Bruno - Direct** — Page 46

1  A.  Because we made a proposal to Jason.
2  It's in one of those e-mails that you just gave
3  to me.
4      There it is. You gave it to me.
5  Exhibit No. 7. "Conversation, February about
6  doing a partnership with Live Nation, DeLuno to
7  your boys, and AreaEvent," which is us.
8  Q.  Okay. We'll get to that, but your
9  recollection is that the --
10  A.  That I pushed this.
11  Q.  -- that the e-mail that we saw that's
12  a Bruno deposition exhibit reflects the team's
13  decision to make a proposal to Live Nation to
14  partner on this event?
15  A.  Yes.
16  Q.  Is it your recollection that the team
17  -- everyone agreed with that approach or did
18  Mr. Barrett and Mr. Dorfman disagree with that
19  approach?
20  A.  I don't remember. I don't recall.
21  Q.  There's an e-mail in Bruno-7 where
22  Mr. Dorfman says "Call me. This information is
23  incorrect completely," and Mr. Dimatteo responds
    by saying "Call Vito."
      Do I see that correctly?

**Bruno - Direct** — Page 47

1  A.  Yeah, that's correct.
2  Q.  Do you remember what that was about?
3  A.  I do not.
4  Q.  Now, going back to the list of things
5  that you told me you were responsible for while
6  you were involved in the event, one of the things
7  you said was production.
8      Did I recall that correctly?
9  A.  Yes, sir.
10  Q.  What did you mean by "production"?
11  A.  Sounds, lights, staging, fencing,
12  barricades, et cetera, power, getting the acts in
13  and out, writers, schedules.
14  Q.  And I think you mentioned you had a
15  relationship with someone who had done the Ultra
16  Festival?
17  A.  Yeah, you have the e-mail there also.
18  It was actually -- it was an e-mail from the
19  first batch of papers I gave you which is a
20  print-out of the e-mail of the costs that they
21  had done from A. Viera for 400,000 or $500,000 it
22  says on that thing or something like that.
23  Q.  Yeah, I'll show you the document.
24  A.  There was three of those things in the
25  file.

**Bruno - Direct** — Page 48

1      (E-Mail is received and marked as
2  Exhibit Bruno-9 for Identification.)
3  Q.  I've handed you what we've marked for
4  Identification as Bruno-9. It's a one-page
5  document that you provided to us in the materials
6  today.
7      On the upper-right hand corner it
8  appears to be dated Wednesday, February 16, 2011,
9  9:18:59 p.m.
10     It looks like it's an e-mail from
11  somebody named Abraham Viera, Sr. to --
12  A.  Me.
13  Q.  To you?
14  A.  Me.
15  Q.  And the subject is "Ultra New York."
16     Is this the e-mail that you were
17  talking about?
18  A.  Yes, sir.
19  Q.  And who is Abraham Viera?
20  A.  He owns a major audio/visual
21  production company that does sound staging,
22  lighting, stage management, production
23  management.
24  Q.  Okay. And he was involved in the
25  Ultra Festival?

Case 2:11-cv-07318-CCC-CLW  Document 73-16  Filed 10/17/16  Page 12 of 18 PageID: 722

Bruno - Direct                                      Page 69

A. How the deal flowed?
Q. Let's step back a minute.
   If we look at Bruno-6, there are four partners; there's Barrett, Dorfman, Sacks, and Potter. You're not even included as a partner in Bruno-6. Okay, and then we get to Bruno-10 and we've got six --
A. On top, but they're not on the bottom.
Q. We have six partners who are Barrett, Dorfman, Sacks, Bruno, Dimatteo and Arteca.
   Did I read that correctly?
A. Yes.
Q. Okay. Now, is it your recollection that you all reached an agreement as to each person's percentage ownership in the joint venture?
A. Yes.
Q. Were all six people listed on Bruno-10 included in that venture as partners?
A. That I was aware of, yes.
Q. What were the percentages that were agreed on?
A. I know it was 50-50 between their company and my company on our -- on our end. If I want -- I vaguely remember we

Bruno - Direct                                      Page 70

gave -- on our side we gave Brian 5 or 10 percent on our side, and me and Joe had the rest, and I don't recall the splits on their side. I don't know if it was equal or not.
Q. And who was on their side?
A. Alan, Thomas, and Chris, or at the final thing did we just split Alan in the middle? I remember that was a discussion, so I'm looking for what the final was, but where Alan fell into the deal was the discussion.
Q. And was it your recollection that there was an e-mail or some other writing that everyone indicated they were in agreement to concerning the allocation of interest as you just described it?
A. I remember seeing something. That's what I was trying to find out before I came here, to find that piece of paper or e-mail or whatever it was, but I remember seeing something that laid it out.
   Whether everybody got it or agreed, I don't recall. I'm trying to find it to shake my memory.
Q. Okay. So we don't know from Bruno-10 what the percentage of interest is in this

