**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**LIVE NATION ENTERTAINMENT, INC.,**<br><br>**Defendant.** | **Civil Action No. 2:11-cv-07318-WHW-CLW**<br><br>**Hon. William H. Walls** |

# PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**STONE & MAGNANINI LLP**
David S. Stone
Amy Walker Wagner
100 Connell Drive, Suite 2200
Berkeley Heights, New Jersey 07922
Tel: (973) 218-1111
Fax: (973) 218-1106

**AJAMIE LLP**
Thomas R. Ajamie (*pro hac vice*)
David S. Siegel (*pro hac vice*)
Pennzoil Place – South Tower
711 Louisiana Street, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699

*Attorneys for Plaintiffs Juice Entertainment LLC, Thomas Dorfman, and Chris Barrett*

# TABLE OF CONTENTS

INTRODUCTION .......... 1

FACTUAL BACKGROUND .......... 3

A. PLAINTIFFS' OBTAIN THE EXCLUSIVE CONTRACT .......... 3

B. PLAINTIFFS BEGIN TO PERFORM THEIR OBLIGATIONS .......... 6

C. LIVE NATION'S CAMPAIGN OF INTERFERENCE .......... 7

1. Live Nation Targets William Morris .......... 7

2. Live Nation Targets Al Dorso At The State Fair .......... 10

3. Live Nation Admits Its Interference .......... 13

ARGUMENT .......... 16

A. Standard for Summary Judgment .......... 16

B. The Evidence Supports the Tortious Interference Claims .......... 17

C. Plaintiffs' Defamation Claim is Substantiated .......... 23

D. Plaintiffs' Lost Profits Damages Should Not Be Precluded on Summary Judgment .......... 28

CONCLUSION .......... 30

**TABLE OF AUTHORITIES**

Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................. 17

*Gregory v. Gregory*, No. 15-00320, 2015 U.S. Dist. LEXIS 142736 (D.N.J. Oct. 21, 2015)...... 23

*Hall v. Heavey*, 195 N.J. 590 (1984)........................................................................................ 27

*Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737 (3d Cir. 1996) .......................................... 17

*In re Merritt Logan, Inc.*, 901 F.2d 349, 358 (3d Cir. 1990) ...................................................... 28

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993)......................................... 18, 28

*Material Techs. v. Carpenter Tech. Corp.*, 2004 U.S. Dist. LEXIS 28892 (D.N.J. Dec. 15, 2004) ........................................................................................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................... 17

*Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 563 A.2d 31 (N.J. Sup. Ct. 1989) ........................................................................................................... 20

*Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.*, 58 F. Supp. 2d 370 (D.N.J. 1999)..... 17

Rules

Fed. R. Civ. P. 56(a) ........................................................................................................... 16

Treatises

Restatement (Second) of Torts (1979), § 766B, comment c ……...……………………………..19

**INTRODUCTION**

The motion for summary judgment submitted by Defendant Live Nation Entertainment, Inc. ("Live Nation") fails to establish that no triable issues of fact remain and fails to justify why any damages for lost profits should be barred. When considering their motion for summary judgment, the Court should draw all reasonable inferences in favor of Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett (collectively "Plaintiffs") as the non-moving party.

As demonstrated herein, there is considerable circumstantial evidence that Live Nation, fearing competition from a determined upstart company, worked behind the scenes to encourage agents for various electronic dance music ("EDM") acts to decline performing at their music festival at the New Jersey State Fair in 2011 (the "Event") and to encourage the state fair manager who hired them to terminate their contract. It did so by defaming Plaintiffs, impugning their honesty and business ethics and claiming they did not have the resources necessary to produce the festival.

Live Nation employed an erratic promoter named John D'Esposito to act as a "heavy" to disrupt Plaintiffs' efforts to perform under their contract with the State Fair, then used D'Esposito's well-known reputation for being "crazy" and "uncontrollable" to insulate itself from any claim that it directly interfered with Plaintiffs' contract with the State Fair and their relationships with agents representing EDM artists sought by Plaintiffs for the festival. Notwithstanding this effort at distancing itself, the evidence shows that Live Nation essentially admits that D'Esposito is capable of any kind of obnoxious behavior.

Live Nation's behavior in this case is perfectly in line with its reputation for playing hardball with competitors and counter-parties in its business dealings. Live Nation's motion disparages Plaintiffs, referring to them as "dreamers" and "wannabes", but as is shown below,

Live Nation certainly did not take them lightly in attempting to destroy their business. This is not surprising for a company whose executives once vowed to "crush, kill and destroy" a competitor. (Wagner Cert., Ex. 41, JUICE0009522-9531).

Moreover, as the movant, Live Nation has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Live Nation has failed to present any evidence that conclusively shows it did not interfere with Plaintiffs' contract with the State Fair or their relationships with various agents. Instead, Live Nation relies on conclusory statements that it did not interfere. It is obvious that Live Nation has not, and will not, simply admit that it interfered with Plaintiffs' contract with State Fair Events Management ("SFEM") to produce up to nine (9) years of EDM festivals for the New Jersey State Fair starting in 2011. There is no question that it would be error to dismiss Plaintiffs' claims on such conclusory evidence without allowing a jury to determine the credibility of the witnesses and parties, particularly in light of the documentary evidence set forth herein.

Live Nation's motion also attempts to impose a per se rule on Plaintiffs' lost profits claims when the applicable law does not call for one while, at the same time, ignoring New Jersey's application of per se liability in defamation claims. Live Nation argues Plaintiffs cannot prove they were damaged by any allegedly defamatory remarks made by Live Nation's agents. However, Plaintiffs have evidence that Live Nation made false statements regarding professional misconduct, which is per se defamatory under New Jersey law and entitles Plaintiffs to a presumption of damages. Live Nation then argues that this Court should deny any lost profits damages to Plaintiffs under the new business rule, ignoring the fact that New Jersey federal courts and the Third Circuit no longer apply the new business rule in cases where lost profits damages have been asserted.

Finally, Live Nation's motion misrepresents Plaintiffs' professional experience and resources, using unnecessarily mean-spirited language that is frowned upon in this Court. Live Nation describes Plaintiffs as "wannabes," "hopelessly out of their depth," and "dreamers" in an attempt to ridicule Plaintiffs' experience and ambitions. Not only is such language inappropriate for a legal brief, it shows a great misunderstanding of both Plaintiffs' professional backgrounds and the music industry in general. Plaintiffs Thomas Dorfman and Chris Barrett have spent years working in the music scene, particularly in northern New Jersey. They had been steadily working their way up the industry ladder as both DJs and concert promoters when they contracted with SFEM to put on the EDM festival during the New Jersey State Fair. They are not the newcomers or "wannabes" that Live Nation makes them out to be. It is precisely such condescension that supports the inference of interference with Plaintiffs' contract. Instead, Plaintiffs were on the cutting edge of a new genre of music that would soon take the music industry by storm. Live Nation simply could not accept that Plaintiffs could obtain an exclusive contract as valuable as the one involved in this case, and justified its tortious interference and defamation to itself on that basis.

Accordingly, this Court should respectfully deny Live Nation's Motion for Summary Judgment as there are genuine issues of triable fact for a jury to decide.

