# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT, | ) ) ) ) | Civil Action No. 2:11-cv-07318-WHW-CLW |
| Plaintiffs, | ) ) | Hon. William H. Walls |
| vs. | ) ) | |
| LIVE NATION ENTERTAINMENT, INC., | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' COUNTERSTATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Federal Rule of Civil Procedure 56 and 56.1 of the Local Rules for the District of New Jersey, Plaintiffs Juice Entertainment, LLC ("Juice"), Thomas Dorfman, and Chris Barrett (collectively "Plaintiffs"), hereby submits their responses to Defendant Live Nation Entertainment, Inc.'s ("Live Nation") statement of undisputed facts and Plaintiffs' counterstatement of facts requiring denial of Live Nation's motion for summary judgment.

## PLAINTIFFS' RESPONSES TO DEFENDANT'S
## LOCAL RULE 56.1 STATEMENT

1.    On March 7, 2011, Plaintiff Juice Entertainment, LLC ("Juice") and State Fair Event Management ("SFEM") entered into a Contract giving Juice the right to stage an electronic dance music ("EDM") event during the 2011 State Fair (the "Event"). *See* Marx Cert. Ex. 5 (Mar. 7, 2011 Contract between Juice and SFEM (the "Contract")).

**RESPONSE:**

It is undisputed that Plaintiffs and SFEM entered into a Contract on March 7, 2011 giving Plaintiffs the right to stage an EDM event during the 2011 State Fair at the Meadowlands Fair Grounds in East Rutherford, New Jersey.

2.      The Contract specified that the Event would be held on June 25 and 26, 2011.  *Id.* at Sect. 1(a).

**RESPONSE:**

It is undisputed that the Contract specified that the Event would be held on June 25 and 26, 2011.

3.      The Contract required Plaintiffs to provide SFEM, by March 1, 2011 (the "Talent Contract Deadline"), with "a copy of talent/acts/entertainment" booked for the Event, as well as "copies of all [corresponding] contracts." *Id.* at Sect. 3(c).

**RESPONSE:**

It is undisputed that the Contract required Plaintiffs to provide SFEM, by March 1, 2011, with "a copy of talent/acts/entertainment" booked for the Event, as well as "copies of all [corresponding] contracts."

4.      SFEM extended the Talent Contract Deadline by 30 days (i.e., to April 1).  *See* Marx Cert. Ex. 25 (March 7, 2011 Request for Extension) (granting Juice's request for 30-day extension "pertaining to section 3 item (c)").

**RESPONSE:**

It is undisputed that the SFEM extended the Talent Contract Deadline by 30 days (i.e., to April 1).

5.      In early 2011, Plaintiffs sought help from non-party John Dimatteo to produce the Event. *See* Marx Cert. Ex. 3 (Dorfman Dep. at 141:19-23).

**RESPONSE:**

It is undisputed that in early 2011 Plaintiffs added John Dimatteo, an experienced, well-connected, and successful music industry producer, and talent buyer, to their team to assist with

booking artists he had strong relationships with, including potential headliners for the Event such

as Tiesto, David Guetta, and Steve Angello.

6.      In particular, Plaintiffs relied on John DiMatteo to convey offers to the three talent agencies representing EDM artists – AM Only, the Windish Agency ("Windish") and William Morris Entertainment ("WME") – in an attempt to procure artists to appear at the Event.  *See* Marx Cert. Ex. 1 (Barrett Dep. at 42:21-23).

**RESPONSE:**

It is undisputed that Plaintiffs relied upon John Dimatteo to convey offers to the three

talent agencies representing EDM artists—AM Only, Windish, and WME—in an attempt to

procure artists to appear at the event.

7.      DiMatteo was in charge of all talent offers and received all responses to offers made in connection with the Event.  *See* Marx Cert., Ex. 3 (Dorfman Dep. at 121:1-5) (confirming that "John DiMatteo made all the offers … and received all of the responses to offers); Marx Cert., Ex. 1 (Barrett Dep. at 45:20-46:7) (acknowledging that he (Barrett) never bought talent through AM Only, Windish or WME, and never had any direct communications with any of them).

**RESPONSE:**

Disputed.   John Dimatteo was in charge of booking headliners for the Event.  Alan Sacks

was in charge of booking supporting acts for the Event.  (Certification of Amy Wagner ("Wagner

Cert."), Ex. 1, Bruno Dep. at 73:2-11).

8.      Plaintiffs believed at least one of the following three artists had to play at the Event if it was to be successful: Tiesto, David Guetta or Steve Angello.  *See* Amended Compl. ¶ 7 (alleging that "Tiesto, David Guetta, and Steve Angello" were important to Event's success); *id.* at ¶ 76 (identifying "[t]hree artists in particular … Tiesto, Steve Angello, and David Guetta").

**RESPONSE:**

It is undisputed that Plaintiffs believed that booking at least one of the following three artists—Tiesto, David Guetta or Steve Angello—would have greatly improved the chances for a successful Event.

9.      On January 26, 2011, DiMatteo sent Tiesto's talent agent, Paul Morris, at the AM Only talent agency, an offer for Tiesto to play at the Event.  *See* Marx Cert. Ex. 20 (Jan. 26, 2011 email from DiMatteo to Morris).

**RESPONSE:**

It is undisputed that on January 26, 2011, Dimatteo sent Tiesto's talent agent, Paul Morris, at the AM Only talent agency, an offer for Tiesto to play at the Event.

10.      Tiesto never accepted this offer.  *See* Marx Cert., Ex. 11 (DiMatteo Dep. at 34:10-12 ("Tiesto's offer was not accepted because … he was going to Electric Zoo.") and at 108:3-109:2 (finding it reasonable that Tiesto's agreement with Electric Zoo prohibited him from playing at Plaintiffs' Event: "It happens all the time.").

