Exhibit 1

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

---

*Vito Bruno*
*February 4, 2014*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*



Min-U-Script® with Word Index

Juice Entertainment, et al v.
Live Nation Entertainment

| Bruno - Direct | Page 57 |
|---|---|

1  talent rider, you can't get the equipment.
2  Q.  The talent rider is something that's
3  attached to the contract when --
4  A.  Correct.
5  Q.  -- when the owner of the show
6  contracts with the talent?
7  A.  Correct. So there would be additional
8  production elements that need to be added in.
9  Q.  And I think you said before that those
10 production elements could add significantly to
11 the cost of production?
12 A.  Yes, sir.
13 Q.  How so?
14 A.  Well, if somebody wants video screens
15 of a certain DPI, if somebody wants a certain
16 speaker, certain equipment, certain configuration
17 of the stage, certain risers.
18    A lot of times you could get people to
19 share stuff. You know, you say "This is what the
20 festival setup is. This is what the program is,"
21 but your headliner you try to accommodate and
22 then have everybody else work off that, work
23 backwards.
24 Q.  And were there any further
25 communications between you and Mr. Viera about

| Bruno - Direct | Page 58 |
|---|---|

1  productions relating to this event other than --
2  A.  Not happening.
3  Q.  When did you tell him that?
4  A.  I don't remember, but sorry, it's not
5  happening.
6  Q.  Now, I think you told me that you were
7  -- your role in connection with this event
8  involved production and equipment, which I think
9  we've already covered --
10 A.  Yes, sir.
11 Q.  -- and financing?
12    Did I recall financing correctly?
13 A.  Yes.
14 Q.  What exactly were you going to do as
15 far as financing this event?
16 A.  They asked me for $300,000 to put up.
17 I had to show -- I had to actually show proof of
18 funds at the point when Johnny D from Live Nation
19 went into Al over at the Meadowlands Fair and
20 told him that nobody had any money, so he had to
21 show proof of funds that Chris and Tommy came to
22 my office and printed out proof of funds and they
23 went back to Al Dorso, is that his name,
24 Meadowlands --
25 Q.  Okay.

| Bruno - Direct | Page 59 |
|---|---|

1  A.  -- with a piece of -- a document
2  showing that there was $300,000 at that point
3  available for that.
4  Q.  Okay. Did you have any other role
5  related to financing other than providing the
6  $300,000 that they asked for from you?
7  A.  No. They had other financing in place
8  from other people.
9  Q.  Did they ever ask whether you would be
10 willing to provide more than $300,000 in
11 financing?
12 A.  No.
13 Q.  Did you ever agree to provide more
14 than $300,000 in financing?
15 A.  No, but I could have.
16 Q.  Did you ever agree with Barrett,
17 Dorfman, and Sacks that you would provide
18 financing sufficient to put on the entire event?
19 A.  The entire event?
20 Q.  Yes.
21 A.  No.
22 Q.  Did you ever agree to provide up to
23 $2 million in financing this event?
24 A.  No.
25 Q.  Would you ever have made such an

| Bruno - Direct | Page 60 |
|---|---|

1  agreement?
2  A.  Two million in advance, no, but Abe
3  would have rolled out 2 million in equipment for
4  me.
5  Q.  Okay. Would you -- would you have
6  provided any -- strike that.
7     Did you come out-of-pocket by way of
8  providing any monetary contribution to this
9  event?
10 A.  Besides meetings and dinners and other
11 than that, no.
12 Q.  Would you have provided any financial
13 contribution toward this event without having a
14 signed agreement relating to your participation
15 in the event?
16 A.  I would have. I do it all the time.
17 Q.  But you didn't do that in this case?
18 A.  There was no -- no ask for money.
19 There was no contract that needed to be funded.
20 There was nothing that needed to be funded.
21 Q.  Were you considering doing an event in
22 Englishtown, New Jersey in the summer of 2011?
23 A.  I looked at that space, yes, with
24 John.
25 Q.  John Dimatteo?

Case 2:11-cv-07318-CCC-CLW    Document 75-3    Filed 12/19/16    Page 4 of 99 PageID: 849
Juice Entertainment, et al v.
Live Nation Entertainment

| Bruno - Direct | Page 73 |
|---|---|

1  promotor stuff.
2  Q.  Okay.  And how would you describe your
3  duties under the deal that you had at the Grand
4  Lux?
5  A.  Like we just said, I would oversee the
6  production element of it.  I would assist in the
7  marketing of the event.  I would provide 300,000.
8  John would book it -- John and Alan would book
9  it.  Chris and Tommy had the venue, and they were
10  promotors to help promote it, and that was pretty
11  much it.
12      And Brian would be a promotor also and
13  they'll get the people in, and I had other radio
14  station contacts that we could try to plug in or
15  attempt to plug in if they felt it was good for
16  their radio station.
17  Q.  What was the name of the event?
18  A.  It was -- that was one of our big
19  discussions, was what to call it.
20      I think John already called it
21  "Overland" or "Overview" or something like that,
22  then they went to "One Big Sky" to "Luna Air."
23      In those documents I put 50 names
24  from, you know, traditional to absurd names for a
25  festival to try to nail down a name.

| Bruno - Direct | Page 74 |
|---|---|

1  Q.  Was there ever a final agreement as to
2  what the name of the event was?
3  A.  Oh, yes.  I think Alan pulled the
4  trigger on the name.  I didn't care for it much.
5  Q.  What was the name?
6  A.  I don't remember.  It didn't stick
7  with me.  It was a terrible name.
8  Q.  Do you know when that decision was
9  made?
10  A.  No, sir.  Was it "Under One Sky" or
11  something like that?
12      Did you hear that name at any of these
13  depositions?
14  Q.  I have heard the name "Under One Sky."
15  A.  "Under One Sky", is that it?
16  Q.  I'm asking you.  I wasn't there.
17  A.  I'm saying at all these depositions
18  did that name come up, something like that, is
19  that right?  I couldn't tell you.
20  Q.  Did you have any discussions with
21  anybody from Live Nation concerning this event?
22  A.  We had asked -- if I remember
23  correctly, I think we actually asked if Jason
24  wanted to come in on this as a third partner, and
25  that's why that e-mail was shot off by John about

| Bruno - Direct | Page 75 |
|---|---|

1  them partnering up.  There's an e-mail about them
2  being the third partner.  You just gave it to us.
3  Q.  Okay, yeah, we looked before at --
4  A.  Yes, and laid out the deal -- Bruno-7,
5  bottom half of Bruno-7.
6      Mr. Jason Miller from John, copying me
7  and Tommy, and it looks like Tommy had a -- this
8  is incorrect completely.  I don't recall what was
9  incorrect about it.
10      MR. MARX:  Why don't we mark the next
11  exhibit, which I think will assist us here,
12  Bruno-11.
13      (Series of E-Mails received and marked
14  as Exhibit Bruno-11 for Identification.)
15      (Witness reviewing exhibit.)
16      MR. MARX:  Bruno-11 is one of the
17  documents that was produced here today.
18      It's a series of e-mails that appear
19  to be dated March 5, 2011.
20      I will identify it a little more
21  specifically for the record while you review
22  it.
23      It looks to me like the first
24  document, reading up from the bottom, was
25  sent from John Dimatteo on Saturday,

| Bruno - Direct | Page 76 |
|---|---|

1  March 5th at 7:30 in the evening to Alan
2  Sacks, Tom Dorfman, Chris Barrett, Vito
3  Bruno and Brian Arteca.
4      The subject is "How does this sound?"
5  And then there's in all capitals "HOW'S
6  THIS?", and then some text which I perceive to be
7  a draft e-mail to Jason who is -- I'm guessing is
8  Jason Miller --
9  A.  Um-hum, to everybody.
10  Q.  -- to everybody.  Then there's a
11  response from you to Mr. Dimatteo saying "Not
12  good.  Not what we discussed at meeting," and
13  then there's a response from Mr. Dimatteo to you
14  saying "I could hardly hear Jason at the meeting"
15  -- no, I read that incorrectly.
16      Mr. Dimatteo said, "I could hardly
17  hear at Jason the meeting.  You were on the other
18  side of table.  Too loud.  I missed things."
19      First, did I read that correctly?
20  A.  Yeah.
21  Q.  Okay.  Now does this assist you in
22  connection with answering my question about any
23  discussion you had with Live Nation concerning
24  this event?
25  A.  Yes.  We talked to Jason about this,

| Bruno - Direct | Page 113 |
|---|---|

1  have to be there.
2  Q.  Assuming you had an agreement with the
3  provider?
4  A.  Yeah, same thing with a lot of
5  marketing stuff.  Radio stations they'll bill me
6  30 days after an event because they know me.
7     So lot of those bills you really only
8  needed -- you had to come up with a deposit of,
9  you know, if it's 1.2 million for a talent
10  budget, you come up with a deposit of half.
11  Q.  So you had to come up with 600?
12  A.  Yeah.
13  Q.  What was it you had --
14  A.  I know Live Nation does 10 percent
15  down binder agreement.
16  Q.  Was it your view that you had
17  sufficient funding on your team's behalf with
18  your 300 and the 300 from the Dorfman and Barrett
19  team in order to put on this event?
20  A.  Oh, yeah, I would not have gone into
21  -- and I would have, you know, not been the nice
22  guy when it comes down to spending the nickels.
23     I would nickel and dime this thing
24  down to -- I was taking a 2 million budget down
25  to at least a third off of it.

| Bruno - Direct | Page 114 |
|---|---|

1  Q.  So could you have done the event with
2  $600,000 in financing if the expenses were
3  $2 million?
4  A.  Yes, probably, yes.
5  Q.  Can you explain to me how that would
6  happen?
7  A.  Because I just --
8  Q.  Okay, that was your explanation?
9  A.  The explanation prior to.
10  Q.  That's how you could do it on $600,000
11  of financing?
12  A.  Correct.
13     MR. MARX: David, are you ready in
14  Houston to pick up the questioning because I
15  have no further questions for Mr. Bruno?
16     MR. SIEGEL: I would like to go off
17  the record briefly and talk with my
18  co-counsel and we'll get back to you very
19  shortly.
20     MR. MARX: Fair enough.  I will escort
21  her to a secure location where you can have a
22  private discussion.
23     MR. SIEGEL: Thank you.
24     (Recess.)
25

| Bruno - Cross | Page 115 |
|---|---|

1     CROSS-EXAMINATION BY MR. SIEGEL:
2
3  Q.  My name is David Siegel.  I am counsel
4  for the plaintiffs in this case, along with my
5  colleague, Amy Walker Wagner, who is present
6  there in the room with you.
7     We have just a few follow-up
8  questions, each one of us is going to have some
9  questions, but overall it shouldn't take long and
10  you shouldn't be nervous because even our
11  combined talents fall short of the formidable
12  Mr. Marx.
13     So let me ask you with respect to
14  Tiesto and his appearance at the festival or
15  event, do you recall John Dimatteo recounting to
16  you a story about a conversation that he had with
17  Tiesto's road manager in Las Vegas?
18  A.  No, not that I can recall.
19  Q.  Did Mr. Dimatteo ever tell you about
20  an encounter he had with Kelly Cobb discussing
21  whether or not Tiesto would appear at this
22  festival?
23  A.  Kelly Cobb was put into place with
24  Tiesto by John Dimatteo.  That was John's boy.
25     They talked every day, so there's a

| Bruno - Cross | Page 116 |
|---|---|

1  lot of conversations with Kelly Cobb, so if you
2  can refresh my memory maybe it will jog my memory
3  on it.
4  Q.  What was that?
5  A.  If you give me some specifics, I could
6  see if I remember.
7  Q.  Well, you said he was put into place
8  by Mr. Dimatteo.
9     I'm just asking generally do you know
10  what services he performed for Kelly Cobb --
11  sorry -- for Tiesto?
12  A.  Kelly?
13  Q.  Yes.
14  A.  He originally was production and
15  became road manager and then he's road manager
16  plus.  Now, I don't believe he's on the road all
17  the time with them anymore.
18  Q.  But you believe at the time in 2011
19  you think he was traveling on the road with
20  Tiesto?
21  A.  Yes.
22  Q.  Okay.  And did Mr. Dimatteo ever tell
23  you about a conversation he had with Kelly Cobb
24  in Las Vegas in February of 2011 during which
25  Mr. Cobb told Mr. Dimatteo that Tiesto told him,

**Bruno - Cross** — Page 117

1  Mr. Cobb, that Live Nation asked him not to
2  perform at this festival?
3  A. I don't recall that.
4  Q. Do you recall any -- any story about
5  such a conversation between Mr. Dimatteo and
6  Mr. Cobb at all?
7  A. No, I don't.
8  Q. Do you recall Mr. Dimatteo flying out
9  to Las Vegas at one point in February of 2011 to
10  try to secure Tiesto's consent to appear at the
11  event?
12  A. I do remember him flying to Vegas and
13  I do remember him going to see Tiesto.
14  Q. And do you recall getting any reports
15  back from him as to how that was proceeding?
16  A. Good.
17  Q. Was that feedback coming from Tiesto
18  himself, as far as you know?
19  A. From John Dimatteo.
20  Q. Right. When you said the feedback was
21  "good", was -- to your recollection, was
22  Mr. Dimatteo reporting feedback that he was
23  getting from Tiesto himself?
24  A. I don't recall.
25  Q. And you don't have any specific

**Bruno - Cross** — Page 118

1  recollection of Mr. Dimatteo reporting any
2  feedback from Kelly Cobb as you sit here today?
3  A. I don't recall.
4  Q. Do I need to repeat the question?
5  MR. SIEGEL: Ian, do I need to repeat
6  the question?
7  MR. MARX: I think he answered it.
8  You may not have heard the answer.
9  MR. SIEGEL: I didn't.
10  (Answer read back.)
11  MR. MARX: The reporter just indicated
12  the answer was "I don't recall."
13
14  BY MR. SIEGEL:
15  Q. Mr. Bruno, I know you're probably
16  trying to do this, but with the phone connection
17  it's little bit more difficult for me to hear
18  you, so it's good that the court reporter can
19  hear you, but if you could try to make sure that
20  I can hear you this will go more smoothly.
21  A. We just moved the phone and I just
22  moved up.
23  Q. Okay, great.
24  You testified earlier about a meeting
25  that you attended with Samantha Kirby at William

**Bruno - Cross** — Page 119

1  Morris in which she suggested or you got the
2  impression that she was suggesting that it would
3  be a good idea to partner with Live Nation in
4  planning and producing this event.
5  Is that correct?
6  A. Repeat that again, please.
7  Q. You testified earlier this morning to
8  Mr. Marx that you participated in a meeting with
9  Samantha Kirby at William Morris about this
10  event, and I think your testimony about that
11  meeting was, among other things, that Ms. Kirby
12  suggested that it would be a good idea for my
13  clients and for you, in tandem with my clients,
14  to partner with Live Nation in planning and
15  producing the event that this lawsuit is about.
16  Is that correct?
17  A. Yes.
18  Q. Do you know if Ms. Kirby has a close
19  working relationship with anyone in Live Nation
20  in particular?
21  A. In particular?
22  Q. Yes.
23  A. No, but William Morris is one of the
24  premier major agencies, and right now, after this
25  acquisition with IMG, they're probably the single

**Bruno - Cross** — Page 120

1  biggest agency in the world at this point, I
2  would assume.
3  And Live Nation, being the biggest
4  promotor in the world, I would say they would
5  have a good relationship with lots and lots of
6  people.
7  Q. During that meeting that you had at
8  William Morris with Samantha Kirby, do you recall
9  her naming anyone in particular at Live Nation in
10  connection with this event that my clients should
11  partner with?
12  A. I don't recall.
13  Q. Do you recall during that meeting how
14  this idea of a partnership with Live Nation first
15  came up? Did Ms. Kirby simply volunteer that
16  first?
17  A. Yes.
18  Q. She volunteered it?
19  A. Yes.
20  Q. I'm sorry, did you say "yes"?
21  A. Yes.
22  Q. Did you get the sense that William
23  Morris was willing to work towards the event that
24  my clients were planning without a partnership
25  with Live Nation?

Bruno - Cross                                    Page 133

1  Q.  But it's true that you decided to
2  become involved anyway.  Is that not true?
3  A.  Yes, sir.
4  Q.  You thought it would be successful?
5  A.  Yes, sir.
6  Q.  But you wouldn't have devoted all of
7  the time you did devote toward working on this
8  and you wouldn't have volunteered to make
9  financing available and you wouldn't have put
10 your reputation on the line if you didn't think
11 it could have been successful, correct?
12 A.  That's correct.
13 Q.  Earlier you also told Mr. Marx that
14 you don't ultimately know why my clients were
15 unsuccessful in getting final contracts from any
16 artists and you told him that Alan Sacks and John
17 Dimatteo were the best people to speak to that
18 issue, but you also told him that Mr. Sacks and
19 Mr. Dimatteo expressed to you their -- something,
20 either their opinions or stories about why they
21 thought you weren't successful.
22     Do you remember that?
23 A.  Not specifically.
24 Q.  Well, let me just ask it this way.
25     What do you recall, if anything,

Bruno - Cross                                    Page 134

1  either Mr. Sacks or Mr. Dimatteo telling you
2  about why they, in the final analysis, couldn't
3  sign up any artists for this event?
4  A.  According to Dimatteo, some of the
5  acts were asked not to do the show.
6  Q.  And which one of -- which acts were
7  those?
8  A.  The only act I could specifically
9  remember John telling me was Steve Angelo from
10 the Swedish House Mafia, that he would do a show
11 on that day anywhere else.
12 Q.  I'm sorry, I heard "Steve Angelo", and
13 then what did you say after that?
14 A.  That he would do a show for us on that
15 day anywhere else but at that venue and at that
16 festival.
17 Q.  But did Mr. Dimatteo tell you -- what
18 did he tell you about that?
19     Did he say that he heard that from
20 Mr. Angelo directly?
21 A.  Either the manager, agent or Steve
22 Angelo.  I'm not sure.
23 Q.  And did he elaborate as to what the
24 reason for that position was?
25 A.  Not to me.

