# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT,<br><br>      Plaintiffs,<br><br>vs.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>      Defendant. | Civil Action No. 11-07318 (WHW) (CLW)<br><br>*Oral Argument Requested* |

_____

**DEFENDANT LIVE NATION ENTERTAINMENT, INC.'S**
**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

_____

                **GREENBERG TRAURIG, LLP**
                Philip R. Sellinger (PS 9369)
                Ian S. Marx (IM 1704)
                500 Campus Drive
                Florham Park, N.J. 07932
                (973) 360-7917 (Telephone)
                (973) 301-8410 (Facsimile)
                *Attorneys for Defendant*
                *Live Nation Entertainment, Inc*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .............................................................................................................2

    I.    PLAINTIFFS HAVE PROVIDED NO COMPETENT EVIDENCE TO PRECLUDE JUDGMENT ON THEIR INTERFERENCE CLAIMS ................................................................................................2

    II.    PLAINTIFFS HAVE PROVIDED NO COMPETENT EVIDENCE TO PRECLUDE JUDGMENT ON THEIR DEFAMATION CLAIM .....7

    III.    PLAINTIFFS' RESPONSE TO LIVE NATION'S SUMF RAISES NO GENUINE ISSUE OF MATERIAL FACT ......................................10

        A. Plaintiffs Raise No Genuine Issue of Material Fact Regarding Their Allegation That Live Nation "Blocked" Tiesto from Accepting Plaintiffs' Offer to Appear at the SFEM Event ..................11

        B. Plaintiffs Offer No Evidence That Live Nation Asked Steve Angello Not to Appear at the SFEM Event .........................................12

        C. Plaintiffs Offer No Competent Evidence That the SFEM Contract Was Canceled Due to Defamatory Statements by Live Nation ..........13

    IV.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE PLAINTIFFS CANNOT PROVE DAMAGES .......................................14

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*,
  826 F. 2d 1335 (3d Cir. 1987) ...................................................................................7

*Blackburn v. UPS, Inc.*,
  179 F. 3d 81 (3d Cir. 1999) .....................................................................................12

*Cargill Global Trading v. Applied Dev. Co.*,
  706 F. Supp. 2d 563 (D.N.J. 2010) ............................................................................5

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................................................1

*F.D.I.C. v. Bathgate*,
  27 F. 3d 850 (3d Cir. 1994) .....................................................................................14

*In-Tech Mkt'ng, Inc. v. Hasbro, Inc.*,
  1990 U.S. Dist. LEXIS 4858 (D.N.J. Apr. 25, 1990) ................................................6

*Jersey Cent. Power & Light Co. v. Lacey*,
  772 F. 2d 1103 (3d Cir. 1985) ...................................................................................1

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F. 3d 1153 (3d Cir. 1993) .......................................................................................4

*In re Merritt Logan, Inc.*,
  901 F. 2d 349 (3d Cir. 1990) ...................................................................................15

*Minerva Marine, Inc. v. Spiliotes*,
  2005 U.S. Dist. LEXIS 41854 (D.N.J. Apr. 4, 2005) ................................................8

*Minerva Marine, Inc. v. Spiliotes*,
  2006 U.S. Dist. LEXIS 13922 (D.N.J. Mar. 13, 2006) ..............................................8

*Padillas v. Stork-Gamco, Inc.*,
  186 F. 3d 412 (3d Cir. 1999) .....................................................................................1

*Philbin v. Trans Union Corp.*,
  101 F. 3d 957 (3d Cir. 1996) .............................................................................12, 13

*Robles v. U.S. Envtl. Univ. Servs., Inc.*,
  469 F. App'x 104 (3d Cir. 2012) .......................................................................14

*Sery v. Fed. Bus. Ctrs., Inc.*,
  616 F. Supp. 2d 496 (D.N.J. 2008) (Chesler, J.) ...............................................6, 7

