# EXHIBIT A

# In The Matter Of:

*Juice Entertainment, et al v.*
*Live Nation Entertainment*

*John DiMatteo*
*July 17, 2013*

*Rizman Rappaport Dillon & Rose*
*66 W. Mt. Pleasant Ave.*
*Livingston, N.J. 07039*
*(973) 992-7650*

**Min-U-Script® with Word Index**

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 3 of 8 PageID: 1428
Juice Entertainment, et al v.
Live Nation Entertainment

Page 45

1  Q. Have you dealt with William Morris
2  other than in connection with this event?
3  A. Yes.
4  Q. For how long have you been dealing
5  with William Morris?
6  A. Since they started the electronic
7  division.
8  Q. When was that?
9  A. I don't remember. It could be looked
10 up. When they started the electronic division is
11 when I started with them.
12 Q. So these events took place --
13 A. It might have been in 2008, early 2008
14 I think. Don't quote me on that. You can look it
15 up and see exactly.
16 Q. Who have you dealt with in connection
17 with the --
18 A. With this event?
19 Q. Just generally at William Morris?
20 A. Generally at William Morris?
21 Q. Yes.
22 A. Names of people I deal with there are
23 Joel Zimmerman, Samantha Kirby, Alex Chakin, Peter
24 Wiederleit. Prior to this date, right? You are
25 talking about who did I deal with, William Morris

Page 46

1  from 2011 and prior?
2  Q. Sure. Yes.
3  A. Okay. Yeah, that pretty much sums it
4  up.
5  Q. And how about since then?
6  A. Since then the names mentioned, in
7  addition to the names mentioned, since then Connor
8  Sheldon, Jonas Shoeman, Connor Sheldon, Jonas
9  Shoeman, Mike Berkowitz, Ryan King. That about does
10 it.
11 Q. Who from William Morris did you deal
12 with in connection with this event?
13 A. Alex Chakin, Samantha Kirby, Pete
14 Wiederleit.
15 Q. What about Joel Zimmerman?
16 A. Yes. Joel Zimmerman, yes.
17 Q. Can you explain to me, if you know,
18 the relationship between those folks at William
19 Morris to each other? In other words, is one of
20 them the boss and the others not? Can you explain
21 that to me?
22 A. Yes. I can.
23 Q. All right.
24 A. Joel Zimmerman is the head of the
25 electronic department. Amanda Kirby is a senior

Page 47

1  agent. Alex Chakin works under both of them. Pete
2  Wiederleit runs the northeast territory, works under
3  them. Joel is the head of the electronic
4  department.
5  Q. Okay. And how were the four of them
6  involved in connection with this event?
7  A. I spoke with Joel about The Event. I
8  had a meeting at their office with Sam Kirby, Alex
9  Chakin and I believe Pete Wiederleit was there and
10 we spoke about The Event.
11 Q. Do you recall when that meeting was?
12 A. First quarter of 2011 is as close as I
13 can get to it.
14 Q. Where was the meeting?
15 A. At the William Morris office, 6th
16 Avenue.
17 Q. In New York?
18 A. In New York.
19 Q. How long did the meeting last?
20 A. Maybe an hour, estimating an hour.
21 Vito Bruno was with me.
22 Q. So the participants were you and
23 Mr. Bruno from Area?
24 A. Right.
25 Q. And the William Morris participants

Page 48

1  you identified?
2  A. Yup.
3  Q. Did you record that meeting?
4  A. No.
5  Q. Do you know whether anybody else did?
6  A. I don't know.
7  Q. Did you take notes?
8  A. No.
9  Q. Do you know whether anybody else did?
10 A. I don't remember.
11 Q. Do you remember the meeting?
12 A. Somewhat.
13 Q. Tell me what you remember.
14 A. They asked what we were doing. We
15 told them we were doing a festival at the
16 Meadowlands State Fair. They asked what the name of
17 it was. We didn't have one yet. They asked if the
18 venue was confirmed and if we had a confirmed deal
19 with the venue. I said "yes." And then we
20 discussed different potential options for talent.
21 Q. How did the meeting come about?
22 A. Through Joel. I spoke to Joel first
23 about The Event and he had set up a meeting.
24 Q. How did you wind up reaching out to
25 Joel about The Event?

