# EXHIBIT D

```
                                                              Page 1
 1          **CONFIDENTIAL ** CONFIDENTIAL **
 2     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW JERSEY
 3     CIVIL ACTION NO.: 2:11-cv-07318-WHW-SCM
       ---------------------------------------x
 4     JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN,
       and CHRIS BARRETT,
 5
 6                     Plaintiffs,
 7         -against-
 8
       LIVE NATION ENTERTAINMENT, INC.,
 9
10                     Defendant.
11     ---------------------------------------x
12                     December 18, 2013
                       10:06 a.m.
13
14
15          DEPOSITION of JOHN D'ESPOSITO,
16     Nonparty Witness, taken by Plaintiffs, held at
17     the offices of Greenberg Traurig, 200 Park
18     Avenue, Florham Park, New Jersey, before Eileen
19     Mulvenna, CSR/RMR/CRR, Certified Shorthand
20     Reporter, Registered Merit Reporter, Certified
21     Realtime Reporter and Notary Public of the State
22     of New York.
23
24
25
```

Page 138

D'Esposito - Confidential

1
2  A.  Al B.
3  Q.  I don't know who that is.
4  A.  His name is Al B. He's a promoter.
5  Q.  Who did he work for?
6  A.  Himself. Al B. works for himself.
7  Q.  When you say "Tiesto is what Al
8  recognized," what do you mean? Recognized from
9  where?
10  A.  I don't know. Al -- I don't know
11  these names. Al is the only name they
12  recognize -- Al tells me -- Al says a name and
13  that's a good artist you should get. Al B. is
14  our street promoter, hands out fliers.
15       I have no idea about anything to do
16  with electronic dancers at this time in my life.
17  I have no idea, zero. Braille.
18  Q.  And when Jason Miller writes back
19  to you a minute later, same day, and says,
20  "I would imagine they are holding Tiesto with
21  Al," do you think he's referring to the same Al
22  that you thought you were referring to?
23  A.  No.
24       MR. MARX: Object to the form of
25       the question.

Page 139

D'Esposito - Confidential

1
2       THE WITNESS: I think he has a
3       mistake on that.
4  BY MR. SIEGEL:
5  Q.  Well, I'll ask him about it, but --
6  my question is -- this e-mail was sent to you.
7  Did you understand that he was talking about the
8  same Al that you were talking about?
9  A.  Probably not. There was a lot of
10  people in this situation. I don't know Al B.
11  from Tommy D. from Mel Ski, who is another
12  promoter. I'm surprised his name hasn't come up
13  yet.
14  Q.  In the e-mail that you wrote, you
15  said "Tiesto was what Al recognized."
16       That -- to me when I read that, it
17  seems like he was shown a list and he recognized
18  the name off the list.
19  A.  Yeah.
20  Q.  Is this something -- is this a
21  discussion or an exchange that you had with Al?
22  I mean, did you show him a list?
23  A.  Al who?
24  Q.  Al B., the one you're referring to
25  in your e-mail.

Page 140

D'Esposito - Confidential

1
2  A.  Al B., yeah, I always have a
3  discussion. I don't know electronic dance
4  music. So he used sources to figure it out, if
5  it's worth taking a risk.
6  Q.  When you said --
7  A.  Al Dorso wouldn't know electron
8  music either. We were both in the same pond on
9  this one.
10  Q.  But when you say "they are
11  holding," were you referring to Al -- were you
12  referring to --
13  A.  William Morris or whoever was
14  holding.
15  Q.  For what venue, for what show?
16  A.  I don't know.
17  Q.  Well, are you saying you don't know
18  now or you didn't know --
19  A.  It could be Asbury Park. I don't
20  know. I don't know what's going on with this
21  situation.
22  Q.  You wrote the e-mail. What I'm
23  trying to ask you is, what did you mean when you
24  sent the e-mail? Do you recall today what you
25  meant --

Page 141

D'Esposito - Confidential

1
2  A.  No.
3  Q.  -- when you sent that e-mail?
4  A.  No, that was so long ago. Oh, my
5  God.
6       (D'Esposito Exhibit 11, Bates Nos.
7       LN0001697 through 98, E-mail Chain, marked
8       for identification.)
9  BY MR. SIEGEL:
10  Q.  I'm showing you what's been marked
11  as Exhibit No. 11. This is a series of e-mails.
12  Again it contains the long e-mail from
13  Mr. Miller to Joel Zimmerman and Samantha Kirby
14  from February 15, 2011, that we looked at a
15  moment ago.
16       He apparently forwards it to you,
17  says, "FYI." Then you respond, "Good e-mail. I
18  need a shortened and money unpaid, trouble
19  collecting e-mail to send to Al to make this
20  swinged back."
21  A.  Uh-huh.
22  Q.  What did you mean when you said
23  that?
24  A.  I needed to get my production in to
25  host Big Time Rush. So I needed to swing back

36 (Pages 138 - 141)

Page 142

D'Esposito - Confidential

that I had the right staging from Mountain staging. And they had unpaid bills from these other shows, I guess, that would hurt my ability to bring in the production that I need for Big Time Rush at the State Fair, potentially, or at the IZOD or at Six Flags, where it ended up playing.

