NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT, <br><br>  Plaintiffs,<br>  v.<br><br> LIVE NATION ENTERTAINMENT, INC., <br><br>  Defendant. | **OPINION** <br><br> Civ. No. 11-7318 (WHW) (CLW) |

**Walls, Senior District Judge**

Defendant Live Nation Entertainment, Inc. ("Live Nation") moves for summary judgment against Plaintiffs Juice Entertainment, LLC ("Juice Entertainment"), Thomas Dorfman, and Chris Barrett under Federal Rule of Civil Procedure 56. ECF No. 73. Plaintiffs oppose. ECF No. 75. Decided without oral argument under Federal Rule of Civil Procedure 78, Live Nation's motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This dispute concerns alleged interference with an effort to stage an electronic dance music ("EDM") event at the 2011 New Jersey State Fair. The parties agree on some basic facts. Dorfman and Barrett are principals of Juice Entertainment. On March 7, 2011, Juice Entertainment entered into a contract with State Fair Event Management ("SFEM") giving Juice Entertainment the right to stage an EDM event during the 2011 New Jersey State Fair, June 25 and 26, 2011 (the "Event"). Pls.' Counterstatement of Facts at 1–2, ECF No. 75. According to the terms of the contract, Juice Entertainment agreed to provide SFEM with the identities of performers booked for the Event, as well as copies of all corresponding contracts, by March 1,

1

2011. *Id.* at 2. In a rider to the contract, SFEM agreed to extend that deadline by 30 days, resulting in an April 1, 2011 deadline for Juice Entertainment to book performers for the Event. *Id.*

Before signing the March 7 contract with Plaintiffs, SFEM was in discussions with both Plaintiffs and Live Nation regarding the State Fair. Al Dorso of SFEM offered Live Nation's John D'Esposito the opportunity to produce concerts at the State Fair, but D'Esposito declined. Wagner Cert., Ex. 15, ECF No. 75. After some discussions with Plaintiffs in fall 2010, Dorso issued a December 1, 2010 engagement letter to enable Plaintiffs to "get investors and book acts" for the Event. Marx Cert., Ex. 4, ECF No. 73.

Plaintiffs had little experience planning and producing concerts as large as the planned Event. Before forming Juice Entertainment in 2009, neither Barrett nor Dorfman had produced an outdoor festival event, EDM event, or any other concert or event with more than 5,000 attendees. Pls.' Counterstatement of Facts at 14. Plaintiffs' largest event before early 2011 was a 2010 Latin music festival—produced under a separate agreement with SFEM—which lost money. *Id.* at 15. In early 2011, Plaintiffs sought the assistance of non-party John DiMatteo to help produce the Event and, in particular, to convey offers to three talent agencies representing EDM artists—AM Only, the Windish Agency ("Windish"), and William Morris Entertainment ("WME")—to perform at the Event. *Id.* at 2–3. While there is some dispute about the extent of DiMatteo's booking responsibilities, he was at least in charge of booking headline acts for the Event. *Id.* at 3. Plaintiffs also received assistance from Alan Sacks, Paul Potter, and Vito Bruno. Wagner Cert., Exs. 6, 18, 19, 20, 21, 60.

Plaintiffs targeted three EDM artists in particular, Tiesto, David Guetta, and Steve Agnello. Pls.' Counterstatement of Facts at 3–4. DiMatteo, through his company Area Events,

had successfully booked Tiesto in the past. Wagner Cert., Ex. 31. Between January 26 and February 21, 2011, DiMatteo sent each performer's agent an offer to perform at the Event. Pls.' Counterstatement of Facts at 4–7. None ultimately accepted. *Id.* DiMatteo also made offers to roughly 30 other WME-represented EDM performers, all of which expired on February 12, 2011. *Id.* at 7–8. On February 22, DiMatteo sent Windish offers for five of its performers. *Id.* DiMatteo also expressed interest in 20 other AM Only EDM artists. *Id.* at 5. Of DiMatteo's offers, only one was accepted. *Id.* at 7–8. That acceptance, by performer Matthew Dear, did not ultimately result in a contract. *Id.* Plaintiffs did not meet their April 1, 2011 deadline to produce signed contracts with EDM artists to perform at the Event, and SFEM cancelled the contract. *Id.* at 10–11.

