# EXHIBIT A



SMITH
+SCHWARTZSTEIN
LEGAL SERVICES

Andrew Smith
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960
T:  973.206.1725
F:  973.794.2589
E:  asmith@sslegalservices.com

June 6, 2019

**VIA HAND DELIVERY**
Ian S. Marx, Esq.
Greenberg Traurig LLP
500 Campur Drive
Florham Park, New Jersey 07932

> **Re:  Juice Entertainment LLC, Thomas Dorfman and Chris Barrett v. Live Nation Entertainment Inc.**
> **Civil Action No. 2:11-cv-07318-WHW-CLW**

Dear Ian:

As you know, my firm represents Plaintiffs Juice Entertainment LLC, Thomas Dorfman and Chris Barrett ("Plaintiffs") in the above referenced matter.  Enclosed please find the expert report of Dr. Rich Barnet.  The report addresses two of the defenses made by Defendant Live Nation Entertainment Inc. ("Defendant") here.  This report is being served now for a variety of reasons, including but not limited to the fact that discovery here was produced extremely late, and that said discovery was intentionally produced in a manner to hide key documents by breaking documents into pieces and spreading them out over a large production.

This report is important and necessary for trial.  First, it not only addresses the issue of whether Plaintiffs should have taken the deal offered to them by Defendant to co-promote the event at issue, but demonstrates that the reason was due to Defendant's fraud.  Plaintiffs knew at the time they made the decision that they could not possibly have taken that deal, but the late produced discovery documents, once pieced together, identified exactly why – because Defendant has instituted a scheme which essentially defrauds everyone involved accept it, from the artists to the ticket purchasers, and especially including co-promoters like Plaintiffs.  By entering into contingent compensation agreements which specifically exclude "ancillary income" like rebates from the split at the end of the event, and then negotiating with the venues behind the artists and co-promoter's backs to pay the venues (mostly owned by Defendant) more in exchange for more rebates which only inure to Defendant's benefit, Defendant not only ensures that it is the only one assured of making money, but that co-promoters like Plaintiffs cannot possibly make a profit on the event.  Dr. Barnet, perhaps the foremost academic authority on promotion, confirms this for Plaintiffs.  This information is relevant both to the prosecution of the underlying case, but also to Plaintiffs' arguments for punitive damages.

Second, it addresses the important issue of Plaintiffs' experience and ability not just to have promoted this event, but also to promote future events as well.  Dr. Barnet, an unquestioned authority who literally wrote the book on music promotion, is as well placed as anyone to opine

as to their qualifications.  This will be both helpful at trial, and in front of the Third Circuit on appeal, as it directly contradicts the Judge's erroneous finding.  For your convenience, I have attached all of the supporting documentation justifying Dr. Barnet's opinions.

Thank you for your time and attention.  If you have any questions or concerns, please do not hesitate to contact me directly.

Yours Truly,
SMITH + SCHWARTZSTEIN LLC


Andrew B. Smith, Esq.

Enclosures

# EXHIBIT B

## STATEMENTS of OPINION

This document contains the opinions of Richard D. Barnet, Ph.D. These opinions are drawn from his professional experience in live entertainment, his experience as a professor who has taught live entertainment courses throughout his 38-year career as a professor, his authorship and co-authorship of several books, including *This Business of Concert Promotion and Touring* (the textbook most often adopted by universities offering a course in live entertainment), his review of other texts and treatises on the relevant subject matter, and the review of the many documents provided to him by the plaintiffs in Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett vs. Live Nation Entertainment.

Kindly refer to *Attachment No. 1* in order to view my complete resume.

BRIEF STATEMENT OF FACTS

I reviewed facts presented in:

FIRST AMENDED COMPLAINT: DEMAND FOR JURY TRIAL JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND   CHRIS BARRETT Plaintiffs, vs. LIVE NATION ENTERTAINMENT, INC., Defendant Civil Action No. 11-7318-WHW-MCA UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

LIST OF DOCUMENTS PROVIDED TO ME BY PLAINTIFFS

Kindly refer to *Attachment No. 2* for a list of documents the plaintiffs provided me.

BIBLIOGROPHY

Kindly refer to *Attachment No. 3* to view my bibliography.

DEFINITIONS

Because there exists no lexicon for the concert promotion and touring industry, professionals occasionally use different terms to describe the same thing. I am, therefore, providing the terms that are relevant, and ones that I use, in this document. This will also help one better understand the various terms that are presented in the many documents presented and discussed throughout this litigation.

### BUSINESS ENTITIES

The basic "triad" of a concert is typically: the talent buyer, the venue owner and/or operator, and the act.

The talent buyer is the person or entity who engages the services of the act and rents the venue. The myriad talent buyers include concert promoters, fairs, festivals, casinos, and clubs of various sizes and capacities. It should be noted that venues often act as their own in-house talent buyers or enter into a co-promotion agreement with a promoter or other entity.

1

The venue is the space in which the act will be presented and the performance held. Venues typically provide services for the talent buyer, including security, ticket takers, ushers, merchandise sales staff, and local stagehands. When the act does not travel with their own sound system, lighting instruments, and stage set, the venue, in collaboration with the talent buyer, provides this technical equipment and any technicians necessary to operate the equipment.

The act is one or more performers that entered into the performance agreement with the talent buyer. It is, typically, a written agreement that contains the elements necessary to ascend to a legal contract. In legal documents, the act is often referred to as *ARTIST*. When this term is used, it can refer to a solo artist, a duo, or a band.

## FEE STRUCTURES

The fee structure is the "deal" that is struck by the talent buyer and the act for payment to perform. Acts typically are represented by an agent to procure engagements on the act's behalf. They may be referred to as a booking agent or talent agent. Regardless of their preferred title, they do the same thing: Find talent buyers to promote the acts on the agent's roster.

The two basic types of fee structures are the "guarantee" and the "backend deal." A guarantee is a flat fee that has been agreed upon in the performance agreement and is paid to the act regardless of the number of paid tickets. A backend deal is some form of a percentage deal that cannot be calculated until all ticket revenues have been calculated. The most simple backend deal is a "straight percentage," often referred to as a door deal. It means that the act is paid a specific percentage of ticket revenues. It might be a percentage of gross box office revenues, net box office income, or net net box office income. [The terms gross, net, and net net are discussed later.] Another, slightly more complicated, fee structure is the "guarantee versus a percentage" deal. In this fee structure, the act is paid the agreed upon guarantee or a percentage, whichever is greater. The most complicated fee structure is the "guarantee plus a percentage" or, simply, a plus deal.

