**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>Defendant. | **Civil Action No. 11-7318-WHW-MCA** |

**PLAINTIFFS' OBJECTIONS, PER FRCP 72(a), OF MAGISTRATE JUDGE WALDOR'S OPINION TO BAR THEIR EXPERT REPORT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ........................................... 2

LEGAL STANDARD...................................................................................................... 9

LEGAL ARGUMENT ................................................................................................... 10

    POINT I: THE MAGISTRATE'S OPINION IS BASED ON ERRONEOUS FACTS
    REGARDING THE SJ ORDER AND EXPERT REPORT SUCH THAT IT SHOULD
    BE REVERSED................................................................................................... 10

    POINT II: THE MAGISTRATE'S OPINION DOES NOT ADDRESS PLAINTIFFS
    ARGUMENTS OR APPLY THE APPLICABLE TEST AND AS SUCH IS IN
    CONTRAVENTION TO THIRD CIRCUIT CASE LAW REGARDING THE LATE
    ADMISSION OF EXPERT REPORTS THAT ARE CRITICAL TO PARTIES'
    EVIDENCE AND DO NOT PREJUDICE THE OPPOSING PARTY ................................ 15

CONCLUSION ............................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**

Bridgestone Sports Co., Ltd. v. Acushnet Co.,  2007 WL 521894 at *4 (D.Del. Feb. 15, 2007). 17

Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113 (3d Cir. 1986)........................................... 9

Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001) .......................... 11

Day v. Woodworth, 54 U.S. 363, 14 L.Ed. 181 (1851) ................................................................. 12

Dome Petroleum Ltd. v.  Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) ........ 9

Exxon Shipping Co. v. Baker, 554 U.S. 471, 493 (2008)........................................................ 11, 12

Gunter v. Ridgewood Energy Corp., 32  F.Supp.2d 162, 164 (D.N.J. 1998)................................. 9

Hartle v. FirstEnergy Generation Corp., 7 F. Supp. 3d 510, 517 (W.D. Pa. 2014) ............... 18, 19

Holbrook v. Woodham, 2008 WL 544719 (W.D.Pa. Feb. 28, 2008) ........................................... 18

In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 791–92 (3d Cir. 1994) .............. 17, 18, 19, 20

In re Trombadore, 201 B.R. 710 (D.N.J. 1996)............................................................................... 9

Marks v. Struble, 347 F.Supp.2d 136, 149 (D.N.J. 2004) ........................................ 9, 11, 12, 15

Miller v. Beneficial Mgmt. Corp., 844 F.Supp. 990, 997 (D.N.J. 1993)........................................ 9

n re TMI Litig., 193 F.3d 613, 722 (3d Cir.1999) ....................................................................... 18

Ponden v. Ponden, 374 N.J. Super. 1, 11 (App. Div. 2004) ........................................................ 19

Santone v. Fusiek, 2010 WL 6813737 (Law Div. Dec. 9, 2010)................................................. 20

South Seas Catamaran, Inc. v. M/V Leeway, 120 F.R.D. 17, 21 (D.N.J. 1988) ......................... 10

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003)..................................... 11

Szalontai v. Yazbo's Sports Café, 183 N.J. 386, 398 (2005) ...................................................... 19

Toth v. Alice Pearl, Inc., 158 F.R.D. at 47, 50 (D.N.J. 1994) ....................................................... 9

U.S. v. Raddatz, 447 U.S. 667 (1980)............................................................................................ 9

United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)...................................................... 9

Velez v. QVC, Inc., 2004 WL 1175726, at *1 (E.D.Pa. 2004)..................................................... 17

**Statutes**

"Notes of Decisions" under 28 U.S.C.A. §636................................................................................. 9

28 U.S.C.A. §636 (b)(1)(A)............................................................................................................ 9

**Rules**

4 Restatement §908(2) ................................................................................................................. 12

Federal Rule of Civil Procedure (FRCP) 72(a).............................................. 2, 9, 11, 12, 15, 22

Restatement (Second) of Torts §903, pp.453-454 (1979)............................................................ 11

## PRELIMINARY STATEMENT

In this David verses Goliath matter, Magistrate Judge Cathy L. Waldor (the "Magistrate") took David's stone on the eve of trial by barring the explosive expert report of Dr. Richard Barnet (the "Expert Report") based on an erroneous reading of both the Expert Report and the summary judgment opinion and order of Judge Walls dated May 23, 2108 (the "SJ Order").[1]  On August 23, 2019, Defendant Live Nation Entertainment, Inc. ("Defendant"), a $1.7 billion a year company, filed a motion to strike the Expert Report submitted by plaintiffs Juice Entertainment, LLC ("Juice"), Thomas Dorfman and Chris Barrett (collectively, "Plaintiffs"),[2] arguing that Plaintiffs violated the Confidentiality Order in allowing their expert to see confidential documents and that Plaintiffs' delay in serving the Expert Report justified barring Dr. Barnet and his report (the "Motion").  Plaintiffs filed their objection to the Motion, explaining the reasons for their justifiable delay in filing the Expert Report and setting forth case law that clearly supports the proposition that an expert report may be admissible even where it is served after the discovery end date if certain criteria, met here, so justify.

Nevertheless, on September 27, 2019, the Magistrate opined in an oral decision (the "Opinion") that the Expert Report had to be barred because it was in "contravention" of SJ Order. The Magistrate's basis for the Expert Report being in contravention of the SJ Order was the Magistrate's contention that the Expert Report was only relevant to damages, and no damages at all were allowed per the SJ Order.  However, not only is the Expert Report focused on liability, rather than damages, but the SJ Order did **not** preclude Plaintiffs from seeking direct or punitive

---

[1]      The motion at issue was originally supposed to have been heard by Judge Claire C. Cecchi, and was adjourned to October 7, but was decided by Judge Waldor on September 27.