Bruno - Direct                                      Page 71

venture?
A. Correct.
Q. And we don't know it from any writings that we have here today with us?
A. Correct.
Q. You think you may have seen one, but you don't have a strong --
A. Correct. I'll do my best efforts to try to find that.
Q. And separate and apart from whether there's a writing, you don't have a recollection as to what those numbers are; in that you don't know whether Alan is on your side or the other side?
A. Our side, their side or split in the middle, which is something I would probably have recommended.
Q. Very diplomatic?
A. Yes, sir, always.
Q. I think we got on the subject of looking at these contracts but I wanted to know from you what was the deal that you discussed at the Grand Lux and came to an agreement on?
A. 50-50. We put up 300, they put up 300, I could help roll out the equipment. They

Bruno - Direct                                      Page 72

booked the talent, John and Alan.
   I could help with marketing and promotion. Those kids are allegedly promoters. Brian is -- you know, has -- you know, a dozen promoters, he worked with some promoters. That was basic framework of the deal.
Q. Did they tell you that they had $300,000 lined up?
A. They said they had the money.
Q. Did you ask them anything about that?
A. No. I found out later that they got money from a third party. It wasn't theirs. I didn't know that at the time.
Q. If I wanted to know the most accurate description of what the deal was, should I look at Bruno-10 or should I look at the deposition testimony you just gave me where you described your understanding of the deal?
A. Probably -- well, we just spoke about the testimony.
Q. Right. Is that because in your view Bruno-10 didn't really describe the deal?
A. It didn't describe -- it doesn't look like it described the duties of what each person is doing. This is more lawyer stuff than

Case 2:11-cv-07318-CCC-CLW  Document 73-16  Filed 10/17/16  Page 14 of 18 PageID: 724

**Bruno - Direct** — Page 105

1  that payment that was made?
2  A. Yeah.
3  Q. And did that episode impact your
4  relationship with Live Nation?
5  A. That episode? No. We never had any
6  issues prior to.
7  Q. Do you know whether that episode
8  impacted Live Nation's relationship with
9  Mr. Dimatteo?
10 A. I do not know, but he was very
11 protective of Live Nation's relationship.
12 Q. John Dimatteo was?
13 A. Yeah.
14 Q. Now, home stretch, a couple more
15 questions.
16    (E-Mail is received and marked as
17 Exhibit Bruno-14 for Identification.)
18 Q. I'm going to ask you about one of the
19 e-mails that was printed out from the flash drive
20 when we did that.
21    I handed you that e-mail. It's marked
22 Bruno-14. It's a one-page e-mail dated Monday,
23 July 8, 2013, which appears to be an e-mail from
24 Alan Sacks, "Subject: E-Mails", and there's two
25 e-mail addresses; ChrisAsta and TD627.

**Bruno - Direct** — Page 106

1    Do you know what this is?
2  A. Don't recall.
3  Q. Excuse me?
4  A. I don't recall what I wanted from
5  them.
6  Q. Did Mr. Sacks e-mail you these
7  addresses on July 8, 2013?
8  A. Obviously, yes, that's what it looks
9  like.
10 Q. Do you recall why?
11 A. No. I might have wanted to get in
12 touch with these guys so I wouldn't have to be
13 here. That would be my only contact with these
14 guys over the last years. "Guys, I don't want to
15 be here."
16    Every conversation I had last year or
17 so with these guys was "Do not bring me into
18 this."
19 Q. How many conversations have you had
20 with them over the past -- since the event did
21 not take place?
22 A. Only a few; all about the same thing.
23 "Don't want to be here, don't get me involved
24 with this. My friends are Live Nation. I've
25 done business with them. I want to continue to

**Bruno - Direct** — Page 107

1  do business with them. I do not want to be in
2  this frigging thing."
3  Q. And what have they told you in
4  response to that?
5  A. That they repeated the whole thing and
6  Live Nation blocked them, this, that, the whole
7  -- the whole story, and they weren't going to
8  have me deposed.
9  Q. So it's their contention -- let me ask
10 you this.
11    Why was this event unsuccessful?
12 A. Which one?
13 Q. The June 25th and 26, 2011 Electronic
14 Dance.
15 A. No talent confirmed.
16 Q. And do you know why no talent
17 confirmed?
18 A. Well, that would be John Dimatteo and
19 Alan Sacks question of exactly why.
20 Q. Because they're the ones who were
21 involved in booking talent?
22 A. Day-to-day, correct.
23 Q. You have no personal knowledge of why
24 any talent failed to confirm which led to the
25 lack of success of the event?

**Bruno - Direct** — Page 108

1  A. Say that again, please.
2  Q. You don't have any personal knowledge
3  of why the talent didn't confirm?
4  A. Just what I heard from John Dimatteo
5  or Alan.
6  Q. So if I want to know why the talent
7  didn't confirm, I should talk to John Dimatteo or
8  Alan?
9  A. That would be the best bet, yeah. Al
10 would be more accurate than John. How's that?
11    John has been known to be not
12 truthful. He will protect a relationship to all
13 ends.
14 Q. But because Alan and John were the
15 ones dealings with the talent they're the ones in
16 the position to know?
17 A. They're in the position to know
18 exactly what happened with each act or each
19 offer.
20 Q. Okay. And you have no personal
21 knowledge of that?
22 A. Just what I've heard from them in
23 stories.
24    (Handwritten Notes received and marked
25 as Exhibit Bruno-15 for Identification.)