## FACTUAL BACKGROUND

### A. PLAINTIFFS' OBTAIN THE EXCLUSIVE CONTRACT

Juice Entertainment, its principals Thomas Dorfman and Chris Barrett, and its predecessors Base Production Inc. and Deluna Inc., all had successful experience producing live music shows. Mr. Dorfman began working in the music industry in 1997 and became a key player and top event producer, coordinating events at many of New Jersey's, New York's, and

Miami's top venues. Mr. Dorfman produced events including top artists and entertainers such as Charlie Sheen, Tommy Lee, Snoop Dog, Kid Cudi, Paris Hilton, Jonathan Peters, and L.M.F.A.O., among others. Mr. Dorfman operated Bliss Night Club from 2007-2010 and routinely grossed more than $1 million a year in revenues. Mr. Dorfman's success in the industry led to his receiving many accolades, including a notable 2011 nomination in the Star-Ledger for Best Promoter in New Jersey. (Wagner Cert., Exs. 18, 19, and 20, JUICE0002960-61; JUICE0001279; JUICE0004234). By 2010 Mr. Dorfman enjoyed a reputation as "the best in the industry, for being a hard worker and for following through on promises. (Wagner Cert., Ex. 60, LaVecchia Dep. at 28:1-29:17). He was viewed as having a good stature in the industry and had a track record of successful promotions. (Wagner Cert. Ex. 6, Sacks Dep. at 35:5-11).

Mr. Barrett has also enjoyed a similar reputation as a rising promoter and entrepreneur in the music industry. (Wagner Cert., Ex. 21, JUICE0004436-36). He began working as a professional DJ in 1998, playing alongside Victor Calderone, Junior Vasquez, Paul Oakenfold, Erick Morillo, Jonathan Peters and many other accomplished DJs. (Wagner Cert., Ex. 19, JUICE0001279). Later, Mr. Barrett teamed up with Mr. Dorfman, and together they have been promoting and staging shows at various New Jersey venues for years, frequently producing concerts with an average attendance of thousands of people.

In June 2010, Base Production Inc. entered into an agreement with SFEM to produce a one-day show for a Latin Music Festival on July 4, 2010, in connection with the 2010 NJ State Fair. Mr. Barrett, a principal of Juice Entertainment, was also a principal in Base Production Inc. Mr. Dorfman, also a principal in Juice Entertainment, assisted Mr. Barrett in the production of this event. The Latin Music Festival was produced in roughly one month from inception to finish. It faced significant challenges, including unpredictably bad weather on the day of the

event. Nevertheless, due to Plaintiffs' diligence and ability to competently promote the Latin Music Festival, Al Dorso, President of SFEM, wanted to work with Plaintiffs again on the following year's New Jersey State Fair events at the Meadowlands. (Wagner Cert., Ex. 15, Dorso Dep. at 99:17-100:17).

Plaintiffs began discussions in the Fall of 2010 with SFEM with the intention of entering into a long-term agreement for the production of concerts at the State Fair. Live Nation had been given the opportunity to produce these contemplated events at the State Fair, but had declined. (Wagner Cert., Ex. 15, Dorso Dep. at 10:15-24). On December 1, 2010, Al Dorso verbally granted Plaintiffs Dorfman and Barrett exclusive rights to produce an electronic dance event, as well as any and all concerts in the designated special events area of the State Fair, for the next five years. This verbal agreement was reduced to writing in the form of an engagement letter, also dated December 1, 2010, granting DeLuna Inc. (the predecessor to Plaintiff Juice Entertainment, LLC) "the right to broker, stage, and promote concert events in the designated special event area of the fair, held yearly between mid June and mid July." (Wagner Cert., Ex. 17, JUICE0002202).

This was formalized on March 7, 2011, when Plaintiffs Dorfman and Barrett were awarded a contract by the SFEM (the "Contract") to stage an EDM festival during the 2011 New Jersey State Fair (the "Event"). (Wagner Cert., Ex. 22, JUICE0010183-199). Based on the demonstrated talent, expertise, and work ethic shown during the 2010 Latin Music Festival for the New Jersey State Fair, Al Dorso awarded Plaintiffs the exclusive Contract to promote the Event for the following year's State Fair — and up to nine (9) years in all. The Contract formalized the relationship that had already been in place for months, and represented

confirmation by Mr. Dorso that he recognized that Mr. Dorfman and Mr. Barrett were competent to perform their obligations.

**B. PLAINTIFFS BEGIN TO PERFORM THEIR OBLIGATIONS**

As soon as Plaintiffs had a verbal understanding with Al Dorso, Plaintiffs Dorfman and Barrett began to make arrangements in anticipation of the electronic dance event, and other events, to take place on June 25th and June 26th at the 2011 State Fair. They assembled a team of music industry veterans—particularly John Dimatteo, Alan Sacks, and Vito Bruno— with a history of booking headliner talent and funding large scale events and festivals. In particular, as the evidence below shows, Live Nation itself had a history of working with Mr. Dimatteo. Actions speak louder than words, and Live Nation had no compunction about working with Mr. Dimatteo when it saw opportunities to do so, but disparaged him when Plaintiffs made him a part of their team. The only explanation for such behavior is that Live Nation was deliberately trying to scuttle the Plaintiffs' efforts.

In January and early February of 2011, before the Contract was even formalized, Plaintiffs began contacting talent agencies and artists to perform at the Event. Their initial efforts were well received. On January 14th, for example, Steve Angello's agent, Steve Goodgold, told John Dimatteo, "I really like the idea of something outdoor[s], especially if it's something new and different … something with Tiesto would be good … I don't have my NYC play and I need it." (Wagner Cert., Ex. 10, WINDISH0000018-21).

The Head of Global Electronic Music for top talent agency William Morris Endeavor ("WME"), Joel Zimmerman, was initially pleased with Plaintiffs' Event and wrote on January 25, 2011: "John DiMatteo in NY is doing a new festival at the Meadowlands parking lot June 25 and 26 … Interesting concept to tie in with the state fair." (Wagner Cert., Ex. 27, WME000093-

94). Noting that there were heretofore no successful EDM summer festivals in the area, Zimmerman also noted to Samantha Kirby Yoh of WME and other agents that John Dimatteo "has been successful in the past and think with the right timing and play could make this work … feels like first one out of the gate in NY will get the proper summer festival." (Wagner Cert., Ex. 28, WME00098-100). Plaintiffs had every reason to be optimistic at this point, with their own track record of booking headliners and talent agencies expressing interest in booking their artists for Plaintiffs' Event. And, Zimmerman's email underscores that because of the location of the Event and the fact that Plaintiffs were first to recognize its potential, the contract was extremely valuable. Nonetheless, in the background, Samantha Kirby Yoh was corresponding about her concerns and suggested that Plaintiffs team up with Live Nation.