**RESPONSE:**

While it is undisputed that Tiesto did not appear at the Event, Live Nation's use of John Dimatteo's deposition testimony to support this fact is misleading.  Plaintiffs dispute that the reason Tiesto did not accept this offer was simply that Tiesto "was going to Electric Zoo." Dimatteo had a very close relationship with Tiesto and had booked Tiesto many times.  He had made significant progress with Tiesto's road manager, Kelly Cobb, and fully expected to book Tiesto for Plaintiffs' event.  (Wagner Cert., Ex. 2, JUICE0000359-60).  Dimatteo later explained in an April 20, 2011 meeting with Plaintiffs that Cobb confirmed to him that Tiesto indicated to him that Live Nation blocked him from accepting Plaintiffs' offer.  (Wagner Cert., Ex. 57, 4/20/11 Mtg. Tr. at 15-16).

11.    Tiesto's agent, Paul Morris never agreed that Tiesto would appear at the Event for $400,000.  *See* Marx Cert. Ex. 11 (DiMatteo Dep. at 77:3-19); *see also id.* at 77:20-22 (reiterating that Morris never agreed that Tiesto would appear at the Event).

**RESPONSE:**

It is undisputed that Tiesto's agent, Paul Morris, never agreed that Tiesto would appear at the Event for $400,000.  Nevertheless, Plaintiffs had a reasonable expectation that they would be able to book Tiesto for the Event.  When they did not, Plaintiffs suspected that Live Nation was "trying to manage tiesto WITHOUT paul." (Wagner Cert, Exs. 4 and 5, JUICE0004153-5; 3/5/11 Mtg. Tr. at 33-34 (JUICE0010823-24)).  John Dimatteo, as an independent promoter, had successfully booked Tiesto for other events on numerous occasions and was responsible for booking most if not all of Tiesto's performances in the Tri-state area for Live Nation prior to 2012.  According to Alan Sacks, John Dimatteo had booked Tiesto "12, 20, 30 times ... so the money wasn't an issue there." (Wagner Cert., Ex. 6, Sacks Dep. at 161:21-162:10).  Even Live Nation's Jason Miller expected that John Dimatteo, on the strength of his close relationship with Tiesto, would be able to book Tiesto for the Event.  (Wagner Cert., Ex. 7, 12/19/13 Miller Dep. at 143:18-144:2).

12.    DiMatteo also expressed an interest in 20 other artists represented by AM Only, including potential headliner David Guetta and on February 16, 2011, DiMatteo sent Guetta's agent Paul Morris an offer for Guetta to play at the Event.  *See* Marx Cert. Ex. 20 (Feb. 16, 2011 email from DiMatteo to Morris).

**RESPONSE:**

It is undisputed that Dimatteo also expressed an interest in 20 other artists represented by AM Only, including potential headliner David Guetta, and that on February 16, 2011, Dimatteo sent Guetta's agent Paul Morris an offer for Guetta to play at the Event.  Paul Morris was eager

to confirm the headline offers at this point and sent Dimatteo an email to that effect.  (Wagner

Cert., Ex. 58, JUICE0002015-6).

13.    David Guetta never accepted this offer.  *See* Marx Cert., Ex. 11 (DiMatteo Dep. at 78:2-15).

**RESPONSE:**

It is undisputed that David Guetta never accepted this offer.  The reason why David

Guetta, Tiesto, and other headliners never accepted Plaintiffs' offers to perform at the Event, is

nevertheless very much in dispute.  Live Nation's defamatory comments about Plaintiffs and

their associates made to talent agents, Al Dorso, and to Plaintiff's themselves, led Plaintiffs to

reasonably infer that David Guetta and others were not accepting their offers because Live

Nation did not want them to.  (Wagner Cert., Ex. 8, Dorfman Dep. at 265:5-273:11).  Paul

Morris, agent for Tiesto and David Guetta, expressed interest in the Event and solicited offers

from John Dimatteo. (Wagner Cert, Ex. 58, JUICE0002015-2016).  Dimatteo reported that

Morris was very eager to participate in the Event.  (Wagner Cert., Ex. 57, 4/20/11 Mtg Tr. at 29-30).

14.    David Guetta's agent Paul Morris never agreed that Guetta would appear at the Event.
*Id*. at 78:2-15 (Marx Cert. Ex. 11).

**RESPONSE:**

It is undisputed that David Guetta's agent Paul Morris never agreed that Guetta would

appear at the Event.  But this fact alone, again, fails to explain the reason why Guetta rejected

Plaintiffs' offer.  Live Nation has failed to provide evidence to rebut the reasonable inference

that Live Nation interfered in their ability to book David Guetta for the proposed Event.

15.    On or around February 21, 2011, DiMatteo sent talent agent Steve Goodgold, at the Windish Agency, an offer for Steve Angello to play at the Event.  *See* Marx Cert. Ex. 22 (Feb. 21-22, 2011 e-mail exchange between DiMatteo and Goodgold).

**RESPONSE:**

It is undisputed that on or around February 21, 2011, Dimatteo sent talent agent Steve Goodgold, at the Windish Agency, an offer for Steve Angello to play at the Event.

16.    Steve Angello never accepted this offer.  *See* Marx Cert. Ex. 11 (Dimatteo Dep. at 82:19-83-2 and 83:22-84:14) (Dimatteo's discussions with Angello's agent never got beyond "a back and forth dialogue about the Event" and that Angello was declining the offer).

**RESPONSE:**

While it is undisputed that Steve Angello never accepted the offer from Plaintiffs, Live Nation's use of Dimatteo's deposition testimony is misleading and does not adequately explain why Steve Angello did not accept Plaintiffs' offer.  Plaintiffs were having advanced  discussions with Steve Goodgold of the Windish Agency  concerning the details of the appearance of his artist, Steve Angello, at the Event. (Wagner Cert., Ex. 50, JUICE0004139-41).   Then, without explanation, the situation changed, and Dimatteo testified that Angello" for some reason, just did not want to do it. I don't know why."  (Wagner Cert., Ex. 9, Dimatteo Dep. at 34:3-13).  Vito Bruno testified that, according to Dimatteo, "some of the acts were asked not to do the show," including Steve Angello, who was willing to "do a show for us on that day anywhere else but at that venue and at that festival."  (Wagner Cert., Ex. 1, Bruno Dep. at 134:4-16).