Bruno - Cross                                    Page 135

1  Q.  Do you recall any other artists other
2  than Mr. Angelo about whom Mr. Dimatteo said they
3  were asked not to perform?
4  A.  No, I do not.
5  Q.  When I first asked you the question
6  you used the "artists" as plural, you said
7  "artists", so now you can't recall anyone
8  specifically, but do you think there was more
9  than one?
10 A.  Possibly.
11 Q.  Is there anything you can think of in
12 any of your documents that you brought with you
13 today that would refresh your recollection as to
14 who those other artists might have been?
15 A.  No.  I've sent offers and second
16 offers.  I think one of those documents has
17 offers and second offers to talent.
18     And you guys spoke with John and Alan,
19 so I -- that's their -- their field of expertise.
20 Q.  So aside from what we just talked
21 about, which is what Mr. Dimatteo recounted to
22 you, what do you recall Mr. Sacks telling you
23 about his -- about the inability to sign talent?
24 A.  Alan was talking mainly to John.
25 Q.  So you don't recall Mr. Sacks saying

Bruno - Cross                                    Page 136

1  anything differently than what you just told me
2  Mr. Dimatteo told you?
3  A.  I don't know if Alan even knows about
4  that specifically with Steve Angelo.
5  Q.  And aside from that, you don't recall
6  anything else that Mr. Sacks told you about why
7  we were unable to sign up any talent for this
8  event?
9  A.  No, sir.
10 Q.  Do you believe that if Live Nation
11 wanted to prevent talent from playing at a
12 particular show it could do so, that it had the
13 power to do so?
14 A.  Yes, sir.
15 Q.  And what's the basis of that belief?
16 A.  In our business he with the biggest
17 pocketbook and the most venues and the best
18 relationship wins.
19 Q.  Do you have any -- I know you've been
20 in the business a very long time so it's hard to
21 -- it's hard to recall everything that may have
22 happened over a 30-plus year span, but can you
23 recall any instances of Live Nation using its
24 market power in such a way?
25 A.  To get an act?

Exhibit 2

Ktu Beatstock -A concert held At PNC Bank Arts Center And Jones Beach. (Live Nation Venues) Held Yearly in August Attendance between 25 and 30k people.Freestyle Top 40 Dance music. Run and operated by Vito Bruno. Most successful show of its kind.

William Morris and AM only control 85% of the Electronic Dance Market. In order to produce a successful event one must book through either. We had 90% of all our offers though these two Agencies. Tiesto was represented by AM only.

April 2011 Alans Sack spoke with Steve Goodgold of Windish Agency. Steve represents Steve Angello. The first thing Goodgold said to Alan was Live Nation had nothing to do with Steve Angelo not playing. ( This was Alans first conversation with steve)


Ticketing: Al has and exclusive agreement granted by NJSEA. NJSEA mandates all ticketing must go through Ticketmaster. Therefore our tickets must issued through Al must come from Ticketmaster. When we coordinate an Event with Al. Al requests the Tickets from NJSEA. NJSEA prints a hard ticket and releases them to Al. Al releases them to us. Al's organizations facilitates our online ticketing through Ticketmaster.com

The response to the question you had about Jason Millers inaudible does not exist In actuality it is Tom Speaking.


<u>Chris Text from Dimatteo</u>


Feb 5, 2011

John Dimatteo: We are going to have to pay Tiesto more than $300,000. Prob 350-400k


John Dimatteo: Yes Kelly says we can make it happen we have to address concerns. We have 2 days and money does talk. $400,000 should get this done. Vito is going to lose it but its worth it once we confirm Tiesto it will make everything else easier.


February 7,2011


John Dimatteo: Im sending the new offer

JUICE0000359

Chris: 400k to Tiesto

John: Yes Zoo is at 300k its necessary.

Chris: Did you speak with Kelly or Tiesto and find out if 400k gets it done?

John: Yes. 400k gives us a good shot. I am also sending them the talent we are looking at. They don't know about the William morris artists.

February 11,2011

John: Long list of DJ's

They want offers. I think we got Tiesto

Chris: That's great news John.

JUICE0000360

Exhibit 3

Exhibit 3 Intentionally Omitted

Exhibit 4

# Conversation with 6467737700 on Mar 6, 2011

JUICE0004153

received at 5:26 AM

I&apos;m trying to set up a meeting with ther CEO of live nation. Thru neil moffit. He said he&apos;s setting me up with the higher ups. Said we need to go way ov

received at 5:26 AM

er Jason&apos;s head.

received at 5:26 AM

I have info :)

received at 5:26 AM

Neil is with us

received at 5:26 AM

Ä

received at 7:34 AM

I&apos;m meeting with Neil on Monday

received at 7:35 AM

Live nation is trying to manage tiesto WITHOUT paul.

JUICE0004154

Generated with MyTexts for BlackBerry

JUICE0004155

Exhibit 5

**Speakers:** Alan Sacks, Chris Barrett, Thomas Dorfman, Vito Bruno

**Location:** AMPM Entertainment Headquarters 415 63rd Street Brooklyn, NY 11220

DORFMAN:  -- be at the gym everyday, I wish I could.  (laughter)

BRUNO:    I know the feeling.  I sneak a walk whenever I can.

    If I get a 30-40 minute walk in early in the morning, late

    at night.

BARRETT:  If I get a good phone call, I'll walk around the

    block.  Yeah, half hour-hour.  Yeah, good cardio.

BRUNO:  I lost like [40] pounds, can't keep it off.  It's hard.

    (multiple conversations; inaudible)  (laughter) Atkins

    diet.

BARRETT:  Really?

SACKS:    Tell him what you weighed when you were at your

    highest, Vito.

BRUNO:    What's that?

SACKS:    Your highest, when you were your biggest.

BRUNO:    What do you mean?

SACKS:    Weight wise.

BRUNO:    332 pounds.

SACKS:    332, right?

DORFMAN:  Wow.  She put you on there.  You should be in that

    commercial.  (laughter)

SACKS:    So you don't eat no carbohydrates?

1

Awesome.  And then we can play with their fucking money.
Where we at with Live Nation?

DORFMAN:  Yeah, that's where I wanted to get at because Live
Nation, where we're at, and some of it's (inaudible) like
with me, with the venue.  I don't need to, per my
agreement, produce contracts, OK?

BRUNO:   They said that there's some loopholes in your
contract, so I guess they saw it somehow.

DORFMAN:  Well, Live Nation--.

BRUNO:   That there are loopholes that they can-- that this
kid, Johnny D, could bounce you out if they provide
content.

SACKS:   Who told you that?

BRUNO:   Huh?

SACKS:   Who told you that?

BRUNO:   Jason Miller.

BARRETT:  Well, just-- let's go back in the beginning (multiple
conversations; inaudible)

BRUNO:   A little behind the scenes.  Jason [Miller] is looking
for an exit strategy.  We've been talking to that Jason, if
he gets blown out of there and his contract is up--.

DORFMAN:  At Live Nation.

BRUNO:   --at Live Nation, there's a door here, there's a desk
here for him.  So he's given the-- that's why I kept saying

15

we're going to see Jason, but then you go to Jason because

Jason you know, always thinking of coming here.  He-- this

is-- we had the door open to him.  I've offered him you

know, dude you want to do shit with us?  You could do it

with Live Nation, and then you could get also a paycheck on

the outside with us.  So that's why we're (inaudible) is

all I'm getting the inside dirt.  Because this guy is

looking to fucking--.

BARRETT:  They're looking to fry us out of there?

BRUNO:    Yes.

DORFMAN:  They're trying to find a loophole to fry us out?

BRUNO:    Right.

BARRETT:  That's why they sat down at the [Meadow Lands] and

told them that we can't produce talent.

DORFMAN:  Anybody that talked should have just like-- like I

said, just starting-- going in the back history a little

bit.  When they went and bashed you so bad to the Meadow

Lands that you guys were thieves, that you guys owe this

massive amount of money.  I sat there and heard the

conversation.

BRUNO:    Massive amount of money?

BARRETT:  Yeah, they told us you were (inaudible) amount of

money.  New Years (multiple conversations; inaudible)

16

DORFMAN:  They said-- they came and said you guys owed a mass

    amount of money, this--.

BRUNO:    To whom?

DORFMAN:  To-- Live Nation said it to the Sports Authority, and

    to Al Dorso and us.

BRUNO:    To whom?

BARRETT:  You owe Live Nation money.

DORFMAN:  And they told us that you're a thief.  Why are you

    working with the guy?

BRUNO:    Who said that?  Live Nation?

BARRETT:  Live Nation.

BRUNO:    Really?

DORFMAN:  So when they said-- we--.

BRUNO:    I don't believe Live Nation said that?

DORFMAN:  No, we told you guys this--.

BRUNO:    No, (overlapping dialogue; inaudible) who said this?

    Johnny D?

DORFMAN:  Jason Miller and Johnny.

BARRETT:  That they were like they owe us money, you're going to

    let them work in (overlapping dialogue; inaudible)?

BRUNO:    (overlapping dialogue; inaudible) money from New

    Year's Eve, that's owed to both.

DORFMAN:  And I understood that, that you guys put three grand

    in (inaudible).  And they made it very clear though that

17

when you go to that [three-way] conversation that there's money owed to both of you guys. It's not you didn't rob them.

SACKS:    It was a mutual party.

DORFMAN:  You know, (overlapping dialogue; inaudible) rob them. And you just go from day one with that-- they went to the venue and attacked you, and John horribly. I stood there and said listen, these are my partners.

BRUNO:    20 years you're getting attacked by it.

DORFMAN:  I'm just saying this. This is the way it (inaudible). Just the reality where everything is. I said (inaudible) no, they're solid, stand up. They're the people-- I've got resumes on them, I've done business in the past, they're my partners. I said we have a (overlapping dialogue; inaudible) 50/50 agreement, you know. They are my partners, you know. Cause he was kind of saying why do you want to work with these guys if they're robbing from everybody? I said they're not. The other people are full of shit, OK? So I said that. Now what happened with me--.

BRUNO:    (inaudible) from Johnny or Jason?

DORFMAN:  To the venue, I don't know if it came from Johnny or Jason. I don't know that. When I sat there, it came from both their mouths, but then I'll get into that meeting after, you know. But so I came in there. So the biggest

18

weren't, but had seen it.  If they already knew Live

Nation, and they contacted Joel Zimmerman or Paul Morris,

they could have very well have stalled --

BRUNO:     Absolutely.

SACKS:     -- all these contracts dead.

BRUNO:     Absolutely 100% (pause)  (multiple conversations;

inaudible)

BRUNO:     What?

SACKS:     That don't fly.

BRUNO:     He also said something to the effect of that it's

something in the contract with this first or fifth date

doesn't happen, they could promise and deliver-- Al was

asking if they could deliver content.  And they said they

could do it with four or five events.  (pause)  So then

they went (inaudible) and I said well, (pause) deliver

them.  We'll be more than happy to work with you.

DORFMAN:   Like you said, (overlapping dialogue; inaudible).

BRUNO:     I says you know, put the stages in there, and keep

them.  As far as (inaudible) do a deal for a stage for the

fucking full three weeks rather than put it up, and take it

down, and have to deal with the unions, and this and that.

And then we dispersed the costs of the labor over

(overlapping dialogue; inaudible) the deal, this and that.

(multiple conversations; inaudible)  So he wants (pause)

33

give him basically numbers immediately, and that's

(inaudible) and said you know, but then and I should send

it to you, and you should send it to Al.  This way it's all

a little bit completely transparent, you know.  This-- and

really just go to Al and say you know, Live Nation guys are

really causing a problem.  (inaudible) did he say that to

(inaudible) at all?

SACKS:    No.

BRUNO:    No, let's talk about it.  These guys have really

caused a problem, they've stolen the talent on us.  You

know, we went, we all made an offer for them, they're

really trying to fuck us.  We made them an offer, and we'll

show you the offer (inaudible) writing it up tonight,

tomorrow.  Says what do you want to do with them?  Your

blessing before we send it to them.

SACKS: (inaudible).

BRUNO:    John's (inaudible).

DORFMAN:  Cause I'm meeting with Al tomorrow-- Monday.

BARRETT:  Monday.

BRUNO:    Monday.  I got to get him to do it.

SACKS:    He's got to stop what he's doing in Vegas, and do

that.  (multiple conversations; inaudible) it should be

done on the plane on the way.

BARRETT:  When's he flying home?

34

AUDIO TRANSCRIPTION CENTER    A DIVISION OF THE SKILL BUREAU

729 Tremont Street
Boston, MA. 02108
Tel: 617-423-2151
Fax: 617-423-9183

### CERTIFICATE

I, Patrick Emond, do hereby certify that the following 50 pages embody a true and accurate transcript.  Prepared in the Audio Transcription Center to the best of our abilities, it comprises the contents of the relevant portion of a digital audio file provided to us by our client, Juice Entertainment.  The digital audio file contained a meeting between Alan Sacks, Chris Barrett, Thomas Dorfman, Vito Bruno held on March 5, 2011.

1/27/2014
_____
Date

_____
Patrick Emond, Operations Manager
Audio Transcription Center

Exhibit 6

# In The Matter Of:

*Juice Entertainment, LLC v.*
*Live Nation Entertainment*

---

*Alan Sacks*
*July 18, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

Min-U-Script® with Word Index 

Page 5

1  asking questions and you are going to be providing
2  answers. Do you understand that?
3  A.  Yes.
4  Q.  You are giving me verbal answers,
5  which is good. The reason you have to do that is
6  because there is a court reporter here who is
7  creating a transcript of this deposition, meaning
8  that she is taking down the questions and the
9  answers and will create a written document. Do you
10  understand that?
11  A.  Yes.
12  Q.  That's the reason you have to give a
13  verbal response. You are doing a great job of that.
14  If you want to take a break at any time let me know.
15  We will accommodate your request. Do you understand
16  that?
17  A.  Yes.
18  Q.  Will you let me know if any of my
19  questions are unclear?
20  A.  Sure.
21  Q.  If you don't tell me a question is
22  unclear I am going to operate with the assumption
23  that you understood my question. Do you understand
24  that?
25  A.  Yes.

Page 6

1  Q.  Also here are lawyers for the
2  plaintiffs. They are sitting around the table and I
3  will ask them to introduce themselves.
4      MR. SIEGEL: David Siegel.
5      MS. WAGNER: Amy Wagner.
6  Q.  Mr. Siegel or Ms. Wagner may object to
7  a question. In the event that I ask a question that
8  is technically improper, I doubt it will happen, but
9  it might. If it does, we may have a discussion
10  about the form of the question. If we do that I
11  will ask you not to answer until we have resolved
12  our issues.
13  A.  All right.
14  Q.  Did you bring any documents with you?
15  A.  No, the ones that I provided you via
16  e-mail is all that I had.
17  Q.  You recall receiving the Subpoena that
18  we served you with?
19  A.  Yes, I actually have it.
20  Q.  You have it?
21  A.  That, I have.
22  Q.  The Subpoena had a list of documents
23  that we asked you to search for if you had in your
24  possession.
25  A.  Correct.

Page 7

1  Q.  And you did that search?
2  A.  Yes.
3  Q.  And you e-mailed me the documents that
4  you found that you had in your possession on Monday?
5  A.  Yes, that's everything.
6  Q.  The e-mails that you gave us, that was
7  the complete universe of things that you had that
8  were asked for in the list?
9  A.  Correct.
10  Q.  And did you give us those documents in
11  the form that you maintained them?
12  A.  Yes.
13  Q.  Were there any documents that you were
14  aware of that you had at one time but that you
15  didn't have at the time you got the subpoena?
16  A.  I may have deleted some e-mails, you
17  know, over time.
18  Q.  Before you got the Subpoena?
19  A.  Yes, of course.
20  Q.  Do you recall any documents that you
21  may have deleted specifically or do you just have a
22  general recollection?
23  A.  No, not really. I receive quite a few
24  e-mails every day.
25  Q.  Did you have e-mails concerning the

Page 8

1  issues in this lawsuit in a separate folder or
2  organized in any way?
3  A.  No.
4  Q.  How did you find the e-mails that
5  related to this case?
6  A.  I had a folder.
7  Q.  Okay.
8  A.  I had a folder.
9  Q.  What was that folder?
10  A.  Meadowlands State Fair.
11  Q.  Okay. And another folder actually
12  that said "contracts." That's where the contract
13  for some of the artist came from? You searched both
14  of those folders?
15  A.  Yes. That was easy to do because of
16  the dates, you know.
17  Q.  I am going to ask you about the event
18  that gives rise to this lawsuit in a minute. First
19  I would like you to tell me what you do for a living
20  and for how long you've been doing it.
21  A.  I do talent acquisition, marketing and
22  promotions for Night Life in New York/New Jersey for
23  the past 15 to 16 years or so, working at Night
24  Life.
25  Q.  How did you get into that industry?

Page 9

1 A. I actually started off as a DJ.
2 Q. DJ Alan Sacks?
3 A. Yes.
4 Q. When did you start doing that?
5 A. Probably 1990.
6 Q. What did that work --
7 A. Dance music, dance music, primarily
8 dance music.
9 Q. Do you do business through a company?
10 A. I do now.
11 Q. What's the nature of your company?
12 A. Digital Domain Events.
13 Q. How long has Digital Domain Events
14 been in business?
15 A. Well, since 1995 but we only
16 incorporated about three years ago.
17 Q. For whom does Digital Domain Events
18 acquire talent and produce events?
19 A. I'm kind of like an owner's rep for
20 venues. So if a DJ wants to book a club for a
21 particular night I would book that artist and figure
22 out how to promote that artist in the area.
23 Q. What does owner's rep mean?
24 A. I use that term kind of like in
25 construction. When someone does development they

Page 10

1 would hire an owner's rep and that person would take
2 care of coordinating all the efforts for that
3 construction project. It seems like an easy way to
4 explain it.
5      I would kind of act that way with an
6 owner of a venue where I would, like I said, acquire
7 talent, guide them on how to market and promote that
8 and actually deal with the contracts and the agent
9 for that artist.
10 Q. How much of your business is comprised
11 of the owner's rep activities that you just
12 described?
13 A. Now not as much, because I do more
14 marketing and promotions for restaurants, bars,
15 lounges. The bigger nightclubs in New York have
16 kind of shrunk. That pool of venues has shrunk
17 dramatically. I focus more attention into getting
18 into festivals and things like this. That's where I
19 met Tommy and Chris. They contacted me for talent.
20 Q. Had you done business with Tommy and
21 Chris before this event?
22 A. No. Tommy used to actually work as a
23 sub promoter for one of the clubs in New York that I
24 worked took care of. He kind of took care of New
25 Jersey and this area for promotions. We never

Page 11

1 worked together like that.
2 Q. Do you have a particular expertise in
3 acquiring talent in a particular segment of the
4 entertainment industry?
5 A. I would say specifically dance music,
6 yeah. I have some good relationships with the
7 agencies.
8 Q. Which are the agencies that you have
9 particularly good relationships with?
10 A. A.M. Only, William Morris. A lot of
11 the agents started out kind of like when I did, back
12 in '95, so we all know each other.
13 Q. Now, did you come to be involved with
14 Mr. Barrett and Mr. Dorfman in connection with the
15 event that gave rise to this lawsuit. First off,
16 what is the event? What event were you involved
17 with?
18 A. Actually, to answer your question,
19 Tommy called me. He knew I had some good
20 relationships with artists. I guess Chris and him
21 had done a show. They said they did a show a
22 previous year that had not met with great success
23 and they wanted to beef up the talent lineup and
24 they knew I had some good relationships with artists
25 directly and to the agents.