*Thabault v. Chait*,
  541 F. 3d 512 (3d Cir. 2008) .............................................................................15

*U.S. v. DiSalvo*,
  34 F. 3d 1204 (3d Cir. 1994) .............................................................................12

**Other Authorities**

Fed. R. Civ. Pro. 12(b)(6) .....................................................................................8

Fed. R. Civ. Pro. 805 ..........................................................................................12

Fed. R. Evid. 802 ...............................................................................................12

## **PRELIMINARY STATEMENT**

Plaintiffs ask the Court to deny summary judgment because "Live Nation has failed to present any evidence that conclusively shows it did not interfere with Plaintiffs' contract with the State Fair or their relationships with various agents." Pl. Br. at 2. Plaintiffs misapprehend their burden, as non-moving party, on this motion. Where, as here, the moving party has pointed out the absence of evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to "produce specific facts showing that there is a genuine issue for trial" (*Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986); *accord Padillas v. Stork-Gamco, Inc.,* 186 F. 3d 412, 414 (3d Cir. 1999)), and "speculative assertions will not suffice." *Jersey Cent. Power & Light Co. v. Lacey,* 772 F. 2d 1103, 1109 (3d Cir. 1985).

Live Nation has pointed out the utter absence of any evidence supporting Plaintiffs' remaining three claims. Plaintiffs are now required to produce such evidence; however, they have failed to do so, offering, instead, only speculative assertions. *See, e.g.,* Pl. Br. at 1 (claiming that their accusations against Live Nation are "perfectly in line with its reputation for playing hardball…" and must be true because Live Nation's "[John] D'Esposito is capable of any kind of obnoxious behavior"). At the summary judgment stage, speculative assertions cannot substitute for hard evidence.

Plaintiffs also try to create the appearance of disputed facts by

mischaracterizing, misquoting and distorting deposition testimony and emails; relying on statements that are multiple levels of hearsay; and submitting, as exhibits, documents that would never be admissible at trial. In addition, Plaintiffs offer transcripts of largely inaudible tape recordings that they surreptitiously orchestrated with this lawsuit in mind. To the extent these self-serving, contrived transcripts are even comprehensible, they are rife with hearsay, and Plaintiffs' interpretation of them is contradicted by the sworn deposition testimony of the declarants upon whose statements Plaintiffs rely.

Implicitly conceding their inability to prove their case, Plaintiffs repeatedly state that they are entitled to all reasonable inferences. The key word, however, is "reasonable." No reasonable inferences favorable to Plaintiffs can be made based on the materials they have submitted. Speculative inferences that are inconsistent with sworn testimony of witnesses with actual knowledge are not reasonable. This is exactly the kind of case for which the summary judgment process was intended.

## ARGUMENT

### I. PLAINTIFFS HAVE PROVIDED NO COMPETENT EVIDENCE TO PRECLUDE JUDGMENT ON THEIR INTERFERENCE CLAIMS

Stripped to their essence, Plaintiffs' tortious interference claims are based on a single allegation, namely, that Live Nation disparaged Plaintiffs to the agents of the artists they wished to engage for the State Fair EDM event.[1] Plaintiffs claim

---

[1] Terms used herein are as defined in Live Nation's moving brief.

that, as a result of that supposed disparagement, they were unable to engage the agents' artists before the April 1, 2011 deadline by which they were required to provide SFEM with a talent roster of committed acts, and that, in turn, caused the SFEM to cancel their contract for the State Fair EDM event. Thus, for Plaintiffs' tortious interference claims, the crucial question is, what evidence have they offered to support their claim that Live Nation disparaged them to the agents?