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 4 of 8 PageID: 1429
Juice Entertainment, et al v.
Live Nation Entertainment

Page 49

1  A. How did I reach out what does that
2  mean?
3  Q. What made you call Joel?
4  A. Because he represents a great deal of
5  talent. William Morris represents a great deal of
6  talent. The first or second largest agency in North
7  America for this genre of music so that's why we
8  choose them to book artists.
9  Q. What else can you tell me about that
10 meeting at William Morris?
11 A. It was at night. I don't remember
12 much else except for the time of day.
13 Q. Did you have any other in-person
14 meetings with Joel Zimmerman about this event?
15 A. No. We spoke about it on the phone
16 though.
17 Q. How many times did you speak with him
18 on the phone about it?
19 A. I don't know exactly.
20 Q. Did Mr. Zimmerman tell you at that
21 meeting that William Morris wanted to be the wind
22 behind your sails for this project?
23 A. No, not at that meeting. Joel wasn't
24 at the meeting.
25 Q. Joel was not at the meeting?

Page 50

1  A. No.
2  Q. Did anybody from William Morris tell
3  you that William Morris wanted to be the wind behind
4  your sails?
5  A. Joel and I, in our initial
6  conversation, had asked me to send over the budget.
7  He said because William Morris gets involved in
8  certain festivals and it is something that Mark
9  Geiger from William Morris heads up and he
10 potentially wanted to get involved in this festival
11 as a partnership.
12 Q. Did he use the phrase "wind behind
13 your sails" during that?
14 A. I don't remember.
15 Q. Have you ever heard that phrase before
16 being used by someone at William Morris in
17 connection with this event?
18 A. I don't remember.
19 Q. Have you ever heard anybody use that
20 phrase in connection with anything that you've been
21 involved in?
22 A. I don't remember. Wind beneath my
23 sails.
24 Q. Wind behind your sails?
25 A. I don't know.

Page 51

1  Q. Anything with wind and sails?
2  A. No.
3  Q. Do you think that's the kind of thing
4  you would remember?
5  A. No, I don't. It is a phrase. It is a
6  cliche. I'm on the phone all the time. I don't
7  remember each cliche that people tell me.
8  Q. Do you recall ever telling Mr. Barrett
9  or Mr. Dorfman that somebody at William Morris said
10 that William Morris wanted to be the wind behind
11 your sales in connection with this event?
12 A. I told them -- I can't confirm or deny
13 that I've used that phrase, but I did explain to
14 them the nature of the call I had with Joel
15 Zimmerman.
16 Q. What did you explain to them?
17 A. Just like I did with you. They wanted
18 to get involved in the potential partnership and
19 they get involved in festivals and so forth.
20    MR. MERINGOLO: Can we take a break?
21    MR. MARX: Yes.
22    (There was a brief recess taken.)
23    MR. MARX: Back on the record.
24 Q. I am going to hand the witness the
25 next two exhibits. Exhibit Dimatteo-5 is a one-page

Page 52

1  document with Bates number Juice 2208.
2     (Exhibit Dimatteo-5 was marked for
3  identification.)
4     MR. MARX: Dimatteo-6 is a multiple
5  page document bearing bates numbers Juice 2187
6  through 2192.
7     (Exhibit Dimatteo-6 was marked for
8  identification.)
9  Q. I am going to hand them to the witness
10 and ask that he look at them and then I will ask
11 some questions.
12    Also please mark Dimatteo-7.
13    (Exhibit Dimatteo-7 was marked for
14 identification.)
15    MR. MARX: I'm also going to hand
16 Mr. Dimatteo what we've marked as Dimatteo-7, a
17 two-page document bearing Juice 4130 to 4131.
18 Q. Have you had a chance to review
19 Exhibits Dimatteo-5, Dimatteo-6 and Dimatteo-7?
20 A. Yes.
21 Q. Can you turn to Exhibit 5, please?
22 A. Yes.
23 Q. That's an e-mail, looks like it is
24 from you to Vito Bruno with copies to Alan Sacks,
25 Chris Barrett, Brian Arteca?