These guys were in the middle of our production, and they had no competency or ability to produce a show. And I was being asked to put my band in their hands, and that wasn't happening.

So I wanted to swing it back so I could produce Big Time Rush the way the band expected and the way the agent and the company, Nickelodeon, wanted that show produced.

Q. When you say "these guys" were in the middle of your production, who are you referring to?

A. The guys that Al introduced us to. This one dude, John, who had no idea what a SAM-550 stage was. He didn't even know what it was.

Q. What is it?

Page 143

D'Esposito - Confidential

A. He's the only one I talked to from that group. I don't even think his name was mentioned earlier.

Q. So you're asking for an e-mail -- a shortened version of the e-mail that's set out here?

A. Yes.

Q. Who did you want to send it to?

A. What do you mean?

Q. You say "I need" --

A. I wanted to send it to Al so I could show I needed to use my production for my show.

Q. Al Dorso?

A. Yes. I wasn't putting my band on their production. They didn't even have production. They couldn't even tell you the name of the lighting company, the sound company.

Q. What event are you talking about? Are you saying that there was an event that was under discussion that somebody wanted you --

A. They had contact at the State Fair, your clients did. I was told by Al Dorso to go contact them to use their resources for my show.

Page 144

D'Esposito - Confidential

Q. For Bamboozle or Big Time Rush?

A. Big Time Rush.

Q. And that would have been before the State Fair?

A. It would have been during the State Fair, at the time that they were -- that your clients had this arrangement. I don't even know what it was for. I wanted to use the site for Big Time Rush. We were either going to play State Fair or we were going to play Six Flags.

So we chose Six Flags because these guys had no ability to produce a show. They had no technical information. They had no experience. They had no real support system in place. So it was a disaster. Al set us up for a disaster, but he wanted the show.

Q. This is in February of 2011.

A. Uh-huh.

Q. And we're talking about concerts that would have taken place at the State Fair, which is in June and July; correct?

A. Yes.

Q. So how did you know in February of

Page 145

D'Esposito - Confidential

2011 that it was a disaster and couldn't have been done?

A. Because I asked them what kind of production they were using, what did they plan on doing. They're the producers. They own the venue now -- or they own the production. I had to use their resources. I needed to know. It's what a renter would do. I want --

Q. You needed to know that in February why?

A. Because you plan a tour months and months and months in advance.

Q. Even though earlier you testified you could make it happen in six seconds.

A. You can make it happen in six seconds.

Q. Right.

A. If I wanted Justin Bieber to jump on stage with Selena Gomez and he was standing next to me, I could ask him to go on stage in six seconds and he would.

Q. So Al Dorso was asking you --

A. No, he was telling us.

Q. He was telling you that your Big

37 (Pages 142 - 145)

Page 146

1  D'Esposito - Confidential
2  Time Rush show that you wanted to produce -- or
3  promote had to be done in conjunction with my
4  clients?
5      A.   Yes.
6      Q.   And do you know what day -- my
7  clients were primarily planning an electronic
8  dance event for the first weekend of the State
9  Fair in 2011.  When would Big Time Rush --
10     A.   They had a music exclusive on the
11 festival -- on the fair to all music.
12     Q.   So if you -- but did you -- would
13 this have been the same time that you produced
14 Big Time Rush at that venue the prior year?
15     A.   From what?
16     Q.   Well, you put on Big Time Rush
17 shows more than one year; correct?
18     A.   Yes.
19     Q.   And was it always in June or July
20 of the summer?
21     A.   Usually.
22     Q.   And before --
23     A.   Or August.
24     Q.   Before 2011, for how many years had
25 you done it?  Do you know?