Plaintiffs then sued Live Nation for tortious interference with contract, unlawful interference with contract, tortious interference with business relations, defamation, and unfair competition. *See* Compl., ECF No. 1. The Court granted Live Nation's motion to dismiss Plaintiffs' claim for tortious interference with contract, finding that Plaintiffs insufficiently pled that there was a reasonable probability they would have succeeded in carrying out their contract with SFEM in the absence of interference. ECF No. 20. The Court also dismissed Plaintiffs' claims for defamation, unfair competition, and unlawful interference with contract. *Id.* Plaintiffs then filed an amended complaint, alleging tortious interference with contract, tortious interference with business relations, and defamation. ECF No. 24. Live Nation answered the amended complaint, ECF No. 25, and now moves for summary judgment. ECF No. 73.

## **LEGAL STANDARD**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute between the parties must be both genuine and material to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A disputed fact is material where it would affect the outcome of the suit under the relevant substantive law. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is genuine where a rational trier of fact could return a verdict for the non-movant. *Id.*

The movant bears the initial burden to demonstrate the absence of a genuine issue of material fact for trial. *Beard v. Banks*, 548 U.S. 521, 529 (2006). Once the movant has carried this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" in question. *Scott*, 550 U.S. at 380 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir.1995).

Each party must support its position by "citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Facts must be viewed in the light most favorable to the

nonmoving party only if there is a genuine dispute as to those facts. *Scott*, 550 U.S. at 380. At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter." *Anderson*, 477 U.S. at 249.

## DISCUSSION

### I. Tortious Interference (Counts 1 and 2)

Under New Jersey law, an action for tortious interference requires: (1) a protectable right (a prospective economic or contractual relationship); (2) interference done intentionally and with malice; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) damage from the interference. *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751 (1989). In addition, a cause of action for tortious interference can only be directed against defendants who are not parties to the relationship. *Id.* at 752. "Malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *MacDougall v. Weichert*, 144 N.J. 380, 404 (1996).

Count 1 alleges that Live Nation interfered with Plaintiffs' SFEM contract by "exert[ing] pressure on SFEM directly and through the [New Jersey Sports and Exposition] Authority with the design and intent to obtain for itself a portion of the business represented by the [SFEM contract]," and by "blocking access to the agencies and the artists that Juice Entertainment needed to stage concerts." Amended Compl. ¶¶ 110–11. Count 2 alleges that Live Nation interfered with Plaintiffs' prospective business relations with talent agencies, EDM artists, SFEM, and the Authority. *Id.* ¶ 120.

Live Nation argues that the Court should grant summary judgment on Counts 1 and 2 because the record contains no evidence of interference. Specifically, Live Nation contends that the record evidence contains no support for Plaintiffs' contention that Live Nation "block[ed]

access to the agencies and the artists" or "pressure[d] those parties . . . to prevent them from doing business with Plaintiffs." Def.'s Mot. at 30, ECF No. 73. It further argues that, regarding Count 2, Plaintiffs had no protectable right because they "had no existing or reasonable expectation that any of the artists to whom they had made offers would actually perform at the Event." *Id.* at 31.

    a. <u>There is a triable issue of fact regarding Live Nation's alleged interference.</u>

The record contains sufficient evidence raising a question of fact regarding whether Live Nation interfered in Plaintiffs' prospective business relationships. That evidence takes two principal forms: interference with talent agents, and interference with SFEM.

    i. Interference with talent agents

The record contains sufficient evidence to raise a triable issue of fact regarding whether Live Nation interfered with Plaintiffs' efforts to book talent for the Event. There is evidence that Live Nation learned the terms of Plaintiffs' possible agreement with SFEM as early as February 18, 2011. *See* Def.'s Resp. to Plaintiffs' Counterstatement of Material Facts at 20 (undisputed that Miller, D'Esposito, and Dorso met on February 18); Wagner Cert. Ex. 15 (Dorso testifying that he told D'Esposito at a meeting that Plaintiffs "had to meet certain criteria and timelines" under their contract, that he could not recall the date of the meeting, and suggesting it was possibly sometime in March); *Id.* Ex. 56 (February 23 text message from Miller states that "if they don't have talent and funding locked up by 2 weeks or something, the site bails on them"); *Id.* Ex. 8 (Dorfman testifying that D'Esposito told him on March 3 that "[t]here are loopholes in your contract, I can kick you out of your contract anytime I want").