It is important to note that the guarantee plus a percentage deal is complicated and must have a detailed budget attached to the basic performance agreement in order to calculate and project the potential final payment to the act and talent buyer. The act's guarantee is the first item in the expense sheet. The second item is an amount or percentage that the talent buyer receives and is referred to as the "promoter profit." The third item is a detailed list of agreed upon expenses that the talent buyer is permitted to deduct before the final percentage split. The last item in the budget is the percentage (split) that the talent buyer and act will each earn respectively from what, if any, income is left.

As one can see, the *detailed list of expenses* to be deducted before the talent buyer/act percentage split is crucial. There have been, unfortunately, instances of talent buyers inflating - "padding" - the expenses in order to increase talent buyer income and decrease payment to the act.

Settlement is the meeting at which a representative for the act, usually the tour manager or tour accountant, a representative for the talent buyer, box office manager, and a venue representative review the financials. The ticket sales revenue is controlled by the talent buyer; the talent buyer pays everyone their calculated amount.

BASIC FINANCIAL TERMS

Some terms that agents and promoters use to describe important elements of deal structures and budgets are not typically used by the other industries. The following are those that are commonly used in concerts and touring:

Gross Potential (GP) is the amount of income that would be generated if the show were a sellout. This is calculated in advance and is the basis from which negotiations begin.

Gross (at Settlement) is the actual box office income that ticket sales generated.

Net is the what remains after tax on tickets is deducted. The tax on tickets is a state tax and varies from state-to-state and city-to-city. It may be called amusement tax, entertainment tax, or other term.

Net Net is what is left after tax on tickets and agreed upon expenses have been deducted.

Offer is the summary of the details of the proposed deal that is sent from the talent buyer to the act through the act's booking agency. When it is a backend deal of any complexity, the critical element contained in the offer is the budget that contains financial terms that the talent buyer hopes that the act will accept. Normally, the talent buyer and the agent will then discuss the offer. When the agent, often with approval of the act and the act's manager, agrees with the talent buyer. the agent sends a performance agreement. The performance agreement should contain the agreed upon deductions that the talent buyer may deduct. These deductions should reflect those that appear in the performance agreement and attached budget.

Caveat: As mentioned above, there is no lexicon that presents consistent industry-wide terminology in the field of live entertainment. Therefore, talent buyers and agents may use financial terms that differ from these.

SUMMARY OF OPINIONS:

1.  To a reasonable degree of certainty, Plaintiffs' decision not to accept the offer of the Defendant to co-promote/produce the State Fair event was both sound and necessary, considering evidence here that suggest a business model adopted by the Defendant that is extremely financially predatory against, among others, co-independent promoters;

2.  To a reasonable degree of certainty, Plaintiffs had all the necessary experience and physical/practical requisites to perform their contract with State Fair. While Juice Entertainment is a new "Corporation," when examining the necessary disciplines, subject matter, industry and the background/experience of the Plaintiffs as well as their strategic associations with Partners, it is my view that they are not in fact a "New Business" in their Meadowlands endeavor from each practical standpoint within the live event/entertainment industry.

DISCUSSIONS:

This case is about the Defendant Live Nation, the largest live entertainment promoter and producer in the world, who most recently merged with Ticketmaster, the largest ticketing agency in the

3

world, interfering with Plaintiffs, Juice Entertainment LLC's performance of a contract with New Jersey State Fair, to, among others, produce and promote EDM (Electronic Dance Music) events/festivals at the Meadowlands fairgrounds. Plaintiffs allege that Live Nation tortuously interfered with the performance of their said contract, leading to its termination, and the Plaintiffs losing their business. Defendant's defenses addressed in this report include that Live Nation offered to allow Plaintiffs to co-promote/produce with Live Nation in the performance of said contract with State Fair such that refusing Live Nation's offer was part of the reason for the Plaintiff's loss, AND, that the Plaintiffs were a "new" business that could not have handled the promotion and production of necessary event/s to satisfactorily perform under the said contract with State Fair without Live Nation.

After review of documented information and events relative to this case, I am able to provide the following opinions to a reasonable degree of certainty:

- Live Nation at times engages the services of artists through their agents and/or managers and co-independent promoters on contingent compensation agreements;

- Live Nation negotiated 3rd party expenses, like rental costs with venues, directly with vendors in exchange for exclusive financial gains not disclosed to the artists or their agents, managers, or independent co-promoters in the form of "rebates." There appears to be a direct correlation between the value of these negotiated increased expenses and the value of rebates received by Live Nation for its exclusive benefit;

- The higher that 3rd party expenses are, the more expensive it is to produce and promote an event for all involved, including agents, artists, co-independent promoters within these contingency arrangements. In these circumstances, from the evidence presented to me, it seems Live Nation can enjoy 100% of the benefit, while, at least, passing on material costs (more than 50% at times) onto unknown 3rd parties, such as artists, agents, managers and certainly, co-independent promoters;

- Such a business model creates a conflict of interest with Live Nation's fiduciary responsibility to the artists and others mentioned under these contingency compensation arrangements;

- Such "rebates" to Live Nation are based on "volume" of ticket sales, while artists, agents, managers and co-independent promoters are compensated based on "value" of ticket sales, insulating Live Nation's profit in many ways, from the price of each ticket sold. From the financial documents presented to me, it appears most shows indicate a "loss" or "very low profit" on public settlements presented to artists, agents, managers and co-independent promoters, but a "profit" after factoring in the "rebates" in the internal accounting documents of the Defendant;

- The location of this "rebate" is included in the accounting item "contribution margin," which is a non-traditional accounting item for the live entertainment industry. Contribution Margin is apparently arrived at by adding "promoter profit" with "ancillary income." The "rebate" discussed here appears to fall under "ancillary income" according to the Defendant's own contractual definitions, supported by the chart of events provided by the Defendants;

4

- This business model can be seen as extremely predatory on, among others, co-independent promoters, who often have to share up to 50% of all the expenses of producing and promoting an event, but are not entitled to the real "profit" of the event beyond ticket sales, which appears to be the "rebates" discussed. It is arguable that this business model, at best, ensures a lower profit margin for the co-independent promoter, among others, or ensure the financial ruin of a co-independent promoter at worst;

- This business model also appears to allow Live Nation to show "loss" or low "promoter profit" to its vendors and partners, including co-independent promoters, while boast a material profit or at least, higher income, to the regulators and their shareholders for its events in contrast; and,

- I also found from my review that Thomas Dorfman and Christopher Barrett were industry veterans in the production and promotion of, among others, live EDM performances in the relevant geographical location/market for over 10+ years prior to this dispute. With the support of State Fair as well as other industry veterans such as John Dimatteo and Veto Bruno, it is my view that: A) Production of an EDM event at the Meadowlands would not constitute a new business for Juice Entertainment from any practical standpoint, and B) It is more likely than not, Juice Entertainment would have, at very least, successfully promoted and produced the intended EDM event at the Meadowlands within the time afforded under the relevant contract with State Fair.