[2]      Juice is no longer operating and Mr. Dorfman, the main principle of Juice, now sells cable.

damages. Further, the Opinion did not address the merits of Plaintiffs' opposition or even attempt to conduct the balancing test mandated by case law when considering a late report, which would weigh heavily in favor of admission. As such, Plaintiffs hereby object, pursuant to Federal Rule of Civil Procedure ("FRCP") 72(a), to the Magistrate's Opinion and seek to have it set aside.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

By way of brief background, Plaintiff Juice Entertainment LLC, its principals, Plaintiffs Thomas Dorfman and Chris Barrett, and its predecessors Base Production Inc. and Deluna Inc., all had successful experience producing live music shows. Mr. Dorfman has been working in the music industry since 1997 producing events featuring top artists and entertainers. Mr. Dorfman produced events including top artists and entertainers such as Charlie Sheen, Tommy Lee, Snoop Dog, Kid Cudi, Paris Hilton, Jonathan Peters, and L.M.F.A.O., among others. Mr. Dorfman operated Bliss Night Club from 2007-2010 and routinely grossed more than $1 million a year in revenues. Mr. Dorfman's success in the industry has led to his receiving a stellar reputation along with many accolades including a notable 2011 nomination in the Star-Ledger for Best Promoter in New Jersey.

Mr. Barrett has enjoyed a similar reputation as a rising promotor and entrepreneur in the music industry. He began performing as a professional DJ in 1998, playing alongside accomplished DJs such as Victor Calderone, Junior Vasquez, Paul Oakenfold, Erick Morillo, and Jonathan Peters, among others. Together, Mr. Barrett and Mr. Dorfman have been promoting and staging shows at various New Jersey venues for years, frequently producing concerts with an average attendance of thousands of people.

In June 2010, under the name Base Production Inc., Plaintiffs entered into an agreement with SFEM to produce a one-day show for a Latin Music Festival on July 4, 2010. Due to

Plaintiffs' diligence and ability to competently promote the Latin Music Festival despite facing significant challenges along the way, Al Dorso, President of SFEM, wanted to work with Plaintiffs again on the following year's New Jersey State Fair events at the Meadowlands.  Plaintiffs and Mr. Dorso entered a verbal agreement for exclusive rights to produce an electronic dance music ("EDM") event, as well as any and all concerts in the designated special events area of the State Fair in December 2010.  This agreement was formalized on March 7, 2011 (the "Contract").

In January and early February of 2011, before the Contract was even formalized, Plaintiffs began contacting talent agencies and artists to perform at the Event. Their initial efforts were well received and they were well on track to putting on a successful event.  However, at the same time Plaintiffs were working toward producing the Event contemplated in their contract, Defendant was establishing an entire division to capitalize on the popularity of EDM and was working to consolidate its dominance in the EDM market through various tours and arrangements with artists and venues.

Defendant had previously rejected an agreement similar to the one Plaintiffs had with SFEM.  However, upon learning of Plaintiffs' Contract they began a systematic campaign to prevent Plaintiffs from being able to perform.  At the outset, when Defendant first perceived the risk posed by Plaintiffs, talent agents were already optimistic about Plaintiffs' Event.  But after Defendant's efforts, artists that were initially very interested in Plaintiffs' Event in January, a month or so later suddenly were not. Talent agents that expressed enthusiasm about Plaintiffs' Event in early 2011 were no longer interested in working with them. Consequently, Plaintiffs were not able to sign artists sufficient to stage the shows at the State Fair.

Defendant also began making defamatory statements about Plaintiffs directly to Mr. Dorso.  At the same time, in an attempt to eliminate Plaintiffs as competition, Defendant offered

a contract with Plaintiffs, essentially giving them the option of taking their deal or being destroyed by their anti-competitive efforts.  Plaintiffs rejected the proposal.  Then, during the last meeting Plaintiffs had with Al Dorso before he terminated the contract, Dorso reminded Plaintiffs that he had warned them that Defendant would interfere with Plaintiffs ability to sign talent.  On April 26, 2011, the SFEM, through Dorso, informed Plaintiffs that the Contract was terminated pursuant to Section 3(c), which required Plaintiffs to furnish copies of contracts with the artists who would perform at the State Fair. Through a combination of defamatory statements made to representatives of SFEM and the Authority, pressure applied by Defendant to artists and their agents, and pressure applied to SFEM and the Authority, Plaintiffs' Contract with SFEM was terminated.

As a result of the termination of the Contract, which granted Plaintiffs an exclusive right to stage concerts at the State Fair for four years, with an option for an additional five years thereafter, Plaintiffs lost all the potential benefits associated with the proposed Events and were left with damaged reputations, so much so that both Dorfman and Barrett no longer work in the music industry.  As such, they filed the Complaint at issue here.

Given the lengthy history of this case, Plaintiffs will only mention the procedural history relevant to Plaintiffs' objections to Magistrate Judge Waldor's oral opinion on September 27, 2019.  The Motion is the result of the Expert Report, served on Defendant on June 6, 2019.  See Barnet Expert Report with Cover Letter attached to Certification of Counsel as Exhibit A.