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Bruno - Direct** — Page 113

1 have to be there.
2 Q. Assuming you had an agreement with the
3 provider?
4 A. Yeah, same thing with a lot of
5 marketing stuff. Radio stations they'll bill me
6 30 days after an event because they know me.
7    So lot of those bills you really only
8 needed -- you had to come up with a deposit of,
9 you know, if it's 1.2 million for a talent
10 budget, you come up with a deposit of half.
11 Q. So you had to come up with 600?
12 A. Yeah.
13 Q. What was it you had --
14 A. I know Live Nation does 10 percent
15 down binder agreement.
16 Q. Was it your view that you had
17 sufficient funding on your team's behalf with
18 your 300 and the 300 from the Dorfman and Barrett
19 team in order to put on this event?
20 A. Oh, yeah, I would not have gone into
21 -- and I would have, you know, not been the nice
22 guy when it comes down to spending the nickels.
23    I would nickel and dime this thing
24 down to -- I was taking a 2 million budget down
25 to at least a third off of it.

---

**Bruno - Direct** — Page 114

1 Q. So could you have done the event with
2 $600,000 in financing if the expenses were
3 $2 million?
4 A. Yes, probably, yes.
5 Q. Can you explain to me how that would
6 happen?
7 A. Because I just --
8 Q. Okay, that was your explanation?
9 A. The explanation prior to.
10 Q. That's how you could do it on $600,000
11 of financing?
12 A. Correct.
13    MR. MARX: David, are you ready in
14 Houston to pick up the questioning because I
15 have no further questions for Mr. Bruno?
16    MR. SIEGEL: I would like to go off
17 the record briefly and talk with my
18 co-counsel and we'll get back to you very
19 shortly.
20    MR. MARX: Fair enough. I will escort
21 her to a secure location where you can have a
22 private discussion.
23    MR. SIEGEL: Thank you.
24    (Recess.)
25

---

**Bruno - Cross** — Page 115

1    CROSS-EXAMINATION BY MR. SIEGEL:
2
3 Q. My name is David Siegel. I am counsel
4 for the plaintiffs in this case, along with my
5 colleague, Amy Walker Wagner, who is present
6 there in the room with you.
7    We have just a few follow-up
8 questions, each one of us is going to have some
9 questions, but overall it shouldn't take long and
10 you shouldn't be nervous because even our
11 combined talents fall short of the formidable
12 Mr. Marx.
13    So let me ask you with respect to
14 Tiesto and his appearance at the festival or
15 event, do you recall John Dimatteo recounting to
16 you a story about a conversation that he had with
17 Tiesto's road manager in Las Vegas?
18 A. No, not that I can recall.
19 Q. Did Mr. Dimatteo ever tell you about
20 an encounter he had with Kelly Cobb discussing
21 whether or not Tiesto would appear at this
22 festival?
23 A. Kelly Cobb was put into place with
24 Tiesto by John Dimatteo. That was John's boy.
25    They talked every day, so there's a

---

**Bruno - Cross** — Page 116

1 lot of conversations with Kelly Cobb, so if you
2 can refresh my memory maybe it will jog my memory
3 on it.
4 Q. What was that?
5 A. If you give me some specifics, I could
6 see if I remember.
7 Q. Well, you said he was put into place
8 by Mr. Dimatteo.
9    I'm just asking generally do you know
10 what services he performed for Kelly Cobb --
11 sorry -- for Tiesto?
12 A. Kelly?
13 Q. Yes.
14 A. He originally was production and
15 became road manager and then he's road manager
16 plus. Now, I don't believe he's on the road all
17 the time with them anymore.
18 Q. But you believe at the time in 2011
19 you think he was traveling on the road with
20 Tiesto?
21 A. Yes.
22 Q. Okay. And did Mr. Dimatteo ever tell
23 you about a conversation he had with Kelly Cobb
24 in Las Vegas in February of 2011 during which
25 Mr. Cobb told Mr. Dimatteo that Tiesto told him,

```
 1                    C E R T I F I C A T E

 2

 3        I CERTIFY that the foregoing is a true and

 4   accurate transcript of the testimony as taken by

 5   and before me stenographically at the time and

 6   place aforementioned.

 7

 8

 9        I FURTHER CERTIFY that I am neither attorney

10   for nor counsel to any of the parties; parties of

11   any of the attorneys in this action; and that I

12   am not financially interested in the outcome of

13   this case.

14
          [signature: Susan Gioffre]
15   _____

16   SUSAN GIOFFRE, CCR
     License No. XI001220
17   Notary Public of the State of New Jersey

18
     My Commission Expires:
19   March 30, 2014

20

21

22

23

24

25
```