**C. LIVE NATION'S CAMPAIGN OF INTERFERENCE**

***1. Live Nation Targets William Morris***

Live Nation recognized the importance of the EDM space. Electronic Dance Music, or "EDM", is an umbrella term that includes various genres of dance oriented music, generated primarily electronically. At the same time Plaintiffs were working toward producing the Event contemplated in their contract, Live Nation was establishing an entire division to capitalize on the popularity of EDM and was working to consolidate its dominance in the EDM market through various tours and arrangements with artists and venues. (Wagner Cert., Exs, 42 and 43, LN0007094, LN0007245-7246). Jason Miller of Live Nation admitted that he was interested in entering into some sort of partnership with Plaintiffs concerning the Event because of the popularity of EDM and the desirability of the venue Plaintiffs had secured. (Wagner Cert., Ex. 7, Miller Dep. at 86:6-87:6).

Live Nation had previously rejected a similar agreement with SFEM, but as soon as it learned that Plaintiffs had a contract with SFEM it began a campaign to prevent Plaintiffs from being able to perform. At the outset, when Live Nation first perceived the risk posed by Plaintiffs, talent agents were already optimistic about Plaintiffs' Event. Toward the end of January 2011, William Morris was actively discussing the availability of its artists to appear at the Event with Mr. Dimatteo, acting on behalf of Plaintiffs. (Wagner Cert., Ex. 26, WME000589-590). An agent at William Morris enthusiastically referred to the notion of a new festival at Giant's Stadium. (Wagner Cert., Ex. 44, WME000192). And, Plaintiffs were making progress toward securing talent for the Event. Plaintiffs were discussing technical production aspects with WME with regard to the artist Serge Devant. (Wagner Cert., Ex. 24, WME000321). William Morris was also actively soliciting offers for other artists under its management. (Wagner Cert., Ex. 45, JUICE0004124). On February 7, 2011 a William Morris agent wrote to Mr. Dimatteo confirming one of his artist's appearance at the Event. (Wagner Cert., Ex. 23, WME000208).

Jason Miller of Live Nation met with Plaintiffs for the first time on February 4, 2011. (Wagner Cert., Ex. 34, JUICE0001742). That same day he began trying to insinuate himself into Plaintiffs' contract and business opportunities. On February 4, 2011, Mr. Miller emailed Samantha Kirby Yoh at William Morris to, seemingly innocuously, discuss possibilities for outdoor music festivals. (Wagner Cert., Ex. 46, WME000198). He listed the "Meadowlands/Izod parking lots" as a possible venue, without mentioning Plaintiffs or acknowledging their right to the venue. (*Id.*). Miller went even further and touted the convenience of the Meadowlands, given that Live Nation's Bamboozle Festival would be vacating at that time and infrastructure would be in place for another show. (*Id.).* Miller clearly was angling to have William Morris commit to

a festival promoted by Live Nation without any involvement by Plaintiffs. He told Samantha Kirby Yoh that the State Fair had the site from June 24 through July 10, and the implication was that William Morris should work with Live Nation to do a festival before that time, without Plaintiffs. (*Id.*).

Live Nation then began to ratchet up its efforts to destroy Plaintiffs' contract and potential business relations. On February 15, 2011, Jason Miller, Senior Vice President of Bookings for Live Nation and Live Nation's Rule 30(b)(6) witness, sent an email to William Morris agents Joel Zimmerman and Samantha Kirby Yoh criticizing Dimatteo's performance of a New York event he helped put on with Live Nation, claiming he owes Miller $100,000. (Wagner Cert., Ex. 11, LN0000993-4). While Zimmerman was optimistic about Plaintiffs' Event, Samantha Kirby Yoh, a close friend and colleague of Miller, began making the same sorts of unsubstantiated comments to Zimmerman and other agents about Dimatteo that Miller had been making: "[T]hink it's great to combine with fair … however John is a flake so far on other things" and "it's the same flaky promoter that just f***ed up the new York marketing and owes live nation money…." (Wagner Cert., Exs. 27 and 12, WME000093-94, WME000349-350). Samantha Kirby Yoh also began to suggest that someone else should be working with Plaintiffs to produce their Event: "John is not great (per my pvd experience) re execution…need REAL producer re costs/production capabilities etc. Best case in this scenario Morrow and John together." (Wagner Cert., Ex. 32, WME000113).

Kevin Morrow is a producer for Live Nation who worked with Jason Miller and John D'Esposito on a 2009 Tiesto event put on by Live Nation. (Wagner Cert., Ex. 33, LN0008091). Jason Miller told Zimmerman, copying Samantha Kirby Yoh, that he had a "positive personal relationship" with John Dimatteo and that he has worked with Dimatteo and in his assessment

Dimatteo is a "good street promoter," but "when it comes to event execution his is vastly different; which is probably why we make for such a good team…. I have still not settled internally with John. He owes me in excess of $100K. This is not a concern of artist or agent, but hopefully an illustration as to why I would require to be in control of finances on a show when significant funds are in play." (Wagner Cert, Ex. 35, LN0007574-76). These exchanges were extraordinary. Plaintiffs had the contract to produce shows in conjunction with the State Fair, but, notwithstanding this fact, Live Nation simply muscled its way into the planning discussions and promoted the idea that it obviously would be involved. Indeed, Jason Miller admitted in his deposition that the fact that Plaintiffs had a contract was no deterrent to him, and he behaved accordingly. (Wagner Cert., Ex. 7, Miller Dep. at 69:14-23). Miller's full-court press apparently had an effect: when Vito Bruno met for the first time with Samantha Kirby Yoh at William Morris to discuss the Event he was taken aback when she suggested that Plaintiffs find a place for Live Nation in the deal. (Wagner Cert., Ex. 1, Bruno Dep. at 119:7-17).

***2. Live Nation Targets Al Dorso At The State Fair***

Live Nation, in a separate effort to undermine or obtain a piece of Plaintiffs' Event, also began making defamatory statements about Plaintiffs directly to Al Dorso. In response to Miller's email calling into question Dimatteo's reputation, D'Esposito responded to Miller strategizing about how they could undercut Plaintiffs' efforts by convincing Al Dorso to consider Live Nation to be a better partner than Plaintiffs for the proposed Event: "Good email. I need a shortened and money unpaid, trouble collecting email to send to al to make this swing back." (Wagner Cert., Ex. 36, LN0001697-98). Shortly thereafter Miller and D'Esposito met with Dorso to, in Miller's words, "explore if there was an opportunity with an independent promoter." (Wagner Cert., Ex. 7, Miller Dep. at 70:2-3). After that meeting, Dorso informed Plaintiffs that

"Live Nation's badmouthing the whole event and you guys to the powers that be over there." (Wagner Cert., Ex. 16, 3/7/11 Mtg. Tr.). Dorso also informed Plaintiffs that "two people in high places" warned him to "watch out for" John Dimatteo, and that he didn't "hear a lot of good stuff about John." (Wagner Cert., Ex. 16, 3/7/11 Mtg. Tr.). Of course, Live Nation willingly partnered with Mr. Dimatteo on their own productions, underscoring the fact that it was willing to say anything to influence Dorso's attitude toward Plaintiffs, even if the statements were belied by their own conduct.