17.    In addition to the three potential headliners, DiMatteo also made offers to about 30 lesser-known artists represented [by] WME.  *See* Marx Cert. Ex. 23 (Feb. 3, 2011 e-mail from DiMatteo to Joel Zimmerman, *et al*, at WME.

**RESPONSE:**

It is undisputed that in addition to the three potential headliners, Dimatteo also made offers to about 30 lesser-known artists represented [by] WME.

18.     All of the WME offers expired on February 12, 2011.  *See id.*; *see also* Marx Cert., Ex. 11 (DiMatteo Dep. at 55:17-21) (confirming that all WME offers expired February 12, 2011).

**RESPONSE:**

It is undisputed that all of the WME offers expired on February 12, 2011, but discussions with William Morris continued the following month.

19.     On February 22, 2011, DiMatteo sent Windish offers for five of its artists. *See* Marx Cert Ex. 24 (Feb. 22, 2011 e-mail from DiMatteo to Plaintiffs and others attaching copies of Windish offers).  All of the Windish offers expired on March 1, 2011.  *See id.*

**RESPONSE:**

It is undisputed that on February 22, 2011, Dimatteo sent Windish offers for five of its artists and that all of the Windish offers expired on March 1, 2011.

20.     Of the approximately 57 offers made by DiMatteo to artists represented by AM Only, Windish and WME, to play at the Event only one was accepted; the rest of the offers expired or were rejected.  The one acceptance was from Windish artist Matthew Dear. No contract was signed with Dear, however, "because [Plaintiffs] didn't have the headliners."  *See* Marx Cert. Ex. 11 (DiMatteo Dep. at 86:20-87:21).

**RESPONSE:**

Plaintiffs do not dispute that of the approximately 57 offers made by Dimatteo to artists represented by AM Only, Windish and WME to play at the Event only one was accepted.

However, Plaintiffs dispute Live Nation's characterization of Dimatteo's deposition testimony.

The testimony cited by Defendants fails to adequately explain why Plaintiffs were not able to

book a headliner or to explain why the 56 artist offers, which were contingent upon first booking at least one headliner, were allowed to expire or were rejected.  Additionally, the evidence shows that the artist Afrojack did accept an offer to appear at the Event, but was informed by William Morris on April 5, 2011, after Live Nation's interference, that the Event was not happening. (Wagner Cert., Ex. 59, WME000414).

21.     Many of the artists to whom DiMatteo had made offers to appear at Plaintiffs' Event (including all three of the potential headliners –Tiesto, Steve Angello and David Guetta) appeared at Electric Daisy Carnival ("EDC") in Las Vegas, which fell on the same days that the Plaintiffs' Event was to be held in New Jersey.  *See* Marx Cert. Ex. 6 (list of performers at EDC); *see also* Marx Cert., Ex. 3 (Dorfman Dep. at 121:22-124:5) (confirming that Tiesto, Angello, Guetta and many others to whom DiMatteo had made offers had, in fact played at EDC in Las Vegas on the same days as plaintiffs' proposed Event in New Jersey).

**RESPONSE:**

Disputed.  Plaintiffs' event was to take place on June 25-26, 2011, and they expected to sign Tiesto, Angello and others prior to decisions made by artists about other events in competition with their Event.  Nevertheless, according to Live Nation's list of EDC performers, Tiesto and Steve Angello, among others, were to perform a day before Plaintiffs' Event, on June 24, 2011, and on information and belief they did perform at the EDC on that date.  Live Nation has failed to provide facts that explain why it would not have been possible for either of the aforementioned headliners to have originally signed with Plaintiffs or performed at both the EDC in Las Vegas on June 24th and then, for example, Plaintiffs' Event in New Jersey on June 26th, when in fact is was possible.  (Wagner Cert., Ex. 53, WME000375-77).  Steve Angello's agent, Steve Goodgold, was at one point considering the possibility of Angello playing the EDC on the 24th and then Plaintiffs' Event a day or two later.  (Wagner Cert., Ex. 10, WINDISH0000018).

22.    Live Nation did not pressure anyone at WME, AM Only or Windish to withhold their artists from the Event.  *See* Marx Cert. Ex. 11 (DiMatteo Dep. at 85:6-14).

**RESPONSE:**

Disputed.  The evidence supports the inference that Live Nation did indeed pressure agents at WME, AM Only, or Windish to withhold artists from the Event.  After Jason Miller first met with Plaintiffs, he communicated with talent agents to confirm whether or not particular artists were confirmed to play at Plaintiffs' Event.  (Wagner Cert., Ex. 7, Miller Dep. at 227:6-230:24).  Despite knowing that Plaintiffs' had exclusive rights to promote the Event, Live Nation contacted agents and began to make disparaging remarks about Plaintiffs and their proposed Event.  Jason Miller, for instance, emailed Samantha Kirby Yoh and Joel Zimmerman questioning John Dimatteo's integrity and competence and claiming Dimatteo owed Live Nation "in excess of $100K".  (Wagner Cert., Ex. 11, LN0000993).  Samantha Kirby Yoh, a friend of Miller's, in a subsequent email, repeated to other agents what Miller had said about Dimatteo: "It's the same flaky promoter that just f\*\*cked up the new york marketing and owes live nation money…." (Wagner Cert., Exs. 12 and 11, WME000349-350; LN0000993-4).  Kirby Yoh could not have known this information without Live Nation giving it to her.  Around the same time he was making these comments about Dimatteo to agents, Miller was working with Dimatteo, as he had in the past, to book headliners such as Steve Angello and Tiesto for Live Nation events. (Wagner Cert., Exs. 13 and 14, LN0001039; LN0001048).

23.    When Plaintiffs did not meet their April 1, 2011 deadline to produce signed contracts with artists, SFEM cancelled Plaintiffs' Contract.  *See* Marx Cert. Ex. 4 (Dorso Dep. at 10:6-16); *id.* at 85:15-86:1 ("My decisions were made based on a contract, and they [i.e., Plaintiffs] couldn't perform.") (emphasis added).