Page 12

1      They approached me to work with them
2 on this event as a partner. It was a good
3 opportunity to get involved with the Meadowlands. I
4 thought it was a great opportunity.
5 Q. What specifically was the event that
6 you were being asked to participate in?
7 A. It was to be a two or three-day dance
8 music event with DJ's and some live performances I
9 guess.
10 Q. When was it supposed to take place?
11 A. I believe it was June 26th -- 25th,
12 26th, 27th. It was either going to be the Friday,
13 Saturday or Sunday depending on the availability of
14 the talent or all three days.
15 Q. Did you talk about whether it was
16 going to be a one-time only event or was it supposed
17 to occur on recurring years?
18 A. It was supposed to -- I believe it was
19 supposed to be for five years, with a five-year
20 option to continue to do shows at that location,
21 exclusively on that weekend.
22 Q. Was it your anticipation that you
23 would be included in the future years as well?
24 A. Yes, of course.
25 Q. When Tommy first reached out to you

Juice Entertainment, LLC v.
Live Nation Entertainment

Page 33

1 A. The exact date?
2 Q. Well, if you knew the exact date I
3 would appreciate it.
4 A. I don't know the exact date. I think
5 there was a lot of ideas of we will be able to do
6 this next year, so that exact date is very foggy to
7 me at the moment. I would probably say two months
8 before the event was supposed to happen. I mean,
9 there reaches a certain point where you know you are
10 marketing and promotions and bookings aren't going
11 to happen. There's not enough time. The people are
12 booked and the marketing is the process, right, so
13 that's why we talk about it a year in advance.
14 Q. So roughly April 2011 you were no
15 longer --
16 A. Pretty much there's no way you can
17 pull the event off at that point anyway.
18 Q. So can you -- I am going to ask a
19 broad two-part question.
20 A. Okay.
21 Q. If it is too broad and I have to break
22 it down, let me know. I'm not trying to be
23 difficult. I'm trying to get the information from
24 you.
25     (Whereupon, there was a brief recess

Page 34

1 taken.)
2     MR. MARX: Back on the record.
3 Q. Let me know if the question is too
4 broad and we can break it down.
5     What I would like you to explain to us
6 is a summary of what happened in connection with the
7 event from the time you became involved until the
8 time you stopped working on it, at some point in
9 April of 2011. The second part would be if you are
10 able to identify who was doing what during the
11 process. Did you understand that question?
12 A. So you want me to tell you how things
13 transpire from when I first was engaged with Tommy
14 and Chris until the event and when we decided that
15 the event was a no go?
16 Q. Yes.
17 A. Yes.
18 Q. Yes.
19 A. That's not that broad of a question.
20 What time is it? Oh, boy. Well, okay. So like I
21 said before, I got contacted by Tommy to help them
22 produce this event at the Meadowlands. They
23 informed me that they had done a previous year that
24 had not met with great success but they had good
25 standing with the venue and wanted to produce a two

Page 35

1 or three-day event the following summer and if I can
2 get involved with them and help them acquire talent
3 and help out producing the event and be a part of
4 the process.
5     I immediately agreed to do that
6 because I knew Tommy to be someone of good stature,
7 a good promoter especially in New Jersey. He had
8 done some pretty good nightclub events that were
9 very successful and I had worked with him in the
10 past and he had a good reputation in New Jersey for
11 doing these type of nightclub shows.
12     I met up with them and we talked about
13 how we would work together, what the deal was, what
14 they were offering me, you know, was I coming in as
15 a consultant, did they want to hire me, did they
16 have funding, like I talked to you before about.
17 And they didn't have funding at that point but they
18 had someone, another person they were going to bring
19 in, another person named John Sandburg that was
20 going to be involved with them on their side, either
21 as a consultant or partner. I didn't know at that
22 point. It was all new -- as a consultant.
23     But I met with John and Chris again
24 another time and John had said that he would be able
25 to provide seed money, startup money for the event

Page 36

1 and that they had another investor interested in
2 working with them that owned a nightclub here in New
3 Jersey. I'm not sure of the gentleman's name, but
4 he would be able to provide the rest of the
5 financing up to whatever we needed basically to do
6 this event because, again, my concern was they had
7 not really done a festival of that size and maybe
8 didn't understand what the financial repercussions
9 were of doing an event of that size.
10     Immediately I said this could be a $3
11 million event. It was not a problem. It seemed
12 like the funding wouldn't be hard for them to
13 obtain.
14     So based on that meeting we decided
15 that we would work together, that there would be a
16 partnership between us to do this because my
17 billable hours they probably wouldn't be able to
18 afford that based on nine months or a year of work
19 that would have to be done. It made sense for us to
20 kind of work together. At the end of it I saw the
21 potential earning of the festival and of course I
22 wanted to be part of that. It made sense to me. It
23 is kind of where I wanted to be anyway in that
24 industry, if you will. So maybe about a month later
25 John was able to come up with $300,000 investment

Juice Entertainment, LLC v.
Live Nation Entertainment

---

Page 161

1  night to play for two hours is it your testimony
2  that you have to have $100,000 Saturday morning
3  wired to that person or do you pay them after the
4  fact, after you settle up with the gate and the
5  concession and all of those things?
6  A.  No.  Typically in a case like that
7  with a $100,000 artist they are paid before they get
8  there in full.  That money actually needs to be in
9  place, I believe sometimes two weeks or a month
10  before the event even happens.  They are paid before
11  they get there.
12  Q.  Was there a discussion of that
13  requirement in any of the negotiations surrounding
14  this event?
15  A.  Sure, of course.
16  Q.  Is it your testimony -- I think you've
17  testified that John Dimatteo was primarily
18  responsible for negotiating the appearance of Steve
19  Angelo and Tiesto.  Is that correct?
20  A.  Correct.
21  Q.  So did you have any discussions
22  yourself with Paul Morris about the ability to
23  actually pay a certain amount of money to have
24  Tiesto appear?
25  A.  No.  John took care of that.

---

Page 162

1  Q.  So you don't have any firsthand
2  knowledge of whether Mr. Morris ever told
3  Mr. Dimatteo we cannot accept this because you
4  haven't proven to me that you can pay me?
5  A.  No.  Can I expand on that?
6  Q.  Sure.
7  A.  I don't think that was the question
8  with John.  John has booked him 15, 20, 30 times.
9  Q.  Right.
10  A.  So the money wasn't an issue there.
11  Q.  So what was your belief about Vito
12  Bruno's financial ability to finance this event?
13  A.  That he could do it.
14  Q.  He could do it?  He could afford it if
15  he wanted to?
16  A.  To a degree.  I knew that he could
17  probably come up with a million and-a-half so
18  dollars to execute some percentage of the event.
19  Could he come up with $3 million.  I'm sorry.
20  Q.  No.  That's all right.  Do you have an
21  opinion as to how he would have been able to raise
22  that money?  Was it his liquid cash?
23  A.  Yes.  Personally could he have
24  borrowed money, had he wanted to.  I can't speak for
25  Vito.  I would assume so.  He's a good investment.

---

Page 163

1  I would invest in him.
2  Q.  I don't remember exactly the exhibit
3  number, but we were looking at a list with your
4  friend, Alex Svezia, the Latin events?
5  A.  Yes.
6  Q.  I believe you testified this is Sacks
7  Exhibit 9?
8  A.  Got it.
9  Q.  Actually this is not the one I want to
10  refer to, Sacks-6.
11  A.  Okay.
12  Q.  This is a list of confirmed acts.  I
13  think you referred to them earlier as mostly B list
14  acts.  This is as of April 23rd, 2011.  This is
15  fairly late in the process?
16  A.  Correct.
17  Q.  I think what you told Mr. Marks was
18  the team did have money available to book these
19  acts.  Is that correct?
20  A.  Sure.
21  Q.  And for acts of this stature, as maybe
22  distinct from Tiesto, would Felix The House Cat or
23  Doc Martin, would these acts need to be paid in full
24  before they appeared or would you pay a deposit,
25  have them appear and then pay in full after the

---

Page 164

1  event?
2  A.  Well, those three particular artists
3  are more towards the A list artists on this list.
4  Yes, Dan Ross from XMix.  That's how he does all of
5  his contracts.  They don't do 50 percent deposit the
6  night of because something can happen.  The events
7  get closed down.  Anything can happen.  They want
8  their artist paid before they get there.
9      Some of these artists, no, they
10  probably take deposit.  A smaller list probably
11  would take anything because they know me and I will
12  just take care of them after the fact.
13  Q.  Even assuming -- let's assume you
14  didn't have the personal relationship.  These were
15  all strangers.  Let's just hypothetically query
16  whether you could have come up with the money to pay
17  all of these people in full, had that been
18  necessary?
19  A.  I'll put it to you this way.  If John
20  Dimatteo called them they probably would settle for
21  getting paid the day of the show.  If somebody a
22  little further down the food chain you are going to
23  want to get paid before they get there.  It is about
24  seasoning, right, have you done this before, they
25  know, all right, that guy has done a lot of work in

---

Exhibit 7

Page 1

1           **CONFIDENTIAL ** CONFIDENTIAL **
2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW JERSEY
3      CIVIL ACTION NO.: 2:11-cv-07318-WHW-SCM
       -------------------------------------------x
4      JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN,
       and CHRIS BARRETT,
5
6                          Plaintiffs,
7         -against-
8
       LIVE NATION ENTERTAINMENT, INC.,
9
10                         Defendant.
11     -------------------------------------------x
12                         December 19, 2013
                           9:34 a.m.
13
14
15           DEPOSITION of JASON MILLER,
16     taken by Plaintiffs, held at the offices of
17     Greenberg Traurig, 200 Park Avenue, New York,
18     New York, before Eileen Mulvenna, CSR/RMR/CRR,
19     Certified Shorthand Reporter, Registered Merit
20     Reporter, Certified Realtime Reporter and Notary
21     Public of the State of New York.
22
23
24
25

Page 69

1            Miller - Confidential

2        Q.      -- with Mr. Dorso, which was a few

3    weeks before you met with my clients?

4        A.      Correct.

5        Q.      How do you think Mr. D'Esposito

6    knew that there was a, quote-unquote,

7    opportunity to do something at the State Fair?

8                MR. MARX:  Object to the form of

9         the question.

10               THE WITNESS:  I don't know.  I know

11        that Mr. D'Esposito and Mr. Dorso have a

12        relationship.

13   BY MR. SIEGEL:

14       Q.      If you had known the first time he

15   mentioned it to you that another group of people

16   had a contract to produce those events, would

17   that have deterred you from taking the meeting

18   with Mr. Dorso?

19               MR. MARX:  Object to the form of

20        the question.

21   BY MR. SIEGEL:

22       Q.      You can answer it.

23       A.      No.

24       Q.      Why not?

25       A.      I still would have wanted to

                          Miller - Confidential

1
2      explore if there was a partnership opportunity
3      with an independent promoter.  I would have
4      wanted to have met your clients and heard their
5      philosophy.  And maybe there's an opportunity
6      for us to do business together.  I would have
7      wanted to explore that opportunity.
8              Q.     Is it your belief that there's
9      always an opportunity to do business in a
10     certain space even if somebody else already has
11     a contract to do that just by entering into some
12     partnership with Live Nation?
13             A.     Not always.
14             Q.     Why do you think that might have
15     been available in this instance?
16             A.     This was a festival intended to be
17     a large-scale event.  It was with promoters
18     that -- no one that I generally or regularly
19     conducted business with, had ever known or heard
20     of.  Not that that mattered per se, but -- but
21     that struck me as -- I know what -- I know what
22     goes into a festival.  It takes more effort than
23     two or three people.  And there may have been
24     services I was able to provide given the
25     independent nature of the clients -- how

Page 86

1                   Miller - Confidential
2        the money.
3            Q.      And that means production expenses,
4        talent acquisition, all of those things?
5            A.      Yes.
6            Q.      Based on what you knew about it
7        then and how they described it to you, did you
8        view it an interesting prospect?  Is it
9        something that you wanted to do?
10           A.      I viewed it as an interesting
11       prospect, yes.
12           Q.      Was that primarily because of
13       electronic dance music's popularity at the time?
14           A.      Yes.
15           Q.      Did you also think that the tie-in
16       with the State Fair made it an attractive
17       prospect, or did that not figure into your
18       thinking?
19           A.      It made it interesting.  I hadn't
20       attended the State Fair before, so I was really
21       thinking about what the event might look like,
22       what it could be more so than the accoutrements
23       that come with a State Fair.  But certainly the
24       idea of an experience where there was carnival
25       rides and funnel cake and things -- to me, the

```
                                              Page 87
 1                  Miller - Confidential
 2        prospect of the event could be more than just --
 3              Q.     More than your average concert?
 4              A.     More participatory than
 5        observatory, if that's a word.  More actively
 6        engaged, for lack of better words.
 7              Q.     Do you recall telling my clients at
 8        that meeting that you had a long relationship
 9        with the New Jersey Sports & Exposition
10        Authority?
11              A.     No.
12              Q.     Do you recall Mr. D'Esposito saying
13        that?
14              A.     No.  I don't recall what
15        Mr. D'Esposito said.
16              Q.     At all?
17              A.     No, really, I don't.
18              Q.     So he was emotional?
19              A.     Yes.
20              Q.     Was he angry?
21              A.     No.  He's a loud individual.
22              Q.     He what?
23              A.     He tends to be loud.  I don't
24        necessarily equate that with anger.
25              Q.     What's the next contact you
```

Page 142

1                    Miller - Confidential

2        I was setting up for my events in New York.  And

3        I recognized that the way the events run in

4        New Jersey may be different and what works in

5        New York doesn't necessarily work in New Jersey.

6        I just wanted him to be aware of how I was

7        approaching New York.

8              Q.    He writes back to you five minutes

9        later on that same day.  He says, "Is it Axwell

10       they are holding, Tiesto is what Al recognized."

11             Do you know who the "Al" that he's

12       referring to in that sentence is?

13             A.    No, I don't.

14             MR. MARX:  Object to the form of

15             the question.

16    BY MR. SIEGEL:

17             Q.    You write back to him a few minutes

18       later saying, "I'm doing Axwell at Roseland on

19       the 23rd of April.  DiMatteo is my partner.  I

20       would imagine they are holding Tiesto with Al.

21       Paul Morris will sell him Tiesto all day long.

22       John DiMatteo is deep in Tiesto's camp."

23             Who were you referring to when you

24       said, "I would imagine they're holding Tiesto

25       with Al"?

Page 143

1               Miller - Confidential
2          A.    I'm not sure.  I apologize.  I'm
3     not sure.
4          Q.    Could it have been Al Dorso?
5          A.    I don't think so, but it could
6     have -- sure.  It could have.
7          Q.    Do you know any other Als as you
8     sit here today that you might have been
9     referring to at that time?
10         A.    I mean --
11         Q.    You just don't know?
12         A.    I just don't know.
13         Q.    You say, "Paul Morris will sell him
14    Tiesto all day long."
15               Paul Morris is Tiesto's agent at
16    AM Only; is that correct?
17         A.    Yes.
18         Q.    What were you saying here, that
19    Morris will do a deal with DiMatteo --
20         A.    Yes.
21         Q.    -- for Tiesto?
22         A.    Yes.
23         Q.    And that's because you think they
24    have a deep relationship?  Is that what you mean
25    when you say "He is deep in Tiesto's camp"?

Page 144

Miller - Confidential

1

2          A.      That was my thought at the time.

3          Q.      You say, "I would imagine they are

4    holding Tiesto."

5                  Who is the "they" that you are

6    referring to?

7          A.      I don't know.  Possibly AM Only.  I

8    don't know.

9                  (Miller Exhibit 5, Bates No.

10         LN0001015, E-mail Chain, marked for

11         identification.)

12                 (Witness peruses the exhibit.)

13   BY MR. SIEGEL:

14         Q.      Have you had a chance to look at

15   Exhibit No. 5?

16         A.      Yes, sir.

17         Q.      At the top, it appears to have a

18   normal e-mail layout.  It appears to be an

19   e-mail from you to John D'Esposito on February

20   23rd, 2011.

21                 Do you agree with that?

22         A.      Yes.

23         Q.      But underneath that, in the body of

24   it, it looks to me like it's a series of

25   exchanges between you and somebody named Steph

```
1                 Miller - Confidential
2         Q.      Wiederlight was in New York?
3         A.      Yes.
4         Q.      And Cara Lewis?
5         A.      Was in New York.
6         Q.      Now, this transcription is dated
7    April 22, 2011.  Do you recall when you spoke to
8    these people at William Morris?
9         A.      No, but it would have been sometime
10   after the first meeting with your clients and
11   before this meeting.
12        Q.      What was the -- I just want to make
13   sure I understand who you spoke with.
14                Did you speak with Mr. Muller
15   directly or an assistant?
16        A.      An assistant.
17        Q.      Do you know who that person was?
18        A.      No.  I don't recall.
19        Q.      Let me just take them one by one.
20   Tell me what you recall about your conversation
21   with Mr. Muller's assistant.  Did you place the
22   call?
23        A.      Maybe.  Maybe meaning that I might
24   have placed a call or it might have been a topic
25   that came up on -- within another conversation.
```

Page 228

1          Miller - Confidential

2                Do you understand what I'm saying?

3          Q.     Yes.

4                Would that person have been in

5     Los Angeles when you spoke with her or him?

6          A.     Yes.

7          Q.     Was it a her or a him?  I'm pretty

8     sure it was either -- either of those two.

9          A.     I'm fairly sure it was a him.

10         Q.     Tell me what you recall about that

11    conversation.

12         A.     During that first meeting with your

13    client -- clients, I think that they had

14    suggested at a certain point certain talent who

15    they represented were confirmed to play the

16    event.  And I was trying to see if they were

17    making an accurate statement.

18         Q.     Do you remember what Mr. Muller's

19    assistant told you?

20         A.     Yes.

21         Q.     What was that?

22         A.     I asked them whether or not The

23    Prodigy were scheduled to be in New Jersey on or

24    about the time of the festival, The Prodigy

25    being a client -- an artist, sorry.  And I was

Page 229

1              Miller - Confidential

2    told no, that they had no plans to be in the

3    United States at that time.

4         Q.    Did you ask whether or not my

5    clients had made an offer, or did you simply ask

6    whether they were going to be in New Jersey at

7    that time?

8         A.    I just asked if they were in the

9    general vicinity.

10        Q.    Now, is that the totality of your

11   conversation with Mr. Muller's assistant?

12        A.    Yes.

13        Q.    Prodigy is the --

14        A.    Sole client.  Because he was -- he

15   was the agent that represented The Prodigy day

16   to day at that moment in time.  I don't believe

17   he is today.

18        Q.    Tell me what you asked

19   Mr. Wiederlight -- or spoke about with

20   Mr. Wiederlight.

21        A.    I would have had the same

22   conversation -- he would have been the -- he

23   would have been the third person I spoke to.  I

24   would have spoken to Cara Lewis next or in --

25   right about the same time about N.E.R.D.,

Page 230

                    Miller - Confidential

1

2     another artist, and asked the same question,

3     whether or not they were available or scheduled

4     to appear -- I don't know if I used the word

5     "available" -- whether or not they were

6     scheduled to appear in the New York or New

7     Jersey area on or about the time of this

8     festival and if they were actively looking for

9     work in my region at that time, and I was told

10    no.