Plaintiffs base their tortious interference allegations primarily on a February 15, 2011 email from Live Nation's Jason Miller to WME agents Joel Zimmerman and Samantha Kirby Yoh. *See* Wagner Cert. Exs. 11, 35, 36, 52.[2] (The emails concern a concert featuring Axwell, a Swedish EDM performer, on which Live Nation was intending to collaborate with Plaintiffs' colleagues, John DiMatteo and Vito Bruno, who had incorporated themselves as "Area Event LLC."[3]) Plaintiffs characterize Miller's email as being disparaging to DiMatteo, and they cite it as the source of Yoh's negative attitude toward DiMatteo. *See* Pl. Br. at 9-10 (claiming that, after Miller's email, Yoh "began making the same sorts of unsubstantiated comments … that Miller had been making"). Plaintiffs want the Court to infer that it was Miller's email that caused WME to reject the offers to WME artists that DiMatteo had made on Plaintiffs' behalf.

---

[2] All of the listed Exhibits are part of the same email chain.
[3] *See* October 17, 2016 Certification of Ian S. Marx (submitted with moving brief), Ex. 11 (DiMatteo Dep. at 13:6-20).

3

Plaintiffs are not entitled to that inference. First, the undisputed evidence establishes that Yoh's negative opinion of DiMatteo was <u>based on her own experience</u> with him, and <u>she had expressed that opinion before Miller ever sent his email</u>. In an internal WME email chain dated <u>January 25, 2011</u> (i.e., several weeks <u>before</u> Miller's email), Zimmerman told Yoh and others about DiMatteo's plan to do "a new festival at the Meadowlands parking lot June 25 and 26." *See* Wagner Cert., Ex. 27. Yoh was immediately skeptical, noting that "John is a flake so far on other things." *Id.* Yoh reiterated her concerns about DiMatteo in another internal WME email dated January 31, 2011 (also before the Miller email), saying: "My concern – as [I] have said before – is that John is not great (per my pvd[4] experience) re execution and that [we] need a REAL producer re costs/production capabilities etc. Best case in this scenario [is] Morrow [from Live Nation] and John together." *Id.*, Ex. 32. Thus, the cause-and-effect linkage that Plaintiffs are trying to make between Miller's February 15, 2011 email and Yoh's negative opinion of DiMatteo (needed for a tortious interference claim, *see Lightning Lube, Inc. v. Witco Corp.,* 4 F. 3d 1153, 1167 (3d Cir. 1993)) simply does not exist.[5]

---

[4] "pvd" is Paul van Dyk, another EDM artist. *See* website www.paulvandyk.com/

[5] Plaintiffs also attempt to support their tortious interference claims with transcripts of meetings they surreptitiously recorded in preparation for this lawsuit. As noted in Point III, *infra,* the transcripts are inadmissible hearsay, and, based on the transcripts, the recordings are largely inaudible and incomprehensible. Moreover, all of the meeting participants except Plaintiffs have given sworn testimony that contradicts Plaintiffs' interpretation of the transcripts.

Moreover, Miller's subsequent comments in his February 15 email were not tortious. Miller wrote that he had "nothing but a positive personal relationship with John Dimatteo. I do think he is a good street promoter and I think he has the very best intentions out there." Miller did express reservations concerning DiMatteo's "event execution," in particular, DiMatteo's attention to detail concerning ticketing and finances, and he described the ticketing problems that had occurred when he worked with DiMatteo at the "New Year's Eve" (NYE) event a month earlier. Miller also noted that, although NYE was "a tremendously successful sold out engagement," he had "still not settled internally with John. He owes me in excess of $100k" – a fact that DiMatteo freely admits.[6] Miller's providing indisputably truthful, unchallenged information to WME, even if negative, is simply not actionable. *See Cargill Global Trading v. Applied Dev. Co.,* 706 F. Supp. 2d 563, 576 (D.N.J. 2010) (Walls, J.) (providing truthful information is not tortious interference). While Miller was perfectly willing to work with DiMatteo again on Axwell, he believed that having Live Nation "control the ticketing and finances" would be "the best recipe for success." Such statements, being "motivated by a genuine business-related concern," are not tortious. *See id.*

---

[6] *See* Certification of Ian S. Marx, dated January 23, 2017 (the "Marx Reply Cert."), Ex. A (DiMatteo Dep. at 101:1-25 (testifying that he had been involved in a New Year's event with Live Nation, that he had owed Live Nation over $100k, and that it had taken "a little longer to get [it back to] them than [it] should have").