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 5 of 8 PageID: 1430
Juice Entertainment, et al v.
Live Nation Entertainment

Page 101

1  concerning payment?
2  A.  For the New Years show we owed Live
3  Nation some money that we took a little while to get
4  to them but we got it to them.
5  Q.  That was New Years Eve 2010?
6  A.  Yes.
7  Q.  Did that involve something called
8  Newyearseve.com?
9  A.  No.
10 Q.  That's something --
11 A.  I don't know what.
12 Q.  You don't know what that is?
13 A.  No.
14 Q.  I obviously don't know what that is
15 either.
16 A.  That makes two of us.
17 Q.  What was the nature of the New Years
18 Eve issue from 2010?
19 A.  When we settled the show we had some
20 money in our account that we owed them.  I wouldn't
21 call it an issue.  We just took a little longer to
22 get to it them than we should have but we got it to
23 them.
24 Q.  How much money?
25 A.  A little over $100,000.

Page 102

1  Q.  When do you recall getting them the
2  money?
3  A.  I don't remember.
4  Q.  Okay.
5  A.  Maybe a couple months after the show.
6  Q.  Do you recall it being a contentious
7  situation between you and Live Nation?
8  A.  Contentious?
9  Q.  Yes.
10 A.  No, not really.
11 Q.  When was the last time you spoke to
12 Mr. Barrett or Mr. Dorfman?
13 A.  Last year, when they told me about
14 this.
15 Q.  Did you meet with their lawyers?
16 A.  No.
17 Q.  Did they ask you to provide them with
18 a sworn statement?
19 A.  No.
20 Q.  Did they ask you to provide them with
21 any documents or other evidence?
22 A.  No.
23 Q.  Did they instruct you that you should
24 preserve any of your evidence related to this
25 matter?

Page 103

1  A.  I don't remember.
2  Q.  You've already told me everything you
3  can recall about the conversation you had with this
4  lawsuit with Mr. Dorfman and Mr. Barrett?
5  A.  Correct.
6  Q.  I think you mentioned that you are
7  doing business under the name of Area Events but
8  that's not the actual name of the company?
9  A.  Currently.
10 Q.  What's the current name of the
11 company?
12 A.  We have six companies.
13 Q.  Okay.
14 A.  There's a parent company called
15 Electronic Music Enterprises.  And then there's five
16 subsidiaries.  It is a bunch.
17 Q.  Is Mr. Bruno involved in any of those?
18 A.  No, no.
19 Q.  Since when have you and Mr. Bruno not
20 been doing business?
21 A.  April 2011.
22 Q.  Why are you no longer doing business?
23 A.  It just wasn't working out.
24 Q.  Was there any event that caused that
25 to happen?

Page 104

1  A.  No.
2  Q.  Was it related to this event in any
3  way?
4  A.  Not to my knowledge.
5  Q.  Who made the decision to separate the
6  relationship?
7  A.  I did.
8  Q.  Is the separation a subject of
9  litigation between you and Mr. Bruno?
10 A.  No.
11    MR. MARX: I am going to check my
12 notes, confer with my colleague.  My guess is I've
13 got no further questions.
14    (There was a brief recess taken.)
15    AMY WALKER WAGNER: For the record,
16 please send a copy of the deposition transcript to
17 the attention of Amy Wagner at Stone & Magnanini in
18 Short Hills, New Jersey.
19
20    (Whereupon, Ms. Wagner hangs up and
21 leaves the deposition.)
22
23    MR. MARX: No further questions.
24
25

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 6 of 8 PageID: 1431
Juice Entertainment, et al v.
Live Nation Entertainment

Page 125

1  Q.  What do you think you meant when you
2  said "They are just making shit up?"
3  A.  I don't know.  I don't know what it
4  was in regards to specifically.
5  Q.  If we go further down the page, two
6  from the bottom, and I'll read it.  This time you
7  are speaking.  Dimatteo is speaking.  It says "The
8  fucking Meadowlands, dude.  You want to do Governors
9  fucking Island or do you want to do the fucking
10  Meadowlands, I tried several times."
11      It seems to me that what you are
12  saying to me there is that it is implausible that
13  Steve Angelo would be disinterested in playing at
14  the Meadowlands.  Is that a fair characterization of
15  what you were saying?
16  A.  That sounds right for that statement,
17  yes.
18  Q.  And you compare it in that paragraph
19  to Governors Island.  I'm not aware of what that is.
20  What I take you to mean is that the Meadowlands is a
21  more attractive venue than playing Governors Island?
22  A.  In some cases, yes.
23  Q.  If you will turn to page 16.
24  A.  Okay.
25  Q.  I am going to read it in the record,