Page 147

1  D'Esposito - Confidential
2      A.   I don't remember.
3      Q.   But it's something that you had
4  done repeatedly.  And so the summer of 2011 was
5  coming up and Mr. Dorso asked you to --
6      A.   Didn't ask.
7      Q.   -- he told you to cooperate with --
8      A.   Yes.  That's why you're completely
9  off with what you're going for here.  You're
10 fishing for Big Time Rush.  You have it.  I
11 don't know anything about EDM Festival.  I don't
12 care about it.  And I don't know anything about
13 it.  I don't know any of this.  So this is a
14 waste of time.  I've said that many times.
15         (D'Esposito Exhibit 12, Bates Nos.
16     LN0001012 through 13, E-Mail Chain, marked
17     for identification.)
18 BY MR. SIEGEL:
19     Q.   This is Exhibit No. 12.  It's a
20 series of e-mails between you and Chris Femiano
21 from February 23, 2011.  And you're talking
22 about -- it appears you're talking about the
23 Jonathan Peters show in Asbury Park that you
24 referred to earlier.  You tell Mr. Femiano --
25 you ask him, "What did Tommy do again?  I need

Page 148

1  D'Esposito - Confidential
2  to explain to the agent.  Did he stiff the
3  artist?"
4          When you say you need to explain to
5  the agent, what were you referring to there?
6      A.   Jonathan Peters, through a mutual
7  friend, wanted to play at Convention Hall again.
8  I didn't want to do the show.
9      Q.   So you're referring to Jonathan
10 Peters' agent there?
11     A.   Yes.
12     Q.   What I'm trying to understand is,
13 why Tommy D. would have been relevant to this
14 discussion.  You say -- I think you testified
15 earlier that you had the ability to book talent
16 for the Asbury Park venue, the Convention Hall.
17         If you wanted Jonathan Peters to
18 appear at the Convention Hall, couldn't you have
19 simply done that without Tommy D.'s involvement?
20     A.   I'm not an EDM promoter.
21     Q.   You're not an EDM promoter?
22     A.   No.
23     Q.   So your understanding was that if
24 Peters was going to appear at that venue again,
25 somehow Tommy D. would need to be involved?

Page 149

1  D'Esposito - Confidential
2      A.   An EDM promoter would need to be
3  involved.  It's not my specialty.
4      Q.   So why did you need to explain to
5  the agent what you think happened with Tommy on
6  the prior show?
7      A.   Because there's concerns about the
8  venue.  That's why Chris says in there he didn't
9  play Convention Hall.  There was a lot of
10 confusion.  Jonathan thought he was playing
11 Convention Hall.  He went down there and he was
12 playing the beach bar.  He was lied to.  He
13 wasn't paid.  It was a big disaster.
14         He saw a great crowd there for him,
15 but he didn't want to play because he didn't
16 have the production.  So he left and wanted his
17 money.  Got in a fight.  They left.
18         Year later, I guess, or whatever,
19 he comes back, Can we do that again?
20         I don't want any part of it.  I'm
21 asking the venue, Is Tommy D. still there?
22         I don't know what's going on.  It's
23 not my expertise.  But at this point, John
24 DiMatteo would be a better buyer than me.
25         MR. SIEGEL:  I am pressing forward

38 (Pages 146 - 149)

```
                                          Page 194
 1
 2         ERRATA SHEET
      VERITEXT/NEW YORK REPORTING, INC.
 3           1-800-727-6396
 4
 5   NAME OF CASE:    JUICE V. LIVE NATION
      DATE OF DEPOSITION: DECEMBER 18, 2013
 6   NAME OF DEPONENT:   JOHN D'ESPOSITO
 7
 8   PAGE  LINE(S)   CHANGE          REASON
 9   ___|____|_____|_____
10   ___|____|_____|_____
11   ___|____|_____|_____
12   ___|____|_____|_____
13   ___|____|_____|_____
14   ___|____|_____|_____
15   ___|____|_____|_____
16   ___|____|_____|_____
17   ___|____|_____|_____
18   ___|____|_____|_____
19
20            _____
21              JOHN D'ESPOSITO
22   Subscribed and sworn to before me
23   this _____ day of _____, 2014.
24   _____    _____
25   (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

```
                                          Page 195
 1
 2   STATE OF NEW YORK   )
 3           ss:
 4   COUNTY OF NEW YORK  )
 5
 6        I, Eileen Mulvenna, Notary Public
 7   within and for the State of New York, do hereby
 8   certify:
 9
10        That I reported the proceedings in
11   the within entitled matter, and that the within
12   transcript is a true record of said proceedings.
13
14
15        I further certify that I am not
16   related to any of the parties to the action by
17   blood or marriage, and that I am in no way
18   interested in the outcome of this matter.
19
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 3rd day of January, 2014.
22
23            _____
24              Eileen Mulvenna, CSR/RMR
25
```