In a February 15, 2011 email from Live Nation's Jason Miller to WME agents Joel Zimmerman and Samantha Kirby, Miller sought to convince the agents to allow Live Nation to

partner with Area Events, DiMatteo's company, in producing a show. Wagner Cert. Ex. 11. In doing so, he referred to DiMatteo—who, at the time, had partnered with Plaintiffs in producing the Event—as a "street promoter" who was ill-equipped to handle a larger event. *Id.*

Plaintiffs claim that Miller's February 15, 2011 email to Kirby was an attempt to influence her opinion of DiMatteo, on whom Plaintiffs relied to book "anchor" talent. Miller's success, according to Plaintiffs, is reflected in a February 23 email in which Kirby responded to an inquiry from another WME agent about the Event by stating, "it[']s the same flaky promoter that just [messed] up the new york marketing and owes live nation money . . . ." *Id.* Ex. 12. While Kirby had expressed reservations about DiMatteo in the past, *see id.* Ex. 32, the evidence suggests that her claim about DiMatteo owing Live Nation money originated from Miller's February 15 email, and whether her opinion of DiMatteo as "flaky" and having poor marketing performance was colored by Miller's comments is a disputed fact. *See id.* Ex. 11.

Plaintiffs met with Miller and D'Esposito on March 3 at Live Nation's headquarters. *Id.* Ex. 8. Dorfman testified that, at this meeting, Miller expressed Live Nation's desire to partner with Plaintiffs to stage the Event, saying "I'm not going to allow you to get talent unless you partner with us," and that WME was Live Nation's "exclusive agency" from which Plaintiffs "were not getting any talent." *Id.* Live Nation disputes Dorfman's "self-serving recollection of what allegedly transpired at the meeting," *see* Def.'s Resp. to Pls.' Counterstatement of Material Facts at 22, but it raises the question whether Dorfman's recollection is accurate and, if so, whether Live Nation followed through on its threats.

Plaintiffs also offer a series of transcripts of meetings with various parties—apparently recorded surreptitiously—as evidence of Live Nation's interference. In one, Al Dorso "insinuated to Plaintiffs that Live Nation had been badmouthing them and their attempts to stage

7

the Meadowlands concert to agents for various artists . . . ." Opp. at 21. Assuming Plaintiffs could lay a proper authenticity foundation to introduce the transcripts or audio recordings themselves at trial, Dorso's insinuation is inadmissible hearsay. *See* Fed. R. Evid. 801 (hearsay is a statement that "a party offers in evidence to prove the truth of the matter asserted . . . ."); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 n.3 (3d Cir. 1987) ("Summary judgment, of course, looks only to admissible evidence."). The Court reaches the same conclusion regarding DiMatteo's tape-recorded April 20 recounting of statements made to him by Tiesto's road manager. Opp. at 21.

Miller's statements at an April 22 meeting with Plaintiffs, however, are likely excluded from the hearsay prohibition as the statements of an opposing party, and are admissible upon a showing of authenticity. *See* Fed. R. Evid. 801(d)(2)(D) ("A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ."). In that meeting, Miller acknowledged that Plaintiffs were unlikely to be able to book "premium talent" for the Event or future shows unless they partnered with Live Nation. *See* Wagner Cert. Ex. 40 (Miller: "How were you going to get [premium talent]? If you weren't going to get it with me . . ., how were you going to get it done? . . . Well there's just a lot of talent we have, and we've got it."). Miller was employed by Live Nation at the time, and Plaintiffs have offered evidence suggesting that talent-booking and event-management were within the scope of his duties.