After reviewing the documents, I am able to provide the following specific and detailed discussion and conclusions related to the overall questions of the viability of Plaintiffs partnering with Live Nation and Juice Entertainment LLC's status and ability to promote the State Fair events, and ultimately an opinion related thereto.


FURTHER DISCUSSIONS:

My opinion is that it is not customary for concert promoters, producers of concert tours, and festival promoters to provide booking agents, managers, and co-independent promoters an amount of money that they refer to as "contingent compensation arrangements." The manager and agent are artist representatives and are paid by the artist. They are customarily paid on a commission basis. Co-independent concert promoters divide the income as per their pre-concert arrangements. It should be noted that the amount of income ticket sales is the most important financial factor at settlement for a ticketed event.

Further, in my opinion, it is not industry standard for promoters or producers to negotiate a third-party expense in exchange for exclusive financial gains unless these arrangements are agreed upon and clearly stated in the performance agreement. The primary goal of a concert is to maximize the "value" of gross ticket sales. It is not standard practice to base distribution of income, as defined in the respective performance agreements, on the "number" of tickets sold for one party, here Live Nation, and the "value" of the tickets sold for everyone else. It should also be noted that the venue rental is created by a contractual agreement between the venue and the talent buyer. The venue and talent buyer, at that time, accept a fiduciary responsibility to the artist. To do otherwise violates their fundamental fiduciary responsibility. (An exception might be an "in-house

promotion." i.e., when the venue assumes the role of concert promoter or co-promoter.)  Any deceitful collaboration between the venue and the talent buyer represents a serious conflict of interest.

A full review of the documents demonstrates how this arrangement works.  A term that appeared in Live Nation performance agreements that I examined is "Ancillary" income.  It was described in several Live Nation agreements as follows:

*Purchaser [Live Nation] and/or its affiliated entities, due to a larger overall relationship with a vendor, such as an agreement to provide certain numbers of shows to a facility or contractor, may be entitled to receive certain payments ... which **will not be included with settlement with artist**.* (Emphasis added)

In documents that I reviewed, I also encountered the term that referred to the practice of "contribution margins."  This term, as far as I am able to determine from documents that I examined, is arrived at by adding "promoter profit" and "ancillary" income.

As described in documents that I examined, contribution margins involve manipulation of rental income agreed upon by the venue and the talent buyer without the knowledge of the act or act's representatives.  This involves Live Nation paying more in rental expenses in exchange for additional rebates, which are exempt from the contingent compensation agreements as "ancillary income."  In addition, it is, in my opinion, not customary for the talent buyer to share a portion of the ticket sales revenue without this arrangement being made clear and mutually agreed up with the act.

It is a reality, in my opinion, that Live Nation, the largest concert promotion company in the United States, is a company that a venue operator must please.  (Note that Live Nation boasts that they are "The Global Leader" in Live [Entertainment]."  If Live Nation is displeased with a particular venue for not "cooperating," the venue may face the risk of being excluded from future concerts promoted by this behemoth talent buyer.  If a large concert promoter such as Live Nation selects a competing venue in which to promote a major act, the excluded venue experiences a potential major financial loss.  Even though under this arrangement the venue makes its money by way of increased venue cost in exchange for rebates, it is my opinion that a venue (not owned by Live Nation) would not participate in a "contribution margin" or "kickback" unless it is somehow coerced into doing so.

The industry dominance is important to note.  The following figures are posted on their website as of 2019 (livenationentertainment.com).

    A. Live Nation promotes 3,500 concert events annually;
    B. More than 100 music festivals annually;
    C. They present 4,000 artists; and,
    D. They own more than 200 venues.

These data demonstrate that an act has the potential of playing many venues and festivals owned by Live Nation.  Arenas that depend on concerts to keep from going into the red, must consider the tremendous number and stature of artists they have the potential of hosting, unless they are shunned by Live Nation.  It is supported by a statement made by a Live Nation representative.

When Live Nation was not selected to promote concerts at the New York State Fair in 2009, the Live Nation representative was quoted as stating that his company "will not allow any of the acts it promotes to appear at the Syracuse-based fair," in an obvious retaliation to New York State's decision.

In my opinion, an example of Live Nation Entertainment's disregard for conflicts of interest is evident in their creation of a division that manages acts. One of an artist manager's primary responsibilities is to advise the artist regarding the most beneficial promoter, booking agency, and venues to advance their career. It is unlikely that Live Nation Entertainment advises their artists to work with any other promoters, even when the competing promoter would be more beneficial to the artist's income.

Allegations of conflict of interest were discussed in the media. A conflict of interest was established by booking agent Jeffrey Azoff, the son of Live Nation Entertainment chairman Irving Azoff, became a booking agent at the CAA booking agency. Note that CAA is a powerful, national talent agency. Jeffrey Azoff working for an agency that booked acts managed by his father at Live Nation was criticized by many industry professionals. Irving Azoff was well connected: He had worked at Front Line Management for five years. Front Line management company, was founded in 2004 by Irving Azoff before he sold it to Live Nation and began to work for Live Nation.

Furthermore, Ticketmaster, the largest ticketing services company in the United States and a sibling division of Live Nation, is an asset for concerts promoted by Live Nation. Ticketmaster requires any venue that uses their services to adhere to exclusivity. This arrangement allows Ticketmaster to have oversight and control of ticket sales figures.