For context, Plaintiffs have had an extremely difficult time obtaining discovery in his case, to say the least.  See Certification of Mike Ma ("Ma Cert.") at ⊩ 2 attached to Certification of Counsel as Exhibit F.  Plaintiffs first had to compel discovery from the Defendant in 2013.  See id. at ⊩ 3.  However, even after the order was issued by the Court ordering the production of

4

documents, Defendant still refused to produce the ordered discovery. See id. at ¶ 5. Plaintiffs proceeded to seek leave to file for Rule 37 sanctions against the Defendant. See id. Before the issue was resolved, a telephone conference was held before the Magistrate on March 27, 2014, whereby, recognizing the impasse between the Defendant and the Plaintiffs regarding the issue of discovery, it was agreed between the parties that the case would be stayed for ninety (90) days in order for the parties to participate in Court Ordered mediation. See id. at ¶ 7. After the mediation failed, the parties resumed discovery. See id. at ¶ 9.

Between 2014 and 2016, varies extensions were given to Defendant to allow production of discovery. See id. Numerous telephone conferences were also held before the Court during that time whereby Plaintiffs continued to seek production of discovery. See id. Despite this, Defendant missed virtually every deadline for production of discovery. See id. The last extension of discovery was granted on February 3, 2016, setting the fact discovery end date as March 31, 2016. See id. at ¶ 11.

However, Defendant produced the most significant documentation relevant to the contents of the expert report at issue on or about April 13, 2016, almost three (3) years after first ordered by the Court in 2013 and well after that Court-ordered fact discovery end date of March 31, 2016, prejudicing Plaintiffs. See id. at ¶ 13. Per Defendant's own papers, that meant that Plaintiffs had just over two (2) weeks to review thousands of pages of documents, which were produced in such a way as to hide documents, find an expert, have him review the documents, and have him write a report, in order to meet the May 2, 2016 deadline for experts. See id. at ¶ 14. This does not even consider the fact that by producing documents three (3) years late and after the fact discovery end date, Plaintiffs were deprived of the opportunity to depose any of Defendant's witnesses on their most significant production of documents. See id.

Importantly, 90% of all documents analyzed by Dr. Barnet for his expert report came from the last discovery effort made by the Defendants, almost three (3) years after the original order by the Court and after the fact discovery end date. See id. at ₱ 15. Further, some of the issues in the expert report at issue were not raised by Defendant until well after the fact discovery end date. See id.

Moreover, despite all this, Defendant still did not produce the relevant documentation ordered. See id. at ₱ 16. As of today's date, the Defendant still has not produced all documents requested by the Plaintiffs and Ordered by the Court in 2013. See id. For example, due to the public nature of live entertainment events, Plaintiffs went to the extraordinary effort of listing every single event for which it sought documents from the Defendants. See id. at ₱ 17. Out of approximately 40 comparative NY/NJ events Plaintiffs obtained from public events database, including from Defendant's own website during the relevant times, documents relating to approximately 5 have been produced by the Defendants to date. See id. Most of the documents produced by Defendant related to events are not from NJ/NY despite Plaintiff's request and particularization of same. See id. Even with the clear public record of events by Defendant, almost all the documents related to events sought by the Plaintiffs remain unproduced by the Defendant to date. See id.

This is a frequent tactic of Defendant. See id. at ₱ 19. Defendant simply fails to produce documents, forcing plaintiffs to expend significant resources fighting for production, and hope they eventually give up or time runs out. See id. Unfortunately, that is what happened here, as after fighting with the Defendant over discovery for three (3) years, Plaintiffs were nearing the end of their resources and could not continue to fight with a $1.7 billion dollar a year company over production of documents. See id.

6

In addition, the limited discovery that was actually produced was produced in a manner designed to hide the information contained in the discovery. See id. at ¶ 20. For example, a key spreadsheet was produced in pieces over thousands of pages of production in 2016, so that it took a massive effort just to identify and then piece together the document itself. See id. at ¶ 21. In fact, it was almost by accident that Plaintiffs discovered the relevant information that is the subject of this current motion from the last production made by the Defendant, as it would have been impossible to pick up by contemporary AI driven E-Discovery methodologies, or by anyone without (simultaneously), a legal, accounting, live events/entertainment and financial fraud expertise. See id. at ¶ 22.

In the early 2018, Defendant filed a motion for summary judgment as to all counts of the Amended Complaint of Plaintiffs. On May 23, 2018, Judge Walls granted in part, and denied in part, Defendant's motion for summary judgment and precluded Plaintiffs' ability to seek lost-profits damages. See SJ Order attached to Certification of Counsel as Exhibit B. The Order did not, however, preclude Plaintiff from seeking direct damages or punitive damages. See id. Thereafter, Plaintiffs' attorneys withdrew from the case on September 7, 2018. Smith + Schwartzstein LLC was substituted in on that same date. New counsel then had to get up to date on seven (7) years of litigation, all while moving to appeal the summary judgment motion interlocutory. See id. at ¶ 23. As such, it was not until recently that the information necessary to seek the expert at issue was discovered. See id. at ¶ 24.