In addition to making defamatory statements to Al Dorso about Plaintiffs, Live Nation also began pressuring Dorso and the New Jersey Sports and Exposition Authority (the "Authority") to convince Plaintiffs to meet with them to discuss ways in which Live Nation could obtain a portion of the contractual right to produce the proposed Event. On February 22, 2011, D'Esposito sent an email to Al Dorso, Jr., telling him that he would "get you the background info on Tommy D the promoter who is trying to weasel into the state fair." (Wagner Cert., Ex. 47, LN0001004). On February 23, 2011, a day before D'Esposito met with Al Dorso D'Esposito followed through on his promise and sent Al Dorso, Jr. another email. The email was the result of an inquiry he made to Chris Femiano, someone with whom Dorfman had worked, requesting information about how Dorfman allegedly bungled a concert and stiffed the artist. He then relayed to Dorso that "Chris Femiano….did the deal with Tommy D and was the one who was left to clean up the mess when Tommy was intoxicated and unable to sort out a very disorganized and hectic situation…street kids, they CAN NOT produce an event…They are good at handing out flyers and hustling tickets on the streets…They could do damage to your father's event, drugs are huge…we had 12 overdoses in Asbury for the Tiesto event…Tommy D is a smooth talker, but a serious liability…see you tomorrow." (Wagner Cert., Ex. 37, LN1020-

22). These emails are clear evidence of tortious interference and they had their intended effect. After Dorso met with D'Esposito and heard all the accusations leveled against Plaintiffs, Dorso called Plaintiffs to ask them if any of Live Nation's accusations were true and to encourage Plaintiffs to meet with Live Nation and "find a way to work with them." (Wagner Cert., Ex. 15, Dorso Dep. at 73:1-74:23).

On or about March 3, 2011, following the advice of Al Dorso, Plaintiffs Thomas Dorfman and Chris Barrett met with Jason Miller and John D'Esposito. In this meeting, Miller and D'Esposito repeated the same threats they had made to Dorso, including the threat that Tiesto and talent managed by William Morris would be prevented from appearing at the State Fair. They told Plaintiffs that they needed to break existing contacts and associations with Vito Bruno and John Dimatteo, key members of their team. Miller and D'Esposito also told Plaintiffs that unless Live Nation was permitted to become partners with Plaintiff under the Contract, Live Nation would use its clout with the Authority to get Plaintiffs terminated from the Contract. Referring to Live Nation, Vito Bruno recalled the conversation:

> BRUNO: They said that there's some loopholes in your contract, so I guess they saw it somehow.
> DORFMAN: Well, Live Nation--.
> BRUNO: That there are loopholes that they can—that this kid, Johnny D, could bounce you out if they provide content.
> SACKS: Who told you that?
> BRUNO: Huh?
> SACKS: Who told you that?
> BRUNO: Jason Miller.

(Wagner Cert., Ex. 5, 3/5/11 Mtg. Tr. at 15). As a result of Live Nation's interference with Plaintiffs' attempts to secure talent, Plaintiffs were required to seek a 30-day extension of the Agreement's requirement to provide contracts with artists to SFEM.

At the last meeting Plaintiffs had with Al Dorso before he terminated the contract, Dorso reminded Plaintiffs that he had warned them that Live Nation would interfere with Plaintiffs ability to sign talent: "[T]old you it was going to happen….[I]t's Live Nation, it's what they do." (Wagner Cert., Ex. 48, 4/15/11 Mtg. Tr. at 3). Dorso confirmed that John D'Esposito was impeding Plaintiffs' in their efforts to perform, noting "[T]he guy that's stepping on your head right now is John D." (*Id*. at 17). Dorso confirmed that Jason Miller told him that Live Nation would block their talent. ( *Id.* at 20). In a final phone call with Dorso, on April 26, 2011, Dorso reminded Plaintiffs he had warned them of Live Nation's influence, saying "[W]hat did I tell you? What did I tell you two months ago? I told you what was going to happen, I told you, go make a deal, right?" (Wagner Cert., Ex. 49, 4/26/11 Phone Tr. at 4 (JUICE0001019)). Dorso had reported earlier that Miller told him that William Morris was Live Nation's exclusive agency and "nobody's getting nothing." (Wagner Cert., Ex. 16, 3/7/11 Mtg. Tr.). This proved to be correct. And Dorso also noted that D'Esposito was so irritated that Plaintiffs had been given their contract that he retaliated against Dorso by making equipment for a different concert unavailable, breaking a course of dealing of long standing. (Wagner Cert., Ex. 48, 4/15/11 Mtg. Tr. at 5).

Miller candidly admitted that the purpose of Live Nation's campaign, directed at Al Dorso, was to convince him to allow Live Nation to produce concerts at the State Fair. He noted that he expected Dorso to realize "the hard way [that] he backed the wrong horse" in giving the Contract to Plaintiffs. (Wagner Cert., Ex. 65, LN0001027).

***3. Live Nation Admits Its Interference***

Jason Miller himself acknowledged that the impressions Dorso had were absolutely true. On April 22, 2011, Plaintiffs again met with Miller. In this meeting, Miller implied that Live Nation and other industry heavyweights had a stranglehold on talent, suggested that Live Nation

wanted to, at least in part, control Plaintiffs' Event, admitted that Miller himself spoke to agents about Plaintiffs' Event, and noted that Plaintiffs lacked a "strong advocate", like Live Nation, to contact agents and book talent for the Event.

DORFMAN: I didn't have the premium talent I couldn't get.
MILLER: How were you going to get it? If you weren't going to get it with me and you weren't going to get it with [Eddie Dean], and you weren't going to get it with [Pasquale], how were you going to get it done?
* * *
DORFMAN: You know what I mean? I understand that there's some talent we're not going to get, because he doesn't want us to have it.
MILLER: Not only that…. Well, there's just a lot of talent we have, and we've got it.
* * *
MILLER: It's not even that I would want to—we're not looking to necessarily control the whole thing, it's just that—
* * *
BARRETT: But the point is, we realize, we put out a million dollars in offers, you know? You spoke with the agents, and basically, nothing came back.
MILLER: Yeah. You probably need a strong advocate—

* * *
MILLER: I mean, we have a deep relationship, and we do tons and tons of business with William Morris, and you know – you're probably right… I don't like to paint myself Mr. Heavy, but – and I'll talk…you want to call a spade a spade, sure – you know.

* * *
MILLER: I get it. You guys were totally ambushed, for no particular reason.

(Wagner Cert., Ex. 40, 4/22/11 Mtg. Tr. at 2, 8, 10, 12, 28-30).

At this same April 22, 2011 meeting, Miller admitted that his business partner, John D'Esposito, was capable of interfering with Plaintiffs' Event, that he threatened to disrupt Plaintiffs' efforts and that neither he nor Live Nation—despite the fact that D'Esposito worked for Live Nation—could control D'Esposito's actions.

MILLER: He's a whole, out there, loose cannon that nobody can control. I mean, like I guess he does, and whether he is or not…I could only tell you that—I mean, he's just crazy. He's just crazy. He's on my team, but he's his own f***ing thing that does his own, like—it's not necessarily representative

of what I do… John's very emotional, like, yeah, he thinks the [Meadowlands] space is his own.

* * *

DORFMAN: I remember when we first came in here – part of the reason it didn't go forward was, John was like, "I can get you kicked out of the venue at any time I want."