**RESPONSE:**

Plaintiffs do not dispute that there was an April 1, 2011 deadline to produce signed contracts with artists and that Plaintiffs' Contract was cancelled.  Plaintiffs do dispute Live Nation's misleading use of Dorso's testimony to explain why the Contract was cancelled.  Live Nation's desire to be involved in the proposed Event and their defamatory comments about Plaintiffs may very well have influenced Dorso's decision to cancel the Contract.  Live Nation's John D'Esposito testified that, prior to termination of Plaintiffs' Contract, he met with Dorso and told him "well, you know, I can produce this thing.  I would like to talk to these guys.  These guys don't know what they are doing, you know, we should get together."  (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 67:5-12).  Dorso, in fact, knew that Live Nation was in a position to exert its considerable influence and encouraged Plaintiffs to meet with them and to concede to Live Nation's intentions: "I said to the guys, I don't know why you don't take what you can get, I said, they are the 800 pound gorilla in the room. You should talk to them and you should negotiate and make this thing happen, because if they don't want it to happen, it won't happen." (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 11:16-22).  It is not unreasonable to infer that, following Live Nation's February 18, 2011 meeting with Al Dorso in which they questioned Plaintiffs' integrity, finances, competence, and experience, Live Nation influenced Dorso's decision to terminate Plaintiffs' Contract.

24.    SFEM did not cancel the Contract based on any alleged defamatory statements by Live Nation.  No one from Live Nation ever told Dorso that Plaintiffs "associated with thieves," "lacked funding" or "lacked the experience necessary to put on a show of the type [they were contemplating]."  *See* Marx Cert. Ex. 4 (Dorso Dep. at 84:12-16; 85:8-19; 86:19-87:3].

**RESPONSE:**

Disputed.  Plaintiffs assert that one could reasonably infer that Al Dorso cancelled the Contract at least in part because of defamatory statements against Plaintiffs made by John D'Esposito of Live Nation.  Dorso told Plaintiffs that "Live Nation is bad mouthing the whole event and you guys to the powers that be over there". (Wagner Cert., Ex. 16, 3/7/11 Mtg. Tr.).  Live Nation's Jason Miller and John D'Esposito, prior to the termination of Plaintiffs' Contract, had a preliminary meeting with Al Dorso, and then two follow-up meetings with Plaintiffs.  In one of the meetings with Plaintiffs, Thomas Dorfman recalled what Live Nation told them about their partners Vito Bruno and John Dimatteo:

DORFMAN:  They said – they came and said you guys owed a mass amount of money.
BRUNO:  To whom?
DORMAN:  To—Live Nation said it to the Sports Authority, and to Al Dorso and us.
BRUNO:  To whom?
BARRETT:  You owe Live Nation money.
DORFMAN:  And they told us that you're a thief. Why are you working with the guy?
BRUNO:  Who said that? Live Nation?
BARRETT:  Live Nation.
BRUNO:  Really?
DORFMAN:  So when they said—we--.
BRUNO:  I don't believe Live Nation said that?
DORMAN:  No, we told you guys this--.
BRUNO:  No, (overlapping dialogue) who said this? Johnny D?
DORFMAN:  Jason Miller and Johnny [D'Esposito].

(Wagner Cert., Ex. 5, 3/5/11 Mtg. Tr. at 17).

In another meeting, Al Dorso recalled that D'Esposito, in an effort to dissuade Dorso from continuing to do business with Plaintiffs, told him Plaintiffs did not pay their bills.  "[S]omebody told me about--it may have been John [D'Esposito]--about some production that Chris or Tom was involved with in the winter, didn't pay their bills. I don't remember where that came from.  I think it came from John [D'Esposito]." (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 84:12-23).

Plaintiffs deny D'Esposito's accusation that Plaintiffs owed Live Nation or anyone else money.

(Wagner Cert., Exs. 16 and 38, 3/7/11 Mtg. Tr. at 2-3 and 3/28/16 Dorfman Dep. at 402:14-414:9).

25.     Even if such allegedly defamatory statements *had* been made to Dorso, it would not have led SFEM to terminate the Contract.  *Id.* at 85:2-7 ("[I]t wouldn't have mattered.  I mean, there is a contract in place, and why would any of that matter?").

**RESPONSE:**

        Disputed.  Live Nation speculates as to what led to SFEM terminating the Contract, but fails to provide facts supporting its conclusion that its own actions are immaterial.  Evidence compiled in this case points to a reasonable inference that Live Nation's defamatory statements to Dorso may very well have influenced his decision to terminate the Contract.  Moreover, Dorso's statements and contradictory testimony point to what he had predicted for Plaintiffs: that they better bend to Live Nation's will, to take what they can get, or they will lose the entire Event to Live Nation.  (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 11:16-22; 67:5-12). Plaintiffs assert that defamatory statements were made by D'Esposito to Dorso and that these statements could very well have predisposed Dorso to terminate the Contract.

26.     In addition, having learned, post-Contract, that EDM is not consistent with the family friendly atmosphere of the State Fair, even had Plaintiffs been able to produce the first day of the Event in 2011 (on June 25), SFEM would have exercised its contractual right to terminate both day two of the Event (June 26) and any contract renewal.  *See* Marx Cert. Ex. 4 (Dorso Dep. at 45:8-46:2; 91:6-8).

**RESPONSE:**

Disputed.  Al Dorso testifies that he would not necessarily have terminated the contract if certain acts were not consistent with a "family friendly" atmosphere, but would have first considered working with Plaintiffs to replace them with other artists.

> Q.    My question is really would you have terminated the contract, the entire contract if you felt there was something unpalatable about the electric dance, or would you simply have said let's try to find other acts?
>
> A.    Right, that would be, obviously, it if was successful and they did as they said and it was a good production, but it was uncontrollable, then you move on to the other acts. Are you guys willing to do this or not? That's where you go with it.