11              And Pete Wiederlight -- I may

12    have -- I would have asked the same question

13    about an artist named Booka Shade, B-O-O-K-A.

14              MR. MARX:  Shade spelled like

15         shade?

16              THE WITNESS:  (Witness nods head.)

17    BY MR. SIEGEL:

18         Q.    Is it your testimony that the

19    complete extent of your conversations with

20    Mr. Wiederlight, Ms. Lewis and Mr. Muller's

21    assistant was simply asking whether or not

22    certain bands were scheduled to be in New York

23    or New Jersey at that time?

24         A.    Yes, or available to appear.

25         Q.    Did you tell them why you were

Exhibit 8

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

---

*Thomas Dorfman*
*November 12, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

ORIGINAL

Min-U-Script® with Word Index

---

Dorfman - direct                                    Page 193

1  Q  It doesn't say Chris Barrett,
2  silent partner, it says Christopher Barrett,
3  partner, correct?
4  A  Yes.
5  Q  And why is John Sandberg signing
6  this agreement as a partner of Juice
7  Entertainment, LLC?
8  A  Well, Mr. Marx, when we had this
9  meeting on March 7th, we really did not think
10 that Al Dorso was going to stand up to his
11 honorable word and give us a contract.
12     At this point in time your client
13 had respectfully told him -- not respectfully,
14 your client told him that our talent was being
15 blocked by your client and multiple agencies.
16     That our partners were thieves,
17 that they were broke, that they were bad
18 mouthing us and all of our partners to the
19 Sports Authority, to him, the pressure he was
20 getting from the Sports Authority to the powers
21 that may be.
22     We also met with your clients
23 just days before, and they reiterated exactly
24 the same things that Al Dorso said and more to
25 our face.

---

Dorfman - direct                                    Page 194

1      When this contract came and he
2  actually was signing it, I, quite frankly, would
3  have let my secretary sign the thing.  Didn't
4  even pay attention.  It was most important that
5  it got signed.  I was actually shocked that the
6  guy would honor his word after knowing that we
7  were basically destroyed.
8      Me being the sole owner of Juice
9  Entertainment, the main thing to me was that my
10 name was signed on the line, and the main thing
11 was that Al Dorso signed his signature.
12 Q  Why did John Sandberg sign this
13 contract as a partner of Juice Entertainment,
14 LLC?
15 A  I don't know if John Sandberg
16 signed it as he wanted to be a partner of Juice
17 Entertainment, LLC, or a partner, partnering in
18 one of the events.  I don't know.  I can't
19 answer that.
20     All I know is that I was
21 absolutely shocked that Al Dorso signed the
22 contract, and I was really happy to sign my name
23 on that dotted line and have this contract.
24 Q  I assume, given the location of
25 where Mr. Sandberg signed, he signed it on the

---

Dorfman - direct                                    Page 195

1  actual nice line with the signature block, yours
2  is next to it.
3      I assume that Mr. Sandberg signed
4  first because he put his name on the actual
5  line, is that correct?
6  A  I can't recall that, Mr. Marx.
7  Q  Do you recall -- when you put
8  your signature on this, why didn't you say to
9  Mr. Sandberg, you're not a partner in Juice
10 Entertainment, LLC, why are you signing this
11 contract?
12 A  Mr. Marx, again, if my secretary,
13 assistant, anyone signed the contract at this
14 point that was sitting in that room, I would
15 absolutely have no problem with it.  I thought
16 the chances of Al Dorso signing this contract
17 would be one in a million.
18     When he signed this contract I
19 was very, very happy for the short period of
20 time then, and that's all I was focused on.
21 Q  Did you have any discussion about
22 section three of the contract?  It's on page
23 three.  It says, "Financial terms."
24     More specifically, my question
25 is, did you and Al Dorso have any discussions

---

Dorfman - direct                                    Page 196

1  concerning section three before you signed it?
2  A  Yes, we did.
3  Q  What did you discuss?
4  A  On the day of the contract
5  signing?
6  Q  At any time.
7  A  Paragraphs A, B and C, or A and
8  B?
9  Q  Anything concerning financial
10 terms.
11 A  Just to be clear, A, B and C?
12 Q  Yes.
13 A  I have to go to page four then,
14 correct?
15 Q  Feel free to go anywhere you need
16 to go.  I'm trying to get your best recollection
17 of things that you discussed with Al Dorso
18 concerning the contract before you signed it.
19     MR. SIEGAL: He's asking if you
20 have a recollection of what you talked about.
21 You don't have to regurgitate this to him.
22     Do you remember what you talked
23 about?
24 A  Yes, in financial terms of the
25 contract, yes.

---

Dorfman - direct                                    Page 265

1 Q  Had you told me everything you
2 can recall about that call?
3 A  Best I can.
4 Q  When did the meeting take place?
5 A  I believe it's March 3rd.
6 Q  Where?
7 A  Live Nation headquarters in
8 New York by Times Square.
9 Q  Who was present?
10 A  Myself, Christopher Barrett, John
11 Sandberg, Jason Miller, John D'Esposito.
12 Q  The other participant, how long
13 was the other participant involved in the
14 meeting?
15 A  Two seconds.
16 Q  How long was the meeting?
17 A  Probably 20 minutes, 30 minutes.
18 Not a long time.
19 Q  Was it in a conference room or in
20 someone's office?
21 A  It was in Jason Miller's office.
22 Q  Did you record the meeting?
23 A  No, I did not record it. If I
24 did record it, I don't believe we would be
25 sitting here today.

Dorfman - direct                                    Page 266

1 Q  Did anybody else record it to
2 your knowledge?
3 A  Not to my knowledge.
4 Q  Did you take notes?
5 A  No, I did not.
6 Q  Did anybody else take notes to
7 your knowledge?
8 A  Not to my recollection. Not to
9 my knowledge.
10 Q  After the meeting did you do
11 anything to memorialize your recollection of
12 what occurred during the meeting?
13 A  I remember what happened.
14 Q  But did you do anything to
15 memorialize your recollection of what happened
16 during the meeting?
17 A  Can you state that over?
18 Q  Sure.
19     Did you write a summary of the
20 meeting?
21 A  I know we spoke, me and Chris and
22 John spoke about it, and we told other
23 individuals about it, such as Vito Bruno, but I
24 don't know if anything was written down or not.
25 Not to my knowledge.

Dorfman - direct                                    Page 267

1 Q  Did you write anything down?
2 A  Myself, not to my recollection.
3 Q  Do you know whether any of the
4 other participants did?
5 A  Not to my recollection.
6 Q  When is the first time that you
7 spoke to someone other than you, Mr. Barrett or
8 Mr. Sandberg about the meeting?
9 A  After the meeting?
10 Q  Yes.
11 A  We spoke to Vito Bruno. We were
12 calling Vito and John's phones off the hook.
13 Spoke to Vito or John that day, if not both of
14 them.
15 Q  Do you recall whether you spoke
16 to them together or separately?
17 A  I don't recall if it was together
18 or separately we definitely spoke with both of
19 them, though.
20 Q  Let's go to the -- are you able
21 to recall the meeting in terms of who said what?
22 A  Yes, I am.
23 Q  Or do you have a general
24 recollection of what was said?
25 A  I have a pretty good memory of

Dorfman - direct                                    Page 268

1 it.
2 Q  Why don't you give me that memory
3 that you have of that meeting from the start to
4 the finish to the best of your recollection.
5 A  Start to finish. We went to Live
6 Nation headquarters. We were brought into Jason
7 Miller's office. I excused myself to the
8 bathroom briefly, came back into Jason Miller's
9 office.
10     Jason Miller then called John
11 D'Esposito into his office, and Jason Miller
12 started talking and wanted to talk about the
13 electronic dance event and them being involved.
14     I told Jason Miller that we were
15 not interested in doing anything with them in
16 the electronic dance event. We'd been working
17 on it for over nine months. We had partners in
18 place. We had everything lined up that we
19 needed. We had no interest in speaking to them
20 about the electronic dance event.
21     If they were interested on
22 putting on some other shows, we would be willing
23 to talk.
24     They immediately came in and, we
25 are not talking about the electronic dance.

Dorfman - direct                                      Page 269

1   There is nothing to talk about.
2       John D'Esposito asked me who the
3   fuck I was. I told them my name is Tommy D, and
4   he said, I never fuckin' heard of you.
5       Told them all I'm coming from a
6   different background from your music, but I
7   produce very successful shows, Newark,
8   New Jersey area over the last 15 years and I've
9   heard great things about yourself and
10  Mr. Miller.
11  Q   Okay.
12  A   Then Mr. Miller immediately came
13  in and said they wanted to be involved in the
14  electronic dance event.
15      I told them we had partnered with
16  Vito Bruno and John DiMatteo 50/50 partners in
17  the event.
18      They told me the same
19  allegations, the same things that Al Dorso told
20  me on February 18th, now it's coming to be true,
21  coming from the horse's mouth.
22      Jason Miller told me John and
23  Vito were broke. They don't know how to produce
24  an event. They are thieves. That they can't
25  produce an event, they weren't capable of

Dorfman - direct                                      Page 270

1   producing an event. And he told me, I spoke to
2   the agents, you don't have any talent. I'm not
3   going to allow you to get talent unless you
4   partner with us.
5       D'Esposito was pacing back and
6   forth, frustrated, behind Mr. Miller's desk.
7       I told Mr. Miller I'm not
8   interested in partnering with them. He told me
9   if we kicked out John and Vito and partner with
10  him, that he would fund the project a hundred
11  percent and give us 50 percent of the share.
12      He said he spoke with William
13  Morris agency, said it was the exclusive agency,
14  we were not getting any talent.
15      He then came in to say that with
16  John and Vito we would be prevented from getting
17  tickets at the Meadowlands, that they would
18  block our ticketing.
19      Chris Barrett came in and said,
20  we got ticketing last year from Michelle Cattena
21  from the Meadowlands.
22      He said, it doesn't matter. Your
23  partners are Vito and John. You will not get
24  tickets from the Meadowlands.
25      Then they bad mouthed John and

Dorfman - direct                                      Page 271

1   Vito probably for another several minutes.
2   Q   You can tell me what they said.
3   A   They just said that they are
4   fucking thieves, they are incapable of producing
5   any shows, they are incapable of obtaining
6   talent. And I defended them, saying they
7   procured a lot of good talent and produced a lot
8   of shows. I defended Vito, saying he produced
9   Beatstock for 10, 15 years.
10      Jason Miller then turned and
11  said, Vito never produced Beatstock, but he
12  claimed that he did.
13      One of us in the room said, we
14  have a contract.
15      John D'Esposito, said contracts
16  don't mean shit.
17      John Sandberg then defended the
18  contract.
19      John D'Esposito said, I have seen
20  your contract. There are loopholes in your
21  contract, I can kick you out of your contract
22  anytime I want. It was really a shock on my
23  behalf.
24      So I defend our situation, and
25  they try to make us look horrible. I actually

Dorfman - direct                                      Page 272

1   told them, which was untruthful, that we had 10
2   acts booked, as the mere fact they knew we
3   didn't have any, and I told them that we had ten
4   acts booked, to try to stand up for ourselves a
5   little bit here.
6       They pushed the issue again,
7   kicking them out, and gave us an ultimatum that
8   we either partner with them or there is no
9   event.
10      I told them that I was not going
11  to break my contract with Vito and John and that
12  was it. I told him I would not break it in any
13  way.
14      After I stressed that several
15  times, they then all changed their tune and
16  said, we love John, we love Vito, but business
17  is business.
18      John D'Esposito went back and
19  said, there are all kinds of methods that we can
20  get you kicked out of the stadium. I have a
21  close relationship with Al Dorso. I have a
22  close relationship with the Sports Authority. I
23  can throw you out anytime I want.
24      I wasn't going to be bullied. So
25  I told them, look, sorry, we worked on this for

Case 2:11-cv-07318-CCC-CLW    Document 75-3    Filed 12/19/16    Page 50 of 99 PageID: 895
Juice Entertainment, et al v.
Live Nation Entertainment

Dorfman - direct                              Page 273

1 nine months. If there is room next year for you
2 guys to try to get in the situation a little
3 bit, it would be great to talk. You guys want
4 to put any other shows on, very happy to speak
5 with you about it.
6     They just kept attacking even
7 more. I said, I'm willing to speak to John and
8 Vito and see what we can do.
9     They told us to get back to them
10 or we wouldn't have -- we wouldn't be in the
11 Meadowlands. That's how the meeting ended.
12 Q  Now have you told me everything
13 that you can recall from the meeting?
14 A  Yes, that's the best of my
15 recollection.
16 Q  There is nothing that you can
17 review to refresh your recollection? There are
18 no recordings, you didn't take any notes. This
19 is your best recollection?
20 A  Yeah, but I remember it pretty
21 well, pretty much like the day you die. You
22 remember it.
23 Q  You felt me everything you recall
24 Jason Miller telling you, correct?
25 A  Yes.

Dorfman - direct                              Page 274

1 Q  And you recall everything that
2 you, John Sandberg and Chris Barrett told them,
3 correct?
4 A  Yes.
5 Q  Did you know what D'Esposito was
6 talking about when he said, we seen your
7 contract? Because my understanding is that your
8 contract was signed on March 7th, which was
9 several days after this March 3rd meeting.
10    Do I have that sequence of events
11 correct?
12 A  Yes, it was.
13 Q  Did that occur to you during the
14 meeting?
15 A  Yeah, it did. We did have a
16 verbal contract with Al dating back to October,
17 and the other contract was already on the table
18 that was at Al Dorso's office.
19 Q  The draft he forwarded to you on
20 February 15th, right?
21 A  Yeah. And the one thing --
22 actually, now you just refreshed my memory, the
23 one thing that I do recall, in addition I know
24 dates in your contract, and that's when he went
25 into the loopholes and I can kick you out.

Dorfman - direct                              Page 275

1 Q  Did you have any assumption as to
2 where D'Esposito would have gotten this
3 information from?
4 A  I assumed from -- assumptions --
5 I assumed from Al Dorso and some from the
6 agents.
7 Q  Who said he had spoken to the
8 agents, D'Esposito, Miller or both?
9 A  Both of them did.
10 Q  And did they tell what agents
11 they spoke to?
12 A  They said that they spoke to
13 William Morris, and then one of them referred to
14 agents.
15 Q  What happened next?
16 A  Well, we walked out of the office
17 and we were in complete despair, because it's
18 one thing to hear the threats from Al Dorso, and
19 to immediately feel the effects when all offers
20 are out and everything is looking great with the
21 agents, and now nothing is coming back.
22    Now to hear from their mouth
23 directly, we felt we were in serious trouble.
24 We at that point knew that our electronic talent
25 was not going to happen unless there is a

Dorfman - direct                              Page 276

1 miracle and we were probably going to lose our
2 contract and be blown out of our deal and our
3 careers, to be quite frank.
4     Us three were extremely,
5 extremely, extremely stressed out.
6     I don't know how much further you
7 would like me to go.
8 Q  That's how you were feeling.
9 What did you do next, if anything, with respect
10 to the event?
11 A  I believe Chris Barrett called up
12 Jason Miller -- I wasn't speaking to Jason
13 Miller because I didn't want to speak to him
14 again -- and asked him if we would agree to all
15 your arrangements, would you put the Tiesto dead
16 mouse tour on our stage, something I believe
17 they were planning, for the following year?
18 Q  When did Barrett make this call
19 to Miller?
20 A  Several minutes after leaving
21 Live Nation.
22 Q  Did Miller take the call?
23 A  Yes, he did.
24 Q  How did that conversation go?
25 A  From what Chris said -- I did not

Exhibit 9

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

---

*John DiMatteo*
*July 17, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*



Min-U-Script® with Word Index

Case 2:11-cv-07318-CCC-CLW    Document 75-3    Filed 12/19/16    Page 53 of 99 PageID: 898
Juice Entertainment, et al v.
Live Nation Entertainment

Page 33

1  A.  Yes, to secure sponsorship, to secure
2  staff, negotiate all the terms of the venue. There
3  is a lot of other things.
4  Q.  You mentioned the concept of having a
5  headliner. Did I recall that correctly?
6  A.  Yes, you did.
7  Q.  Can you tell me the need to have a
8  headliner at an event that was being contemplated?
9  A.  Can you be more specific?
10 Q.  Sure. Why did this event need a
11 headliner?
12 A.  You need an artist to anchor The
13 Event, an artist that's capable of selling at least
14 50 percent of the capacity of the venue on their
15 own. The headliner is typically to anchor for the
16 event and it is supported with other talent.
17 Q.  Who were the headliners that were
18 being discussed in connection with this event?
19 A.  Tiesto.
20 Q.  Any others?
21 A.  Steve Angelo, at a certain point, and
22 I don't remember if there were others.
23 Q.  And Tiesto and Angelo would be
24 sufficiently important as players in the industry
25 that they could be headliners for an event like

Page 34

1  this?
2  A.  Yes.
3  Q.  Did you make offers to Tiesto and
4  Steve Angelo?
5  A.  Yes.
6  Q.  Were they accepted?
7  A.  No.
8  Q.  Do you know why they were not
9  accepted?
10 A.  Tiesto -- Tiesto's offer was not
11 accepted because he played for -- he was going to
12 Electric Zoo. And Steve Angelo, for some reason,
13 just didn't want to do it. I don't know why.
14 Q.  Do you know whether the fact that
15 Mr. Steve Angelo and Tiesto declining offers had an
16 impact on whether other artists were accepting or
17 not accepting offers to appear at The Event?
18 A.  For sure. Having or not having an
19 artist of Tiesto's caliber will dictate, to a
20 certain extent, whether the support artists and
21 other talent on the show confirm. It is the first
22 thing they will say is "who else is playing." When
23 you say Tiesto is playing it gives The Event instant
24 credibility. When you have a headliner and you are
25 launching a new event it becomes difficult to secure

Page 35

1  the rest of the talent.
2  Q.  Now, I believe your testimony was that
3  Tiesto declined the offer because he went to
4  Electric Zoo. Did I recall that correctly?
5  A.  Yes.
6  Q.  What is Electric Zoo?
7  A.  Electric Zoo is a music festival that
8  was launched in 2009. It takes place annually on
9  Labor Day weekend on Randall's Island and it is
10 produced by a company called Main Event.
11 Q.  How do you know that Tiesto declined
12 the offer to appear at this event, so that he could
13 appear at the Electric Zoo event?
14 A.  The agent told me.
15 Q.  Who is the agent?
16 A.  Paul Morris.
17 Q.  Did Mr. Morris tell you that orally or
18 in writing?
19 A.  Orally.
20 Q.  Do you recall when he told you that?
21 A.  No.
22 Q.  Did you tell anybody else what
23 Mr. Morris had told you about the reason why Tiesto
24 was declining the offer to appear at this event?
25 A.  Repeat that, please.