5

But most damning for Plaintiffs' tortious interference claims is <u>their conscious decision not to depose, or obtain affidavits from, the very people who could have put this whole issue to rest once and for all: the agents who were the alleged targets of Live Nation's interference</u>. *See* Marx Reply Cert. ¶¶ 6-7 (Plaintiffs served WME, AM Only and Windish with deposition subpoenas but then never deposed them). Plaintiffs insist that they were not obliged to obtain evidence from the agents. *See* Pl. Br. at 23, n.2. But it is their burden to produce evidence sufficient to raise disputed issues of fact; if they do not, summary judgment should be granted. *See Sery v. Fed. Bus. Ctrs., Inc.,* 616 F. Supp. 2d 496, 506-07 (D.N.J. 2008) (Chesler, J.) (granting summary judgment on tortious interference claim where, "even after being given ample time for discovery," the non-moving party offered no evidence to establish the claim's elements); *In-Tech Mkt'ng, Inc. v. Hasbro, Inc.,* 1990 U.S. Dist. LEXIS 4858, at *7 (D.N.J. Apr. 25, 1990) (Wolin, J.) (granting defendants summary judgment on tortious interference claim where "[p]laintiffs were given ample time to take discovery" on that issue and "offered the Court no adequate justification" for failing to do so).[7] In order to respond to the summary judgment motion they knew was forthcoming, it was incumbent on Plaintiffs to depose, or obtain affidavits from, the agents. They did

---

[7] Plaintiffs had more than ample time to take discovery here. *See* Marx Reply Cert. ¶¶ 3-7 (describing discovery schedule and Plaintiffs' decision not to proceed with the agents' depositions).

6

not do so because, to paraphrase Colonel Jessep in "A Few Good Men," they couldn't handle the truth. Instead, they rely solely on speculative inferences that have no foundation in fact. But "[m]etaphysical doubt about the facts will not suffice." *Sery,* 606 F. Supp. 2d at 507. On summary judgment, the non-movant must offer <u>admissible evidence</u>. *See Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.,* 826 F. 2d 1335, 1339, n.3 (3d Cir. 1987).

## II. <u>PLAINTIFFS HAVE PROVIDED NO COMPETENT EVIDENCE TO PRECLUDE JUDGMENT ON THEIR DEFAMATION CLAIM</u>

Plaintiffs allege that Live Nation (1) told agents that "Plaintiffs lacked the funding, business acumen, and experience in concert promotion" to perform the SFEM contract, and (2) told "members of SFEM and the Authority … that Plaintiffs associated with 'thieves' and could not be trusted." Amended Compl. ¶ 133. Plaintiffs have offered no evidence to support a defamation claim based on either statement. With respect to (1), Plaintiffs again rely on the February 15, 2011 Miller email. But Miller's email is not defamatory to DiMatteo (and it does not even mention Plaintiffs), and, by February 15, 2011, Yoh had already formed a negative opinion of DiMatteo based on her own experiences with him. *See* Point I, *supra.* Thus, the Yoh statements that Plaintiffs cite in support of their defamation claim (*see* Pl. Br. at 26) are entirely immaterial as they are the statements of a third party who had her own independent views of Plaintiffs and was not Live Nation's

7

agent.[8] More broadly, Plaintiffs have submitted no admissible evidence showing that Live Nation made defamatory statements to agents, much less that any such alleged statements caused the SFEM contract to be terminated. *See* Def. Br. at 35-36 (plaintiff must show that allegedly defamatory statements caused "special damages").[9]

As for statements allegedly made to SFEM and the Authority (i.e., the venue), that part of Plaintiffs' defamation claim fails for the same reason this Court dismissed their entire defamation claim on Live Nation's Rule 12(b)(6) motion:

> To state a claim for defamation, Plaintiffs must plead … special damages. [internal citations omitted] The damages Plaintiffs allege consist of the cancellation of their contract with SFEM. … All of the

---

[8] The email Plaintiffs cite to show the supposedly "close symbiotic relationship" between Miller and Yoh (*see* Pl. Br. at 25, citing Wagner Cert., Ex. 55) is grossly misleading, as it had nothing to do with Plaintiffs or the SFEM event (they were discussing a Swedish House Mafia concert at Madison Square Garden), and it was sent on September 28, <u>2012</u>, long after the 2011 New Jersey State Fair took place.

[9] Plaintiffs also assert that Jason Miller defamed them to agent Stephani LaFera by "imp[lying] … that the Plaintiffs are not funded and have no talent [i.e., artists signed], and they could lose their contract within 2 weeks if not remedied." Pl. Br. at 26 (citing Wagner Cert., Ex. 56). Plaintiffs misquote Miller, as the entire statement was conditional ("<u>if</u> they don't have funding…") (emphasis added). Plaintiffs also cannot dispute its truthfulness. *See* Def. Br. at 34 (defamation requires false statement). In any event, Plaintiffs never pled that statement as a basis for their defamation claim; thus, it should not be considered on this motion. *See Minerva Marine, Inc. v. Spiliotes,* 2006 U.S. Dist. LEXIS 13922, at *105-11 (D.N.J. Mar. 13, 2006) (Walls, J.) (on summary judgment motion, refusing to consider any allegedly defamatory statements that had not been specifically pled); *see also Minerva Marine, Inc. v. Spiliotes,* 2005 U.S. Dist. LEXIS 41854, at *13 (D.N.J. Apr. 4, 2005) (Walls, J.) ("If plaintiff uncovered additional statements that could form the basis of a defamation claim, plaintiff should have moved to amend its defamation claim to include such statements.").

alleged defamatory statements made to SFEM and the venue <u>predated the finalization of Plaintiffs' contract</u>.

(Dkt. 20) (emphasis added).[10] The Court's earlier conclusion remains valid. The SFEM contract was finalized on March 7, 2011 (*see* Wagner Cert. Ex. 22), and Plaintiffs do not contend that Live Nation made any defamatory statements to the SFEM or the venue after that date. *See* Pl. Br. at 23-25.[11]

Plaintiffs try to sidestep that claim-dispositive fact by conjecturing that Live Nation's alleged statements "may very well" have influenced SFEM's eventual decision to terminate the contract. *See* Counterstatement to SUMF (Dkt. 75-1) ¶¶ 23, 25; *see also id.* at ¶ 25 (speculating that statements allegedly made by D'Esposito to Al Dorso, Jr. in <u>February 2011</u> (*see* Wagner Cert., Exs. 37, 47) "could very well have predisposed Dorso [Sr.] to terminate the Contract" in <u>April 2011</u>). But Dorso testified under oath that he does not recall Live Nation making any of the statements that Plaintiffs allege. *See* Def. Br. at 26. Moreover, Dorso

---

[10] The Amended Complaint attempts to address the Court's ruling by alleging that, in addition to causing the cancellation of their SFEM contract, the supposedly defamatory statements made to the SFEM and the venue also caused them "reputational damage" (Amended Compl. ¶ 134) and "adversely impacted their careers and future business opportunities in the entertainment industry." *Id.* at ¶ 136. Plaintiffs offer no evidence to support those conclusory allegations; moreover, reputational damage is insufficient to establish the special damages required for a defamation claim. *See* Def. Br. at 36 (citing authority).