Page 126

1  if you will follow along with me.  Second speaker
2  from the top is Thomas Dorfman.  He says:
3      DORFMAN: "They jump into everything.
4  You saw it.  You had all of the talent set up."
5      And then Dimatteo responds:
6      DIMATTEO: "Tiesto confirmed it to
7  Kelly."
8      Barrett says:
9      BARRETT: "Confirm" then (inaudible).
10      Dimatteo says:
11      DIMATTEO: "Without saying it.  He said
12  to Kelly -- Kelly goes, you know he said it again"
13  (inaudible) "goes you really fucked us this time"
14  (inaudible) "I got to ask you something.  He goes
15  did Live Nation interfere?  He just went --"
16      And then Dorfman says:
17      DORFMAN: "He shook his head up and
18  down?"
19      Dimatteo says:
20      DIMATTEO: "Yeah.  Shook his head up
21  and down, didn't say a word.  He just went like --
22  this" (inaudible) doing the face like this like."
23      Dorfman says:
24      DORFMAN: "He didn't want to say it."
25      Dimatteo says:

Page 127

1      DIMATTEO: "Yeah."
2      Can you explain what that exchange
3  refers to?
4  A.  I'm not sure.
5  Q.  Where it says "He said to Kelly" is
6  that Kelly Cobb?
7  A.  Yes.
8  Q.  In that fifth paragraph down from the
9  top you say "He said to Kelly" are you referring to
10  Tiesto when you said "he?"
11  A.  I don't know.  I don't know.
12  Q.  But two paragraphs up you say "Tiesto
13  confirmed it to Kelly."  Is that correct?
14  A.  Correct.
15  Q.  My understanding of this exchange, an
16  you just correct me if I'm wrong, is that Tiesto,
17  without speaking, but simply by shaking his head up
18  and down, confirms to Kelly Cobb that Live Nation
19  interfered with the opportunity to play at this
20  event.  Is that a fair reading of this?
21  A.  I guess you can say it is fair.  I
22  don't remember exactly.
23  Q.  You don't remember today saying it?
24  A.  Right.
25  Q.  But what I'm asking you is, now that

Page 128

1  you've read it and refreshed your memory --
2  A.  Based on what you are saying, sure.
3  Q.  My paraphrase of it is a fair
4  construction of it, correct?
5  A.  Sure.
6  Q.  Apart from the fact that I've given it
7  a fair reconstruction, is it your testimony today
8  that you don't remember this conversation?
9  A.  I don't remember this conversation.
10  Q.  You don't remember telling Barrett and
11  Dorfman but do you remember -- well, let me ask you
12  this.
13      Were you present when Kelly Cobb had
14  this exchange with Tiesto?
15  A.  Definitely not.
16  Q.  When do you think it might have
17  happened?
18  A.  I don't know.  He's with the guy 24-7.
19  It could be any time.
20  Q.  At time period of these events Kelly
21  Cobb would have had almost constant access to
22  Tiesto?
23  A.  Yes.
24  Q.  In order for you to relate this to my
25  clients, Kelly must have told you.  Is that correct?

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 7 of 8 PageID: 1432
Juice Entertainment, et al v.
Live Nation Entertainment

Page 129

1  A.  I don't know.  I think so.  According
2  to what's written here, sure.
3  Q.  If you will turn to page 18.
4  A.  18, okay.
5  Q.  Five paragraphs from the top you are
6  the speaker.  I am going to read it into the record
7  "Oh he told me.  He goes yeah.  They weren't going
8  to do anything anyway.  I mean, they weren't even
9  looking at it.  They don't need it.  They have 100
10  other venues that they can't even fill up.  So
11  what's the big deal?  They were more upset about
12  somebody else like you might" and then it says
13  "inaudible."
14      In that paragraph were you telling my
15  clients that it was your perception that Live Nation
16  was upset that somebody other than Live Nation would
17  produce The Event at the Meadowlands?
18  A.  I guess so.  I mean --
19  Q.  That's, again -- that's a fair reading
20  of what it says, correct?
21  A.  I don't really know.  I don't remember
22  saying this.
23  Q.  If you go to the fourth paragraph from
24  the top.
25  A.  Fourth?  What does it start with?