8

ii. Interference with SFEM

The record also contains sufficient evidence of Live Nation's interference with SFEM to raise a material question of fact. On February 16, Miller forwarded his February 15 email correspondence with Zimmerman and Kirby to D'Esposito, who replied with a request for "a shortened and money unpaid, trouble collecting email to send to [Al Dorso] to make this swing back." Wagner Cert. Ex. 36. D'Esposito testified that he was referring to a show that he hoped to produce at the State Fair, and for which Dorso wanted him to collaborate with Plaintiffs. *See* Marx Reply Cert. Ex. D. D'Esposito did not want to partner with Plaintiffs. *See id.*

Later, in a February 22 email, D'Esposito promised Al Dorso Jr., Dorso's son and employee, that he would "get [Dorso Jr.] the background info on tommy d the promoter who is trying to weasel into the state fair." Wagner Cert. Ex. 47. D'Esposito began that effort on February 23 by emailing Chris Femiano, a venue manager who had worked with Dorfman in the past. *Id.* Ex. 37. D'Esposito forwarded Dorso Jr. that email exchange with Femiano in which Femiano claimed, among other things, that Dorfman had forged a contract and was intoxicated at the event. *Id.* D'Esposito's email to Dorso Jr. claimed that Plaintiffs "are street kids, they CAN NOT produce an event . . . . This crowd could do damage to your father's event, drugs are huge at these events . . . . Tommy D is a smooth talker, but a serious liability." *Id.* Dorso testified that, soon thereafter, D'Esposito expressed interest in producing shows at the State Fair despite having turned down that opportunity when it was presented to him in the past; Dorso likened the State Fair to a sandbox, testifying that D'Esposito "didn't want to play in it until other kids seemed to play in it." *Id.* Ex. 15. According to Dorso, D'Esposito stated that he wanted to speak with Plaintiffs about collaborating, saying, "These guys don't know what they are doing." *Id.*

NOT FOR PUBLICATION

According to Dorfman, at Plaintiffs' March 3 meeting with D'Esposito and Miller, D'Esposito claimed that he had "seen [Plaintiffs'] contract," that "[t]here are loopholes in your contract, I can kick you out of your contract anytime I want," and that "I have a close relationship with Al Dorso . . . I can throw you out anytime I want." *Id.* Ex. 8. Dorfman testified that Miller and D'Esposito gave Plaintiffs "an ultimatum that we either partner with them or there is no event." *Id.* Barrett testified that, at the March 3 meeting, Miller and D'Esposito informed him that WME and Windish talent belonged to Live Nation. Marx Cert. Ex. 1.

> b. <u>Because all alleged interference occurred before Plaintiffs entered into a contract with SFEM, Plaintiffs' tortious interference with contract claim must fail.</u>

"In order to prove tortious interference with a contract . . . there must be an existing contract." *Woods Corporate Assocs. v. Signet Star Holdings, Inc.*, 910 F.Supp. 1019, 1031 (D.N.J. 1995). All alleged interference occurred before Plaintiffs and SFEM entered into their March 7, 2011 contract. Thus, for alleged interference occurring between December 1, 2010, and March 7, 2011, to have constituted tortious interference with contract, the December 1 engagement letter must have been an enforceable contract. Neither party addresses this issue in their briefing.

"A contract arises from offer and acceptance, and must be sufficiently definite so 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992) (citing *West Caldwell v. Caldwell*, 26 N.J. 9, 24–25 (1958); *Friedman v. Tappan Dev. Corp.*, 22 N.J. 523, 531 (1956); *Leitner v. Braen*, 51 N.J.Super. 31, 38–39 (1958)). "Where parties do not agree to one or more essential terms, however, courts generally hold that the agreement is unenforceable." *Weichert*, 128 N.J. at 435. (citing *Heim v. Shore*, 56 N.J.Super. 62, 72–73 (1959) (holding agreement unenforceable

because parties did not agree on terms of payment, principal amount of mortgage, due date, and interest rate)).

"New Jersey law deems the price term, *i.e.*, the amount of compensation, an essential term of any contract." *Baer v. Chase*, 392 F.3d 609, 619 (3d Cir. 2004) (citing *MDC Inv. Prop., L.L.C. v. Marando*, 44 F.Supp.2d 693, 698–99 (D.N.J. 1999)). Absent a specified price, a contract is unenforceable unless it specifies "a practicable method by which [the parties] can determine the amount." *Baer*, 192 F.3d at 619 (citing *Moorestown Mgmt., Inc. v. Moorestown Bookshop, Inc.*, 104 N.J.Super. 250, 259 (1969)). Here the December 1 engagement letter contains no price term, and specifies no alternative method by which Dorfman, Barrett, and SFEM could determine compensation. *See* Wagner Cert. Ex. 17. It is not an enforceable contract. This conclusion is consistent with the parties' stated intent that they would enter into "a formal contract at a later date as more information is forthcoming." *Id.* Because all alleged interference pre-dates Plaintiffs' March 7, 2011 contract, the Court grants summary judgment to Live Nation on Count 1.