A Ticketmaster representative typically attends settlement and provides the promoter and others a settlement sheet. Because Ticketmaster sleeps in the same corporate bed as Live Nation, they have control of sales data as well as financial information presented to the act. The promoter and venue present expenses and, therefore, the potential exists for secretive collaboration. If the promoter, venue, and ticket services were to create a scheme to inflate expenses, the artist would earn less than they should have. The most critical part of any concert venture is control of the information.

The evolution of the two live entertainment giants, Ticketmaster and Live Nation, and their eventual merger, is noteworthy:

Ticketmaster was formed in 1996 in Phoenix by two Arizona State University graduate students/staff members. In 2008 Ticketmaster acquired Front Line Management. The name of the new company became Ticketmaster Entertainment, Inc.

After Clear Channel Radio spun-off its live entertainment division, a newly independent company, known as Live Nation, was created on December 21, 2005.

In 2010 Live Nation and Ticketmaster Entertainment entered into a merger agreement. Their corporate name became Live Nation Entertainment (Live Nation Entertainment Investor Relations, 2019).

It is important to note that Ticketmaster requires each venue that uses Ticketmaster's services to promise exclusivity. This requirement has been in place since the creation of Ticketmaster in

7

1996. This means venues that wish to use Ticketmaster can use no other ticketing service. This creates an intimate financial relationship between Ticketmaster and Live Nation, because they are each a division of Live Nation Entertainment.

In fact, *Rolling Stone* described the process Ticketmaster uses to create alliances with arenas and concert promoters as far back as 1994. Said *Rolling Stone*, "In fact, according to industry sources, Ticketmaster has even loaned promoters money to meet the guarantees of stadium acts and has given money to venues for promotion and marketing. Several recent lawsuits call Ticketmaster's dividends to venues "kickbacks." (Strauss, Neill in *Rolling Stone*, 1994).

In my analysis of the documents provided to me, I observed the potential for co-operation between Live Nation and Ticketmaster. While there is some counter-evidence to this, it is troubling to observe Jason Miller admitting at his ultimate meeting with the Plaintiffs on the 22nd of April 2011 that "*Dorfman: I had a deal...you guys were trying to blow Vito out of the deal...we stood up for them...you or John was saying, you can't get ticketing through the Meadowlands.... Miller: Yeah.*" This concern is also supported by other testimonies of the Plaintiff of a more specific and explicit threat made by Live Nation regarding ticketing to Al Dorso of State Fair and again, directly in person to the Plaintiffs.

I should add that, in my opinion, there are "winners" and "losers" in the financial manipulations that Live Nation and some arenas create. The losers are consumers, who will likely experience higher ticket prices; artists who are not compensated in a bona fide manner; booking agents who are paid a commission of the act's gross income; and, some co-promoters. The winners in this scenario are the arena, Live Nation, and Live Nation Entertainment stockholders.

When plaintiffs discovered that Live Nation created undisclosed financial agreements, previously referred to as "contribution margins/ancillaries," it demonstrated the inherent advantages for the talent buyer, Live Nation. Among others, such an arrangement allows Live Nation to outbid everyone for Talent by offering a higher percentage of the traditional revenue pie to artists, and Live Nation still collect a higher portion of the overall revenue pie at the end of the day. Oddly, according to documents, Live Nation manipulated venue rental payments in spite of anticipated losses by Live Nation in their ticket sales revenues. In theory, Live Nation could show higher venue rental figures at settlement, and then split the additional money with the venue for their help in doing this. It is my opinion that there is logic to this theory.

My review of documents, including at LN0033966-33969, indicated that Jason Miller, former Director of Talent Acquisition for Live Nation and currently Director of Live Nation operations in the Tri-state area, instructed Ambar Brilliant, Live Nation accountant, to post an entry of $90,000 rent for settlement, but apply only $75,000 "internally" for this same item and event. This is a seriously suspicious accounting disparity and, without a valid explanation, would amount to dishonest business practice. In fact, the emails at LN0034937-39 provides direct evidence of negotiating amount of rebates based on the amount of the expenses between Live Nation and the Venue.

Additionally, while reviewing documents provided by the plaintiff, I found it unusual that a "promoter profit & loss" statement revealed a large loss, but, according to Jason Miller, speaking with Scott Holtz, Head of Ticketing for Live Nation, the event actually "made money."

8

I noticed in the email chain that someone named Wayne Goldberg was included. I could not find out who Wayne Goldberg is and what he does.

For a simple illustration, I am going to try to put it into a flow diagram as follows with respect to the above:

**NOTE/CAVEAT:**
*The flow chart is provided in this instance specifically pertaining to this matter and documents provided. Ticket Sales is the most significant item of sharable income according to the documents reviewed, but it is not exhaustive under these contingency arrangements between LN with co-independent promoters, artists/managers/agents*

**Traditional/Ethical Business Model Re: Co-Independent Promoters**

Ticket Sales



50/50 Expenses LN and Co-Independent Promoter Share



Promoter Profit, after Expenses 50/50 LN and Co-Independent Promoter Share

**LN Business Model Re: Co-Independent Promoters**

Ticket Sales



50/50 Expenses LN and Co-Independent Promoter Share



Rebate Based on Undisclosed Negotiations Between LN and 3rd Party Vendor, 100% Rebate to LN Based on **NUMBER** of Tickets Sold. Income Item is Created to Fall Within Contractually Excluded Income Category (Ancillary income/Contribution Margin) to Co-Independent Promoters

Promoter Profit, after Expenses 50/50 LN and Co-Independent Promoter Share. Formula: VALUE of Gross Ticket Sales – **VALUE** of Gross Expenses

**NOTE/CAVEAT:**

*The flow chart is provided in this instance specifically pertaining to this matter and documents provided. Ticket Sales is the most significant item of sharable income according to the documents reviewed, but it is not exhaustive under these contingency arrangements between LN with co-independent promoters, artists/managers/agents*

**Traditional/Ethical Business Model Re: Artists/Agents/Managers**

Ticket Sales



Artists/Agents/Managers Agree to Share % of Promoter Profit, in Exchange for 0 or Low Performance Guaranteed Compensation for Artist



Promoter Profit, after Expenses % LN and Artists/Agents/Managers. Formula: VALUE of Gross Ticket Sales – **VALUE** of Gross Expenses

**LN Business Model Re: Artists/Agents/Managers** 

Ticket Sales

Artists/Agents/Managers Agree to Share % of Promoter Profit, in Exchange for 0 or Low Performance Cost for Artist