Plaintiffs served the Expert Report on Defendant on June 6, 2019. See Barnet Expert Report with Cover Letter attached to Certification of Counsel as Exhibit A. In the letter accompanying the Expert Report, Plaintiffs made Dr. Barnet available for deposition at any time and noted that they would not object to any counter reports. See id. On August 23, 2019,

7

Defendant filed a motion to strike the Expert Report, alleging that Plaintiffs violated the Confidentiality Order in this case and noting that the Expert Report was served after the discovery end date. See Defendants Brief re: Motion to Strike attached to Certification of Counsel as Exhibit C. On September 9, 2019, Plaintiffs opposed the Motion (the "Opposition"), explaining to the Court that Defendant's Motion is fraught with inaccuracies, half-truths and omissions and that Plaintiff did not violate the Confidentiality Order because Dr. Barnet signed the proper non-disclosure documentation before reviewing documents provided through discovery by Defendants. See Plaintiffs' Opposition Brief re: Motion to Strike attached to Certification of Counsel as Exhibit D. Plaintiffs also explained that the reason for their delay in providing the expert report was due to Defendant's failure to meet any discovery deadlines throughout the case, finally providing thousands of documents sought after nearly three years past the original discovery deadline. See id. Plaintiffs argued that they had a justifiable and good faith reason for filing the Expert Report when they did due to the time needed to sift through the documents finally provided and find a suitable expert willing to review them. See id. Likewise, Plaintiffs argued that there was no prejudice to Defendant here that cannot, or could not, have been cured had Defendant met its discovery deadlines in a timely manner, and the Expert Report, rather than "disrupt the orderly and efficient trial of the case," would do the opposite. See id. Finally, Plaintiffs provided clear case law support from the Third Circuit in allowing in expert report evidence past discovery deadlines and applied it the case here. See id.

Regardless of Plaintiffs' thorough and articulate Opposition to the Motion, on September 27, 2019, the Magistrate opined that the Defendant's Motion should be granted because to allow in the Expert Report would be in contravention of the SJ Order, without addressing any of Plaintiffs other arguments. See Magistrate's Opinion at p.4 attached to Certification of Counsel as Exhibit

E. For these reasons, to be articulated further below, Plaintiff objects to the Opinion as based on clearly erroneous facts and respectfully requests that it be set aside by this Court.

## **LEGAL STANDARD**

FRCP 72(a) states, in part, that "The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." See also 28 U.S.C.A. §636 (b)(1)(A) (parroting the language of FRCP 72(a)). Under this section, it is clear that the District Court Judge is the ultimate decision-maker and has "broad discretion to accept, reject or modify the magistrate's proposed findings." See "Notes of Decisions" under 28 U.S.C.A. §636, citing U.S. v. Raddatz, 447 U.S. 667 (1980).

The District Court in Marks v. Struble, 347 F.Supp.2d 136, 149 (D.N.J. 2004) explained a District Judge's ability to reverse, modify or vacate a Magistrate Judge's order:

> A Magistrate Judge is accorded wide discretion in addressing non-dispositive motions. Miller v. Beneficial Mgmt. Corp., 844 F.Supp. 990, 997 (D.N.J. 1993). The Court may not reverse, modify, or vacate a Magistrate Judge's order addressing a non-dispositive motion unless that order is "clearly erroneous or contrary to law." 28 U.S.C. §636(b)(1); Fed.R.Civ.P. 72(a); Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1113 (3d Cir. 1986). This is so even if we would have decided the issue differently. Toth v. Alice Pearl, Inc., 158 F.R.D. at 47, 50 (D.N.J. 1994). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) (quotations and citation omitted). A Magistrate Judge's determination is contrary to law if the Magistrate Judge misinterpreted or misapplied the applicable law. Gunter v. Ridgewood Energy Corp., 32 F.Supp.2d 162, 164 (D.N.J. 1998).

"Findings of facts are clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been committed." See In re Trombadore, 201 B.R. 710 (D.N.J. 1996), citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see also South Seas

Catamaran, Inc. v. M/V Leeway, 120 F.R.D. 17, 21 (D.N.J. 1988) (A magistrate judge's ruling is clearly erroneous when the reviewing Court is left with a definite and firm conviction that a mistake has been made). Here, the Opinion relied on the clearly erroneous belief of the Magistrate Judge that the Expert Report was only relevant to damages, as well as the clearly erroneous reading of the SJ Order as eliminating any and all damages, including direct and punitive damages; further, the decision was contrary to applicable law, which was not addressed by the Magistrate.

## **LEGAL ARGUMENT**

### **POINT I: THE MAGISTRATE'S OPINION IS BASED ON ERRONEOUS FACTS REGARDING THE SJ ORDER AND EXPERT REPORT SUCH THAT IT SHOULD BE REVERSED**

The Magistrate's Opinion is based on the erroneous reading of the SJ Order, claiming that "Judge Walls granted summary judgment as to count one, tortious interference with contract; and limited damages [to nominal] on count three, the defamation claim; and precluded damages on count two." See Magistrate's Opinion at p.4 attached to Certification of Counsel as Exhibit E. However, the SJ Order does not "preclude damages on count two;" rather, it precludes "**lost-profits** damages" as to Count Two. See id.; SJ Order attached to Certification of Counsel as Exhibit B. It makes no ruling as to either direct damages or punitive damages. See SJ Order attached to Certification of Counsel as Exhibit B.

However, the Opinion then takes that false assumption and applies a second false assumption that the Expert Report, which the Magistrate indicated she has not read, is only relevant to Plaintiffs' damages. See Magistrate's Opinion at p.4 attached to Certification of Counsel as Exhibit E ("Plaintiff now submits to defendant an ***expert report on damages***.") (*emphasis added*).[3]

---

[3] The Magistrate notes that the Expert Report was not submitted by Plaintiffs; however, Defendant (despite demanding Plaintiffs destroy the report as a violation of the Confidentiality Order) submitted the Expert Report as Exhibit B to its papers. Plaintiffs, after having been attacked by Defendant for even having the report in the first place,

The Magistrate goes on to state that hence "any proposed expert report is in contravention of Judge Walls' summary judgment opinion and order, and hints at this Court reversing his opinion."  See id.  In essence, the Magistrate is holding that because the SJ Order allows no damages (false) and the Expert Report is only relevant to damages (false), it is in contravention of the SJ Order.  See id.  Since that analysis, which provides the *only* analysis of the Motion,[4] was based on clearly erroneous facts, the Opinion should be reversed.  See FRCP 72(a); Marks, supra at 149.