MILLER: Yeah. He is a grimy motherf***er.

(Wagner Cert., Ex. 40, 4/22/11 Mtg. Tr. at 16-17).

Plaintiffs did not consent to Live Nation's proposals to partner with them for the proposed Event. The events that followed were consistent with what Live Nation, and especially John D'Esposito, had been had been telling Al Dorso and Plaintiffs. Artists that were initially very interested in Plaintiffs' Event in January, a month or so later suddenly were not. Talent agents that expressed enthusiasm about Plaintiffs' Event in early 2011 were no longer interested in working with them. Consequently, Plaintiffs were not able to sign artists sufficient to stage the shows at the State Fair. For example, in February 2011, Plaintiffs were having advanced discussions with Steve Goodgold of the Windish Agency concerning the details of the appearance of his artist, Steve Angello, at the Event. (Wagner Cert., Ex. 50, JUICE0004139-41). Then, without explanation, Dimatteo reported that Goodgold had changed his mind and was no longer interested in the opportunity and that "some of the acts were asked not to do the show." (Wagner Cert., Ex. 1, 2/4/14 Bruno Dep. at 134:4-24).

Similarly, Live Nation interfered with Plaintiffs' efforts to sign Tiesto, a headliner level talent. Live Nation itself had co-promoted Tiesto with John Dimatteo previously. (Wagner Cert., Ex. 61, LN0007445-46). In an email exchange with his co-worker, D'Esposito, Miller acknowledges that Dimatteo had the ability to book Tiesto and opined that he thought Plaintiffs' and Tiesto's agent were "holding Tiesto with Al. [P]aul Morris will sell him Tiesto all day long. [J]ohn Dimatteo is deep in Tiesto's camp." (Wagner Cert., Ex. 52, LN0000999). D'Esposito

tellingly responded "I will help anyway I can." (*Id.)*. In this exchange Miller and D'Esposito were clearly strategizing about how to prevent Plaintiffs from successfully booking Tiesto to appear at the Event. A mere week later D'Esposito did indeed "help" by sending the email referred to above in which he ominously warned Al Dorso, Jr. that Plaintiffs could "do damage to your father's event." (Wagner Cert., Ex. 37, LN0001020-22). In the end, the Tiesto camp did not agree to perform at the Event, and John Dimatteo reported that Tiesto's road manager, Kelly Cobb, asked Tiesto directly whether Live Nation had interfered and Tiesto responded by nodding his head up and down affirmatively. (Wagner Cert., Ex. 57, 4/20/11 Mtg. Tr. at 16).

On April 26, 2011, the SFEM, through Dorso, informed Plaintiffs that the Agreement was terminated pursuant to Section 3(c) of the Agreement, which required Plaintiffs to furnish copies of contracts with the artists who would perform at the State Fair. Through a combination of defamatory statements made to representatives of SFEM and the Authority, pressure applied by Live Nation to artists and their agents, and pressure applied to SFEM and the Authority, Plaintiffs' Agreement with SFEM was terminated.

As a result of the termination of the Agreement, which granted Plaintiffs an exclusive right to stage concerts at the State Fair for four years, with an option for an additional five years thereafter, Plaintiffs lost all the potential benefits associated with the proposed Events and were left with damaged reputations, so much so that both Dorfman and Barrett no longer work in the music industry.

## ARGUMENT

### A. STANDARD FOR SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Once the moving party has properly

supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, 'its opponent must do more than simply show that there is some metaphysical doubt as to material facts.'" *Stewart Title Guaranty Co. v. Greenlands Realty, L.L.C.*, 58 F. Supp. 2d 370, 380 (D.N.J. 1999) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "What the non-moving party must do is go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. (citations omitted). In evaluating whether summary judgment is warranted, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**B. THE EVIDENCE SUPPORTS THE TORTIOUS INTERFERENCE CLAIMS**

Live Nation's claim that there is no evidence of interference with Plaintiffs' contract with SFEM and their business relations with talent agencies, artists, SFEM, and the New Jersey Sports and Exposition Authority ("Authority") is wrong. Implicit in the summary judgment standard is that all reasonable inferences must be construed in favor of the non-moving party. *See Ideal Dairy Farms v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). Summary judgment may not be granted if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed. *Id*. at 744. Plaintiffs have provided considerable circumstantial evidence that Live Nation tortiously interfered with their negotiations with agents, artists, SFEM and the Authority by defaming them, which ultimately led SFEM to cancel Plaintiffs' contract.

Under New Jersey law, to prove a cause of action for both tortious interference with a contract and tortious interference with business relations, a plaintiff must prove the following:

1. an existing or reasonable expectation of economic benefit or advantage;
2. the defendant's knowledge of that expectancy;
3. the defendant's wrongful, intentional interference with that expectancy;
4. the reasonable probability it would have received the anticipated economic benefit in the absence of interference; and
5. damages resulting from the defendant's interference.

*See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993). Live Nation argues that there is no evidence supporting the "expectation" and "interference" elements of Plaintiffs' tortious interference claims. Live Nation is wrong on both counts.

There is evidence Plaintiffs had "an existing or reasonable expectation of economic benefit or advantage." While Plaintiffs did not have their written contract with the SFEM until March 7, 2011, they had been working with both Al Dorso of SFEM and agents for various EDM performers for several months before that. SFEM and Plaintiffs signed an engagement letter on December 1, 2010 related to the proposed EDM festival. Plaintiffs then partnered with experienced concert promoters John Dimatteo, Vito Bruno, Alan Sacks, and Paul Potter to negotiate with the agents for various EDM artists. These negotiations took place over January and February 2011, and the record shows that the agents were consistently interested in the State Fair Event.

For example, agents for Calvin Harris, AfroJack, Serge Devant, the Chemical Brothers, and LA Riots told Plaintiffs and their representatives that their clients were interested and inquired about dates to make sure they made themselves available and the festival did not fall on the same day as other concerts. (Wagner Cert., Exs. 23, 24, 25, and 26 (WME000208, WME000321, JUICE0002228, WME000589)). Two artists Plaintiffs had identified as potential headliners also consistently expressed interest in the show. Steve Angello's agent exchanged

emails with John Dimatteo discussing various flight and production details related to the festival. The agent told Dimatteo that Angello liked the idea of performing at an outdoor festival and playing the New York City metro area, and Plaintiffs' planned festival fit these criteria. (Wagner Cert., Ex. 10, (WINDISH0000018). Dimatteo also had multiple conversations and exchanged several emails with agents for Tiesto where he expressed his interest in the festival. Indeed, Dimatteo had a longstanding relationship with Tiesto and his management, having booked Tiesto for several shows in the tri-state area prior to his work on the State Fair Event. (Wagner Cert., Exs. 2 and 51, JUICE0000359, JUICE0004149). Dimatteo also formerly worked with, Kelly Cobb, one of Tiesto's road managers and had a close relationship with him. (Wagner Cert., Ex. 1, Bruno Dep. at 115:23-25). Dimatteo's relationship with Tiesto is one of the reasons Plaintiffs partnered with him. Tiesto was one of the most popular EDM acts at the time, and having him as a headliner likely would have led to most of the festival's other bookings and a highly successful Event, paving the way for greater successes in subsequent years. Having worked with him before, Live Nation was also well aware of Dimatteo's close relationship with Tiesto's representatives and assumed Tiesto would play for Plaintiffs because of this fact. (Wagner Cert., Ex. 62, LN0000996) Dimatteo and Cobb were actively planning for Tiesto to appear at the Event. (Wagner Cert., Ex. 51, JUICE0004149).