(Wagner Cert., Ex. 15, Dorso Dep. at 99:5-16)

Dorso's experience with Plaintiffs' production of the Latin Music Festival was positive and, based on their performance, he entrusted them with the proposed Event with no expectation that the event would detract from the success of the State Fair or that any of the acts they booked would mirror family unfriendly events that have taken place at other concerts.  (Wagner Cert., Ex. 15, Dorso Dep. at 99:5-100:17).  Any conjecture regarding whether or not the acts that Plaintiffs' intended to book were "family-friendly" is purely speculative and has no bearing on Plaintiffs' contract and their Event at the State Fair.

27.    Prior to the formation of Juice in 2009, Plaintiffs had never produced an outdoor festival event, an EDM event, or any concert or event with more than 5,000 patrons in attendance.  *See* Marx Cert. Ex. 1 (Barrett Dep. at 273:9-12) (testifying that his only previous experience with outdoor music festivals had been as a performer); Marx Cert. Ex. 3 (Dorfman Dep. at 29:9-30:10 (he was not involved with any large scale event festivals prior to 2010) at 35:1-6 (at most Dorfman's club events had 5,000 attendees) and at 38:16-39:1 (Dorfman's largest talent contract was $150,000 for Jonathan Peters)).

**RESPONSE:**

It is undisputed that prior to the formation of Juice in 2009, Thomas Dorfman and Chris Barrett had never produced an outdoor festival event, an EDM event, or any concert or event with more than 5,000 patrons in attendance.  Nevertheless, Dorfman and Barrett had extensive

experience in outdoor and smaller venues, including EDM concerts, and brought in industry veterans John Dimatteo, Vito Bruno, Paul Potter, and Alan Sacks to work with them to put on the Event. (Wagner Cert., Ex. 6, Sacks Dep. at 35:5-11; Ex. 18, JUICE0002960-61; Ex. 19, JUICE0001279; Ex. 20, JUICE0004234; Ex. 21, JUICE0004436; Ex. 60, LaVecchia Dep. at 28:1-29:17). Dorfman and Barrett also produced the Latin Music Festival one year before the Event was contemplated by the contract at issue here and that was an outdoor festival event. (Wagner Cert., Ex. 15, Dorso Dep. at 99:17-100:17).

28.     The only moderately large scale music festival Plaintiffs ever produced lost money. *See* Marx Cert. Ex. 1 (Barrett Dep. at 23:7-8; 23:14-24:1) (testifying that Plaintiffs lost between $5,000 and $10,000 on the Latin festival); Marx Cert., Ex. 3 (Dorfman Dep. at 30:4-10, 70:25-71.8, 73:1-5 ("We rushed the event and we actually didn't land an anchor.") and 81:14-83.8 (testifying that "[w]e lost money" and that they had anticipated 10,000 attendees but only about 1,500 to 2,000 showed up)); Marx Cert. Ex. 4 (Dorso Dep. at 21:15-22:11) ("[W]as [Plaintiffs' 2010 Latin festival] successful? No, it was not … It was poorly attended and I think it was poorly marketed.").

**RESPONSE:**

It is undisputed that Plaintiffs' 2010 Latin festival fell short of financial expectations. Plaintiffs do note, however, that one of the reasons it did not go well was bad weather and that the Event was a success in that it lead to future opportunities for Plaintiffs. Al Dorso recalled that due to it being an unusually hot day "daytime attendance [for the Latin festival] was definitely suppressed. The nighttime attendance which should have picked up, didn't pick up to their expectations, obviously, or mine. But they still managed it well. They did everything they said they were going to do. They were honorable through the whole thing. They tried very hard. That's why I gave them another chance the next year." (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 100:3-17).

29.     Juice did not conduct any business, and consequently earned no profit, prior to executing the Contract with SFEM in 2011.  *See* Marx Cert. Ex. 3 (Dorfman Dep. at 175:15-176:9).

**RESPONSE:**

Disputed.  Plaintiffs were working on the proposed Event well in advance of the signing of the Contract—at this point under the name Deluna Inc.—and even had a letter of intent for the proposed Event signed by Al Dorso on December 1, 2010 under that name.  (Wagner Cert., Ex. 17, JUICE0002202).   Thomas Dorfman testified that Plaintiffs had been working on it for "nine months" prior to Live Nation's proposal in March of 2011 to partner with Plaintiffs for the proposed Event.  (Wagner Cert., Ex. 8, Dorfman Dep. at 268:5-20).  And, the principals of Juice Entertainment, Dorfman and Barrett, did have extensive experience in the EDM industry, as shown below.

## PLAINTIFFS' COUNTERSTATEMENT
## OF MATERIAL FACTS

1.     Plaintiffs' Thomas Dorfman and Chris Barrett, with their company Juice Entertainment and its predecessors Base Production Inc. and Deluna Inc., both had successful careers in the music industry and had built up excellent reputations as producers of live music shows.  (Wagner Cert., Ex. 6, Sacks Dep. at 35:5-11; Ex. 18, JUICE0002960-61; Ex. 19, JUICE0001279; Ex. 20, JUICE0004234; Ex. 21, JUICE0004436-36; Ex. 60, LaVecchia Dep. at 28:1-29:17).

2.     Dorfman began working in the music industry in 1997 and became a key player and top event producer, coordinating events at many of New Jersey, New York, and Miami's top venues.  Events he produced included top artists and entertainers such as Tommy Lee, Snoop

Dog, Kid Cudi, Paris Hilton, Jonathan Peters, and L.M.F.A.O., among others. Dorfman operated Bliss Night Club from 2007-2010 and routinely grossed more than $1 million a year in revenues. Dorfman's success in the industry led to his receiving many accolades, including a 2011 nomination in the Star-Ledger for Best Promoter in New Jersey. (Wagner Cert., Exs. 18, 19 and 20 (JUICE0002960-61; JUICE0001279; JUICE0004234)). By 2010 Mr. Dorfman enjoyed a reputation as "the best in the industry, for being a hard worker and for following through on promises." (Wagner Cert., Ex. 60, LaVecchia Dep. at 28:1-29:17). He was viewed as having a good stature in the industry and had a track record of successful promotions. (Wagner Cert. Ex. 6, Sacks Dep. at 35:5-11).