Page 36

1  Q.  Sure. Mr. Morris told you that Tiesto
2  was declining the offer to appear at this event?
3  A.  Right.
4  Q.  Because he was going to appear at
5  Electric Zoo?
6  A.  Right.
7  Q.  Did you tell anybody what Mr. Morris
8  had told you?
9  A.  I probably told -- I don't remember
10 exactly. I really can't give a definitive answer.
11 I'm assuming I told the people that we were working
12 with, the plaintiff.
13 Q.  Do you know whether you told them in
14 writing or --
15 A.  No, no, no, definitely not in writing.
16 Q.  Okay.
17 A.  Not to my knowledge anyway.
18 Q.  Okay.
19 A.  I should just say not to my knowledge.
20 Q.  Did you speak about the reasons why
21 Tiesto was declining the offer at this event with
22 anyone else associated with Tiesto?
23 A.  I don't remember.
24 Q.  Now, you've been describing for me
25 what the partners you identified to me were doing in

Page 45

1 Q. Have you dealt with William Morris
2 other than in connection with this event?
3 A. Yes.
4 Q. For how long have you been dealing
5 with William Morris?
6 A. Since they started the electronic
7 division.
8 Q. When was that?
9 A. I don't remember. It could be looked
10 up. When they started the electronic division is
11 when I started with them.
12 Q. So these events took place --
13 A. It might have been in 2008, early 2008
14 I think. Don't quote me on that. You can look it
15 up and see exactly.
16 Q. Who have you dealt with in connection
17 with the --
18 A. With this event?
19 Q. Just generally at William Morris?
20 A. Generally at William Morris?
21 Q. Yes.
22 A. Names of people I deal with there are
23 Joel Zimmerman, Samantha Kirby, Alex Chakin, Peter
24 Wiederleit. Prior to this date, right? You are
25 talking about who did I deal with, William Morris

Page 46

1 from 2011 and prior?
2 Q. Sure. Yes.
3 A. Okay. Yeah, that pretty much sums it
4 up.
5 Q. And how about since then?
6 A. Since then the names mentioned, in
7 addition to the names mentioned, since then Connor
8 Sheldon, Jonas Shoeman, Connor Sheldon, Jonas
9 Shoeman, Mike Berkowitz, Ryan King. That about does
10 it.
11 Q. Who from William Morris did you deal
12 with in connection with this event?
13 A. Alex Chakin, Samantha Kirby, Pete
14 Wiederleit.
15 Q. What about Joel Zimmerman?
16 A. Yes. Joel Zimmerman, yes.
17 Q. Can you explain to me, if you know,
18 the relationship between those folks at William
19 Morris to each other? In other words, is one of
20 them the boss and the others not? Can you explain
21 that to me?
22 A. Yes. I can.
23 Q. All right.
24 A. Joel Zimmerman is the head of the
25 electronic department. Amanda Kirby is a senior

Page 47

1 agent. Alex Chakin works under both of them. Pete
2 Wiederleit runs the northeast territory, works under
3 them. Joel is the head of the electronic
4 department.
5 Q. Okay. And how were the four of them
6 involved in connection with this event?
7 A. I spoke with Joel about The Event. I
8 had a meeting at their office with Sam Kirby, Alex
9 Chakin and I believe Pete Wiederleit was there and
10 we spoke about The Event.
11 Q. Do you recall when that meeting was?
12 A. First quarter of 2011 is as close as I
13 can get to it.
14 Q. Where was the meeting?
15 A. At the William Morris office, 6th
16 Avenue.
17 Q. In New York?
18 A. In New York.
19 Q. How long did the meeting last?
20 A. Maybe an hour, estimating an hour.
21 Vito Bruno was with me.
22 Q. So the participants were you and
23 Mr. Bruno from Area?
24 A. Right.
25 Q. And the William Morris participants

Page 48

1 you identified?
2 A. Yup.
3 Q. Did you record that meeting?
4 A. No.
5 Q. Do you know whether anybody else did?
6 A. I don't know.
7 Q. Did you take notes?
8 A. No.
9 Q. Do you know whether anybody else did?
10 A. I don't remember.
11 Q. Do you remember the meeting?
12 A. Somewhat.
13 Q. Tell me what you remember.
14 A. They asked what we were doing. We
15 told them we were doing a festival at the
16 Meadowlands State Fair. They asked what the name of
17 it was. We didn't have one yet. They asked if the
18 venue was confirmed and if we had a confirmed deal
19 with the venue. I said "yes." And then we
20 discussed different potential options for talent.
21 Q. How did the meeting come about?
22 A. Through Joel. I spoke to Joel first
23 about The Event and he had set up a meeting.
24 Q. How did you wind up reaching out to
25 Joel about The Event?

Juice Entertainment, et al v.
Live Nation Entertainment

---

**Page 49**

1 A.  How did I reach out what does that
2 mean?
3 Q.  What made you call Joel?
4 A.  Because he represents a great deal of
5 talent.  William Morris represents a great deal of
6 talent.  The first or second largest agency in North
7 America for this genre of music so that's why we
8 choose them to book artists.
9 Q.  What else can you tell me about that
10 meeting at William Morris?
11 A.  It was at night.  I don't remember
12 much else except for the time of day.
13 Q.  Did you have any other in-person
14 meetings with Joel Zimmerman about this event?
15 A.  No.  We spoke about it on the phone
16 though.
17 Q.  How many times did you speak with him
18 on the phone about it?
19 A.  I don't know exactly.
20 Q.  Did Mr. Zimmerman tell you at that
21 meeting that William Morris wanted to be the wind
22 behind your sails for this project?
23 A.  No, not at that meeting.  Joel wasn't
24 at the meeting.
25 Q.  Joel was not at the meeting?

---

**Page 50**

1 A.  No.
2 Q.  Did anybody from William Morris tell
3 you that William Morris wanted to be the wind behind
4 your sails?
5 A.  Joel and I, in our initial
6 conversation, had asked me to send over the budget.
7 He said because William Morris gets involved in
8 certain festivals and it is something that Mark
9 Geiger from William Morris heads up and he
10 potentially wanted to get involved in this festival
11 as a partnership.
12 Q.  Did he use the phrase "wind behind
13 your sails" during that?
14 A.  I don't remember.
15 Q.  Have you ever heard that phrase before
16 being used by someone at William Morris in
17 connection with this event?
18 A.  I don't remember.
19 Q.  Have you ever heard anybody use that
20 phrase in connection with anything that you've been
21 involved in?
22 A.  I don't remember.  Wind beneath my
23 sails.
24 Q.  Wind behind your sails?
25 A.  I don't know.

---

**Page 51**

1 Q.  Anything with wind and sails?
2 A.  No.
3 Q.  Do you think that's the kind of thing
4 you would remember?
5 A.  No, I don't.  It is a phrase.  It is a
6 cliche.  I'm on the phone all the time.  I don't
7 remember each cliche that people tell me.
8 Q.  Do you recall ever telling Mr. Barrett
9 or Mr. Dorfman that somebody at William Morris said
10 that William Morris wanted to be the wind behind
11 your sales in connection with this event?
12 A.  I told them -- I can't confirm or deny
13 that I've used that phrase, but I did explain to
14 them the nature of the call I had with Joel
15 Zimmerman.
16 Q.  What did you explain to them?
17 A.  Just like I did with you.  They wanted
18 to get involved in the potential partnership and
19 they get involved in festivals and so forth.
20     MR. MERINGOLO: Can we take a break?
21     MR. MARX: Yes.
22     (There was a brief recess taken.)
23     MR. MARX: Back on the record.
24 Q.  I am going to hand the witness the
25 next two exhibits.  Exhibit Dimatteo-5 is a one-page

---

**Page 52**

1 document with Bates number Juice 2208.
2     (Exhibit Dimatteo-5 was marked for
3 identification.)
4     MR. MARX: Dimatteo-6 is a multiple
5 page document bearing bates numbers Juice 2187
6 through 2192.
7     (Exhibit Dimatteo-6 was marked for
8 identification.)
9 Q.  I am going to hand them to the witness
10 and ask that he look at them and then I will ask
11 some questions.
12     Also please mark Dimatteo-7.
13     (Exhibit Dimatteo-7 was marked for
14 identification.)
15     MR. MARX: I'm also going to hand
16 Mr. Dimatteo what we've marked as Dimatteo-7, a
17 two-page document bearing Juice 4130 to 4131.
18 Q.  Have you had a chance to review
19 Exhibits Dimatteo-5, Dimatteo-6 and Dimatteo-7?
20 A.  Yes.
21 Q.  Can you turn to Exhibit 5, please?
22 A.  Yes.
23 Q.  That's an e-mail, looks like it is
24 from you to Vito Bruno with copies to Alan Sacks,
25 Chris Barrett, Brian Arteca?

---

Page 101

1  concerning payment?
2  A.  For the New Years show we owed Live
3  Nation some money that we took a little while to get
4  to them but we got it to them.
5  Q.  That was New Years Eve 2010?
6  A.  Yes.
7  Q.  Did that involve something called
8  Newyearseve.com?
9  A.  No.
10  Q.  That's something --
11  A.  I don't know what.
12  Q.  You don't know what that is?
13  A.  No.
14  Q.  I obviously don't know what that is
15  either.
16  A.  That makes two of us.
17  Q.  What was the nature of the New Years
18  Eve issue from 2010?
19  A.  When we settled the show we had some
20  money in our account that we owed them.  I wouldn't
21  call it an issue.  We just took a little longer to
22  get to it them than we should have but we got it to
23  them.
24  Q.  How much money?
25  A.  A little over $100,000.

Page 102

1  Q.  When do you recall getting them the
2  money?
3  A.  I don't remember.
4  Q.  Okay.
5  A.  Maybe a couple months after the show.
6  Q.  Do you recall it being a contentious
7  situation between you and Live Nation?
8  A.  Contentious?
9  Q.  Yes.
10  A.  No, not really.
11  Q.  When was the last time you spoke to
12  Mr. Barrett or Mr. Dorfman?
13  A.  Last year, when they told me about
14  this.
15  Q.  Did you meet with their lawyers?
16  A.  No.
17  Q.  Did they ask you to provide them with
18  a sworn statement?
19  A.  No.
20  Q.  Did they ask you to provide them with
21  any documents or other evidence?
22  A.  No.
23  Q.  Did they instruct you that you should
24  preserve any of your evidence related to this
25  matter?

Page 103

1  A.  I don't remember.
2  Q.  You've already told me everything you
3  can recall about the conversation you had with this
4  lawsuit with Mr. Dorfman and Mr. Barrett?
5  A.  Correct.
6  Q.  I think you mentioned that you are
7  doing business under the name of Area Events but
8  that's not the actual name of the company?
9  A.  Currently.
10  Q.  What's the current name of the
11  company?
12  A.  We have six companies.
13  Q.  Okay.
14  A.  There's a parent company called
15  Electronic Music Enterprises.  And then there's five
16  subsidiaries.  It is a bunch.
17  Q.  Is Mr. Bruno involved in any of those?
18  A.  No, no.
19  Q.  Since when have you and Mr. Bruno not
20  been doing business?
21  A.  April 2011.
22  Q.  Why are you no longer doing business?
23  A.  It just wasn't working out.
24  Q.  Was there any event that caused that
25  to happen?

Page 104

1  A.  No.
2  Q.  Was it related to this event in any
3  way?
4  A.  Not to my knowledge.
5  Q.  Who made the decision to separate the
6  relationship?
7  A.  I did.
8  Q.  Is the separation a subject of
9  litigation between you and Mr. Bruno?
10  A.  No.
11      MR. MARX: I am going to check my
12  notes, confer with my colleague.  My guess is I've
13  got no further questions.
14      (There was a brief recess taken.)
15      AMY WALKER WAGNER: For the record,
16  please send a copy of the deposition transcript to
17  the attention of Amy Wagner at Stone & Magnanini in
18  Short Hills, New Jersey.
19
20      (Whereupon, Ms. Wagner hangs up and
21  leaves the deposition.)
22
23      MR. MARX: No further questions.
24
25

Exhibit 10

| | |
|---|---|
| **From:** | steve@windishagency.com |
| **To:** | John Dimatteo |
| **Sent:** | 1/15/2011 1:43:37 AM |
| **Subject:** | Re: Steve Angello |

You need to keep in mind that steve does edc the night before. That date is a bit harder because I have to put steve on an early flight against the clock. We can look at the possibilities but keep this in mind cause it has to make a lot of sense.


Sent from my Verizon Wireless BlackBerry

---

**From:** John Dimatteo <john@areaevent.com>
**Date:** Fri, 14 Jan 2011 19:15:09 -0600
**To:** steve@windishagency.com<steve@windishagency.com>
**Subject:** Re: Steve Angello

Hold max and AN21 for 25th.

Let's put a lineup together



--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com | AIM: jdimatteo http://www.areaevent.com | http://www.facebook.com/areaevent

---

**From:** steve@windishagency.com <steve@windishagency.com>
**To:** John Dimatteo
**Sent:** Fri Jan 14 19:00:38 2011
**Subject:** Re: Steve Angello

I really like the idea of something outdoor especially if its something new and different.

Roseland should be the backup plan.

Something with Tiesto would be good, except for that I'm needing a Size Matters gig with AN21 + Max and so on. I don't have my NYC play and I need it.


Sent from my Verizon Wireless BlackBerry

---

**From:** John Dimatteo <john@areaevent.com>
**Date:** Fri, 14 Jan 2011 18:56:53 -0600
**To:** steve@windishagency.com<steve@windishagency.com>
**Subject:** Re: Steve Angello

I will have info on that on Monday.

I have several out door spaces that I am working on.

Coney Island, Flyod Bennet Field and others. Will send you a full report EOD Monday.

WINDISH0000018

Tiesto is also around June 25th maybe we can put them together with a few others and do something larger.

I love Roseland in July too

--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com | AIM: jdimatteo http://www.areaevent.com | http://www.facebook.com/areaevent

---

**From:** steve@windishagency.com <steve@windishagency.com>
**To:** John Dimatteo
**Sent:** Fri Jan 14 18:48:36 2011
**Subject:** Re: Steve Angello

Any progress on governors island?

Sent from my Verizon Wireless BlackBerry

---

**From:** John Dimatteo <john@areaevent.com>
**Date:** Fri, 14 Jan 2011 18:16:09 -0600
**To:** JasonMiller@LiveNation.com<JasonMiller@LiveNation.com>; steve@windishagency.com<steve@windishagency.com>
**Subject:** Re: Steve Angello

Interesting

--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com | AIM: jdimatteo http://www.areaevent.com | http://www.facebook.com/areaevent

---

**From:** Jason Miller <JasonMiller@LiveNation.com>
**To:** Steve Goodgold <steve@windishagency.com>
**Cc:** John Dimatteo
**Sent:** Fri Jan 14 18:09:38 2011
**Subject:** RE: Steve Angello

Summerstage is not available for ticketed events on weekends.

They only accept shows on Mondays – Wednesdays – except for what they call 'managed events' which occur prior to June 5 and after Aug 27

You can get Roseland July 4 weekend

If you wanted Roseland June 25 I would have to blow out Gay Pride which is a little dicey – but for Steve and you motherfuckers I would do it.  That particular date we would want to do sooner rather than later with the politics involved

---

**From:** Steve Goodgold [mailto:steve@windishagency.com]
**Sent:** Friday, January 14, 2011 7:05 PM
**To:** Jason Miller
**Cc:** John Dimatteo

WINDISH0000019

**Subject:** Re: Steve Angello

Can we get Summer Stage July 4 weekend or on Sat June 25?

Steve Goodgold
Agent

The Windish Agency
New York Office
580 Broadway, Suite 707
New York, NY 10012

(773) 489-3500 phone
(773) 489-3535 fax

steve@windishagency.com
http://www.windishagency.com

Main Office Address:
1658 N. Milwaukee Avenue, #211
Chicago, IL 60647

On Jan 14, 2011, at 7:03 PM, Jason Miller wrote:

May 21 is 1st possible date it could be done

I could also check Convention Hall in Asbury

**From:** John Dimatteo [mailto:john@areaevent.com]
**Sent:** Friday, January 14, 2011 6:59 PM
**To:** Jason Miller; steve@windishagency.com
**Subject:** Re: Steve Angello

What about summer stage?

--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com | AIM:
jdimatteo http://www.areaevent.com | http://www.facebook.com/areaevent

WINDISH0000020

**From**: Jason Miller <JasonMiller@LiveNation.com>
**To**: Steve Goodgold <steve@windishagency.com>; John Dimatteo
**Sent**: Fri Jan 14 17:50:21 2011
**Subject**: Steve Angello

We can not do Hammerstein May 6

Load in for the May 7 event begins at 12 midnight which doesn't work


Jason Miller| Senior Vice President |New York
ph: 917.421.5160/ 917.421.5043 fx
e: **JasonMiller@livenation.com**
<image001.jpg>

WINDISH0000021

Exhibit 11

## Microsoft Outlook

| | |
|---|---|
| **From:** | John D'Esposito |
| **Sent:** | Wednesday, February 16, 2011 4:08 PM |
| **To:** | Jason Miller |
| **Subject:** | Re: Axwell - Area Event |

Is it axwell they are holding, tiesto is what al recognized.

**From**: Jason Miller
**Sent**: Wednesday, February 16, 2011 04:02 PM
**To**: John D'Esposito
**Subject**: FW: Axwell - Area Event

FYI

**From:** Jason Miller
**Sent:** Tuesday, February 15, 2011 5:23 PM
**To:** Joel Zimmerman
**Cc:** Samantha Kirby Yoh
**Subject:** Axwell - Area Event

Dear Joel (and Sam);

As we discussed I wanted to give you guys a synapsis of NYE at Roseland with Steve Angello.

First let me say that I have nothing but a positive personal relationship with John Dimatteo. I do think he is a good street promoter and I think he has the very best intentions out there. When it comes to event execution his is vastly different; which is probably why we make for such a good team.

We suffered from a huge ticketing mess on NYE that the artist – Steve Angello – was insulated from. The ticketmaster portion of the tickets were executed fine, but the fulfillment of sub-promoter (consignment) tickets, Wantickets and VIP left a lot to be desired. This resulted in a massive back up at the door that took longer than it should have to fix.