[11] For instance, the email to Al Dorso, Jr. concerning Dorfman was sent on February 23, 2011. *See* Pl. Br. at 24 (Wagner Cert., Ex. 37). Likewise, the alleged "proof of funds" conversation about which Bruno testified (*see id.* at 26) would have occurred long before the Contract was entered, and it is inadmissible hearsay in any event.

testified that, even if such statements had been made, "it wouldn't have mattered. … My decisions were made based on a contract, and [Plaintiffs] couldn't perform." *Id.* at 26-27.

### III. PLAINTIFFS' RESPONSE TO LIVE NATION'S SUMF RAISES NO GENUINE ISSUE OF MATERIAL FACT

While Plaintiffs purport to dispute several of the facts listed in Live Nation's SUMF (*see* Plaintiffs' Responses to Live Nation's SUMF) (Dkt. 75-1), only four (Facts 10, 16, 24 and 25) merit discussion.[12]

---

[12] Plaintiffs' quibbles about four other facts (Facts 7, 21, 26 and 29) are either off-point or inaccurate. Plaintiffs attempt to qualify **Fact 7** ("DiMatteo was in charge of all talent offers and received all responses to offers made in connection with the Event") by asserting that, while "DiMatteo was in charge of booking headliners…, Alan Sacks was in charge of booking supporting acts." But Plaintiffs agree that only the "headliners" (i.e., Tiesto, David Guetta and Steve Angello) were crucial to the Event's success. *See* Response to Fact 8. Plaintiffs misread **Fact 21**. Fact 21 does not state that it was impossible for artists to appear at both the Electric Daisy Carnival and the Event; rather, it states that "[m]any of the artists to whom DiMatteo had made offers, including all three headliners, appeared at EDC," a fact that Plaintiffs cannot dispute. The evidence does show, however, that agents viewed the simultaneous scheduling as a negative. *See* Wagner Cert., Ex. 10 (Steve Angello's agent to DiMatteo: "You need to keep in mind that steve does edc the night before. That date is a bit harder because I have to put steve on an early flight against the clock. We can look at the possibilities but keep this in mind cause it has to make a lot of sense."). **Fact 26** (which repeats Dorso's clear testimony that, once he learned that the Event was to involve electronic dance music, he likely wouldn't have permitted them to continue for a second night, much less for subsequent years) relates to damages. The incomprehensible portion of Dorso's deposition transcript that Plaintiffs cite in response does not contradict that. Plaintiffs misread **Fact 29** ("Juice did not conduct any business, and consequently earned no profit, prior to executing the Contract with SFEM in 2011"), which also relates to damages. Plaintiffs do not assert that they had earned any profits but simply state that they "were working on the proposed Event well in advance of the signing of the Contract…." That is non-responsive.

### A. Plaintiffs Raise No Genuine Issue of Material Fact Regarding Their Allegation That Live Nation "Blocked" Tiesto from Accepting Plaintiffs' Offer to Appear at the SFEM Event

Fact 10 states that "Tiesto never accepted [Plaintiffs'] offer [to appear at the SFEM Event." Plaintiffs do not dispute that; however, they blame Live Nation for Tiesto's non-acceptance.[13] As support for that claim, Plaintiffs rely on the following portion of a transcript of an April 20, 2011 meeting among Plaintiffs and DiMatteo:

> DORFMAN: They [Live Nation] jump into everything. You saw it. You had all the talent set up.
> *DIMATTEO: Tiesto confirmed it to Kelly [Cobb, Tiesto's road manager].*
> BARRETT: Confirm [*inaudible*].
> *DIMATTEO: Without saying it. He said to Kelly – Kelly goes, you know he said it again [inaudible] goes you really fucked us this time [inaudible] I got to ask you something. He goes did Live Nation interfere? He just went –*
> DORFMAN: He shook his head up and down?