Page 130

1  Q.  Fourth from the top "Dorfman."
2  A.  Right.
3  Q.  "They really got them because Vito is
4  -- Jason said -- kicked you guys out."
5  A.  Yes.
6  Q.  So in the next paragraph when you say
7  "They were more upset" were you referring to Jason
8  Miller?
9  A.  I can't confirm or deny that.  I
10  honestly don't know.
11  Q.  As you sit here now reading this can
12  you think of anyone else you were referring to when
13  you said that?
14  A.  I really don't know.  I really don't
15  know.
16  Q.  If you go roughly to the middle of the
17  page you are the speaker.  The paragraph starts
18  "we're just assuming."
19  A.  Right.  "Just the whole way they
20  played it and threatening every DJ from here, here
21  and here.  I have never experienced roadblocks like
22  that in my life.  It was unreal.  Vito says all the
23  time, it was the fact that Steve Angelo will do
24  other things but not that space and that's the
25  better space."

Page 131

1      Now, again, in that paragraph were you
2  referring to Live Nation when you said "threatening
3  DJ's"?
4  A.  "Just the whole way they played it,
5  threatening every DJ from here, here and here" I
6  don't know.  Probably.
7  Q.  Probably?
8  A.  Yes.  Reading this is confusing me
9  more than not reading it.
10  Q.  What's confusing about it?
11  A.  I just don't remember a lot of the
12  things.  You know what I am saying?
13  Q.  I want to draw a distinction between
14  not remembering and whether or not the reading I'm
15  giving to it is plausible.
16      MR. MERINGOLO:  Can we just clarify
17  one thing for Mr. Dimatteo, where it says inaudible
18  that's not the word?
19      THE WITNESS:  It means they can't
20  understand the tape.
21      MR. MERINGOLO:  It could be something
22  else.
23      THE WITNESS:  Right.
24  Q.  I understand that today you may not
25  recall saying these things.  What I'm asking you is

Page 132

1  now that you've read it can you think of anyone
2  other than Live Nation you were referring to in that
3  paragraph?
4  A.  I mean, it could be agents.  It could
5  be -- I don't know.  It could be other promoters.
6  I'm not 100 per sure.
7  Q.  When you say "they have 100 other
8  venues."
9  A.  That has to be --
10  Q.  Live Nation, right?
11  A.  Yes, sure.
12  Q.  Okay.  Go to page 20.  If you go to
13  the fourth paragraph down from the top, you are the
14  speaker.
15  A.  Okay.
16  Q.  It starts with the word "vicious."
17  A.  Right.
18  Q.  "Vicious.  He was being like -- he was
19  the one that was really angry about it because he's
20  like Jersey end of Live Nation and he was the one
21  that was really going."
22      Were you talking about John
23  De Esposito when you said that?
24  A.  It sounds that way.
25  Q.  What did you mean when you said "he

Case 2:11-cv-07318-CCC-CLW   Document 76-2   Filed 01/23/17   Page 8 of 8 PageID: 1433
Juice Entertainment, et al v.
Live Nation Entertainment

Page 137

1  A. Well, it is realistic that a promoter
2  of that size can influence talent from playing with
3  competitive competition, competitive buyers,
4  promoters.
5     MR. SIEGEL: I don't think I have any
6  more questions.
7     MR. MERINGOLO: I have no cross.
8     Thank you.
9
10    (The Deposition of JOHN DIMATTEO was
11  concluded at 3:54 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 138

1            CERTIFICATE    OF    OFFICER
2
3
4            I, DONNA KELLS, a Certified Court
5  Reporter and a Notary Public of the State of New
6  Jersey, do hereby certify that prior to the
7  commencement of the examination the witness was duly
8  sworn by me.
9            I DO FURTHER CERTIFY that the
10 following is a true and accurate transcript of the
11 testimony as taken stenographically by and before me
12 at the date, time and place aforementioned.
13           I DO FURTHER CERTIFY that I am neither
14 a relative nor employee, nor attorney or counsel to
15 any parties involved; that I am neither related to
16 nor employed by any such attorney or counsel, and
17 that I am not financially interested in the action.
18
19
20
21 A NOTARY PUBLIC OF THE STATE OF NEW JERSEY
   C.S.R. License No. 1207
22
23
24
25