   c. <u>There is a triable issue of fact regarding whether Plaintiffs had an existing or reasonable expectation of booking Windish or WME-represented artists.</u>

A claim for tortious interference must be grounded in some protectable right—either a contract or some prospective economic relationship. *Printing Mart-Morristown*, 116 N.J. at 751. Where the protectable right is not an existing contract, "there must be allegations of fact giving rise to some reasonable expectation of economic advantage." *Id.* (citations and quotations omitted). The New Jersey Supreme Court has counseled that, in tortious-interference claims, "the right protected is plaintiff's right to pursue business," and that its precedents "found a reasonable expectation of economic gain in as slight an interest as prospective public sales." *Id.* at 754 (citations and quotations omitted). Live Nation claims that Plaintiffs had no "reasonable

11

expectation" that the artists to whom they offered performance contracts would accept those offers. Def.'s Mot. at 31. The summary-judgment record, however, contains sufficient evidence to create "genuine issue as to a material fact for trial." *Siegel Transfer, Inc.*, 54 F.3d at 1130–31.

In early 2011, Plaintiffs and DiMatteo began contacting talent agents in order to sign their artists for the Event. The record evidence suggests that numerous agents expressed interest in booking their clients for the Event. In mid-January, Steve Angello's agent, Steve Goodgold of Windish, indicated that Angello would be amenable to a June 25 outdoor show in the New York City area. Wagner Cert. Ex. 10. By January 25, WME appeared to be interested in playing a large role in the Event; WME's Joel Zimmerman proposed to his team that WME talent perform on the Event's second day, calling it "our day." *Id.* Ex. 27. In response to a January 28, 2011 inquiry from DiMatteo, WME agent Peter Wiederlight stated that big-name artists Afrojack and the Chemical Brothers were "def. possible." *Id.* Ex. 26. WME agent Alex Chaykin wrote in a February 7, 2011 email that "Calvin [Harris] can confirm MEADOWLANDS festival. We just have to work on the exact date as I am awaiting a EDC LA offer. Also will have to review set times/billing/stage as well." *Id.* Ex. 23.

Live Nation claims that artists did not accept Plaintiffs' various offers because the Event overlapped with the Electric Daisy Carnival in Las Vegas ("EDC"), and Plaintiffs thus could not have had a reasonable expectation of getting any talent booked for or contemplating performing at EDC. But record evidence indicates that various agents considered having their artists perform at both EDC and the Event, one day after the other. *See id.* Ex. 10 (Goodgold informing DiMatteo that he "need[s] to keep in mind that Steve [Angello] does EDC the night before. That date is a bit harder because I have to put Steve on an early flight against the clock."); *id.* Ex. 27 (Zimmerman noting that he "floated the idea of WME having the Sunday where we will have all

the EDC LA talent from the agency avail[able] to be our day"). Plaintiffs have thus made a sufficient showing that they had "a reasonable expectation of economic advantage" to survive summary judgment. *Printing Mart-Morristown*, 116 N.J. at 751.

## II. Count 3: Defamation

To succeed on their defamation claim, Plaintiffs must show, "in addition to damages, (1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting to at least negligence by the publisher." *DeAngelis v. Hill*, 180 N.J. 1, 12–13 (2004). Plaintiffs' defamation claims rest on its allegations that "Live Nation told third parties that Plaintiffs lacked the funding, business acumen, and experience in concert promotion to be able to perform under the Agreement with SFEM. According to Plaintiffs, in meetings with members of SFEM and the Authority, Live Nation falsely stated that Plaintiffs associated with 'thieves' and could not be trusted." Amended Compl. ¶ 133.