Rebate Based on Undisclosed Negotiations Between LN and 3rd Party Vendor, 100% Rebate to LN Based on **NUMBER** of Tickets Sold. Income Item is Created to Fall Within Contractually Excluded Income Category (Ancillary income/Contribution Margin) to Artists/Agents/Managers

Promoter Profit, after Expenses % LN and Artists/Agents/Managers. Formula: VALUE of Gross Ticket Sales – **VALUE** of Gross Expenses



Live Nation's financial maneuvers would present unfair competition with other promoters. A major live concert promotion company might engage in this practice as a way to prevent other promoters from gaining dates in certain venues and the booking of artists. As such, a full review of the documents clearly demonstrates that adopting Live Nation's deceptive practices meant that Juice would not likely have profited, or at least, their profitability materially adversely affected, from any agreement between Live Nation and Juice to co-promote/produce, no matter how successful the event.

It is also my opinion that several entertainment veterans, including Thomas Dorfman, John Dimatteo, and Vito Bruno possessed impressive credentials and were extremely well qualified to work as a team to present an outdoor festival, especially one featuring EDM acts.

Thomas Dorfman has been successful in the EDM market and had productive liaison with top DJ acts and their agents. Before his Meadowlands venture was disrupted by Live Nation, Dorfman owned "Bliss," a well-known club that presented major DJs and had a strong fan clientele for that genre. The club was so impressive that it and Dorfman were featured in *Club Systems* magazine. The publication noted the club's impressive production, i.e., sound system, lighting, and stage set design. Note that these are the same type of production elements necessary to promote an outdoor show. A review of Dorman's overall credentials relevant to the promotion and production of shows similar to those under the State Fair agreement is impressive, and Chris Barrett's experience as a well-known DJ also brought additional value to Dorfman.

Moreover, Plaintiffs were teamed with industry stalwarts like John Dimatteo and Vito Bruno, as well as having concurrent access to all the resources of State Fair in terms of ticketing, production, marketing and an active clientele of over 500 thousand average fair visitors each year to the State Fair over the 3-5 weeks of its usual annual operation.

Vito Bruno owned a promotion and management company and was a 35-year veteran of the live entertainment industry. Bruno had tremendous success presenting DJs and producers of Electronica, a genre that morphed into EDM. His concert production successes include "Beatstock," which was entered into the Guinness Book of World Records. Bruno, having substantial financial resources, had committed to fund millions of dollars of support to Juice and their ventures at the Meadowlands.

John Dimatteo was the most successful booking agent representing the top DJs in the world. He had a consistent history of success in this genre. He represented Juice in their communication with acts and agents. He had an excellent relationship with the top DJs in the world, including Tiesto, Steven Angello, and David Gutta.

In several ways, the plaintiffs were better qualified than Live Nation to produce an EDM event at the Meadowlands. Juice and their associates had a long-held positive relationship with EDM acts and their representatives. It is my opinion that they also had an intimate understanding of this youth-oriented genre, more than AEG and Live Nation, the two largest concert promotion companies worldwide, seemed to have.

The most important functions that an outdoor promoter must accomplish are production - sound, lighting, staging, and other technical elements, talent acquisition, and promoting the event through

11

publicity and advertising. Juice was prepared to perform these festival elements professionally, just as they had in smaller venue EDM shows.

Juice could have provided all necessary production equipment and staff necessary to operate this equipment for such a festival. Independent production companies capable of providing sound, lights, and staging are commonly used for festivals. There are ample production companies available, especially in New Jersey and New York. In addition, the fair staff and Meadowlands staff are well qualified and have a wealth of experience in large outdoor events. The support that was available to handle all production elements was readily available to Juice for this event.

Documents that I reviewed indicated that EDM acts and their artist representatives were familiar with Juice and their associates. Furthermore, Juice had established and excellent reputation in the EDM world. It should be noted that the overwhelming number of acts signed to rosters of the largest booking agencies are also signed to major record labels. An agent from the William Morris Agency (Now William Morris Endeavor or WME) told me, "Our agency doesn't do A&R, labels do that. Therefore, we typically sign only with acts that have a recording contract with a major label." Most EDM artists struggle to get signed to major record label deals. Mega booking agencies work predominantly with large, national Pop, Rock, Urban, and Country acts, but have comparatively few EDM acts on their rosters.

The function at which Juice would have been more effective is publicity and advertising. This is evidenced by the Juice associates' outstanding coverage in media that specialize in this genre. To gain publicity - unpaid media support - is most successful when the promoter has an established relationship with the journalists from EDM publications and websites. EDM fans read magazines such as *EDM World, Clublife,* and, *Electro*. In my opinion, it is doubtful that the largest promoters were familiar with these publications, let alone known to journalists in these and other publications for this genre at the time Juice attempted to present their festival.

Juice had knowledge of, and access to, social media, including those that they had gained by "harvesting" them from previous shows and from those of the acts with whom they had developed a positive relationship. It is my opinion that large promoters, those that typically present Country, Pop, Rock, R&B, and Urban, and other mainstream genre, were unlikely to have understood how to navigate the social media for EDM as well as Juice did. Media buys for ad campaigns to promote EDM shows are much different than those for other genre. Again, Juice likely would have better knowledge of these media than the largest promoters. As such, even assuming the Meadowlands event would have been the largest Dorfman had done to date, the size would not have rendered Juice, run by an experienced promoter, a "new" business from all practical analysis of necessary disciplinary experience, resources, ideas and means.

Previously, I explained my theory of the basic "triad" of a concert. It is typically: the talent buyer, the venue owner and/or operator, and the act. It is my opinion that the plaintiff's qualifications to produce and promote a large, outdoor EDM (Electronic Dance Music) festival at the Meadowlands were excellent at the time that they began negotiations with New Jersey State Fair representatives; they possessed the qualifications necessary to succeed in what I've described as the triad.

It is my opinion that few other individuals and business entities would benefit from the business model described in the documents that I reviewed. Booking agencies that worked closely with Live Nation's business model would have a "pipeline" to the mega-concert promoter. Vendors who might give kickbacks to any powerful promoter such as Live Nation would continue to

12

procure lucrative offers for future work.  Most of all, it is my opinion that any arena that were to manipulate finances in consort with Live Nation would benefit greatly by earning additional income and gain future events promoted by Live Nation.