In fact, each erroneous fact, by itself, warrants reversal.  First, the Opinion erroneously failed to consider that Plaintiffs still have the ability to seek other compensatory and punitive damages at trial, and as such the Expert Report, even if based entirely on damages, would be relevant and admissible.  Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003)(*quoting* Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001) and citing Restatement (Second) of Torts §903, pp.453-454 (1979)). Here, Plaintiffs should be compensated for the loss of the benefit of the contract at issue, the monetary damages lost in time, effort and money put forth toward that event by Plaintiffs, and other such compensation.  See id.

Punitive damages are those whose aim are not to compensate but rather to punish (retribution) and deter future harmful conduct.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 493 (2008); State Farm, supra, at 416.  Punitive damages are appropriate in cases where the defendant's conduct is outrageous, owing to "gross negligence," "willful, wanton and reckless

---

did not resubmit the Expert Report.  However, given the Magistrate's comment and the fact that the Expert Report was already submitted by Defendant, Plaintiffs attach it here.

[4]    The Opinion also simply mentions that the Expert Report was late; however, that was not in dispute, and is not dispositive on the issue.  As the case law and analysis below demonstrate, there is a specific test the Court should have performed when considering a late report.

indifferent for the rights of others" or other deplorable behavior.  Exxon, supra at 493 (citing 4 Restatement §908(2) and Day v. Woodworth, 54 U.S. 363, 14 L.Ed. 181 (1851)).   Here, Defendant's conduct towards Plaintiffs, including its systematic campaign to interfere with Plaintiffs' ability to sign certain artists for its State Fair Electronic Dance Music event, its defamatory statements about Plaintiffs,  and its threats to destroy Plaintiffs if they didn't sign the contract to work with Defendant, all amount to deplorable behavior that is outrageous.   This is not Defendant's first attempt to shut down competition, as previously mentioned, but Plaintiffs want to send a clear message by seeking punitive damages that it should be their last attempt.

The Expert Report drives this fact home, and exposes a scheme which defrauds not just competition like Plaintiffs, but venues (not owned by Defendant), artists, managers, agents, and, importantly, the paying public who have seen the prices of tickets go up tenfold (particularly after Defendant merged with Ticketmaster), all so Defendant, a $1.7 billion dollar a year company, can line its pockets.  See Barnet Expert Report with Cover Letter attached to Certification of Counsel as Exhibit A.  As such, the Expert Report that includes facts that could not only prove Defendant's liability in this action and prove Plaintiffs' qualifications to perform the contract (as will be discussed below), but also inform on a compensatory and/or punitive damages claim is critical to Plaintiffs' case and should be allowed into evidence.  See id.  Since the Opinion erroneously held that such information was barred by the SJ Order, it should be set aside by this Court. See FRCP 72(a); Marks, supra at 149.

Second, even if Plaintiffs had no recourse by way of any damages, the Expert Report would still be relevant and admissible because it addresses the issue of liability at length.  In fact, the main thrust of the Expert Report is its claim that Defendant had a systematic scheme by which it eliminated competition like Plaintiffs.  See Barnet Expert Report with Cover Letter at p.5 attached

to Certification of Counsel as Exhibit A (stating in his "summary of opinions" section as follows: "To a reasonable degree of certainty, Plaintiffs' decision not to accept the offer of the Defendant to co-promote/produce the State Fair event was both sound and necessary, considering evidence here that suggest a business model adopted by the Defendant that is extremely financially predatory against, among others, co-independent promoters"). Moreover, the Expert Report also addresses Defendant's defense that it didn't tortuously interfere with Plaintiffs because it offered to co-promote the event with Plaintiffs, opining that "from the evidence, [Juice] would have, more likely than not, suffered financially, regardless of the success of the event if they had accepted the offer of co-promotion/production from Live Nation if the same business model was to be observed as was observed in the documents provided to me for the purpose of this report." See id. at p.13.

These liability issues were specifically delineated at length in the very beginning of the Expert Report, when Dr. Barnet stated,

> After review of documented information and events relative to this case, I am able to provide the following opinions to a reasonable degree of certainty:
>
> -    Live Nation at times engages the services of artists through their agents and/or managers and co-independent promoters on contingent compensation agreements;
> -    Live Nation negotiated 3rd party expenses, like rental costs with venues, directly with vendors in exchange for exclusive financial gains not disclosed to the artists or their agents, managers, or independent co-promoters in the form of "rebates." There appears to be a direct correlation between the value of these negotiated increased expenses and the value of rebates received by Live Nation for its exclusive benefit;
> -    The higher that 3rd party expenses are, the more expensive it is to produce and promote an event for all involved, including agents, artists, co-independent promoters within these contingency arrangements. In these circumstances, from the evidence presented to me, it seems Live Nation can enjoy 100% of the benefit, while, at least, passing on material costs (more than 50% at times) onto unknown 3rd parties, such as artists, agents, managers and certainly, co-independent promoters;

13

- Such a business model creates a conflict of interest with Live Nation's fiduciary responsibility to the artists and others mentioned under these contingency compensation arrangements;

- Such "rebates" to Live Nation are based on "volume" of ticket sales, while artists, agents, managers and co-independent promoters are compensated based on "value" of ticket sales, insulating Live Nation's profit in many ways, from the price of each ticket sold. From the financial documents presented to me, it appears most shows indicate a "loss" or "very low profit" on public settlements presented to artists, agents, managers and co-independent promoters, but a "profit" after factoring in the "rebates" in the internal accounting documents of the Defendant;