When considering whether someone has "a reasonable expectation of economic benefit or advantage," New Jersey courts follow the reasoning of the Restatement (Second) of Torts:

> The expression, prospective contractual relation, is not used in this Section in a strict, technical sense. It is not necessary that the prospective relation be expected to be reduced to a formal, binding contract. It may include prospective quasi-contractual or other restitutionary rights or even the voluntary conferring of commercial benefits in recognition of a moral obligation.
>
> * * *

> Included are interferences with the prospect of obtaining employment or employees, the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts.

Restatement (Second) of Torts (1979), § 766B, comment c (quoted in *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 755, 563 A.2d 31, 39 (N.J. Sup. Ct. 1989).

By this standard, there is ample evidence Plaintiffs had a reasonable expectation of economic advantage. Plaintiffs engaged in ongoing discussions with the agents for various EDM artists about the festival. Many of them were interested and began planning their schedules around this festival. None of them ever told Plaintiffs that they were unwilling to negotiate with them to appear at the festival. As to the State Fair itself, Plaintiffs had a signed contract with SFEM by March 2011 and, before that, a signed letter of intent showing SFEM intended to do business with Plaintiffs. Live Nation's motion should be denied on this point.

There is also evidence Live Nation intentionally and wrongfully interfered with Plaintiffs' economic expectations with respect to the EDM festival. Emails and transcripts of meetings indicate that in late February 2011, D'Esposito made defamatory comments about Plaintiffs, their associates, and their business to Dorso and various agents who had been negotiating with Plaintiffs about the State Fair's EDM concert. In addition to the evidence set forth herein, the following are examples of Live Nation's interference with the SFEM contract and with its attempts to recruit talent for the State Fair Event:

- In an email dated February 23, 2011 to Al Dorso, D'Esposito misrepresented the facts surrounding Thomas Dorfman's involvement in a concert in Asbury Park, told him Plaintiffs could not produce an event, and could cause damage to the state fair. (Wagner Cert., Ex. 63, 64, 37, LN00001008, LN00001010, LN00001020). In fact, the Asbury Park concert had gone poorly because the venue management changed the location at the last minute, not because of any mismanagement by Dorfman. (Wagner Cert., Ex. 38, (Dorfman Dep. at 402:14-414:9)). In internal Live Nation emails sent the day before, D'Esposito reveals his intent to defame Plaintiffs by saying he would try to find damaging information about Plaintiffs trying to "weasel into the state fair" so they could

"make [the festival] swing back" to Live Nation. (Wagner Cert., Exs. 36, 35, and 47, LN00001697, LN00007574, LN00001004).

- Also on February 23, 2011, internal correspondence at WME about the Meadowlands festival shows Samantha Kirby Yoh of WME calling John Dimatteo a "flaky promoter" who messed up "New York marketing" and owed Live Nation money. (Wagner Cert., Ex. 12, WME0000349). This is not true. Dimatteo's firm paid Live Nation the money it owed them, and in fact, both Live Nation and Dimatteo's firm were owed money by a third party who was also involved in the event. (Wagner Cert., Ex. 9, Dimatteo Dep. at 101:2-102:9, Wagner Cert, Ex. 5, 3/5/11 Mtg Tr. at 17-18). Moreover, because Yoh is employed by WME, she could not have personal knowledge of such an allegation unless she heard it from a Live Nation employee. Live Nation's Motion does not rebut the reasonable inference that such false allegations influenced agents such as Samantha Kirby Yoh to decline having their artists appear at the Event.

- In a meeting in March 2011, Dorso insinuated to Plaintiffs that Live Nation had been badmouthing them and their attempts to stage the Meadowlands concert to agents for various artists and noted that Live Nation had detailed information about Plaintiffs' contract with SFEM. (Wagner Cert., Ex. 16, 3/7/11 Mtg. Tr.).

- In a meeting with Plaintiffs, John Dimatteo recounted a meeting he had with Kelly Cobb, the road manager for Tiesto. During the meeting, Cobb indicated to Dimatteo that Live Nation stepped in and pressured Tiesto not to play the Meadowlands concert. (Wagner Cert., Ex. 57, 4/20/11 Mtg. Tr. at 16).

- In a meeting with Jason Miller of Live Nation in April 2011, Miller indicated to Plaintiffs that John D'Esposito interfered with Juice's attempts to bring in artists for the festival. The meeting transcripts also indicate that Miller knew that D'Esposito had made derogatory comments about Plaintiffs to multiple parties involved in the proposed EDM festival and Miller failed to control or reprimand him. Miller attempted to deflect D'Esposito's actions by painting him as a lone wolf with a reputation for being "crazy" and "uncontrollable" that was well-known in the industry. (Wagner Cert., Ex. 40, 4/22/11 Mtg. Tr. at 15-16).

This type of strong arming is the equivalent of the Mafia Capo who says "not on my block" and "go teach them a lesson." It is a pattern of intimidation and economic coercion that certainly

demonstrates that Live Nation knew of Plaintiffs' contract and that they intended to interfere with the State Fair contract.[1]

Following these defamatory comments and interferences, Plaintiffs' once-highly promising EDM festival began to collapse. Previously-interested talent agents suddenly informed Plaintiffs their talent would not play the festival. Dorso saw Plaintiffs were suddenly having trouble booking talent, knew Live Nation was meddling with the festival, and granted Plaintiffs a 30-day extension on the contract. Ultimately, he felt he had to cancel the contract because Live Nation did not want Plaintiffs to work with the agents for major EDM artists or run the Event. The evidence shows Live Nation's agents made defamatory comments about Plaintiffs and encouraged artists not to perform at the festival. The artists refused to perform at the proposed festival, and SFEM had no choice but to cancel its contract with Plaintiffs.

Live Nation uses speculation rather than actual evidence to attempt to prove it did not interfere with Plaintiffs' production. For example, Live Nation claims that the Electric Daisy Carnival, and not its own meddling, was the reason Plaintiffs' event failed. The Electric Daisy Carnival, a popular annual EDM festival in Las Vegas, was scheduled for June 24-26, 2011, overlapping with Plaintiffs' event. Plaintiffs were well-aware of this fact when they were negotiating with potential talent. Some of the talent agents discussed scheduling their artists for June 24th at the Electric Daisy Carnival so that the artists could fly to New Jersey to perform at the Meadowlands on June 26th. (Wagner Cert., Ex. 53, WME000375-77). This is a common scenario for EDM artists. EDM artists tour heavily and are frequently in a new city every night. (Wagner Cert., Ex. 54, JUICE0009554). They do not have the equipment constraints that other

[1] Moreover, Live Nation's practices are well known and have been the subject of litigation and a Department of Justice Judgment prohibiting retaliation and unfair competition. *See* https://www.justice.gov/atr/case-document/final-judgment-180.

musicians have because of how their music is played through a laptop. Using the Electric Daisy Carnival as a reason for the State Fair EDM festival's failure is just speculation by Live Nation.