3.      Barrett has also enjoyed a similar reputation as a rising promoter and entrepreneur in the music industry. (Wagner Cert., Ex. 21, JUICE0004436-39). He began working as a professional DJ in 1998, playing alongside Victor Calderone, Junior Vasquez, Paul Oakenfold, Erick Morillo, Jonathan Peters and many other accomplished DJs. (Wagner Cert., Ex. 19, JUICE0001279). Later, Barrett teamed up with Dorfman, and together they have been promoting and staging shows at various New Jersey venues for years, frequently producing concerts with an average attendance of thousands of people.

4.      In June of 2010, Dorfman and Barrett of Base Production Inc. entered into an agreement with SFEM to produce a one-day show for a Latin Music Festival on July 4, 2010. The Latin Music Festival was produced on relatively short notice and had significant challenges, including unpredictably bad weather on the day of the event. Nevertheless, having witnessed Plaintiffs' diligence and ability to competently promote the Latin Music Festival, Al Dorso, President of SFEM, wanted to work with Plaintiffs again on the following year's New Jersey State Fair events at the Meadowlands. (Wagner Cert., Ex. 15, Dorso Dep. at 99:17-100:17).

5.      Prior to any formal offer to Plaintiffs, Al Dorso of SFEM made an offer to John D'Esposito for Live Nation to produce concerts at the New Jersey State Fair, but D'Esposito declined.  (Wagner Cert., Ex. 15, Dorso Dep. at 10:15-24).

6.      In the fall of 2010, Plaintiffs began discussions with SFEM with the intention of entering into a long-term agreement for the production of concerts at the New Jersey State Fair (the "Event").  On December 1, 2010 Al Dorso verbally granted Messrs. Dorfman and Barrett exclusive rights to produce an electronic dance event, as well as any and all concerts in the designated special events area of the State Fair, for the next five years.  This verbal agreement was reduced to writing in the form of an engagement letter, also dated December 1, 2010, granting Deluna Inc., the predecessor to Plaintiff Juice Entertainment, LLC, "the right to broker, stage, and promote concert events in the designated special event area of the fair, held yearly between mid June and mid July."  (Wagner Cert., Ex. 17, JUICE0002202).

7.      On March 7, 2011, Plaintiffs Dorfman and Barrett were awarded the Contract by Dorso and the SFEM.  (Wagner Cert., Ex. 22, JUICE0010183-199).

8.      After obtaining exclusive rights to produce the Event, Plaintiffs Dorfman and Barrett began to make arrangements in anticipation of the electronic dance event, and other events, to take place on June 25 and June 26 at the 2011 State Fair.  They assembled a team of music industry veterans—including John Dimatteo of Area Events, Alan Sacks, Paul Potter, and Vito Bruno—that had a history of booking headliner talent and funding and producing large scale events and festivals.  (Wagner Cert., Ex. 28, WME00098-100; Ex. 66, JUICE0004492; Ex. 67, JUICE0004509; Ex. 6, Sacks Dep. at 8:19-11:12).

9.      In January and early February of 2011, Plaintiffs began contacting talent agencies and artists to perform at the Event.  Their initial communications with agents were promising.

For example, agents for Calvin Harris, AfroJack, Serge Devant, the Chemical Brothers, and LA Riots told Plaintiffs and their representatives that their clients were interested and inquired about dates to make sure they made themselves available and the festival did not fall on the same day as other concerts. (Wagner Cert., Exs. 23, 24, 25, and 26 (WME000208, WME000321, JUICE0002228, WME-589)). On January 14th, headliner Steve Angello's agent, Steve Goodgold of the Windish Agency ("Windish"), told John Dimatteo, "I really like the idea of something outdoor[s], especially if it's something new and different … something with Tiesto would be good … I don't have my NYC play and I need it." (Wagner Cert., Ex. 10, WINDISH0000018-21). Another agent, Joel Zimmerman (William Morris Endeavor Entertainment ("WME")), was initially pleased with the prospect of Plaintiffs' Event, telling fellow agents that "John Dimatteo in NY is doing a new festival at the Meadowlands parking lot June 25 and 26 … Interesting concept to tie in with the state fair", discussing some of the logistics, and forwarding a list of 32 or so possible artists to consider for the Event. (Wagner Cert., Ex. 27, WME000093-94). Noting that there were heretofore no successful EDM summer festivals in the area, Zimmerman also noted to Samantha Kirby Yoh and other agents that John Dimatteo "has been successful in the past and think with the right timing and play could make this work … feels like first one out of the gate in NY will get the proper summer festival." (Wagner Cert., Ex. 28, WME00098-100).

10. On January 25, 2011, John Dimatteo and Vito Bruno met with Joel Zimmerman, at Zimmerman's request, and other agents from William Morris to discuss the proposed Event and WME's expressed interest in helping book talent for Plaintiffs' Event. (Wagner Cert., Ex. 9, Dimatteo Dep. at 47-51).

11.    Various talent agents had also conveyed to Plaintiffs the interest of several other artists in performing at the Event and inquired about dates to ensure the artists were free.  These artists included Calvin Harris, AfroJack, Serge Devant, the Chemical Brothers, and LA Riots. (Wagner Cert., Exs. 23, 24, 26, and 25 (WME000208, WME000321, WME000589, and JUICE002228)).

12.    Live Nation's Jason Miller and John D'Esposito were aware of the rise in popularity of electronic dance music ("EDM") years before the proposed Event and were interested in Live Nation becoming a larger producer of EDM shows in New Jersey and working with headliner EDM artists.  (Wagner Cert., Ex. 29, LN0007036).  With the help of John Dimatteo, Miller booked Tiesto, an EDM artist he was particularly impressed with, for a Live Nation event that took place in September of 2009. (Wagner Cert., Ex. 30, LN0008099-101)[1]. Live Nation put on other Tiesto shows with Dimatteo, praising Dimatteo and Area Events for their "enduring bonds with top talent and DJs from all genres, including Danny Tenaglia, Tiesto, Victor Calderone and scores of others."  (Wagner Cert., Ex. 31, LN000255-56).