Consignment tickets, while a standard of electronic music, are difficult for me as a 'traditional' promoter because they are nearly impossible to reconcile. I have a fiduciary responsibility to the artist and agent and if there is no means of control and tickets can not be reconciled against an audit, there is no way for me to know for sure or properly represent how many tickets are actually out there, what they were sold for, and protect all of our shared interests. We generally arrange for a swap of consignment tickets for ticketmaster tickets so that we have a 1 to 1 swtich and it is sold into the audit. This has worked very well for me in the past, but Steve Angello was different because they gave different sub-promoters different 'rips' on the ticket which resulted in many different financial amounts that the show retained against what was sold. Not a good business practice and near impossible to settle accurately

Then, Wantickets, was completely un-prepared for the amount of tickets they sold and the will call they had to fulfill. They were not properly staffed, nor did they have experienced folks staffing. Someone on the want staff actually got frustrated and left mid show – making things worse. A better practice would have been to force shipment of tickets in advance, but I am told that results in much lower sales.

Finally, the VIP set up was overwhelming and understaffed. An area that John was to be expert in. I have pulled this off previously for Deadmau5 entirely on my own with no glitch, but NYE was disastrous.

With all of this in mind my intent and suggestion moving forward with Area and any independent promoter is that I will be in control of all finances and ticketing. Because Axwell has a relationship with Ticketfly, I do not see us using Wantickets. Want has had some issues, so I have been told, paying promoters and artists their funds due. I haven't had that problem yet, but they initially owned some resources that we sold tickets on for NYE and have been slow to pay

1

**CONFIDENTIAL**

John. As a result I told them I would not support Want in the meantime beginning immediately with an upcoming Wolfgang Gartner show where they have requested an allotment to sell.

Most importantly, New Years Eve was a tremendously successful sold out engagement, yet I have still not settled internally with John. He owes me in excess of $100K. This is not a concern of artist or agent, but hopefully an illustration as to why I would require to be in control of finances on a show when significant funds are in play.

As all of this relates to Axwell I would offer this

1) Live Nation will control the ticketing and finances of the event, which is not an issue based upon our previous discussions. I would suggest we do not use consignment tickets, but if we choose to – they are pulled off of the Ticketmaster system and signed for by the person responsible for selling them in small, manageable allotments
2) Because there is a relationship with the Artist and Ticketfly, I suggest we maximize this opportunity and not use Wantickets. There should be no more than 2 ticket companies on any given show.
3) Any VIP sales will be sold and fulfilled by me and I will be personally responsible for the execution. I have a system that has previously proven to be flawless.
4) Area Event will focus on what they do best – street marketing. They will enhance my efforts and handle the hand to hand combat in the clubs as well as supplement what we do online. I will continue to handle production as I do for all of the shows

I believe this is the best recipe for success. Please call if you would like to discuss

JAS

Jason Miller| Senior Vice President |New York
ph: 917.421.5160/ 917.421.5043 fx
e: JasonMiller@livenation.com



CONFIDENTIAL

LN0000994

Exhibit 12

**From:**    Samantha Kirby Yoh                                          February 23, 2011 9:27:36 AM (-08)
**To:**      Alex Chaykin; David Levy; SAMK
**Cc:**
**Bcc:**
**Subject:**    **RE: PVD June 25/26**

**Attachments:**

its the same flaky promoter that just fucked up the new york marketing and owes live nation money...

Samantha Kirby Yoh | WME
skirby@wmeentertainment.com
212.903.1149

---

**From:** Alex Chaykin
**Sent:** Wednesday, February 23, 2011 11:44 AM
**To:** David Levy; SAMK
**Subject:** FW: PVD June 25/26

See below re Meadowlands Festival in NY/NJ.

Is this 100% out?

Alex Chaykin | WME
achaykin@wmeentertainment.com
212.903.1598
212.632.1207 (f)

---

**From:** John Dimatteo [mailto:john@areaevent.com]
**Sent:** Saturday, February 19, 2011 2:16 PM
**To:** Alex Chaykin
**Cc:** Samantha Kirby Yoh; Peter Wiederlight
**Subject:** PVD June 25/26

Alex,

Do you think we sway PVD to play here instead of Europe to play for $80,000?

Let me know your thoughts.

Thanks,

--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com | AIM:
jdimatteohttp://www.areaevent.com | http://www.facebook.com/areaevent

CONFIDENTIAL                                                                                     WME000349

| From: | Alex Chaykin | February 23, 2011 9:30:01 AM (-08) |
|---|---|---|
| To: | Samantha Kirby Yoh; David Levy; SAMK | |
| Cc: | | |
| Bcc: | | |
| Subject: | RE: PVD June 25/26 | |

**Attachments:**

Noted.

**From:** Samantha Kirby Yoh
**Sent:** Wednesday, February 23, 2011 12:28 PM
**To:** Alex Chaykin; David Levy; SAMK
**Subject:** RE: PVD June 25/26

its the same flaky promoter that just fucked up the new york marketing and owes live nation money...

Samantha Kirby Yoh | WME
skirby@wmeentertainment.com
212.903.1149

**From:** Alex Chaykin
**Sent:** Wednesday, February 23, 2011 11:44 AM
**To:** David Levy; SAMK
**Subject:** FW: PVD June 25/26

See below re Meadowlands Festival in NY/NJ.

Is this 100% out?

Alex Chaykin | WME
achaykin@wmeentertainment.com
212.903.1598
212.632.1207 (f)

**From:** John Dimatteo [mailto:john@areaevent.com]
**Sent:** Saturday, February 19, 2011 2:16 PM
**To:** Alex Chaykin
**Cc:** Samantha Kirby Yoh; Peter Wiederlight
**Subject:** PVD June 25/26

Alex,

Do you think we sway PVD to play here instead of Europe to play for $80,000?

Let me know your thoughts.

Thanks,

WME000350

Exhibit 13

**Microsoft Outlook**

| | |
|---|---|
| **From:** | Jason Miller |
| **Sent:** | Wednesday, April 06, 2011 4:36 PM |
| **To:** | John Dimatteo; John D'Esposito |
| **Cc:** | Jesse Bellin |
| **Subject:** | RE: Asbury Park |

I think it is available still - John/Jesse?

Can you guys send John Dimatteo and I some expenses and the running hours etc?

How late can we go?

-----Original Message-----
From: John Dimatteo [mailto:john@areaevent.com]
Sent: Wednesday, April 06, 2011 4:16 PM
To: Jason Miller
Subject: Asbury Park

Hey Jason,

Is June 25th available at Asbury summer stage for Steve Angello and friends?

How would the deal work?

What are the running hours?

Let me know

Thank you,


--
John Dimatteo | Area Event
O +1.646.224.6964 | Fx+1.646.514.1497 john@areaevent.com  | AIM: jdimatteo http://www.areaevent.com |
http://www.facebook.com/areaevent

CONFIDENTIAL

LN0001039

Exhibit 14

## Microsoft Outlook

**From:** Jason Miller
**Sent:** Thursday, May 12, 2011 5:33 PM
**To:** loub516@aol.com; John D'Esposito
**Subject:** Asbury Park

Lou B;

I want you to meet John D

John D is the founder and creative genius behind the Bamboozle Festival. He found the Jonas Brothers, Demi Lovato, and a host of bands too long to mention

He is also the purveyor of EVERYTHING in Asbury Park, NJ – which includes the Stone Pony, the Stone Pony outdoor summer stage and Convention Hall

Last summer we did 2 nights of Tiesto with John Dimatteo which sold out Convention Hall and we had 7,800 paid over the two nights

We would like to do something this summer as well

Can you get John connected with Rob Fernandez and maybe the three of you – and myself as well – figure out if we have an opportunity that makes sense? We can make some cash


John D;

Meet my most trusted friend and partner in dance music in New York – Lou B.

Lou is a Long Island guy – but he works closely with Pacha and together they are the most focused force in dance in New York

If we want to put something together Lou and Rob are our guys.

I simply do not have Rob's email handy

Take it away Lou...

Jason Miller| Senior Vice President |New York
ph: 917.421.5160/ 917.421.5043 fx
e: JasonMiller@livenation.com



CONFIDENTIAL

LN0001048

Exhibit 15

# In The Matter Of:

*Juice Entertainment, LLC, et al v.*
*Live Nation Entertainment, Inc.*

---

*Al Dorso*
*July 16, 2013*

---

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

Received
JUL 26 2013

COPY

Min-U-Script® with Word Index

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - direct | Page 9 |
|---|---|

1   was recorded in any way?
2   A   I don't believe so.
3   Q   Did you take notes during the
4   meeting?
5   A   No.
6   Q   Do you know whether the other
7   people took notes?
8   A   I don't recall.  I assume, but I
9   don't recall that.
10  Q   What do you recall discussing
11  with them?
12  A   I think they asked me and my
13  lawyers what I thought transpired between the
14  parties, and I told them.
15  Q   Were there any other subjects
16  that you discussed?
17  A   No.
18  Q   Did they ask whether you would
19  sign a statement or anything of that nature?
20  A   No.
21  Q   Did you offer to do so?
22  A   No.
23  Q   Did you discuss whether you would
24  be a witness in this case?
25  A   I don't believe so.

| Dorso - direct | Page 10 |
|---|---|

1   Q   You told me that they asked you
2   what you thought happened in this matter and
3   that you told them?
4   A   Um-hum.
5   Q   What did you tell them?
6   A   Well, the boys at Juice had a
7   contract and they had set certain goals at
8   certain times, and they were way past those
9   goals and they were at the edge of not -- I
10  actually kept giving them the benefit of the
11  doubt.  They are young guys.  I thought that
12  they needed a break and they were trying hard,
13  so I kept extending the -- you know, they were
14  at the edge of those goals.
15      They weren't performing to the
16  contract.  So at one point I heard from Live
17  Nation -- actually, not from Live Nation, from
18  John D, who was producing Bamboozle there, and
19  we were providing some fencing, or supposed to
20  be providing some fencing and some other
21  equipment at the Bamboozle concert.
22      He said, why weren't we offered
23  this, this event?  And I said, to be honest, you
24  were, but you yawned.
25      These guys came along and, you

| Dorso - direct | Page 11 |
|---|---|

1   know, out of the blue, and I gave them a shot at
2   it.
3       So they said, well, we would like
4   to have a chance.  I said, they have a contract.
5   Why don't you talk to them?  They talked.  I
6   don't know what about.  I just know that they
7   talked.
8       The boys from Juice said they
9   couldn't come to any agreement, and Johnny D
10  said that they weren't going to agree to
11  anything, and he was a little irritated that,
12  you know, there was a concert that was going to
13  happen and he thought it should be his because
14  we had some sort of relationship, which was not
15  really a great relationship to begin with.
16      And, you know, honestly, I said
17  to the guys, I don't know why you don't take
18  what you get, I said, they are the 800 pound
19  gorilla in the room.  You should talk to them
20  and you should negotiate and make this thing
21  happen, because if they don't want it to happen,
22  it won't happen.
23      They said no, no, no, we have
24  contracts in place, we have everything in place.
25      Within a matter of months the

| Dorso - direct | Page 12 |
|---|---|

1   whole thing fell apart, and they were way
2   outside their contract agreement anyway, and in
3   my mind they couldn't put it together at that
4   time, so it didn't -- almost they couldn't get
5   it together from the time they started talking
6   to Live Nation.
7       My feeling was if they connected
8   with somebody like Live Nation they would be
9   able to put it together and get it done, because
10  I don't think they had the tools that were
11  necessary to get it done at that point.
12      So, I mean, that was basically
13  what I said.
14  Q   Do you recall saying anything
15  else to the lawyers for the plaintiffs at that
16  time?
17  A   No, no, I don't recall.
18  Q   Did the lawyers ask you follow-up
19  questions in response to what you told them?
20  A   Obviously I didn't remember what
21  they looked like, so I got to be honest, I'm
22  telling you now not what I told them, what I
23  think I told them, because that's what's in my
24  mind.  I repeated that story a number of times.
25      MR. SIEGAL: I want to state an

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - direct | Page 65 |
|---|---|

1  so it is under 10,000, a few dollars rental, 13,
2  $15,000, I would say.
3  Q  Does SFEN have a current business
4  relationship with Live Nation?
5  A  No.
6  Q  Does it wish to?
7  A  No.
8  Q  Who do you know at Live Nation?
9  A  Nobody, really.  I mean, you
10  know, I've met some of the guys, but don't know
11  them, no relationships with any of them.
12  Q  When SFEM was doing business with
13  Live Nation, who were the Live Nation folks that
14  you were doing business with?
15  A  Johnny D, you know, for
16  Bamboozle, and that was it.
17  Q  By John D, is that John
18  D'Esposito?
19  A  Right.  He's the only guy I knew,
20  the production guy, I don't remember his name.
21  Q  When is the last time that you
22  spoke with John D'Esposito?
23  A  Probably when I told him I wasn't
24  going to provide anything for his Bamboozle
25  concert in 2011, which may have been in May or

| Dorso - direct | Page 66 |
|---|---|

1  so -- no, the concert was in May.  So it might
2  have been in early April.
3  Q  Did you ever speak to anyone at
4  Live Nation concerning Mr. Barrett, Mr. Dorfman,
5  Juice Entertainment?
6  A  About this concert?
7  Q  By this concert you are pointing
8  to the contract, yes, yes.
9  A  When Johnny D came to talk about
10  equipment that they needed, he was -- I guess he
11  had found out through the grapevine that there
12  was a concert that was happening, and that may
13  have been in late March, I would say, maybe
14  early March, I don't recall, but that's usually
15  two months before the concert we would be
16  contacted, and the Bamboozle concert was usually
17  in the beginning to the middle of May.  I'm just
18  trying to put a time frame on it.
19      He had heard that there was a
20  concert going to happen at the fair, and might
21  have even asked to do it, which I told him two
22  years prior -- we asked him if he was interested
23  and he had no interest.
24      Now he was interested for what
25  reason?  I tried to reason with him, you know.

| Dorso - direct | Page 67 |
|---|---|

1  He was like -- seemed like he had the sandbox,
2  you know, and then didn't want to play in it
3  until other kids seemed to play in it.  That's
4  what it seemed like to me.
5      I tried to reason with him.  I
6  told him, you know, you didn't want it until
7  somebody else wanted it and then, you know.  So
8  that went on.  He was okay.  He says, well, you
9  know, I can produce this thing.  I would like to
10  talk to these guys.  These guys don't know what
11  they are doing, you know, we should get
12  together.
13      I said, yes, you should.  I
14  called, I don't know if it was Tom or Chris.  I
15  told them that they should contact Johnny D and
16  someone else with him too, I don't know who it
17  was.  I told him I would give him the phone
18  number, to contact them, if they have interest
19  you should listen.  They are real players.  They
20  know what they're doing.  They know how to do it
21  and they will do it right.  Maybe everybody
22  makes money.
23      I think they contacted them
24  within the week and I know they met, and I don't
25  know what happened from there.  All I know is

| Dorso - direct | Page 68 |
|---|---|

1  that Tom or Chris said they couldn't come to any
2  agreement, that they wanted to take what we had
3  in place and only give us a pittance.
4      I said, well, let's call it
5  negotiation.  They asked for everything and then
6  you ask for more, I said that's what you should
7  be doing with it.
8      No, we are not going to do that.
9  We are going to do it ourselves.  We don't need
10  them.  Okay.
11      I explained to them the 800 pound
12  gorilla theory, and then we went on.  That's it.
13  Q  So am I correct in understanding
14  your testimony to be that you had a conversation
15  with John D'Esposito in the context of
16  discussing your not providing --
17  A  No.  At that time we were talking
18  about providing equipment for the Bamboozle
19  concert.  That's why they were here, to go over
20  the equipment that they were using.  And the
21  conversation came up about this concert that was
22  going to happen at the fair.
23  Q  Okay.
24      This was in March of 2011?
25  A  I'm saying it would be about two

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

---

**Dorso - direct**                                            Page 73

1  Q   Going back to the conversation
2  that you recall having with Mr. Esposito and
3  possibly another production person from Live
4  Nation here in Belleville in March of 2011.
5      Did you take any notes of that
6  conversation?
7  A   No.
8  Q   Do you know whether anybody else
9  did?
10 A   No, I don't think so.
11 Q   Did you record that conversation?
12 A   No.
13 Q   Do you know whether anybody else
14 did?
15 A   Not to my knowledge.
16 Q   Did you discuss that conversation
17 with anybody?
18 A   Well, with Tommy or Chris, called
19 one of them to call Johnny D to see if they can
20 work with them.  That's about it.
21 Q   How soon after your conversation
22 with Mr. Esposito did you call Chris or Tommy?
23 A   Probably the next day, yeah,
24 probably the next day.
25 Q   Do you recall how long you spoke

---

**Dorso - direct**                                            Page 74

1  with Chris or Tommy concerning your conversation
2  with Mr. Esposito?
3  A   No, no.  Probably a couple of
4  occasions we discussed it.  You know, they were
5  asking for advice, you know, what should they do
6  and how should they do it.
7  Q   Let's go back to the first time
8  that you discussed your conversation with
9  Mr. D'Esposito or Mr. Dorfman or Mr. Barrett.
10 What did you tell them?
11 A   What did I tell?
12 Q   Mr. Dorfman or Mr. Barrett about
13 your conversation with Mr. D'Esposito?
14 A   I don't recall.
15 Q   Did you tell Mr. Dorfman or
16 Mr. Barrett that they should call
17 Mr. D'Esposito?
18 A   I believe I did.
19 Q   Do you recall anything else you
20 said to them?
21 A   Other than what I've already
22 testified to, that they should find a way to
23 work with them.
24 Q   Did you tell Mr. D'Esposito any
25 of the details of the contract between SFEM and

---

**Dorso - direct**                                            Page 75

1  Juice with respect to the event?
2  A   Yeah.  I told them that they had
3  to meet certain criteria and time lines that
4  they had to meet.  And the only way out of that
5  was to was them meeting their time lines, you
6  know, you have no contract after that.
7      I don't think I gave them
8  specific times or dates, but I told them there
9  was a performance based contract.
10 Q   Did you tell Mr. D'Esposito where
11 Juice stood relative to the deadline that was
12 contained in the contract?
13 A   I don't recall that.  I don't
14 believe -- I may have told them -- I may have
15 told them, you know, gave them a roundabout
16 time.  I wouldn't have known off the top of my
17 head probably what the actual date was.
18 Q   Do you know who Tiesto is?
19 T-i-e-s-t-o.
20 A   Yeah, that's the guy that they
21 said was the DJ.  He was the big name.  They
22 said -- that's one of the things they said to
23 me, they were -- they couldn't get it done.
24 They said that Live Nation blocked the Tiesto
25 deal, and they were scrambling for another

---

**Dorso - direct**                                            Page 76

1  entertainer -- name entertainer.
2  Q   Okay.
3      So who is the "they"?
4  A   Tom or Chris, one of the two.
5  Q   So Tom or Chris identified
6  somebody named Tiesto to you as being involved
7  in the event?
8  A   Yeah.  They told me that this
9  guy -- I had no clue who he was, to be honest.
10 They said that this big entertainer, he's two or
11 $400,000 to bring in, and they were friends
12 with, or one of their acquaintances was best
13 friends with his manager, and they had the yes
14 from the manager and they had an agreed upon
15 price, one of the things that they showed me.
16     I believe they said -- this is
17 coming from I don't know where.  They said they
18 were flying out to Las Vegas to get the contract
19 signed, and Tiesto refused to sign it.
20     They said that the manager of
21 Tiesto said they can't do it, Live Nation is
22 blocking it.  They said, we can't do whatever we
23 are supposed to do if I do this.
24     That was their story, you know.
25 So, okay, they tried to get, I guess, another