---

[13] Plaintiffs also "dispute that the reason Tiesto did not accept this offer was simply that Tiesto 'was going to Electric Zoo.'" First, Fact 10 merely states that "Tiesto never accepted [Plaintiffs'] offer," which Plaintiffs do not dispute. Moreover, the document upon which Plaintiffs rely as support for their assertion that "DiMatteo … fully expected to book Tiesto for Plaintiffs' event" (Wagner Cert., Ex. 2) is an inadmissible, uncertified, highly cherry-picked, typed copy of part of a text conversation that Plaintiff Barrett claims he had with DiMatteo. The complete version of that document (attached as Exhibit B to the Marx Reply Cert.) is devastating to Plaintiffs' assertions here, as it shows that Tiesto was reluctant to appear at the Event and that he was concerned about Plaintiffs' being "new in the festival market," unlike Electric Zoo, which was "established." *Id.* The document also shows that, far from "fully expect[ing] to book Tiesto," as Plaintiffs contend, the most DiMatteo would say was that offering Tiesto "$400k gives us a good shot." *Id.*

11

> *DIMATTEO: Yeah. Shook his head up and down, didn't say a word. He just went – like this [**inaudible**] doing the face like this like.*

Wagner Cert. (Ex. 57) at 16 (emphasis added). The portion of the recording on which Plaintiffs rely is <u>triple hearsay</u>, with (1) DiMatteo (who admits he was not present when the supposed "conversation" between Tiesto and Cobb took place[14]) relating what (2) Kelly Cobb supposedly told him that (3) Tiesto supposedly "told" Cobb by making faces and by "sh[aking] his head up and down." Such "[h]earsay is not admissible" (Fed. R. Evid. 802) unless Plaintiffs satisfy their burden to show, for each of the included hearsay statements, that an exception to the hearsay rule applies. *See FRCP 805; Blackburn v. UPS, Inc.,* 179 F. 3d 81, 103 (3d Cir. 1999).[15] Plaintffs point to no hearsay exception, and "a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion." *Philbin v. Trans Union Corp.,* 101 F. 3d 957, 961, n.1 (3d Cir. 1996).

### B. Plaintiffs Offer No Evidence That Live Nation Asked Steve Angello Not to Appear at the SFEM Event

---

[14] Asked if he was present when the alleged "conversation" took place, DiMatteo responded "Definitely not." *See* DiMatteo Dep. 128:13-15 (Marx Reply Cert., Ex. A).

[15] The fact that Plaintiffs have simply recorded their own colleague also renders the recording inherently untrustworthy. In addition, the transcript's large number of "inaudibles" renders it inadmissible. *See U.S. v. DiSalvo,* 34 F. 3d 1204, 1220 (3d Cir. 1994) (recordings are inadmissible if "the unintelligible portions are so substantial as to render untrustworthy the recording as whole"). It is also worth noting that DiMatteo does not even recall the conversation. *See* DiMatteo Dep. 127:2-129:2 (Marx Reply Cert., Ex. A).

Fact 16 states that "Steve Angello never accepted [Plaintiffs'] offer [to appear at the SFEM event]." Plaintiffs do not dispute that; however, they suggest (but do not actually assert) that Live Nation was responsible for Angello's non-acceptance. Plaintiffs point to an email exchange between Angello's agent and DiMatteo (*see* Wagner Cert., Ex. 50), which they contend shows "advanced discussions" concerning Angello's potential appearance at the SFEM event. In fact, the emails show that Angello's agent was not particularly excited about the SFEM event. *See id.* ("Steve gets bigger offers for these kinds of events elsewhere."). Plaintiffs also rely on Vito Bruno's deposition testimony that, "[a]ccording to Dimatteo, some of the acts were asked not to do the show." *See* Bruno Dep. 134:4-16 (Wagner Cert., Ex. 1). That statement is plainly inadmissible hearsay. Moreover, Bruno did not testify that DiMatteo told him that Live Nation had asked any of the acts not to do the SFEM event. Indeed, DiMatteo has testified that Angello "for some reason just did not want to do it. I don't know why." *See* DiMatteo Dep. 34:3-13 (Wagner Cert., Ex. 9).