Live Nation first argues that there is no competent evidence that it made any defamatory statements. Def.'s Mot. at 35. Next, it contends that, even if Live Nation made those statements, "they would have had no effect on SFEM's decision to terminate Plaintiffs' contract." *Id.* Finally, Live Nation argues that Plaintiffs cannot show damages because the alleged defamatory statements pre-dated the SFEM contract. *Id.* at 35–36.

### a. Alleged Statements

Plaintiffs allege a number of defamatory statements: first, at his deposition, Dorfman recalled a conversation with Dorso in which Dorso informed him about Live Nation's meddling; Dorso told him that Live Nation said "[t]hat [Plaintiffs'] partners were thieves, that they were broke, that [Live Nation] was bad mouthing [Plaintiffs] and all of [Plaintiffs'] partners to the

13

Sports Authority, to [Dorso] . . . ." Pls.' Opp. at 24 (citing Wagner Cert. Ex. 8). At his deposition, Dorso did not recall anyone at Live Nation making these statements. *See* Marx Cert. Ex. 4.

Plaintiffs point to D'Esposito's February 23, 2011 email to Dorso Jr. in which he forwarded an email from Femiano claiming, among other things, that Dorfman had forged a contract and was intoxicated at the event. Wagner Cert. Ex. 37. D'Esposito stated that Plaintiffs "are street kids, they CAN NOT produce an event . . . . This crowd could do damage to your father's event, drugs are huge at these events . . . . Tommy D is a smooth talker, but a serious liability." *Id.*

Plaintiffs point to Miller's February 16, 2011 email to WME employees Zimmerman and Kirby in which he stated that DiMatteo "owes me in excess of $100K." *Id.* Ex. 36. Plaintiffs claim that "Miller shared with D'Esposito his text message on February 23, 2011, wherein he implied to Stephani LaFera, Manager of Kaskade, another prominent DJ, that the Plaintiffs are not funded and have no talent, and they could lose their contract within 2 weeks if not remedied." Pls.' Opp. at 26 (citing Wagner Cert. Ex. 56). "Vito Bruno testified that he 'had to actually show proof of funds at the point when Johnny D from Live Nation went into Al over at Meadowlands Fair and told him that nobody had any money.'" *Id.* (quoting Wagner Cert. Ex. 1).

Hearsay problems doom some of Plaintiffs' efforts to prove that Live Nation made a defamatory statement. Dorfman's testimony recounts the out-of-court statement of non-party Al Dorso, and Bruno's testimony indicates that he heard about what D'Esposito said to Dorso about Plaintiffs' funding second-hand. *See* Wagner Cert. Ex. 1 (Bruno testifying that Plaintiffs served as intermediaries in providing Dorso proof of funding). Each piece of testimony thus contains at least two layers of hearsay: Live Nation's alleged out-of-court statements to Dorso, and Dorso's

recounting of those statements to the testifying witness, either directly or indirectly. While Live Nation's out-of-court statements may be excluded from the hearsay prohibition as statements of a party-opponent, *see* Fed. R. Evid. 801(d)(2)(D), their recounting by others does not appear to qualify as nonhearsay or fall within any hearsay exception. See Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *Nichols v. Bennett Detective & Protective Agency, Inc.*, 245 Fed. Appx. 224, 228 (3d Cir. 2007) (affirming district court's refusal to consider plaintiff's "own testimony about out-of-court statements allegedly made by" a non-party conveying defendant's allegedly defamatory remarks). Plaintiffs are thus unable to offer any admissible evidence of either allegedly defamatory statement.

Another allegedly defamatory statement suffers from a different defect: all available evidence indicates that it was true. DiMatteo testified that, after a New Years Eve show at the end of 2010, he owed Live Nation "[a] little over $100,000." Marx Reply Cert. Ex. A. He acknowledged that "[w]e just took a little longer to get it to them than we should have but we got it to them. . . . Maybe a couple months after the show." *Id.* Miller's February 16 email was within "a couple months" of the show, indicating that DiMatteo had not yet paid him. The record contains no evidence suggesting that Miller's statement about DiMatteo was false, and a true statement cannot support a claim for defamation. *See G.D. v. Kenny*, 205 N.J. 275, 293 (2011).