CONCLUDING THOUGHTS

Based on my review and study of the defendants' actions, it is my opinion to a reasonable degree of certainty that Juice would have presented a successful EDM event in Meadowlands were it not for interference from Live Nation, and would likely have had success moving forward. Conversely, from the evidence, they would have, more likely than not, suffered financially, regardless of the success of the event if they had accepted the offer of co-promotion/production from Live Nation if the same business model was to be observed as was observed in the documents provided to me for the purpose of this report.

It is also my opinion to a reasonable degree of certainty, after reviewing documents provide to me, that Live Nation business practices and their suspicious accounting practices caused financial harm to artists that they promoted. Furthermore, it is my opinion that Live Nation Entertainment, their stockholders, and arenas are the primary beneficiaries of these business practices.

Respectfully Submitted,

Richard Barnet, Ph.D.

13

# Attachment No. 1

- Resume of Dr. Richard Barnet

Attachment No. 1
Resume of Richard Barnet

RICH BARNET

Professor of Music Business
Concert Promotion and Touring Specialist

Rich.Barnet@mtsu.edu
Mobile: (615) 400-5869

<u>Education</u>

| | |
|---|---|
| Arizona State University - Tempe, Arizona | Ph.D. in Higher Education Administration<br>Cognates: Arts Management and Quantitative Systems |
| Ithaca College - Ithaca, New York | Master of Music in Performance<br>Master of Music Education |
| Illinois State University - Normal, Illinois | Bachelor of Music in Performance |

<u>Publications</u>

Barnet, Richard D., Jake Berry, and Ray Waddell.  *This Business of Concert Promotion and Touring*.  NY: Billboard Books/Random House, 2007.
[Worth mentioning: Jake Berry, co-author, is Production Manager for U2 and formerly PM for the Rolling Stones, and other major recording artists.  Ray Waddell, co-author was Senior Editor of Touring for *Billboard* Magazine at the time of writing.  This book is the most commonly used textbook for live entertainment courses.]

Barnet, Richard D., Bruce Nemerov, and Mayo Taylor.  *The Story Behind the Song: 150 Songs that Chronicle the Twentieth Century*.  Westport, CT: Greenwood Press/ABC-CLIO, 2004.
Note: Jiangsu Publishing Company has acquired the Asian rights to this book and plans to release the Chinese language edition.

Barnet, Richard D. and Larry Burriss.  *Controversies of the Music Industry: Twelve Ethical Issues*.  Westport, CT: Greenwood Press, 2001.

Allen, Paul and Richard D. Barnet.  "Music Broadcasting" in the *Encyclopedia of Appalachia*.  Knoxville, TN: University of Tennessee Press, 2006.

Barnet, Richard D.  "Women in Audio" in *Women and Music in America since 1900: An Encyclopedia*.  Phoenix, AZ: Oryx Press, 2002.

1

Barnet, Richard D.  "The Recording Industry Production Process" in the *Encyclopedia of Information and Communication*.  New York: Macmillan Publishing, 2001.

Barnet, Richard D. (1998 and 1997).  "Living the Dream: The Touring Performer," *In Concert* magazine, fall 1997; reprinted in 1998 career issue.  Kansas City, Missouri: Townsend Outlook Publishing.

Barnet, Richard D. and Toto Sutarso (1997).  *Predictive Validity of Radio Airplay for Record Sales*.  Proprietary research for RCA Records (Now *SONY/BMG Music*).

Barnet, Richard D., Rush Hicks, and David Moser (1996).  "Interns and the Labor Law" in *Proceedings of the Music and Entertainment Industry Educators Association*.  Miami, FL: MEIEA.

<u>Academic Experience</u>

<u>MIDDLE TENNESSEE STATE UNIVERSITY</u> - Murfreesboro, Tennessee

- Professor, Department of Recording Industry (1991 - Present)

- Chairman, Department of Recording Industry (1991 - 1996)

- Instruction: Teach Concert Promotion and Touring, Understanding the Nashville Music Business, Ethics of the Recording Industry, and Advanced Concert Promotion

<u>CALIFORNIA STATE UNIVERSITY</u> - San Bernardino, California

Associate Dean, School of Humanities and Director of Commercial Music

- Directed three ensembles in the Commercial Music/Jazz Studies program and taught Survey of the Music Industry; Administrative duties included grant writing, scheduling, and student appeals

<u>JAMES MADISON UNIVERSITY</u> - Harrisonburg, Virginia

Director of Concert and Support Services and Associate Professor of Music Industry

- Taught music business courses including Concert Production and Promotion, Legal Aspects of the Music Industry, Music in Advertising, Arts Administration, and Music Merchandising.

- Managed 1,200-seat concert hall

- Promoter of Fine Arts Series

<u>Music Industry Experience</u>

<u>BOB SHIPSTAD PRODUCTIONS</u> - Hollywood, CA
Production Staff, Music Department

• Music Department staff member for touring shows; Duties included coordinating recording sessions, arranging/copying/editing sheet music, and constant liaison with AFTRA, AFofM, and AGVA unions.

<u>HOLIDAY ON ICE INTERNATIONAL</u> - Hollywood, CA

Touring Conductor/Music Director

• Toured arenas in the US and Canada as conductor of 21-piece pit orchestra; conducted 9 shows per week

<u>SHIPSTADS AND JOHNSON'S ICE FOLLIES</u> - Hollywood, CA

Touring Music Director and Conductor

• Toured arenas in major cities throughout U.S. and Canada

• Conducted large pit orchestra using 35 local musicians in each city for 32-week tours of U.S. and Canada.  Conducted 9-shows per week.

<u>SHENANDOAH VALLEY MUSIC FESTIVAL</u>

Festival Manager

•Managed publicity, advertising, production, box office, and other functions of multi-concert series. Shows presented over several weekends.