- The location of this "rebate" is included in the accounting item "contribution margin," which is a non-traditional accounting item for the live entertainment industry. Contribution Margin is apparently arrived at by adding "promoter profit" with "ancillary income." The "rebate" discussed here appears to fall under "ancillary income" according to the Defendant's own contractual definitions, supported by the chart of events provided by the Defendants;

- This business model can be seen as extremely predatory on, among others, co-independent promoters, who often have to share up to 50% of all the expenses of producing and promoting an event, but are not entitled to the real "profit" of the event beyond ticket sales, which appears to be the "rebates" discussed. It is arguable that this business model, at best, ensures a lower profit margin for the co-independent promoter, among others, or ensure the financial ruin of a co-independent promoter at worst;

- This business model also appears to allow Live Nation to show "loss" or low "promoter profit" to its vendors and partners, including co-independent promoters, while boast a material profit or at least, higher income, to the regulators and their shareholders for its events in contrast.

See id. at pp.4-5.

Review of these issues makes clear that they go directly toward liability – i.e. whether Plaintiffs could have avoided the tortious interference by accepting Defendant's deal, which Defendant now uses in a defense, whether Defendants acted with "malice," and more generally whether Defendant engages in unlawful actions to eliminate competition by others like Plaintiffs.

Moreover, while the Magistrate focused on the portion of the Expert Report relating to Plaintiffs' ability and interpreted that to be directly related to the SJ Order's decision on lost profits,

14

even that portion of the Expert Report goes to liability.  See Magistrate's Opinion at p.4 attached to Certification of Counsel as Exhibit E.  Defendant's claim that irrespective of Defendant's actions towards Plaintiffs, Plaintiffs could never have performed the contract at issue anyway because they lacked the requisite experience and ability.  The Expert Report opines on that very issue, going over Plaintiffs' qualifications to perform the contract at issue in detail.  See Barnet Expert Report with Cover Letter attached to Certification of Counsel as Exhibit A.  This issue is extremely important to liability not just on the issue of tortious interference, but to the slander claim.  Defendant claims what they said about Plaintiffs, i.e. they couldn't handle the contract, are true, and hence not slander.  The Expert Report addresses that claim directly.  See id.

As such, the Expert Report, rather than being contradictory to the SJ Order, would clearly help the jury in understanding liability on specific issues such as whether Plaintiffs failure to make a deal with Defendant is dispositive of their claims, whether there was "malice" as required for the claims here, and what it takes within the industry to promote an event like that at issue, as well as form a basis for punitive damages.  Therefore, the Opinion, which completely relies on the assumption that Plaintiffs only want to introduce the Export Report to prove damages and that the SJ Order does not allow any damages, is clearly erroneous and should be set aside by this Court. See FRCP 72(a); Marks, supra at 149.

**POINT II: THE MAGISTRATE'S OPINION DOES NOT ADDRESS PLAINTIFFS ARGUMENTS OR APPLY THE APPLICABLE TEST AND AS SUCH IS IN CONTRAVENTION TO THIRD CIRCUIT CASE LAW REGARDING THE LATE ADMISSION OF EXPERT REPORTS THAT ARE CRITICAL TO PARTIES' EVIDENCE AND DO NOT PREJUDICE THE OPPOSING PARTY**

The Opinion is contrary to the law of the Third Circuit, and therefore, should be set aside by this Court.  See Gunter, 32 F.Supp.2d at 164.  The Opinion stated that "any proposed expert report is in contravention of Judge Walls' summary judgment opinion and order and hints at this

Court reversing his opinion." <u>See</u> Magistrate's Opinion at p.4 attached to Certification of Counsel as Exhibit E. As such, the Opinion does not address the merits of Plaintiffs' Opposition to the Motion, such as Defendant's practice of failing to provide discovery to force parties to drop their lawsuit against Defendant. In numerous lawsuits brought against the Defendant, it has engaged in a scheme to defraud parties by refusing to respond to discovery until forced to do so, months or even years late (as is the case here), causing opponents so much expense, frustration and prejudice to their case that they often give up. <u>See</u> Ma Cert. at ¶19-22 attached to Certification of Counsel as Exhibit F; June 12, 2019 Attorney Correspondence attached to Certification of Counsel as Exhibit G. Plaintiffs pointed out in the Opposition to the Motion that this affected them, how they continuing to push for their rightful access to thousands of documents, reviewing each document, and diligently searching for an expert who was willing to review these thousands of documents and testify against Defendant (many experts in the industry feared retaliation by Defendant). <u>See</u> Plaintiffs' Opposition Brief re: Motion to Strike at p. 6-7 attached to Counsel Cert. at D.

Plaintiffs acknowledge that they were untimely with their filing of the Expert Report but Plaintiffs explained at length the reason for their delay: Defendant, after having served documents three (3) years after being ordered to do so in a manner designed to hide key documents, depriving Plaintiffs not just of the ability to obtain an expert report, but depriving them of the opportunity to depose witnesses on the most important documents produced, attempted to use Plaintiffs' failure to meet the unrealistic May 2, 2016 expert deadline as justification to exclude extremely important evidence. <u>See id.</u> at p. 14, ¶ 2. There was simply no way Plaintiffs could have reviewed the thousands of late produced documents which comprised of 90% of the documents used by Dr. Barnet, pieced together the hidden documents, gotten them to an expert, and had the expert write a report in the nineteen (19) days between the production and the deadline. <u>See id.</u> As such, if

16

there was any bad faith here, it was on the part of Defendant.  The Magistrate fails to address these arguments in The Opinion.