Plaintiffs have introduced evidence that raises fact issues regarding their economic expectations and Live Nation's interference with their business relations with artists and agents,[2] and with the SFEM contract related to the State Fair EDM festival. Its motion for summary judgment on Plaintiffs' tortious interference claims should be denied.

**C. PLAINTIFFS' DEFAMATION CLAIM IS SUBSTANTIATED**

Live Nation has not demonstrated that it is entitled to judgment as matter of law on Plaintiffs' claim for defamation. As Plaintiffs alleged and discovery established, Live Nation made false and defamatory statements concerning the Juice Entertainment team. These statements were communicated to representatives of the State Fair, representatives of the Authority, artists, and talent agents.

"To establish defamation under New Jersey law, a plaintiff must show '(1) that defendant[ ] made a false and defamatory statement concerning [plaintiffs]; (2) that the statement was communicated to another person (and not privileged); and (3) that defendant[ ] acted negligently or with actual malice.'" *Gregory v. Gregory*, No. 15-00320, 2015 U.S. Dist. LEXIS 142736, at *8-9 (D.N.J. Oct. 21, 2015) (citation omitted).

In its motion, Live Nation hangs its hat on one piece of evidence – Dorso's testimony – to argue that Live Nation never made any defamatory remarks to him. However, if the Court looks at the transcript, Dorso testified that he did not remember. SMF ¶ 24, citing Dorso Dep. 84:12-16; 86:19-87:3. In fact, Dorso testified that he could not remember multiple statements that he

[2] Live Nation's attempt to challenge Plaintiffs' choice to take written discovery of the agents but not depose them is a red herring and has no bearing on this motion. There is nothing to be gleaned from a decision about who to depose when Live Nation did not even take written discovery of the agents.

had previously made on an audio recording, though he did not challenge their accuracy or disagree that he made the statements, and he in fact thought they sounded like him. (Wagner Cert., Ex. 15, Dorso Dep. 110:4-6; 111:15-19; 112:4-17; 114:11-15; 116:23-24).

Dorso informed Plaintiffs that Live Nation was blocking Plaintiffs' acquisition of artists. (Wagner Cert., Ex. 15, Dorfman Dep. at 193:12-15). Dorso told Plaintiffs, "[y]ou know how Live Nation works. They're all over this event." (Wagner Cert, Ex. 16, 3/7/11 Mtg. Tr.). Live Nation told Dorso "[t]hat our partners were thieves, that they were broke, that [Live Nation] was bad mouthing [Plaintiffs] and all of [Plaintiffs'] partners to the Sports Authority, to him, the pressure he was getting from the Sports Authority . . . ." (Wagner Cert., Ex. 8, Dorfman Dep. at 193:16-21). Dorso further corroborated this in a later meeting:

> BARRETT: Well, he was badmouthing us and he didn't even know us.
> DORFMAN: Remember (inaudible) you're the one that told us about all the stuff John D. said. Who's the one that told you (inaudible) because you told us before I knew that.
> DORSO: Tiesto (inaudible).
> BARRETT: We had no idea.
> BARRETT: We had no idea. You had told us. We had an offer to Tiesto, four hundred thousand dollars.
> DORFMAN: And you told us that he was out.
> * * *
> DORSO: Miller (inaudible) he said they're going to. He said not (inaudible) he said Live Nation is going to just block -- he said they won't get him. Not that he will, but they will.
> DORFMAN: That Live Nation would block (inaudible) on us?
> DORSO: Yeah.

(State Fair Meeting Tr., Apr. 15, 2011, at 19-20).

Miller had also been meeting with Dorso's son and relayed to Dorso, Jr. that Dorfman was a "smooth talker" but a "serious liability" and boldly stated that he could not produce an event. (Wagner Cert., Ex. 37, LN0001020-22). He falsified a story about Dorfman being intoxicated at a concert he produced in Asbury Park and that the concert became chaotic, without

verifying its accuracy, because he knew it would sway Dorso Jr.'s attitude about Plaintiffs. (Wagner Cert., Ex. 37, LN0001020-22).

Thus, Dorso's deposition testimony that Live Nation did not defame Plaintiffs is directly rebutted by the audio recordings and only a jury is in a position to judge Dorso's credibility and recollection of the facts.

Nonetheless, the defamatory statements were not just made to Dorso and his son. In its "campaign to prevent Plaintiffs from securing their contract with SFEM and to prevent performance under the executed Agreement, Live Nation told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM." (Compl. ¶ 133).

In their efforts to derail Plaintiffs, Miller made false statements to WME executives, Joel Zimmerman and Samantha Kirby Yoh, on February 16, 2011, about one of Plaintiffs' team suggesting impropriety and incompetence: "[Dimatteo] owes me in excess of $100K. This is not a concern of artist or agent, but hopefully an illustration as to why I would require to be in control of finances on a show when significant funds are in play." (Wagner Cert., Ex. 36, LN0001697-98). As further evidence that Live Nation was meddling and intended to fabricate harmful statements, D'Esposito responded: "Good email. I need a shortened and money unpaid, trouble collecting email to send to al [Dorso] to make this swing back." (Wagner Cert., Ex. 36, LN0001697-98).

Miller was also able to utilize his close symbiotic relationship with Samantha Kirby Yoh, to wield WME's influence to support him. (Wagner Cert., Ex. 55, LN0036330-36331 ) ("I think we need your help. . . . What if we gang up on them… I know this is a problem…but I need some help to get there"). Though Zimmerman had demonstrated optimism about Plaintiffs'

Event in late January 2011, Samantha Kirby Yoh perpetuated the false and unsubstantiated statements to Zimmerman and other WME agents about Dimatteo that Miller had been making, through late February 2011, such as: "[T]hink its great to combine with fair . . . however John [Dimatteo] is a flake so far on other things" and "[i]ts the same flaky promoter that just f***ed up the new york marketing and owes live nation money. . . ." (Wagner Cert., Exs. 27 and 12, WME000093-94, WME000349-350). Samantha Kirby Yoh also used the defamatory statements to suggest that someone else should be working with Plaintiffs to produce the Event: "John [Dimatteo] is not great (per my pvd experience) re execution and that need a REAL producer re costs/production capabilities etc. Best case in this scenario [Kevin] Marrow [Live Nation' SVP of touring] and John together." (Wagner Cert., Ex. 32, WME000113).

Live Nation continued defaming Plaintiffs to other agents. Jason Miller shared with D'Esposito his text message on February 23, 2011, wherein he implied to Stephani LaFera, Manager of Kaskade, another prominent DJ, that the Plaintiffs are not funded and have no talent, and they could lose their contract within 2 weeks if not remedied. (Wagner Cert., Ex. 56, LN0001015).

In addition, Vito Bruno testified that he "had to actually show proof of funds at this point when Johnny D from Live Nation went into Al over at Meadowlands Fair and told him that nobody had any money." (Dorso Dep. Tr. 58:17-20). To the contrary, Bruno did have funds to support Plaintiffs and D'Esposito just fabricated another falsity to squash Plaintiffs.