13.    Soon after learning that Plaintiffs had been awarded the Contract for the State Fair Event, Live Nation began providing derogatory and misleading information about Plaintiffs to talent agencies and artists.  For example, on February 15, 2011, Live Nation's Jason Miller sent an email to William Morris agents Joel Zimmerman and Sam Kirby Yoh criticizing Dimatteo's handling of a past New York event and claiming he owed Miller more than $100,000.  (Wagner Cert., Ex. 11, LN0000993-4).

---

[1] In an effort to avoid sealing documents marked confidential, counsel have conferred and agreed to redact the confidential information that is irrelevant to this motion for summary judgment. Thus, none of the Live Nation and WME documents cited herein required a motion to seal.

14.     While Zimmerman was initially interested in working with Plaintiffs on their proposed Event, fellow agent, Samantha Kirby Yoh, a close friend of Jason Miller, began making the same sorts of unsubstantiated comments to Zimmerman and other agents about Dimatteo that Miller had been making: "[T]hink it's great to combine with fair … however John is a flake so far on other things" and "it's the same flaky promoter that just f**ked up the new York marketing and owes live nation money…." (Wagner Cert., Exs. 27 and 12, WME000093-94, WME000349-350).

15.     Samantha Kirby Yoh also began suggesting to fellow agents that Plaintiffs, and in particular John Dimatteo, were incapable of promoting the proposed event themselves and pushing for Live Nation to take over at least a part of the proposed Event: "John is not great (per my pvd experience) re execution…need REAL producer re costs/production capabilities etc. Best case in this scenario Morrow and John together." (Wagner Cert., Ex. 32, WME000113). Kevin Morrow is a producer for Live Nation that worked with Jason Miller and John D'Esposito on the 2009 Tiesto event put on by Live Nation described above. (Wagner Cert., Ex. 33, LN0008091).

16.     On February 2, 2011, John Dimatteo and Vito Bruno met with Joel Zimmerman and Samantha Kirby Yoh of William Morris. In this meeting, Kirby Yoh suggested to Plaintiffs that they partner with Live Nation for Plaintiffs' Event. (Wagner Cert., Exs. 9 and 1, Dimatteo Dep. at 50-51; Bruno Dep. at 119-120).

17.     On February 4, 2011, Jason Miller of Live Nation met with John Dimatteo and Vito Bruno to discuss Plaintiffs' Event and presented a possible three-way partnership with Live Nation, Deluna and Area Events. (Wagner Cert., Ex. 34, JUICE0001742). On the very same day, February 4, 2011, Mr. Miller emailed Samantha Kirby Yoh at William Morris to discuss

possibilities for outdoor music festivals. (Wagner Cert., Ex. 46, WME000198). He lists the "Meadowlands/Izod parking lots" as a possible venue, without mentioning Plaintiffs or acknowledging their right to the venue. (*Id*.).

18.     On February 15, 2011, Jason Miller sent Zimmerman, copying Samantha Kirby Yoh, an email raising doubts about John Dimatteo and telling Zimmerman that he had a "positive personal relationship" with John Dimatteo and that he has worked with Dimatteo and in his assessment Dimatteo is a "good street promoter," but "when it comes to event execution his is vastly different; which is probably why we make for such a good team…. I have still not settled internally with John.  He owes me in excess of $100K.  This is not a concern of artist or agent, but hopefully an illustration as to why I would require to be in control of finances on a show when significant funds are in play."  (Wagner Cert, Ex. 35, LN0007574-76).

19.     Live Nation, in a separate effort to undermine or obtain a piece of Plaintiffs' Event, also began making defamatory statements about Plaintiffs directly to Al Dorso Jr.  On February 16, 2011, John D'Esposito responded to Jason Miller's email, strategizing about how they can present Live Nation to Dorso as a better partner for the Meadowlands Event than Plaintiffs: "Good email. I need a shortened and money unpaid, trouble collecting email to send to al to make this swing back."  (Wagner Cert., Ex. 36, LN0001697-98).

20.     Just before he met with Al Dorso Jr., D'Esposito sent him an email.  The email was the result of an inquiry he made to Chris Femiano, someone with whom Dorfman had worked, requesting information about how Dorfman allegedly bungled a concert and stiffed the artist.  He then relayed to Dorso that "Chris Femiano….did the deal with Tommy D and was the one who was left to clean up the mess when Tommy was intoxicated and unable to sort out a very disorganized and hectic situation…street kids, they CAN NOT produce an event…They are

good at handing out flyers and hustling tickets on the streets…They could do damage to your father's event, drugs are huge…we had 12 overdoses in Asbury for the Tiesto event…Tommy D is a smooth talker, but a serious liability…see you tomorrow." (Wagner Cert., Ex. 37, LN1020-22).  In fact, the Asbury Park concert had gone poorly because the venue management changed the location at the last minute, not because of any mismanagement by Dorfman.  (Wagner Cert., Ex. 38, (Dorfman Dep. at 402:14-414:9).

21.     On February 18, 2011, Miller and Dimatteo met with Dorso to, in Miller's words, "explore if there was an opportunity with an independent promoter."  (Wagner Cert., Ex. 7, 12/19/13 Miller Dep. at 70:2-3).

22.     After Dorso and Miller met, Dorfman recalled that Dorso informed Plaintiffs that Live Nation "told him that our talent was being blocked by [Live Nation] and multiple agencies. That our partners were thieves, that they were broke, that [Live Nation] was bad mouthing us and all of our partners to the Sports Authority, to him, the pressure he was getting from the Sports Authority to the powers that may be."  (Wagner Cert., Ex. 8, Dorfman Dep. at 193:12-21).