---

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - direct | Page 81 |
|---|---|

1 A  Yes.
2 Q  And that after you made that
3 suggestion, Barrett and/or Dorfman reported back
4 to you that an agreement could not be reached?
5 A  Yes.
6 Q  Correct?
7 A  Yes.
8 Q  Now what I'm trying to find out
9 is whether you had a subsequent discussion with
10 John D'Esposito after he was unable to reach a
11 deal with Dorfman and Barrett.  Do you
12 understand my question?
13 A  Yes, I do, and I honestly don't
14 recall whether I did or not.  And in my best
15 recollection, I think it was John who told me
16 about Tiesto not being able to do it because of
17 contractual obligations in New York.
18    That's in the back of my head,
19 and I don't know who told me that.  And I know
20 that, as I said before, that Tom or Chris told
21 me that they blocked Tiesto.  And that's one of
22 the things, you know, that was a big act and
23 that's what they were banking on.  You know, in
24 their minds they had been screwed out of this
25 act.  That was their cornerstone of the concert.

| Dorso - direct | Page 82 |
|---|---|

1 Q  So I would like your best -- see,
2 I want to know from you everything that you
3 remember John D'Esposito saying to you about the
4 Juice event, about anybody from Juice, Dorfman,
5 Barrett, Sandberg, the event for 2011.
6 A  Unfortunately, I don't have that
7 kind of a recollection.  You are talking about
8 three plus years ago.  I just don't have it.
9 Q  And so I understand you, you
10 recall the March meeting that you had in person
11 here.
12 A  I do.
13 Q  In Belleville?
14 A  Yes.
15 Q  And you don't recall any other
16 discussions that you had with Mr. D'Esposito?
17 A  I honestly don't.  They may have
18 been phone.  They may have been in person.  I
19 honestly don't know after that.
20 Q  Okay.  Have you told me your best
21 recollection as to whether Mr. D'Esposito told
22 you that Live Nation blocked Tiesto from
23 performing at the 2011 New Jersey State Fair
24 event?
25 A  Say that again.

| Dorso - direct | Page 83 |
|---|---|

1 Q  Yes, okay.  I apologize.  I will
2 say it in a different way.
3    Did John D'Esposito tell you that
4 Live Nation had blocked Tiesto from performing
5 at the 2011 New Jersey State Fair?
6 A  Not to my recollection.
7 Q  Did anybody else from Live Nation
8 tell you that?
9 A  No.
10 Q  Did Mr. D'Esposito tell you that
11 Live Nation had blocked any other artist from
12 appearing at the 2011 New Jersey State Fair?
13 A  Not to my recollection.
14 Q  Did anybody from -- anybody else
15 from Live Nation ever tell you that?
16 A  No.
17 Q  Did anybody from Live Nation ever
18 tell you -- strike that.
19    Are you familiar with the William
20 Morris talent agency?
21 A  I am.
22 Q  What is William Morris?
23 A  A big talent agency out in
24 California, and that's all I can tell you.  They
25 book acts.  They manage acts.  That's all I

| Dorso - direct | Page 84 |
|---|---|

1 know.
2 Q  Did anybody from Live Nation ever
3 tell you that the William Morris agency belonged
4 exclusively to Live Nation?
5 A  I don't recall that.
6 Q  Did anybody from Live Nation ever
7 tell you that no William Morris artists would be
8 allowed to play at the New Jersey State Fair?
9 A  I don't recall that.
10 Q  Did anybody ever -- strike that.
11 I'll start the question again.
12    Did anybody from Live Nation ever
13 tell you that Juice Entertainment, Mr. Barrett,
14 Mr. Dorfman, Mr. Sandberg, that they associated
15 with thieves?
16 A  I don't recall.  You know,
17 somebody told me about -- it may have been
18 John -- about some production that Chris or Tom
19 was involved with in the winter, didn't pay
20 their bills.  I don't remember where that came
21 from.  I think it came from John.
22 Q  And by John, you mean John D?
23 A  John D, yeah.
24 Q  And do you think that was during
25 the March meeting that you had here in

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - cross | Page 97 |
|---|---|

1  of electric dance?
2  A   Yes.
3  Q   Do you think you would have been
4  within your contractual rights to terminate the
5  contract --
6      MR. MARX: Object to the form of
7  the question.
8      MR. SIEGAL: I wasn't finished.
9  Q   -- terminate the contract based
10  on your appraisal of whether it was a family
11  friendly event?
12      MR. MARX: Yes, same objection.
13  A   Yes, based on discussions with
14  whether they are in here or not.
15  Q   Okay.
16  A   The contract -- and again, I'm at
17  a disadvantage because it's three years ago, I
18  didn't read the entire thing --
19  Q   Sure.
20  A   If they can't control and produce
21  an event, not to say that there were other
22  contracts, it says in here they were going to
23  produce other genres of music, which could be
24  rock and other things which they spoke about,
25  you know, this is their initial concept that

| Dorso - cross | Page 98 |
|---|---|

1  they were going to produce and then it was going
2  on.
3      If all went well, we were going
4  to move on to other weekend events.
5  Q   Right.
6  A   If this did not go well, was not
7  handled properly and managed properly, then I
8  believe -- I have to look at the wording in
9  here, that's probably what happened, the
10  contract would go back and forth -- the next
11  thing you know you're signing a contract that is
12  a totally different thing.
13      I don't know that happened, I'm
14  not sure, but we, by contract, actually have to,
15  when we allow anything that comes in there, has
16  to say, at the discretion of the Sports and
17  Exposition Authority.
18      If it doesn't say that here, it
19  means that it was omitted, or we failed to put
20  it in initially, which is my mistake.
21  Q   I'm not trying to be sneaky.
22  A   No, I know that.
23  Q   It does say it on page two. "All
24  acts are subject to the approval of the State
25  Fair."

| Dorso - cross | Page 99 |
|---|---|

1  A   Okay.
2  Q   I'm not trying to hide the ball
3  there.
4  A   Okay.
5  Q   My question is really would you
6  have terminated the contract, the entire
7  contract if you felt there was something
8  unpalatable about the electric dance, or would
9  you simply have said let's try to find other
10  acts?
11  A   Right, that would be, obviously,
12  if it was successful and they did as they said
13  and it was a good production, but it was
14  uncontrollable, then you move on to other acts.
15      Are you guys willing to do this
16  or not?  That's where you go with it.
17  Q   In that connection, going back to
18  the prior year, I think your testimony was that
19  Tom and Chris actually did perform the Latin
20  dance event as they represented they would.  In
21  other words, acts that they said would appear
22  did appear, correct?
23  A   Yes.
24  Q   And you also testified that the
25  revenue and attendance figures were less than

| Dorso - cross | Page 100 |
|---|---|

1  projected.
2  A   Yes.
3  Q   Correct me if I'm wrong, but my
4  characterization of what you were testifying is
5  that it was an unusually hot day, you think
6  attendance was suppressed because of how hot it
7  was?
8  A   I think the daytime attendance
9  was definitely suppressed.  The nighttime
10  attendance which should have picked up, didn't
11  pick up to their expectations, obviously, or
12  mine.
13      But they still managed it well.
14  They did everything they said they were going to
15  do.  They were honorable through the whole
16  thing.  They tried very hard.  That's why I gave
17  them another chance the next year.
18  Q   Okay.
19      Now, in the discussions leading
20  up to giving them a contract in 2011, do you
21  ever recall any discussion about the fact that
22  electronic dance could pose problems because of
23  the kinds of crowds that it might attract?
24  A   I think there are always
25  questions -- you're not familiar, you know, with

Case 2:11-cv-07318-CCC-CLW    Document 75-3    Filed 12/19/16    Page 79 of 99 PageID: 924

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - cross | Page 109 |
|---|---|

 1  refresh his recollection as to the conversation.
 2      MR. MARX: No one is admitting
 3  anything in evidence today. We are just going
 4  to identify it for the record, what's being
 5  shown. Whether it's a thermos or a piece of
 6  paper or a napkin, whatever it is, we ought to
 7  memorialize it by putting a sticker on it so we
 8  know what it is.
 9      MR. SIEGAL: I don't have any
10  objection to that.
11      (Exhibit marked for
12  identification Dorso-6, Two-sided transcript
13  page.)
14  Q  Mr. Dorso, this page of the
15  transcript has been marked Dorso-6. If you will
16  look just about above the mid point of the page,
17  you say -- you can read that.
18  A  "You know how Live Nation works.
19  They are all over this event. They are telling
20  Tiesto, you play that event --" I don't know
21  what that says.
22  Q  Then your voice trails off, or
23  transcript stops?
24  A  Stops, right.
25  Q  Okay.

| Dorso - cross | Page 110 |
|---|---|

 1      Do you recall saying something to
 2  that effect?
 3  A  No.
 4  Q  Do you have any reason to believe
 5  that this is inaccurate?
 6  A  Could be accurate.
 7      MR. SIEGAL: Mark that one.
 8      (Exhibit marked for
 9  identification Dorso-7, Two-sided transcript
10  page.)
11  Q  I'm going to show you what has
12  been marked as Exhibit 7. I represent that that
13  is a further transcript from the same meeting
14  that you had on March 7, 2011.
15      (Exhibit handed to the witness.)
16  Q  If you will just look at the
17  bottom of the page here, you are having an
18  exchange with Mr. Dorfman and Mr. Barrett. If
19  you could read from that line right there and
20  say who the speaker is?
21  A  Where I start? "Do you have
22  other talent that you can be successful?"
23  Q  Yes.
24  A  So I say -- Dorso says: "Do you
25  have enough talent that you can be successful?"

| Dorso - cross | Page 111 |
|---|---|

 1      "Dorfman: Oh, I can be
 2  successful, but Live Nation doesn't.
 3      "Sandberg: I know more about
 4  this house market than Jason Miller does."
 5      Dorfman says: "There was one
 6  agency that they were probably interfering
 7  holding up the town --" it's probably talent.
 8      The other one, Miller said that
 9  who do you -- Miller said that, "Who do you
10  use?"
11      "Barrett: William Morris.
12      "Dorso: William Morris. That's
13  the one who's interfering with.
14      "Right."
15  Q  Does that reflect your
16  recollection as to being told by Jason Miller
17  that they were interfering with William Morris?
18  A  I have no recollection of it, to
19  be honest.
20  Q  When you met with Mr. D'Esposito,
21  do you recall if Mr. Miller was also present at
22  that meeting?
23  A  That must have been the other
24  person. Is that Jason Miller?
25  Q  Jason Miller.

| Dorso - cross | Page 112 |
|---|---|

 1  A  He may have been there. Again, I
 2  couldn't -- if I saw him on the street I
 3  wouldn't know him.
 4  Q  As you sit here today, you don't
 5  have any recollection specifically of Miller
 6  saying anything about William Morris, but you
 7  have no reason to believe that this is
 8  inaccurate?
 9  A  To be honest with you, no.
10  Q  This is at least what you told my
11  clients in March of 2011 as reflected by the
12  transcript.
13  A  Okay.
14  Q  And you have no reason to suspect
15  that we fabricated this or you didn't say that
16  to my clients?
17  A  No. I mean, okay, whatever.
18      (Exhibit marked for
19  identification Dorso-8, Two-sided transcript
20  page.)
21  Q  I'm going to show you what has
22  been marked as Dorso Exhibit Number 8. This is
23  further conversation from the same meeting. If
24  you will just start at the top of the page here
25  and read down to Dorfman here.

Juice Entertainment, LLC, et al v.
Live Nation Entertainment, Inc.

| Dorso - cross | Page 113 |
|---|---|

1  A  Dorso says: "So when I --
2  because here's the, you know that the same
3  thing's going on over at the Sports Authority.
4  Live Nation is bad mouthing the whole event and
5  you guys to the powers that be over there.  So
6  they are telling me to protect your ass, which
7  means protect your ass.
8      "Al:  That's what they are
9  saying.
10      "Dorfman:  I know."
11  Q  Now, Mr. Marx asked you if you
12  had any recollection of -- I'm not exactly sure
13  how he phrased the question, whether you had any
14  recollection of being told by the Sports
15  Authority that Live Nation was making
16  disparaging comments about the event or about my
17  clients.
18  A  I got to be honest, I don't
19  remember any of that.
20  Q  This appears to indicate that
21  somebody at the Sports Authority was telling you
22  they were hearing about this from Live Nation.
23  A  Right.
24  Q  Is that a fair paraphrase?
25  A  Yeah, that's what it appears to

| Dorso - cross | Page 114 |
|---|---|

1  be.
2  Q  Right.
3  A  And it could have been, honestly,
4  a lower level, I can't even imagine, could even
5  have been stadium, not Sports Authority.  You
6  know, at that time it was MetLife Stadium.
7  Q  What you say is, "Live Nation is
8  bad mouthing the whole event and you guys to the
9  power that be over there."
10  A  Right.
11  Q  That sounds like they were saying
12  some pretty negative things to not low level
13  people.  Is that fair?
14  A  That's what it says.  If I'm
15  telling them, it must be what I hear.
16      (Exhibit marked for
17  identification Dorso-9, Two-sided transcript
18  page.)
19  Q  I'm going to show you what has
20  been marked Dorso-9.
21  A  Can I ask when this conversation
22  took place?
23  Q  I'm going to represent that was
24  March 7, 2011.
25  A  The same day we signed the

| Dorso - cross | Page 115 |
|---|---|

1  contract?
2  Q  I believe so, or the same day the
3  contract is dated.  I don't know when you
4  actually signed it.
5      (Exhibit handed to the witness.)
6  Q  Here's an exchange between you
7  and Chris Barrett.  If you will just read
8  starting from there, Chris Barrett.
9  A  Barrett says: "Who is helping us
10  this year?  Everybody from Creamfields and
11  England has opened up a small door for us to
12  book talent, kind of underneath what Live Nation
13  has done.  As you know, Live Nation blocked
14  Tiesto and several other artists as you told
15  us."
16      Then I say, "Told you it was
17  going to happen."
18  Q  Okay.
19  A  So that has to be --
20  Q  Let me ask a question.
21  A  The timeline --
22  Q  Does this refresh your
23  recollection as to whether you were ever told by
24  anyone at Live Nation that they had the
25  abilities or power or intention to prevent

| Dorso - cross | Page 116 |
|---|---|

1  Tiesto from appearing?
2  A  Let me tell you how -- you know,
3  a lot of the conversation could be motivational.
4  The assumption of what Live Nation does, you
5  know, I've used the term 800 pound gorilla,
6  there is an assumption and there is obvious
7  proof of things that they do in the market.
8      You know, they control radio
9  stations.  They control events.  They have seven
10  markets in concert venues in our area.  They
11  want to have that lock.  They don't want anybody
12  else in that business.  It's well known.
13      What they do is just an
14  assumption.  I always say, you can only assume.
15  That's probably an assumption on my part that
16  what I think as a fairly seasoned business guy,
17  you know, I would know not to mess with the big
18  guy.
19      You know, but young guys, they
20  are all full of piss and vinegar.  They are
21  going to show them.  That's what I think I was
22  trying to get to them.
23      Again, I have no recollection of
24  it, but it sounds like me.  It sounds like
25  motivational stuff, saying, I know, listen,

Exhibit 16

**Speakers:** Al Dorso, Al Dorso Jr. Chris Barrett, John Sandberg, Thomas Dorfman, Alex Sveskia(M. on speakerphone)

**Location:** State Fair Event Management Headquarters 229 Main Street, Belleville, NJ 07109


### Meeting State Fair 2011 03 07


DORSO:     All right boys, what the hell are you doing?

DORFMAN:  Getting organized like you said, come prepared.

DORSO:     Good.  Did you guys get coffee?

DORFMAN:  Yeah, I had some.

DORSO:     That's no good for you.

DORFMAN:  How did it go with the sports event?

DORSO:     You can't really leave all kinds of shit just laying around.

DORFMAN:  An important investor, John Sandberg is with him, and he's

    going to sit in today.

DORSO:     What's his name?

BARRETT:  John Sandberg.  He's going t come a little bit later and he

    also has -- he's got some major contracts for us this morning,

    for three major headlining acts.

DORSO:     So he was just in the process of getting that?

BARRETT:  He's in the process of getting those printed and over here.

DORFMAN:  This first order of business here.  This is our original.

    I'm going to ask you to look at your copy.  Hey what's up John?

Yeah, there's an army training service here, next to us.  Yeah, right next door to that.  Actually walk straight, just walk straight.

DORSO:    The tunnel's in the back.  See assistant branch manager.

DORFMAN:  I was your senior assistant?  You've got to walk straight down.

BARRETT:  What kind of elements do you pick?  Who was that?

DORFMAN:  That's Vito (inaudible) company.  It can show funds up to two hundred.  They're huge since '67.

DORSO:    That's $467,000.

SANDBERG: John Sandberg.

DORSO:    How are you?  Nice to meet you.  This guy owed money to that guy um…

DORFMAN:  Jason Miller?

BARRETT:  The situation --

DORSO:    Did you talk to Jason?

BARRETT:  We went and we met with Jason.

DORSO:    Because I told him, I said don't owe any money on John D.?  Do you know John D.?

DORFMAN:  Yeah, we met John D.

DORSO:    But I said guys, the best thing for you to do is go talk to them.  If you want to be involved, it's a way to be involved, go see them.

DORFMAN:  So with Jason Miller (inaudible) bottom of that was they do events with them right now, in north shore.  They do Live Nation

events with them.  They do (inaudible) Axwell (inaudible) there's two other ones.

BARRETT:  There's two other ones.

DORFMAN:  For the next two months.  April 23rd and when you told me that Live Nation has said those guys robbed the money, this, that, this, this, this, this, that, I confronted them (inaudible) the situation.  Obviously to protect ourselves (overlapping dialogue; inaudible) side partner (inaudible) they said no.  At first they said they (inaudible) Vito Bruno didn't have any money.

DORSO:   Well the reason they said that I guess, is because well then, you see that's John D. talking.  The other guy (inaudible) he said we did a project, they lost $50,000 or lost $100,000, I was out $50,000 that they promised me because it didn't make any money (inaudible) another concert, where was it, Asbury park.

DORFMAN:  They made money there, where it comes down to would be basically just making up a lie about the money situation, because I listened to it on a three-way conversation.  That's almost the work that he does every day, he wouldn't say that.  I said well that's trying to get in on our real estate, our deal you know, that's what it is and I don't know why.  And he goes, the only concert was New Years Eve, we did a party, and there's a third party company called New Years Eve.com, that owes Live Nation and Area events money.

everything.  That's Jerry Blair.  He is a company that we are the

primary -- our primary label present that as well.