### C. Plaintiffs Offer No Competent Evidence That the SFEM Contract Was Canceled Due to Defamatory Statements by Live Nation

Plaintiffs dispute related Facts 24 and 25, which state that "SFEM did not cancel the Contract based on any alleged defamatory statements by Live Nation" and that even if such statements had been made, it would not have led SFEM to terminate the SFEM contract. In support of their position, Plaintiffs cite a

13

transcript of a recording they surreptitiously made of a March 7, 2011 meeting in which Dorso is quoted as saying: "Live Nation's badmouthing the whole event and you guys to the powers that be over there [meaning the venue]." *See* Wagner Cert., Ex. 16. This is an out-of-court statement offered for the truth of the matter asserted and, as such, is hearsay. In any event, "badmouthing" is not sufficiently specific to constitute defamation. *See F.D.I.C. v. Bathgate,* 27 F. 3d 850, 875 (3d Cir. 1994) (for defamation claim, plaintiff must actually "identify the defamatory words"), and, as this Court has previously held, the challenged statement could not have caused any harm since it was allegedly made on the same day that Plaintiffs and Dorso signed the SFEM contract.[16] Most dispositive, however, is Dorso's sworn testimony that he does not recall Live Nation making any of the statements that Plaintiffs allege and that, even if they had made such statements, "it wouldn't have mattered. … My decisions were made based on a contract, and [Plaintiffs] couldn't perform." Def. Br. at 26-27.

**IV. SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE**

---

[16] Plaintiffs also assert that a recorded March 5, 2011 meeting included Live Nation. *See* SUMF Response at 12 (Wagner Cert. Ex. 5). In fact, only Bruno and Plaintiffs were in attendance. Thus, the meeting was nothing more than an echo chamber in which Plaintiffs and their colleague aired their grievances against Live Nation. In addition, Plaintiffs cite testimony from Al Dorso in which he testified that "[s]omebody … it may have been [D'Esposito] … [told him that Plaintiffs] didn't pay their bills." *See* SUMF Response at 12 (Wagner Cert. Ex. 15). That is far too indefinite to constitute defamation. *See Robles v. U.S. Envtl. Univ. Servs., Inc.,* 469 F. App'x 104, 109 (3d Cir. 2012) (for defamation claim, plaintiff must plead sufficient facts to identify both the defamatory words and "their utterer").

14

## PLAINTIFFS CANNOT PROVE DAMAGES

Plaintiffs' protestations notwithstanding, New Jersey appellate courts routinely dismiss lost profits claims under the new business rule. *See* Def. Br. at 36-37 (citing cases). Even if that rule is not a *per se* bar to Plaintiffs' lost profits claim, they still must prove lost profits "with reasonable certainty" (*see In re Merritt Logan, Inc.,* 901 F. 2d 349, 358 (3d Cir. 1990)), and they must also prove causation. *See Thabault v. Chait,* 541 F. 3d 512, 522-23 (3d Cir. 2008). Plaintiffs have done neither (*see* Points I-III, *supra, passim*), and, for that reason, they also cannot recover lost profits. If the Court does not grant Live Nation's motion in its entirety, it should, at a minimum, rule that Plaintiffs cannot claim more than one year of lost profits. *See* SUMF 26 (citing Dorso's sworn testimony that, once he learned the Event was to involve electronic music, he likely wouldn't have permitted them to continue for a second night, much less for subsequent years). In other words, even if the Court were to credit the inadmissible evidence upon which Plaintiffs rely and make the speculative inferences they urge, the most they should be able to recover is one year's lost profits. A ruling providing that clarity would likely eliminate the need to try this case and would promote its resolution by the parties.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By:   <u>*s/ Ian S. Marx*</u>
      Philip R. Sellinger
      Ian S. Marx
      GREENBERG TRAURIG, LLP
      500 Campus Drive
      Florham Park, New Jersey 07953
      Attorneys for Defendant
      Live Nation Entertainment, Inc.

Dated: January 23, 2017

16