Apparently Plaintiffs misread this allegedly defamatory statement: in Miller's February 23 text message to Stephani LaFera, he clearly states, "if they don't have talent and funding locked up by 2 weeks or something, the site bails on them." Wagner Cert. Ex. 56 (emphasis added). Thus, Miller did not claim that Plaintiffs lacked talent and funding; he merely (and

truthfully) recited the consequences if Plaintiffs failed to comply with the terms of the contract Plaintiffs were negotiating with SFEM. That statement was neither false nor defamatory.

That leaves the final allegedly defamatory statement: D'Esposito's February 23 email to Dorso Jr., stating that Plaintiffs "are street kids, they CAN NOT produce an event . . . . This crowd could do damage to your father's event, drugs are huge at these events . . . . Tommy D is a smooth talker, but a serious liability." Wagner Cert. Ex. 37. Live Nation does not argue that this particular statement is non-defamatory; instead, it claims that Plaintiffs cannot show any resulting damages because the statements pre-dated Plaintiffs' March 7 contract with SFEM. Def.'s Reply at 8–9. That contention is addressed below.

b. Damages

Live Nation next contends that Plaintiffs cannot show damages for two reasons. First, "the statements that were allegedly made pre-dated the very contract whose 'dissolution' they supposedly caused." Def.'s Mot. at 35. Second, the allegedly defamatory statements were not the reason that SFEM terminated the contract, and Plaintiffs' claimed reputational damages are not recoverable. *Id.* at 35–36.

Plaintiffs respond that "[s]tatements made and influenced by Live Nation were a major contributing factor to the cancellation of the SFEM contract because they prevented Plaintiffs from locking down the talent and gave Dorso a basis to not go forward with the contract. As a result of this conduct, the artists refused to perform at the proposed festival and the Event was cancelled." Pls.' Opp. at 27. Plaintiffs further claim that they have "established defamation *per se* which does not require any proof of damages." *Id.*

New Jersey law recognizes three categories of damages in defamation actions: actual, punitive, and nominal. *Nuwave Inv. Corp. v. Hyman Beck & Co.*, 221 N.J. 495, 499 (2015).

16

"Actual" damages include "special" damages, which compensate a plaintiff for specific economic or pecuniary loss, and "general" damages, which "address harm that is not capable of precise monetary calculation," including "impairment to reputation and standing in the community, along with personal humiliation, mental anguish, and suffering to the extent that they flow from the reputational injury." *Id.* (quoting *W.J.A. v. D.A.*, 210 N.J. 229, 239 (2012)). "Nominal" damages include "presumed" damages, which are "a procedural device that allows a defamation case to go to the jury in the absence of proof of actual damages. If the jury finds the statement defamatory, without proof of actual damages, only nominal damages can be awarded." *Id.* at 498–99.

In deciding Live Nation's earlier motion to dismiss Plaintiffs' complaint, the Court dismissed Plaintiffs' original claim for defamation, holding that they failed to plead any damage from Live Nation's allegedly defamatory statements because the allegedly defamatory statements pre-dated the finalization of Plaintiffs' contract with SFEM. ECF No. 20. The same logic applies here—Plaintiffs cannot claim that DiMatteo's February 23, 2011 statement caused the dissolution of their March 7, 2011 contract with SFEM, and thus cannot recover special damages.

Nor do Plaintiffs effectively rebut Live Nation's argument that Plaintiffs cannot show any "general" damages resulting from reputational impairment. Plaintiffs claim that "Live Nation's defamatory statements and the resulting consequences destroyed [Dorfman's] reputation in the industry." Pls.'s Opp. at 27. But they fail to cite any record evidence in support of that claim, and their counterstatement of facts does not address reputational damage. Regarding "general" damages, Plaintiffs have thus failed to meet their burden of "present[ing] actual evidence that creates a genuine issue as to a material fact for trial." *Siegel Transfer*, 54 F.3d at 1130–31.

Plaintiffs' defamation claim can survive summary judgment, however, because of the presumed-damages doctrine. Any recovery at trial on the defamation claim will be limited to those nominal damages.

### III.  Lost Profits

Finally, Live Nation argues that, even if some of Plaintiffs' claims proceed to trial, "well-settled law precludes Plaintiffs from recovering speculative lost profits for a new venture that did not, and would never, turn any profit." Def.'s Mot. at 36. Consequently, "the Court should enter an order barring Plaintiffs from attempting to introduce any lost profit evidence." *Id.* Plaintiffs counter that Live Nation "ignores the fact that New Jersey federal courts and the Third Circuit have concluded that the 'reasonable certainty' test is the better test to apply when evaluating claims for lost profits." Pls.' Opp. at 28.