-END-

3

# Attachment No. 2

Documents Provided to Dr. Richard Barnet from Plaintiff's Attorney

**Court Documents:**
- Plaintiff's First Amended Complaint 09-04-12
- Deposition of Jason Miller 03-23-16
- Deposition of Al Dorso 07-16-13
- Deposition of John D'Esposito 07-17-13
- Deposition of Thomas Dorfman 11-12-13

**Plaintiff Attorney Work Product:**
- Diagram and Case Study of Financial Irregularity (4 pages)

**Plaintiff's Evidence:**
- Certified recording transcript of meeting between Thomas Dorfman, Chris Barrett and Jason Miller 04-22-11
- Professional Biographies and List of Events of Thomas Dorfman, John Dimatteo and Vito Bruno

**Defendant's Evidence:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LN0002101 | LN0003589 | LN0003603 | LN0004644 | LN0018292 | LN0023702 | LN0033478 | LN0034753 |
| LN0002102 | LN0003590 | LN0003604 | LN0004645 | LN0018328 | LN0023704 | LN0033480 | LN0034777 |
| LN0002282 | LN0003591 | LN0003605 | LN0011427 | LN0018335 | LN0023708 | LN0033521 | LN0034801 |
| LN0002353 | LN0003592 | LN0003606 | LN0012447 | LN0018711 | LN0025444 | LN0033535 | LN0034825 |
| LN0002354 | LN0003594 | LN0003607 | LN0012616 | LN0018903 | LN0025448 | LN0033704 | LN0034933 |
| LN0002355 | LN0003595 | LN0003608 | LN0014406 | LN0019327 | LN0025626 | LN0033721 | LN0034937 |
| LN0003223 | LN0003596 | LN0003609 | LN0016086 | LN0019338 | LN0028334 | LN0033865 | LN0034940 |
| LN0003224 | LN0003597 | LN0003610 | LN0016629 | LN0019492 | LN0032592 | LN0033966 | LN0034948 |
| LN0003225 | LN0003598 | LN0003611 | LN0016774 | LN0019594 | LN0032644 | LN0034059 | LN0034981 |
| LN0003226 | LN0003599 | LN0003612 | LN0017997 | LN0020148 | LN0032651 | LN0034097 | LN0034982 |
| LN0003227 | LN0003600 | LN0003613 | LN0018004 | LN0020276 | LN0032733 | LN0034162 | LN0034985 |
| LN0003587 | LN0003601 | LN0003614 | LN0018117 | LN0020847 | LN0032791 | LN0034369 | |
| LN0003588 | LN0003602 | LN0004643 | LN0018119 | LN0022378 | LN0032861 | LN0034400 | |

# Attachment No. 3

### Bibliography

Allen, Paul. *Artist Management, 4th ed*.  NY: Routledge, 2018.

Barnet, Richard, and Larry Burriss. *Controversies of the Music Industry.* Westport, CT: Greenwood Press, 2001.

Baskerville, David.  *Music Business Handbook and Career Guide, 9th ed.* Thousand Oaks, CA: Sherwood Publishing Partners, 2010.

Live Nation Entertainment Investor Relations, 2019. https://investors.livenationentertainment.com

Reynolds, Andy.  *The Tour Book, 2nd ed.* Boston: Cengage, 2013.

Strauss, Neill. "Pearl Jam Takes Ticketmaster to Capitol Hill: The Band is Waging an Anti-Trust War Against the Ticketing Giant" in *Rolling Stone*, August 4, 1994.

Waddell, Ray, Jake Berry, and Rich Barnet. *This Business of Concert Promotion and Touring*. NY: Billboard Books/Random House, 2007.

Waddell, Ray. "New Ticketmaster Chief Eyes Untapped Resources," in *Billboard*, October 31, 2008. https://www.ticketmaster.com/about/our-history.html

White, Jess and Patrick Preston. "Concert Promotion Centralization and the Artist Management Response: 1990s - 2010s" in *Journal of the Music & Entertainment Industry Educators Association, Vol. 14, Number 1, 2014.*

-end-

# EXHIBIT C

 **GT** GreenbergTraurig

Ian S. Marx
Tel 973.360.7951
Fax 973.301.8410
marxi@gtlaw.com

June 11, 2019

**BY EMAIL AND REGULAR MAIL**

Andrew Smith, Esq.
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960

     Re:    **Juice Entertainment, LLC et al. v. Live Nation Entertainment, Inc.**
           **Civil Action No. 11-07318 (WHW) (CLW)**

Dear Mr. Smith:

     I am writing with respect to your letter of June 6, 2019, under cover of which you have provided an undated document bearing the title "Statement of Opinions" from Richard D. Barnet, Ph.D. Your attempt to serve this expert report more than three years after the relevant Court-ordered deadline is inappropriate and troubling for a host of reasons. Unless you immediately take the remedial steps outlined below, we will take all necessary actions to protect our client's interests.

     First, according to the Court's Amended Scheduling Order entered on May 16, 2016 (ECF # 70), fact discovery in this case closed on March 31, 2016, which is the date by which all documentary evidence and depositions were taken. While your letter claims that this report is being served now because "discovery here was produced extremely late," it has been well over *three years* since your clients were provided with any fact discovery from Live Nation. Moreover, the Amended Scheduling Order provides for the service of affirmative expert reports on or before June 15, 2016, rebuttal expert reports to be served by July 15, 2016 and for expert discovery to be concluded by August 15, 2016. Regardless of whether Dr. Barnet's report is an affirmative or rebuttal report, it was due approximately three years ago. You have neither sought nor obtained a modification of this Court-ordered deadline (nor would there be any plausible or conceivable basis upon which such relief would be warranted) and thus Dr. Barnet's report is untimely and served in violation of the Court's order. Finally, based upon the list of materials Dr. Barnet claims to have reviewed, it appears that you (or your clients) have improperly provided Dr. Barnet with confidential materials produced in discovery this case by Live Nation pursuant to the Court's Discovery Confidentiality Order entered on April 18, 2013 (ECF # 31). Dr. Barnet is not an authorized recipient of those materials and whomever provided Dr. Barnet with those materials has thus violated the Court's Order.

Andrew Smith, Esq.
June 11, 2019
Page 2

_____

Given the foregoing, we ask that you confirm, in writing, on or before 5pm on June 12, 2019, the following:

1.  Plaintiffs will withdraw Dr. Barnet's report and agree that it shall not be used by Plaintiffs for any reason, in this or any proceeding, and that it will not be shared with anyone other than Plaintiffs, Live Nation, or the Court.