More importantly, in failing to consider these arguments, the Magistrate failed to follow the law.  The Third Circuit has repeatedly held that although the Federal Rules clearly contemplate the exclusion of untimely or improper expert disclosures, because "[t]he exclusion of critical evidence is an extreme sanction," the remedy of exclusion should be reserved for circumstances amounting to "willful deception or flagrant disregard of a court order by the proponent of the evidence."  See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 791–92 (3d Cir. 1994) (internal quotation marks and citations omitted); see also In re Mercedes-Benz Antitrust Litig., 225 F.R.D. 498, 506 (D.N.J.2005) ("'The Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony.'") (citations omitted); Bridgestone Sports Co., Ltd. v. Acushnet Co.,  2007 WL 521894 at *4 (D.Del. Feb. 15, 2007) (noting that while the decision to exclude expert testimony is context-specific, "evidence should be excluded sparingly and only in circumstances involving litigation conduct that is clearly unprofessional or inappropriate, and in circumstances creating prejudice to the party against whom the evidence is offered"); Velez v. QVC, Inc., 2004 WL 1175726, at *1 (E.D.Pa. 2004) (stating that before imposing the "extreme sanction" of preclusion of evidence, the Court must either find that the party "(1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of due diligence."), quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 905 (3d Cir. 1977).  Here, the Magistrate did not even attempt to consider if Plaintiffs' actions in serving the Expert Report late were "willful deception

or flagrant disregard of a court order by the proponent of the evidence," which, of course, they were not.  See In re Paoli, 35 F.3d at 791–92.

Moreover, the Third Circuit has found a party to have violated a scheduling order willfully or in bad faith where the violation at issue was one in a line of violations by the non-moving party.  See In re TMI Litig., 193 F.3d 613, 722 (3d Cir.1999) (finding bad faith where defendants engaged in a "pattern of filings that constituted a flagrant violation" of court's orders.  Willfulness or bad faith has **not** been found, however, where a party's actions have amounted to a mere "'[l]ack of diligence.'" See Paoli, 35 F.3d at 793 (internal citation omitted); see also Holbrook v. Woodham, 2008 WL 544719 (W.D.Pa. Feb. 28, 2008) (noting that a finding of willfulness should be reserved for repeated disregard for court orders or otherwise "flagrant" disregard of those orders, and that an "egregious" showing of bad faith was necessary for exclusion); Hartle v. FirstEnergy Generation Corp., 7 F. Supp. 3d 510, 517 (W.D. Pa. 2014) (finding a report issued a year late was admissible where there was no bad faith and there was an opportunity to cure).  Again, the Magistrate did not address whether the Plaintiffs had a history of being late, which they do not.  See In re TMI Litig., 193 F.3d at 722.

If the Magistrate had considered the law here, she would have found that there is no evidence at all of "willful deception or flagrant disregard of a court order by" Plaintiffs.  See Paoli, 35 F.3d at 791–92.  Unlike the cases where such bad faith has been found, Defendant has not pointed to a single other instance of late service – in stark contrast to Defendant's conduct as described above.  See id.; In re TMI Litig., 193 F.3d at 722.  Moreover, the fact that Plaintiffs are using new counsel indicates this was not a "pattern of filings" such that bad faith can be found.  See In re TMI Litig., 193 F.3d at 722.  Defendant simply has no basis for suggesting bad faith here, especially considering that Plaintiffs have made every effort to cure any prejudice by making

18

Dr. Barnet available and offering to give Defendant time for a rebuttal report. <u>See</u> June 12, 2019 Attorney Correspondence attached to Certification of Counsel as Exhibit G; <u>see</u> <u>also</u> <u>Hartle</u>, 7 F.Supp.3d at 517.

At best, the late report was due to a mere "'[l]ack of diligence'" not by Plaintiffs or their current attorney, but by their previous attorney who left the case a year ago, which is not grounds to strike. <u>See</u> <u>Paoli</u>, 35 F.3d at 793 (internal citation omitted); Ma Cert. at ¶ 23 attached to Certification of Counsel as Exhibit F. However, the uncontroverted reality here is that Plaintiffs reasonably did not discover the information and expert needed to produce the report until recently, due in large part to Defendant itself failing to comply with the same Order they now want to use to preclude the Expert Report, and despite significant hardships. Plaintiffs produced the Expert Report as quickly as it possibly could. <u>See</u> Ma Cert. at ¶¶ 2-26 attached to Certification of Counsel as Exhibit F. In fact, it was Plaintiffs who were prejudiced by Defendant's service of documents three (3) years after being ordered to do so by this Court, after the fact discovery end date, which is the underlying reason for Plaintiff's own late service of the Expert Report. <u>See</u> <u>id.</u> As will be discussed further below, any prejudice to Defendant can easily be cured, and the Expert Report is extremely important to this case. <u>See</u> <u>id.</u> at ¶¶ 27-34.