In sum, the evidence shows that Live Nation's agents knowingly made false statements about Plaintiffs, or at the very least negligently failed to confirm the validity of the disparaging statements that they disseminated verbally and in emails. It is evident that despite Live Nation's defamatory statements Dorso still formalized the SFEM contract with Plaintiffs. However, their

defamatory statements took their toll on Plaintiffs' relationships with Dorso, agents, and artists. Statements made and influenced by Live Nation were a major contributing factor to the cancellation of the SFEM contract because they prevented Plaintiffs from locking down the talent and gave Dorso a basis to not go forward with the contract. As a result of this conduct, the artists refused to perform at the proposed festival and the Event was cancelled. Prior to Live Nation's defamatory statements, Dorfman had a sterling reputation in the industry. (Wagner Cert., Exs. 18 and 60). Live Nation's defamatory statements and the resulting consequences destroyed his reputation in the industry. Not only did Mr. Dorfman suffer emotionally, but his career in the music industry was destroyed and could not be rebuilt after the leading agents in the industry believed their remarks and watched the Event get crushed by Live Nation.

A jury could conclude that these defamatory statements not only contributed to Plaintiffs' inability to secure artists and led to the dissolution of the contract with SFEM but they also caused damage to Plaintiffs' business reputations, which has adversely impacted their careers and future business opportunities in the entertainment industry.

Likewise, Plaintiffs have established defamation per se which does not require any proof of damages, so summary judgment would be inappropriate. New Jersey courts employ per se liability in instances where a defendant falsely imputes "misconduct affecting one's business, trade, profession, office or calling." *Hall v. Heavey*, 195 N.J. 590, 595 (1984), quoting Restatement (Second) of Torts, § 520. The application of defamation per se requires the Court to presume that the reputation of the defamed party has been impaired. *Id.* As set forth above, Plaintiffs have submitted more than ample evidence that Live Nation made oral and written statements that impugned the professionalism and honesty of Plaintiffs and their team.

Plaintiffs have established sufficient evidence to prove that they were defamed. At the very least, Live Nation's statements entitle Plaintiffs to the application of defamation per se and thus a presumption that they were injured by their statements. In either event, Live Nation's motion for summary judgment on this point should be denied.

**D. PLAINTIFFS' LOST PROFITS DAMAGES SHOULD NOT BE PRECLUDED ON SUMMARY JUDGMENT**

Finally, Live Nation argues that Plaintiffs should not be allowed to seek any lost profits damages because the new business rule prohibits the recovery of lost profits. Live Nation only relies on New Jersey state court cases for this proposition. It ignores the fact that New Jersey federal courts and the Third Circuit have concluded that the "reasonable certainty" test is the better test to apply when evaluating claims for lost profits. *See Material Techs. v. Carpenter Tech. Corp.*, 2004 U.S. Dist. LEXIS 28892, *89 (D.N.J. Dec. 15, 2004) (finding that it was bound by Third Circuit precedent and applying the reasonable certainty rule to lost profits); *see also Lightning Lube v. Witco Corp.*, 4 3d. 1153, 1176-77 (3d Cir. 1993). Because this case is pending in New Jersey federal court, the Court should employ the "reasonable certainty" test when evaluating lost profits.

Under the reasonable certainty rule, "damages may be established…with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." *In re Merritt Logan, Inc.*, 901 F.2d 349, 358 (3d Cir. 1990) (quoting Restatement (Second) of Contracts § 352 comment b). Plaintiffs have offered damages evidence based on this type of data that is supported by projections from both parties and financial data from Live Nation related to another EDM concert, which will be proven at trial with the assistance of Plaintiffs' expert. Plaintiffs are entitled to have their damages, including any

potential lost profits damages, evaluated by a jury. These claims should not be thrown out by a per se rule that is no longer employed by the Third Circuit and New Jersey federal courts. Furthermore, far from being "wannabes", the facts show that Plaintiffs and their team had years of experience in the music industry. They were experienced entrepreneurs who were among the first to recognize the tremendous potential of this genre of electronic dance music and capitalize on it. Plaintiff Juice Entertainment, LLC was the successor entity of both Base Productions Inc. and DeLuna Inc. Plaintiffs Thomas Dorfman and Chris Barrett had worked together for several years both under their own names and under the names Base Productions, DeLuna and Juice to produce shows at clubs through New Jersey. Indeed, at the time they were putting together the Meadowlands EDM festival, Plaintiffs had more experience putting on EDM concerts than Live Nation did. Plaintiffs clearly had a track record and business that existed for a number of years and buttressed that experience with some of the most successful promoters in the field, including Dimatteo and Bruno.

Plaintiffs had been steadily working their way up in the concert promotion industry when they first partnered with Al Dorso to put on a Latin music festival at the Meadowlands in 2010. The festival underperformed mostly due to the weather and not any action on Plaintiffs' part. Because of their hard work and professionalism related to the Latin festival, Dorso and SFEM entered into an exclusive contract with Plaintiffs to produce music festivals, including an EDM event, at the 2011 New Jersey State Fair. (Wagner Cert., Ex. 15, Dorso Dep. at 99:17-100:17). Plaintiffs' secured this exclusive contract from Dorso, because he saw them successfully promote the Latin Event and believed they could successfully promote this one. (Wagner Cert., Ex. 15). There are certainly enough facts in dispute for a jury to conclude that this is not a new business and they had the qualifications and resources to satisfy this contract.

As set forth above, Plaintiffs understood that in order for the EDM festival to be a success, they needed to bring in other industry professionals who had more experience in certain areas, such as booking talent. They partnered with experienced professionals to organize the festival and attract talent, including Dimatteo, a music industry veteran who has worked with Live Nation many times over the years and who had a close relationship with Tiesto, one of the headlining acts Plaintiffs hoped to book for the festival. The combined experience of Plaintiffs and their partners for the State Fair EDM festival was more than adequate for producing the festival. This was not some fly-by-night operation by a group of inexperienced "wannabes" as Live Nation would like the Court to believe. These were accomplished, successful businessmen with their fingers on the pulse of what was going to become one of the most popular areas of music in the industry. A jury will see that Plaintiffs are hard-working music industry professionals who were determined to expand their footprint in the New Jersey concert promotion scene.

Applying the reasonable certainty standard and considering Plaintiffs' previous professional experience, the Court should deny Live Nation's attempts at excluding any evidence of Plaintiffs' lost profits and allow this matter to be determined by a jury.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Live Nation's motion for summary judgment in its entirety.

By: /s/ David S. Stone

David S. Stone
Amy Walker Wagner
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, NJ 07922
Tel: (973) 218-1111
Fax: (973) 218-1106

Thomas R. Ajamie (*pro hac vice*)
David S. Siegel (*pro hac vice*)
AJAMIE LLP
Pennzoil Place – South Tower
711 Louisiana Street, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699

**ATTORNEYS FOR PLAINTIFFS JUICE ENTERTAINMENT LLC, THOMAS DORFMAN AND CHRIS BARRETT**