23.     In addition to making defamatory statements to Al Dorso about Plaintiffs, Live Nation also pressured Dorso to convince Plaintiffs to meet with them to discuss ways in which Live Nation could obtain a portion of the contractual right to produce the proposed Event. (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 73:1-74:23).

24.     Following his February 18, 2011 meeting with Live Nation, Dorso called Plaintiffs to relay what he had been told, to ask them if any of Live Nation's accusations were true, and to encourage Plaintiffs to meet with Live Nation and "find a way to work with them." (Wagner Cert., Ex. 15, 7/16/13 Dorso Dep. at 73:1-74:23).

25.     On or about March 3, 2011, following the advice of Al Dorso, Plaintiffs Thomas Dorfman and Chris Barrett met with Jason Miller and John D'Esposito.  In this meeting, Miller and D'Esposito repeated the same threats they had made to Dorso, including the threat that Tiesto and talent managed by William Morris would be prevented from appearing at the State Fair.  They told Plaintiffs that they needed to break existing contacts and associations with Vito Bruno and John Dimatteo, key members of their team.  (Wagner Cert., Ex. 8, Dorfman Dep. 268:2-273:10).

26.     Miller and D'Esposito also told Plaintiffs that unless Live Nation was permitted to become partners with Plaintiff under the Contract, Live Nation would use its clout with the Authority to get Plaintiffs terminated from the Contract.  Referring to Live Nation, Vito Bruno recalled the conversation:

> BRUNO:      They said that there's some loopholes in your contract, so I guess they saw it somehow.
> DORFMAN:  Well, Live Nation--.
> BRUNO:      That there are loopholes that they can—that this kid, Johnny D, could bounce you out if they provide content.
> SACKS:      Who told you that?
> BRUNO:      Huh?
> SACKS:      Who told you that?
> BRUNO:      Jason Miller.

("Wagner Cert., Ex. 5, 3/5/11 Mtg. Tr. at 15).

27.     As a result of Live Nation's interference with Plaintiffs' attempts to secure talent, Plaintiffs were required to seek a 30-day extension of the Agreement's requirement to provide contracts with artists to SFEM.

28.     On April 22, 2011, Plaintiffs again met with Jason Miller.  In this meeting, Miller implied that Live Nation and other industry heavyweights had a stranglehold on talent, suggested that Live Nation wanted to, at least in part, control Plaintiffs' Event, admitted that Miller himself

spoke to agents about Plaintiffs' Event, and noted that Plaintiffs lacked a "strong advocate", like

Live Nation, to contact agents and book talent for the Event.

> DORFMAN:    I didn't have the premium talent I couldn't get.
> MILLER:     How were you going to get it? If you weren't going to get it with me and
>             you weren't going to get it with [Eddie Dean], and you weren't going to
>             get it with [Pasquale], how were you going to get it done?
>
> ….
>
> DORFMAN:    You know what I mean? I understand that there's some talent we're not
>             going to get, because he doesn't want us to have it.
> MILLER:     Not only that…. Well, there's just a lot of talent we have, and we've got it.
>
> ….
>
> MILLER:     It's not even that I would want to—we're not looking to necessarily
>             control the whole thing, it's just that—
> ….
>
> BARRETT:    But the point is, we realize, we put out a million dollars in offers, you
>             know? You spoke with the agents, and basically, nothing came back.
> MILLER:     Yeah. You probably need a strong advocate--

(Wagner Cert., Ex. 40, 4/22/11 Mtg. Tr. at 2, 8, 10, 12).

29.    At this same April 22, 2011 meeting, Miller admitted that his business partner,

John D'Esposito, was capable of interfering with Plaintiff's Event, that he threatened to disrupt

Plaintiffs' efforts and that neither he nor Live Nation—despite the fact that D'Esposito worked

for Live Nation—were responsible for his actions.

> MILLER:     He's a whole, out there, loose cannon that nobody can control.  I mean,
>             like I guess he does, and whether he is or not…I could only tell you that—
>             I mean, he's just crazy. He's just crazy. He's on my team, but he's his own
>             f***ing thing that does his own, like—it's not necessarily representative
>             of what I do… John's very emotional, like, yeah, he thinks the
>             [Meadowlands] space is his own.
>
> ….
>
> DORFMAN:    I remember when we first came in here – part of the reason it didn't go
>             forward was, John was like, "I can get you kicked out of the venue at any
>             time I want."

MILLER:      Yeah. He is a grimy motherf***er.

(Wagner Cert., Ex. 40, 4/22/11 Mtg. Tr. at 16-17.

30.      Plaintiffs did not consent to Live Nation's proposals to partner with them for the Event.  (Wagner Cert., Ex. 7, Miller Dep. at 86:6-87:6).

31.      Plaintiffs were unable to sign artists that were initially very interested in Plaintiffs' Event in January, but a month or so later suddenly were not.  Talent agents that expressed enthusiasm about Plaintiffs' Event in January and February of 2011 were, by March, no longer interested in working with them.  Consequently, Plaintiffs were not able to sign artists sufficient to stage the shows at the State Fair.  (Wagner Cert., Ex. 1, 2/4/14 Bruno Dep. at 134:4-24; Ex. 50, JUICE0004139-41; Ex. 52, LN0000999; Ex. 57, 4/20/11 Mtg. Tr. at 16).

Respectfully submitted,


/s/ David S. Stone_____
    *Attorneys for Plaintiffs Juice Entertainment,*
    *LLC, Thomas Dorfman, and Chris Barrett*

    David S. Stone
    Amy Walker Wagner
    STONE & MAGNANINI LLP
    100 Connell Drive, Suite 2200
    Berkeley Heights, NJ 07922
    Tel:  (973) 218-1111
    Fax: (973) 218-1106

    Thomas R. Ajamie
    David S. Siegel
    AJAMIE LLP
    Pennzoil Place – South Tower
    711 Louisiana Street, Suite 2150
    Houston, Texas 77002
    Tel:  (713) 860-1600
    Fax: (713) 860-1699