DORSO:    Jethro Tull, where's he?

BARRETT:  I think he's dead.

DORSO:    Jethro Tull's dead?

DORFMAN:  I think so.

(overlapping dialogue).

DORFMAN:  And Area Event -- that's John Dimatteo

DORSO:    And what's John doing for you?

DORFMAN:  He's doing talent booking.  He's partners with Vito.

DORSO:    I don't hear a lot of good stuff about John.

DORFMAN:  No?

DORSO:    No.  Do you know him?

BARRETT:  I've known John for about seven to ten years.  Did business

    with him on and off.

DORSO:    We've got two people in high places saying watch out for

    John.

DORFMAN:  That's not cool.

DORSO:    So I'm telling you, watch out for John.

DORFMAN:  All right.

DORSO:    All right?  Very well informed people.  I didn't question

    why.  OK, what else you got?

DORFMAN:  This company, this is primarily, that we're working with

    right now.  The company is co-produced –

BARRETT:  No we don't have Tiesto.  That's just an email

    correspondence.  Tiesto is on the offer sheet.

DORSO:    This guy thinks Tiesto is going to close down the show.

DORFMAN:  No, if you see the correspondence, he corrects it and says

    that was just left on the sheet accidentally.  That's that.

    There are also -- our partner is actually in

SANDBERG: Las Vegas.

DORFMAN:  Las Vegas with Tiesto.

DORSO:    You know how Live Nation works.  They're all over this

    event.  They're telling Tiesto, you play that event --

    (overlapping)

SANDBERG: We know that they're blocking talent.  We know that they're

    doing something because (inaudible) four of the biggest artists

    in a week (inaudible) so I know (inaudible) you have money to

    show and you have proof of funds to show (inaudible).

BARRETT:  Live Nation is blocking talent (inaudible).  Live Nation is

    trying to interfere on all levels.

DORSO:    The deal is, if you can prove that, you can make more money

    in a lawsuit than you can in this venue.  I would be doing both.

    Of course, I don't know where you'd go from there, you know if

    you ever go anywhere in the business, because Live Nation is the

    800-pound gorilla (inaudible).

    (overlapping dialogue)

DORSO:    So when I -- because here's the -- you know that the same

     thing is going on over at the sports authority.

DORFMAN:  Live Nation.

DORSO:    Live Nation's badmouthing the whole event and you guys to

     the powers that be over there.  So they're telling me you know,

     protect your ass, which means protect our ass Al that's what

     they're saying.

DORFMAN:  I know.

DORSO:    So on the production end if I say these guys, they'll know

     who they are.

     (overlapping dialogue)

DORFMAN:  Vito Bruno's one, he's done Beatstock for 15 years.  There's

     production companies that we can bring in.  I can bring in ten

     different production companies at least.

(overlapping dialogue)

SANDBERG: I really had to go out and make phone calls.  You know I

     mean, that's not going to need Live Nation.

DORFMAN:  And production.  We feel comfortable.

DORSO:    Just make sure that we do it right, because you do

     understand that if we do it wrong.

DORFMAN:  Yes.

DORSO:    And they'll say, we're not going to have you guys, you can't

     do that anymore.

DORFMAN:  Yes, understood.  We're going to do our best.

DORFMAN:   That's the one he's interfering with is William Morris, he

        told us that, you know, he's interfering with our talent at

        William Morris.

DORSO:      But he said that that's his agency.  He says, we use that

        agency **EXCLUSIVE**   (inaudible) nobody's getting nothing.

DORFMAN:   But this is the thing.

SANDBERG: That's not true.

DORFMAN:   No, that's not true (inaudible) contract.

        (overlapping dialogue) what they did do is they (inaudible).

        We're working on seven different projects and working on the

        electronic dance at the same time, and we're working on four or

        five things already on the table.  So, one thing they did was

        they delayed the talent where no one can get it at the

        Meadowlands this year, because it ended up going to electric

        daisy carnival, which we could have the work done or we could

        work (inaudible).  So then that moved to L.A., so who's got it

        locked up?  It's a Sunday gig, they took this.  (inaudible) We

        will be able to stage a successful show (inaudible) Live Nation

        will not help us this year in bringing one more person to --

SANDBERG: They're not willing to put -- they're not --

DORFMAN:   Because you want in on this.  We worked towards the thing,

        you have to fund it.  Supposedly, they would fund it.  But this,

        the one partner sent an email out last night (inaudible) to Jason

        Miller.  And it was supposed to state just on the electronic

        dance agreement, that it would be a third, a third, a third but

THE AUDIO TRANSCRIPTION CENTER    A DIVISION OF THE SKILL BUREAU

129 Tremont Street
Boston, MA  02108
Tel:  617-423-2151
Fax: 617-423-9183

## CERTIFICATE

I, Patrick Emond, do hereby certify that the following 88 pages embody a true and accurate transcript.  Prepared in the Audio Transcription Center to the best of our abilities, it comprises the contents of the relevant portion of a digital audio file provided to us by our client, Juice Entertainment.  The digital audio file contained a meeting between Al Dorso, Al Dorso Jr. Chris Barrett, John Sandberg, Thomas Dorfman, Alex Sveskia held on March 7, 2011.

_1/27/2014_
Date

_P. E._
Patrick Emond, Operations Manager
Audio Transcription Center

Exhibit 17



229 Main Street    Belleville, NJ 07109
Phone (973) 450-1070 Fax (973) 751-7397

**Engagement Letter**

December 1, 2010

Dear Chris and Tom,

Whereas State Fair Event Management, a New Jersey Corporation, conducts an event known as State Fair at The New Meadowlands Fairgrounds, East Rutherford New Jersey, by reason of an exclusive contract with the New Jersey Sports and Exposition Authority.

State Fair Event Management grants Deluna Inc. the right to broker, stage and promote concert events in the designated special event area of the fair, held yearly between mid June and Mid July, (The 2011 Fair dates are June 23 thru July 10). Additionally State Fair Event Management grants Deluna Inc. the exclusive right to broker stage and promote an electric dance event to include DJ and live act performances with musical genre to include house, techno, trance, and any sub genre of electric dance.

The terms and conditions of this agreement will be set forth in a formal contract at a later date as more information is forthcoming. It is our intention to enter into a multiyear non-conflicting, performance-based agreement beginning in June 2011 through July 2014 with an additional five year option.

Yours Truly,

Al Dorso President

State Fair Event Management

JUICE0002202

Exhibit 18

| | |
|---|---|
| **From:** | John Oliver <JOliver@RRMARKETING.COM> |
| **To:** | <td627@yahoo.com via 68.180.158.203>;<Mon>;<16 May 2011 11:18:25 -0700>;td627@yahoo.com <td627@yahoo.com> |
| **CC:** | Dean Cambria <Dean.Cambria@RRMARKETING.COM> |
| **Sent:** | 5/16/2011 6:18:29 PM |
| **Subject:** | NJ Rocks - Best Promoter nominee! |
| **Attachments:** | NJ Rocks Welcome Letter.pdf |

Tommy,

Hope all is well and you guys are blowing it out with some great parties at Dragonfly. I recently started working with The Star-Ledger and Steppin Out magazine on a new concept called NJ Rocks, which is an awards competition/party that will be honoring the best in New Jersey nightlife. For the past 3 weeks we were taking nominees from readers of Steppin Out and Star-Ledger for each of the categories in NJ Rocks. I am happy to announce that for the category of Best Promoter ... you were nominated!

The guys at Dragonfly were also nominated for Best Outdoor Bar and Best Male Bartender (Zach Wehner at Dragonfly). The voting period for each of the categories runs now through June 5 and all voting can be placed at www.njrocksnightlife.com

I would like to encourage you to get your fans and followers to vote for you and for Dragonfly ... you can vote as often as you would like, there are no restrictions on the number of times you can vote.

Please let the guys at Dragonfly know that there are promotional materials available to advertise NJ Rocks in their club and get their consumers voting. We have posters, staff t-shirts, table tents and we also have a promo party available if they take in 6 bottles of Eristoff Vodka, the official sponsor of NJ Rocks. At the promo activation, girls will come and collect votes for Dragonfly (and of course for Best Promoter as well) and hopefully help them to win the categories they were nominated for. If they are intersested in any of these promo materials, please have them contact our salesreps, Dean Cambria and he will deliver to them.

I am attaching a welcome/congratulatory letter that briefly explains what NJ Rocks is all about. And I would like to invite you to come to The First Annual NJ Rocks Awards Party at 4Sixty6 on June 21. All of the winners will be announced at the awards party. Good luck!!!

John Oliver
Director of Marketing
R&R Marketing / The Charmer Sunbelt Group
973-461-2362

Exhibit 19

**Christopher Barrett, Managing Partner**

Schooled in Business as well as music production from esteemed Baruch College and SAE (School of Audio Engineering) in New York, **Christopher Barrett** has been a professional DJ since 1998. Born in 1983 on Staten Island, New York, Chris has worked hard to realize his dream of becoming a successful DJ and Entrepreneur. Chris has played alongside the world's best and most accomplished DJs, including Victor Calderone, Junior Vasquez, Paul Oakenfold, Erick Morillo, and Jonathan Peters, to name a few. Already, Barrett has been featured in **DJ TIMES MAGAZINE** and on **CLUBPLANET.COM**. In 2006 Chris opened a wholesale car dealership services servicing local customers and businesses with vehicle needs. Currently, Chris maintains a full time position at FRS representing clients such as Kellogg, United Way as well as Major Health Systems including Oakwood Healthcare and The Pocono Health system to name a few. Chris continues to pursue his dreams as a DJ/Entrepreneur as a Managing partner of the Meadowlands Music Festivals.

**Thomas Dorfman, Managing Partner**

Since 1997 Tom has been a key player and top event producer in the "Nitelife Industry." Tom has coordinated events at many of New York, New Jersey and Miami's major Dance Clubs and Concert Venues. Major events he produced included world top artists such as Tommy Lee, Snoop Dog, Kid Cudi, Paris Hilton, Jonathan Peters and L.M.F.A.O to name a few. Tom has been featured for his "Nitelife" expertise in major publications such as **Club Systems Magazine**, **Live Design and Mix Magazine.**

JUICE0001279

Exhibit 20

**Tommy D Event History**

| Venue* | Event Type | Date/Timeframe | Attendance(est) |
|---|---|---|---|
| Kokomos | Weekly-Wed | June 97-Oct 97 | 1500 |
| Drama | Weekly-Thurs | Dec 97-Sept 02 | 800 avg |
| Drama | Weekly- Fri | 2001-2002 | 800 avg |
| Drama | Danny Tenaglia | appearance 1999 | 1300 |
| Drama | Denny Tsettos | 1998 1999 | 1400 |
| Soundfactory-Jonathan Peters | Weekly- Sat | 1999-2001 | 2500 avg |
| Bermuda Club | Weekly- Sat | May 00- Sept 00 | 1500 avg |
| Abyss | Weekly- Fri | Sept 00-May 01 | 1250 avg |
| Surf Club | Weekly- Sun* | May 02- Sep02 | 2000 avg |
| South Park | Weekly- Thurs* | May 02- Nov 03 | 1000 avg |
| South Park | Weekly- Sat* | Sept 02-June 04 | 1000 avg |
| South Park | Tommy Lee | May 20,2004 | 1200 |
| Djais | Weekly Fri,Sat,Sun* | May 02- Sep05 | 3000+ |
| Studio 9 | Weekly Sat | Dec 04-June 06 | 1500 avg |
| Studio 9 | Viva La Bam | Feb 18,2005 | 1500 |
| Studio 9 | Jonathan Peters | July 14,2005 | 1200 |
| Studio 9 | Jonathan Peters | October 1,2005 | 2000 |
| Studio 9 | Cascada | Jan 26,2006 | 1750 |
| Studio 9-Hex Hector | Classics by Creators | Feb 18,2006 | 1700 |
| Studio 9 | Djais Party | | 3000 |
| Abyss | Tiesto | Dec,8 2006 | 2000+ |
| Nikki Beach | Jonathan Peters | March25,2006 | 4000 |
| Roseland Ballroom | Jonathan Peters | 12/31/05 | 3400 |
| Sandbar | Weekly- Fri*** | March 06-Sept06 | 2000 avg |
| Sandbar | Dj Boris | may5,2006 | 3000 |
| Sandbar | DJ AM | Jul3,2006 | 3000 |
| Surf Club | Weekly- Sun* | May 06-Sept 08 | 2500 avg |
| Surf Club | Victor Calderone | July30,2006 | 3500 |
| Surf Club | Jonathan Peters | June11,2006 | 2500 |
| Surf Club | Jonathan Peters | June10,2007 | |
| Surf Club | Serge Devant | July,8.2007 | |
| Surf Club | Mind Control | May 4,2008 | 2700+ |
| Surf Club | Tom Stephan | July13,2008 | |
| Surf Club | Ferry Corsten | July20,2008 | |
| Surf Club | Boris | July 27,2008 | |
| Surf Club | Mind Control | August3,2008 | |
| Surf Club | The Martinez Brother | August10,2008 | |
| Surf Club | Chus & Ceballos | August31,2008 | 3000+ |
| Sandbar | Weekly- Fri* | May 08-Sep 09 | 2000 avg |
| Sandbar-Gym Class Heroes | Travis McCoy | July20,2008 | |
| Sandbar | Ceballos | June20,2008 | |
| Sandbar | LMFAO | August8,2008 | |
| Karma-Jersey Shore | Weekly Sat* | Summer 2010 | 2200 avg |
| 4Sixty6 | Weekly Sat | Sept,10-March11 | 700 avg |
| 4Sixty6 | The Situation | | 1000 |
| 4Sixty6 | Jonathan Peters | 12/31/10 | 1700 |

JUICE0004234

## Bliss Ownership/Production History

| Weekly Parties | Type | Date | Attendance |
|---|---|---|---|
| Latin Wednesdays | Latin crowd Dj/Live E | 2/28/07 | 700 avg |
| College Thursdays | Mixed Dj/Live Ent | 1/11/07 | 700 avg |
| Bliss Fridays | Electronic Dance | 12/29/07 | 700 avg |
| Bliss Saturdays | Mixed Dj/Live Ent | 12/30/07-9/12/09 | 700 avg |
| Latin Saturdays | Latin crowd Dj/Live E | 9/12/09 | 800 avg |
| Sundays | Special Events | Mixed | varied |

## Premium Talent Bookings at Bliss

| Artist | Market | 1/2/04 | Attendance |
|---|---|---|---|
| Benji Madden(Good Charlotte) | A List Celeb | 2/8/07 | |
| Jonathan Peters | Electronic Dance | 2/9/07 | 1250 |
| Serge Devant | Electronic Dance | 3/30/07 | 1000 |
| Travis McCoy(Gym Class Heroe: | Mainstream Pop | 4/26/07 | |
| Robert Iler (AJ Soprano) | A List Celeb | 5/4/07 | |
| Jonathan Peters | Electronic Dance | 5/11/07 | 1200 |
| Serge Devant | Electronic Dance | 5/18/07 | |
| Dubfire | Electronic Dance | 6/22/07 | |
| Nick Cannon | B list Celeb | 7/12/07 | 1000 |
| Sean Kingston | Mainstream Pop | 7/19/07 | 1400 |
| Cascada | Mainstream Pop | 8/16/07 | 1300 |
| Tommy Lee | Electronic Dance | 9/14/07 | 1200 |
| DHT | Mainstream Pop | 9/27/07 | |
| Deborah Cox | Mainstream Pop | 10/12/07 | |
| Kat Deluna | Mainstream Pop | 10/18/07 | |
| Jonathan Peters (Pacha Road) | Electronic Dance | 11/9/07 | 1000 |
| Gary Pine | Live Performance | 11/10/07 | |
| Brody Jenner | Celeb | 11/29/07 | 1100 |
| Sharam | Electronic Dance | 12/7/07 | |
| Jonathan Peters (Pacha Road) | Electronic Dance | 2/8/08 | 800 |
| Toby Love | Latin | 6/9/08 | 1100 |
| Richie Santanna | Electronic Dance | 6/26/08 | |
| Enferno (Madonna) | DJ A LIST | 10/4/08 | |
| Chris Willis | Electronic Dance | 9/27/08 | |
| Oscar G | Electronic Dance | 10/10/08 | 1100 |
| Jonathan Peters | Electronic Dance | 10/12/08 | 700 |
| Robbie Rivera | Electronic Dance | 11/21/08 | 1000 |
| La India | Latin | 12/10/08 | |
| Tommy Lee | Electronic Dance | 11/28/08 | 1000 |
| Judy Torres | Freestyle Legend | 12/13/08 | |
| Oscar G | Electronic Dance | 1/16/09 | |
| Chus & Ceballos | Electronic Dance | 1/18/09 | 900 |
| DJ Riz | Mash up DJ | 1/24/09 | |
| Kid Cudi | Hip Hop A list | 1/29/07 | 1200 |
| Samantha Ronson | A List Celeb DJ | 2/7/09 | 1100 |

JUICE0004235

| LMFAO | Mainstream Pop | 2/13/09 | |
| Paris Hilton | A List Celeb | 3/27/09 | 1000 |
| Danny Tenaglia | Electronic Dance | 4/24/09 | 800 |
| Samantha Ronson | A List Celeb DJ | 4/25/09 | 800 |
| Oscar G | Electronic Dance | 5/1/09 | |
| TKA | Freestyle Legend | 5/2/09 | 900 |
| Robbie Rivera | Electronic Dance | 5/8/09 | |
| Serani | Latin | 9/16/09 | |
| Serani | Mainstream Pop | 11/5/09 | |
| Fabolous | Mainstream Pop | 11/12/09 | 1400 |
| En Vivo | Latin | 11/18/09 | |
| Kelly Rowland | Mainstream Pop | 12/4/09 | |
| Oscar G | Electronic Dance | 12/11/09 | |
| Oscar G | Electronic Dance | 1/29/10 | |
| Angelina | Jersey Shore cast | 2/4/10 | |
| Frank Reyes | Latin | 2/27/10 | |
| Mind Control | Electronic Dance | 2/19/10 | |
| Maino | Hip Hop | 3/4/10 | 700 |
| Boris | Electronic Dance | 3/5/10 | 1200 |
| Fabolous | Hip Hop | 3/18/10 | 1000 |
| Red Café | Hip Hop | 4/8/10 | 700 |
| Snoop Dog/Shannon Twins | A List Celeb | 4/15/10 | |
| Los Adolocentes | Latin | 4/24/10 | 1200 |
| El Sapito | Latin | 5/26/10 | |
| Lloyd Banks | Hip Hop | 5/27/10 | |
| Juelz Santana | Hip Hop | 6/10/10 | |
| Tony Dize | Latin | 6/23/10 | 900 |

* All Venues are New Jersey Nightclubs with the exception of Soundfactory which is in NYC

JUICE0004236