Lost profits are a measure of compensatory damages that may be recoverable if capable of being established to a "reasonable degree of certainty." *Desai v. Bd. of Adjustment of Town of Phillipsburg*, 360 N.J. Super. 586, 595 (App. Div. 2003) (citing *Stanley Co. of Am. v. Hercules Powder Co.*, 16 N.J. 295, 314 (1954)), cert. denied, 177 N.J. 492 (2003). Anticipated profits that are too remote, uncertain, or speculative are not recoverable. *Id.* That a plaintiff may not be able to fix its lost profits with precision will not preclude recovery of damages, but courts require a "reasonably accurate and fair basis for the computation of alleged lost profits." *V.A.L. Floors, Inc. v. Westminster Communities, Inc.*, 355 N.J. Super. 416, 424 (App. Div. 2002). The new-business rule provides that there should be no award of lost profits for a new business because the "prospective profits of a new business are considered too remote and speculative to meet the legal standard of reasonable certainty." *RSB Lab. Servs., Inc. v. BSI Corp.*, 368 N.J. Super. 540, 556 (App. Div. 2004).

18

NOT FOR PUBLICATION

Some doctrinal confusion resulted in the 1990s from federal courts' departure from the new-business rule. *See Lightning Tube v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993). That departure was occasioned by the New Jersey Supreme Court's plurality opinion in *Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 129 N.J. 479 (1992), which New Jersey courts have since declined to follow. *See Bell Atl. Network Serv., Inc. v. P.M. Video Corp.*, 322 N.J. Super. 74, 98–99 (App. Div. 1999) (adhering to the new-business rule and noting that "the arguments for abandonment of the 'new business rule' . . . appear only in the plurality opinion in *Perini*[,] . . . which only involved arbitration and was itself overruled on other grounds . . . ."). Because New Jersey courts view the new-business rule as controlling law, so will this Court.

The new-business rule operates here to bar Plaintiffs from recovering lost profits. New Jersey courts have applied the new-business rule in analogous cases. In *Seaman v. U.S. Steel Corp.*, 166 N.J. Super. 467 (App. Div. 1979), the plaintiffs operated a marine-salvage business and sought to construct a 100-ton-capacity floating crane. *Id.* at 469. The plaintiff found that the steel plates it purchased from the defendant to build the crane were faulty, and sued for lost profits, including lost profits under a contract that required the use of the crane, and loss of the crane's monthly rental value. *Id.* at 469–72. Because the plaintiff had "never operated a crane of this size in their business, nor had they ever rented such a crane to others," the court found that those claimed lost profits were too speculative to recover. *Id.* at 475. Similarly, in *Weiss v. Revenue Building & Loan Association*, 116 N.J.L. 208, 212 (E&A 1936), the new-business rule precluded lost-profits recovery for a plaintiff who sought to transition from operating a rooming house to a fifty-six unit residential property. *See also Sea Crest Enterprises, L.L.C. v. City of Elizabeth*, 2006 WL 2590327, at *10 (N.J. App. Div. Aug. 8, 2006) (affirming denial of lost-profits recovery under new-business rule where plaintiff, an "experienced builder," had never

19

worked on "a major redevelopment project" like the one at issue, and where "the numerous contingencies that had to be satisfied made the completion of the project with the anticipated profits too uncertain to form the basis for an award of damages").

While Plaintiffs may have successfully promoted and produced smaller shows, the Event was of a much larger scale, and Plaintiffs' sole foray into large-scale outdoor-event production resulted in losses, not profits. Lost-profits damages are thus "too remote and speculative to meet the legal standard of reasonable certainty." *RSB Lab. Servs.*, 368 N.J. Super. at 556.

## CONCLUSION

Live Nation's motion for summary judgment is granted as to Count 1, and denied as to Counts 2 and 3. Further, Plaintiffs will be precluded from seeking lost-profits damages at trial. An appropriate order follows.

DATE: 23/M/g 2018

William H. Walls
Senior United States District Court Judge