2.  Dr. Barnet will immediately:

    a.  Advise whether he has shared documents stamped "confidential" and produced by Live Nation to Plaintiffs in this case (the "Live Nation Confidential Documents") to any other person (and, if so, provide the identity of any such recipients);

    b.  Destroy all Live Nation Confidential Documents in his possession, custody or control;

    c.  Agree that the information reflected in Live Nation Confidential Documents will not be shared by him with anyone else;

    d.  Destroy all versions of his expert report; and

    e.  Provide Live Nation and the Court with a sworn statement attesting to the foregoing.

If you are unable or unwilling to provide us with the foregoing by 5pm on June 12, 2019, we will bring these issues to the Court's immediate attention and intend to seek all appropriate remedies, including the dismissal with prejudice of the remaining claims in Plaintiffs' Complaint.

Very truly yours,

IAN S. MARX

ISM/dad

*NY 245946473v1*

# EXHIBIT D



Andrew Smith
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960
T: 973.206.1725
F: 973.794.2589
E: asmith@sslegalservices.com

June 12, 2019

**<u>VIA EMAIL</u>**

Ian S. Marx, Esq.
Greenberg Traurig LLP
500 Campur Drive
Florham Park, New Jersey 07932

      **Re:**   **Juice Entertainment LLC, Thomas Dorfman and Chris Barrett v. Live Nation Entertainment Inc.**
             **Civil Action No. 2:11-cv-07318-WHW-CLW**

Dear Ian:

      As you know, my firm represents Plaintiffs Juice Entertainment LLC, Thomas Dorfman and Chris Barrett ("Plaintiffs") in the above referenced matter. This letter is in response to your June 11, 2019 letter to me (the "Letter"). The Letter appears to be an empty threat born of fear of the contents of Dr. Richard Barnet's expert report (the "Expert Report"). As for the threats regarding "confidential" documents, the very Confidentiality Order you cite specifically states at Section 4(b) that such documents can be reviewed by experts. Since the Expert Report is very clearly an expert report, there was no violation of the Confidentiality Order.

      Further, it is well settled that an expert report may be admissible even where it is served after the discovery end date. <u>See</u> <u>Meyers v. Pennypack Woods Home Ownership Ass'n</u>, 559 F.2d 894, 904 (3d Cir.1977) (holding that before excluding evidence, the Court should consider (1) the prejudice or surprise to the party against whom the evidence would be presented; (2) the ability to cure the prejudice; (3) the extent to which the evidence, if admitted, would disrupt trial of the case; and (4) bad faith or willfulness in failing to comply with the Court's Order); <u>In re Mercedes-Benz Anti-Trust Litigation</u>, 225 F.R.D. 498, 504-05 (D.N.J. 2005) (stating that the Third Circuit has expressed a distinct aversion to the exclusion of important evidence unless there is evidence of extreme neglect or bad faith on the part of the proponent of the testimony, and the Court should exercise particular restraint in deciding a motion to preclude evidence); <u>Velez v. QVC, Inc.</u>, 2004 WL 1175726, at *1 (E.D.Pa. May 25, 2004) (stating that before imposing the "extreme sanction" of preclusion of evidence, the Court must either find that the party "(1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of due diligence."), *quoting* <u>Meyers</u>, 559 F.2d at 905; <u>see</u> <u>also</u> <u>Tucci v. Tropicana Casino</u>, 364 N.J. Supper. 48, 52 (App. Div. 2003) (stating that New Jersey courts have long held that it is "particularly indulgent in not barring a late expert's report where the report was critical to the claim or defense, the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent."). Here, there is both

a legitimate reason for the late issuance of the report and a lack of prejudice to Defendant Live Nation Entertainment, Inc. ("Defendant").  See id.

Plaintiffs had to file numerous motions in order to get discovery from Defendant, and even after orders were issued by the Court ordering the production of documents, Defendant still refused to produce the ordered discovery.  To this day, Defendant has not produced all the discovery ordered by the Court to be produced.  Further, Defendant itself produced discovery after the discovery end date.  In addition, though you lament Plaintiffs' serving the Expert Report after the dates set forth for expert reports, Defendant itself repeatedly failed to meet deadlines in the very same order.  Moreover, even the discovery that was produced was produced in a manner designed to hide the information contained in the discovery.  For example, a key spreadsheet was produced in pieces over thousands of pages of production, so that it took a massive effort just to identify and then piece together the document itself.

In addition, Plaintiffs had tremendous difficulty finding any expert in the specific industry willing to testify against Defendant.  While experts approached did not doubt Plaintiffs, there was concern about retaliation by Defendant for even just providing a report to Plaintiffs, regardless of what it said.  Further, some of the issues in the Expert Report were not raised by Defendant until the summary judgment motion, and other issues were only recently discovered.  Plaintiffs efforts were made all the more difficult with the withdrawal of Plaintiffs' original counsel through no fault of Plaintiffs.  Considering all of these difficulties, Plaintiffs have provided the Expert Report as expeditiously as they could.

There is also no prejudice to Defendant here.  The Expert Report was based almost entirely on documents produced by Defendant itself, as well as some transcripts that have been in Defendant's possession for quite some time.  Defendant has plenty of time to depose Dr. Barnet, as Plaintiffs will make him available for his deposition upon request.  Further, Defendant also has time to submit a counter-expert report if it deems one necessary, and Plaintiffs will of course consent to any extensions of time necessary for it to do so if needed.

Finally, no trial date has been set as of yet.  As such, the rules regarding admission of a late expert report are relaxed.  See Szalontai v. Yazbo's Sports Café, 183 N.J. 386, 398 (2005) (discovery rules are more relaxed before arbitration has been held and/or a trial date has been set); Tucci, 364 N.J. Supper. at 52 (courts should be "indulgent" were there is no trial date set); Ponden v. Ponden, 374 N.J. Super. 1, 11 (App. Div. 2004) (finding that trial judge mistakenly exercised discretion in barring plaintiff's expert report when trial date was not yet scheduled and such report was crucial to plaintiff's claim); Santone v. Fusiek, 2010 WL 6813737 (Law Div. Dec. 9, 2010) (courts will allow late expert reports where the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent).  As such, the Expert Report is admissible and can be used at trial.  See id.

Please let me know as soon as possible if you would like to depose Dr. Barnet.  Thank you for your time and attention.  If you have any questions or concerns, please do not hesitate to contact me directly.

Yours Truly,
SMITH + SCHWARTZSTEIN LLC

/s/ Andrew Smith

Andrew B. Smith, Esq.