Moreover, the Magistrate did not consider that it is well settled that the standard for admission of late expert reports prior to a trial date being set is relaxed. <u>See</u> <u>Meyers</u>, 559 F.2d at 904; <u>see</u> <u>also</u> <u>Szalontai v. Yazbo's Sports Café</u>, 183 N.J. 386, 398 (2005) (discovery rules are more relaxed before arbitration has been held and/or a trial date has been set); <u>Tucci</u>, 364 N.J. Supper. at 52 (courts should be "indulgent" were there is no trial date set); <u>Ponden v. Ponden</u>, 374 N.J. Super. 1, 11 (App. Div. 2004) (finding that trial judge mistakenly exercised discretion in barring plaintiff's expert report when trial date was not yet scheduled and such report was crucial to

plaintiff's claim); Santone v. Fusiek, 2010 WL 6813737 (Law Div. 2010) (courts will allow late expert reports where the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent). Here, no trial date, or even pre-trial conference date was set at the time of service of the Expert Report, and to date there is no trial date set. See Ma Cert. at ¶ 37 attached to Certification of Counsel as Exhibit F. Plaintiffs will make Dr. Barnet available for deposition if the Court allows in his Expert Report. See id. at ¶ 38. Since there is no evidence of bad faith on the part of Plaintiffs, any prejudice can be cured and no trial date has been set, per established Third Circuit law, the Magistrate's Opinion must be set aside to avoid the "extreme sanction" of striking the Expert Report. See Paoli, 35 F.3d at 791–92.

Finally, the Magistrate failed to apply the four-point test repeatedly articulated by the Third Circuit and cited to by Defendant in The Motion at page 5, demonstrating why the Opinion must be set aside. See Nicholas, 227 F.3d at 148. Looking at the first factor, "the prejudice or surprise," the important and frequently cited factor is "prejudice," and there is no prejudice to Defendant here. The Expert Report was based almost entirely on documents produced by Defendant itself, as well as some transcripts that have been in Defendant's possession for quite some time. See Ma Cert. at ¶¶ 13, 15 attached to Certification of Counsel as Exhibit F. Defendant has had and will continue to have plenty of time to depose Dr. Barnet, as Plaintiffs will make him available for his deposition upon request. See id. at 38. Further, Defendant also has time to submit a counter-expert report if it deems one necessary, and Plaintiffs will of course consent to any extensions of time necessary for it to do so if needed. See id.

As for the second factor, "the ability to cure that prejudice," to the extent there was such prejudice, it can hardly be questioned that Defendant has the ability to cure any such prejudice.

See <u>Nicholas</u>, 227 F.3d at 148.  Again, no trial date has been set.  See <u>Ma Cert.</u> at ⁋ 37 attached to Certification of Counsel as Exhibit F.  Defendant can depose Dr. Barnet and submit a counter-report, the only things they could have done had the Expert Report been issued earlier.  <u>See</u> <u>id.</u> at ⁋ 38.  If Defendant so chooses, it can be in the exact same position it would have been if the report was issued on May 2, 2016.  <u>See</u> <u>id.</u>

The third factor, the extent that the Expert Report would "disrupt the orderly and efficient trial of the case" was barely addressed by Defendant in The Motion, and only by pointing out once again that the Expert Report was late, which is the very reason for the analysis in the first place.  <u>See</u> Defendant's Brief at 8; <u>See</u> <u>Nicholas</u>, 227 F.3d at 148.  But again, there has been no trial date set here, meaning it can't possibly disrupt a trial simply by being late.  <u>See</u> Ma Cert. at ⁋ 37 attached to Certification of Counsel as Exhibit F.  Moreover, the Expert Report itself will make trial much more efficient, as it will allow complex issues to be explained by an industry expert.  <u>See</u> <u>id.</u> at 29-33.  There is simply no reason to think that the Expert Report will make trial any less efficient.

The fourth factor, "bad faith or willfulness in failing to comply" was not addressed at all by Defendant and is addressed by Plaintiffs at length above.  <u>See</u> <u>Nicholas</u>, 227 F.3d at 148.  The analysis above demonstrates that this factor too weighs in favor of Plaintiffs.  But there are two other factors which have been cited by the Court that Defendant did not even list, and which clearly tip the scales in Plaintiffs' favor, if the scales weren't already there: The Court in <u>Withrow v. Spears</u>, 967 F. Supp. 2d 982, 1000–01 (D. Del. 2013) cited six factors when deciding whether to allow a late expert report, including two additional factors which are frequently mentioned in the applicable case law: (1) the explanation for the failure to disclose and (2) the importance of the testimony sought to be excluded.  As discussed at length above, one simply needs to read the Ma Cert. to understand that Plaintiffs have adequately explained their reason for the Expert Report.

See Ma Cert. attached to Certification of Counsel as Exhibit F.  Similarly, the Ma Cert. addresses the importance of the Expert Report.  See id.  The Expert Report is extremely important to multiple liability issues that go to the very heart of this case – Defendant's tactics in eliminating the competition by the very method Defendant uses as a defense here, and Plaintiffs' ability to have complied with the contract at issue.  See id. at ¶¶ 29-33.  The former in particular is extremely complicated and industry specific, and the Expert Report is crucial for a full understanding of Plaintiffs' case.

Since all six of the factors here weigh in favor of Plaintiffs, and the Magistrate's Opinion is in contravention to other Third Circuit opinions on the matter of allowing tardy expert reports into evidence, the Opinion of the Magistrate must be set aside.  See Gunter, 32 F.Supp.2d at 164.

## CONCLUSION

For the foregoing reasons, pursuant to FRCP 72(a), Plaintiffs objects to the Opinion of the Magistrate which denies Plaintiffs from introducing their Expert Report at trial, and requests that the Court reverse the Opinion and allow the Expert Report.

**SMITH + SCHWARTZSTEIN LLC**

BY:      /s/ Andrew Smith
_____
ANDREW B. SMITH, ESQ.
71 Maple Avenue
Morristown, NJ 07960
Telephone: 973-206-1725
Fax: 973-794-2589

DATED:  October 11, 2019

22