# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT,<br><br>Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>Defendant. | Civil Action No. 11-7318-WHW-MCA |

# CERTIFICATION OF MIKE MA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO STRIKE

I, Mike Ma, hereby certify as follows:

1.      I am a consultant and legal assistant of Plaintiff Juice Entertainment LLC ("Juice"). I am fully familiar with all matters discussed herein and I submit this certification in support of Plaintiffs Juice, Thomas Dorfman and Chris Barrett's ("Plaintiffs") opposition to Defendant Live Nation's ("Defendant") motion to strike Plaintiffs' expert report.

2.      Plaintiffs have had an extremely difficult time obtaining discovery in this case, to say the least.

3.      Plaintiffs had to compel discovery from the Defendant.

4.      True and accurate copies of the notice of motion and order related thereto are attached hereto as Exhibit A.

5.      However, even after the order was issued by the Court ordering the production of documents, Defendant still refused to produce the ordered discovery.  Plaintiffs proceeded to seek leave to file for Rule 37 sanctions against the Defendant.

6.      True and accurate copies of said order and request for leave to file for Rule 37 sanctions are attached hereto as Exhibit B.

7.      A telephone conference was held before the Honorable Cathy Waldor on March 27, 2014, whereby, recognizing the impasse between the Defendant and the Plaintiffs regarding the issue of discovery, it was agreed between the parties that the case would be stayed for ninety (90) days in order for the parties to participate in Court Ordered mediation.

8.      A true and accurate copy of the Order related thereto is attached hereto as Exhibit C.

9.      After the mediation failed, the parties resumed discovery.  Between 2014 and 2016,

varies extensions were given to Defendant to allow production of discovery.  Numerous telephone

conferences were also held before the Court during that time whereby Plaintiffs continued to seek

production of discovery.  Despite this, Defendant missed virtually every deadline for production

of discovery.

10.     True and accurate copies of the correspondence so demonstrating are attached

hereto as Exhibit D.

11.     The last extension of discovery was granted on February 3, 2016, setting the fact

discovery end date as <u>March 31, 2016</u>.

12.     A true and accurate copy of the minutes of that Order from PACER is attached

hereto as Exhibit E.

13.     However, Defendant produced the most significant documentation relevant to the

contents of the expert report at issue on or about <u>April 13, 2016</u>, almost three (3) years after first

ordered by the Court in 2013 and well after that Court-ordered fact discovery end date of March

31, 2016, prejudicing Plaintiffs.

14.     Per Defendant's own papers, that meant that Plaintiffs had just over two (2) weeks

to review thousands of pages of documents, which were produced in such a way as to hide

documents, find an expert, have him review the documents, and have him write a report, in order

to meet the May 2, 2016 deadline for experts.  This does not even consider the fact that by

producing documents three (3) years late and after the fact discovery end date, Plaintiffs were

deprived of the opportunity to depose any of Defendant's witnesses on their most significant

production of documents.

15.    Importantly, 90% of all documents analyzed by Dr. Barnet for his expert report came from the last discovery effort made by the Defendants, almost three (3) years after the original order by the Court and after the fact discovery end date. Further, some of the issues in the expert report at issue were not raised by Defendant until well after the fact discovery end date.

16.    Moreover, despite all this, Defendant still did not produce the relevant documentation ordered. As of the date of this Certification, the Defendant still has not produced all documents requested by the Plaintiffs and Ordered by the Court in 2013.

17.    For example, due to the public nature of live entertainment events, Plaintiffs went to the extraordinary effort of listing every single event for which it sought documents from the Defendants. Out of approximately 40 comparative NY/NJ events Plaintiffs obtained from public events database, including from Defendant's own website during the relevant times, documents relating to approximately 5 have been produced by the Defendants to date. Most of the documents produced by Defendant related to events are not from NJ/NY despite Plaintiff's request and particularization of same. Even with the clear public record of events by Defendant, almost all the documents related to events sought by the Plaintiffs remain unproduced by the Defendant to date.

18.    A true and accurate copy of a spreadsheet prepared by the Plaintiffs and communicated to the Defendants and the Court during the discovery dispute demonstrating the above is attached hereto as Exhibit F.

19.    My extensive study of cases against Live Nation indicates this is a frequent tactic of Defendant. They simply fail to produce documents, forcing plaintiffs to expend significant resources fighting for production, and hope they eventually give up or time runs out. Unfortunately, that is what happened here, as after fighting with the Defendant over discovery for

three (3) years, Plaintiffs were nearing the end of their resources and could not continue to fight with a $1.7 billion dollar a year company over production of documents.

20.    Moreover, the limited discovery that was actually produced was produced in a manner designed to hide the information contained in the discovery.

21.    For example, a key spreadsheet was produced in pieces over thousands of pages of production in 2016, so that it took a massive effort just to identify and then piece together the document itself. The spreadsheet, marked confidential and therefore not included here, included Bates numbers LN003587, LN003588, LN003589, LN003590, LN003591, LN003592, LN003594, LN003595, LN003596, LN003597, LN003598, LN003589, LN003600, LN003601, LN003602, LN003603, LN003604, LN003605, LN003606, LN003607, LN003608, LN003609, LN003610, LN003611, LN003612, LN003613, LN003614.

22.    In fact, it was almost by accident that Plaintiffs discovered the relevant information that is the subject of this current motion from the last production made by the Defendant in 2016, as it would have been impossible to pick up by contemporary AI driven E-Discovery methodologies, or by anyone without (simultaneously), a legal, accounting, live events/entertainment and financial fraud expertise.

23.    Plaintiffs' efforts were made more difficult with the withdrawal of Plaintiffs' original counsel through no fault of Plaintiffs in the summer of 2018. New counsel then had to get up to date on seven (7) years of litigation, all while moving to appeal the summary judgment motion interlocutory.

24.    As such, it was not until recently that the information necessary to seek the expert at issue was discovered.

25.     In addition, Plaintiffs had tremendous difficulty finding any expert in the specific industry willing to testify against Defendant. While experts approached did not doubt Plaintiffs, there was concern about retaliation by Defendant for even just providing a report to Plaintiffs at all, regardless of what it said. Dr. Barnet was the first expert who was willing to even look at any documents or review the issues at all.

26.     Considering all these difficulties, Plaintiffs provided the expert report at issue as expeditiously as they could.

27.     Further, Plaintiffs made their expert available for deposition at any time as of June 6, 2019, over three (3) months ago, and Defendant made no attempt to depose Plaintiffs' expert, nor have they served any counter-report, despite Plaintiffs' offer for them to do so.

28.     A true and accurate copy of Plaintiffs' counsel's letter so offering is attached hereto as Exhibit G, along with copy of Plaintiff's counsel's response to Defendant's counsel thereafter.

29.     The expert report at issue is important to this case in a variety of ways. First, it provides necessary context for Plaintiffs rejection of the gun-to-head offer of Defendant. Defendant's claim that Plaintiffs were not damaged because they could have taken Defendant's offer, but Plaintiffs argued that it was because they knew that Defendant, who has a virtual monopoly in the industry, has effectively destroyed numerous independent promotors like them with similar deals.

30.     It is well known that Defendant is and has been involved in a number of anti-competitive lawsuits and investigations, including one recent investigation by the Department of Justice, and they have settled cases like this one for significant sums.

31.     True and accurate copies of new articles so demonstrating are attached hereto as Exhibit H.

32.     Plaintiffs are one of very few litigants to get past summary judgment against Defendant, and their persistence despite significant obstacles allowed them to obtain by way of the expert report at issue significant evidence to back up their claim that Defendant's tactics, like those implemented here, have been used by Defendant to ensure that not only all independent promoters like Plaintiffs are put out of business, but that 90% of the money goes to Defendant (the remainder going to the few venues they don't own and the artists themselves). These tactics have also been largely responsible for the massive increase in ticket prices.

33.     Without the expert report at issue, it will be difficult for Plaintiffs to articulate this complex scheme, which goes to the very heart of the case. An expert perspective will be crucial to the jury's understanding of the key issues in this case.

34.     Further, the expert report at issue helps resolve another hotly contested issue, that of Plaintiffs' ability to perform the contract at issue in the case. Defendants have argued that Plaintiffs lacked the requisite experience to have been successful, and the expert report at issue provides a non-party industry expert opinion would significantly help a jury understand that issue.

35.     Finally, contrary to the assertions by Defendant, Plaintiffs not only retained Dr. Barnet as an expert witness but had him sign the applicable documentation per the Confidentiality Order in this case.

36.     A true and accurate copy of the agreement to be bound to the confidentiality order signed by Dr. Barnet is attached hereto as Exhibit I.

37.     As of the date of this certification, no trial date has been set. Although a pre-trial conference is scheduled for October 3, 2019, no pre-trial conference was scheduled until months after the report was served.

38.    Plaintiffs will continue to make their expert available for his deposition, and further will not object if Defendant wants time to serve a counter-expert report, as Plaintiffs stated on June 6, 2019.

39.    Therefore, for the reasons provided stated above and within Plaintiffs' papers, Plaintiffs respectfully request that Defendant's motion to strike be denied.

I hereby certify that the foregoing statements made by me are true. I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

BY:    _____

Mike Ma, Juice Entertainment LLC

DATED:  September 9, 2019

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT,<br><br>               Plaintiffs,<br><br>   v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>             Defendant. | **Civil Action No. 11-7318-WHW-MCA** |

# Exhibit A

Case 2:11-cv-07318-CCC-CLW   Document 117-7   Filed 10/11/19   Page 1 of 1 PageID: 933
Case 2:11-cv-07318-CCC-CLW   Document 36   Filed 08/08/13   Page 1 of 1 PageID: 933
PageID: 2079

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT.<br><br> Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br> Defendants. | Civil Action No. 2:11-CV-07318-WHW-SCM<br><br>**ORDER ON INFORMAL MOTION TO COMPEL DISCOVERY**<br><br>**[D.E. 36]** |

**THIS MATTER** having come before the Court on August 7, 2013 for oral argument on motion by Plaintiffs to compel discovery from Defendant, [D.E. 36], and the Court having considered the joint submission of the parties and the arguments of all counsel, and for good cause having been shown,

**IT IS** on this Wednesday, August 07, 2013 ordered as follows:

Plaintiff's motion is granted in part and denied in part for the reasons set forth today on the record.



Honorable Steve Mannion, U.S.M.J.
United States District Court,
for the District of New Jersey
phone: 973-645-3827

8/7/2013 2:32:52 PM

Case 2:11-cv-07318-WHW-CLW   Document 86-17   Filed 07/22/19   Page 1 of 2 PageID: 326
Case 2:11-cv-07318-WHW-CLW   Document 61-7   Filed 10/14/19   Page 12 of 203
PageID: 2080

# STONE ◼ MAGNANINI
## LLP

### COMPLEX COMMERCIAL LITIGATION

**NEW JERSEY OFFICES**   150 JFK Parkway, Short Hills, NJ 07078   P 973.218.1111   F 973.218.1106

July 22, 2013

**<u>VIA CM/ECF & REGULAR MAIL</u>**

Honorable Steven C. Mannion
United States Magistrate Judge
United States District Court
For the District of New Jersey
Martin Luther King Courthouse
50 Walnut Street, Courtroom MLK 4A
Newark, NJ 07101

      Re:    *Juice Entertainment, LLC, et al. v. Live Nation Entertainment, Inc.*,
               Civ. Action No. 11-7318 (WHW)(SCM)

Dear Judge Mannion:

      We represent Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett in the above-captioned matter.  Counsel for Plaintiffs and Defendant apprised the Court, by letter dated June 28, 2013, of the current status of discovery.  As noted in that letter, the parties have been engaged in paper discovery, meeting and conferring regarding discovery disputes and scheduling party and non-party depositions.  Last week, the parties took three non-party depositions.

      The current fact discovery end date is July 31, 2013.  Though the parties have been cooperating toward scheduling depositions, the calendar is to some extent beyond the control of counsel given that non-parties are involved and have to be accommodated.  Accordingly, while depositions have begun, they will not be completed at least until Mid August.  As we noted in our last correspondence the parties request that this be considered a joint application to formally extend the fact discovery end date and all other remaining dates.  However, existing discovery disputes prevent the parties from being able to know with certainty how much time will be required to complete discovery.  Simply put, the parties have disagreements about the permissible scope of discovery, the resolution of which will largely determine how much additional time is required.

      Set forth below are Plaintiffs' positions followed by Defendant's positions on the discovery issue.  Defendant's positions are in italics.

Case 2:11-cv-07318-WHW-CLW   Document 86-17   Filed 07/22/19   Page 2 of 2 PageID: 327
Case 2:11-cv-07318-CCC-CLW   Document 61-7   Filed 10/14/19   Page 13 of 203
PageID: 2081

Honorable Steven C. Mannion
July 22, 2013
Page 2

At this point the discovery disputes solely involve Defendant's responses to Plaintiffs' discovery requests.  *Live Nation's objections to Plaintiffs discovery requests are primarily based on three grounds:  1 Live Nation produces and promotes events worldwide and does not maintain any centralized storage facility of documents and communication -- accordingly it would be unduly burdensome for Live Nation to produce such documents and communications; 2) Events in music genres other than electronic dance, events in venues other than live outdoor concerts or festivals such as night clubs or arenas and events in markets outside the greater New Jersey area are irrelevant to Plaintiffs' allegations in their Amended Complaint; and 3) Live Nation is willing to stipulate that it has relationships with William Morris Endeavor Agency ("William Morris"), AM Only Agency ("AM Only") and the Windish Agency ("Windish") thereby eliminating the need to produce documents and communications to that effect.*

Initially, Plaintiffs object to certain of Defendant's General Objections, which have the effect of impermissibly and arbitrarily limiting the scope of discovery.  With regard to Plaintiffs' Requests for Production of Documents, Defendant's General Objection #5 arbitrarily limits the time frame for which it is willing to produce documents to January 1, 2010 forward.  A Key aspect of Plaintiffs' case is that Live Nation has longstanding relationships with artists and agents that give it influence with such parties.  Plaintiffs should be entitled to develop evidence of the depth of those ties by reviewing documents from January 1, 2008 to the present.

*Live Nation objects to the production of documents prior to January 1, 2010 on the grounds that Plaintiffs themselves allege in their Amended Complaint that the facts giving rise to action began in 2010 after Plaintiffs produced the Latin Festival at the 2010 New Jersey Meadowlands State Fair.  See Am. Compl. ¶ 4.  Furthermore, Live Nation is willing to stipulate that it has extensive relationships with William Morris, AM Only and Windish thereby evidencing ties to the three agencies..  Any discovery prior to January 1, 2010 is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.*

Document Request 6 seeks documents related to contracts between Defendant and any of the artists named in Plaintiffs Complaint.  Defendant has offered only to generate a list of artists for whom Defendant produced or promoted a concert or a tour.  This response is insufficient because Plaintiffs need to review the actual contracts at issue to determine, among other things, whether they contain provisions related to the artist's ability to appear for other producers or promoters.

*Live Nation objects to production of the actual contracts for any artist because Live Nation produces and promotes live concerts, events and festivals globally.  Thus, for example, a contract for a night club event in Ibiza, Spain, has no bearing on the outdoor music festival in New Jersey upon which Plaintiffs base their claims.  Additionally, Live Nation does not maintain all of its contracts in a central repository.  Accordingly, to locate all contracts for events by Plaintiffs' list of 34 artists all over the world would be unduly time consuming and costly.  Live Nation objects to production of the actual contracts and any related documents as overbroad,*

Case 2:11-cv-07318-WHW-CLW   Document 86-17   Filed 07/22/19   Page 3 of 203
Case 2:11-cv-07318-CCC-CLW   Document 61-7   Filed 10/14/19   Page 14 of 232
PageID: 2082

Honorable Steven C. Mannion
July 22, 2013
Page 3

*unduly burdensome, and not reasonably calculated to lead to the discovery of admissible
evidence.*

Document Requests 7-9 seek documents, including communications, concerning
contracts between Defendant and the three major talent agencies involved in this case. Again,
Defendant has offered to possibly produce a list of such contracts (indeed, Counsel has only
suggested that he would ask Defendant whether it would be willing to prepare such a list). This
is insufficient because the contracts themselves may contain evidence of conditions imposed on
the agencies by Defendant. Moreover, a list does not address the element of the Requests that
seek communications about the contracts, which could contain relevant information beyond the
contracts themselves.

*Live Nation enters into contracts with artists represented by William Morris, AM Only,
and Windish for the performance of live concerts worldwide and for artists of all types of music
genres and accordingly, Live Nation is willing to stipulate that it has relationships with William
Morris, AM Only and Windish. Plaintiffs have not identified what relevant information may
arise from contracts or communications regarding live music concerts worldwide or involving
all music genres. Live Nation objects to Requests 7-9 as irrelevant, overbroad, unduly
burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.*

Document Requests 10-13 seek documents related to Defendants acquisition of Hard
Events, Inc., and Cream Holdings, Inc., two companies involved in the electronic dance segment
of the music industry, as well as documents related to the business performance of those entities.
Defendant has refused to produce any documents related to its acquisition of these companies, or
their business performance. Plaintiffs believe that such material is relevant to the calculation of
damages in this case because the operating results of such businesses as well as the price
Defendant was willing to pay to acquire them are relevant to what a business venture in the same
segment of the music industry might be worth.

*Live Nation's acquisition of Hard Events, Inc. and Cream Holdings has nothing to do
with this case as the Amended Complaint alleges that Live Nation interfered with Plaintiffs'
attempt to produce a concert in New Jersey in 2011. The process of acquiring a company is
completely separate from the process of promoting or producing a music festival. Similarly the
valuation of a company, including its business performance, is distinct from the ticket pricing,
cost and revenue calculations associated with a music festival. Additionally, as Cream Holdings
was based in United Kingdom and Hard Events was based in Los Angeles, those companies
served different geographic markets that have different characteristics from the New Jersey
market. Live Nation objects to Requests 10-13 as irrelevant, overbroad, unduly burdensome,
and not reasonably calculated to lead to the discovery of admissible evidence. Live Nation
further objects to these Requests to the extent that it seeks documents available in the public
domain as Live Nation is a public company required to make Securities and Exchange
Commission filings.*

Case 2:11-cv-07318-WHW-CLW  Document 36-17  Filed 07/22/19  Page 4 of 4 PageID: 2329
Case 2:11-cv-07318-CCC-CLW  Document 61-7  Filed 07/18/19  Page 15 of 203
PageID: 2083

Honorable Steven C. Mannion
July 22, 2013
Page 4

Document Request 20 seeks documents and communications related to any electronic dance music concerts or festivals produced or promoted by Defendant from January 1, 2008 to the present. Again, counsel has represented that he will ask Defendant to produce a list showing such concerts. Leaving aside that it is unclear at this point whether Defendant has consented to produce such a document, it would not sufficiently respond to the Request. Plaintiffs believe the Request is relevant insofar as responsive documents could show production costs, revenue figures, artists who appeared, locations of the shows, and ticket prices, among other relevant facts. And, again, a list of such shows, even if it contained all the categories of information just enumerated, would not encompass communications about the shows, which may also contain relevant information.

*As discussed above, Live Nation produces concerts and festivals all over the world and for venues of all different sizes. Thus, production costs, revenue figures and ticket prices in other markets are not relevant and electronic dance concerts at venues other than outdoor events are not relevant. Moreover, production costs, revenue figures, artists, show locations and ticket prices are generally publicly available information, as demonstrated by certain documents Plaintiffs themselves produced. Beyond these categories, Plaintiffs have not identified what relevant information may be gleaned from communications regarding these other events that are not the subject of this lawsuit. Live Nation objects to this Request as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.*

Document Requests 21-23 seek documents and communications concerning instances where Defendant hired artists represented by the three major agencies to appear at concerts or festivals promoted or produced by Defendant. These are companion requests to Requests 7-9, discussed above. Plaintiffs concede there may be some degree of overlap in these Requests, depending on the particulars of how a particular artist is engaged. For example, the actual contract for an artist to appear might be between the Defendant and the artist directly, in which case there would not be a document directly responsive to Requests 7-9, even though there might be a document responsive to Requests 21-23, for example communications discussing the artist's engagement. If, on the other hand, Defendant contracts directly with the agency, then the same documents might be responsive to each Request. The larger point here is that Plaintiffs are entitled to documents concerning agreements between Defendant and either the artist directly, or its agent, because such documents constitute evidence of the relationship between Defendant and the artists and agencies and those relationships are directly relevant to Plaintiffs' claim that Defendant had the requisite leverage to interfere with Plaintiffs' business relationships with the same parties.

*Live Nation is willing to provide a list of artists in the Amended Complaint for which it has produced or promoted events. As with Requests 7-9 Live Nation is also willing to stipulate that it has relationships with William Morris, AM Only and Windish. The same objections to Requests 7-9 apply to Requests 21-23, even if this Court considers the two sets of requests as not entirely overlapping. Live Nation objects to Requests 21-23 as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Live Nation further objects to Requests 21-23 as unreasonably cumulative, duplicative, oppressive, or intended to harass.*

Honorable Steven C. Mannion
July 22, 2013
Page 5

Document Request 39 seeks documents related to the criminal records, if any, of Jason Miller and John D'Esposito, as well as records reflecting judgments or liens against them. This mirrors a request from Defendant to Plaintiffs for similar records. Plaintiffs responded to this request by indicating that it had no such documents. Defendant, however, has taken the position that the Request is irrelevant and will not state whether responsive documents exist or not. Plaintiffs contend that if the Request was relevant when posed to them it is equally relevant when posed to Defendant. A criminal history could certainly be relevant given that the essence of Plaintiff's claim is that Defendant competed unfairly and used strong-arm tactics.

*While Plaintiffs' criminal history, if any, is relevant to Live Nation's defenses against defamation, Jason Miller and John D'Esposito's criminal history, if any, will not in any way support Plaintiffs claims. Neither Miller nor D'Esposito were named as defendants by Plaintiffs in this lawsuit. Their criminal histories, if any, could not be imputed to Live Nation, the named defendant, and would not have any bearing whether "Defendant competed unfairly and used strong-arm tactics." Live Nation objects to this Request as irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.*

Regarding Plaintiffs' Interrogatories, Defendant's General Objection No. 5 states that Defendant will limit its answers, as it did with the document requests, to the period from and after January 1, 2010 and also to a specific geographical region it refers to as "the greater part of New Jersey." As discussed above in connection with document requests, Plaintiffs believe that a time period beginning January 1, 2008 is not overly burdensome and is relevant to Plaintiffs' position that Defendant's long term relationships with artists and agents are relevant to its ability to interfere with Plaintiffs' business relationships. Regarding the attempted limitation on geographical grounds, Plaintiffs contend that any instance of Defendant doing business with either an artist or an agent involved in this case is relevant, whether it happened in New Jersey or California or anywhere in between. What matters is that Defendant transacts a certain type and volume of business with the agents and artists. A contract between Defendant and a particular artist or agent does not become any less relevant here because it relates to a show in California as opposed to New Jersey.

*Live Nation asserts the same objections to Plaintiffs' requested time period as set forth above regarding Live Nation's General Objection 5 to Plaintiffs' Document Requests. With respect to geographic scope, the greater part of New Jersey, including the Meadowlands, is the relevant market because factors such as ticket pricing and costs vary from market to market and type of venue. However, Live Nation is willing to treat geographic location on a case by case basis, and expand the geographical boundaries accordingly. Furthermore, again, Live Nation concedes that it has relationships with the three agencies Plaintiffs reference in the Amended Complaint. Thus, Live Nation already admits that it "transacts a certain type and volume of business with the agents and artists," which Plaintiffs themselves deem significant.*

Case 2:11-cv-07318-WHW-CLW   Document 86-17   Filed 07/22/19   Page 6 of 9 PageID: 2085
Case 2:11-cv-07318-CCC-CLW   Document 61-7   Filed 10/14/19   Page 17 of 203
PageID: 331

Honorable Steven C. Mannion
July 22, 2013
Page 6

Defendant's General Objection No. 6 states that all information regarding Cream Holdings and Hard Events is irrelevant. Plaintiff disagrees for the reasons stated above. Information regarding the operating results of these companies and the purchase price Defendant paid to acquire them is relevant to damages in this case.

*Live Nation maintains that any information regarding Cream Holdings and Hard Events is irrelevant, overbroad, unduly burdensome, beyond the scope of discovery and not reasonably calculated to lead to the discovery of admissible evidence as stated above.*

In response to Interrogatory 8, which asks Defendant to identify any electronic dance music concerts or festivals it had produced or promoted from January 1, 2008 to the present, Defendant listed three shows, all in New Jersey, from 2010 to the present. Plaintiffs do not agree that Defendant may arbitrarily limit its answer to the time period or geographic region of its choosing. For the reasons previously stated Plaintiffs believe that concerts from around the country going back to 2008 are relevant. Also, Plaintiffs note that the fact that there were only 3 shows in New Jersey since 2010 belies Defendant's contention that it would be burdensome to identify all such concerts nationally for two additional years.

*Live Nation reasserts its objections to Plaintiffs' time period and unbounded geographic scope as stated above. While Live Nation is willing to identify other events in the greater New Jersey area for 2008 and 2009, Live Nation objects to the production of any contracts or communications related to those events also for the reasons stated above. As Live Nation does not store all of its contracts in one location, locating contracts and communications for events across the country for a four-year period would be unduly burdensome and involve searching countless databases and employees' files.*

Interrogatories 9-11 ask Defendant to identify its employees with primary responsibility for working with each of the three agencies involved in this case when Defendant seeks to hire an artist represented by the agency. Defendant identified Jason Miller as the relevant person for each agency, with respect to electronic dance music events. Plaintiffs do not concede that Defendant should be permitted to limit its answer to electronic dance music events. Plaintiffs' contend that a relationship between a Live Nation employee and an agency is relevant to whether Defendant has the requisite leverage to influence the agencies decisions, whether that relationship concerns electronic dance music or any other genre in the business.

*Live Nation's admission that it has relationships with William Morris, AM Only and Windish includes relationships in other genres of music as well. Additionally, Live Nation is willing to stipulate that there is no one central point of contact at Live Nation for each of the three agencies. Because Plaintiffs allege in their Amended Complaint that Messrs. Miller and D'Esposito interfered with Plaintiffs' contract for an electronic dance music festival at the New Jersey State Fair at the Meadowlands by threatening the three agencies, identification of any other Live Nation employee and other genres of music are irrelevant, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence.*

Case 2:11-cv-07318-CCC-CLW Document 61-7 Filed 07/22/13 Page 18 of 203
Case 2:11-cv-07318-WHW-CLW Document 36-17 Filed 07/10/12 Page 7 of 7 PageID: 332
PageID: 2086

Honorable Steven C. Mannion
July 22, 2013
Page 7


Interrogatories 12 and 13 ask Defendant to identify the employees who assisted in the Cream Holdings and Hard Events acquisitions. Defendant refuses to identify such persons on the same basis that it refuses to provide documents about the acquisitions, that the deals are irrelevant to this case. For the reasons stated above, Plaintiffs contend that those acquisitions are relevant to damages in this case. Plaintiffs are entitled to review documents related to the acquisitions and to depose people with knowledge of the acquisitions.

*In addition to the objections regarding Cream Holdings and Hard Events Live Nation set forth above, Live Nation objects to the identification of employees who assisted in the two acquisitions because those employees are attorneys and business people who have no role in producing or promoting events. Interrogatories 12 and 13 are irrelevant, overbroad, unduly burdensome, seeking privileged information and not reasonably calculated to lead to the discovery of admissible evidence.*

\*      \*      \*

The parties appreciate the Court's kind consideration of and attention to this matter. Counsel will make themselves available for a conference, or a conference call, to discuss these issues, at the Court's earliest convenience.

Sincerely,


  s/ David S. Stone
David S. Stone
*Counsel for Plaintiffs Juice Entertainment, LLC, Thomas Dorfman and Chris Barrett*

cc:     Ian S. Marx, Esq. (via CM/ECF and e-mail)
        David S. Siegel, Esq. (via CM/ECF and e-mail)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT,

                Plaintiffs,

      v.

LIVE NATION ENTERTAINMENT, INC.,

              Defendant.

**Civil Action No. 11-7318-WHW-MCA**

# Exhibit B

Case 2:11-cv-07318-CCC-CLW   Document 117-7   Filed 10/11/19   Page 20 of 203
Case 2:11-cv-07318-CCC-CLW   Document 36   Filed 08/08/13   Page 1 of 1 PageID: 933
PageID: 2088

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT.<br><br>       Plaintiffs,<br><br>v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br>       Defendants. | Civil Action No. 2:11-CV-07318-WHW-SCM<br><br>**ORDER ON INFORMAL MOTION TO COMPEL DISCOVERY**<br><br>**[D.E. 36]** |

**THIS MATTER** having come before the Court on August 7, 2013 for oral argument on motion by Plaintiffs to compel discovery from Defendant, [D.E. 36], and the Court having considered the joint submission of the parties and the arguments of all counsel, and for good cause having been shown,

**IT IS** on this Wednesday, August 07, 2013 ordered as follows:

Plaintiff's motion is granted in part and denied in part for the reasons set forth today on the record.



Honorable Steve Mannion, U.S.M.J.
United States District Court,
for the District of New Jersey
phone: 973-645-3827

8/7/2013 2:32:52 PM

Case 2:11-cv-07318-WHW-CLW Document 45-17 Filed 03/10/10 Page 21 of 203
Case 2:11-cv-07318-CCC-CLW Document 51-7 Filed 03/07/14 Page 1 of 4 PageID: 402
PageID: 2089



HOUSTON
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002

NEW YORK
460 Park Avenue - 21st Floor
New York, New York 10022

713 860 1600 telephone
713 860 1699 facsimile
www.ajamie.com

David S. Siegel
dsiegel@ajamie.com

*VIA CM/ECF*                                                    March 7, 2014

Honorable Cathy L. Waldor, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

      Re:    *Juice Entertainment, LLC, etal. v. Live Nation Entertainment, Inc.*
            Civil Action No. 11-07318 (WHW) (CLW)

Dear Judge Waldor:

    We represent Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett ("Plaintiffs") in the above-captioned matter.  We write to request leave to file a motion for sanctions against Defendant Live Nation Entertainment, Inc. ("Live Nation") for its failure to comply with Judge Mannion's August 7, 2013 Order requiring it to produce documents related to certain concerts produced by Live Nation. Judge Mannion conducted a phone conference on August 7, 2013 and issued his Order on the phone that same day.

    The transcript containing Judge Mannion's substantive rulings is Docket Entry No. 40. The relevant portions, concerning Live Nation's documents related to electronic dance music concerts it produced, can be found on pp. 53-54, referring to Plaintiffs' Document Request No. 20.

    Live Nation did not move to have Judge Mannion's Order reconsidered, did not file an appeal, or object to it in any way. It has simply refused to comply with this portion of the Order from the date it was issued until now. The current deadline for the end of fact discovery in this case is March 14, 2014.  Plaintiffs require the documents at issue both for the contents of the documents themselves, to be able to conduct meaningful depositions of 30(b)(6) witnesses yet to be proffered by Live Nation, and to provide to their expert.

    Despite Plaintiffs' considerable patience with Live Nation and repeated attempts to resolve this discovery dispute in good faith, Defendant has not exhibited the same good faith and Plaintiffs must move for sanctions on this discovery dispute so they are not prejudiced by

March 7, 2014
Page 2

Defendant's delay in complying with Judge Mannion's Order. The record of correspondence with the Court since the date of Judge Mannion's Order establishes that Live Nation has had ample time to comply with Judge Mannion's Order. On October 30, 2013, already two and a half months after Judge Mannion's Order, the parties submitted a joint letter to the Court requesting extensions of the scheduling order then in place which would have given Live Nation until February 1, 2014 to produce the requested documents. The parties did cooperate toward conducting substantial discovery between October 30, 2013 and February 1, 2014, but these documents were not forthcoming. Plaintiffs conducted depositions of two key Live Nation witnesses during that time without the benefit of these documents in order to keep discovery moving forward.

The parties wrote to the Court again on January 30, 2014, when it became apparent that the earlier deadline of February 1, 2014 for the end of fact discovery could not be met. During the period between October 30, 2013 and February 1, 2014, counsel for Plaintiffs wrote to counsel for Live Nation on three occasions, via email, asking when the documents would be produced. Plaintiffs' counsel renewed those requests at least two more times via email after February 1, 2014, after the issuance of the most recent Scheduling Order. Plaintiffs' counsel also raised the matter in person at depositions in early February and were told that documents would be produced soon, perhaps on a rolling basis, and that they would be voluminous. The parties engaged in a meet and confer on March 4, 2014 to further discuss this issue. Defendant's counsel implied, for the first time, that to produce these documents would likely be burdensome and he advised that he would speak with his client again about what documents exist and their willingness to produce these documents.  To date, these documents which Judge Mannion ordered produced back in August of 2013 still have not been produced, Live Nation has still not provided any information on when or if these documents will be produced, and the parties find themselves, again, facing a discovery cutoff date.

Plaintiffs have to this point acquiesced in repeated extensions of the discovery calendar based at least partly on Live Nation's representations that these documents would be forthcoming. Plaintiffs do not contend that all of the previously extended time periods were necessitated solely by Live Nation's delay in producing the documents at issue, and Plaintiffs note that Live Nation has generally cooperated in good faith on other discovery related issues. However, the remaining documents, which could have, and should have, been produced at any time over the last 6 months, are now the sole remaining reason why fact discovery cannot be completed by the current deadline. Plaintiffs have no choice but to move for sanctions in order to finally secure the discovery Live Nation has already been ordered to produce.

Fed. R. Civ. P. 37(b)(2)(A) clearly authorizes sanctions under these circumstances, including but not limited to:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

March 7, 2014
Page 3

      (iii)    striking pleadings in whole or in part;
      (iv)    staying further proceedings until the order is obeyed;
      (v)    dismissing the action or proceeding in whole or in part;
      (vi)    rendering a default judgment against the disobedient party; or
      (vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A); *see also Cannon* v. *Cheny Hill Toyota, Inc.,* 190 F.R.D. 147,157 (D.N.J. 1999) ("Rule 37(b)(2) permits the Court to impose sanctions when a party fails to comply with a court order to produce discovery."). In addition, Fed. R. Civ. P.37(b)(2)(C) provides that "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

Given Live Nation's demonstrated willingness both to ignore its legitimate discovery obligations (by refusing to produce clearly relevant discovery – thus necessitating the initial motion to compel) and to defy the Order of this Court directing it to produce discovery, it is clear that no remedy short of harsh sanctions will be sufficient. *See Dos Santos* v. *Borough of Flemington,* 2012 WL 406402, at *5 (D.N.J. Jan. 4, 2012) ("The Third Circuit has advised a pattern of wrongdoing may require a stiffer sanction than an isolated incident[.]") (quoting *Republic of Philippines* v. *Westinghouse ElectricCo.,* 43 F.3d 65, 100 (3d Cir. 1994)). A further order to compel will just as likely be ignored, and in any event there is no reason at this point to believe Live Nation will make a good faith effort to comply with the existing Order of this Court regarding the discovery it must produce, potentially requiring further motions to compel and unnecessarily delaying the trial in this action. Live Nation has had ample opportunity to engage in good faith in the Court-ordered discovery that will enable the parties to fully and fairly litigate their claims and defenses. Nonetheless, Live Nation has utterly refused to do so.

Live Nation's conduct more than satisfies the standard set by the Third Circuit in *Poulis* v. *State Farm Fire &Casualty Co.,* 747 F.2d 863, 868 (3d Cir. 1984), that govern when a party may be deprived of a right to pursue or defend against a claim as a Rule 37sanction. Those factors are:

    (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary; (3) whether there has been a history of dilatoriness; (4) whether the conduct of the party or attorney was willful or in bad faith; (5) the effectiveness of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Ramada Worldwide, Inc.* v. *Anita Nguyen, LLC,* No. 11-921 (ES)(CLW), 2012 U.S. Dist.LEXIS 53855, at *6-7 (D.N.J. Jan. 10,2012) (recommending that an order be entered striking the defendants' answer and entering default).

March 7, 2014
Page 4

     For the foregoing reasons, Plaintiffs respectfully request a telephone conference with the Court to discuss their request for leave to file a formal motion for Rule 37 sanctions.

          Respectfully submitted,

          *David S. Siegel*

cc:   Ian S. Marx, Esquire (***VIA CM/ECF***)
      GREENBERG TRAURIG, LLP
      200 Park Avenue
      Florham Park, New Jersey 07932

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT LLC, THOMAS
DORFMAN and CHRIS BARRETT,

                    Plaintiffs,

      v.

LIVE NATION ENTERTAINMENT, INC.,

                 Defendant.

**Civil Action No. 11-7318-WHW-MCA**

# Exhibit C

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, and CHRIS BARRETT, | Civil Action No. 11-cv-7318 (WHW)(CLW) |
| Plaintiffs, | |
| vs. | **ORDER OF DESIGNATION FOR MEDIATION** |
| LIVE NATION ENTERTAINMENT, INC., | |
| Defendant. | |

The Court having adopted L.Civ.R.301.1 and Appendix Q, and this Rule having established a program for mediation of civil actions; and it appearing that mediation of this civil action would conserve the resources, and be in the best interests, of the Court and of the parties; and good cause appearing;

**IT IS** on this 27th day of March, 2014,

**ORDERED THAT**:

1.     This civil action be, and hereby is, referred to mediation consistent with said Rule.

2.     Counsel and the parties shall participate in mediation and shall cooperate with the mediator.

3.     Counsel and the parties shall mutually participate in mediation and shall cooperate with the mediator who has been selected by the parties.

4.     Counsel and the parties (including individuals with settlement authority) shall attend mediation sessions as requested by the mediator.

5.     The mediator may meet with counsel and parties jointly or ex parte. All information presented to the mediator shall be deemed confidential and shall be disclosed by the mediator only upon consent of counsel, except as necessary to advise the Court of an apparent failure to participate. The mediator shall not be subject to subpoena by any party. No statements made or documents prepared for mediation sessions shall be disclosed in any subsequent proceeding or be constructed as an admission against interests.

6.     All proceedings in this civil action are hereby stayed for a period of 90 days from the date hereof, except for discovery as agreed to by the mediator and counsel.

7.  The parties shall notify the Court immediately after the mediation has concluded.

8.  The Court will hold a teleconference, to be initiated by Plaintiff, on July 9, 2014 at 12:15 PM.  Parties may contact chambers at (973) 776-7862

s/ Cathy L. Waldor
**CATHY L.WALDOR**
**UNITED STATES MAGISTRATE JUDGE**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

JUICE ENTERTAINMENT LLC, THOMAS
DORFMAN and CHRIS BARRETT,

                Plaintiffs,

     v.

LIVE NATION ENTERTAINMENT, INC.,

                Defendant.

**Civil Action No. 11-7318-WHW-MCA**

---

# Exhibit D

# Greenberg Traurig

Ian S. Marx
Tel. (973) 360-7951
Fax. (973) 301-8410
marxi@gtlaw.com

August 26, 2015

**VIA ELECTRONIC FILING**

Honorable Cathy L. Waldor, U.S.M.J.
United States District Court
  for the District of New Jersey
M.L. King, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re: *Juice Entertainment, LLC v.*
> *Live Nation Entertainment, Inc.,*
> **11 Civ. 07318 (WHW) (CLW)**

Dear Magistrate Judge Waldor:

　　We represent Defendant Live Nation Entertainment, Inc. ("Live Nation"); counsel for Plaintiffs Juice Entertainment, LLC, Thomas Dorfman and Christopher Barrett, join in this letter.

　　Following the telephonic conference with the Court on July 29, 2015, counsel have met and conferred concerning a proposed schedule for the completion of discovery.  In this regard, the parties jointly request that the deadlines contained in the Court's Second Amended Scheduling Order dated August 21, 2013 (as amended by the Court's Order entered on October 31, 2013), be extended as follows:

1. Document production to be completed by November 1, 2015.

2. Fact discovery to be completed by January 31, 2016.

3. Plaintiffs' expert disclosures to be made by February 31, 2016. Defendant's expert disclosure to be made 10 days after Plaintiffs' expert report is due.

4. Plaintiffs' expert report(s) to be served by March 31, 2016. Deposition of plaintiffs' expert(s) to be completed by April 31, 2016.

5. Defendant's expert report to be served by April 31, 2016. Deposition of defendant's experts) to be completed by May 31, 2016.

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH

www.gtlaw.com

Case 2:11-cv-07318-CCC-CLW   Document 117-7   Filed 10/11/19   Page 30 of 203
Case 2:11-cv-07318-CCC-CLW   Document 86-1   Filed 08/26/15   Page 2 of 29 PageID: 442
PageID: 2098

Honorable Cathy L. Waldor, U.S.M.J.
August 26, 2015
Page 2
_____

      6.   Dispositive Motions to be filed by June 31, 2016.

*    *    *

      Counsel for the parties are available at the Court's convenience should the Court have any questions, issues or concerns.  We thank the Court for its consideration and courtesies in connection with this joint request.

          Respectfully submitted,

          /s/ Ian S. Marx_____
          IAN S. MARX

cc: Amy Walker Wagner, Esq. (via ECF)
    David S. Siegel, Esq. (via ECF)

# Greenberg Traurig

Ian S. Marx
Tel. (973) 360-7951
Fax. (973) 301-8410
marxi@gtlaw.com

February 26, 2015

**VIA ELECTRONIC FILING**

Honorable Cathy L. Waldor, U.S.M.J.
United States District Court
  for the District of New Jersey
M.L. King, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re:   *Juice Entertainment, LLC v.*
>      *Live Nation Entertainment, Inc.,*
>      **11 Civ. 07318 (WHW) (CLW)**

Dear Magistrate Judge Waldor:

On behalf of Defendant Live Nation Entertainment, Inc. ("Live Nation"), we submit this letter as Live Nation's supplemental response in opposition to Plaintiffs' request for permission to make a formal motion to compel additional discovery regarding 246 of Live Nation's electronic dance music ("EDM") concerts and festivals produced in the mid-Atlantic region, to which Plaintiffs claim they are entitled under the Court's August 7, 2013 Order (the "Discovery Order"). [Dkt # 45, 61].

For the reasons set forth in our previously-submitted letter of March 12, 2014, [Dkt 46], the Court should deny Plaintiffs' request. Live Nation has complied with the terms of the Discovery Order. Moreover, the additional documents Plaintiffs seek are beyond the scope of permissible discovery under Rule 26 in that they are irrelevant, will not satisfy any element of Plaintiffs' tortious interference claim and unnecessary based on evidence already established in this case. Finally, requiring Live Nation to produce additional documents would be unduly burdensome because Live Nation would have to search for potentially responsive documents in 246 separately maintained files, in disparate locations, including potentially in storage facilities, maintained by 27 individual Live Nation employees concerning events staged at 38 different venues.

As always, we appreciate the Court's consideration of this matter. We note, however, that since "inheriting" this case from Judge Mannion, Your Honor has not had the occasion to conduct an in-person conference. To the extent that Your Honor contemplates entry of an Order that would require Live Nation to provide the requested discovery concerning the 246 shows that is sought, given the magnitude of that relief, and the concomitant burden this would

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH

Greenberg Traurig, LLP | Attorneys at Law | 200 Park Avenue, Post Office Box 677 | Florham Park, New Jersey 07932 | Tel. 973.360.7900 | Fax 973.301.8410

www.gtlaw.com

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 2

_____

cause, we respectfully request that the Court hold oral argument in Court on a formal motion, rather than dealing with this on an informal basis.

## SUMMARY OF BACKGROUND[1]

 Plaintiffs' amended complaint alleges that Live Nation improperly interfered with a contract between Plaintiff Juice Entertainment, LLC ("Juice") and non-party State Fair Event Management ("SFEM") pursuant to which Juice was awarded the right to produce an electronic dance music festival (the "Event") in the parking lot of the Meadowlands in East Rutherford, New Jersey during the June 2011 New Jersey State Fair, and as a result of such interference, SFEM terminated the contract and there was no Event. Plaintiffs' surviving claims in this matter are tortious interference with contract and business relations and defamation. Plaintiffs essentially complain that Live Nation prevented them from procuring agreements to appear at the Event from 34 artists represented by 3 major talent agencies [see Complaint ¶¶ 70-72], which resulted in SFEM's termination of Juice's contract (and that such termination was also the result of defamatory comments from Live Nation).[2]

 The discovery dispute here concerns Plaintiffs' Document Request No. 20, which requests the production of:

_____

[1] A more complete recitation is contained in our March 14, 2014 letter.

[2] Fact discovery in this matter has been substantially completed. Live Nation has deposed, among others, Plaintiffs Thomas Dorfman and Christopher Barrett (the principals of Juice), as well as non-parties Al Dorso, Sr. (the principal of SFEM), John DiMatteo (alleged to be Plaintiffs' "agent" and the person upon whom Plaintiffs relied to book the talent for the Event), Alan Sacks (also alleged by Plaintiffs to be responsible for booking talent) and Vito Bruno (who Plaintiffs allege had agreed to provide financing for the Event). Plaintiffs have deposed Jason Miller and John D'Esposito of Live Nation, who Plaintiffs allege were the Live Nation agents responsible for the "interference" and "defamation" that led SFEM to terminate Plaintiffs' contract.

 This discovery yields the following conclusions, summarized in our prior submission to Your Honor, which has not been meaningfully disputed. Plaintiffs have no evidence whatsoever to support any of their claims; indeed, the evidence that has been adduced actually disproves them. Plaintiffs have no evidence, either testimonial or documentary, showing that Live Nation ever pressured any talent agency to withhold their artists. (Tellingly, Plaintiffs have never sought to depose anyone from any of the talent agencies, nor have Plaintiffs sought to depose any of the supposedly "pressured" headline artists.) Moreover, the evidence definitively shows that Plaintiffs never had any agreement, "firm" or otherwise, with any headline artist. As a final coup de grâce, the person at SFEM (with whom Plaintiffs negotiated their contract) has testified that Live Nation did not defame Plaintiffs and that the reason Plaintiffs' contract was canceled by SFEM was that they failed to perform it.

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 3
_____

All documents and communications concerning any Electronic Dance Music ("EDM") concerts or festivals produced or promoted by Live Nation from 2008 to the present, including but not limited to documents and communications showing the artists who appeared at any such concerts or festivals, the production costs associated with such concerts or festivals, the ticket prices for admission to such concerts or festivals, and the revenues generated at such concerts or festivals.

Live Nation initially wholly objected to producing documents in response to this Request, primarily because the Request is overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.[3]

On August 7, 2013 in their motion to compel, Plaintiffs' counsel argued to Magistrate Judge Mannion that the purpose of this Request was to obtain documents related to Plaintiffs' damages. In the Discovery Order, Judge Mannion ruled that Document Request No. 20 was limited to the time frame of January 1, 2008 to the present, for the geographical limits of concerts or festivals in Connecticut, Maryland, New Jersey, New York, Pennsylvania and Washington, D.C (the "mid-Atlantic region").

Thereafter, Live Nation produced to Plaintiffs electronic data for 246 EDM concerts that occurred between January 1, 2008 and February 12, 2014 in the mid-Atlantic region. Specifically, Live Nation supplied 3,690 data points for those 246 EDM concerts in satisfaction of Plaintiffs' requests and the Discovery Order, including:

- Artist performing
- Artist's agency
- Venue location information
- Deal date
- Number of shows involved
- Live Nation promoter
- Paid and actual attendance
- Ticket revenue
- Show, talent and other expenses
- Gross profit

In producing this data, Live Nation provided the full extent of the requested information that is centrally available to the company, based on Live Nation's records keeping methodologies. Following production of this data, in connection with the mediation process overseen by Mr. Curtin, Live Nation responded to a series of questions posed concerning the data, with which, we believe, plaintiffs were satisfied.

_____

[3] Information concerning the concerts Live Nation itself has produced within a five-state region over the past five years will not advance Plaintiffs' baseless claims one iota. The only theoretical "relevance" these concerts have to this case (and the only relevance Plaintiffs have attempted to argue) is that they might somehow be relevant to Plaintiffs' damages claim.

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 4

_____

On March 7, 2014, Plaintiffs' counsel averred that Live Nation's foregoing response was incomplete pursuant to the Discovery Order and sought relief from Your Honor [Dkt # 45], which is the basis of the instant discovery dispute whether Live Nation must produce additional documents regarding Live Nation's EDM concerts and festivals in the mid-Atlantic region. We responded that Live Nation's production has adequately satisfied the Discovery Order [Dkt # 46]. Moreover, Plaintiffs' have no plausible bases to obtain additional documents, and are attempting to force Live Nation to expend time, energy and resources for meaningless and burdensome discovery.

From March 27, 2014 to the present, this matter has been stayed as the parties are attempting to resolve this suit through mediation [Dkt # 52, 61]. As previously mentioned, Mr. Curtin facilitated the exchange of some additional information concerning Live Nation's production of data on the 246 EDM shows.

## ARGUMENT

### I. Plaintiffs' Request for Permission to Make a Formal Motion to Obtain an OrderCompelling the Production of Additional Documents Should be Denied Because the Documents they Seek are Beyond the Permissible Scope of Discovery

It is well-settled that although the scope of discovery under Rule 26 is broad, it is not unlimited. *Bayer AG v. Betachem, Inc.,* 173 F.3d 188, 189 (3d Cir.1999). And, "while the standard of relevancy is a liberal one, it is not so liberal as to allow a party to roam in shadow zones of relevancy and to explore matter which does not appear germane merely on the theory that it might become so." *Justiano v. G4S Secure Solutions, Inc.*, 291 F.R.D. 80, 83 (D.N.J. 2013). Thus, Courts have discretion to narrowly tailor discovery to meet the needs of each case. *Crawford–El v. Britton,* 523 U.S. 574, 598 (1998). Rule 26 is one of proportionality "intended to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." *Leksi, Inc. v. Federal Ins. Co.,* 129 F.R.D. 99, 105 (D.N.J.1989) (quoting Rule 26 advisory committee note) (internal quotations omitted); *see also Public Service Enterprise Group, Inc. v. Philadelphia Elec. Co.,* 130 F.R.D. 543, 551 (D.N.J.1990) (employing the rule of proportionality to exclude "marginally relevant evidence" from the scope of discovery); *Bowers v. N.C.A.A.,* C.A. No. 97–2600(JBS), 2008 WL 1757929, at *6 (D.N.J. Feb. 27, 2008) (exercising discretion to bar "marginally relevant evidence").

Live Nation's production of data concerning the 246 EDM shows, as described above, satisfies its obligations under the Discovery Order and fulfills its discovery obligations by providing the information that is germane to Plaintiffs' request. Plaintiffs specifically requested the artists who appeared, production costs, and revenues, and that is exactly what Live Nation provided. Beyond the information already produced by Live Nation, any

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 5
_____

additional discovery would not even be marginally relevant to Plaintiffs' claims and Plaintiffs should not be permitted to go on a fishing expedition.

Plaintiffs claim that Live Nation tortiously interfered with Juice's contract with SFEM and Plaintiff's prospective economic advantage by preventing artists from signing contracts to appear at the Event thereby leaving Plaintiffs with no talent. To establish these claims, Plaintiffs must show:

> (1) [the] plaintiff's existing or reasonable expectation of economic benefit or advantage; (2) the defendant's knowledge of that expectancy; (3) the defendant's wrongful, intentional interference with that expectancy; (4) the reasonable probability that the plaintiff would have received the anticipated economic benefit in the absence of interference; and (5) damages resulting from the defendant's interference.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F. 3d 1153, 1167 (3d Cir. 1993) (internal citations omitted); *MacDougall v. Weichert*, 144 N.J. 380, 404(1996).

The additional documents Plaintiffs are not relevant to the establishment of facts concerning these elements because those documents would relate to **Live Nation's** attempts to produce its **own** EDM concerts and festivals and consist of irrelevant details of **Live Nation's** costs and revenues. These documents will have no bearing on Plaintiffs' contract with SFEM or Plaintiffs' agents attempts to procure talent for the Event.[4] Even if Plaintiffs' dreams of finding correspondence in which Live Nation strong arms its own talent were fulfilled, such evidence would not demonstrate any element of Plaintiffs' claim because such evidence does not bear on Live Nation's knowledge as to Plaintiffs' contracts or expectancies, Live Nation's intentional action with respect to Plaintiffs, or Plaintiffs' damages.

The elements of Plaintiffs' cause of action make clear that it is Plaintiffs' economic benefit and damages to them that are at issue in this matter. Plaintiffs, despite their arguments to the contrary, cannot base their harm or damages on the minute details Live Nation's correspondence with artists, attendance, costs and revenues, which additional documents may reveal. *See Shalley v. Borough of Sea Bright*, No. A-5928-07T2, 2009 WL 1324024, at *5-6, 8-9 (N.J. Super. Ct. App. Div. May 14, 2009) (dismissing plaintiffs' tortious interference with contract or prospective economic advantage claim because plaintiff could not properly establish lost profits through testimony regarding a different restaurant, since the other restaurant was in

_____

[4] Plaintiffs and their agents testified that John DiMatteo and Alan Sacks, not Plaintiffs, were in charge of booking talent. DiMatteo and Sacks further testified that they were unable to confirm artists for the Event because of factors including the lack of Plaintiffs' experience, conflict with other big-name established events and inability to ensure the Event was properly funded. Neither DiMatteo nor Sacks testified that Live Nation interfered with the artists they were attempting to book.

Case 2:11-cv-07318-CCC-CLW   Document 117-3   Filed 02/26/15   Page 6 of 49 PageID: 2103
Case 2:11-cv-07318-CCC-CLW   Document 81-7   Filed 10/14/19   Page 36 of 203 PageID: 436
PageID: 2104

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 6
_____

a different town, had a different menu, different supplier, different name, and different
financing scheme and the other restaurant was significantly larger).[5]

Plaintiffs' contentions that the additional discovery is necessary to conduct 30(b)(6)
depositions and for their experts are precisely the theories of shadowy relevancy the rule of
proportionality is designed to guard against.

## II.      Production of Additional Documents Would be Unduly Burdensome

In addition to empowering Courts the discretion to limit discovery to that which is
proportionate and relevant, Rule 26 also permits Courts to circumscribe discovery where "the
discovery sought is unreasonably cumulative or duplicative, or where the burden or expense of
the proposed discovery outweighs its likely benefit."  Fed.R.Civ.P. 26(b)(2)(C); *Justiano*, 291
F.R.D. at 83.

Here, the time, burden and expense to Live Nation of providing additional discovery
significantly outweigh any marginal benefits the additional documents may possess.  As
described above, Live Nation has already produced the contents of its centrally stored data files
for the requested information concerning the 246 EDM concerts and festivals responsive to the
Discovery Order.  To search for and produce any additional potentially responsive documents,
Live Nation would have to revert to an individual file, if any, for each of the 246 events, which
is maintained by each promoter according to his or her own practices.  The 246 events were
promoted by 27 different Live Nation promoters, whose files are often sent to storage after the
event is completed.  Thus, separate storage facilities for each office where a promoter works
could also potentially have to be searched for potentially responsive documents.  Additionally,
for electronic data, the 27 employees' hard drives and email would have to be individually and
separately searched, as there is no ability to perform that function centrally.  Furthermore,
certain "show file" documents are only maintained by the venue, and there are 38 venues where
the foregoing 246 mid-Atlantic concerts and festivals occurred.  Live Nation would have to
coordinate with each of these 38 venues (some of which are not subject to Live Nation's
control) to determine the location of the venue's documents and potentially search them.  The
foregoing, efforts, we estimate, would take a significant amount of time and would subject Live
Nation to substantial expense.  Accordingly, even if Your Honor were to determine that the
additional discovery Plaintiffs seek is marginally relevant, the benefit is highly outweighed by
the burden of searching for potentially responsive documents additional documents from 27
individuals and 38 venues and searching storage facilities.

For these reasons as well as those set forth in our March 12, 2014 letter, Live Nation
respectfully requests that this Court deny Plaintiffs' request for permission to make a formal

_____
[5] Also, the testimony elicited in this matter, including testimony from Plaintiffs Thomas
Dorfman and Christopher Barrett, demonstrates that Plaintiffs themselves had never booked
any of the artists listed in Live Nation's 246 concerts and festivals.  Thus, further information
about Live Nation's events is not germane to this case.

Honorable Cathy L. Waldor, U.S.M.J.
February 26, 2015
Page 7
_____

motion to obtain additional documents related to Live Nation's EDM concerts and festivals in the mid-Atlantic region.   As previously suggested, in the event that the Court grants the request, Live Nation requests oral argument.

Respectfully submitted,


/s/ Ian S. Marx_____
IAN S. MARX


cc: Amy Walker Wagner, Esq. (via ECF)
    David S. Siegel, Esq. (via ECF)

Case 2:11-cv-07318-CCC-CLW   Document 117-7   Filed 10/14/19   Page 38 of 203
PageID: 2106
Case 2:11-cv-07318-CCC-CLW   Document 46-1   Filed 03/12/14   Page 1 of 39 PageID: 406

# Greenberg Traurig

Ian S. Marx
Tel. (973) 360-7951
Fax. (973) 301-8410
marxi@gtlaw.com

March 12, 2014

**VIA ELECTRONIC FILING**

Honorable Cathy L. Waldor, U.S.M.J.
United States District Court
  for the District of New Jersey
M.L. King, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re:  *Juice Entertainment, LLC v.*
>      *Live Nation Entertainment, Inc.,*
>      **11 Civ. 07318 (WHW) (CLW)**

Dear Magistrate Judge Waldor:

On behalf of defendant Live Nation Entertainment, Inc. ("Live Nation"), we are responding to the letter that Plaintiffs' counsel, David S. Siegel, Esq., sent to Your Honor on March 7, 2014 regarding a discovery issue. Specifically, Mr. Siegel asserts that Live Nation has failed to comply with an August 7, 2013 Order from Judge Mannion that, among other things, required Live Nation to identify all electronic dance concerts that it has produced within a five-state area from 2008 to the present and to provide documents relating to such events. In fact, Live Nation has already complied with the August 7, 2013 Order. Before delving deeper into the non-issue raised by Mr. Siegel, however, Your Honor may find a concise description of this case useful.[1]

---

[1] Plaintiffs' initial Complaint [Dkt. # 1] essentially alleged that Live Nation wrongfully interfered with a contract between Plaintiff Juice Entertainment, LLC ("Juice") and State Fair Event Management ("SFEM"), under which Juice had the right to produce an electronic dance music festival ("the Event") in the parking lot at the Meadowlands during the New Jersey State Fair in June 2011 and that such alleged interference resulted in SFEM's terminating their contract. The Court partially granted Live Nation's motion to dismiss the initial Complaint [*see* Dkt. #s 20 and 21], resulting in an Amended Complaint [Dkt. # 24]. The surviving claims against Live Nation are tortious interference with contract and business relations and defamation. Plaintiffs essentially complain that Live Nation prevented them from procuring agreements to appear at the Event from 34 artists represented by 3 major talent agencies [*see* Complaint ¶¶ 70-72], which resulted in SFEM's termination of Juice's contract (and that such termination was also the result of defamatory comments from Live Nation).

ALBANY
AMSTERDAM
ATLANTA
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LOS ANGELES
MIAMI
NEW JERSEY
NEW YORK
ORANGE COUNTY, CA
ORLANDO
PHILADELPHIA
PHOENIX
SACRAMENTO
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO
TYSONS CORNER
WASHINGTON, D.C.
WEST PALM BEACH
ZURICH

www.gtlaw.com

Honorable Cathy L. Waldor, U.S.M.J.
March 12, 2014
Page 2

_____

### Brief background:  Plaintiffs' claims versus the evidence[2]

Fact discovery in this matter has been substantially completed.[3]  Live Nation has deposed, among others, Plaintiffs Thomas Dorfman and Christopher Barrett (the principals of Juice), as well as non-parties Al Dorso, Sr. (the principal of SFEM), John DiMatteo (alleged to be Plaintiffs' "agent" and the person upon whom Plaintiffs relied to book the talent for the Event), Alan Sacks (also alleged by Plaintiffs to be responsible for booking talent) and Vito Bruno (who Plaintiffs allege had agreed to provide financing for the Event).  Plaintiffs have deposed Jason Miller and John D'Esposito of Live Nation, who Plaintiffs allege were the Live Nation agents responsible for the "interference" and "defamation" that led SFEM to terminate Plaintiffs' contract.  These depositions reveal the following facts.

In Fall 2010, Plaintiffs were rank amateurs in the music festival industry.  They had big dreams, however, one of which was to produce a two-day electronic music festival as part of the 2011 New Jersey State Fair.  But as Plaintiffs began to try to cobble an event together, their lack of experience became obvious.  In fact, Plaintiffs made virtually every mistake imaginable, from picking concert dates that conflicted with well-established big-name events, to waiting to approach talent until well past what experienced advisors told them was the cut-off date, to failing to obtain the funding necessary for an event of the size they were contemplating.  Unable to comply with the terms of their contract with SFEM (which obligated Plaintiffs to produce a roster of talent by a date certain), SFEM canceled their contract.

Unwilling to accept responsibility for their failure, Plaintiffs looked around for someone to blame.  Live Nation (which, as a concert producer, was everything Plaintiffs were not) became the target, and Plaintiffs wasted no time concocting an elaborate tale of intrigue with Live Nation as villain.  In this suit, Plaintiffs accuse Live Nation of having pressured talent agencies to withhold their artists, of having pressured headline artists to break their "firm agreements" to perform at Plaintiffs' event, and of having defamed Plaintiffs to SFEM, all of which (according to Plaintiffs) resulted in their contract with SFEM being canceled and their reputations being ruined.

Plaintiffs have no evidence whatsoever to support any of their claims; indeed, the evidence that has been adduced actually disproves them.  For starters, Plaintiffs have no

_____

[2]  The facts summarized below are fully established by deposition testimony and/or documents and, thus, are either undisputed or undisputable.  Should Plaintiffs suggest otherwise, Live Nation requests that it be allowed to substantiate any challenged statements with citations to the record.

[3]  As Mr. Siegel indicates, Plaintiffs have served Live Nation with a Rule 30(b)(6) deposition notice, seeking testimony on 35 topics.  Based on discussions with Plaintiffs' counsel, Live Nation anticipates producing a witness (or witnesses) to testify on those topics that have been properly identified and are the proper subject of discovery following the Court's resolution of this document dispute.

Honorable Cathy L. Waldor, U.S.M.J.
March 12, 2014
Page 3

_____

evidence, either testimonial or documentary, showing that Live Nation ever pressured any talent agency to withhold their artists. (Tellingly, Plaintiffs have never sought to depose anyone from any of the talent agencies, nor have Plaintiffs sought to depose any of the supposedly "pressured" headline artists.)[4] Moreover, the evidence definitively shows that Plaintiffs never had any agreement, "firm" or otherwise, with any headline artist. As a final coup de grâce, the person at SFEM (with whom Plaintiffs negotiated their contract) has testified that Live Nation did not defame Plaintiffs and that the reason Plaintiffs' contract was canceled by SFEM was that they failed to perform it.

Given the foregoing, it is plain that having information concerning the concerts Live Nation has produced within a five-state region over the past five years will not advance Plaintiffs' baseless claims one iota. The only theoretical "relevance" these concerts have to this case (and the only relevance Plaintiffs have attempted to argue) is that they might somehow be relevant to Plaintiffs' damages claim. Despite there being no proffered nexus between these 246 concerts and SFEM's termination of its contract with Plaintiffs in April 2011, in compliance with the August 7, 2013 Order, Live Nation has provided the information requested.

**Live Nation has already complied with Judge Mannion's August 7, 2013 Order**

The August 7, 2013 order entered by Judge Mannion resolved an extensive number of disputes between the parties concerning dozens of issues. The present dispute concerns one of them – specifically, the Court's requirement that Live Nation identify the electronic dance music ("EDM concerts") it produced in the mid-Atlantic region and produce documents relating to such concerts. Live Nation has complied with the Court's Order.

On December 13, 2013, Live Nation identified for Plaintiffs 246 EDM concerts that it produced in a five-state area (plus the District of Columbia) from 2008 to present, and, on February 12, 2014, Live Nation provided Plaintiffs with documents relevant to those concerts. With respect to the latter, Live Nation produced electronic data that, for each of the 246 EDM concerts, contained 3,690 data points reflecting the following information:

- name of the headline artist;
- talent agency through which the artist was booked;
- name of the venue and its location;
- date the deal with the talent agency was consummated;
- booking promoter who handled the deal on behalf of Live Nation;
- offer ID number (an internal tracking number for the event at Live Nation);

_____

[4] Plaintiffs initially served deposition subpoenas on the three talent agencies with whom they allege Live Nation interfered. When documents produced by those talent agencies showed no evidence of interference by Live Nation, Plaintiffs decided not to depose the talent agents after all. Thus, Plaintiffs deliberately opted not to depose the "targets" of Live Nation's alleged interference.

Honorable Cathy L. Waldor, U.S.M.J.
March 12, 2014
Page 4

_____

- number of shows involved;
- paid attendance (i.e., the number of tickets sold);
- "drop count" (i.e., the number of actual attendees);
- revenue from ticket sales;
- show expenses;
- talent expenses;
- co-promoter expenses (where applicable);
- other expenses; and
- gross profit (i.e., revenues minus expenses).

The foregoing electronic data produced by Live Nation concerning the 246 EDM concerts was extracted from Live Nation's official books of record from the only centralized source of data Live Nation maintains concerning its live music events.

The information produced by Live Nation concerning the 246 EDM concerts adequately addresses the August 7, 2013 Order. Plaintiffs, however, are not satisfied and are now demanding that Live Nation produce every shred of paper generated in connection with each and every one of these 246 concerts. Not surprisingly, Plaintiffs cannot articulate a single plausible reason why they could possibly need such documents. The one they give Your Honor is simply double-talk. *See* Siegel letter at 1 (claiming that "Plaintiffs require the documents at issue both for the contents of the documents themselves, to be able to conduct meaningful depositions of 30(b)(6) witnesses still to be proffered by Live Nation, and to provide to their expert"). The real reason Plaintiffs are engaging in this pseudo-dispute is to prevent this case from being decided on its merits, as it has none. Plaintiffs would rather try to force Live Nation to expend time, energy and resources on the kind of meaningless and burdensome discovery they demand here, in the hope that settlement discussions will ensue.[5]

Mr. Siegel concludes his letter with a request that the Court schedule a call to discuss his request for leave to file a formal motion for leave to seek relief under Rule 37. For the reasons summarized above, upon which we would be pleased to expand in a call or at a

_____

[5] As noted, the electronic data that Live Nation has produced is the only information concerning the 246 EDM concerts that can be accessed from a centralized source; there is no other centralized data or document storage system that can be searched for documents relating to these events. If Live Nation were required to search alternative sources for documents, it would have to review the personal files maintained by each of the 27 Live Nation booking agents who were involved in the 246 shows or possibly attempt to retrieve documents from the 38 venues at which the EDM concerts were held. Given the low probative value of the extensive discovery Plaintiffs seek, the high degree of burden on Live Nation to produce such discovery, and the fact that Live Nation has already provided the results of the 246 EDM concerts (which, although not connected in any way to Plaintiffs' claims against Live Nation, is the only information that could conceivably be of any use to a damages expert), the Court should find that Live Nation has complied with its obligations.

Honorable Cathy L. Waldor, U.S.M.J.
March 12, 2014
Page 5
_____

conference, there is no basis for any such relief. Plaintiffs additionally state that the unreasonable discovery demands they make here are "the sole remaining reason why fact discovery cannot be completed by the current [March 14, 2014] deadline." Siegel letter at 2. Live Nation would put it differently: if Plaintiffs' unreasonable discovery demands are denied, fact discovery will be substantially completed as of March 14, 2014. Live Nation respectfully requests that Your Honor rule that the requirements of the August 7, 2013 Order have been satisfied, that fact discovery will close and that this case should move forward as scheduled.

Respectfully submitted,


/s/ Ian S. Marx
IAN S. MARX


cc: Amy Walker Wagner, Esq. (via ECF)
    David S. Siegel, Esq. (via ECF)

**AJAMIE**
LLP

HOUSTON
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002

NEW YORK
460 Park Avenue - 21st Floor
New York, New York 10022

713 860 1600 telephone
713 860 1699 facsimile
www.ajamie.com

David S. Siegel
dsiegel@ajamie.com

*VIA CM/ECF*                                                          February 25, 2015

Honorable Cathy L. Waldor, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

        Re:    *Juice Entertainment, LLC, et al. v. Live Nation Entertainment, Inc.*
              Civil Action No. 11-07318 (WHW) (CLW)

Dear Judge Waldor:

We represent Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett ("Plaintiffs") in the above-captioned matter. We write pursuant to the status conference telephone call held on February 11, 2015. During that call there was discussion of the pending discovery dispute involving documents related to electronic dance music concerts produced by Defendant Live Nation Entertainment, Inc. ("Live Nation"). This letter serves as a very brief summary of Plaintiffs' position on the discovery dispute. Plaintiffs fully set out their position in two previous letters to the Court. These letters were dated March 7, 2014 and March 19, 2014, and may be found at ECF No. 45 and ECF No. 48, respectively.

First, Live Nation has waived the right to argue about whether it should have to produce the requested documents. As we detailed in our prior letters, Judge Mannion ruled in August 2013 that Live Nation was obligated to produce the requested documents concerning the concerts in question, within a narrow geographic area. Live Nation failed to follow the proper procedure for challenging Judge Mannion's ruling. Live Nation neither moved for reconsideration nor filed an appeal. Instead, Live Nation strung Plaintiffs along, leading them to believe that the documents would be forthcoming. These documents were the subject of multiple conversations and emails between counsel for both sides. As discovery was proceeding to a close, it became imperative for Plaintiffs to bring the matter before Your Honor in March 2014. Until that point, Plaintiffs were unaware that Live Nation was not gathering the ordered discovery because they never affirmatively sought relief from the Court for their perceived burden. Another year has now passed and Live Nation still has not produced the requested documents.

February 25, 2015
Page 2

Second, the requested documents are relevant or are likely to lead to relevant evidence. Plaintiffs have requested documents reflecting the financial operating results of the concerts, which is relevant to our damages analysis. Plaintiffs have also requested correspondence about the concerts. Live Nation has produced email correspondence between itself and artists or their agents concerning a very small number of concerts. This demonstrates that such correspondence would typically occur in the planning stages of any concert. This comports with common sense-a concert simply cannot happen without advanced discussions between Live Nation and the artists, agents, and venue owner/operator. Plaintiffs' central theory of liability is that Live Nation has sufficient clout to dictate to artists and their agents where they want artists to appear and not appear. Therefore, contrary to Live Nation's position, even though the concerts in question are distinct from the one at the center of this dispute, correspondence about those other concerts could easily shed light on the key issue of whether Live Nation has the power to direct where artists appear.

Third, Live Nation can be expected to argue that it would be too burdensome for it to gather the correspondence related to the identified concerts. As counsel for Live Nation conceded during the February 11th phone conference, Live Nation has the burden of proving that any burden associated with producing the requested documents outweighs Plaintiffs' need for the documents. Live Nation has not made any such showing to this point. Plaintiffs' understanding is that there might be between 20 and 30 custodians of the relevant correspondence within Live Nation. On its face this would not appear to present an undue burden of production for Live Nation. However, given that Plaintiffs have not yet had an opportunity to review and digest Live Nation's submission on this point, Plaintiffs respectfully request an opportunity to submit a brief reply letter shortly after Live Nation's submission if Plaintiffs feel that they have anything to add to the argument.

Sincerely

David S. Siegel

cc:   Ian S. Marx, Esquire (*VIA CM/ECF*)
      GREENBERG TRAURIG, LLP
      200 Park Avenue
      Florham Park, New Jersey 07932

# STONE ⬧ MAGNANINI

## COMPLEX LITIGATION

February 2, 2016

**VIA CM/ECF**

Honorable Cathy L. Waldor, U.S.M.J.
United States District Court
for the District of New Jersey
M.L. King, Jr. Federal Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

      **Re:**   **Juice Entertainment, LLC, et al. v. Live Nation Entertainment, Inc.**
            **Docket No.: 11-cv-07318 (WHW) (CLW)**

Dear Magistrate Judge Waldor:

     We represent Plaintiffs Juice Entertainment, LLC, Thomas Dorfman and Christopher Barrett ("Plaintiffs").

     In anticipation of the telephonic conference with the Court on February 3, 2016, counsel have met and conferred concerning a proposed schedule for the completion of discovery. In this regard, Plaintiffs request (and Defendant does not oppose) that the deadlines contained in the Court's Second Amended Scheduling Order dated August 21, 2013, as amended by the Court's Order entered on October 31, 2013, and as proposed to be amended by letter from defense counsel dated August 26, 2015 (which was not formalized into an Order), be extended as follows:

     1.  Fact discovery to be completed by March 31, 2016.

     2.  Plaintiffs' expert disclosures to be made by May 2, 2016. Defendant's expert disclosure to be made 10 days after Plaintiffs' expert report is due.

     3.  Plaintiffs' expert report(s) to be served by June 1, 2016. Deposition of Plaintiffs' expert(s) to be completed by July 1, 2016.

     4.  Defendant's expert report to be served by July 1, 2016. Deposition of Defendant's expert(s) to be completed by August 1, 2016.

     5.  Dispositive Motions to be filed by September 1, 2016.

     * * *

Honorable Cathy L. Waldor, U.S.M.J.
February 2, 2016
Page 2


     Counsel for the parties are available at the Court's convenience should the Court have any questions, issues or concerns. We thank the Court for its consideration and courtesies in connection with this joint request.

         Respectfully submitted,]


         s/ Amy Walker Wagner
         Amy Walker Wagner


AWW/dlw

cc:    Ian S. Marx, Esq.
       David S. Siegel, Esq.



HOUSTON
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002

NEW YORK
460 Park Avenue - 21st Floor
New York, New York 10022

713 860 1600 telephone
713 860 1699 facsimile
www.ajamie.com

David S. Siegel

dsiegel@ajamie.com

**VIA CM/ECF**                                                                                      March 2, 2015

Honorable Cathy L. Waldor, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

> Re:   *Juice Entertainment, LLC, et al. v. Live Nation Entertainment, Inc.*
>        Civil Action No. 11-07318 (WHW) (CLW)

Dear Judge Waldor:

Plaintiffs respectfully request leave to file this very brief reply to the letter submitted by counsel for Live Nation on February 26, 2015. (Dkt. # 63). Plaintiffs only wish to address a few inaccuracies contained in Live Nation's letter and will not belabor the arguments they have already made in their prior letters concerning this dispute.( Dkt. #45, Dkt. #48, and Dkt.# 62).

First, since Live Nation argues repeatedly that it has "complied" with Judge Mannion's August 7, 2013 Order, it is necessary that Your Honor have a clear understanding of exactly what Live Nation has produced with respect to the concerts in dispute. On February 12, 2014 Live Nation produced a spread sheet populated with various bits of data concerning the 246 EDM concerts at issue. Live Nation did not explain who prepared this spreadsheet or what the source material was. This document is, by Live Nation's own admission, a summary of underlying information. Moreover, the document only purports to reflect certain basic data about each concert such as the particular Live Nation promoter involved, the attendance, the costs and revenues, etc. The document does not "comply" with Judge Mannion's Order. The most obvious deficiency is that Judge Mannion, in granting Plaintiffs' Request, stated that it sought "communications related to any electronic dance music concerts or festivals produced or promoted by defendants…" (Dkt. # 40, p. 53). And, to restate the obvious, during the August 7, 2013 hearing which yielded Judge Mannion's Order, Plaintiffs argued repeatedly that they needed the actual correspondence related to the concerts because it was relevant to Live

March 2, 2015
Page 2

Nation's ability to dictate to artists and agents where and when they should appear. (See, e.g., Dkt. 40, p.30).  Live Nation concedes that correspondence about these concerts exists, and there is no ambiguity about whether Judge Mannion ordered such correspondence produced.

Second, Live Nation had ample opportunity to argue both the relevancy of the requested documents and the alleged burden associated with producing them to Judge Mannion before he issued his Order.  On July 22, 2013 in a joint letter to the Court, Live Nation objected to all of the Plaintiffs' discovery requests on the basis that the lack of a centralized storage system would make it burdensome for Live Nation to produce documents (Dkt. # 30). Live Nation did not elaborate on this assertion in the July 22, 2013 letter.  And, during the August 7, 2013 hearing the issue of burden was vetted before Judge Mannion.  Plaintiffs argued that Live Nation had failed to demonstrate with any specificity why it would be burdensome to produce documents. (Dkt. #40, pp. 13-14). Live Nation responded only that it had been required to review a large number of documents to make the limited production it has made. (Dkt. #40, pp. 15-16). Judge Mannion heard these arguments and granted Plaintiffs' request, even curtailing the geographic scope of the required production.  In its most recent letter to the Court, 18 months after Judge Mannion's Order, Live Nation is still making conclusory arguments about the burden of producing the relevant documents, arguing vaguely that it would be burdensome because a number of promoters were involved in the relevant concerts, or that their files may have been sent to storage.  Surely, in the modern litigation landscape, the mere facts that numerous employees are involved and documents may be in storage are not sufficient to show undue burden. Judge Mannion heard and rejected these arguments.

Finally, and on this  point  Plaintiffs are sensitive to the risk of wearing out their welcome by repeating themselves, Live Nation simply should not be heard on any of these matters at all at this juncture.  Judge Mannion issued an Order on these disputes, and Live Nation has cavalierly ignored it for a year and a half.  Live Nation failed to either appeal the Order or move for its reconsideration.  Plaintiffs have legitimate concerns about whether the absence of the requested documents has distorted the mediation process in this case. Plaintiffs would obviously have less settlement leverage if they were ignorant of documents damaging to Live Nation's defenses.  At the very least Live Nation's behavior has caused a severe delay in the resolution of this case, a delay that a large corporation, and a defendant, is far better positioned to tolerate than individual, non-corporate plaintiffs. Live Nation should be ordered to immediately produce the subject documents, and sanctioned severely if it fails to comply.

Sincerely

David S. Siegel

March 2, 2015
Page 3


cc:     Ian S. Marx, Esquire (*VIA CM/ECF*)
        GREENBERG TRAURIG, LLP
        200 Park Avenue
        Florham Park, New Jersey 07932

Case 2:11-cv-07318-WHW-CLW Document 45-17 Filed 03/10/19 Page 50 of 203
Case 2:11-cv-07318-WHW-CLW Document 41-7 Filed 03/07/14 Page 1 of 4 PageID: 402
PageID: 2118



**HOUSTON**
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002

**NEW YORK**
460 Park Avenue - 21st Floor
New York, New York 10022

713 860 1600 telephone
713 860 1699 facsimile
www.ajamie.com

David S. Siegel
dsiegel@ajamie.com

*VIA CM/ECF*

March 7, 2014

Honorable Cathy L. Wa1dor, U.S.M.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

Re:   *Juice Entertainment, LLC, etal. v. Live Nation Entertainment, Inc.*
Civil Action No. 11-07318 (WHW) (CLW)

Dear Judge Waldor:

We represent Plaintiffs Juice Entertainment, LLC, Thomas Dorfman, and Chris Barrett ("Plaintiffs") in the above-captioned matter. We write to request leave to file a motion for sanctions against Defendant Live Nation Entertainment, Inc. ("Live Nation") for its failure to comply with Judge Mannion's August 7, 2013 Order requiring it to produce documents related to certain concerts produced by Live Nation. Judge Mannion conducted a phone conference on August 7, 2013 and issued his Order on the phone that same day.

The transcript containing Judge Mannion's substantive rulings is Docket Entry No. 40. The relevant portions, concerning Live Nation's documents related to electronic dance music concerts it produced, can be found on pp. 53-54, referring to Plaintiffs' Document Request No. 20.

Live Nation did not move to have Judge Mannion's Order reconsidered, did not file an appeal, or object to it in any way. It has simply refused to comply with this portion of the Order from the date it was issued until now. The current deadline for the end of fact discovery in this case is March 14, 2014. Plaintiffs require the documents at issue both for the contents of the documents themselves, to be able to conduct meaningful depositions of 30(b)(6) witnesses yet to be proffered by Live Nation, and to provide to their expert.

Despite Plaintiffs' considerable patience with Live Nation and repeated attempts to resolve this discovery dispute in good faith, Defendant has not exhibited the same good faith and Plaintiffs must move for sanctions on this discovery dispute so they are not prejudiced by

March 7, 2014
Page 2

Defendant's delay in complying with Judge Mannion's Order. The record of correspondence with the Court since the date of Judge Mannion's Order establishes that Live Nation has had ample time to comply with Judge Mannion's Order. On October 30, 2013, already two and a half months after Judge Mannion's Order, the parties submitted a joint letter to the Court requesting extensions of the scheduling order then in place which would have given Live Nation until February 1, 2014 to produce the requested documents. The parties did cooperate toward conducting substantial discovery between October 30, 2013 and February 1, 2014, but these documents were not forthcoming. Plaintiffs conducted depositions of two key Live Nation witnesses during that time without the benefit of these documents in order to keep discovery moving forward.

The parties wrote to the Court again on January 30, 2014, when it became apparent that the earlier deadline of February 1, 2014 for the end of fact discovery could not be met. During the period between October 30, 2013 and February 1, 2014, counsel for Plaintiffs wrote to counsel for Live Nation on three occasions, via email, asking when the documents would be produced. Plaintiffs' counsel renewed those requests at least two more times via email after February 1, 2014, after the issuance of the most recent Scheduling Order. Plaintiffs' counsel also raised the matter in person at depositions in early February and were told that documents would be produced soon, perhaps on a rolling basis, and that they would be voluminous. The parties engaged in a meet and confer on March 4, 2014 to further discuss this issue. Defendant's counsel implied, for the first time, that to produce these documents would likely be burdensome and he advised that he would speak with his client again about what documents exist and their willingness to produce these documents. To date, these documents which Judge Mannion ordered produced back in August of 2013 still have not been produced, Live Nation has still not provided any information on when or if these documents will be produced, and the parties find themselves, again, facing a discovery cutoff date.

Plaintiffs have to this point acquiesced in repeated extensions of the discovery calendar based at least partly on Live Nation's representations that these documents would be forthcoming. Plaintiffs do not contend that all of the previously extended time periods were necessitated solely by Live Nation's delay in producing the documents at issue, and Plaintiffs note that Live Nation has generally cooperated in good faith on other discovery related issues. However, the remaining documents, which could have, and should have, been produced at any time over the last 6 months, are now the sole remaining reason why fact discovery cannot be completed by the current deadline. Plaintiffs have no choice but to move for sanctions in order to finally secure the discovery Live Nation has already been ordered to produce.

Fed. R. Civ. P. 37(b)(2)(A) clearly authorizes sanctions under these circumstances, including but not limited to:

(i)     directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii)    prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

March 7, 2014
Page 3

    (iii)    striking pleadings in whole or in part;

    (iv)    staying further proceedings until the order is obeyed;

    (v)    dismissing the action or proceeding in whole or in part;

    (vi)    rendering a default judgment against the disobedient party; or

    (vii)    treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A); *see also Cannon* v. *Cheny Hill Toyota, Inc.,* 190 F.R.D. 147,157 (D.N.J. 1999) ("Rule 37(b)(2) permits the Court to impose sanctions when a party fails to comply with a court order to produce discovery."). In addition, Fed. R. Civ. P.37(b)(2)(C) provides that "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

    Given Live Nation's demonstrated willingness both to ignore its legitimate discovery obligations (by refusing to produce clearly relevant discovery – thus necessitating the initial motion to compel) and to defy the Order of this Court directing it to produce discovery, it is clear that no remedy short of harsh sanctions will be sufficient. *See Dos Santos* v. *Borough of Flemington,* 2012 WL 406402, at *5 (D.N.J. Jan. 4, 2012) ("The Third Circuit has advised a pattern of wrongdoing may require a stiffer sanction than an isolated incident[.]") (quoting *Republic of Philippines* v. *Westinghouse ElectricCo.,* 43 F.3d 65, 100 (3d Cir. 1994)). A further order to compel will just as likely be ignored, and in any event there is no reason at this point to believe Live Nation will make a good faith effort to comply with the existing Order of this Court regarding the discovery it must produce, potentially requiring further motions to compel and unnecessarily delaying the trial in this action. Live Nation has had ample opportunity to engage in good faith in the Court-ordered discovery that will enable the parties to fully and fairly litigate their claims and defenses. Nonetheless, Live Nation has utterly refused to do so.

    Live Nation's conduct more than satisfies the standard set by the Third Circuit in *Poulis* v. *State Farm Fire &Casualty Co.,* 747 F.2d 863, 868 (3d Cir. 1984), that govern when a party may be deprived of a right to pursue or defend against a claim as a Rule 37sanction. Those factors are:

    (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary; (3) whether there has been a history of dilatoriness; (4) whether the conduct of the party or attorney was willful or in bad faith; (5) the effectiveness of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Ramada Worldwide, Inc. v. Anita Nguyen, LLC,* No. 11-921 (ES)(CLW), 2012 U.S. Dist.LEXIS 53855, at *6-7 (D.N.J. Jan. 10,2012) (recommending that an order be entered striking the defendants' answer and entering default).

Case 2:11-cv-07318-CCC-CLW Document 117-7 Filed 10/16/19 Page 53 of 203
PageID: 2121
Case 2:11-cv-07318-WHW-CLW Document 45-1 Filed 03/07/14 Page 4 of 4 PageID: 405

March 7, 2014
Page 4


      For the foregoing reasons, Plaintiffs respectfully request a telephone conference with the Court to discuss their request for leave to file a formal motion for Rule 37 sanctions.


                    Respectfully submitted,

                    David S. Siegel


cc:   Ian S. Marx, Esquire (*VIA  CM/ECF*)
      GREENBERG TRAURIG, LLP
      200 Park Avenue
      Florham Park, New Jersey 07932

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT LLC, THOMAS
DORFMAN and CHRIS BARRETT,

                   Plaintiffs,

     v.

LIVE NATION ENTERTAINMENT, INC.,

               Defendant.

**Civil Action No. 11-7318-WHW-MCA**

**Exhibit E**

**Full docket text for document 69:**

TEXT ORDER: The Court will hold a telephone conferences, to be initiated by plaintiff, on 5/16/16 at 10:00 AM and 7/14/16 at 10:00 AM. Scheduling Order: Fact discovery to be completed by March 31, 2016. Plaintiffs expert disclosures to be made by May 2, 2016. Defendants expert disclosure to be made 10 days after Plaintiffs expert report is due. Plaintiffs expert report(s) to be served by June 1, 2016. Deposition of Plaintiffs expert(s) to be completed by July 1, 2016. Defendants expert report to be served by July 1, 2016. Deposition of Defendants expert(s) to be completed by August 1, 2016. So Ordered by Magistrate Judge Cathy L. Waldor on 2/3/16. (tjg, )

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/09/2019 15:09:09 | | | |
| **PACER Login:** | chrisasta1:5182553:0 | **Client Code:** | |
| **Description:** | History/Documents | **Search Criteria:** | 2:11-cv-07318-CCC-CLW |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT LLC, THOMAS
DORFMAN and CHRIS BARRETT,

                Plaintiffs,

      v.

LIVE NATION ENTERTAINMENT, INC.,

              Defendant.

**Civil Action No. 11-7318-WHW-MCA**

**Exhibit F**

## NON NY/NJ Events Discovered

| Date | Headliner | Location | Size | Space | co-promoter | Doc Count | | | |
|------|-----------|----------|------|-------|-------------|-----------|---|---|---|
| | | | | | | | | Non NY/NJ Discovered | **6823** |
| | | | | | | | | NY/NJ Discovered | **937** |
| | | | | | | | | | |
| 4/23/2011 | Mimosa | House of Blues CA | | indoor | | 31 | | Non NY/NJ Events Discovered | **120** |
| 9/23/2011 | Deadmau5 | Festival Pier-PA | 6800 | outdoor | | 3 | | | |
| 10/13/2011 | Trentemoller | Theatre living arts | 1050 | indoor | | 7 | | NY/NJ Events Discovered | **44** |
| 10/16/2011 | Deadmau5 | One civic center plaza | **7595** | indoor | | 21 | | | |
| 10/23/2011 | Avicii | The Dome at Oakdale CT | | indoor | | 14 | | Comparative Non NY/NJ Events Discovered | **5** |
| 10/27/2011 | Boris | Irving Plaza | | indoor | | 33 | | Comparative NY/NJ Events Discovered | **11** |
| 11/17/2011 | Avicii | Byrce Jordan Center | 6515 | indoor | | 38 | | | |
| 11/18/2011 | Avicii | Dc Armory | **10,000** | indoor | | 14 | | NY/NJ Events Not Discovered | **35** |
| 11/19/2011 | armin van buuren | Dc Armory | **10,000** | indoor | | 11 | | Comparative NY/NJ Events Not Discovered | **7** |
| 1/4/2012 | Bass Nation | Soundgarden Hall | 1850 | indoor | | 67 | | | |
| 2/11/2012 | 12th Planet | Theatre living arts | 1050 | indoor | | 59 | | Total File Discovered by LN | **12848** |
| 2/15/2012 | Steve Aoki | The Dome at Oakdale CT | 1999 | indoor | | 42 | | Total LN Discovery Accounted | **7760** |
| 2/18/2012 | Alesso | Drexel Armory | | indoor | | 12 | | Approximate Duplicate and Unreadables | **4791** |
| 2/23/2012 | Tiesto | The Liacouras Center PA | | indoor | | 96 | | | |
| 3/24/2012 | Tiesto | Mohegan Sun | **7798** | Indoor | | 97 | | | |
| 3/28/2012 | Dj Shadow | Irving Plaza | | indoor | | 31 | | | |
| 3/31/2012 | SBTRKT | Theatre living arts | 1050 | indoor | | 5 | | | |
| 5/8/2012 | Porter Robinson | Theatre living arts | 1050 | indoor | | 13 | | | |
| 5/24/2012 | Mustard Pimp | Theatre living arts | 1050 | indoor | | 5 | | | |

| Date | Artist | Venue | Capacity | Type | | Count | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6/8/2012 | Flux Pavillion | The Dome at Oakdale CT | 2000 | indoor | | 30 | | | |
| 6/28/2012 | Kaskade | Piers Landing PA | 5800 | outdoor | | 39 | | | |
| 6/29/2012 | Kaskade | 1st Mariner Arena (baltimore) | 11,480 | indoor | | 12 | | | |
| 9/2/2012 | Dj Shadow | Theatre living arts | 1050 | indoor | | 3 | | | |
| 9/22/2012 | Dayglow | Festival Pier | | indoor | | 134 | | | |
| 10/7/2012 | Tiesto/bingo plyrs | Sands Bethlehem PA | | indoor | | 170 | | | |
| 10/12/2012 | Pretty Lights | The Dome at Oakdale CT | 2000 | indoor | | 86 | | | |
| 10/13/2012 | Nadia Ali/starkillers | Soundgarden Hall | 1850 | indoor | | 65 | | | |
| 10/19/2012 | Tritional | Soundgarden Hall | 1850 | indoor | | 81 | | | |
| 10/27/2012 | SQUAREPUS HER | Theatre living arts | 1050 | indoor | | 34 | | | |
| 10/27/2012 | Crookers | Soundgarden Hall | 1850 | indoor | | 13 | | | |
| 10/31/2012 | Zomboy | Soundgarden Hall | 1850 | indoor | | 49 | | | |
| 11/2/2012 | Datsik | Soundgarden Hall | 1850 | indoor | | 71 | | | |
| 11/2/2012 | Firepower | Soundgarden Hall | 1850 | indoor | | 5 | | | |
| 11/21/2012 | Paul Van Dyk | Soundgarden Hall | 1850 | indoor | | 51 | | | |
| 11/24/2012 | Bro Safari | Soundgarden Hall | 1850 | indoor | | 47 | | | |
| 12/1/2012 | BOYS NOIZE | Theatre living arts | 1050 | indoor | | 24 | | | |
| 12/21/2012 | Helicopter Showdown | Soundgarden Hall | 1850 | indoor | | 25 | | | |
| 12/22/2012 | Cazzette | Soundgarden Hall | 1850 | indoor | | 4 | | | |
| 1/12/2013 | Dash Berlin | Soundgarden Hall | 1850 | indoor | | 191 | | | |
| 1/18/2013 | Alvin Risk | Soundgarden Hall | 1850 | indoor | | 52 | | | |
| 1/18/2013 | Popeska | Soundgarden Hall | 1850 | indoor | | 14 | | | |
| 1/20/2013 | Diplo | Soundgarden Hall | 1850 | indoor | | 83 | | | |
| 1/26/2013 | John O'Callaghan | Soundgarden Hall | 1850 | indoor | | 25 | | | |
| 2/1/2013 | Skism | Soundgarden Hall | 1850 | indoor | | 37 | | | |

| Date | Artist | Venue | Capacity | Type | | Attendance | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2/2/2013 | reelbigfish | Theatre living arts | 1050 | indoor | | 1 | | | |
| 2/8/2013 | EOTO Grizzly | Theatre living arts | 1050 | indoor | | 16 | | | |
| 2/9/2013 | AC Slater | Soundgarden Hall | 1850 | indoor | | 71 | | | |
| 2/14/2013 | Eric Prydz | The Dome at Oakdale CT | 2000 | indoor | | 37 | | | |
| 2/15/2013 | Above & Beyond | Soundgarden Hall | 1850 | indoor | | 113 | | | |
| 2/17/2013 | Funtcase | Soundgarden Hall | 1850 | indoor | | 36 | | | |
| 2/17/2013 | Dara | Soundgarden Hall | 1850 | indoor | | 17 | | | |
| 2/23/2013 | Tiesto | Soundgarden Hall | 1850 | indoor | | 134 | | | |
| 2/25/2013 | Tiesto | Sands Bethlehem PA | 3188 | indoor | | 126 | | | |
| 2/26/2013 | Tiesto | Byrce Jordan Center | | indoor | | 58 | | | |
| 2/27/2013 | Aly & Fila | Soundgarden Hall | 1850 | indoor | | 40 | | | |
| 3/1/2013 | Gemini | Soundgarden Hall | 1850 | indoor | | 21 | | | |
| 3/1/2013 | Koan Sound | Soundgarden Hall | 1850 | indoor | | 33 | | | |
| 3/2/2013 | Hard Rock Sofa | Soundgarden Hall | 1850 | indoor | | 37 | | | |
| 15-Mar | Jrabbit | Soundgarden Hall | 1850 | indoor | | 11 | | | |
| 3/22/2013 | Maor Levi | Soundgarden Hall | 1850 | indoor | | 48 | | | |
| 3/26/2013 | Dillon Francis | Soundgarden Hall | 1850 | indoor | | 70 | | | |
| 4/10/2013 | Netsky Live | Soundgarden Hall | 1850 | indoor | | 74 | | | |
| 4/11/2013 | Markus Schulz | Soundgarden Hall | 1850 | indoor | | 76 | | | |
| 4/19/2013 | Gladiator | Soundgarden Hall | 1850 | indoor | | 59 | | | |
| 5/19/2013 | Bloody Beatroots | Theatre living arts | 1050 | indoor | | 36 | | | |
| 7/12/2013 | Mightyfools | Soundgarden Hall | 1850 | indoor | | 19 | | | |
| 7/13/2013 | Nerd Rage | Soundgarden Hall | 1850 | indoor | | 6 | | | |
| 7/26/2013 | Diplo | Soundgarden Hall | 1850 | indoor | | 83 | | | |
| 7/27/2013 | MAD DECENT | Riverstage Penns landing | **6400** | outdoor | | 124 | | | |

| 8/2/2013 | Minnesota | Soundgarden Hall | 1850 | indoor | | 27 | | | |
| 8/10/2013 | Maor Levi | Soundgarden Hall | 1850 | indoor | | 48 | | | |
| 8/16/2013 | Bass Nation | Soundgarden Hall | 1850 | indoor | | 67 | | | |
| 8/16/2013 | Vaski | Soundgarden Hall | 1850 | indoor | | 32 | | | |
| 8/17/2013 | AC Slater | Soundgarden Hall | 1850 | indoor | | 71 | | | |
| 8/24/2013 | Dzeko Torres | Soundgarden Hall | 1850 | indoor | | 21 | | | |
| 8/30/2013 | Mt Eden | Soundgarden Hall | 1850 | indoor | | 82 | | | |
| 9/6/2013 | Mak J | Soundgarden Hall | 1850 | indoor | | 49 | | | |
| 9/7/2013 | Liquid Stranger | Soundgarden Hall | 1850 | indoor | | 15 | | | |
| 9/12/2013 | Flume | Theatre living arts | 1050 | indoor | | 31 | | | |
| 9/13/2013 | Xilent | Soundgarden Hall | 1850 | indoor | | 41 | | | |
| 9/19/2013 | savant | The fillmore | 1085 | indoor | | 165 | | | |
| 9/20/2013 | Nicky Romero | Soundgarden Hall | 1850 | indoor | | 45 | | | |
| 9/21/2013 | The Partysquad | Theatre living arts | 1050 | indoor | | 4 | | | |
| 9/27/2013 | W&W | Soundgarden Hall | 1850 | indoor | | 443 | | | |
| 9/28/2013 | Sebastien Ingrosso | Festival Pier | | outdoor | | 16 | | | |
| 9/28/2013 | UZ | Soundgarden Hall | 1850 | indoor | | 32 | | | |
| 10/4/2013 | Alvin Risk | Soundgarden Hall | 1850 | indoor | | 52 | | | |
| 10/5/2013 | Myon Shane 54 | Soundgarden Hall | 1850 | indoor | | 155 | | | |
| 10/12/2013 | Le Castle Vania | Soundgarden Hall | 1850 | indoor | | 109 | | | |
| 10/13/2013 | Deltron | Theatre living arts | 1050 | indoor | | 5 | | | |
| 10/18/2013 | Rusko | The fillmore | | indoor | | 40 | | | |
| 10/18/2013 | Henrix | Soundgarden Hall | 1850 | indoor | | 48 | | | |
| 10/19/2013 | Morgan Page | Soundgarden Hall | 1850 | indoor | | 40 | | | |
| 10/24/2013 | Beats Antique | Theatre living arts | 1050 | indoor | | 17 | | | |
| 10/26/2013 | Orjan Nielsen | Soundgarden Hall | 1850 | indoor | | 38 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/27/2013 | Steve Aoki | The Dome at Oakdale CT | 2000 | indoor | | 42 | | |
| 10/30/2013 | Just Blaze | Soundgarden Hall | 1850 | indoor | | 33 | | |
| 10/31/2013 | Skism | Soundgarden Hall | 1850 | indoor | | 37 | | |
| 11/6/2013 | Flux Pavillion | The Dome at Oakdale CT | 2000 | indoor | | 30 | | |
| 11/7/2013 | Adventure CLub | Soundgarden Hall | 1850 | indoor | | 60 | | |
| 11/8/2013 | Madeon | Soundgarden Hall | 1850 | indoor | | 56 | | |
| 11/11/2013 | S-Type | Soundgarden Hall | 1850 | indoor | | 855 | | |
| 11/14/2013 | Doctor P | Soundgarden Hall | 1850 | indoor | | 16 | | |
| 11/15/2013 | Kill The Noise | Soundgarden Hall | 1850 | indoor | | 5 | | |
| 11/23/2013 | 3lau/Carnage | Soundgarden Hall | 1850 | indoor | | 46 | | |
| 11/24/2013 | Pendulum | Soundgarden Hall | 1850 | indoor | | 107 | | |
| 11/29/2013 | Mimosa | Theatre living arts | 1050 | indoor | | 55 | | |
| 11/30/2013 | Mimosa | The fillmore | 2000 | indoor | | 148 | | |
| 12/2/2013 | Holy Ghost | Theatre living arts | 1050 | indoor | | 41 | | |
| 21-Dec | Mt Eden | Soundgarden Hall | 1850 | indoor | | 82 | | |
| 10/25/2014 | Flux Pavillion | Soundgarden Hall | 1850 | indoor | | 71 | | |
| 12-Mar | Steve Aoki | The Dome at Oakdale CT | 2000 | indoor | | 42 | | |
| 12/11/2017 | cosmic gate | Soundgarden Hall | 1850 | indoor | | 52 | | |
| 1/30&31/13 | Feed Me | Theatre living arts | 1050 | indoor | | 5 | | |
| 2/10?? | Unearth etc | Theatre living arts | 1050 | indoor | | 9 | | |
| 2/12?? | Heavy Light | Theatre living arts | 1050 | indoor | | 1 | | |
| 2/14/??? | intronaut | Theatre living arts | 1050 | indoor | | 2 | | |
| 2/16?? | Gojira | Theatre living arts | 1050 | indoor | | 34 | | |
| 3/17/?? | the saw doctors | Theatre living arts | 1050 | indoor | | 3 | | |
| | Hardwell | The Dome at Oakdale CT | | indoor | | 8 | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Identity Festival * | Hartford cd | | outdoor | | | | | | | |

## NY/NJ Events Discovered

| Dates | Headliners | Venue | Size | Format | Promoter | Financials | Production | Talent | Misc | Prohibitive | Ticketing | Gross/Net Discd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/6/2008 | Soulwax | The fillmore | 1085 | indoor | | | | | | | | 8 |
| | Deadmau5 | The armory East Rochester | | indoor | | | | | | | | 2 |
| 10/19/2013 | Bingo Players | Roseland | | indoor | | | | | | | | 55 |
| 8/29/2009 | PVD | Rumsey nyc | | indoor | | | | | | | | 48 |
| July/16-17/2011 | Tiesto | Asbury Convention | 1050 | indoor | Dimatteo | | | | | | | 254 |
| August/24-26 2009 | Tiesto | Hammerstein Ballroom | 10,086 | indoor | Dimatteo | | | | | | | 121 |
| 2/5/2011 | Pendulum | Irving Plaza | | indoor | | | | | | | | 23 |
| 10/27/2011 | Boris | Irving Plaza | | indoor | | | | | | | | 31 |
| 3/28/2012 | Dj Shadow | Irving Plaza | | indoor | | | | | | | | 21 |
| 8/14/2012 | Identity Festival * | NJ | | outdoor | | | | | | | | 101 |
| 8/21/2012 | Identity Festival * | NY | | outdoor | | | | | | | | 40 |
| 2/28/2013 | Swedish house mafia | Hammerstein Ballroom | 3430 | indoor | | | | | | | | 1 |
| March 26 2009 | Prodigy | RoseLand Ball Room; 239 West 52nd St Ny,NY | sold out occupany 3200 | Indoor | | LN0003986, LN0004842, LN0004844 | LN0004822 | | LN0004834, LN0004836, | LN0004844 | | 9 |
| April 28 2010 | NERD/J Electronica | Irving Plaza 17 Irving Pl Ny, NY | 1,035 | Indoor | Livenation (Celebrity access) | N/A | N/A | N/A | LN0004869 | N/A | N/A | 1 |
| October 28,2010 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | indoor | Livenation | | | | | | | |
| October 29,2010 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | Indoor | Livenation | N/A | LN0002563 | N/A | N/A | N/A | N/A | 1 |
| October 30,2010 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | Indoor | Livenation | | | | | | | |
| Deceember 31 2010 | Steve Angelo | Roseland Ball Room; 239 West 52nd St Ny,NY | 7K plus | Indoor | Livenation area event | N/A | N/A | N/A | LN0000996 | N/A | N/A | 1 |
| April 09 2011 | Steve Aiko | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 | Indoor | Livenation/ DIMI Mark | N/A | N/A | N/A | LN0002142 | N/A | N/A | 1 |

| Date | Artist | Venue | Capacity | Type | Promoter | | | | | | Count |
|---|---|---|---|---|---|---|---|---|---|---|---|
| April 23,2011 | Axwell | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus sold out | Indoor | Livenation/Area Events | N/A | LN0001770, LN0001761, LN0001694, LN0007081 | LN0004869, LN0110121 | LN0000018, LN0002563, LN0000996, | LN0000393, LN0001763, LN0001762, LN0001763, LN0001766, LN0007094, LN0001760, LN0001764, LN0007050, LN0007177, LN0007194, LN0007085, LN0007086, LN0001858, LN0001858 LN0007090, LN0007574, LN0007568, LN0007566, LN0007095, LN0007053, LN0007091, LN0007093, LN0007196, LN0007089, LN0007175, LN0007572, LN0001876, LN0001876, LN0001697, LN0007398, LN0007399, LN0001769, LN0001765, LN0001875, LN0001727, LN0001764    LN0007078 | 45 |
| April 28,2011 | Wolfgang Gartner | Irving Plaza 17 Irving Pl Ny,NY | 1,025 | Indoor | Jason Miller/ Livenation (Celebrity Access) | N/A | LN0033534 | LN0001866, LN0004205, LN0001870, LN0007188, LN0001861, LN0001863, LN0001872, LN0001862, LN0001864, LN0001868, LN0001873 | LN0007180, LN0007182 | LN0001867, LN0001859, LN0001860, LN0001865, LN0001869, LN0007178, LN0007179, LN0007183, LN0007190, LN0007185, LN0007193, LN0007181, LN0007187 | 27 |
| October 04 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation (BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | | | | | | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| October 05 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation(BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | | | | | | |
| October 06 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation (BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | LN0018097, LN0016154, LN0018101, LN0018108, LN0016158, LN0018117, LN0016156 | LN0002333, LN0018087 | LN0016115, LN0016082, LN016163, LN0016118, LN0016124, LN0016162, LN00016160, LN0018110, LN0018114, LN0018095 | LN0001641, LN0001633, LN0001638, LN0001644, LN0001648, LN0007411, LN0016135, LN0016142, LN0018112, LN0018094, LN0018107, LN0007231, LN0007406, LN0016067LN0016152 | LN0001645, LN0016176, LN0001649, LN0016086, LN0016164, LN0016169, LN0016092, LN0001637 | 6 (4) |
| October 07 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation (BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | | | | | | |
| October 08 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation (BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | | | | | | |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| October 09 2011 | Deadmau5 | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | Indoor | Jason Miller/ Livenation (BROKE RECORD CONSECUTIVE DAYS SOLD OUT JASON MILLER ARTICLE) | | | | | | | |
| October 28,2011 | kascade | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 | Indoor | Livenation | LN0033088 | N/A | N/A | N/A | N/A | N/A | 1 |
| October 29,2011 | kascade | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | Indoor | Livenation/ Jason Miller (press article) | | | | | | | |
| Decemeber 16, 2011 | Swedish House Mafia | Madison Square Garden NY | 20,000 sold out | Indoor | Livenation Jason Miller (Celebrity Access) Press article 96,3614 | N/A | N/A | N/A | LN0002282, LN0003372 | LN0003378, LN0002996, LN0003002, LN0003402 | | 6 |
| Decemeber 30,2011 | Afrojack | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 sold out | Indoor | Livenation | LN0002387, LN0002393, LN0002386 | LN0002205, LN0002215 | LN0004282 | LN0002227, LN0002208 | LN0002226, LN0002211, LN0002232, LN0002210, LN0002222, LN0002187, LN0002191, LN0002183, LN0002196, LN0002218, LN0002207, LN0001919, LN0002197, LN0002219, LN0002188, LN0004096, LN0001921, LN0003995, LN0002184, LN0002204 | LN0002201, LN0002211, LN0002223, LN0002192 | 32 |
| September 27 2012 | Avicii | RadioCity music hall NY | 6,015 | Indoor | | LN0032733 | LN0001682 | | LN0007423 | LN0001679 | | 4 |

| Date | Artist | Venue | Capacity | Type | Promoter | | | | | | | Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February 23 2012 | Axwell | HammerStein Ballroom NY | 3,500 | Indoor | Livention (believe that there was a 2nd day show on the 24th) | N/A | LN0002686 | N/A | LN0002820, LN0010121 | LN0002679, LN0002846 | LN0002681 | 6 |
| May 10,2012 | Flux Pavilian | RoseLand Ball Room; 239 West 52nd st Ny,NY | 3,500 | Indoor | Livenation | LN0015237 | N/A | N/A | N/A | N/A | N/A | 1 |
| May 18 2012 | Skrillex/ Bambozil | | 100k + | Outdoor | John Despoisico | N/A | N/A | N/A | LN0001054 | N/A | N/A | 1 |
| May 19 2012 | Paulie D | Asbury Park Convention Center (Bamboozle After Party) | 3600 capacity | Indoor | Livenation/ john Desposito | N/A | N/A | N/A | LN0001054 | N/A | N/A | 1 |
| June 15,2012 | Kaskade (freaks of nature tour) | MCU Park Brooklyn, NY | 8,000 sold out | Outdoor | Livenation | LN0033088, LN0033055 | LN0011375, LN0011165 | LN0011381, LN0011354 | LN0003402, LN0002414 | LN0002427 | LN0015593, LN0015790 | 13 |
| September 06 2012 | Madonna/ Avicii | Yankee Stadium | 76,000 sold out 12.6 millon revenue | Outdoor | Livenation Global Touring (Celebrity Access) $12,599,540 | N/A | LN0002469, LN0002298, LN0002348, LN0002469, LN0002425, LN0002469, LN0002427, LN0002272, LN0002279, LN0002289 | LN0002433, LN0002472, LN0002419, LN0002459, LN0002341 | LN0002402, LN0002265, LN0002353, LN0002306 | LN0002282, LN0002293, LN0002402, LN0002248, LN0002979, LN0002260, LN0002286, LN0002318, LN0002311 | N/A | 27 |
| October 26 +27,2012 | Sensation Festival * | Barclays Center Brooklyn NY | 15k each night sell out | Outdoor | Livenation jason miller, ID&T (Celebrity access) $3,646,950 | N/A | N/A | N/A | LN0003858 | N/A | N/A | 1 |
| November 22 2012 | Paul Vandyk Evolution World Tour | Pacha NYC | 2,000 to 4,000 | Indoor | ` | N/A | N/A | N/A | LN0019857 | N/A | N/A | 1 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Novemeber 30,2012 | Boys noize | RoseLand Ball Room; 239 West 52nd st ,Ny,NY | 3,500 | Indoor | Livenation / hard events | LN0016493, LN0016556, LN0016522 | LN0016576, LN0016515, LN0016537, LN0016558, LN0016581, LN0016583, LN0016507 | LN0016518, LN0016517 | LN0016629, LN0016504, LN0016572, LN0016455 | LN0016515, LN0016539, LN0016524 | LN0016487 | **20** |
| February 28 2013 | Swedish House Mafia | HammerStein Ballroom NY | sold out | Indoor | Livenation | N/A | LN0010121 | LN0004750 | N/A | N/A | N/A | **2** |
| october 12 2013 | ATB | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 | Indoor | Imsomniac/RPM/PAC HA(Livenations owns imsomniac) | LN0004744 | N/A | N/A | N/A | N/A | N/A | **1** |
| Novemebr 23 2013 | ferry corsten | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 | Indoor | Livenation | N/A | N/A | LN0004654, LN0004633, LN0004699 | N/A | N/A | N/A | **3** |
| September 22,2013 | Afrojack | RoseLand Ball Room; 239 West 52nd st ,Ny,NY | 3,500 sold out | Indoor | Livenation / RPM | N/A | LN0004473, LN0004489, LN0004404 | LN0004481, LN0004658 | LN0004477, LN0004406, LN0004409, LN0004510, LN0004288, LN0004303 | LN0004476, LN0004484, LN0004405, LN0004472, LN0004408, LN0004480, LN0004488, LN0004485, LN0001925, LN0004492, LN0004687, LN0004493, LN0004508, LN0004403 | N/A | **25** |
| Decemeber 31 2013 | Big gigantic/ white panda | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 | Indoor | Livenation | N/A | N/A | N/A | LN0027977 | LN0027950 | N/A | **2** |

## LN NY/NJ Events Not Discovered

| Dates | Headliners | Venue | Size | Format | Promoter | Financials | Production | Talent | Misc | Prohibitve | Ticketing | Gross/Net Discd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Novemeber 09, 2009 | Pretty Lights | Irving Plaza 17 Irving PL Ny, NY | 1,025 | Indoor | Livenation (Celebrity access) $27,500 | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| January 09 2010 | LMFA/Far East Movement | Irving Plaza 17 Irving PL Ny, NY | 1,025 | Indoor | Livenation (Celebrity access) | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| September 25 2010 | Jonathan Peters | Roseland Ball Room; 239 West 52nd St Ny,NY | 3,500 sold out | Indoor | Livenation/Pacha/Ro b Promotions/LouB | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| December 31 2010 | Infected Mushroom | HammerStein Ballroom NY | 3,500 | Indoor | Livenation/one event | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| Decemeber 16, 2011 | Swedish House Mafia | RoseLand Ball Room; 239 West 52nd st  Ny,NY (MSG afterparty) | 3,500 plus | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| December 19 2011 | NERO | House of Blues Atlantic City, NJ | 2,318 | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| February 3,2012 | Skrillex | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus sold out | Indoor | Livenation( Celebrity Access) 156925 | N/A | N/A | N/A | N/A | N/A | | **0 (0)** |
| February 9,2012 | David Guetta | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus sold out | Indoor | Livenation/ Jason Miller (article) | N/A | N/A | N/A | N/A | N/A | | **0 (0)** |
| Febraury 4 2012 | David Guetta | Borgata Casino Atlantic City NJ | Sold out (11,235) | | Livenation(Celebrity Access) $89,4485 | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| February 12,2012 | Steve Aiko | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus | Indoor | Livenation | | | | | N/A | | **0 (0)** |
| February 17 2012 | Steve Aiko | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus | Indoor | Livenation | | | | | N/A | | **0 (0)** |
| March  3,2012 | Nero | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus | Indoor | Livenation | | | | | N/A | | **0 (0)** |
| October 10,2012 | Dirty South | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 | Indoor | Livenation/PachaNYC | N/A | | | | N/A | | **0 (0)** |
| October 18 + 19 2012 | Erik Prydz | HammerStein Ballroom NY | sold oyt 3500 plus | Indoor | livenation/pacha | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| October 27 2012 | Nero | HammerStein Ballroom NY | 3500 plus | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| Novemeber 19, 2012 | Cystal Method | Gramercy Theatre- 1027 East 23rd St Ny,NY | 499 | Indoor | livenation / GBH | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| November 24, 2012 | Erik Prydz | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus | Indoor | Livenation/pachaNyc /RPM | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| Decemeber 31 2012 | Tiesto | Revel Ovation Hall Atlantic City | 5,000 seating at one time | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| December 31,2012 | Pretty Lights | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 plus at one time | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| January 16 2013 | Zedd | Highline Ballroom NYC | 700 | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |
| January 18,2013 | Datsik | Irving Plaza 17 Irving PL Ny, NY (was at asbury park convention hall in nj but moved to Irving) | 1,025 | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | **0 (0)** |

| Date | Artist | Venue | Tickets | Indoor/Outdoor | Promoter | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January 26 2013 | Thomas Gold | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Livenation/Pacha | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| Februrary 9, 2013 | Porter Robinson | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Livenation/pachaNyc | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| February 16 2013 | above and beyond | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| March  1,2013 | Swedish House Mafia | Madison Square Garden NY | 14,076 sold out | Indoor | Livenation (Celebrity Access) $1,074,015 | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| March 2-3,2013 | Swedish House Mafia | Barclays Center Brooklyn NY | 42,645 sold out | Indoor | Livenation (Celebrity Access) $2,743,383 | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| May 18 2013 | Eletric Daisy Carnival | City field NY | 100,000 to 110,000 | Outdoor | Imsomniac/Livenation (livenation bought EDC on May 2 2013) | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| July 22 2013 | Tegan / Sara | Pier 24 NYC | | Outdoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| August 20 2013 | One republic | Pier 26 NYC | | Outdoor | Livenation (article) | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| October 4 2013 | Zedz dead | Terminal 5 NY City | 3,000 | Indoor | Hard Events | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| October 5 2013 | Kaskade | Barclays Center Brooklyn NY | 12,697 sold out | Indoor | livenation (celebrity access) $642627 | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| October 09,2013 | Bassnectar | House of Blues Atlantic City, NJ | 2,318 | Indoor | Livenaton | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| October 30 2013 | Pretty Lights | RoseLand Ball Room; 239 West 52nd st  Ny,NY | 3,500 sold out | Indoor | Live Nation | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| November 22 2013 | Jonathan Peters | Stage 48 NYC | | Indoor | Live Nation | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| Decemeber 28 2013 | Tiesto | Borgata Casino Atlantic City NJ | 11,235 | Indoor | Livenation | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |
| Decemeber 31 2013 | Deadmau5 | Nassau Coliseum | 18,000 capacity sold out | Indoor | livenation/pacha/rpm | N/A | N/A | N/A | N/A | N/A | N/A | 0 (0) |

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT, <br><br> Plaintiffs, <br><br> v. <br><br> LIVE NATION ENTERTAINMENT, INC., <br><br> Defendant. | **Civil Action No. 11-7318-WHW-MCA** |

**Exhibit G**



Andrew Smith
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960
T: 973.206.1725
F: 973.794.2589
E: asmith@sslegalservices.com

June 12, 2019

**VIA EMAIL**

Ian S. Marx, Esq.
Greenberg Traurig LLP
500 Campur Drive
Florham Park, New Jersey 07932

> **Re:   Juice Entertainment LLC, Thomas Dorfman and Chris Barrett v. Live Nation
> Entertainment Inc.
> Civil Action No. 2:11-cv-07318-WHW-CLW**

Dear Ian:

As you know, my firm represents Plaintiffs Juice Entertainment LLC, Thomas Dorfman and Chris Barrett ("Plaintiffs") in the above referenced matter.  This letter is in response to your June 11, 2019 letter to me (the "Letter").  The Letter appears to be an empty threat born of fear of the contents of Dr. Richard Barnet's expert report (the "Expert Report").  As for the threats regarding "confidential" documents, the very Confidentiality Order you cite specifically states at Section 4(b) that such documents can be reviewed by experts.  Since the Expert Report is very clearly an expert report, there was no violation of the Confidentiality Order.

Further, it is well settled that an expert report may be admissible even where it is served after the discovery end date.  See Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904 (3d Cir.1977) (holding that before excluding evidence, the Court should consider (1) the prejudice or surprise to the party against whom the evidence would be presented; (2) the ability to cure the prejudice; (3) the extent to which the evidence, if admitted, would disrupt trial of the case; and (4) bad faith or willfulness in failing to comply with the Court's Order); In re Mercedes-Benz Anti-Trust Litigation, 225 F.R.D. 498, 504-05 (D.N.J. 2005) (stating that the Third Circuit has expressed a distinct aversion to the exclusion of important evidence unless there is evidence of extreme neglect or bad faith on the part of the proponent of the testimony, and the Court should exercise particular restraint in deciding a motion to preclude evidence); Velez v. QVC, Inc., 2004 WL 1175726, at *1 (E.D.Pa. May 25, 2004) (stating that before imposing the "extreme sanction" of preclusion of evidence, the Court must either find that the party "(1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of due diligence."), quoting Meyers, 559 F.2d at 905; see also Tucci v. Tropicana Casino, 364 N.J. Supper. 48, 52 (App. Div. 2003) (stating that New Jersey courts have long held that it is "particularly indulgent in not barring a late expert's report where the report was critical to the claim or defense, the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent.").  Here, there is both

a legitimate reason for the late issuance of the report and a lack of prejudice to Defendant Live Nation Entertainment, Inc. ("Defendant").  See id.

Plaintiffs had to file numerous motions in order to get discovery from Defendant, and even after orders were issued by the Court ordering the production of documents, Defendant still refused to produce the ordered discovery.  To this day, Defendant has not produced all the discovery ordered by the Court to be produced.  Further, Defendant itself produced discovery after the discovery end date.  In addition, though you lament Plaintiffs' serving the Expert Report after the dates set forth for expert reports, Defendant itself repeatedly failed to meet deadlines in the very same order.  Moreover, even the discovery that was produced was produced in a manner designed to hide the information contained in the discovery.  For example, a key spreadsheet was produced in pieces over thousands of pages of production, so that it took a massive effort just to identify and then piece together the document itself.

In addition, Plaintiffs had tremendous difficulty finding any expert in the specific industry willing to testify against Defendant.  While experts approached did not doubt Plaintiffs, there was concern about retaliation by Defendant for even just providing a report to Plaintiffs, regardless of what it said.  Further, some of the issues in the Expert Report were not raised by Defendant until the summary judgment motion, and other issues were only recently discovered.  Plaintiffs efforts were made all the more difficult with the withdrawal of Plaintiffs' original counsel through no fault of Plaintiffs.  Considering all of these difficulties, Plaintiffs have provided the Expert Report as expeditiously as they could.

There is also no prejudice to Defendant here.  The Expert Report was based almost entirely on documents produced by Defendant itself, as well as some transcripts that have been in Defendant's possession for quite some time.  Defendant has plenty of time to depose Dr. Barnet, as Plaintiffs will make him available for his deposition upon request.  Further, Defendant also has time to submit a counter-expert report if it deems one necessary, and Plaintiffs will of course consent to any extensions of time necessary for it to do so if needed.

Finally, no trial date has been set as of yet.  As such, the rules regarding admission of a late expert report are relaxed.  See Szalontai v. Yazbo's Sports Café, 183 N.J. 386, 398 (2005) (discovery rules are more relaxed before arbitration has been held and/or a trial date has been set); Tucci, 364 N.J. Supper. at 52 (courts should be "indulgent" were there is no trial date set); Ponden v. Ponden, 374 N.J. Super. 1, 11 (App. Div. 2004) (finding that trial judge mistakenly exercised discretion in barring plaintiff's expert report when trial date was not yet scheduled and such report was crucial to plaintiff's claim); Santone v. Fusiek, 2010 WL 6813737 (Law Div. Dec. 9, 2010) (courts will allow late expert reports where the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent).  As such, the Expert Report is admissible and can be used at trial.  See id.

Please let me know as soon as possible if you would like to depose Dr. Barnet.  Thank you for your time and attention.  If you have any questions or concerns, please do not hesitate to contact me directly.

Yours Truly,
SMITH + SCHWARTZSTEIN LLC

/s/ Andrew Smith

Andrew B. Smith, Esq.

Case 2:11-cv-07318-CCC-CLW   Document 117-7   Filed 10/11/19   Page 75 of 203
Case 2:11-cv-07318-CCC-CLW   Document 103-3   Filed 08/23/19   Page 2 of 30 PageID: 1677
PageID: 2143



**SMITH**
**+SCHWARTZSTEIN**

Andrew Smith
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960
T: 973.206.1725
F: 973.794.2589
E: asmith@sslegalservices.com

June 6, 2019

**VIA HAND DELIVERY**
Ian S. Marx, Esq.
Greenberg Traurig LLP
500 Campur Drive
Florham Park, New Jersey 07932

   Re: **Juice Entertainment LLC, Thomas Dorfman and Chris Barrett v. Live Nation**
     **Entertainment Inc.**
     **Civil Action No. 2:11-cv-07318-WHW-CLW**

Dear Ian:

  As you know, my firm represents Plaintiffs Juice Entertainment LLC, Thomas Dorfman and Chris Barrett ("Plaintiffs") in the above referenced matter. Enclosed please find the expert report of Dr. Rich Barnet. The report addresses two of the defenses made by Defendant Live Nation Entertainment Inc. ("Defendant") here. This report is being served now for a variety of reasons, including but not limited to the fact that discovery here was produced extremely late, and that said discovery was intentionally produced in a manner to hide key documents by breaking documents into pieces and spreading them out over a large production.

  This report is important and necessary for trial. First, it not only addresses the issue of whether Plaintiffs should have taken the deal offered to them by Defendant to co-promote the event at issue, but demonstrates that the reason was due to Defendant's fraud. Plaintiffs knew at the time they made the decision that they could not possibly have taken that deal, but the late produced discovery documents, once pieced together, identified exactly why – because Defendant has instituted a scheme which essentially defrauds everyone involved accept it, from the artists to the ticket purchasers, and especially including co-promoters like Plaintiffs. By entering into contingent compensation agreements which specifically exclude "ancillary income" like rebates from the split at the end of the event, and then negotiating with the venues behind the artists and co-promoter's backs to pay the venues (mostly owned by Defendant) more in exchange for more rebates which only inure to Defendant's benefit, Defendant not only ensures that it is the only one assured of making money, but that co-promoters like Plaintiffs cannot possibly make a profit on the event. Dr. Barnet, perhaps the foremost academic authority on promotion, confirms this for Plaintiffs. This information is relevant both to the prosecution of the underlying case, but also to Plaintiffs' arguments for punitive damages.

  Second, it addresses the important issue of Plaintiffs' experience and ability not just to have promoted this event, but also to promote future events as well. Dr. Barnet, an unquestioned authority who literally wrote the book on music promotion, is as well placed as anyone to opine

as to their qualifications.  This will be both helpful at trial, and in front of the Third Circuit on appeal, as it directly contradicts the Judge's erroneous finding.  For your convenience, I have attached all of the supporting documentation justifying Dr. Barnet's opinions.

Thank you for your time and attention.  If you have any questions or concerns, please do not hesitate to contact me directly.

Yours Truly,
SMITH + SCHWARTZSTEIN LLC

Andrew B. Smith, Esq.

Enclosures



SMITH
+SCHWARTZSTEIN
LEGAL SERVICES

Andrew Smith
Smith + Schwartzstein LLC
71 Maple Ave., Suite 3
Morristown, NJ 07960
T: 973.206.1725
F: 973.794.2589
E: asmith@sslegalservices.com

June 12, 2019

**VIA EMAIL**
Ian S. Marx, Esq.
Greenberg Traurig LLP
500 Campur Drive
Florham Park, New Jersey 07932

   Re: **Juice Entertainment LLC, Thomas Dorfman and Chris Barrett v. Live Nation**
     **Entertainment Inc.**
     **Civil Action No. 2:11-cv-07318-WHW-CLW**

Dear Ian:

  As you know, my firm represents Plaintiffs Juice Entertainment LLC, Thomas Dorfman and Chris Barrett ("Plaintiffs") in the above referenced matter.  This letter is in response to your June 11, 2019 letter to me (the "Letter").  The Letter appears to be an empty threat bourn of fear of the contents of Dr. Richard Barnet's expert report (the "Expert Report").  As for the threats regarding "confidential" documents, the very Confidentiality Order you cite specifically states at Section 4(b) that such documents can be reviewed by experts.  Since the Expert Report is very clearly an expert report, there was no violation of the Confidentiality Order.

  Further, it is well settled that an expert report may be admissible even where it is served after the discovery end date.  See Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 904 (3d Cir.1977) (holding that before excluding evidence, the Court should consider (1) the prejudice or surprise to the party against whom the evidence would be presented; (2) the ability to cure the prejudice; (3) the extent to which the evidence, if admitted, would disrupt trial of the case; and (4) bad faith or willfulness in failing to comply with the Court's Order); In re Mercedes-Benz Anti-Trust Litigation, 225 F.R.D. 498, 504-05 (D.N.J. 2005) (stating that the Third Circuit has expressed a distinct aversion to the exclusion of important evidence unless there is evidence of extreme neglect or bad faith on the part of the proponent of the testimony, and the Court should exercise particular restraint in deciding a motion to preclude evidence); Velez v. QVC, Inc., 2004 WL 1175726, at *1 (E.D.Pa. May 25, 2004) (stating that before imposing the "extreme sanction" of preclusion of evidence, the Court must either find that the party "(1) revealed previously undisclosed evidence when trial was either imminent or in progress; or (2) acted in bad faith, which is more than a mere lack of due diligence."), quoting Meyers, 559 F.2d at 905; see also Tucci v. Tropicana Casino, 364 N.J. Supper. 48, 52 (App. Div. 2003) (stating that New Jersey courts have long held that it is "particularly indulgent in not barring a late expert's report where the report was critical to the claim or defense, the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent.").  Here, there is both

a legitimate reason for the late issuance of the report and a lack of prejudice to Defendant Live Nation Entertainment, Inc. ("Defendant"). See id.

Plaintiffs had to file numerous motions in order to get discovery from Defendant, and even after orders were issued by the Court ordering the production of documents, Defendant still refused to produce the ordered discovery. To this day, Defendant has not produced all the discovery ordered by the Court to be produced. Further, Defendant itself produced discovery after the discovery end date. In addition, though you lament Plaintiffs' serving the Expert Report after the dates set forth for expert reports, Defendant itself repeatedly failed to meet deadlines in the very same order. Moreover, even the discovery that was produced was produced in a manner designed to hide the information contained in the discovery. For example, a key spreadsheet was produced in pieces over thousands of pages of production, so that it took a massive effort just to identify and then piece together the document itself.

In addition, Plaintiffs had tremendous difficulty finding any expert in the specific industry willing to testify against Defendant. While experts approached did not doubt Plaintiffs, there was concern about retaliation by Defendant for even just providing a report to Plaintiffs, regardless of what it said. Further, some of the issues in the Expert Report were not raised by Defendant until the summary judgment motion, and other issues were only recently discovered. Plaintiffs efforts were made all the more difficult with the withdrawal of Plaintiffs' original counsel through no fault of Plaintiffs. Considering all of these difficulties, Plaintiffs have provided the Expert Report as expeditiously as they could.

There is also no prejudice to Defendant here. The Expert Report was based almost entirely on documents produced by Defendant itself, as well as some transcripts that have been in Defendant's possession for quite some time. Defendant has plenty of time to depose Dr. Barnet, as Plaintiffs will make him available for his deposition upon request. Further, Defendant also has time to submit a counter-expert report if it deems one necessary, and Plaintiffs will of course consent to any extensions of time necessary for it to do so if needed.

Finally, no trial date has been set as of yet. As such, the rules regarding admission of a late expert report are relaxed. See Szalontai v. Yazbo's Sports Café, 183 N.J. 386, 398 (2005) (discovery rules are more relaxed before arbitration has been held and/or a trial date has been set); Tucci, 364 N.J. Supper. at 52 (courts should be "indulgent" were there is no trial date set); Ponden v. Ponden, 374 N.J. Super. 1, 11 (App. Div. 2004) (finding that trial judge mistakenly exercised discretion in barring plaintiff's expert report when trial date was not yet scheduled and such report was crucial to plaintiff's claim); Santone v. Fusiek, 2010 WL 6813737 (Law Div. Dec. 9, 2010) (courts will allow late expert reports where the late report was submitted well before trial, the defaulting counsel was not guilty of any willful misconduct or design to mislead, any potential prejudice to the adverse party could be remediated, and the client was entirely innocent). As such, the Expert Report is admissible and can be used at trial. See id.

Please let me know as soon as possible if you would like to depose Dr. Barnet. Thank you for your time and attention. If you have any questions or concerns, please do not hesitate to contact me directly.

Yours Truly,
SMITH + SCHWARTZSTEIN LLC

/s/ Andrew Smith

Andrew B. Smith, Esq.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT LLC, THOMAS
DORFMAN and CHRIS BARRETT,

              Plaintiffs,

      v.

LIVE NATION ENTERTAINMENT, INC.,

             Defendant.

**Civil Action No. 11-7318-WHW-MCA**

**Exhibit H**

# Obstructed View:

## What's Blocking New Yorkers from Getting Tickets



**Type the two words:**

SolD oUt AgAln

CAPTCHA



From the Office of:

**New York State Attorney General**

# Eric T. Schneiderman



**This report was a collaborative effort prepared by the Bureau of Internet and Technology and the Research Department, with special thanks to Assistant Attorneys General Jordan Adler, Noah Stein, Aaron Chase, and Lydia Reynolds; Director of Special Projects Vanessa Ip; Researcher John Ferrara; Director of Research and Analytics Lacey Keller; Bureau of Internet and Technology Chief Kathleen McGee; Chief Economist Guy Ben-Ishai; Senior Enforcement Counsel and Special Advisor Tim Wu; and Executive Deputy Attorney General Karla G. Sanchez.**

# TABLE OF CONTENTS

Executive Summary ................................................................. 3

The History of, and Policy Behind, New York's Ticketing Laws ....... 7

Current Law ........................................................................... 9

Who's Who in the Ticketing Industry ......................................... 10

Findings ...............................................................................  11

    A. The General Public Loses Out on Tickets to
    Insiders and Brokers ......................................................... 11

        1. The Majority of Tickets for Popular Concerts Are Not Reserved
        For the General Public ................................................... 11

        2. Brokers & Bots Buy Tickets in Bulk, Further Crowding Out Fans ...... 15

          a. Ticket Bots Amass Hundreds or Thousands of Tickets in an Instant ....... 15
          b. Even without Bots, Brokers Use Industry Knowledge and Relationships
          to Gain an Edge Over Fans ......................................... 21
          c. Ticket Limits Are Not Regularly Enforced ............................. 22
          d. Brokers, With and Without Bots, Buy Up Many
          Tickets to New York Events ......................................... 23
          e. Brokers Sell Tickets at Substantial Markups ........................... 25
          f. Speculative Tickets Increase Confusion and Risk for Fans ....................... 26
          g. The Market Structure Is Atypical ..................................... 27

    B. High Fees for Unclear Purposes Raise Concerns ........................  28
        1. Fees are Charged by Ticket Vendors and Venues ...........................  29
        2. Event Ticket Fees are Higher than Most Online Vendors .................  31

    C. Restraints of Trade in Ticketing .........................................  32
        1. Setting of Ticket Resale Price Floors ................................. 32
        2. Practices That Impede Consumer Access to
        Alternative or "Unofficial" Ticket Resale Platforms............................... 33

Recommendations .................................................................. 34

Appendix – Methodology for NYAG Analyses ...............................38

# EXECUTIVE SUMMARY

The New York Attorney General ("NYAG") regularly receives complaints from New Yorkers frustrated by their inability to purchase tickets to concerts and other events that appear to sell out within moments of the tickets' release. These consumers wonder how the same tickets can then appear moments later on StubHub or another ticket resale site, available for resale at substantial markups. In response to these complaints, NYAG has been investigating the entire industry and the process by which event tickets are distributed – from the moment a venue is booked through the sale of tickets to the public. This Report outlines the findings of our investigation.

More than 15 years ago, NYAG issued a landmark report on what it called "New York's largely underground and unexamined ticket distribution system." The report announced that it was a system that provides "access to quality seating on the basis of bribes and corruption at the expense of fans."

Since that report was written broad changes in the technology of ticketing and an overhaul of New York's ticketing laws have completely transformed the landscape, in ways both good and bad. Following the repeal of New York's "anti-scalping laws" in 2007, the once underground ticket resale economy moved partially above ground. This change has produced some benefits: online marketplaces have replaced waiting in long lines, the growth of ticket resale platforms has sometimes made it easier to sell unwanted tickets, and the last minute-minded can attend shows without interacting with potentially dishonest street scalpers.

Yet many of the problems described in 1999 have persisted and, in some cases, have grown worse. Whereas in many areas of the economy the arrival of the Internet and online sales has yielded lower prices and greater transparency, event ticketing is the great exception. The complaints NYAG receives from consumers concerning ticketing commonly cite "price gouging," "scalping," "outrageous fees" and "immediate sell-outs." As one citizen wrote, in a typical complaint: "The average fan has no chance to buy tickets at face value … this is a disgrace." Many performers voice similar frustrations.[1]

> ## "I think it's extortionate and I think it's disgraceful."
> *- Sir Elton John, referring to inflated secondary sales*

> ## "It's a systematic problem with music …"
> *- Eric Church, referring to scalpers*

The problem is not simply that demand for prime seats exceeds supply, especially for the most in-demand events. Ticketing, to put it bluntly, is a fixed game. Consider, for example, that on December 8, 2014, when tickets first went on sale for a tour by the rock band U2, a single broker purchased 1,012 tickets to one show at Madison Square Garden in a single minute, despite the ticket vendor's claim of a "4 ticket

---

1. See, e.g., Mark Savage, "Sir Elton John: Secondary ticket prices 'disgraceful,'" BBC News (Dec. 16, 2015), *available at* http://www.bbc.com/news/entertainment-arts-35091230; Patrick Doyle, "Eric Church on Scalpers, Bro-Country and Blake Shelton Scandal," Rolling Stone (June 11, 2014), *available at* http://www.rollingstone.com/music/news/eric-church-on-scalpers-bro-country-and-blake-shelton-scandal-20140611.

limit." By the end of that day, the same broker and one other had together amassed more than 15,000 tickets to U2's shows across North America.

Consider that brokers sometimes resell tickets at margins that are over 1,000% of face value. Consider further that added fees on tickets regularly reach over 21% of the face price of tickets and, in some extreme cases, are actually more than the price of the ticket.  Even those who intend their events to be free, like Pope Francis, find their good intent defeated by those who resell tickets for hundreds or even thousands of dollars.

# Findings

## A. The General Public Loses Out on Tickets to Insiders and Brokers.

New Yorkers keep asking the same question:  why is it so hard to buy a ticket at face value?

### 1.  *Holds & Pre-Sales Reduce the Number of Tickets Reserved for the General Public.*

Our investigation found that the majority of tickets for the most popular concerts are not reserved for the general public at least in the first instance.  Rather, before a member of the public can buy a single ticket for a major entertainment event, over half of the available tickets are either put on "hold" and reserved for a variety of industry insiders including the venues, artists or promoters, or are reserved for "pre-sale" events and made available to non-public groups, such as those who carry particular credit cards.

### 2.  *Brokers Use Insider Knowledge and Often Illegal Ticket Bots to Edge Out Fans.*

When tickets are released, brokers buy up as many desirable tickets as possible and resell them at a markup, often earning individual brokerages millions of dollars per year.  To ensure they get the tickets in volume, many brokers illegally rely on special software – known as Ticket Bots – to purchase tickets at high speeds.  As the New York Times reported, Ticketmaster has estimated that "60 percent of the most desirable tickets for some shows" that are put up for sale are purchased by Bots.[2] Our research confirms that at least tens of thousands of tickets per year are being acquired using this illegal software.

Brokers then mark up the price of those tickets – by an estimated 49% on average, but sometimes by more than 1,000% – yielding easy profits.  In at least one circumstance, a ticket was resold at 7,000% of face value.  Finally, some brokers sell "speculative tickets," meaning they sell tickets that they do not have but expect to be able to purchase after locking in a buyer.  Speculative tickets are a risk for consumers and also drive up prices even before tickets are released.

NYAG's investigation identified those brokers re-selling the most tickets for New York events.  Nearly all were unlicensed, and several employed illegal Ticket Bots to buy tickets.  A number of specific investigations and enforcement actions are in process.

---

2. Ben Sisario, "Concert Industry Struggles With 'Bots' That Siphon Off Tickets," N.Y. Times (May 26, 2013), *available at* http://www.nytimes.com/2013/05/27/business/media/bots-that-siphon-off-tickets-frustrate-concert-promoters.html

## B. High Fees for Unclear Purposes Raise Concerns.

Another common complaint concerns the unclear and unreasonable "service fees" added to the face value of tickets, which are generally set by venue operators and ticket vendors. New York law prohibits these parties from adding fees to the prices of tickets unless they are connected to the provision of a "special service" and are "reasonable." Our examination of ticket fees set by 150 venues in New York raises concerns, revealing that unclear "convenience charges," "service fees," and "processing fees" sometimes reach outlandish levels, either as a percentage of the ticket's face value or in absolute dollar terms. On average, New York venues and their ticketing vendors charge fees averaging 21% of face values, which exceeds what other online sellers charge. Moreover, we found fees as high as $42 attached to a ticket to see Professional Bull Riding at Madison Square Garden and $28 to see Janet Jackson at Jones Beach Theater.

## C. Restraints of Trade Exist.

NYAG is concerned by the growing imposition of resale price floors (i.e. "no sales below list price"), along with efforts to mandate that tickets be sold on a single "walled garden" market, as opposed to consumers having the option of buying tickets from different resale platforms. We are also interested in the degree to which excessive service charges may constitute evidence of abuse of monopoly power, especially as they relate to the resale of sports tickets.

# Recommendations

In 1999, NYAG found that, despite long-standing regulation, the law "has not succeeded in eliminating the abuse it was intended to address." That remains true today, and New York remains in need of greater protections for the buying public. We therefore offer several recommendations:

## A. Ticket Resale Platforms Must Ensure Brokers Comply With the Law.

Ticket resale platforms are in the best position to ensure that their broker customers follow the law, and they must take meaningful steps to do so. Specifically, these platforms should require that brokers provide their New York license numbers as a condition of using the resale platform, and disclose to potential customers the face value of tickets they are offering for sale, as already required by New York law.

## B. Industry Players Must Increase Transparency Regarding Ticket Allocations and Limits.

The industry must provide greater transparency into the allocation of tickets, to increase accountability and enable the public to make informed choices. Promoters of events, who know the number of seats being held, should provide that information to ticket vendors, such as Ticketmaster, to make available to the public. In addition, wherever ticket vendors claim that ticket limits are enforced, they should enforce those limits as a matter of course on a per-person basis. If such limits are not actually being enforced, ticket vendors must make that clear.

## C. Ticket Vendors Must Address the Bot Epidemic.

Bot use is a major reason why New Yorkers cannot get tickets at face value. While the industry works on long-term technological solutions to this problem, steps can be taken to reduce Bot use in the near-term. NYAG has contacted Ticketmaster and another major ticket vendor, AXS, to discuss concrete reforms, such as preemptive enforcement of ticket limits, analyzing purchase data to identify ongoing Bot operations for prosecution, and investigating resellers of large volumes of tickets to popular shows, among others.

## D. The Legislature Should Act.

While there is no reason the industry should wait for legislative action to implement the reforms outlined above, the Legislature should act to ensure that reform is meaningful and lasting. Specifically:

*i. Mandate the industry reforms outlined above.*

*ii. End the ban on non-transferrable paperless tickets.*

A solution that most industry participants agree is effective at reducing broker activity is the use of non-transferrable "paperless tickets." Unlike paper tickets and electronic tickets that are freely transferrable from the buyer to another person, non-transferrable paperless tickets require an event attendee to present the credit card that was used to purchase the ticket. As a result, the initial purchaser typically must be present to use the ticket. State law creates a *de facto* ban on these paperless tickets, but this rule makes New York an outlier – ours is the only state that bans the practice – and this ban should be repealed.

*iii.  Impose criminal penalties for Bot use.*

Given that ticket resellers are making considered business decisions when they deploy Bots to acquire massive amounts of tickets near-instantaneously, the prospect of criminal prosecution may well have a deterrent effect on this conduct.

*iv. Cap permissible resale markups.*

Until 2007, New York capped the markup resellers could charge, and the State removed that cap in hopes of benefitting consumers. Unfortunately, competition-driven savings intended to benefit fans have instead been converted to profits for a handful of savvy middlemen using multiple employees or computers, or illegal Bots. New York should reinstitute a reasonable limit on resale markups.

# THE HISTORY OF, AND POLICY BEHIND, NEW YORK'S TICKETING LAWS

New York's approach to ticketing has undergone dramatic changes over the last fifteen years. Understanding both the history and the policy goals of previous and current ticketing legislation is important to all that follows. [3]

## 1920 – 2007: The "Anti-Scalping" Era.

"The greatest evil that theatergoers in this city have to contend with is the ticket speculator," wrote a New York City magistrate in 1901. "They are practically highwaymen and hold up everybody that goes to a place of amusement."[4] As the quote suggests, the resale of tickets for profit has long been considered an aggravation in this State. In 1922, Governor Nathan Miller declared the need for action to combat what he called "gross profiteering" by "ticket scalpers." He signed a law, widely described as an "anti-scalping law," that began the State's regulation of ticket sales for major events. It originally regulated "boxing and wrestling, relating to tickets to places of entertainment," and capped the price of resale tickets at two dollars above face value.[5] The law maintained its basic character for seventy years, broadening in scope, and adding various provisions to ban bribes paid to venues by brokers for tickets (known as "ice"). Eventually, the two-dollar limit became a 20% or 45% price cap (depending on the size of the venue), which the law required to be printed legibly on each ticket.[6] Over the years, the legislature periodically imposed stricter penalties on those selling tickets near venues and took steps to give the State the power to police out-of-state actors dealing in tickets to events within New York.

Nonetheless, as NYAG's report made clear in 1999, the law was both inconsistently enforced and difficult to enforce. Underground brokers flourished, often openly flouting the law. By that year, ticket brokering had grown into a large underground economy typified by law-breaking, secret ticket holds, bribe paying, and a general state of corruption at all levels.

## 2007 – Present: A Regulated Industry.

In 2007, in a sweeping legal change, the New York legislature decriminalized all resale of tickets for profit, or "scalping," and adopted an approach that sought to treat ticketing as a regulated industry. With the price caps lifted, brokers were now free to operate openly and sell tickets at whatever prices consumers might pay. In the face of critics who warned that prices would rise and brokers would reap unseemly profits, the sponsors of the Bill expressed some hope that the new approach might, in fact, reduce ticket prices on the resale markets. As Assemblyman Joseph D. Morelle argued at the time, "By allowing greater competition for the resale dollar, we may actually see a decrease in secondary prices, which is … ultimately best for the consumer."[7]

---

3. The governing statutory provisions are found in New York Arts and Cultural Affairs Law, Article 25 ("N.Y. Arts & Cult. Aff. L.").

4. Kerry Segrave, Ticket Scalping: An American History, 1850-2005 (2006), p. 55.

5. N.Y. General Business Law §§ 167-69k (McKinney 1922) (repealed 1983).

6. The following notice was required to be printed on tickets:
"If the venue to which this ticket grants admission seats 6000 or fewer persons, this ticket may not be resold for more than 20% above the price printed on the face of this ticket, whereas if the venue to which this ticket grants admission seats more than 6000 person, this ticket may not be resold for more than 45% above the price printed on the face of this ticket."

7. Office of Joseph D. Morelle, "Morelle Bill Establishing Free Market for Ticket Resellers Passes Assembly" (May 29, 2007), available at http://assembly.state.ny.us/mem/Joseph-D-Morelle/story/22938.

The operating premise of the 2007 law was not to completely deregulate ticket resale, but to legalize it pursuant to regulation and taxation.  Pre-2007, many of the brokers operated in open violation of the law; the 2007 law introduced a revised licensing system supervised by the Secretary of State.  The licensing system required, among other things, various disclosures of tickets sold, the posting of a bond to cover counterfeit tickets, and the payment of a $5,000 annual fee.

Above all, the 2007 law represented a new and experimental approach to the ticket industry, made clear by the fact that the law regularly sunsets and is therefore subject to ongoing tinkering by the legislature.  The first adjustments came in 2010, when the law underwent major changes, three of which are important here.  First, for the first time, the law banned the use of ticket-buying software, or "Bots."  The New York Senate commentated that such software is "used by unscrupulous speculators to purchase tickets at initial sale ahead of consumers intending to attend an event," and put enforcement duties in the hands of the Attorney General.[8]  Evident in the ban on Bots and the legislature's commentary is the idea that ticket buying, when presented to the public as a fair contest, should in fact be fair, and not subject to manipulation by software or similar techniques.  In other words, the legislature prefers that the ability to obtain tickets be based on factors like showing up at the right time or simple luck of the draw, as opposed to gaining an advantage through software that functions differently than a human could.

> ## What's a Bot?
>
> *A Ticket Bot is software that automates ticket-buying on platforms such as ticketmaster.com.*
>
> *Automation lets the Bot (1) perform each transaction at lightning speed, and (2) perform hundreds or thousands of transactions simultaneously.*
>
> *As a result, in the first moments after tickets to a top show go on sale, Bots crowd out human purchasers and can snap up most of the good seats.*

Second, an important 2010 legal reform addressed growing service fees imposed by primary ticket sellers and their ticket vendor agents, such as Ticketmaster or Telecharge.  It mandated, for the first time, that any fees charged for "special services" must be "reasonable."[9]  Third, the law barred non-transferrable paperless tickets, as discussed in greater detail later in this Report.[10]  The clear tenor of the ticketing statute is to make ticket brokering into a regulated industry and continue "safeguarding the public against fraud, extortion, and similar abuses."  Ticket brokers are not illegal, but must obtain a license, post bonds, disclose their activities to the Secretary of State, and avoid using prohibited Bots.  Whether the new system has operated in the interests of New York citizens remains an open question of public policy.

---

8. New York State Senate Introducer's Mem., SB No. 3840-A.

9. N.Y. Arts & Cult. Aff. L. § 25.29 (as amended July 2, 2010).

10. Id. § 25.30.

# CURRENT LAW

New York State law prohibits engaging "in the business of reselling any tickets to a place of entertainment" within New York State without first procuring "a license.[11] Those who resell, offer to resell, or purchase with the intent to resell five or more tickets without a license are guilty of a misdemeanor and subject to penalties.[12] Additionally, the law requires that brokers post a $25,000 bond with their license application to ensure compliance with the law's provisions and cover damages to their customers from any misconduct.[13] Brokers that resell tickets online must also display a hyperlink to a copy of their licenses,[14] and they must display the face value of tickets along with the resale prices.[15]

New York State law also makes it illegal for brokers to use Bots to bypass security measures on the websites of ticket vendors, such as Ticketmaster, or to maintain any interest in or control of such Bots.[16] Anyone who violates these provisions is subject to penalties and the forfeiture of profits.[17]

No current federal law specifically prohibits the use of Ticket Bots, but legislation has been proposed that would do so. The Better On-line Ticket Sales Act of 2014 or the BOTS Act, supported by Senator Charles Schumer, would prohibit, as an unfair and deceptive act, the sale or use of Ticket Bots. It would also provide for criminal penalties for those who engage in this conduct.

---

11. Id. § 25.13.
12. Id. §§ 25.09(2), 25.35.
13. Id. § 25.15.
14. Id. § 25.19.
15. Id. § 25.23.
16. Id. § 25.24.
17. Id.

# WHO'S WHO IN THE TICKET INDUSTRY



## Artist

When it comes to concerts, the key participants in the industry for tickets and their typical roles in putting on shows and setting the prices consumers pay are as follows:

## Promoter

Responsible for organizing the concert tour or other event, which includes negotiating the performance contract with an artist's agent or manager and leasing all the venues where performances will occur. With the artist, establishes ticket prices. Examples of promoters are AEG, Live Nation, and Bowery Presents.

## Venue Operator

Provides the facility for the event and earns a share of service charges, processing fees, or other add-ons to the ticket price. Examples of venues are Madison Square Garden, Saratoga Performing Arts Center, and the Beacon Theatre.



## Ticket Vendor

Provides for the initial (or "primary market") sale and delivery of tickets, for example through a website or mobile app, and earns a share of service charges, processing fees, or other add-ons to the ticket price. Examples of ticket vendors are Ticketmaster (owned by Live Nation), AXS (owned by AEG), and Telecharge.

## Broker

Buys tickets on the primary market and resells them at a markup on the secondary market.

## Ticket Resale Platform

Provides a website or other platform where tickets are resold, and charges a fee on each sale. Examples of ticket resale platforms are StubHub, TicketsNow (owned by Ticketmaster), and Vivid Seats.

## Public





# FINDINGS

## A. The General Public Loses Out on Tickets to Insiders and Brokers.

The majority of tickets for popular concerts are diverted away from the general public.  First, various "hold" and "pre-sale" programs reduce the total number of tickets available to the general public.  Then, of those tickets that remain, brokers use a number of methods including Bots to seize a large portion of the remaining tickets.  Brokers even sell tickets that they do not actually own, known as "speculative" tickets, to fund their later purchases.

## 1. The Majority of Tickets for Popular Concerts Are Not Reserved For the General Public.

It may come as no surprise to fans that many concert tickets are never made available to the general public, but there is little information available as to where precisely those tickets actually go.  To bring some light to this issue, NYAG has obtained and analyzed information regarding the allocation and distribution of tickets from the largest promoters, Live Nation and AEG, for the top-grossing shows in New York for the years 2012-2015.

NYAG found that, on average, only about 46% of tickets are reserved for the public.  The remaining 54% of tickets are divided among two groups: holds (16%) and pre-sales (38%).[18]  Holds are tickets that are reserved for industry insiders, such as artists, agents, venues, promoters, marketing departments, record labels, and sponsors.  Pre-sales make tickets available to non-public groups before they go on sale to the general public.  The two most common pre-sale events are for credit card holders and members of fan clubs, but venues, promoters, or other groups may run pre-sale events as well.  Brokers, as discussed below, often begin harvesting tickets at these pre-sale events and later during the general on-sale.

---

18. The methodology for this analysis is in the Appendix.

**Figure 1.  Less Than Half of Tickets Are Reserved for the General Public.**
*Source: Live Nation/Ticketmaster (2012 – 2013) and AEG (2012 – 2015)[19]*



**Ticket Allocation**

🟨 Holds for Insiders          🟫 Pre-Sale Events          ⬛ General Public

Among the top grossing shows in New York, approximately 16% of all tickets were reserved through "holds" for industry insiders: artists, venues, agents, marketing departments, sponsors, promoters, and executives.[20]   Often, venues are the biggest beneficiaries of these holds.  For example, Madison Square Garden was typically allocated more than 900 tickets per concert and Barclays Center was allocated an average of 500 tickets per concert for the highest grossing concerts held at those venues.

For some concerts, ticket holds account for well over 16% of the available tickets.  For instance, a Kanye West show at Barclays Center held 29% of tickets for insiders, including over 2,000 tickets for the promoter and more than 500 tickets for the venue.  In all, fourteen of the State's most popular shows held at least 20% of available tickets for insiders, as shown in Figure 2.  Holding a large number of tickets is not necessarily a practice among all shows – the Vans Warped Tour 2013 and Barry Manilow concerts, both at the Nassau Coliseum, held 5% or less of tickets.

---

19. The methodology for this analysis is in the Appendix.

20. It is worth noting that a hold simply represents a reservation, and that in most cases a group that has been allocated tickets through a hold will not use a portion of those tickets.  In these instances, the tickets are released back to the promoter, who will typically make the tickets available for sale to the public.  Because the tickets are usually not released through a publicized on-sale event, tickets released in this manner are often purchased by brokers who are constantly searching for new tickets that are made available closer to the date of the event.

## Figure 2.  Fourteen Popular Shows Held at Least 20% of Tickets for Insiders.

*Source: Live Nation/Ticketmaster (2012 – 2013) and AEG (2012 – 2015)[21]*
*Filtered for shows with 20% or more total capacity placed on hold*



Approximately 38% of tickets to the most popular shows in New York were reserved for "pre-sales," advance sales to select groups of fans and cardholders of major banks and financial institutions.[22] These financial institutions, including American Express, Citibank, and Chase, have negotiated agreements whereby their cardholders have the opportunity to purchase tickets

---

21. The methodology for this analysis is in the Appendix.

22. For the top shows, it is often the case that all of the tickets that are made available through the pre-sale events are sold.  For less popular shows, tickets set aside for pre-sale events can go unsold.  When tickets set aside for a pre-sale event are not sold, the unsold tickets are reallocated to the initial public on-sale.

before the tickets are released for sale to the general public. Importantly, fans are not necessarily the ones purchasing tickets released in pre-sale events. For popular events, brokers, realizing the advantages of pre-sale programs, purchase heavily and often use illegal Bots to maximize their yield in pre-sales, as discussed in greater detail below.[23]  While the majority of pre-sale events are conducted by credit card companies, members of other groups, including fan clubs, social media websites, and specialty shopping sites also receive advance opportunities to purchase tickets.

The number of tickets reserved for pre-sale events can be quite large for some concerts. For example, for more than 30 of New York's most popular concerts, at least half of the tickets were set aside for pre-sale events. Figure 3 identifies ten shows that made more than half of the tickets available through pre-sale events where none of the tickets were explicitly reserved for fan clubs.

### Figure 3.  Ten Popular Shows Reserved Over 50% of Tickets Through Pre-Sales Events, None Explicitly Earmarked for Fan Clubs.
*Source: Live Nation/Ticketmaster (2012 – 2013)[24]*



23. Even setting aside the problem of brokers, cardholder pre-sales may disadvantage many fans. They reserve tickets for holders of select credit cards, who may generally be wealthier than fans who lack those cards and the benefits that come with being a cardholder. As a result, these pre-sales give wealthier fans a better chance of getting tickets at face value, while decreasing the supply of face-value tickets available to less wealthy fans.
24. The methodology for this analysis is in the Appendix.

Holds and pre-sales can leave few tickets for the public. Indeed, for many of the top shows, less than 25% of tickets were actually released to the general public in an initial public on-sale. For example, just over 1,600 tickets (12% of all tickets) were released to the public during the initial public on-sale for a July 24, 2014 Katy Perry concert at Barclays Center. Similarly, for two Justin Bieber concerts at Madison Square Garden, on November 28, 2012 and November 29, 2012, fewer than 2,000 tickets (15% of all tickets) to each show were released to the public during the initial public on-sale.

## 2. Brokers & Bots Buy Tickets in Bulk, Further Crowding Out Fans.

The broker industry, while not the explicitly underground industry it was in the 20th century, remains difficult to learn about and often operates in violation of one or more State laws.

The average fan vying to purchase a ticket to a popular concert has little hope of competing against brokers, many of whom use illegal and unfair means to purchase tickets. Brokers are able to purchase large quantities of tickets to popular events by (a) employing illegal Bots, and/or (b) exploiting their industry knowledge and relationships to get access to tickets.

*a. Ticket Bots Amass Hundreds or Thousands of Tickets in an Instant.*

A Ticket Bot is a software program that automates the process of searching for and buying tickets to events on ticket vendor platforms, such as Ticketmaster. Using Bots, a broker can automate the process of searching for



# The New York Times

**Concert Industry Struggles With 'Bots' That Siphon Off Tickets**

"...According to Ticketmaster, bots have been used to buy more than 60 percent of the most desirable tickets for some shows…."

and buying tickets so that it occurs in the blink of an eye, and conduct tens, hundreds, or even thousands of lightning-fast transactions at the same time.

To successfully buy thousands of tickets, Bots must perform four different functions. These functions may be handled by one Bot or several.

First, spinner, or "drop checker," Bots constantly monitor ticketing sites to detect the release, or "drop," of tickets. Ticketmaster has stated that spinners can account for as much as 90% of the traffic to its website.[25]

Second, Bots automate the search for and reservation of tickets that are up for sale. Here, brokers exploit the fact that most ticketing platforms "reserve" tickets for a few minutes to give the (human) customer time to complete the purchase. Brokers take advantage of this feature by conducting multiple near-instantaneous searches at the precise moment tickets are released for sale, throwing hundreds of tickets into reserve and removing them from the pool of tickets

25. Ticketmaster L.L.C. v. RMG Technologies, Inc., 07-Civ.-2534 (C.D. Cal.) (Application for Entry of Default Judgment); Ben Sisario & Emily B. Hager et al., "Fair Ticketing: Fans Before Scalpers," N.Y. Times Video (May 27, 2013), *available at* http://nyti.ms/13V6sdO.

available for purchase.  The broker may then review the search results and choose which seats to buy.[26]   Figure 4 shows an example of a Bot that has searched for and reserved several groups of tickets, displaying the groups and the time remaining for the Bot-user to purchase each one.

## Figure 4.  Bot Displays Time Remaining to Buy Temporarily "Reserved" Tickets.
*Source:  Ticketbots.net*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TB** Tickets Management - TicketBots.net | | | | | | | |
| Tickets Management Threads | | | | | | | |
| Section | Row | Seats | Qty | Price | Account | Time Remaini... | Status |
| F7 | 12 | 8 - 9 | 2 | US $124.40 | | 06:52 | Ticket(s) Ready |
| F1 | 9 | 15 - 16 | 2 | US $218.20 | | 06:20 | Ticket(s) Ready |
| F3 | 11 | 5 - 6 | 2 | US $218.20 | | 06:27 | Ticket(s) Ready |
| F7 | 13 | 5 - 6 | 2 | US $124.40 | | 04:02 | Loading Shipping Methods |
| F7 | 12 | 6 - 7 | 2 | US $124.40 | | 07:02 | Ticket(s) Ready |
| F7 | 12 | 4 - 5 | 2 | US $124.40 | | 07:16 | Ticket(s) Ready |
| F3 | 11 | 3 - 4 | 2 | US $218.20 | | 06:33 | Ticket(s) Ready |

Third, Bots automate the process of purchasing tickets, using dozens or hundreds of purchaser names, addresses, and credit card numbers.  The names of the "buyers" may be simply invented, or they may be borrowed from real people.

Fourth, and finally, Bots must defeat the anti-Bot security measures that most ticket-selling platforms employ.  The most obvious of the ticket vendors' defensive tools that Bots must bypass is the "CAPTCHA" test ("Completely Automated Public Turing test to tell Computers and Humans Apart").  This test usually requires that a user prove she is human by reviewing text that is distorted or obscured and entering those characters into a text box.

---

26. Some brokers use this interval to offer the temporarily reserved tickets for sale on secondary market platforms such as Stub-Hub at a given markup, and only if the resale is quickly consummated do they then actually buy the reserved tickets from the primary ticket vendor.  This ability to use temporary reserve to avoid risk greatly undermines a shibboleth repeated to NYAG during our investigation, that brokers benefit the ticket industry as a whole, including artists, promoters, and venues, by taking on financial risk through up-front purchases of lots of tickets which they may be unable to resell.

**Figure 5.  Ticket Vendors Use Different Types of CAPTCHA.**



Unfortunately, many Bot programmers have been able to bypass these forms of CAPTCHA. Over the years, Ticketmaster has repeatedly refurbished its CAPTCHA program, using different versions of CAPTCHA created by third parties such as Google and Solve Media.[27]  While these CAPTCHAs may have stopped some Bots, more sophisticated Bot programmers quickly adapted. In many cases, they collected thousands of the new CAPTCHAs and used them to "train" their software to "read" the new CAPTCHAs through improved optical character recognition.  In other instances, the Bots transmit in real-time images of the CAPTCHAs they encounter on Ticketmaster and other sites to armies of "typers," human workers in foreign countries where labor is less expensive.  These typers – employed by companies such as Death by CAPTCHA, Image Typerz, and DeCaptcher – read the CAPTCHAs in real-time and type the security phrases into a text box for the Bot to use to bypass ticket vendors' defenses and use their sites.[28]

Additionally, at various points, Ticketmaster abandoned CAPTCHAs for its mobile app on the iPhone platform, based on the premise that it could better verify identities on mobile and therefore did not need a CAPTCHA test.  Our investigation of brokers reveals that some have targeted the CAPTCHA-free mobile platform by either designing Bots to mimic mobile devices or by using an arsenal of actual mobile devices to buy tickets.

---

27. Some CAPTCHAs incorporate technology that attempts to identify Bots before an image is even shown, to present an easier test to likely humans and more difficult CAPTCHAs to suspected Bots.  See, e.g., Solve Media – High Security Standards, http://solvemedia.com/security/index.html.  Many sophisticated Bot developers have bypassed these additional measures.

28. Some CAPTCHAs now do away with security phrases and use other types of puzzles.  See, e.g., Google – "Introducing No CAPT-CHA reCAPTCHA," https://googleonlinesecurity.blogspot.com/2014/12/are-you-robot-introducing-no-captcha.html.  It remains to be seen if these new approaches will be harder to bypass, especially for Bots that use teams of human typers.

To effectively beat out the many fans (and other Bots) attempting to search for and reserve tickets at the start of a sale, most Bots simultaneously attempt multiple connections to the ticket vendors' systems, often dozens or even hundreds at a time. These connections are often responsible for sudden massive increases in Internet requests to ticketing websites when tickets are released. To conceal that these large numbers of concurrent connections originate from a single source, most Bot users purchase hundreds or thousands of proxy IP addresses to use for each separate connection attempt. Moreover, because ticket vendors block or slow traffic connections from IP addresses that appear to be used by Bots, many Bots automatically rotate through their stores of proxy IP addresses to bypass detection and blocking. Bot users also typically register hundreds or thousands of e-mail addresses, again to conceal that a single purchaser is responsible for many concurrent transactions and to circumvent security measures designed to prevent Bots from purchasing tickets.

With these capabilities, Bots can be extremely effective for brokers. First, they can buy hundreds of tickets in moments. NYAG has identified many instances in which Bots were able to purchase hundreds of tickets within moments of the release of tickets to the general public or through a pre-sale, including the examples shown in Figure 6.

### Figure 6.  Bots Buy Huge Numbers of Tickets Moments After Release.
*Source: NYAG Investigative Materials*

**1,012** tickets in **1 minute**
**U2 2015 Tour**
*Madison Square Garden*

Bought by one bot on December 8, 2014, for a July 19, 2015 concert.

**520** tickets in **3 minutes**
**Beyoncé**
*Barclays Center*

Bought by one Bot on March 4, 2013 for an August 5, 2013 concert.

**15,087** tickets in **1 day**
**U2 2015 Tour**
*Twenty Different Venues*

Bought by two Bots on December 8, 2014 for twenty concerts in the same tour across North America.

**522** tickets in **5 minutes**
**One Direction**
*Jones Beach*

Bought by one Bot on April 14, 2012 for a June 28, 2013 concert.

Additionally, by being first in line, Bots can also purchase the most desirable seats to many shows. For example, NYAG reviewed a case study by one ticket vendor showing that Bots purchased more than 90% of the most desirable tickets to one show.  As part of its own analysis, NYAG found that, of the 251 tickets one Bot operation purchased to a May 5, 2014 Coldplay concert at the Beacon Theatre, 148 of those tickets were in the first seven rows of the theater.  This amounted to more than 60% of seats in those seven rows.

As a result of these huge advantages, Bots are able to purchase many tickets to New York events. The sources we interviewed uniformly stated that the usage of Bots has reached epidemic proportions in the ticketing industry.  Indeed, NYAG found that three brokers using Ticket Bots collectively purchased more than 140,000 tickets to events in New York over a three-year period between 2012 and 2014.

### Broker Profile:  The One-Man Bot Broker

*Revenue:   $1.4 million from events in New York (2014)*
*Method:    Bot mimicking Ticketmaster app & 1,000+ credit cards*

Broker A was an illegal Bot user who represents a typical species of broker.  The company is a one-man operation that opened when its proprietor was still in college.  The company paid overseas programmers for sophisticated ticket-buying Bots designed to mimic the Ticketmaster iPhone app and defeat its anti-Bot defenses.  To maximize its yield, and avoid ticket limits, the company obtained more than 1,000 credit cards, many of which used fictitious names, each designed to appear to Ticketmaster as a different individual.

Armed with its Bot and collection of credit cards, the company directed legions of purchase requests at popular shows; its actions are part of what led to the quick sellouts.  Its harvest was put up for resale on numerous platforms, including Stub-Hub and Vivid Seats, and its own site.  While it made much of its money from New York venues, the company is not licensed in New York.

## Broker Profile:  The Large-Scale Bot Operator

*Annual Revenue:  $42 million (2013)*
*Method:          Multiple custom bots, 10,000+ IP addresses,*
*                 500+ credit cards, dozens of P.O.  boxes*

Broker B was a large-scale illegal Bot user, and among the more profitable illegal brokers making money in the New York resale market.  The company was unlicensed in New York, and used Bots to purchase tickets en masse for resale on secondary market platforms.  On StubHub alone, it sold nearly $31 million worth of tickets in 2013 and earned more than $16 million in gross profits.

Our investigation reveals that the company had use of multiple Bots.  Bot 1 monitored Ticketmaster's website and captured tickets at the precise moment of release.  It then used highly sophisticated optical character recognition ("OCR") software to automatically "read" CAPTCHAs and bypass them to buy tickets.  Bot 2 was specifically designed to defeat anti-Bot defenses on Telecharge to buy tickets to Broadway shows using armies of human typers in foreign countries to bypass CAPTCHAs.  But Bot 3 was the largest source of Broker B's illicit revenue and is made and operated exclusively on Broker B's behalf by the company's partner, a young software developer, in exchange for a share of all profits earned from illegal operation.  This Bot also used sophisticated OCR software to bypass CAPTCHAs, and it was highly effective at this task, obtaining hundreds of thousands of tickets and millions of dollars in illegal profits.  The developer's earnings from his role in this scheme allowed him to buy a $4 million home and a Bentley luxury vehicle.

Broker B used various tools to hide its Bot operations.  Its Bots have used more than 10,000 IP addresses to bypass ticket sellers' defenses that identify buyers by their IP address.  Like Broker A, Broker B uses multiple credit cards issued to made-up names.  Our investigation shows that the company used over 500 American Express cards alone.  Broker B also attempted to conceal his identity from ticketing companies by leasing post office boxes in several cities.

*b. Even without Bots, Brokers Use Industry Knowledge and Relationships to Gain an Edge Over Fans.*

Brokers who do not use Bots nevertheless have several significant advantages over the average fan based on their knowledge of the industry and relationships.

First, brokers in many instances take advantage of pre-sale events offered to holders of certain credit cards. Brokers are aware of which credit cards can be used in pre-sales and open accounts for these credit cards. Brokers also closely follow ticket release schedules and are prepared to purchase tickets at pre-sales, when the competition for tickets is often less than during a public on-sale.

In many instances, artists try to get tickets into the hands of fans by offering pre-sales to official fan clubs, for example by issuing special codes to fan clubs that allow members to log into the pre-sale on ticket vendor sites ahead of the general on-sale. Unfortunately, brokers often sign up for these fan clubs, obtain the codes, and either use them themselves or sell them to other brokers.

Second, Brokers have resources to attempt many concurrent connections. Brokers understand that it is important to try to reserve and purchase as many tickets as possible during the first moments of an on-sale. Many brokers therefore use multiple computers or mobile devices to try to connect to ticketing websites at the same time. NYAG spoke with one broker who owned 100 mobile devices and claimed to use dozens of those at a time by himself to try to purchase tickets. Some brokers employ dozens of people simply to have many humans trying to reserve and purchase tickets at the same time.

Third, many Brokers maintain direct relationships with venues and sports teams. In these cases, brokers are able to purchase tickets without competing for tickets through the ticketing website. Barclays Center, for example, has provided several brokers who own season tickets to Brooklyn Nets games with the option to purchase several hundred tickets to most other events at the venue, including all music concerts. More than 500 tickets to an Elton John concert at Barclays Center were distributed to brokers in this manner.

**Broker Profile:  Licensed Broker**
*Revenue:  $25.4 million (2013)*
*Method:   Employees buy tickets en masse*

Broker C is a licensed ticket broker. In operation since the 1990s, the company has become highly profitable under the new tickets law.  The company employs approximately 25 full-time employees; each employee is paid a wage to keep his or her own accounts and purchase, using his or her own American Express credit cards, as many tickets as possible for shows or events decided upon by management.  The company pays its annual licensing fees to the New York Secretary of State.

Broker C is an example of the 2007 law in operation.  On the one hand, the company pays its licensing fees, discloses its activities, and is in apparent compliance with most of the regulations.  On the other hand, the company's sizable annual profits – $4.8 million in gross profit in 2013 – are direct evidence of the prices that the public pays on the secondary ticket markets.

### c. Ticket Limits Are Not Regularly Enforced.

The consumer may be familiar with the ticket limits that are encountered on the websites of most ticket vendors.  Popular artists and their promoters typically seek to have vendors, like Ticketmaster or AXS, impose a limit on the number of tickets that any individual can purchase for any event.  For concerts, a typical limit is eight tickets per purchase; more popular concerts set smaller limits.  The theory behind limits is intuitive and obvious:  by limiting the number of tickets any one individual can purchase, tickets will be more fairly distributed.  If ticket limits were truly effective – if it were impossible for any one person to buy more than the stated number of tickets – broker activity would be greatly limited.

Our investigation suggests that in the case of some ticket vendors, including Ticketmaster, ticket limits do not always have the effect the public would expect.  Ticketmaster implements ticket limits by restricting the number of tickets that can be purchased in a single transaction (a per-transaction limit).  It does not, however, restrict at the time of sale the number of tickets that can be purchased by a user through multiple transactions (a per-person limit).  In other words, when an artist requests an eight-ticket limit, Ticketmaster will permit a user to purchase only eight tickets in a single transaction, but then will allow the same user to make additional purchases of eight tickets each.

Ticketmaster can attempt to identify violations of the ticket limit after tickets have been sold by canceling those transactions that exceeded the limit the artist had requested. It will only undertake this review, however, if an artist specifically requests the audit. Yet many artists seem unaware of this fact. For example, a sophisticated representative of several top artists playing the largest arenas told NYAG they had been unaware that Ticketmaster required a separate auditing request to enforce limits the artist had already requested, and had therefore never made such a request. Thus, although some artists are trying to make tickets available to average fans by pricing them below market value and setting ticket limits, the lack of real-time enforcement per user at the point of purchase (or thereafter) undermines their efforts.

The main beneficiary of the unenforced ticket limits is, of course, the broker industry. As repeat players, the brokers know well that the limits are rarely enforced. Our interviews with brokers and others in the industry, and our review of ticket purchasing data, reveal that the limits, enforced or not, are easy to evade. The effect of these shortcomings in enforcement of ticket limits is exacerbated where brokers use Bots to speed up their purchases above the limits, to the detriment of ordinary members of the public. As a result, brokers have an advantage as compared to ordinary buyers, who believe the phrase "ticket limits" means what it says.

### d. Brokers, With and Without Bots, Buy Up Many Tickets to New York Events.

Evidence that brokers are responsible for the purchase of large quantities of tickets can sometimes be seen in sales data that tracks the purchasing activities of entities holding multiple credit cards. For example, Figure 6 below shows American Express cardholders who purchased more than $3 million in tickets through Ticketmaster for events in New York State and surrounding areas using their American Express cards. A single broker used 149 different American Express cards to make more than 38,000 purchases totaling over $12 million just from 2013-2015, while other brokers racked up similarly shocking volumes of purchases, sometimes using just a handful of credit cards.

23

**Figure 7.  Twelve Brokers Each Purchased More than $3 Million in Tickets.**
*Source:  American Express Purchases to Ticketmaster for Events
in New York & Surrounding Areas (2013-2015)[29]*

**$12,251,282** through **38,366** transactions and **149** cards .

**$11,668,951** through **45,711** transactions and **87** cards .

**$6,175,235** through **16,805** transactions and **644** cards .

**$5,595,105** through **26,656** transactions and **25** cards .

**$4,625,014** through **11,680** transactions and **54** cards .

**$3,838,637** through **13,678** transactions and **170** cards .

**$3,697,400** through **11,046** transactions and **20** cards .

**$3,592,798** through **10,039** transactions and **23** cards .

**$3,361,108** through **18,776** transactions and **4** cards .

**$3,309,475** through **7,992** transactions and **289** cards .

**$3,280,623** through **8,061** transactions and **57** cards .

**$3,129,622** through **12,450** transactions and **132** cards .

---

29. The methodology for this analysis is in the Appendix.

*e. Brokers Sell Tickets at Substantial Markups.*

Brokers profit by selling tickets at a substantial markup over face value.  NYAG studied six ticket brokers and found they marked up their tickets an estimated 49% on average, ranging by broker from an average of 15% to 118%.  Figure 8 depicts the markups charged by representative brokers for their most profitable shows.

### Figure 8.  Examples of Six Brokers' Markups Show Large Profits.
*Source:  Transactional sales data for select brokers (2011-2014)[30]*



| Broker | Show | Ticket Face Value | Markup Amount |
|---|---|---|---|
| Custom Bot Broker A | One Direction @ Beacon Theatre | $79 | $4,635 |
| | Barbra Streisand @ Barclays Center | $1,602 | $5,336 |
| | One Direction @ Madison Square Garden | $101 | $7,244 |
| Custom Bot Broker B | Pearl Jam @ Barclays Center | $94 | $1,256 |
| | Eagles @ Madison Square Garden | $228 | $1,351 |
| | Ed Sheeran @ Madison Square Garden | $64 | $1,404 |
| Bot Broker A | NHL Conf. Finals @ Madison Square Garden | $693 | $999 |
| | NHL Conf. Finals @ Madison Square Garden | $570 | $1,221 |
| | Yusuf Islam/Cat Stevens @ Beacon Theatre | $250 | $1,306 |
| Bot Broker B | Eric Clapton @ Madison Square Garden | $544 | $1,008 |
| | NHL Conf. Finals @ Madison Square Garden | $443 | $1,155 |
| | Eric Clapton @ Madison Square Garden | $544 | $1,590 |
| Non-Bot Broker A | Stanley Cup Finals @ Madison Square Garden | $218 | $925 |
| | Stanley Cup Finals @ Madison Square Garden | $218 | $932 |
| | U2 @ Madison Square Garden | $350 | $1,249 |
| Non-Bot Broker B | Barbra Streisand @ Barclays Center | $1,600 | $3,526 |
| | NY Rangers v. LA Kings @ Madison Square Garden | $815 | $3,650 |
| | Barbra Streisand @ Barclays Center | $1,600 | $4,400 |

■ Ticket Face Value   ■ Markup Amount

---

30. The methodology for this analysis is in the Appendix.

### Figure 9. Brokers Charge Large Markups.[31]
*Source: Source: Transactional sales data for select brokers (2011-2014)*

| Broker | Avg. Cost | Avg. Resale Price | Markup | | Highest Markup |
|---|---|---|---|---|---|
| | | | Amount | Percent | |
| Custom Bot A | $145 | $317 | $172 | 118% | 7,154% |
| Custom Bot B | $104 | $188 | $84 | 81% | 2,190% |
| Bot A | $100 | $137 | $37 | 36% | 637% |
| Bot B | $105 | $137 | $32 | 30% | 456% |
| Non-Bot Broker A | $78 | $101 | $23 | 29% | 1,537% |
| Non-Bot Broker B | $111 | $128 | $17 | 15% | 1,601% |

Our analysis also reveals that the brokers that commanded the greatest markups in the ticket resale market were those that used Ticket Bots, and, moreover, that the most sophisticated, custom Ticket Bots were associated with the highest markups. This may be because the sophisticated, custom Bots were able to purchase the most desirable seats, which could be resold for the highest prices.

## f. Speculative Tickets Increase Confusion and Risk for Fans.

In early December 2015, tickets purporting to be for Bruce Springsteen's 2016 "River Tour" began appearing on secondary sites like StubHub, TicketNetwork and Vivid Seats. Some tickets were even advertised for inflated prices of as much as $5,800 per ticket. The catch? No such tickets had yet been released. What brokers were selling were "speculative tickets," that is to say, tickets that they planned, or hoped, to buy later.

When a speculative ticket is sold, the broker then tries to purchase an actual ticket, at a lower price, to provide to the buyer. The broker pockets the difference between the price at which he pre-sold the ticket and the price at which he later bought the ticket. Speculative tickets harm both consumers and the ticket industry. In many cases, consumers are just defrauded – they do not receive the specific seats they paid for, instead receiving tickets for some other seats. In some cases, consumers receive no tickets at all. Speculative ticket sales also drive up prices for consumers and often cause widespread confusion and frustration among consumers, who wonder how tickets can appear on the resale market before tickets are even released to the public.

In 2014, singer Eric Church expressed his frustration with such ticketing: "They're taking the money, and they're not even on sale. There's no tickets on sale yet. They don't really have them – they're promising the fact that they can get them. It's a damn scam is all it is. It's the mafia." In the case of the 2016 Springsteen tour mentioned above, NYAG asked StubHub, TicketNetwork, and Vivid Seats to take down the speculative ticket listings, and they all complied. This one-time enforcement action was effective in that instance, but the problem is recurrent.

---

31. The methodology of this study appears in the Appendix.

### g. *The Market Structure Is Atypical.*

Another final point to keep in mind concerning this industry:  the typical market structure is skewed.  For one, tickets are often sold on the primary market for a face value that is below market price.  Although this may sound surprising, our investigation suggests it is common and reflects various factors.  For one thing, matters of goodwill and reputation in the sale of tickets are important to certain performers.  That is clearest, for example, for events where the promoter has non-commercial goals – like Pope Francis, who distributed free tickets for his public appearances – or at events like the New York City Center's annual Fall for Dance Festival, which includes world-renowned performers but sells tickets for just $15, "in keeping with the Festival's commitment to make dance accessible to everyone."[32]

Even more explicitly commercial acts sometimes price their tickets below what they might charge to make them accessible to younger fans or those of ordinary incomes.  The band Fugazi, active over the 1990s and early 2000s, for example, long kept its ticket prices at $5.[33]  Pearl Jam, among the most popular bands of the 1990s, set its ticket prices at or below $20 to make it possible for young fans to attend its concerts.  As the band said in prepared testimony before Congress, "Although, given our popularity, we could undoubtedly continue to sell out our concerts with ticket prices at a premium level, we have made a conscious decision that we do not want to put the price of our concerts out of the reach of many of our fans."[34]

Sometimes a mixture of economic and non-economic motives is evident.  A sports team, like the Brooklyn Nets or New York Mets, might not want to be accused of "gouging" fans, and hoping to build a loyal fan base, and so might price its tickets accordingly.  Some sense of this came in 2009 when the New York Yankees experimented with much higher ticket prices and were subject to widespread criticism and unflattering media coverage.  The New York Post described the Yankees' new plan as "greed-driven-and-delivered" and the prices as "insanely and obscenely high."[35] Eventually, in the face of both criticism and poor sales, the Yankees lowered their prices dramatically.  Sometimes even a profit-maximizing performer might set prices lower than market value to guarantee a sellout and a full house for marketing purposes.  Some of the promoters we spoke with argued that a public sense of high demand and ticket scarcity is necessary to create strong demand for tickets.  Hence, setting ticket prices at a low level, so as to drive sales, may be necessary to create the sense of a "sellout tour" that stokes demand to attend it.

Cheaper tickets could be very beneficial to consumers, as long as they reap the benefits.  The problem with this industry is that a middleman essentially takes the benefits intended for the consumer.  In other words, the ticket broker or reseller, able to buy up tickets before the public gets a chance, profits from the lower priced ticket – charging the consumer a much higher price and pocketing the difference.  To further complicate the industry, the entities most able to stop this practice are either powerless or not economically incentivized to stop the practice.  Artists may want to avoid this from happening but have to rely on the venues to sell tickets.  Venues have an interest in selling out tickets and have little incentive to put protections in place.  Ticket

---

32. Press Release, "New York City Center Announces 2015 Fall for Dance Festival" (July 29, 2015), *available at* https://www.nycitycenter.org/content/misc/PressRelease-FFD15a.pdf.

33. John Pareles, "Review/Rock; Melodies Amid Rant, Thoughts Amid Rage," N.Y. Times (Mar. 7, 1991), *available at* http://www.nytimes.com/1991/03/07/arts/review-rock-melodies-amid-rant-thoughts-amid-rage.html.

34. Hearing of U.S. House Comm. on Gov't Ops., Subcomm. on Info., Justice, Transp., & Ag., 103d Cong. (June 30, 1994).

35. Phil Mushnick, "Pricing fans out of Stadium no good for Yankees or MLB," N.Y. Post (Apr. 27, 2014), *available at* http://nypost.com/2014/04/27/pricing-fans-out-of-stadium-no-good-for-yankees-or-mlb.

vendors also have an interest in selling as many tickets as they can; they collect a fee with each ticket that is sold, a fee that is the same regardless of whether it is paid by you or a reseller.

## B.    High Fees for Unclear Purposes Raise Concerns

Next to sellouts, few issues seem to aggravate consumers as much as the addition of unexplained "convenience" charges or "service" fees to the prices of tickets. These fees can be of considerable cost to consumers as a percentage of a ticket's face value, or in absolute dollar terms. For example, a ticket to the Professional Bull Riding event at Madison Square Garden had $42 in fees attached; a ticket to see Janet Jackson at Jones Beach Theater came with a $28 fee.

> **"I purchased a 30 dollar ticket to see A View From A Bridge. During the transaction I saw that a ten dollar fee would be added for handling. Handling what? I am using my own printer to print my own ticket!"**
>
> *- Typical consumer complaint to NYAG about fees*

In 2010, the New York legislature amended the State's law governing ticket fees.[36] The statute, as it stands, bans the addition of *any* fee to a ticket by a venue operator or its ticket vendor except fees that are associated with "special services" for which a "reasonable service charge" may be levied. The statute states that special services include but are not limited to such services as "sales away from the box office, credit card sales[37] or delivery." Thus, charges added to a ticket's face value violate State law if they are either (1) mandatory, general fees, unconnected to the provision of "special services," or alternatively, when (2) such fees reach levels that are no longer "reasonable."

A ban on the charging of mandatory fees unconnected to a bona fide service is a common consumer protection measure. New York City, for example, expressly bars restaurants from adding general surcharges to the prices on menus.[38] Relatedly, the U.S. Department of Transportation considers it an "unfair and deceptive practice" to advertise ticket prices that do not include mandatory fees and taxes.[39] The New York law on ticket charges creates a similar rule by banning the charging of fees unrelated to the provision of specialized services, and also regulating the fees that are charged.

---

36. N.Y. Arts & Cult. Aff. L. § 25.29.1. The Senate Sponsor Memorandum summarized the provision as follows: "requires that service charges in association with tickets sold be reasonable."

37. Despite this provision, imposing a surcharge on credit card use is illegal under General Business Law § 518. ("No seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means"). See Expressions Hair Design v. Schneiderman, No. 13-4533 (2d Cir. 2015), *available at* http://law.justia.com/cases/federal/appellate-courts/ca2/13-4533/13-4533-2015-09-29.html.

38. New York City Rule § 5-59 provides: "A seller serving food or beverages for consumption on the premises may not add surcharges to listed prices. For example, a restaurant may not state at the bottom of its menu that a 10 percent charge or a $1.00 charge will be added to all menu prices."

39. 14 CFR 399.84.

## 1. Fees are Charged by Ticket Vendors and Venues.

Relying on publicly available information, NYAG conducted a broad study of the fees being charged in New York State by 150 different venues and their ticket vendors.[40] The examination reveals substantial variation in what fees are charged, but it also reveals some clear patterns.

First, it is worth noting that some outlets sell their tickets themselves; these venues are often smaller and non-profit.  Examples include the Lancaster Opera House and the New York City Ballet.  These outlets or organizations either do not charge any mandatory fees at all, or charge a small service and/or handling fee for buying away from the ticket office that does not generally vary with the price of the ticket.

Most venues, however, sell their tickets pursuant to an exclusive contract with a ticket vendor like Ticketmaster or Tickets.com.  This group includes the larger venues, such as Brooklyn's Barclays Center, Albany's Times Union Center, and Buffalo's First Niagara Center.  However, smaller venues, like the Ulster Performing Arts Center in Kingston and the Stanley Center for the Arts in Utica, also use ticket vendors.  Generally speaking, the venue/ticket vendor combinations charge fees and use a variety of formulas to set them, such as adding a fixed charge based on the type of ticket or charging some percentage of the total price of the tickets.

While it is ticketing vendors (mainly Ticketmaster) that bear the brunt of the complaints about fees, some venues play a central role in setting such fees and share in the money that the ticket vendors collect.  Our review of long-term contracts between Ticketmaster and large venues like Barclays Center or Madison Square Garden reveals that the parties negotiate the fee amounts — including "convenience charges" or "service fees" (per ticket) and "processing fees" (per order) – that can be shared between the venue and ticket vendor.[41]  The venue may also ban the ticket vendor from levying other charges, such as "delivery fees" for PDFs of tickets.

Our examination of the fees charged in New York also allowed us to estimate the average fee amounts charged by the larger venues in combination with three ticket vendors for events in this State:  Ticketmaster, TicketWeb, and Tickets.com.  On average, combining the fees charged by these three vendors and their venue clients for 150 New York venues, we found an average surcharge of 21% of the face value of a ticket, which amounts to almost $8 in fees on average.  However, our investigation also revealed that in certain cases, ticket fees charged were surprisingly high in real dollar terms, even if they were not a large percentage of the face value of the ticket.  The following chart shows examples of tickets for several events in which the fees exceeded $25 per ticket.

---

40. The methodology of this study appears in the Appendix.
41. Ticket vendors often enter into multi-year contracts with venue operators to sell tickets to all events at the operator's facility. The terms of these contracts generally set forth the convenience charges and other fees that Ticketmaster must collect, and the portions of those fees and charges that it must deliver to the venue, as well as the portions that Ticketmaster can keep.

**Figure 10. Examples of Large Fees for Select Events and Venues.**
*Source: Fees collected from Ticketmaster, Tickets.com & TicketWeb (2015)*



## 2. Event Ticket Fees are Higher than Most Online Vendors.

Because Ticketmaster, TicketWeb, and Tickets.com all conduct a major portion of their business online, where costs are often lower than for brick-and-mortar retailers, we examined other online platforms that, similar to ticket vendors, interact with consumers on one side and sellers on the other side, to assess whether charging consumers large services fees separate and apart from the ticket's face value is nonetheless typical or perhaps necessary for ticketing. In this regard we examined online vendors of tickets for airplane seats, such as Expedia and Priceline, and vendors of tickets to films, like Fandango and MovieTickets.com. We also examined online platforms that sell a broader mixture of goods, like Amazon and Etsy, to see if they charge consumer fees separate and apart from the posted prices.

Our examination suggests that, among online platforms, the vendors of event tickets appear to charge fees to consumers that are higher than most other online vendors – in fact, most of the online platforms we examined charge no "general" fees to consumers for the sale of tickets or goods and post prices that already reflect the full cost to the consumer. That is true of Amazon and Etsy, and it is also typically true even of vendors of airline tickets, like Expedia and Priceline. [42] The main exceptions are the sites that sell movie tickets, because those vendors charge consumer fees that are close in magnitude to the average fees charged in live event ticketing. Fandango, for example, charges moviegoers a "transaction fee" between 75 cents and $2.50 per ticket, and a "convenience fee" of $1.50 per ticket.

It is unclear what services are covered by the "convenience charges," "service fees," and "processing fees" collected by online vendors of live event tickets, and why those services warrant charging consumers fees that are higher than in most other online contexts. To the extent that ticket vendors and their venue operator clients collect these fees for anything other than the provision of "special services," they would be in violation of New York law. In addition, any of these fees that exceed a "reasonable" charge are impermissible under the law.

---

42. Rather than collecting money through fees to the consumers, these companies collect money from sellers who use their platforms to sell to consumers. We observed no consumer fees being charged on any of these companies' websites, and indeed Expedia and Priceline state they rarely charge broker fees to consumers.

# C. Restraints of Trade in Ticketing

Up to this point, the Report has focused on the sale and brokerage of tickets, which are subject to industry-specific regulation under Article 25 of New York's Arts and Cultural Affairs Law. However, under the Donnelly Act, the Attorney General is also tasked with enforcing the laws prohibiting unreasonable restraints of trade and the unlawful monopolization of markets. Pursuant to that authority, NYAG has serious concerns about several ongoing practices related to the sale and resale of tickets in New York. In particular, NYAG is concerned with the setting of price floors on ticket resale, the practices that impede consumer access to alternative ticket resale platforms, and, in particular, the combined effect of such conduct on consumers. NYAG is involved in an ongoing multi-state investigation of these issues.

## 1. Setting of Ticket Resale Price Floors.

Some ticket issuers – particularly sports teams, including NFL teams and the New York Yankees – have put in place "price floors." Price floors are rules designed to prevent tickets from being sold at a price below some level, usually the face value of the ticket or something close to it. For example, many NFL teams encourage or even require ticket holders to use Ticketmaster's "NFL Ticket Exchange" platform – which is frequently billed as the official resale site and the only "safe" place to buy secondary NFL tickets. However, on NFL Ticket Exchange the seller is then prohibited from setting a price below a certain level – generally the face value of the ticket. Consequently, if a season ticket holder wants to sell his or her tickets for a lower price than he or she paid, he or she may be unable to do so, or may need to use a complex procedure to do so on another platform.

NYAG's concern with price floors is twofold. First, buyers of tickets on Ticket Exchange or other sites with price floors are frequently not informed that the tickets they are buying are subject to a floor. It is therefore easy for buyers to be fooled into believing what they are paying is the market price for a ticket, when in fact the buyer is paying a price artificially inflated by a price floor. The more aggressively sports leagues and individual teams push ticket buyers and sellers to use their "official" secondary markets, the more serious this problem becomes.

More fundamentally, even when buyers are informed of price floors, the floors deprive the public of a chief benefit of the market-driven approach taken by the 2007 law: lower prices. In particular, price floors may make it impossible to obtain tickets on the team-promoted Ticket Exchange platform for below face value when demand decreases. As described above, when contemplating the legalization of ticket resale, the sponsors of the 2007 legislature repeatedly expressed the hope that legalizing profit resale might lower prices for consumers. A clear source of such savings is lower prices when demand falls. For example, near the end of an unsuccessful baseball season, the tickets to watch a team not destined for the playoffs may go down sharply, allowing fans who otherwise might not be able to afford to see a match to buy tickets for far less money.

Overall, NYAG believes there is little to say in favor of price floors: They tend to expose the public to the full costs of the new ticket economy, while depriving the public of the benefits.

## 2. Practices That Impede Consumer Access to Alternative or "Unofficial" Ticket Resale Platforms.

The problems that come with price floors are exacerbated by efforts to push consumers to the resale platforms that maintain them and practices that impede consumer use of platforms that do not. NYAG is therefore greatly concerned with other forms of restraints imposed on the resale of tickets, particularly when those restraints impede or complicate consumer access to resale ticket platforms that do not enforce price floors. Examples of such practices include delayed delivery of PDF versions of resold tickets, and policies that place season ticket holders at risk of cancellation of their ticket subscriptions when they sell on unofficial resale platforms.

The consumer harm caused by price floors is directly related to the success of the efforts to pressure consumers to use only the primary seller's (usually Ticketmaster's) platform. That is because platforms that use price floors are at a natural competitive disadvantage compared to those that do not, and so if consumers engage in comparison shopping, they will gravitate to the platforms with a more open market. However, to the extent that the combination of practices such as PDF-delays and cancellation threats pressure consumers into using the platforms that incorporate a price floor, consumers will be harmed. This is particularly true given the inadequate disclosure of the existence of these price floors. Without knowing that better prices could be available elsewhere, it is harder for consumers to benefit from the competitive market.

# RECOMMENDATIONS

The State regards ticketing and ticket resale as "a matter affected with the public interest."[43] Unfortunately, if one of the purposes of the 2007 law – which repealed the ban on "scalping" – was to reduce ticket prices, or make tickets more available to "ordinary" fans, it has not been successful. While there have been some positive developments, the basic reality described in the 1999 Report remains the same. If nine decades of experience have taught anything, it is that the incredible demand for desirable tickets can be exploited even in the face of determined efforts to get tickets in the hands of the public. The long history of ticket "scalping," the challenges inherent in enforcement, and the incentives and profits available may make some think it is impossible to fix ticketing. Nonetheless, the situation is not hopeless.

There are several concrete steps industry participants can take to make the system fairer and more transparent. In light of the findings in this Report, we believe that the legislature should hold hearings on the subject of ticketing in New York to challenge key members of this industry to put forth how they might help more tickets get into the hands of "ordinary" fans. However, if solutions are not implemented soon, the best and cheapest tickets will continue to go to the resellers and consumers will continue to ask why they cannot get tickets.

## A. Ticket Resale Platforms Must Ensure Brokers Comply With the Law.

Ticket resale platforms such as StubHub, TicketsNow, TicketNetwork and Vivid Seats are the major vehicles through which tickets are sold on the secondary market. They are thus in the best position to effect change in the industry. There are several steps these companies should take to contribute to the success of this market.

First, each ticket resale platform should ensure that professional resellers comply with New York State's licensing provisions by requiring that the resellers provide their ticket reseller license number as a condition of using the platform. In most cases, by examining the volume of resale business a reseller conducts, resale platforms can easily distinguish professional resellers – who engage in the business of ticket resale and are required to obtain a license – from fans that are simply reselling tickets purchased for their own personal use – who are not required to have a license.

Second, each ticket resale platform should enable professional resellers to disclose the face value of the tickets they resell, which is required of resellers by New York State law.[44]  It is currently impossible for well-meaning resellers to disclose the face value of tickets on most resale platforms. Secondary market platforms have the capability, however, of adding functionality to their websites and apps to facilitate brokers' compliance with the law, for example, by enabling resellers to provide face value information when posting a ticket for sale. They should do so.

---

43. N.Y. Arts & Cult. Aff. L.§ 25.01.

44. Id. § 25.23.

## B. Industry Players Must Increase Transparency Regarding Ticket Allocations and Limits.

The precise manner in which tickets are distributed – to industry insiders through holds, to non-public groups through pre-sales, and to the general public through public on-sales –  is rarely, if ever, disclosed to the public.  This information vacuum allows various players in the industry to avoid their share of responsibility for the current problems the industry faces.  It also breeds mistrust from consumers, who feel like the system is fixed against them.

To address these issues, industry players must publicly disclose the allocation of tickets through holds, pre-sale events, and public on-sales.  This requires that many players, including promoters and ticket vendors, work together to effectively distribute information to the public.

In addition, wherever ticket vendors claim that ticket limits are enforced, they should enforce those limits as a matter of course on a per-person basis.  If such limits are not actually being enforced on a per-person basis, ticket vendors must disclose that information.

## C. Ticket Vendors Must Address the Bot Epidemic.

Although NYAG has taken steps to stop many of the largest operations from using Bots to purchase tickets to events in New York, we recognize that other brokers may take their place.  A longer-term solution must include improvements in Bot detection and prevention methods.  While the industry works on long-term technological solutions, steps can be taken to reduce Bot use in the near term.  Towards that end, NYAG has analyzed the information and material gathered through its investigation.  Based on this analysis, we have compiled several recommendations for enhancing Bot detection systems.

NYAG has contacted two of the largest ticketing companies, Ticketmaster and AXS, to discuss our concerns with Bots and ticket limits, and suggested concrete reforms to their operations that, we believe, will substantially reduce the activities of illegal brokers and make the sale of tickets fairer.  Some of the suggestions included preemptively enforcing ticket limits, analyzing purchase data to identify ongoing Bot operations, and investigating resellers regularly offering large numbers of tickets to popular shows, among others.

## D. The Legislature Should Act.

To curb abuses in the industry and create a more equitable process for fans to obtain tickets, the legislature should take the following actions:

*i. Mandate the industry reforms outlined above.*

In many cases, industry players do not have an incentive to reform.  To ensure that the steps described above are implemented in a meaningful and lasting way, the legislature should mandate them.

*ii. End the ban on non-transferrable paperless tickets.*

"Paperless tickets" are non-transferrable event tickets that are designed to avoid resale by brokers.  Their defining feature is their non-transferrable nature, not the fact that they are electronic, because many events offer tickets as PDFs or in other electronic form that the buyer can sell or give to another person to use to attend the event.  Non-transferrable paperless tickets bear some resemblance to airline tickets, requiring the presentation of identification and the credit card used to buy the ticket at the entrance to the venue.  As such, it is harder for paperless tickets to be transferred or resold, given the need to present the purchasing credit card.  Advocates of non-transferrable paperless tickets, including Ticketmaster and many prominent performers such as Bruce Springsteen and Miley Cyrus, have argued that they are an important and effective "anti-scalping" measure because increasing the difficulty of transferring tickets makes it harder for brokers to resell tickets for profit.

In 2010, New York amended its ticketing law to bar the issuance of non-transferrable paperless tickets *unless* consumers are provided with an opt-out, that is, the option of another easily transferable ticketing format at no extra cost.  The law is a *de facto* ban, given that the option allows brokers to request resalable tickets, and therefore erodes the purported function of the non-transferrable paperless ticket.  As such, the change was widely reported as a ban, and appears to be understood that way, at least by some performers.  For example, in September of 2014, popular musician Cat Stevens (now known as Yusuf Islam) canceled a show in New York City on account of the ban.  "I have been a longtime supporter of paperless tickets to my shows worldwide and avoiding scalpers," he said.  "Unfortunately NY has a state law that requires all tickets sold for shows in NYC to be paper, enabling them to be bought and sold at inflated prices."

NYAG believes that New York's ban on non-transferrable paperless tickets – the only one in the nation – should be reconsidered and repealed.  It is true that paperless tickets have met with some resistance; they can sometimes be inconvenient to consumers and venues (for example, if the credit card is forgotten, or if someone wants to give a ticket as a gift).  That may be why, nationwide, the use of such tickets has been limited to those acts that regularly can expect to sell out.  At the same time, paperless tickets appear to be one of the few measures to have any clear effect in reducing the excessive prices charged on the secondary markets and increasing the odds of fans buying tickets at face value.  At least one major artist's representative and one ticketing vendor reported seeing the use of non-transferrable paperless tickets for the most desirable seats greatly reduce resale of tickets for those seats.  Allowing these types of tickets would therefore make it more difficult for brokers to continue hoarding tickets and demanding exorbitant markups from fans.  Moreover, such a change would not require artists, promoters or venues to use paperless tickets, but would merely give them the option to use them.

It is true that paperless ticketing is not a completely foolproof countermeasure.  Brokers wishing to resell such tickets can do so, but must then hire people to go to the concert and physically walk fans through the gate at a show (assuming the ID provision is unenforced), or alternatively, buy tickets with a prepaid "gift" credit card that is physically mailed to the consumer.  Nonetheless, our conversations with promoters of performers who use paperless tickets and others lead us to believe that paperless tickets can effectively limit the ability of brokers to resell at great multiples on secondary markets.  That may explain why, despite still representing a small percentage of total ticket sales, a number of high-profile bands now use non-transferrable paperless ticketing outside of New York, including Bruce Springsteen,

Radiohead, Iron Maiden, Cat Stevens, Paramore, Widespread Panic and Metallica.

NYAG supports repeal of the *de facto* paperless ticket ban, but a repeal raises several concerns.  Among the most important concerns raised against allowing non-transferrable paperless tickets when the legislature passed the ban in 2010 was that they might serve a dual purpose; they might not merely reduce broker markups, but also become a means by which Ticketmaster might leverage its market power over primary ticketing for given events into the domination of secondary sales as well.  This concern follows because, in some implementations of paperless ticketing, tickets would not be completely non-transferrable.  Instead, tickets would be non-transferrable unless the ticket was resold through Ticketmaster's own Ticket Exchange resale platform.  When Ticketmaster is the "exclusive" resale platform, the potential for extending its market power is obvious.

Nonetheless, the potential for abuse does not justify a complete ban on paperless tickets.  When repealing the law, the legislature should consider safeguards that would permit non-transferrable paperless ticketing while mitigating competitive concerns.

*iii. Impose criminal penalties for Bot use.*

There is consensus in the ticket industry that Ticket Bots have no place in a fair and equitable ticket market.  Current law prohibits the usage of Bots and imposes civil sanctions for violations.  However, the prospect of criminal prosecution may well have a greater deterrent effect.  Passage of the BOTS Act by Congress and the criminal penalties that it would impose for the use or sale of bots could also act as a deterrent.

*iv. Cap permissible resale markups.*

Until 2007, ticketing laws capped the price of tickets sold on the secondary market.  At first, for certain events, it was capped at two dollars above face value.  Eventually, the two-dollar limit became a 20% or 45% price cap (depending on the size of the venue).  In 2007, the caps were lifted.  Unfortunately, given the complexities of the market and the skewed incentives that exist, under the current legal regime brokers will continue to use whatever means they can, legal or illegal, to obtain tickets.  New York should therefore reinstitute a reasonable limit on resale markups.  Reinstating caps on markups would still allow brokers a role in the market but would also ensure that any price markups be reasonable.

# APPENDIX — METHODOLOGY FOR NYAG ANALYSES

## Holds & Pre-Sales Analysis

NYAG analyzed ticket allocation data for the highest grossing concerts in New York produced by AEG, Live Nation, and Ticketmaster. NYAG's analysis aggregated the data into four main categories: holds, pre-sales, general on-sales, and other on-sales.

### AEG

AEG produced ticket allocation data for the highest grossing concerts between January 1, 2012 and April 30, 2015 for which AEG served as the promoter at the following venues: Barclays Center, Beacon Theatre, Madison Square Garden, Nassau Coliseum, Nikon at Jones Beach Theater, Saratoga Performing Arts Center, The Theater at Madison Square Garden, Yankee Stadium, and Icahn Stadium.

Data concerning the following concerts were excluded from the analysis due to observed data inconsistencies:

- American Idol 2012 at Nassau Coliseum on August 22, 2012
- Carrie Underwood Fall 2012 at Nassau Coliseum on November 30, 2012
- Dane Cook at Beacon Theatre on September 14, 2013
- Enrique Iglesias at Madison Square Garden on September 25, 2014
- Enrique Iglesias Nassau Coliseum on September 14, 2014
- Fresh Beat Band (Both Shows) at The Theater at Madison Square Garden  on January 17, 2015
- Fresh Beat Band at The Theater at Madison Square Garden  on November 29, 2013
- George Lopez at Beacon Theatre on April 25, 2014
- Jennifer Nettles at Beacon Theatre on March 5, 2014
- Justin Bieber at Barclays Center on August 2, 2013
- Kanye West at Madison Square Garden on November 23, 2013
- Kanye West at Madison Square Garden on November 24, 2013
- Mindless Behavior (Both Shows) at Beacon Theatre on July 13, 2013
- Nashville at Beacon Theatre on April 29, 2015
- Nashville at Beacon Theatre on April 30, 2015
- Nick Cave & The Bad Seeds at Beacon Theatre on March 28, 2012
- Nick Cave & The Bad Seeds at Beacon Theatre on March 29, 2012
- Nick Cave & The Bad Seeds at Beacon Theatre on March 30, 2012
- Pentatonix at The Theater at Madison Square Garden  on March 18, 2015
- R. Kelly at The Theater at Madison Square Garden  on November 21, 2012
- Sytycd at Beacon Theatre on October 30, 2014
- The Who Performing Quadrophenia at Madison Square Garden on November 14, 2012
- The Who Performing Quadrophenia at Barclays Center on December 5, 2012
- Trey Songz at The Theater at Madison Square Garden  on December 5, 2012

For 42 of the remaining concerts, the ticket allocation data for each concert were aggregated in the following way:

• Total Tickets:  The total number of tickets that were made available through a hold, pre-sale, or general on-sale event. This figure was calculated by subtracting the Production Holds figure from the Starting Capacity figure.  AEG defines Starting Capacity as:  "…the total number of tickets to be offered for sale as of the day before the first pre-sale. Additional tickets may be subsequently released for sale." AEG defines Production Holds as:  "… the number of tickets held back from sale due to production elements that create obstructed views or eliminate physical seating. Tickets are often periodically released before the show typically for general public purchase from this total."

• Total Holds:  The total number of tickets placed on hold for an event. Calculated by aggregating the following AEG categories: "artist holds," "agent," "venue," "suite relos" ("seats provided to venue's suite holders due to obstruction of suites") "AEG," "sponsor," "label," and "marketing."  Tickets in the Production Holds group were not included.

• Total Pre-Sale:  The total number of tickets made available through pre-sales events. Calculated by aggregating the following AEG categories:  "Chase," "Amex," "Citi," "Fan Club," "Fan Club / Gilt," and "Venue Club."

• Total Other On-Sale:  The total number of tickets made available through the following ticket groups: "ADA," "VIP Packages / Platinum," and "VIP Packages."

• Total General On-Sale:  The total number of tickets made available to the general public. Calculated by subtracting Total Holds, Total Pre-Sale, and Total Other On-Sale from Total Tickets.

Due to differences in the production of data, for two Katy Perry concerts at Barclays Center on July 24, 2014 and July 25, 2014 the ticket allocation data for each concert were aggregated in the following way:

• Total Tickets:  The total number of tickets that were made available through a hold, pre-sale, or general on-sale event. Used the sum of Total Holds, Total Pre-Sale, Total Other On-Sale, and Total General On-Sale, as defined below.

• Total Holds:  The total number of tickets placed on hold for an event. Calculated by aggregating the following AEG categories: "Artist and Supporting Acts," "AEG," "CAA 'MGMT,'" "Label," "Charity," "Marketing Comps," "Reviewer Comps," and  "Sponsor."

• Total Pre-Sale:  The total number of tickets made available through pre-sales events. Calculated by aggregating the following AEG categories:  "Citibank Pre-Sale," "Facebook," "AMX BluHold," "Venue Club + Nets Basketball," "VIP Pack 1-5," "Platinum," and "Flex Hold." AEG described Flex Hold as follows:  "these are seats not yet priced. Once price is determined they are released for sale during the pre-sale or general on sale."

• Total Other On-Sale: The total number of tickets made available through the AEG category "220° Sell" and "Flex Hold 2".  AEG describes 220° Sell as follows:  "these are seats past the 180 degree full view sell line. Typically sold as 'side view,' they are opened once the full view inventory is depleted."

• Total General On-Sale:  The total number of tickets made available to the general public. Uses the AEG category:  "Estimate Of Total Opens Available For General On Sale," which is described as follows: "This Is Inventory Held Back From The Pre-Sale To Be Sold Only at the general on sale."

## Live Nation/Ticketmaster

Live Nation and Ticketmaster produced ticket allocation data for the highest grossing concerts between January 1, 2012 and December 31, 2013 for which Live Nation served as the promoter at the following venues:  Barclays Center, Beacon Theatre, Madison Square Garden, Nassau Coliseum, Nikon at Jones Beach Theater, Saratoga Performing Arts Center, the Theater at Madison Square Garden, Yankee Stadium, and Icahn Stadium.  NYAG analyzed the data that was produced as described below.

Live Nation also produced ticket allocation data for the highest grossing concerts between December 10, 2013 and August 31, 2015 for which Live Nation served as the promoter for the following venues: Barclays Center, Beacon Theatre, Madison Square Garden, Nassau Coliseum, Nikon at Jones Beach Theater, Saratoga Performing Arts Center, the Theater at Madison Square Garden, Yankee Stadium, and Icahn Stadium.  The data produced by Live Nation, however, did not contain sufficient information to use in the NYAG's analysis.

Data concerning the following concerts were excluded from the analysis due to observed data inconsistencies:

- Eagles at Madison Square Garden on November 8, 2013
- Eagles at Madison Square Garden on November 9, 2013
- Eagles at Madison Square Garden on November 11, 2013
- Macklemore at Madison Square Garden Theatre on November 13, 2013
- Macklemore at Madison Square Garden Theatre on November 14, 2013
- Macklemore at Madison Square Garden Theatre on November 15, 2013

For the remaining 32 concerts, the ticket allocation data for each concert were aggreggated  in the following way:s

• Total Tickets:  The total number of tickets that were made available through a hold, pre-sale or general on-sale event. Calculated by subtracting all ticket groups identified as a production hold, such as "Rearview," "Production Kills," and "Production Holds," from the "Total Tickets Available" figure.

• Total Holds:  The total number of tickets placed on hold for an event. Calculated by aggregating the following groups and others: "Artist(s)," "Management," "Support Act," "Venue," "Tour Sponsor," "Label," "Live Nation," "Sponsor," "Marketing," "Promotion," "Tour Hold," "Artist Agent," and "Live Nation Touring." Ticket groups identified as a production hold, such as "Rearview," "Production Kills," and "Production Holds," were not included.

• Total Pre-Sale:  The total number of tickets made available through pre-sales events. Calculated by aggregating the following groups and others: "Fan Club OnSale," "Fan Club Presale," "LN/Facebook," "Venue Presale," "Artist Presale," "VIP1-2 Presale," "LN & Venue Presale," "Live Nation Presale," "Season Tickets," "Chase Presale," "Mastercard OnSale," "Citi Preferred," "AMEX PreSale," "AMEX Postsale," and "CitiCard Postsale."

• Total Other On-Sale:  The total number of tickets made available through the following ticket groups and others:  "VIP Packages," "Platinum," and "ADA Seating."

• General On-Sale:  The total number of tickets made available to the general public. Calculated by aggregating the following groups: "Public Onsale," "Public Protect Opens," "SRO-Opens Sell Last," "Dress," and "Café Sell Last."

## Analysis of Brokers Using American Express Data

American Express produced information on all transactions through a Ticketmaster merchant account for New York State and surrounding areas for the period of April 1, 2013 to March 1, 2015.  NYAG aggregated the individual transactions for each primary account holder to calculate, for each account holder, the total number of transactions, the total cost of these transactions, and the total number of unique cards used.  NYAG then identified those account holders that had completed purchases totaling more than $3 million.

## Broker Markup Analysis

NYAG analyzed transactional sales data for events in New York produced by six ticket brokers to estimate the margins they typically obtained in connection with their resale of tickets.  The data cover sales by these six brokers made from 2010 to 2014 and include over 90,000 transactions. All reported transactions for which a sales price and cost per ticket that exceeded one dollar were identified in the data were included in the analysis.  The analysis estimated a markup for each transaction, which is defined as the ratio between the net revenue earned by the sale of an individual ticket and its cost.  The average broker markups were then calculated across all transactions and weighted by each transaction's face value.

## Fees Analysis

NYAG conducted a study of ticket fees in an effort to estimate the typical fee amount charged by ticket vendors for entertainment tickets.  The study reflected fees typically charged by these ticket vendors as of October/November 2015.  The study did not include every ticket sold by ticket vendors in the State, but rather relied on information displayed on Ticketmaster, Tickets.com, and TicketWeb's websites in connection with the sale of tickets for events in popular venues.  In particular, the study collected fee information and ticket prices for 150 New York venues listed by the three ticket vendors on their websites.  For each venue, fee information was collected for up to three randomly chosen events and, for each event, information was collected for every ticket category (e.g., orchestra, mezzanine).  In total, a sample consisting of 859 different tickets was created for venues explicitly listed or promoted by ticket sellers.  Fee information included any costs associated with an online sale and delivery of a ticket separate from its face value.  These costs may include service fees, credit card fees, facility fees, and/or any other fees associated with the online sale and delivery of an event ticket.



# Clear Channel stays positive after verdict

- **Chris Smith**Person
- https://www.bizjournals.com/columbus/stories/2005/04/04/tidbits1.html

By Doug Buchanan  –
Apr 4, 2005, 12:00am EDT **Updated** Mar 31, 2005, 3:46pm EST

Clear Channel Communications Inc. is the master of many things - radio, concert promotions, billboards - and now has taken a step toward making its name in corporate spin.

Looking over the news wires last week, it appeared the San Antonio-based company scored a major victory in a 2002 lawsuit involving a promotions deal it has with the American Motorcyclist Association in Pickerington.

The dispute was over an agreement to promote the association's AMA Supercross motorcycle races starting in 2003. A Chicago-based event management firm, JamSports and Entertainment LLC, had alleged that Clear Channel used its industry clout to intimidate the association into reneging on a deal to award the multiyear promotions contract to JamSports.

The dispute landed in U.S. District Court in Chicago and was decided March 21.

Clear Channel put out the good news the same day with a press release titled, "Jury rejects antitrust allegations against Clear Channel from rival promoter."

The release went on to say that the case "was the first time a jury was able to examine such allegations against the company in thorough detail," and that its decision that the company did not violate antitrust laws "sends a powerful signal to those who seek to wrongfully accuse us in the future."

Almost as an aside, the company then noted it was disappointed the jury agreed with Jam Sports' "other claim" and intended to appeal.

Well, that other claim was a doozy. Although the jury did say Clear Channel didn't go so far as to violate federal antitrust laws, it did agree with JamSports that the company interfered in its negotiations with the American Motorcyclist Association, in part by threatening stadium owners that it would pull concerts if they held JamSports-promoted Supercross events.

The jury ordered Clear Channel to pay JamSports more than $90 million, including $73 million in punitive damages.

A powerful signal, indeed.

**Birth of the cool in a kraut martini**

If a dirty martini is your poison, you may be able to find an unusual cure locally, thanks to an Ohio company.

Although dirty martinis commonly call for gin or vodka combined with vermouth and olive juice, the Fremont-based Fremont Co. is urging an extra ingredient - sauerkraut.

"We decided, let's be bold. Let's try to make sauerkraut, of all things, sexy," said Chris Smith, marketing director for the maker of Snowfloss and Frank's brand kraut.

To build enthusiasm for the concoction, Fremont is offering "k-tini" kits to restaurants and clubs in Columbus and Cincinnati, among others cities. The kit includes Frank's Bavarian-style kraut, large olives, advertising materials and a CD - featuring, naturally, Frank Sinatra and Dean Martin.

Fremont's recipe calls for stuffing the olives with sauerkraut and soaking them overnight in vermouth. The rest is standard martini-making procedure, shaken or stirred.

The company conceived the drink in late 2004 during a brainstorming session, Smith said, and has since scored an appearance on "Good Morning America."

Smith said the typical kraut consumer is in his or her mid-40s, a demographic the company hopes to lower with its quirky take on the classic drink.

"Some people don't even know what sauerkraut is," he said. "(Kraut) isn't at the top of their mind, but this is a neat way to introduce them. This is a new way to attach a hip association."

**More kudos for Handke's, this time from big trade pub**

Handke's Cuisine will be honored this May as a 2005 inductee into Nation's Restaurant News' Fine Dining Hall of Fame.

The often-praised restaurant on South Front Street in the Brewery District is among 10 new members revealed this week by the trade publication.

Nominees are singled out for "excellence in food quality, service ambiance and leadership in training and motivating staff," and will be honored at a luncheon May 22 at the Ritz-Carlton in Chicago.

Started in 1980, the magazine's Hall of Fame includes 194 restaurants.



**United States Government Accountability Office**

Report to Congressional Requesters

**April 2018**

# EVENT TICKET SALES

# Market Characteristics and Consumer Protection Issues

April 2018

# GAO Highlights

Highlights of GAO-18-347, a report to congressional requesters

## EVENT TICKET SALES

## Market Characteristics and Consumer Protection Issues

## Why GAO Did This Study

Tickets for concerts, theater, and sporting events can be purchased—typically online—from the original seller (primary market) or a reseller (secondary market). Some state and federal officials and others have raised issues about ticketing fees, the effect of the secondary market on ticket prices, and the transparency and business practices of some industry participants. Event ticketing is not federally regulated. However, federal legislation enacted in 2016 restricts bots (ticket-buying software). Also, the Federal Trade Commission (FTC) has taken two enforcement actions related to deceptive marketing by ticket sellers under its broad FTC Act authority.

GAO was asked to review issues around online ticket sales. This report examines (1) what is known about online ticket sales, (2) consumer protection issues related to such sales, and (3) potential advantages and disadvantages of selected approaches to address these issues.

GAO focused on concert, theater, and major league sporting events for which there is a resale market. GAO analyzed data on fees, ticket volume, and resale prices from a variety of sources; reviewed the largest ticket sellers' websites and purchase processes; and reviewed federal and state laws and relevant academic literature. GAO also interviewed and reviewed documentation from government agencies; consumer organizations; ticket sellers; venue operators; promoters and managers; sports leagues; and academics (selected for their experience and to provide a range of perspectives).

View GAO-18-347. For more information, contact Michael Clements at (202) 512-8678 or ClementsM@gao.gov

## What GAO Found

Ticket pricing, resale activity, and fees for events vary. Tickets to popular events sold on the primary market sometimes are priced below the market price, partly because performers want to make tickets affordable and maintain fans' goodwill, according to industry representatives. Tickets are often resold on the secondary market at prices above face value. In a nongeneralizable sample of events GAO reviewed, primary and secondary market ticketing companies charged total fees averaging 27 percent and 31 percent, respectively, of the ticket's price.

Consumer protection issues include difficulty buying tickets at face value and the fees and marketing practices of some market participants.

- Professional resellers, or brokers, have a competitive advantage over consumers in buying tickets as soon as they are released. Brokers can use numerous staff and software ("bots") to rapidly buy many tickets. As a result, many consumers can buy tickets only on the resale market at a substantial markup.
- Some ticket websites GAO reviewed did not clearly display fees or disclosed them only after users entered payment information.
- "White-label" resale sites, which often appear as paid results of Internet searches for venues and events, often charged higher fees than other ticket websites—sometimes in excess of 40 percent of the ticket price—and used marketing that might mislead users to think they were buying tickets from the venue.

Selected approaches GAO reviewed, such as ticket resale restrictions and disclosure requirements, would have varying effects on consumers and businesses.

- **Nontransferable tickets.** At least three states restrict nontransferable tickets—that is, tickets whose terms do not allow resale. Nontransferable tickets allow more consumers to access tickets at a face-value price. However, they also limit consumers' ability to sell tickets they cannot use, can create inconvenience by requiring identification at the venue, and according to economists, prevent efficient allocation of tickets.
- **Price caps.** Several states cap the price at which tickets can be resold. But according to some state government studies, the caps generally are not effective because they are difficult to enforce.
- **Disclosure requirements.** Stakeholders and government research GAO consulted generally supported measures to ensure clearer and earlier disclosure of ticket fees, although views varied on the best approach (for example, to include fees in an "all-in" price or disclose them separately).

Some market-based approaches are being used or explored that seek to address concerns about secondary market activity. These approaches include technological tools and ticket-buyer verification to better combat bots. In addition, a major search engine recently required enhanced disclosures from ticket resellers using its advertising platform. The disclosures are intended to protect consumers from scams and prevent potential confusion about who is selling the tickets.

_United States Government Accountability Office_

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 3 |
| | Ticketing Practices, Prices, Fees, and Resale Vary by Industry and Event | 6 |
| | Consumer Protection Concerns Include the Ability to Access Face-Value Tickets and the Fees and Clarity of Some Resale Websites | 18 |
| | Effects of Ticket Resale Restrictions and Disclosures on Consumers and Business Would Vary | 36 |
| | Agency Comments | 51 |
| Appendix I | Objectives, Scope, and Methodology | 53 |
| Appendix II | GAO Contact and Staff Acknowledgments | 58 |

**Tables**

| | Table 1: Key Participants in the Primary and Secondary Markets for Event Tickets | 3 |
|---|---|---|
| | Table 2: Selected Research on Ticket Resale Prices and the Extent of Resale | 13 |
| | Table 3: Observed Fees Charged by Three of the Largest Primary Ticketing Companies | 17 |
| | Table 4: Fees Charged by Three of the Largest Ticket Resale Exchanges | 18 |
| | Table 5: Potential Advantages and Disadvantages of Selected Legislative or Regulatory Actions Related to Ticket Resale | 36 |

**Figures**

| | Figure 1: Hypothetical Example of White-Label Search Results and Website | 26 |
|---|---|---|
| | Figure 2: Hypothetical Examples of How a Ticket Price and Fees Can Initially Be Displayed | 43 |

**Abbreviations**

| | |
|---|---|
| BOTS Act | Better Online Ticket Sales Act of 2016 |
| DOJ | Department of Justice |
| FTC | Federal Trade Commission |
| IP | Internet protocol |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC 20548**

April 12, 2018

The Honorable Greg Walden
Chairman
The Honorable Frank Pallone, Jr.
Ranking Member
Committee on Energy and Commerce
House of Representatives

The Honorable Bill Pascrell, Jr.
House of Representatives

The Honorable Fred Upton
House of Representatives

In recent years, consumers and others have raised issues about the online ticket marketplace for concerts, commercial theater, and sporting events.[1] For example, some consumers have complained about difficulty obtaining face-value tickets for popular events at the primary, or initial, sale to the general public—only to find the tickets immediately available at high markups on the secondary, or resale, market. In response, event organizers and legislators have targeted ticket bots—automated software that ticket brokers can use to buy large volumes of tickets. The Better Online Ticket Sales Act of 2016 (BOTS Act) restricted the use of bots and gave the Federal Trade Commission (FTC) and state attorneys general the authority to pursue violators with civil actions.[2] Other issues that have been raised include the amount of ticket fees and restrictions on transferring some tickets.

You asked us to review the marketplace and consumer protection issues related to online ticket sales. This report examines (1) what is known about primary and secondary online ticket sales, (2) the consumer protection concerns that exist related to online ticket sales, and (3)

---

[1]For purposes of this report, we use "online" to refer to activity that occurs on a website or through a mobile application. Although this report focuses on online ticketing, in some cases the issues discussed could also apply to tickets purchased via telephone or at a physical location.

[2]Better Online Ticket Sales Act of 2016, Pub. L. No. 114-274, 130 Stat. 1401 (2016) (BOTS Act).

GAO-18-347  Event Ticket Sales

potential advantages and disadvantages of selected approaches to address these concerns.

To address the first objective, we obtained and analyzed data on ticket volume and resale prices obtained from ticket sellers' websites for a nonprobability sample of 22 events, which were selected to represent a variety of event types and popularity levels. We collected data from October 16 through December 20, 2017. We also reviewed trade industry data on ticket prices and sales.

To address the second objective, we reviewed the websites of 6 primary market ticket sellers, 11 secondary ticket exchanges, and 8 ticket sellers using "white-label" websites.[3] For a sample of 31 events, chosen to reflect a mix of event types and venue sizes (e.g., arenas, theaters), we reviewed the process of purchasing tickets online and documented when and how clearly fees and restrictions were disclosed. In addition, we assessed the accuracy of information that customer service departments of three large secondary ticket exchanges provided. We also reviewed relevant enforcement activity by federal and state agencies and obtained and analyzed summary complaint data from FTC's Consumer Sentinel Network database.

To address the third objective, we reviewed federal and selected state laws and examined the experiences of three U.S. states (Connecticut, Georgia, and New York) with relevant event ticketing laws. We also reviewed foreign government reports to obtain information on relevant ticketing restrictions in two foreign countries (Canada and the United Kingdom) with similar consumer protection issues reviewed in this report. For all three objectives, we reviewed documentary evidence (such as academic studies, trade reports and databases, and industry literature) and interviewed staff from FTC, Department of Justice (DOJ), and three state offices of attorney general; consumer organizations; primary and secondary ticket sellers; venue operators, event promoters, and artists' managers and agents; major sports leagues; and academics who have studied the ticket marketplace—all of whom were selected for their experience and to provide a range of perspectives. For more information on our scope and methodology, see appendix I.

---

[3]A white-label website is a sales website built by one company that allows affiliates to use the software to build their own, uniquely branded websites.

We conducted this performance audit from November 2016 to April 2018, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. We conducted our related investigative work in accordance with investigative standards prescribed by the Council of the Inspectors General on Integrity and Efficiency.

# Background

## The Ticketing Marketplace

The marketplace for primary and secondary ticketing services consists of several types of participants, including primary market ticketing companies, professional ticket brokers, secondary market ticket exchanges, and ticket aggregators (see table 1). Other parties that play a role in event ticketing, as discussed later in this report, include artists and their managers, booking agents, sports teams, producers, promoters, and operators of event venues (such as clubs, theaters, arenas, or stadiums).[4]

**Table 1: Key Participants in the Primary and Secondary Markets for Event Tickets**

| Participant | Description |
|---|---|
| Primary market ticketing companies | Companies that provide initial-sale ticketing services for events |
| Professional ticket brokers | Companies or individuals who buy tickets, usually on the primary market, with the intention of reselling at a profit |
| Secondary market ticket exchanges | Online resale platforms that facilitate transactions between third parties (brokers or consumers), but generally do not maintain their own ticket inventory |
| Ticket aggregators | Websites that aggregate in one place the resale listings from multiple secondary ticket exchanges |

Source: GAO. | GAO-18-347

[4]Although the terms vary with use, "promoter" generally refers to a person or company that contracts with artists or their representatives to arrange events. Promoters also secure venues in which events will occur, arrange for production services, and market events to the public. "Producer" generally refers to a person or company that oversees all aspects of a theater production, including hiring creative staff (such as writers, directors, composers, choreographers, and performers), securing financing and a venue, and promoting the event. For this report, we use "event organizers" to refer to a combination of artists, managers, booking agents, promoters or producers, and venue operators.

The private research firm IBISWorld estimated that online ticketing services (including ticketing for concerts, sporting events, live theater, fairs, and festivals) represented a $9 billion market in 2017, which included both the primary and secondary markets.[5] Another private research firm, Statista, estimated that U.S. online ticketing revenues for sports and music events totaled about $7.1 billion in 2017.[6] Estimates of the total number of professional ticket sellers vary. IBISWorld estimated that the U.S. market for online event ticket sales included 2,571 businesses in 2017. The Census Bureau lists more than 1,500 ticket services companies as of 2015 based on the business classification code for ticket services. However, this does not provide a reliable count of companies in the event ticketing industry because it includes companies selling tickets for services such as bus, airline, and cruise ship travel, among other services.

However, a small number of companies conducts the majority of event ticket sales. In the primary ticket market—where tickets originate and are available at initial sale—Ticketmaster is the largest ticketing company. DOJ estimated that Ticketmaster (whose parent company is now Live Nation Entertainment) held more than 80 percent of market share in 2008, and it was still the market leader as of 2017.[7] Less than a dozen other companies control most of the rest of the primary market, by our estimates. In the secondary market—where resale occurs—more companies are active, but StubHub estimated it held roughly 50 percent of market share as of 2017. According to Moody's Investors Service, Ticketmaster, which in addition to its primary market ticketing has a U.S. resale subsidiary, held the second-largest market share as of 2016.

The majority of ticket sales occur online, through a website or mobile application. Ticketmaster's parent company reported that 93 percent of its primary tickets were sold online in 2017.[8] The industry research group

---

[5]IBISWorld, *Online Event Ticket Sales in the US.: Market Research Report*, (December 2017)

[6]Statista, "Event Tickets," accessed January 17, 2018, https://www.statista.com/outlook/264/109/event-tickets/united-states.

[7]Competitive Impact Statement, United States of America v. Ticketmaster Entertainment, Inc., No. 1:10-cv-00139 (D. D.C. Jan. 25, 2010); Live Nation Entertainment, Inc., Annual Report (Form 10-K) (Feb. 27, 2018). DOJ based its market share estimate on the number of major concert venues Ticketmaster served at the time.

[8]Live Nation Entertainment, Inc. 2017 10-K.

LiveAnalytics reported that in 2014, 68 percent, 50 percent, and 49 percent of people attending concerts, sporting events, and live theater or arts events, respectively, had recently purchased a ticket online.[9]

## Regulation

The event ticketing industry is not federally regulated. However, the Federal Trade Commission Act prohibits unfair or deceptive acts or practices in or affecting commerce, and FTC can enforce the act for issues related to event ticketing and ticketing companies.[10] One federal statute specifically addresses ticketing issues—the BOTS Act, which prohibits, among other things, circumventing security measures or other systems intended to enforce ticket purchasing limits or order rules.[11] The act also makes it illegal to sell or offer to sell any event ticket obtained through these illegal methods and granted enforcement authority to FTC and state attorneys general.[12]

The Department of Justice's Antitrust Division plays a role in monitoring competition in the event ticketing industry. In 2010, Live Nation and Ticketmaster—respectively, the largest concert promoter and primary ticket seller in the United States—merged to form Live Nation Entertainment, Inc. DOJ approved the merger after requiring Ticketmaster to license its primary ticketing software to a competitor, sell off one ticketing unit, and agree to be barred from certain forms of retaliation against venue owners who use a competing ticket service. DOJ may also inspect Live Nation's records and interview its employees to determine or secure compliance with the terms of the final judgment clearing the merger.[13]

State government agencies generally invoke state laws on unfair and deceptive acts and practices to address ticketing violations, according to representatives of two state attorney general offices. In addition, several states have laws that directly apply to event ticketing. For example, some

---

[9]LiveAnalytics, *U.S. Live Event Attendance Study*, June 2014. These included ticket purchases from both primary and secondary market sources.

[10]*See* 15 U.S.C. § 45(a)(1) (2017); 15 U.S.C. § 45c (2017).

[11]BOTS Act, *supra.*

[12]BOTS Act, §2(a)-(c).

[13]*United States of America v. Ticketmaster Entertainment, Inc.*, No. 1:10-cv-00139 (D.D.C. July 30, 2010).

states restrict the use of bots, several other states impose price caps (or upper limits) on ticket resale prices, and states including Connecticut, New York, and Virginia restrict the use of nontransferable tickets (tickets with terms that do not allow resale). Several states require brokers to be licensed and adhere to certain professional standards, such as maintaining a physical place of business and a toll-free telephone number, and offering a standard refund policy.[14]

## Ticketing Practices, Prices, Fees, and Resale Vary by Industry and Event

The concert, sports, and theater industries vary in how they price and distribute tickets. Many tickets are resold on the secondary market, typically at a higher price. Among a nongeneralizable sample of events we reviewed, we observed that primary and secondary market ticketing companies charged total fees averaging 27 percent and 31 percent, respectively, of the ticket's price.

### On the Primary Market, Ticketing Practices Vary by Industry and Popular Events Are Sometimes Priced below Market

Concerts

Ticketing practices for major concerts include presales and pricing that varies based on factors like location and the popularity of the performer. Tickets to popular concerts are often first sold through presales, which allow certain customers to purchase tickets before the general on-sale. Common presales include those for holders of certain credit cards or members of the artist's fan club, although promoters, venues, or other groups also may offer presales. Credit card companies might provide free marketing for events or other compensation in exchange for exclusive early access to tickets for their cardholders. In addition, the artist usually has the option to sell a portion of tickets to its fan club. The venue's ticketing company might want to limit the number of tickets allocated to fan clubs because the artist and manager can sell them through a separate ticketing platform, according to three event organizers we interviewed.

---

[14]In addition to certain state requirements, at least 200 brokers belong to the National Association of Ticket Brokers, which requires its members to adhere to a code of ethics that includes a variety of customer service and consumer protection provisions.

There are no comprehensive data on the proportion of tickets sold through presales because this information is usually confidential. Industry representatives told us that 10 percent to 30 percent of tickets for major concerts typically are offered through presales, although it can be as many as about 65 percent of tickets for major artists performing at large venues. In addition, fan club presales usually represent 8 percent of tickets, although it may be more if the fan club presale uses the venue's ticketing company, according to two event organizers. A large ticketing company told us that 10 percent of tickets may be available for fan club presales. A 2016 study by the New York State Office of the Attorney General found that an average of 38 percent of tickets were allotted to presales for the 74 highest-grossing concerts at selected New York State venues in 2012–2015.[15]

Additionally, venues, promoters, agents, and artists commonly hold back a small portion of tickets from public sale. "Holds" may be given or sold to media outlets, high-profile guests, or friends and family of the artist. They also may be used to provide flexibility when the seating configuration is not yet final. Promoters typically will release unused holds before the event, offering the tickets to the public at face value.

As with presales, little comprehensive data exist on the proportion of tickets reserved for holds. Industry representatives told us holds typically represent a relatively small number of tickets—a few hundred for major events or perhaps a thousand for a stadium concert. The New York Attorney General report's review of a sample of high-grossing New York State concerts found that approximately 16 percent of tickets, on average, were allocated for holds. Of those holds, many went to venue operators—for example, one arena with around 21,000 seats usually received more than 900 holds per concert held there.

The average face-value ticket price in 2017 among the top 100 grossing concert tours in North America was $78.93, according to Pollstar.[16] Concert ticket prices vary by city or day of the week, based on anticipated demand. The main parties involved in price setting are the artist and her

---

[15]New York State Office of the Attorney General, *Obstructed View: What's Blocking New Yorkers from Getting Tickets* (New York, N.Y.: 2016). This figure included both fan club and credit card presales. Some of the concerts included multiple shows or tour stops by the same artist.

[16]Pollstar, *2017 Year End Business Analysis* (Fresno, Calif.: Pollstar, 2018). Pollstar is a trade publication covering the worldwide concert industry.

or his management team, promoter, and booking agent. Venues sometimes provide input based on their knowledge of prevailing prices in the local market. Ticketing companies sometimes offer tools or support to help event organizers price tickets based on their analysis of sales trends.

Concert ticket prices are generally set to maximize profits, according to event organizers. In terms of production costs, the artist's guarantee—the amount the artist is paid for each performance—is usually the largest expense. The most popular artists can command the highest guarantees and their concerts also tend to have the highest production costs.

However, for some high-demand events, tickets might be "underpriced"—that is, knowingly set below the market clearing price that would provide the greatest revenue.[17] Artists may underprice their tickets for a variety of reasons, according to industry stakeholders and our literature review:

- **Reputation risk.** Artists may avoid very high prices because they do not want to be perceived as gouging fans. Similarly, event organizers told us some artists have a certain brand or image—such as working-class appeal—that could be harmed by charging very high ticket prices.

- **Affordability.** Some event organizers told us that artists want to price tickets below market to provide access to fans at all income levels.

- **Sold-out show.** Event organizers may price tickets lower to ensure a sold-out show, which can improve the artist and event organizers' reputations and might help future sales.

- **Audience mix.** Some artists prefer to have the most enthusiastic fans at their shows, rather than just those able to pay the most, especially in the front rows, where tickets are generally the most expensive.

- **Ancillary revenue.** Better attendance through lower ticket prices can increase merchandise and concession sales, which can be a substantial source of revenue.

In addition, event organizers may unintentionally underprice concert tickets because of imperfect information about what consumers are willing

---

[17]For the purposes of this report, we consider high-demand events to be those for which tickets sell out early in the on-sale and prices are higher on the resale market. The market clearing price refers to the price at which the number of tickets available for sale equals the number of tickets customers are willing to buy, resulting in neither a surplus nor a shortage.

to pay. Tickets are also priced based on the prices and sales of the artist's (or similar artists') past tours, but demand can be hard to predict. Three event organizers told us that they have started using data from the ticket resale market to help set prices because that is a good gauge of the true market price.

Sporting Events

For major league professional sports, most decisions about ticket pricing and ticket distribution are made by the individual teams rather than by the league.[18] According to the three major sports leagues we interviewed, their teams generally sell most of their tickets through season packages, with the remainder sold for individual games. Teams favor packages because they guarantee a certain level of revenue for the season. Representatives of two major sports leagues told us that their teams sold an average of 85 percent and 55 percent, respectively, of their tickets through season packages. One league told us that some of its teams increasingly offer not only full-season packages, but also partial-season packages. Another league said that in some cases, its teams might need to reserve a certain number of single game-day tickets—for example, as part of an agreement when public funds helped build a new stadium.

Representatives of the three sports leagues we interviewed told us that their teams do not use presales and holds to the same extent as the concert industry. Although teams do not sell a significant number of tickets through presales, they might offer first choice of seats to season ticket holders or individuals who purchased tickets in the past. In terms of holds, one league told us it requires its teams to hold a small number of tickets for the visiting team and teams might also hold a few tickets for sponsors and performers. Another league told us it does not have league-wide requirements on holds, but its teams sometimes hold a small number of seats for media.

Sports teams generally set their ticket prices to maximize revenue, based on supply and anticipated demand, according to the leagues we interviewed. Ticket prices typically vary year-to-year, based on factors such as the team's performance the previous season and playing in a

---

[18]In this report, sporting events refer to games played by teams of the four largest professional sports leagues in the United States, which are Major League Baseball, the National Football League, the National Basketball Association, and the National Hockey League.

new stadium.[19] Teams in many leagues use "dynamic pricing" for individual game tickets. They adjust prices as the game approaches based on changing demand factors, such as team performance and the weather forecast. The sports leagues with whom we spoke said teams' pricing considerations are based in part on a desire to have affordable tickets for fans of different income levels. In addition, one league told us its teams rely heavily on revenues other than ticket sales, such as from television deals and sponsorships.

**Theater**

Tickets for Broadway and national touring shows are distributed through direct online sales as well as several additional channels, including day-of-show discount booths, group packages, and call centers.[20] Industry representatives told us that these shows use presales and holds, but not as extensively as the concert industry. At our request, a company provided us with data for five Broadway shows from June 2016 to September 2017.[21] Approximately 13 percent of tickets in this sample were sold through presales, almost all of which were group sales (offered to particular groups prior to the general on-sale). Less than 1 percent of tickets in this sample were sold through presales offered to specific credit cardholders. Two shows in high demand held back an average of about 6 percent of tickets, while the other three shows held back about 1 percent.

Producers and venue operators generally set prices, which are influenced by factors like venue capacity and the length of run needed to recoup expenses, according to industry representatives. According to the Broadway League, from May 22, 2017, to February 11, 2018, the average face-value price of a Broadway show was $123—an average of $127 for musicals and $81 for plays. Industry representatives told us they sell about 10 percent of tickets through day-of-show discount booths. Even the most popular shows typically offer steep discounts for a small number of tickets through lotteries or other means.

---

[19]Patrick Rishe and Michael Mondello, "Ticket Price Determination in Professional Sports: An Empirical Analysis of the NBA, NFL, NHL, and Major League Baseball," *Sport Marketing Quarterly*, vol. 13, no. 2 (2004), 111.

[20]In this report, theater refers to Broadway and national tours, which are generally commercial productions. We are excluding community and most nonprofit theater.

[21]We asked a company that collects data on Broadway ticketing to provide us with summary statistics on holds and presales for a small sample of shows that played in June 2016 through September 2017, and to separate the results for high-demand shows (defined as selling 90 percent or more of available seats). The company selected and provided data on five shows, two of which were high-demand shows.

Tickets for some of the most popular Broadway shows have sometimes been underpriced, according to Broadway theater representatives, who told us they feel obligated to maintain relatively reasonable prices and to allow consumers of varying financial resources to attend their shows. Additionally, some shows are underpriced because their popularity was not anticipated. At the same time, in recent years, producers have started charging much higher prices (sometimes exceeding $500) for premium seats or for shows in very high demand, which allows productions to capture proceeds that would otherwise be lost to the secondary market.

**Relationships between Event Organizers and Brokers**

Sometimes event organizers work directly with brokers to distribute tickets on the secondary market. For high-demand events, event organizers may seek to capture a share of higher secondary market prices without the reputation risk of raising an event's ticket prices directly. For lower-demand events, selling tickets directly to brokers can guarantee a certain level of revenue and increase exposure (by using multiple resale platforms rather than a single ticketing site).

- In major league sports, teams sell up to 30 percent of seats directly to brokers, according to a large primary ticket seller.

- For Broadway theater, one company told us it regularly distributes about 8 percent to 10 percent of its tickets to a few authorized secondary market brokers.

- In the concert industry, it is unclear how often artists and event organizers sell tickets directly through the secondary market. Any formal agreements would be in business-confidential contracts, according to industry representatives, and artists may be concerned about disclosing them for fear of appearing to profit from high resale prices.

All the artists' representatives with whom we spoke denied that their clients sold tickets directly to secondary market companies. However, a Vice President of the National Consumers League has cited evidence of cases in which ticket holds reserved for an artist were listed on the secondary market.[22] A representative of one secondary market company told us of two cases in which representatives of popular artists

---

[22]*Legislative Hearing on 17 FTC Bills, House of Representatives, Energy and Commerce Committee, Subcommittee on Commerce, Manufacturing, and Trade*, 114th Cong. 187-198 (May 24, 2016) (statement of John Breyault, Vice President, Public Policy, Telecommunications, and Fraud; National Consumers League).

approached his company about selling blocks of tickets for upcoming tours.

## Tickets to Popular Events Are Often Resold on the Secondary Market at Prices above Face Value

Ticket resale prices can be significantly higher than primary market prices and brokers account for most sales on major ticket exchanges. When tickets on the primary market are priced below market value—that is, priced less than what consumers are willing to pay—it creates greater opportunities for profit on the secondary market. Resale transactions typically occur on secondary ticket exchanges—websites where multiple sellers can list their tickets for resale and connect with potential buyers. Primary ticketing companies have also entered the resale market. For example, Ticketmaster allows buyers to resell tickets through its TM+ program, which lists resale inventory next to primary market inventory, and it owns the secondary ticket exchange TicketsNow.com.

Generally speaking, the secondary market serves two types of sellers: (1) those who buy or otherwise obtain tickets with the intent of reselling them at a profit (typically, professional brokers), and (2) individuals trying to recoup their money for an event they cannot attend (or sports season ticket holders who do not want to attend all games or use resale to finance part of their season package). Representatives from the four secondary ticket exchanges with whom we spoke each said that professional brokers represent either the majority or overwhelming majority of ticket sales on their sites.

Sellers set their own prices on secondary ticket exchanges, but some exchanges offer pricing recommendations. The exchanges allow adjustment of prices over time, and sellers can lower prices if tickets are not selling, or raise prices if demand warrants. Software tools exist that assist sellers in setting prices and in automatically adjusting prices for multiple ticket listings.

However, resale prices are not always higher than the original price, and thus brokers assume some risk. In some cases, the market price declines below the ticket's face value—for example, for a poorly performing sports team. The leading ticket exchange network has publicly stated that it estimates that 50 percent of tickets resold on its site sell for less than face value. However, we were unable to obtain data that corroborated this statement.

Relatively few studies have looked at the ticket resale market for major concert, sporting, or theatrical events. Our review of relevant economic

literature identified six studies that looked at ticket resale prices, one of which also looked at the extent of resale (see table 2). In general, the studies found a wide range of resale prices, perhaps reflecting the different methodologies and samples used or the limited amount of information on ticket resale. Additionally, the data reported are several years old and will not fully reflect the current market.

**Table 2: Selected Research on Ticket Resale Prices and the Extent of Resale**

| Study title | Author and source | Study description | Findings | |
| --- | --- | --- | --- | --- |
| | | | Ticket prices | Extent of resale |
| "Resale and Rent-Seeking: An Application to Ticket Markets" | Phillip Leslie and Alan Sorenson, *The Review of Economic Studies*, vol. 81, no. 1 (2013) | Using a sample of 56 concerts for popular artists in 2004, the study compared the number of tickets and resale prices from a major secondary ticket exchange and an online auction site to the number of tickets sold and prices in the primary market. | Seventy-four percent of tickets were resold above face value and 26 percent of tickets were resold below face value. The average resale price overall was 41 percent higher than the face-value price. | On average, about 5 percent of tickets were resold with a range among concerts of 3–17 percent. |
| "Obstructed View: What's Blocking New Yorkers from Getting Tickets" | New York State Office of the Attorney General (2016) | Reviewed data from six brokers on 90,000 sales transactions made from 2010–2014 that showed the prices at which the brokers purchased and resold the tickets. | On average, the resale price was 49 percent higher than the face-value price. By broker, the average markup ranged from 15 percent to 112 percent. | Not addressed (n/a). |
| "Primary-Market Auctions for Event Tickets: Eliminating the Rents of 'Bob the Broker'?" | Aditya Bhave and Eric Budish, NBER Working Paper No. 23770 (National Bureau of Economic Research, Cambridge, Mass., 2017) | Reviewed face-value and resale prices of tickets to 576 concerts in 2007 and 2008. Looking at the best seats sold using auctions, the study compared the tickets' original face-value prices to initial-sale (by auction) prices and secondary market prices. | Secondary market prices, which were close to the auction prices, were about double the tickets' face-value prices. | n/a |
| "An Examination of Dynamic Ticket Pricing and Secondary Market Price Determinants in Major League Baseball" | Stephen L. Shapiro and Joris Drayer, *Sport Management Review*, vol. 17, no. 2 (2014) | Looking at 12 games in a Major League Baseball team's 2010 season, the study compared the tickets' face-value prices and season ticket holder prices to listed prices on a major secondary ticket exchange. | The average listed resale price was 103 percent higher than the average price paid by season ticket holders and about 45 percent higher than the average single game-day price.[a] | n/a |
| "An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" | Joris Drayer, Daniel A. Rascher, and Chad D. McEvoy, *Sport Management Review*, 15 (2012). | The study compared the secondary market sale price to the primary market price for all 32 NFL teams in the 2007–2008 season. | The average secondary market price was 143 percent higher than the average primary market price. | n/a |

| Study title | Author and source | Study description | Findings | |
|---|---|---|---|---|
| | | | Ticket prices | Extent of resale |
| "Pricing Behavior in Perishable Goods Markets: Evidence from Secondary Markets for Major League Baseball Tickets" | Andrew Sweeting, *Journal of Political Economy*, 120, no. 6 (2012). | The study compared 2007 ticket prices for the home games of 29 Major League Baseball teams to listed prices on a major resale exchange and online auction site. | The average listed resale price was about twice the corresponding face-value price, although prices declined as game-day approached.[a] | n/a |

Source: GAO-selected research. | GAO-18-347

[a]"Listed" resale price refers to the price listed and not necessarily to the price at which the ticket actually sold.

For illustrative purposes, we reviewed secondary market ticket availability and prices for a nongeneralizable sample of 22 events.[23] Among our selected events, the proportion of seats that were listed for resale ranged from 3 percent to 38 percent. In general, among the 22 events we reviewed, listed resale prices tended to be higher than primary market prices. For example, tickets for one sold-out rock concert had been about $50 to $100 on the primary market but ranged from about $90 to $790 in secondary market listings.

For 7 of the 22 events, we observed instances in which tickets were listed on the resale market even when tickets were still available from primary sellers at a lower face-value price.[24] For example, one theater event had secondary market tickets listed at prices ranging from $248 to $1,080 (average of $763), while a substantial number of tickets for comparable seats were still available on the primary market at $198 to $398.[25] We did

[23]We reviewed data from two ticket resale sites for a sample of 22 events, 17 of which we categorized as high-demand. We also reviewed data from the primary ticket market for each event. We defined high-demand events as those that were likely to sell out, which we assessed by reviewing past attendance at other events for the same artist, sports team, or theatrical event. We focused on high-demand events because they have been the focus of interest in issues regarding resale activity. For each event, we determined (1) the proportion of tickets listed on the secondary market, and (2) how listed resale prices compared to face-value prices. Events were selected to represent concert, sporting, and theater events at different demand levels (popular versus other events). We collected data between October 16 and December 20, 2017.

[24]We did not have information on how many tickets were available at various price points and it is possible that the differences in pricing could have been due to the number or quality of seats on the primary market.

[25]To combine data from the two resellers, we computed median weekly ticket prices for each event from each vendor, and then computed an average weighted by the number of available tickets on each website. The primary and secondary market prices do not include fees.

not have data to determine whether the resale tickets actually sold at their listed price. However, as discussed later, it is possible that some consumers buy on the secondary market, at a higher price, because they are not aware that they are purchasing from a resale site rather than the primary seller.

## Total Ticket Fees Averaged 27 Percent on the Primary Market and 31 Percent on the Secondary Market for Events We Reviewed

Ticket fees vary in amount and type among the primary and secondary markets, and among different ticketing companies and events.

### Primary Market Fees

Companies that provide ticketing services on the primary market typically charge fees to the buyer that are added to the ticket's list price and can vary considerably. A single ticket can have multiple fees, commonly including a "service fee," a per-order "processing fee," and a "facility fee" charged by the venue. Most primary ticketing companies offer free delivery options, such as print-at-home or mobile tickets, but charge additional fees for delivery of physical tickets.

Venues usually have an exclusive contract with a single ticketing company and typically negotiate fees for all events at the venue, though in some cases they do so by category of event. Ticketing companies and venues usually share fee revenue and in some cases, the venue receives the majority of the fee revenue, according to primary ticketing companies.[26] In addition, event organizers told us that promoters occasionally negotiate with the venue to add ticket fees or receive fee revenue.

Ticketing companies told us that they do not have a set fee schedule and amounts and types of fees vary among venues. Fees can be set as a fixed amount, a fixed amount that varies with the ticket's face value (for

---

[26]Ticketing companies earn revenue from tickets they sell through their website, mobile application, call center, or physical outlets. However, they typically do not earn any fee revenue from season tickets or tickets sold through the venue box office, or through the artists' fan clubs when the fan club tickets are sold on a third-party ticketing company's platform.

example, $5 for tickets below $50 and $10 for tickets above $50), a percentage of face value, or other variations.

While ticketing fees vary considerably, the 2016 New York Attorney General report found average ticket fees of 21 percent based on its review of ticket information for more than 800 tickets at 150 New York State venues.[27] (In other words, a ticketing company would add $21 in fees to a $100 ticket, for a total price to the buyer of $121.) The 21 percent figure encompassed all additional fees, including service fees and flat fees, like delivery or order processing fees.

We conducted our own review of ticketing fees for a nongeneralizable sample of a total of 31 concert, theater, and sporting events across five primary ticket sellers' websites:[28]

- In total, the combined fees averaged 27 percent of the ticket's face value, and we observed values ranging from 13 percent to 58 percent.[29]

- Service fees were, on average, 22 percent of the ticket's face value, and we observed values ranging from 8 percent to 37 percent.

- Fourteen of the events we reviewed had an additional order processing fee, ranging from $1.00 to $8.20.

- Five of the events we reviewed had an additional facility fee, ranging from $2.00 to $5.10.

Table 3 shows the ticketing fees observed for events sold through three of the largest ticket companies we reviewed.

---

[27]New York State Office of the Attorney General, 29, 41. The report collected fee information and ticket prices for 150 New York venues listed on three primary ticketing websites. For each venue, fee information was collected for up to three randomly selected events and, for each event, information was collected for every seating category (e.g., orchestra, balcony).

[28]A GAO investigator and a GAO analyst collected data between June 19, 2017, and January 16, 2018 on the ticket fees charged for online purchase by five primary ticketing companies. From one to three concert, theater, and sporting events were reviewed for each company, covering 12 events and 10 venues in total. Ticket fees were also reviewed for an additional 20 events sold by the largest ticketing company.

[29]These totals encompassed both fees that were charged as a percentage of face value (such as "service" fees) and fixed-dollar fees (such as "order processing" fees).

**Table 3: Observed Fees Charged by Three of the Largest Primary Ticketing Companies**

| Company | Service fee charged to buyer (as a percent of the face value) | Facility fee | Order processing fee |
|---|---|---|---|
| Ticket company A | 23–27% | None observed | $1.00 |
| Ticket company B | 19–27% | $2.00 | None observed |
| Ticket company C | 8–37% | $2.85–$5.10 | $3.92–$8.20 |

Source: GAO analysis of primary ticket sellers' websites. | GAO-18-347

Notes: Not every ticket we observed had a facility fee or an order processing fee. In total, we observed 28 events from these three companies.

A sixth ticketing company that focuses on theater uses a different fee structure. It simply charges two flat service fees across all of its events ($7 for tickets below $50 and $11 for tickets above $50), plus a base per-order handling charge of $3. Additionally, we noted that the 6 sporting events we observed tended to have lower fees than the 16 concerts and 9 theater events we observed. Specifically, sporting events had total fees averaging roughly 20 percent, compared to about 30 percent for concerts and theater.

**Secondary Market Fees**

Fees charged by secondary ticket exchanges we reviewed were higher than those charged by primary market ticket companies.[30] Secondary ticket exchanges often charge service and delivery fees to ticket buyers on top of the ticket's listed price. For 7 of the 11 secondary ticket exchanges we reviewed, the service fee was a set percentage of the ticket's list price. Three of the remaining exchanges charged fees that varied across events, and the fourth did not charge service fees. Among the 10 exchanges that charged fees:

- In total, the combined fees averaged 31 percent of the ticket's listed price, and we observed values ranging from 20 percent to 56 percent.

- Service fees, on average, were 22 percent of the ticket's listed price, and we observed values ranging from 15 percent to 29 percent.

---

[30]A GAO investigator and a GAO analyst gathered information on fees charged for seven events on the websites of 11 secondary market ticketing companies, which included nine ticket exchanges and two aggregators of ticket resale websites. For each website, from three to five events were reviewed, which included at least one concert, theater, and sporting event per site.

- In addition to the service fee, 8 of the 10 exchanges charged a delivery fee for mobile or print-at-home tickets, ranging from $2.50 to $7.95.

- Eight of the exchanges also charged a fee to the seller (in addition to the buyer), which was typically 10 percent of the ticket's sale price. (For example, if a ticket sells for $100, the seller would receive $90 and the exchange $10.)

Table 4 provides additional information about the fees charged by three of the largest ticket resale exchanges.

**Table 4: Fees Charged by Three of the Largest Ticket Resale Exchanges**

| Exchange | Service fee charged to buyer (as a percent of ticket price) | Delivery fee charged to buyer | Fee charged to seller (as a percent of ticket price) |
|---|---|---|---|
| Resale exchange A | 10–25% | Download: $2.50 or $7.95<br>Mail: $14.95 | 0–10% |
| Resale exchange B | 21–24% | None | 10% |
| Resale exchange C | 29–30% | Download: $7.95<br>Mail: $15.00 | 0–10% |

Source: GAO review of secondary ticket exchange websites. | GAO-18-347

Note: We observed three events per resale exchange. For resale exchanges A and C, data were obtained both from our observations and from communication with company officials.

## Consumer Protection Concerns Include the Ability to Access Face-Value Tickets and the Fees and Clarity of Some Resale Websites

The technology and other resources of professional brokers give them a competitive advantage over individual consumers in purchasing tickets at their face-value price. Views vary on the extent to which the use of holds and presales also affect consumers. Many ticketing websites we reviewed did not clearly display their fees up front, and a subset of websites— referred to as white-label—used marketing practices that might confuse consumers. Other consumer protection concerns that have been raised involve the amount charged for ticketing fees, speculative and fraudulent tickets, and designated resale exchanges (resale platforms linked to the primary ticket seller).

### For Tickets to Popular Events, Consumers Often Must Pay More Than Face Value

Tickets to popular events often are not available to consumers at their face-value price, frequently because seats sell out in the primary market almost as soon as the venue puts them on sale.

| Brokers' Competitive Advantage | Brokers whose business is to purchase and resell tickets have a competitive advantage over individual consumers because they have the technology and resources to purchase large numbers of tickets as soon as they go on sale. Some consumer advocates, state officials, and event organizers believe that brokers unfairly use this advantage to obtain tickets from the primary market, which restricts ordinary consumers from buying tickets at face value. As a result, consumers may pay higher prices than they would if tickets were available on the primary market. In addition, some event organizers and primary ticket sellers have expressed frustration that the profits from the higher resale price accrue to brokers who have not played a role in creating or producing the event. |
|---|---|

Some professional brokers use software programs known as bots to purchase large numbers of tickets very quickly. When tickets first go on sale, bots can complete multiple simultaneous searches of the primary ticket seller's website and reserve or purchase hundreds of tickets, according to the 2016 report by the New York State Office of the Attorney General.[31] Seats reserved by a bot—even if ultimately not purchased—appear online to a consumer as unavailable. This, in turn, can make inventory appear artificially low during the first minutes of the sale and lead consumers to the secondary market to seek available seats, according to event organizers we interviewed.[32] Bots can also automate the ticket-buying process, as well as identify when additional tickets are released and available for purchase. During its investigation of the ticketing industry, the New York State Office of the Attorney General identified an instance in which a bot bought more than 1,000 tickets to a single event in 1 minute.[33]

---

[31] New York State Office of the Attorney General, 15. We did not identify comprehensive information on the prevalence of the use of bots in purchasing event tickets. Representatives from one primary ticketing company told us it believes bots accounted for 21 percent of online ticket inquiries (i.e., attempts to access the system and not necessarily actual purchases) for two high-demand shows over a 3 month period (which it identified based on certain characteristics associated with bot use). Other ticket sellers with whom we spoke said they believe bots are still widely used, especially for the most popular events. However, one said it did not have a reliable estimate on the use of bots, noting that they do not have any way of being certain whether or not a bot was used to purchase a ticket.

[32] Primary ticket sellers typically limit the amount of time buyers have to complete a purchase—for example, 10 minutes from selecting tickets to completing payment. During this time, the selected tickets are removed from the inventory and appear to other buyers to be unavailable.

[33] New York State Office of the Attorney General, 18.

In addition, bots can be used to bypass security measures that are designed to enforce ticket purchase limits. For example, bots can use advanced character recognition to "read" the characters in a test designed to ensure that the buyer is human.[34] Although the BOTS Act of 2016 restricts the use of bots, as discussed later, it is not yet clear the extent to which the act has reduced their use.

Brokers have other advantages over consumers in the ticket buying process, according to the New York State Attorney General's report and industry stakeholders we interviewed. For example, some brokers employ multiple staff, who purchase tickets as soon as an event goes on sale. In addition, brokers can bypass sellers' limits on the number of tickets allowed to be purchased by using multiple names, addresses, credit card numbers, or IP (Internet protocol) addresses.[35] Finally, to access tickets during a presale, some brokers join artists' fan clubs or hold multiple credit cards from the company sponsoring the presale.

**Role of Holds and Presales**

Holds and presales may limit the number of tickets available to consumers at face value, according to some consumer groups, secondary market companies, and other parties. For example, the National Consumers League testified that events with many holds and presales sell out more quickly during the general on-sale because fewer seats are available.[36] Consumers may not be aware that many seats are no longer available by the time of the general on-sale. In addition, the National Consumers League and New York State Office of the Attorney General said they believe the use of holds and presales raise concerns about equity and fairness. They noted that most holds go to industry insiders who have a connection to the promoter or venue, while credit card presales are available only to cardholders, who typically are higher-

---

[34]A common security measure is the Completely Automated Public Turing test to tell Computers and Humans Apart, commonly known as CAPTCHA, which asks users to prove they are human by identifying characters in distorted text or by selecting images that meet certain requirements ("Identify all photos with a car"). In some cases, bots are programmed to bypass this test. In other cases, the bot submits images of the tests to human workers who complete it, according to the report of the New York State Office of the Attorney General.

[35]Ticketing companies often limit the number of tickets a consumer can purchase during a single transaction. An Internet protocol (IP) address is a unique string of numbers that identifies each computer using the Internet to communicate over a network.

[36]Breyault, 2, 5. The National Consumers League is a nonprofit consumer advocacy organization.

income. The New York State Attorney General's office and seven event organizers with whom we spoke expressed concerns that presales benefit brokers, who take special measures to access tickets during presales.

However, other industry representatives told us that holds and presales do not adversely affect consumers. They noted that for most events, the number of tickets sold through presales is not very high and few tickets are held back. Additionally, two event organizers and representatives from a primary ticketing company noted that most presales are accessible to a broad range of consumers—such as tens of millions of cardholders. As a result, the distinction between what constitutes a presale and a general on-sale can be slim. Furthermore, some fan clubs may try to limit brokers' use of presales. For example, one manager said his artist's fan club gives priority for presales to long-time fan club members.

In addition, some industry representatives noted that holds and presales serve important functions that can benefit consumers. For example, credit card presales can reduce event prices by funding certain marketing costs, and fan club presales can offer better access to tickets to artists' most enthusiastic fans, according to event organizers with whom we spoke. And as noted earlier, holds serve various functions, such as providing flexibility for seating configuration.

## Some Ticketing Websites We Reviewed Were Not Fully Transparent about Ticket Fees and Relevant Disclosures

Among the largest primary and several secondary market ticketing companies, we identified instances in which fee information was not fully transparent. We reviewed the ticket purchasing process for a selection of primary and secondary ticketing companies' websites, including a subset of secondary market websites known as "white-label" websites. We reviewed the extent to which the companies' websites clearly and conspicuously presented their fees and other relevant information and also recorded the point at which fees were disclosed in the purchase process.[37] While FTC staff guidance states that there is no set formula for a clear and conspicuous disclosure, it states that among several key factors are whether the disclosure is legible, in clear wording, and proximate to the relevant information.[38] In recent reports, the National

[37]We did not, however, conduct a legal compliance review for these disclosures and do not offer an opinion as to whether any of our findings about selected websites would meet the relevant FTC standard for unfair or deceptive practices.

[38]Federal Trade Commission, *.com Disclosures: How to Make Effective Disclosures in Digital Advertising* (March 2013) (staff guidance).

Economic Council (which advises the President on economic policy) and FTC staff have expressed concern about businesses that use "drip pricing," the practice of advertising only part of a product's price up front and revealing additional charges later as consumers go through the buying process.[39]

## Primary Market Ticketing Companies

For the 23 events we reviewed, the largest ticketing company—believed to have the majority of the U.S. market share—frequently did not display its fees prominently or early in the purchase process.[40]

- For 14 of 23 events we reviewed, fees could be learned only by (1) selecting a seat; (2) clicking through one or two additional screens; (3) creating a user name and password (or logging in); and (4) clicking an icon labeled "Order Details," which displayed the face-value price and the fees.

- For 5 of the 23 events, the customer did not have to log in to see the fees, but the fees were visible only by clicking the "Order Details" icon.

- For 4 of the 23 events, fees were displayed before log-in and without the need to take additional steps.

- Additionally, for 21 of the 23 events, ticket fees were displayed in a significantly smaller font size than the ticket price.

For the five other primary market ticketing companies whose ticketing process we reviewed, fees were displayed earlier in the purchase process and more conspicuously.[41] All five companies displayed fees before asking users to log in, including one that displayed fees during the initial seat selection process. Four of the five companies displayed fees in a font size similar to that of other price information and in locations on the page that were generally proximate to relevant information. However, for

---

[39]White House National Economic Council, *The Competition Initiative and Hidden Fees* (Washington, D.C.: December 2016); and Mary W. Sullivan, *Economic Analysis of Hotel Resort Fees* (Washington, D.C.: January 2017), Federal Trade Commission Bureau of Economics Staff Report.

[40]We reviewed the purchase process on the company's website for 23 events, which included events at 13 different venues of varying sizes, including arenas and theaters. We collected data between June 20, 2017, and January 16, 2018.

[41]For each of these five ticketing companies, a GAO investigator and a GAO analyst reviewed the purchase process for between one and three events. We believe these ticketing companies are among the largest in the U.S.

all companies we reviewed, fees and total ticket prices were not displayed during the process of browsing for different events.

We found that two primary ticket sellers that sometimes offer nontransferable tickets (that is, tickets whose terms and conditions prohibit transfer) had prominently and clearly disclosed the special terms of those tickets—for example, that the buyer's credit card had to be presented at the venue and the entire party had to enter at the same time.[42] One company's website displayed these conditions on a separate screen for 10 seconds before allowing the buyer to proceed. The other company's website similarly displayed information about the tickets' nontransferability on a separate page in clear language in a font size similar to the pricing information.

## Secondary Ticket Exchanges

We also reviewed disclosure of fees and other relevant information on the websites of 11 secondary ticket exchanges and resale aggregators.[43] Two of the 11 websites displayed their fees conspicuously and early in the purchase process, and a third site did not charge ticketing fees. However, we found that ticket resale exchanges sometimes lacked transparency about their fees:

- **Fees often were revealed only near the end.** Seven of the 11 websites disclosed ticket fees only near the end of the purchase process, after the consumer entered an e-mail or logged in. Three of those seven websites displayed fee information only after the credit card number or other payment information was submitted.

- **Fees sometimes were not conspicuously located.** On 2 of the 11 websites, some fees were not displayed alongside the ticket price, but instead were only visible by clicking a specific button.

- **Font sizes were small in two cases.** On 2 of the 11 websites, fees were displayed in a font size significantly smaller than other text.

---

[42]According to industry stakeholders, nontransferable tickets are rarely used. Due to their rarity, we could only identify one event using nontransferable tickets from each of two ticket sellers at the time of our analysis.

[43]The 11 companies included 9 secondary ticket exchanges and 2 ticket resale aggregators, which aggregate listings from multiple exchanges. For each, we reviewed the purchase process for between three and five events.

In contrast to primary market sellers, secondary market sellers' websites sometimes did not clearly disclose when a ticket was nontransferable.[44] Disclosures on secondary market ticket exchanges varied, in part because individual sellers are permitted to enter their own descriptions about ticket characteristics. In some cases, the seller identified nontransferable tickets only by labeling them "gc," indicating that a gift card would be mailed to the buyer to present for entry to the venue.[45]

To further review nontransferable ticket listings, we contacted the customer service representatives of three large secondary ticket exchanges to ask about a nontransferable ticket listing.[46] We asked if we would have difficulty using the ticket because the venue's or ticket seller's website stated that only the original buyer could use the ticket, with one website noting that picture identification might be required for entry. Customer service representatives of all three exchanges told us that despite the purported restrictions, we would be able to use the ticket to gain entry to the venue. To confirm these statements, we contacted officials of these venues, who acknowledged that picture identification had not been required for entry at these events.

Consumers may not always be aware they are purchasing tickets from a secondary market site at a marked-up price. In a 2010 enforcement action, FTC settled a complaint against Ticketmaster after alleging, among other things, that the company steered consumers to its resale site, TicketsNow, without clear disclosures that the consumer was being directed to a resale website. The settlement requires Ticketmaster, TicketsNow, and any other Ticketmaster resale websites to clearly and conspicuously disclose when a consumer is on a resale site and that prices may exceed face value, and to include "reseller price" or "resale price" with ticket listings. In addition, in January 2018, the National Advertising Division, a self-regulatory organization, asked FTC to

---

[44]According to some industry stakeholders, nontransferable tickets are sometimes resold, although the tickets' terms and conditions prohibit it.

[45]Because nontransferable tickets often require the buyer's credit card or other identification be presented at the venue, brokers will sometimes purchase tickets using a prepaid card that is mailed to the buyer.

[46]For two of the companies, a GAO investigator and a GAO analyst sent eight e-mails to each customer service department. For the third company, five "live chats" were conducted with customer service representatives. Each e-mail or live chat inquired about one of two events using nontransferable tickets. We did not identify ourselves as representing GAO during these contacts.

investigate the fee disclosure practices of StubHub, a large secondary ticket exchange, alleging the company did not clearly and conspicuously disclose its service fees when it provides ticket prices.[47]

**White-Label Websites for Ticket Resale**

A subset of ticket resale websites, known as "white label," used marketing practices that might confuse consumers. A company providing white-label support allows affiliates to connect its software to their own, uniquely branded website.[48] This is sometimes also described as a "private label" service in the industry. For event ticketing, a ticket exchange offering white-label support provides the affiliate company with access to its ticket inventory and services, such as order processing and customer service. However, the affiliate uses its own URL (website address), sets the ticket prices and fees, and conducts its own marketing and advertising. Two secondary ticket exchanges operate white-label affiliate programs, under which affiliates create unique white-label websites for ticket resale.

While we did not identify data on the number of white-label websites for event ticketing, they commonly appear in the search results for all types of venues, including smaller venues like clubs and theaters. White-label websites often market themselves through paid advertising on Internet search engines, appearing at the top of search results for venues. Thus, they are often the first search results consumers see when searching for event tickets.[49] Figure 1 provides a hypothetical example of a white-label

---

[47]The National Advertising Division is an investigative unit of the Council of Better Business Bureaus' Advertising Self-Regulatory Council. According to an Advertising Self-Regulatory Council press release, StubHub declined to comply with the division's previous recommendations, stating that its fee disclosure practices were in line with industry practice and that consumers generally understand that fees will be added at the end of the purchase process. See Advertising Self-Regulatory Council, "NAD Refers StubHub Pricing Claims to FTC for Further Review After Advertiser Declines to Comply with NAD Decision on Disclosures" news release, January 16, 2018, http://www.asrcreviews.org/nad-refers-stubhub-pricing-claims-to-ftc-for-further-review-after-advertiser-declines-to-comply-with-nad-decision-on-disclosures/.

[48]White-label programs are used in many industries, not just event ticketing. For example, there are white-label software search engines for booking airlines and hotels.

[49]Two of the largest search engines offer advertising services that allow companies to appear in the search results related to selected products or services. Advertisers identify keywords relevant to their products and when users search for those keywords, their advertisements will appear on top of or next to the relevant search results. These advertised search results are usually identified in some manner to separate them from other search results. Use of paid search results for event ticketing is not limited to white-label websites and is a common marketing practice of many primary and secondary market ticket sellers.

advertisement on a search engine, as well as the typical appearance of a white-label website.

**Figure 1: Hypothetical Example of White-Label Search Results and Website**



Source: GAO. | GAO-18-347

Note: "GAO Arena" is a fictitious venue used for illustrative purposes.

In 2014, FTC and the State of Connecticut announced settlements with TicketNetwork—one of the exchanges operating a white-label program—and two of its affiliates after charges of deceptively marketing resale tickets.[50] The complaint alleged that these companies' advertisements

---

[50]*See* Federal Trade Commission v. TicketNetwork, Inc., No. 3:14-cv-1046 (D. Conn. Aug. 12, 2014); Federal Trade Commission v. SecureBoxOffice, LLC, No. 3:14-cv-1046 (D. Conn. Aug. 12, 2014); Federal Trade Commission v. Ryadd, Inc., No. 3:14-cv-1046 (D. Conn. Aug. 12, 2014).

and websites misled consumers into thinking they were buying tickets from the original venue at face value when they were actually purchasing resale tickets at prices often above face value. According to the complaint, the affiliate websites frequently used URLs that included the venue's name and displayed the venue's name prominently on their websites in ways that could lead consumers to believe they were on the venue's website. The settlements prohibited the company and its affiliates from misrepresenting that they are a venue website or that they are offering face-value tickets, and from using the word "official" on the websites, advertisements, and URLs unless the word is part of the event, performer, or venue name. They also required that the websites disclose that they are resale marketplaces, that ticket prices may exceed the ticket's face value, and that the website is not owned by the venue or other event organizers.

FTC staff with whom we spoke told us that they were aware that similar practices have continued among other white-label companies. Staff told us they have continued to monitor white-label websites and related consumer complaints. Additionally, a wide range of stakeholders with whom we spoke—including government officials, event organizers, and other secondary ticket sellers—expressed concerns about these websites. In particular, they were concerned that consumers confused white-label websites for the venue's website.

We reviewed 17 websites belonging to eight companies that were affiliates of the two secondary ticket exchanges offering white-label programs.[51] We identified the sites by conducting online searches for nine venues (including stadiums, clubs, and theaters) on two of the largest search engines. All nine of the venues had at least one white-label site appear in the paid advertising above the search results. We observed the following:

- **Sites could be confused with that of the official venue.** Fourteen of the 17 white-label websites we reviewed used the venue's name in the search engine's display URL, in a manner that could lead a consumer to believe it was the venue's official website. In addition, 5 of the 17 webpages used photographs of the venue and 11 provided

---

[51]Companies that use white-label ticketing sites typically have multiple websites displaying different URLs in online search results. We reviewed the purchase process for between one and four events per site. For each event, we recorded the prices and fees charged, and how and when the site disclosed its fees and that it was a resale site.

descriptions of the venue (such as its history) that could imply an association with the venue.

- **Fees were higher than on other resale sites.** Total ticketing fees (such as "service charges") for the white-label sites ranged from 32 percent to 46 percent of the ticket's list price, with an average of 38 percent. These fees were generally higher than those of other ticket resellers—for example, the secondary ticket exchanges that we reviewed charged average fees of 31 percent.

- **Fees were revealed only near the end.** All 17 of the white-label sites we reviewed disclosed their fees late in the purchase process. Ticketing fees and total prices were provided only after the consumer had entered either an e-mail address or credit card information.

- **Other key disclosures were present but varied in their conspicuousness.** All 17 of the white label webpages we reviewed disclosed on their landing page and check-out page that they were not associated with the venue and were resale sites whose prices may be above face value. However, this information was presented in a small font or in an inconspicuous location (not near the top of the page) for the landing page of 7 of these webpages, as well as for the check-out page of 12 of the 17 webpages.

- **Ticket prices were higher than other resale sites.** The ticket price charged for the events we reviewed on the white-label sites had an average markup of about 180 percent over the primary market price.[52] By comparison, other ticket resale websites we reviewed had an average markup of 74 percent.

In some cases, we observed white-label websites selling event tickets when comparable tickets were still available from the primary seller at a lower price. For example, two white-label sites were offering tickets to an event for $90 and $111, respectively, whereas the venue's official ticketing website was offering comparable seats for $34. (All figures include applicable fees.) Given the significantly higher cost for the same product, some consumers may be purchasing tickets from a white-label site only because they mistakenly believe it to be the official venue's site. As we discuss in greater detail later in this report, in February 2018, Google implemented requirements for resellers using its AdWords service

---

[52]The primary market price includes the face value and any additional fees, which we obtained from the primary ticket sellers' websites. We compared the primary market price to the total price on the white-label site (including fees).

that are intended, among other things, to prevent consumer confusion related to white-label sites.

## Other Consumer Protection Issues Have Been Identified

Ticket fees, the use of speculative tickets, ticket fraud, and designated resale exchanges have raised consumer protection concerns among government agencies, industry stakeholders, and consumer advocates.

### Amount Charged for Ticket Fees

Consumer protection advocates, event organizers, and some government entities have expressed concerns about high ticket fees.[53] For example, the New York State Attorney General's report expressed concern about what it deemed high ticketing fees charged for unclear purposes. The report found that among online platforms, vendors of event tickets appeared to charge fees to consumers higher than most other online vendors.[54] Concerns about high ticket fees also were frequently cited in 2009 congressional hearings on the proposed merger of Live Nation and Ticketmaster.[55] In addition, some managers and agents we interviewed said their clients were dissatisfied with high ticket fees. Data we received from FTC's Consumer Sentinel Network indicated 67 complaints related specifically to event ticket fees from 2014 through 2016.[56]

A 2010 analysis by the Department of Justice said that the dominance of one company, Ticketmaster, in the primary ticketing market allowed the

---

[53]As previously noted, we found that the primary and secondary markets had average fees of 27 percent and 31 percent, respectively, of face value or listed price.

[54]New York State Office of the Attorney General, 31.

[55]*Hearing on Competition in the Ticketing and Promotion Industry, Judiciary Committee of the United States House of Representatives, Subcommittee on Courts and Competition Policy,* 111th Cong. 1 (Feb. 26, 2009) and *The Ticketmaster/Live Nation Merger: What Does It Mean for Consumers and the Future of the Concert Business?,* Committee on the Judiciary of the United States Senate, Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee,111th Cong. 1 (Feb. 24, 2009). (For example, see testimony of Edmund Mierzwinski, Consumer Program Director, U.S. Public Interest Research Group.)

[56]FTC's Consumer Sentinel Network is a database of consumer complaints received by FTC, as well as those filed with certain other federal and state agencies and nongovernmental organizations, including the Consumer Financial Protection Bureau and the Better Business Bureaus. For our review, we asked FTC staff to search the database from 2014 through 2016 using the terms "ticket," types of events (e.g., concert, sport, theater, game, show), and "fee" or "charge." We asked FTC to limit the search to complaints received against 6 primary ticketing companies and 11 secondary ticket resale exchanges or aggregators.

company to maintain high ticket fees.[57] The report noted high barriers to entry for competitors, among which were high startup costs, Ticketmaster's reputation for providing quality service to venues, and long-term exclusive contracts that large venues typically sign with one ticketing company. In addition, with the merger, Live Nation Entertainment owns both the largest primary ticket seller (Ticketmaster) and largest promoter (Live Nation), and owns many large venues and an artist management company. When the ticketing company is owned by a major promoter, the combined firm's ability to bundle ticketing services and access to artists would require competitors to offer similar services in order to compete effectively, according to the Department of Justice analysis. In an attempt to mitigate these potential effects, the Department of Justice final judgment on the merger prohibited certain forms of retaliation against venues that contract with other ticketing companies. In the United Kingdom, where the venue and promoter typically contract with multiple ticket sellers, ticket fees are lower than in the United States—around 10 percent to 15 percent of the ticket's face value, according to a recent study.[58]

Industry experts generally consider the secondary market for event ticketing to be more competitive than the primary market because of the large number of brokers participating in the industry.[59] According to a report by the National Economic Council, fees in this market may be higher than expected because of the lack of transparency described earlier—consumers may be more willing to accept high fees and less likely to comparison shop when fees are disclosed at the end of a multistep purchase process. An FTC staff report made a similar point regarding hotel resort fees, noting that fees disclosed only at the end of the shopping process could harm consumers by making it more difficult to comparison shop for hotels.[60] In addition, consumers who are led to

---

[57]Competitive Impact Statement, United States of America v. Ticketmaster Entertainment, Inc., No. 1:10-cv-00139 (D. D.C. Jan. 25, 2010).

[58]Michael Waterson, *Independent Review of Consumer Protection Measures Concerning Online Secondary Ticketing Facilities*, a report prepared at the request of the United Kingdom Department for Business, Innovation and Skills and Department for Culture, Media and Sport (London: May 2016), 30-31.

[59]For example, see Daniel A. Rascher and Andrew D. Schwarz, "The Antitrust Implications of 'Paperless Ticketing' on Secondary Markets," *Journal of Competition Law and Economics* 9, no. 3 (May 2013), 659.

[60]Sullivan, 27.

believe that white-label ticketing sites are the official venue site may accept high fees because they think they are buying tickets from the primary ticketing provider, according to two industry representatives with whom we spoke.

The level of fees in the secondary market might also be affected by partnerships between the primary and secondary ticket seller. Primary ticketing companies sometimes offer resale options or use of designated resale exchanges (discussed below). The American Antitrust Institute has expressed the view that these relationships can reduce inventory for rival secondary sellers and in turn, can result in higher fees, as the primary ticket seller essentially has a monopoly over both markets.[61]

**Speculative Tickets**

A speculative ticket refers to a ticket put up for sale by a broker when the broker does not yet have the ticket in hand, perhaps because the event has not yet gone on sale. Brokers may sell speculative tickets because they anticipate they will be able to secure the tickets (whether on the primary or secondary market) and sell them for a profit. The terms of use of most secondary sites we reviewed did not allow speculative ticket listings. However, while we were unable to identify comprehensive data on the extent of speculative tickets, numerous industry representatives told us that these sites commonly do not enforce this prohibition and listing of speculative tickets was widespread. One common form of speculative ticketing occurs when brokers offer tickets after a popular artist has announced a concert schedule but not yet begun ticket sales, according to industry representatives.

Several concerns exist around the use of speculative ticketing:

- **The buyer may never get the ticket.** Speculative ticket listings can result in canceled orders if the broker cannot obtain the ticket, or cannot obtain it at a price that would result in a profit. For example, it was reported that many fans who thought they purchased tickets to the 2015 Super Bowl actually purchased speculative tickets that were subsequently canceled when the supply of tickets was less than

---

[61]James D. Hurwitz, *Restrictive Paperless Tickets: A White Paper by the American Antitrust Institute* (Washington, D.C.: 2012), 36-37, 41-42. The American Antitrust Institute is an independent, nonprofit organization dedicated to promoting competition through its research, education, and advocacy.

expected.[62] According to industry stakeholders, consumers can typically obtain a refund on a canceled order from the broker or secondary ticket exchange, but may still face disappointment, inconvenience, or costs associated with nonrefundable travel to the planned event.

- **The seat location is not guaranteed.** Brokers selling speculative tickets typically do not specify the seat number but rather promise a certain section of the venue, according to two event organizers we interviewed. However, because the broker does not have the ticket in hand, consumers can receive seats that are worse or different than advertised.

- **Speculative ticketing can cause consumer confusion.** One large ticket resale exchange told us it only allows trusted brokers to sell speculative tickets under certain circumstances and requires sellers to use a special label for these listings. However, we observed other exchanges that are less transparent and do not make clear to the buyer that the ticket is speculative. Consumers may not be aware that tickets have not officially gone on sale yet and eventually may be available on the primary market at a lower price.

In its 2010 enforcement action against Ticketmaster and its resale exchange, TicketsNow.com, FTC alleged that the companies failed to tell buyers that many of the resale tickets advertised were being sold speculatively.[63] The settlement required Ticketmaster and its affiliates to disclose if a ticket was being sold speculatively and to otherwise refrain from misrepresenting the status of tickets. FTC staff also sent warning letters to other resale companies that may have been at risk of violating the FTC Act with regard to their speculative ticketing practices. More recently, in 2015 a request by the New York State Attorney General resulted in three major ticket exchanges removing speculative ticket listings for an upcoming tour. Representatives from one of the secondary ticket exchanges told us that while it is difficult to determine if a listing is truly speculative, they have removed listings when they have information

---

[62]For example, see Geoff Baker, "Super Bowl dream becomes nightmare for Seahawks fans after shortage of tickets," *Seattle Times*, January 31, 2015, accessed on February 8, 2018. https://www.seattletimes.com/sports/seahawks/super-bowl-dream-becomes-nightmare-for-seahawks-fans-after-shortage-of-tickets/.

[63]Complaint at 8-9, Federal Trade Commission v. Ticketmaster L.L.C., No. 1:10-cv-01093 (D. Ill. Feb. 18, 2010).

from event organizers to indicate that no one could have obtained the tickets.

Posing as a consumer, a GAO investigator made 11 inquiries to customer service representatives of two of the largest secondary ticket exchanges about two events listing tickets that appeared to be speculative.[64] The customer service representatives generally acknowledged that the sellers did not yet have the tickets in hand but assured the investigator that the tickets would be provided.

Fraudulent Tickets

Event tickets are sometimes fraudulent—for example, a fraudster may create and sell a counterfeit ticket or multiple copies of the same print-at-home ticket, according to industry representatives. We did not identify comprehensive data on the extent of ticket fraud. Event organizers with whom we spoke said that they typically only see a handful of fraudulent tickets at popular events, and do not consider fraudulent ticketing to be a widespread problem. A limited search of FTC's Consumer Sentinel Network data identified relatively few complaints—an estimated 19 related to fraudulent tickets from 2014 through 2016.[65] Industry representatives told us fraudulent tickets are most common for the most popular events and were often purchased on the street outside the venue or through an online classified advertisement.

According to industry representatives, fraudulent ticketing is rare on secondary market exchanges, in part because the exchanges can take action against sellers of fraudulent tickets, such as fining them or banning them from future sales. The National Association of Ticket Brokers requires its members to have a policy to reimburse consumers for fraudulent tickets.[66] Two secondary market participants told us the most

---

[64]We identified ticket listings that appeared to be speculative by searching for events that had been announced but for which tickets had not yet been released through a general on-sale or presale. Acting in an undercover capacity, the investigator contacted one company's customer service through eight e-mail inquiries (each sent from a different e-mail address) and the other company through three separate "live chats."

[65]Our estimate of the number of complaints from 2014 through 2016 related to ticket fraud was derived by having FTC staff search the Consumer Sentinel Network for complaints including the term "ticket" and at least one term signifying fraud (e.g., "fake," "invalid"). The search included only complaints against six primary ticketing companies and 11 secondary ticket resale exchanges or aggregators that we identified.

[66]The National Association of Ticket Brokers is a trade association that represents ticket sellers in the secondary market and is comprised of over 200 broker members.

common fraudulent activity they must address is credit card fraud by buyers rather than invalid tickets posted by sellers.

**Designated Resale Exchanges**

Designated resale exchanges are resale platforms that are linked to the primary ticket seller. They are most commonly used in major league sports. The four major sports leagues have agreements with one of two ticketing companies that allow consumers to buy and sell tickets through an official "fan-to-fan" resale marketplace. In addition, some individual teams and venues have an agreement with a third company to use its resale platform, which uses paperless tickets and can facilitate ticket transfers from one consumer to another or restrict transfers altogether (such as with nontransferable tickets).

On these exchanges, when a consumer lists a ticket for resale, the exchange electronically confirms the seller's identity, then cancels the original ticket information (such as a barcode) and reissues the ticket with the new buyer's name.[67] According to the three sports leagues we interviewed, designated resale exchanges are generally optional—for example, the sports leagues allow brokers and consumers to use other secondary market exchanges as well.

A representative of one of the major sports leagues told us the exchanges provide added revenue to teams because the teams receive some of the fee revenues from sales on the exchanges. The exchanges provide data on event attendees, which is valuable for marketing and security purposes, according to another sports league and a primary ticket seller. In addition, the exchanges can reduce resale fraud because the primary seller verifies the legitimacy of the ticket being resold, according to representatives of the three leagues we interviewed.

However, some academics and secondary market participants we interviewed have argued that designated resale exchanges work to the detriment of consumers. For example, one academic study stated that a primary ticket seller's dominance in the secondary market can substantially reduce inventory for rival secondary sellers, thus impeding

---

[67]League officials we interviewed explained that although they have league-wide resale partnerships with certain companies, individual teams or clubs sometimes have their own partnerships with other companies.

competition in the resale market.[68] The study stated that reduced secondary market competition, in turn, can result in higher fees.

In 2015, a U.S. district court dismissed StubHub's antitrust complaint against the Golden State Warriors basketball team and Ticketmaster, LLC. StubHub claimed that the Warriors' and Ticketmaster's exclusive resale agreement restricted secondary market competition for professional basketball tickets in the Bay Area, but the court disagreed.[69]

Some designated resale exchanges use price floors, below which consumers may not sell their tickets. One sports league's exchange has a price floor of $6, while the exchanges of two other sports leagues do not have league-wide price floors, according to league representatives. In addition, we identified instances of individual teams using price floors on their designated resale exchanges.[70] One purpose of price floors is to protect brand reputation, according to league representatives, because too low a ticket price can lessen an event's perceived value. Price floors also can prevent the secondary market from undercutting a team's own (primary market) price. However, some consumer organizations and secondary ticket sellers said price floors were unfriendly to consumers. Season ticket holders might be unable to sell tickets for low-demand games for which market prices were lower than the floors. In addition, the New York State Attorney General's office noted that consumers might not always be aware that price floors were in effect and thus pay more than they would on another exchange.[71]

---

[68]Rascher and Schwarz, 693.

[69]Order Granting Defendants Motion to Dismiss, *StubHub, Inc. v. Golden State Warriors, LLC,* No. C 15-1436 MMC, 2015 U.S. Dist. LEXIS 151188, at *4 (N.D. Cal. Nov. 5, 2015).

[70]For example, we identified one basketball team with a $20 price floor for tickets sold on its designated resale exchange, and a baseball team's deal with a major ticket resale exchange that set a price floor of 50 percent of the ticket's original season ticket price.

[71]New York State Office of the Attorney General, 32.

## Effects of Ticket Resale Restrictions and Disclosures on Consumers and Business Would Vary

Policymakers, consumer organizations, and industry participants have proposed or implemented a number of ticket resale restrictions and disclosure requirements, each of which have or would have advantages and disadvantages for consumers or industry participants (see table 5). Event ticketing is not federally regulated and some industry participants are using or exploring technology and other market-based approaches to address concerns related to secondary market activity.

**Table 5: Potential Advantages and Disadvantages of Selected Legislative or Regulatory Actions Related to Ticket Resale**

| Action | Description | Key advantages | Key disadvantages |
|---|---|---|---|
| Prohibiting nontransferable tickets | Prohibiting tickets that do not allow transfer from one person to another and therefore restrict resale | Ensures ticketholders can recoup costs on tickets they cannot use<br><br>Efficient allocation because tickets go to those willing to pay the most | Reduced opportunity for consumers to access tickets at lower face-value price |
| Price caps | Capping the price at which tickets can be resold (i.e., limits the markup) | Keeps prices down for consumers by restricting markups<br><br>Still preserves consumers' ability to resell and recoup costs | Challenging to enforce<br><br>Could send resale activity underground, where there are fewer protections<br><br>Inefficient allocation because tickets do not go to those willing to pay the most |
| Requiring up-front disclosure of ticket fees or requiring all-in pricing | Legislative or regulatory requirement to provide up-front disclosure of fees during ticketing process or to wrap fees into the listed price | Increased transparency that allows better consumer decision making and facilitates comparison shopping | Would restrict companies' flexibility in choosing how to disclose fees<br><br>Compliance challenges |
| Requiring disclosure of ticket's face value on resale sites | Legislative or regulatory requirement that resellers show a ticket's face value alongside the list price | Makes the markup transparent and helps ensure consumers know they are buying from a resale site<br><br>Can help consumers assess quality of seat | Could impose challenges for businesses in identifying face value<br><br>Challenging to enforce |
| Requiring disclosure of ticket availability | Legislative or regulatory requirement that venue or event organizers disclose how many tickets are available when event goes on sale | Transparency for consumers on how many tickets are actually available for sale | Unclear how useful this information is for consumers<br><br>Compliance challenges<br><br>May require businesses to disclose proprietary information |

Source: GAO | GAO-18-347

Note: None of these requirements are in effect at the federal level, but some have been implemented or considered at the state level, as described elsewhere in this report.

## Nontransferable Tickets Can Reduce the Price Some Consumers Pay but Also Limit Flexibility

Some event organizers make tickets to their events nontransferable—that is, the terms and conditions of the ticket prohibit its transfer from one person (in whose name the ticket is issued) to another. The prohibition can be enforced by requiring consumers to bring to the venue the credit or debit card used for purchase and matching photo identification. The consumer then receives a seat locator slip—akin to a consumer swiping a credit card at the airport to retrieve a boarding pass.

At least three states—Connecticut, New York, and Virginia—have laws that restrict ticket issuers' ability to sell nontransferable tickets.[72] Similar legislation has been introduced in several other states in recent years.[73]

The use of nontransferable tickets, even in states where they are legal, is relatively uncommon. For example, an artist advocacy group told us that some events that use them make only the first several rows of seats nontransferable. One large primary ticketing company told us it estimated that less than 5 percent of its events used nontransferable tickets, while another told us nontransferable tickets represented less than 1 percent of its tickets in total. Almost all nontransferable tickets are for concerts; the practice is rare for sporting events and theater, according to industry stakeholders with whom we spoke.

### Advantages of Nontransferable Tickets

Advantages to consumers of nontransferable tickets stem from the goal of preventing ticket resale—allowing consumers to pay face value rather than a higher price on the secondary market. As described earlier, markups on the secondary market can be substantial. Proponents of nontransferable tickets, which include a large primary ticket seller and some event organizers and well-known artists, have argued they are an important tool that makes it harder for brokers to resell tickets for profit.

We identified one empirical study on the effects of nontransferable tickets on resale activity. A 2013 study in the *Journal of Competition Law and Economics* compared two events using nontransferable tickets to comparable events using transferable tickets at the same venues. It found that nontransferable tickets significantly reduced resale and that prices

---

[72]See N.Y. Arts & Cult. Aff. Law § 25.30(1)(c) (Consol. 2018); 2017 Conn. Acts 17-28 (Reg. Sess.); Va. Code Ann. § 59.1-466.5 - 59.1-466.7 (2017). New York's law has been in place since 2010, while Connecticut's and Virginia's laws were passed in 2017.

[73]For example, legislation was introduced in Alabama, Maryland, and Missouri that would restrict nontransferable tickets.

were significantly higher for the relatively small portion of nontransferable tickets that were resold.[74]

In addition, there is anecdotal evidence that nontransferable tickets reduce the rate of resale and allow more consumers to access tickets at face-value prices. Many stakeholders told us that making tickets nontransferable reduces secondary market activity, with some stakeholders citing specific examples.[75] For instance, the manager of a large concert venue that primarily uses nontransferable tickets told us that resale is much less common for the venue's events than for comparable events at similar venues. Similarly, the manager of a major musical artist told us that using nontransferable tickets for a subset of seats on a recent arena tour resulted in minimal listings for those seats on the secondary market. The New York State Attorney General's report stated that nontransferable paperless tickets "appear to be one of the few measures to have any clear effect in reducing the excessive prices charged on the secondary markets and increasing the odds of fans buying tickets at face value."[76] But, while we identified evidence that nontransferable tickets limit resale, they may not eliminate resale because sellers may not follow the restriction.

**Disadvantages of Nontransferable Tickets**

However, other parties—including primary and secondary market participants, consumer advocacy groups, academics, and government agencies—have noted that nontransferable tickets can have the following disadvantages to consumers and adverse effects on markets:

**Financial loss.** With nontransferable tickets, ticket buyers who cannot attend an event can lose the ability to recoup their money through resale.

**Inconvenience.** Nontransferable tickets can be inconvenient because the buyer may need to present identification, a debit or credit card, or both, to

---

[74]Rascher and Schwarz, 655-708.  In this study, a theoretical model was developed and an empirical analysis was performed to demonstrate the potential impact of "paperless ticketing," a form of nontransferable tickets, on the quantity and price of resale tickets relative to conventional ticketing.

[75]Industry stakeholders expressing this view included two primary ticket sellers; two booking agents; two venue managers; Broadway representatives; an artists' advocate group; a manager; a promoter; a secondary ticket seller; and the New York State Office of the Attorney General.

[76]New York State Office of the Attorney General, 36. The report recommended repealing the state's prohibition on nontransferable tickets.

gain entry to the venue, which can create delays. Nontransferable tickets also can create challenges for consumers buying tickets for others (including as a gift) because the ticket terms may require the buyer and original purchase card be present to gain entry. However, a primary ticket seller and a promoter told us these obstacles can be overcome—for example, through mechanisms allowing buyers to transfer tickets upon request, and by using processes to speed venue entry (such as automated kiosks).

**Economic inefficiency.** When nontransferable tickets are priced below the prevailing market price in the primary market, this creates excess demand, and tickets are sold without regard to consumers' willingness to pay.[77] Traditional economics maintains that an efficient market would result in tickets going to those willing to pay the highest price, which nontransferability inhibits by restricting a secondary market.[78] In addition, some academics have noted that consumers may be less willing to buy nontransferable tickets because they do not offer the "insurance" that comes with the ability to resell them.[79]

**Potential impingement on property rights.** Some consumer groups and secondary market participants have argued that nontransferable ticket policies impinge on consumers' property rights. These parties argue that once consumers buy a ticket, they should be able to do whatever they like with it.[80]

**Effect on competition.** The New York State Attorney General's office and some economics literature have cautioned that use of

---

[77]Rascher and Schwarz, 682.

[78]Hurwitz, 43; Rascher and Schwarz, 667.

[79]See, for example, Pascal Courty, *Pricing Challenges in the Live Events Industry: A Tale of Two Industries* (January 2015), 7; Hurwitz, 38; and Rascher and Schwarz, 667. Staff we interviewed from the Department of Justice's Antitrust Division also mentioned that the inability to resell nontransferable tickets could be a deterrent for potential buyers.

[80]Some courts have treated tickets as revocable licenses. For example, in a 2014 civil case regarding a National Football League (NFL) team's ticket sales practices, the U.S. District Court of the Western District of Washington stated that tickets to an NFL game are not tangible goods, but instead revocable licenses. *See e.g.,* Williams v. NFL, No. C14-1089 MJP, 2014 U.S. Dist. LEXIS 155488, at *9 (D. Wash. Oct. 31, 2014); James T. Reese and Mark A. Dodds, "Let's Hear It for the Home Team: *Williams v. National Football League* Upholds Geographic Ticket Sales Ban," *Sport Marketing Quarterly*, vol. 24, no. 2 (2015).

nontransferable tickets by primary ticketing companies can impede competition in the secondary market by making these companies' own resale exchanges the only way to transfer tickets.[81]

## Caps on Resale Prices Can Have Advantages and Disadvantages

Several states have caps on the price at which tickets can be resold, while others have repealed caps and some studies have questioned their enforceability. For example, Kentucky generally prohibits the resale of event tickets for more than either face value or the amount charged by the venue, and Massachusetts prohibits resale by brokers of most tickets for more than $2 above face value, with the exception of relevant service charges.[82] New Jersey allows a maximum markup of 20 percent or $3 (whichever is greater) for nonbrokers and a maximum markup of 50 percent for registered brokers, but does not limit resale prices for nonbrokers for sales over the Internet.[83] A number of other states— including Minnesota, Missouri, New York, and Connecticut—repealed their price cap laws in the 2000s. However, the New York State Attorney General's 2016 report recommended bringing back a price cap, through a "reasonable limit" on resale markups.[84]

Price caps are generally intended to protect consumers from high markups and increase the fairness of ticket distribution so that the wealthiest consumers do not have disproportionate access to tickets. In theory, price caps offer consumers the advantages of nontransferable tickets without the disadvantages: they limit high secondary-market prices but still allow consumers to transfer tickets to others or resell tickets they cannot use.

However, three government studies we reviewed stated that price caps are difficult to enforce and are rarely complied with. A 1999 report by the New York Attorney General noted that ticket resellers "almost universally disregarded" a cap in place at the time.[85] Representatives from the office

---

[81]New York State Office of the Attorney General, 37; Hurwitz, 36-37; Rascher and Schwarz, 693-694.

[82]See KY. REV. STAT. ANN. § 518.070 (LexisNexis 2017); MASS. GEN. LAWS ch. 140, § 185D (2017).

[83]N.J. STAT. § 56:8-33 (2017).

[84]New York State Office of the Attorney General, 37.

[85]New York State Office of the Attorney General, *Why Can't I Get Tickets?: Report on Ticket Distribution Practices* May 1999, 21. New York repealed its price cap in 2007.

told us enforcement of such a cap might be easier now because the secondary market is largely on the Internet, which offers greater price transparency. A 2016 study of the United Kingdom's ticket market noted that enforcement of a price cap was complicated by the fact that ticket resellers were not a well-defined group and sales could occur on various platforms and across jurisdictions.[86] Similarly, the New York State Department of State noted in 2010 that enforcement of price caps can be challenging.[87]

In addition, critics of price caps have said that caps might force resale activity underground, which would reduce transparency and protections (such as refund guarantees) that legitimate secondary market exchanges provide. Both the largest ticket exchange and the largest primary market ticket company have opposed price caps, with the ticket exchange arguing that they would result in street-corner transactions, where the risk of counterfeit and fraud would be significant.[88] On formal exchanges, transactions can be monitored and regulated. As with nontransferable tickets, price caps also can create economic inefficiencies because tickets are not necessarily allocated to those willing to pay the highest price.[89]

A 2010 study by the New York State Department of State compared publicly available secondary market listings for high-demand concerts in New York to the same artists' concerts in nearby states with price caps. It found no definitive evidence that price caps resulted in greater or lesser availability on the secondary market or in lower resale prices.[90] The study noted that online resale prices routinely exceeded the price caps. However, the authors of the study acknowledged that their findings were

---

[86]Michael Waterson, *Independent Review of Consumer Protection Measures Concerning Online Secondary Ticketing Facilities*, a report prepared at the request of the United Kingdom Department for Business, Innovation and Skills and Department for Culture, Media and Sport (London: May 2016), 22-23, 150-151.

[87]New York State Department of State, *Report on Ticket Reselling and Article 25 of the Arts and Cultural Affairs Law* (Albany, N.Y.: Feb. 1, 2010), 33.

[88]StubHub, "StubHub Open Letter to Fans Following Passage of the Ontario Ticket Sales Act," December 13, 2017, accessed December 14, 2017, https://www.newswire.ca/news-releases/stubhub-open-letter-to-fans-following-passage-of-the-ontario-ticket-sales-act-663928593.html.

[89]See, for example, Hurwitz, 35.

[90]New York State Department of State, 26.

limited by their inability to obtain data on ticket sales and availability from secondary sellers.

## Stakeholder Views Vary on Effects of Additional Disclosure Requirements

Legislative or regulatory actions to improve disclosure and transparency of ticket fees, resale markups, and ticket availability have advantages and disadvantages.

### Up-front Fee Disclosure

Some government stakeholders have suggested improving fee transparency through a legal requirement to disclose ticket fees earlier in the purchase process. As discussed earlier, ticketing companies in the primary and secondary markets vary on when and how they disclose their fees, and some disclose fees only upon checkout. No federal law expressly addresses fee disclosure in event ticketing. However, at least one state requires disclosure of fees at the beginning of the purchase process.[91]

On the primary market, up-front fee disclosure helps decision making by informing consumers of the total ticket price early in the process. It also helps consumers decide whether to buy from the ticketer's website or at the box office, where there typically are no fees. On the secondary market, up-front fee disclosure aids comparison shopping by helping consumers identify the resale exchange with the best total price. Sellers that do not provide enough or full information on prices through hidden fees could have competitive advantage because they would be perceived as offering lower prices over their competitors who do provide full information showing the price. For products and services in general, FTC staff guidance advocates that fees be disclosed up front, particularly before the point at which the consumer has decided to make a purchase.[92]

---

[91]Connecticut requires any advertisement for an in-state event to include the total price and the portion of that price (in dollars) that represents a service charge. CONN. GEN. STAT. § 53-289a (2017).

[92]For example, see Federal Trade Commission, .com Disclosures: How to Make Effective Disclosures in Digital Advertising, March 2013, 14. Similarly, Canada's Competition Bureau, an independent Canadian law enforcement agency, has stated that not disclosing fees up front can be misleading to consumers because the advertised price is not attainable. See Competition Bureau Canada, "Calling All Ticket Vendors: Be Upfront about the True Cost of Tickets," July 4, 2017, accessed March 12, 2018, https://www.canada.ca/en/competition-bureau/news/2017/06/calling_all_ticketvendorsbeupfrontaboutthetruecostoftickets.html.

Figure 2 provides examples of different approaches to displaying prices and fees.

**Figure 2: Hypothetical Examples of How a Ticket Price and Fees Can Initially Be Displayed**

**Fees not displayed**



| Quantity | Section | Row | Subtotal |
|----------|---------|-----|----------|
| 1 | 204 | 17 | $140 + fees |

**Fees displayed**



| Quantity | Section | Row | Subtotal |
|----------|---------|-----|----------|
| 1 | 204 | 17 | Subtotal: $140<br>Service fee: $35<br>Facility fee: $4<br>Total: $179 |

**All-in pricing**



| Quantity | Section | Row | Total price (including fees) |
|----------|---------|-----|------------------------------|
| 1 | 204 | 17 | $179 |

Source: GAO. | GAO-18-347

Note: These examples are illustrative and are not based on actual tickets or events.

Currently, FTC relies on the Federal Trade Commission Act—which prohibits unfair or deceptive acts or practices—to address problems related to fee disclosures. But FTC staff said it is challenging and resource-intensive to use the act to address inadequate fee disclosures industry-wide because it requires proving violations on a case-by-case basis.[93] FTC staff told us that, depending on the circumstances, a legislative disclosure requirement that specified requirements for fees could facilitate enforcement activity and create a more level playing field

---

[93]Industry stakeholders expressing this view included two managers, one agent, one promoter, two artist advocacy groups, four secondary market ticket exchanges, and the National Association of Ticket Brokers.

for consumers and sellers. Eleven industry stakeholders and three consumer advocacy groups with whom we spoke similarly expressed support for a requirement that ticketing fees be disclosed up front. Many noted that fees should be fully transparent to consumers.

However, a primary ticket seller, two venue managers, and a secondary ticket seller we interviewed questioned the need for an up-front fee disclosure requirement. For example, a primary ticket seller stated that knowing fees up front would not affect a consumer's decision of whether or not to buy a ticket. The two venue managers believed that the timing of the fee disclosure was not important, as long as fees are disclosed before consumers complete the purchase. Representatives of one secondary ticket exchange said that up-front disclosure of fees could be challenging because a ticket's fee is not stable—for example, the fee can change based on price fluctuations, different delivery methods, and the use of promotion codes.

The National Economic Council has stated that "all-in pricing," a form of up-front pricing, may be preferable to other methods of fee disclosure.[94] All-in pricing incorporates the ticket's face value and all mandatory fees and taxes, as illustrated in figure 2 above. According to the National Economic Council, all-in pricing eases comparison across vendors. The FTC staff report analyzing hotel resort fees supported all-in pricing for that industry because it said that breaking out fees, instead of providing a single total price, hindered consumer decision making and often resulted in consumers underestimating the total price.[95] Officials from two state attorney general offices told us that all-in pricing could be advantageous, noting that fee disclosures represent their most significant enforcement issue related to the ticketing industry.

Three secondary ticket sellers told us they might support a requirement to provide all-in pricing, but only if it was required of all ticket sellers. In 2014, the largest secondary market ticketing company began using all-in pricing, with its listings displaying a single total price that incorporated fees. However, the company soon discontinued all-in pricing as the default because, it told us, it put the company at a competitive disadvantage with other secondary market providers whose fees were not

[94]White House National Economic Council, 16.

[95]Sullivan, 27.

included in the initial ticket price displayed to consumers.[96] A requirement that all ticket sellers provide up-front fee disclosure would mitigate or resolve that issue.

One argument against a requirement for all-in pricing is that such regulation would restrict ticket companies' flexibility in choosing how to disclose fees. In addition, a manager, a promoter, and two artist advocacy groups said all-in pricing could give fans the incorrect impression that the artist was charging the full ticket price and receiving its revenues, because the portion of the price going toward ticketing fees would not be transparent.

**Disclosing Face Value on Resale Sites**

Some federal and state policymakers have proposed requirements for resellers to disclose a ticket's face value on secondary ticket websites. Georgia and New York State have enacted similar requirements, with statutes requiring resellers to disclose both the face value of tickets and their list price.[97]

Requiring that ticket resellers disclose the ticket's face value can have several advantages. First, it makes the reseller's markup transparent. Second, it can help consumers assess the quality of the seat location and compare similar seats across resale listings. Third, it might reduce the possibility that consumers mistake a reseller's website for a venue website, as described earlier. This, in turn, could encourage consumers to recognize they are viewing a secondary market exchange and comparison shop for a better price elsewhere.

However, a requirement that resellers disclose a ticket's face value can present challenges because the definition of "face value" may not always be clear, according to three ticket resellers and FTC Bureau of Consumer Protection staff. If the face value does not incorporate fees and taxes charged on the primary market, it would not reflect the full amount paid by

---

[96]The company still provides the customer the option of displaying all-in pricing at the listing page, as do some other secondary market providers.

[97]Georgia's ticketing law requires brokers to disclose to the purchaser, in writing, the difference between a ticket's face value and the price being charged. GA. CODE ANN. § 43-4B-28(a)(3) (2017). New York requires licensed resellers to post a price list showing the established (face value) price charged by the operator of the place of entertainment for which the ticket is being resold. N.Y. ARTS & CULT. AFF. LAW §25.23 (Consol. 2018). At least two foreign jurisdictions—the United Kingdom and Ontario, Canada—have similar laws, according to a United Kingdom government study of the country's ticket resale market and a Canadian government press release.

the original buyer. Similarly, some tickets are sold through VIP packages that do not itemize the price of the ticket and other components, such as backstage access or parking. In addition, with dynamic pricing, a ticket's face value can change frequently. Furthermore, season tickets may display a higher face value than the season ticket holder paid because teams usually sell the packages at a discount.

A requirement to disclose a ticket's face value also could create compliance costs for secondary ticket exchanges, and could be difficult to enforce, according to some stakeholders. Three secondary ticket exchanges told us they do not currently collect information on a ticket's face value and would have difficulty verifying the value provided by the listing broker—in part because of the challenges in defining face value, as described above. The New York State Office of the Attorney General stated in its 2016 report that most resellers cannot comply with the state's disclosure requirement because most secondary ticket exchanges do not offer the option to show the ticket's face value alongside its list price, despite having the capability to add such functionality.[98] In addition, an official from Georgia's Athletic and Entertainment Commission told us that resellers largely disregarded the state's requirement to disclose face value.

**Disclosing Ticket Availability**

Another proposal, advocated by secondary market stakeholders, among others, would require primary ticket sellers to disclose how many tickets are available when an event first goes on sale to the general public. For instance, a venue or ticket seller might be required to provide the venue capacity and number of tickets available for sale after accounting for presales and holds. A 2017 law in Ontario, Canada, requires primary ticket sellers to provide certain information about venue capacity and presales, according to testimony by the Ontario Attorney General.[99]

Such a disclosure would provide consumers a clearer picture of ticket availability and help them manage expectations and make informed decisions, according to three consumer advocacy groups and two academics with whom we spoke. In addition, the National Association of Ticket Brokers and a secondary ticket exchange stated that disclosing ticket availability would shed light on what some consider excessive holds

---

[98]New York State Office of the Attorney General, 34.

[99]*Official Report of Debates (Hansard) No. 136*, Legislative Assembly of Ontario, 2nd Session, 41st Parliament (Dec. 13, 2017).

and presales by the primary market. They said that brokers often are blamed when events quickly sell out on the primary market, whereas there may have been relatively few tickets available for sale in the first place. The New York State Office of the Attorney General stated that the lack of transparency about the manner in which tickets are distributed creates a level of mistrust among consumers.

However, many primary market stakeholders with whom we spoke— including promoters, managers, venue operators, and primary ticket sellers—said such a disclosure would have little-to-no benefit. First, some of them noted that ticket inventory can change as event production details evolve and holds are released, making it difficult to provide an accurate number of tickets available at any one time. Second, some said this disclosure would be confusing or meaningless for consumers, with one promoter noting that for high-demand events, a consumer's odds of getting a ticket are low regardless of whether he or she knows the number of available tickets. Another promoter noted that the seat maps used to select seats when purchasing tickets already provide information on ticket availability. Many stakeholders also told us such a disclosure would only help brokers by giving them information useful in buying tickets and setting resale prices. In addition, a venue manager noted that information on ticket sales is considered proprietary and artists and event organizers should not be required to disclose confidential business information.[100]

## Event Ticketing Is Not Federally Regulated and Some Stakeholders Cite Market-Based Approaches to Address Concerns about Secondary Market Activity

Federal agencies face constraints in addressing ticketing issues. Some industry players are implementing technological and market-based approaches that seek to address concerns about secondary market activity.

---

[100]When initially introduced in October 2017, the Ticket Sales Act enacted by Ontario, Canada, included a provision requiring advance disclosure of the number of tickets to be sold to the general public, according to a statement by the Attorney General of Ontario. He stated that this provision was dropped after opposition from artists and venue operators, who claimed, among other things, that it would provide useful market information advantageous to ticket brokers.

**Federal Regulatory Environment**

As noted earlier, the event ticketing industry is not federally regulated. In contrast, in the airline industry, the Department of Transportation can issue regulations regarding the disclosure of airline fees.[101] Staff from FTC's Bureau of Consumer Protection told us that—in addition to the enforcement activity noted earlier—they monitor consumer complaints related to the event ticket industry. However, they said they have resource and other constraints that make it difficult to conduct industry-wide investigations related to ticketing practices.

Issues around the level and transparency of fees are not unique to the event ticketing industry. For example, as noted earlier, FTC staff have raised concerns about mandatory "resort fees" charged by many hotels but not immediately disclosed (such as in online price search results).[102] In addition, according to the National Economic Council, sellers of other goods and services—such as car dealers and telecommunications companies—sometimes offer low prices up front that rise substantially with the addition of mandatory fees revealed later in the purchase process.[103] As such, options for regulating the transparency of fees can have applicability broader than that of event ticketing.

As noted earlier, the BOTS Act, which prohibits circumventing security measures or other systems intended to enforce ticket purchasing limits or order rules, went into effect in December 2016. However, a variety of industry, consumer, academic, and government stakeholders have expressed doubt that the BOTS Act would have much of an effect on prohibited bot use. Several of these stakeholders told us that bot users can easily evade detection and that enforcement of the act would be extremely difficult, in part because a lot of bot use occurs—or could shift—outside the United States. As of February 2018, FTC had not taken any enforcement action related to the act, but FTC staff told us they were monitoring the situation.

---

[101]For example, since 2010, the Department of Transportation has taken or has proposed a range of actions to improve the transparency of airlines' fees for optional services, such as requiring certain airlines to disclose optional service fees on their websites. See GAO, *Commercial Aviation: Information on Airline Fees for Optional Services*, GAO-17-756 (Washington, D.C. Sept. 20, 2017).

[102]Sullivan, 1.

[103]White House National Economic Council, 9-15.

The degree to which legislation combatting bots is effective may depend in part on the extent to which state attorneys general pursue enforcement actions. As of February 2018, we identified two states that had taken enforcement actions related to bot use. In May 2017, the New York State Office of the Attorney General announced settlements totaling $4.11 million with five ticket brokers which, among other offenses, violated New York State law by using bots to purchase and resell tickets.[104] In April 2016, the office announced settlements totaling $2.7 million with six ticket brokers for similar violations.[105] In February 2018, the Washington State Office of the Attorney General announced settlements totaling $60,000 with two ticket companies that used bots in violation of the state's ticketing law.[106]

## Market-Based Approaches

Industry players, including ticket companies and event organizers, are using or exploring technology and market-based approaches that seek to address concerns about secondary market activity. Examples of these approaches and their potential effects include the following:

- **Delivery delays.** Ticket sellers sometimes use delivery delays, meaning they do not provide the ticket immediately upon purchase. Instead, buyers receive their tickets (in paper or print-at-home form) closer to the day of the event. Delivery delays can inhibit resale activity because they give brokers less time to buy and resell tickets, and allow primary ticket sellers to review whether brokers and bots made bulk purchases, according to some promoters and primary ticket sellers. However, secondary market sellers we interviewed generally argued against delivery delays, with two sellers saying it can

---

[104]New York State Office of the Attorney General, *A.G. Schneiderman Announces $4.19 Million In Settlements with Six Companies That Illegally Purchased and Resold Hundreds of Thousands of Tickets to  Concerts and Other NY Events* (May 11, 2017).

[105]New York State Office of the Attorney General, *A.G. Schneiderman Announces $2.7 Million In Settlements With Six Ticket Brokers That Illegally Bought And Resold Tickets In Bulk* (Apr. 27, 2016).

[106]Washington State Office of the Attorney General, *Ticket Sales Company to Pay $60k for Use of Ticket Bots* (Feb. 8, 2018).

be inconvenient and stressful for consumers to receive a ticket just a few days before an event.[107]

- **Dynamic pricing.** The use of dynamic pricing—which adjusts prices over time based on demand—can reduce secondary market activity by pricing tickets closer to their market clearing price. Raising primary market ticket prices, such as through dynamic pricing, does not necessarily benefit consumers but can help ensure that more ticket revenue accrues to the artist or team rather than ticket resellers.

- **Verified fan program.** At least one major ticket company has a program to sell tickets to pre-approved "verified fans," to help ensure that more consumers and fewer brokers can access tickets on the primary market.

- **New technology.** Two stakeholders noted the potential for distributed ledger technology in ticketing.[108] The technology associates a unique identification code with the ticket and its owner, which can help restrict transfer of the ticket and ensure its authenticity.

- **Adding concerts.** Artists can seek to make their ticket prices accessible by increasing the supply of seats—for example, one major artist has added concert dates with the express purpose of matching ticket supply to demand to prevent higher resale prices.

- **Face-value resale exchanges.** Resale exchanges used by some artists only allow resale at face value (plus a limited amount to account for primary market fees). This allows consumers to recoup their ticket costs if their plans change, while preventing resale markups.

Market-based approaches also may augment regulatory and enforcement action with regard to problems discussed earlier around transparency. In February 2018, Google's AdWords service—which offers paid advertising alongside search results—implemented new certification requirements for businesses that resell event tickets. First, resellers using AdWords must clearly disclose on their website or mobile application that they are a secondary market company and not the primary provider of the tickets.

---

[107]In addition, the National Association of Ticket Brokers and one ticket reseller told us they view delivery delays as an attempt to force ticketholders to use the primary sellers' own secondary marketplaces. They said this was demonstrated by tickets that otherwise have delivery delays being available for instant resale on the resale sites of some primary sellers.

[108]Distributed ledger technology allows participants in a peer-to-peer network to share and retain identical secured records through a decentralized database.

They cannot imply they are the primary provider by using words such as "official" or by including the artist or venue name in their website's URL—practices we noted earlier that were being used by some white-label websites. Second, resellers must prominently disclose when their ticket prices are higher than face value and disclose a price breakdown, including any fees, before the customer provides payment information. Google said in a statement that these measures were intended to protect customers from scams and prevent potential confusion. However, due to the recency of this change, it is too early to determine how it will affect the marketplace.

In addition, the advertising industry's self-regulatory organization has taken steps to address potentially misleading pricing practices in the ticket industry. The Advertising Self-Regulatory Council sets standards for truth and accuracy for national advertisers, monitors the marketplace, and holds advertisers responsible for their claims.[109] As noted earlier, the organization recently referred a major ticket company to FTC for not following its recommendations to conspicuously disclose its fees.[110] Although the council can play a role in monitoring deceptive advertising related to ticketing, it also faces constraints—for example, it addresses practices case-by-case and its recommendations depend on voluntary compliance by the advertiser.

No matter what efforts are made to address concerns about the ticket marketplace, some of the consumer dissatisfaction with event ticketing stems from an intractable issue: demand for tickets to highly popular events exceeds supply. As such, no activity, outside of expanding the supply, is likely to effectively address one key source of consumer dissatisfaction: that tickets are not available to popular sold-out events.

## Agency Comments

We provided a draft of this report to DOJ and FTC for review and comment. We received technical comments from FTC, which we incorporated as appropriate. We also provided relevant excerpts of the draft for technical review to selected private parties cited in our report, and included their technical comments as appropriate.

---

[109]Advertising Self-Regulatory Council, "ASRC Snapshot," accessed February 2, 2018, http://www.asrcreviews.org/about-us/.

[110]Advertising Self-Regulatory Council, "NAD Refers StubHub Pricing Claims to FTC for Further Review After Advertiser Declines to Comply with NAD Decision on Disclosures," (New York, NY: Jan. 16, 2018).

As agreed with your offices, unless you publicly announce the contents of this report earlier, we plan no further distribution until 30 days from the report date. At that time, we will send copies to DOJ, FTC, the appropriate congressional committees and members, and others. In addition, the report will be available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have any questions concerning this report, please contact me at (202) 512-8678 or clementsm@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this report are listed in appendix II.

Michael Clements
Director, Financial Markets and Community Investment

# Appendix I: Objectives, Scope, and Methodology

The objectives of this report were to examine (1) what is known about primary and secondary online ticket sales, (2) the consumer protection concerns that exist related to online ticket sales, and (3) potential advantages and disadvantages of selected approaches to address these concerns. The scope of our work generally focused on ticketing for large concert, theater, and sporting events for which there is a resale market.

To develop background information on the U.S. ticketing industry, we analyzed business classification codes from the North American Industry Classification System, which assigns a 6-digit code to each industry based on its primary activity that generates the most revenue. The code we selected, "All Other Travel Arrangement and Reservation Services," includes theatrical and sports ticket agencies, as well as automobile club road and travel services and ticket offices for airline, bus, and cruise ship travel. Because the Census data do not distinguish event ticketing from other services in particular, we determined the data do not provide a reliable count of companies in the event ticketing industry. In addition, we obtained publicly available data from private research firms and reviewed the largest publicly held ticketing companies' annual public filings with the Securities and Exchange Commission (Form 10-K). We also collected information from firms that collect data related to the ticketing industry, such as IBISWorld and LiveAnalytics.

To examine what is known about primary and secondary online ticket sales, we reviewed data related to ticket prices and sales published by Pollstar, a concert industry trade publication, and the Broadway League, a trade organization representing commercial theater. In addition, we obtained and analyzed data on ticket volume and resale prices for a nongeneralizable sample of 22 events. These events were selected because they (1) occurred in relatively large venues (more than 500 seats) that typically experience ticket resale activity; (2) represented a mix of event types (13 concerts, 3 commercial theater productions, and 6 sporting events); and (3) represented a mix of popularity, including 17 events that would be expected to be in high demand. We defined high-demand events as those that were likely to sell out, which we assessed by reviewing past attendance at other events for the same artist or theatrical event. For sports, we assessed demand by reviewing team performance and rankings. We collected data from October 16 through December 20, 2017. For each event, we analyzed:

- **resale prices and volume**, through data obtained from publicly available listings on the websites of two secondary ticket exchanges;

- **primary market prices and availability**, through data obtained from the websites of primary market ticket sellers; and

- **event capacity**, through data obtained from Billboard or Pollstar (trade publications) for concerts, the Broadway League for theater, and ESPN.com (a media company) for sporting events.

To examine consumer protection concerns, we reviewed the websites of 6 primary market ticket sellers, 11 secondary ticket exchanges, and 8 "white-label" ticket websites.[1] We collected data from June 19, 2017, through January 16, 2018.

- For the primary market ticket seller that represents the majority of market share, we observed the online ticket purchase process for 23 events. Three events were selected using the process described below and the remaining 20 were chosen to reflect 2 events at each of 10 venues, selected because they were among the 200 top-selling arenas or 200 top-selling theaters in the United States in 2017, according to Pollstar.

- For each of the 5 other primary market ticket sellers and the 11 secondary ticket exchanges, we observed the online ticket purchase process for 1–5 events. For each primary ticket seller, we selected one event per category (concert, theater, and sports). For consistency and comparability across companies, we also limited events to the same state (which did not extensively limit ticket resale) and time period. We also selected 2 events in another state because they used nontransferable tickets. For the secondary ticket exchanges, we used 3–5 events from our review of primary ticket sellers' websites. If the event was no longer available, we selected an alternative event at the same venue.

- For each of the 8 white-label ticket sellers, we reviewed 1–4 events from the events described above. In some cases, the same event was not available so we selected an alternative event at the same venue.

For these events—31 events in total—we documented (1) the ticket fees charged, (2) at what point in the purchase process the fees were disclosed, and (3) any restrictions to the ticket. In addition, we assessed

---

[1]A white-label website is a sales website built by one company that allows affiliates to use the software to build their own, uniquely branded websites, which often appear as paid results of Internet searches for venues and events. We identified these websites by conducting searches on two of the largest search engines for the venues of the events we selected for review.

the clarity, placement, and font size of the fees, restriction information, and—for white-label websites—disclaimers that the website was a ticket resale website. We worked with a GAO investigator to review the websites that required users to provide an e-mail address or credit card information before viewing fees. Analysts followed a protocol to help ensure consistency of observations and completed a data collection instrument for each website. A second analyst independently reviewed each website to verify the accuracy of information collected by the first analyst. Any discrepancies between the two analysts were identified, discussed, and resolved by referring to the source websites.

A GAO investigator acting in an undercover capacity contacted the customer service departments of three large secondary ticket exchanges to inquire about two events for which tickets were nontransferable (not allowed to be resold) and two events for which listed tickets were speculative (not yet in-hand by the seller). The nontransferable tickets were identified through press releases and articles about popular touring artists and the speculative tickets were identified by searching for events that had been announced but were not yet for sale on the primary market. The investigator contacted customer service through 16 e-mails to one company and 8 online "live chats" with another company. For the third company, the investigator sent 8 e-mails about nontransferable tickets and did not inquire about speculative tickets because this company labeled such tickets. We also contacted the venues hosting these events to help assess the accuracy of the information provided by the ticket companies' customer service departments.

In addition, we reviewed enforcement activity by federal and state agencies related to ticketing and ticket companies. We also collected information on the number of consumer complaints by requesting the Federal Trade Commission (FTC) conduct a search of its Consumer Sentinel Network database, which includes complaints submitted to FTC, the Consumer Financial Protection Bureau, the Better Business Bureaus, and other sources. The search results covered calendar years 2014–2016 and used the term "ticket" with terms related to events (e.g., "concert," "sport," "theater"), sold-out events (e.g., "sold-out"); fees; fraudulent tickets (e.g., "fake"); delayed delivery (e.g., "late,"); or nontransferable tickets (e.g. "paperless"). We selected our initial search terms by reviewing terms used in similar complaints on the Better Business Bureau website. We made modifications to our search string based on suggestions from FTC staff who reviewed the results of a preliminary search. To help ensure that results were related to event ticket sellers, we limited the search to complaints against the 6 primary

ticket sellers and 11 secondary ticket exchanges in our scope. We
assessed the reliability of the complaint data by interviewing agency
officials. In addition, we have assessed the reliability of Consumer
Sentinel Network data as part of previous studies related to consumer
protection and found the data to be reliable for the purposes of gauging
the extent of consumer complaints about event ticketing. However, in
general, consumer complaint data have limitations as an indicator of the
extent of problems. For example, not all consumers who experience
problems may file a complaint, and not all complaints are necessarily
legitimate or categorized appropriately. In addition, a consumer could
submit a complaint more than once, or to more than one entity, potentially
resulting in duplicate complaints.

To examine the potential advantages and disadvantages of selected
approaches to address consumer protection concerns, we reviewed
federal and selected state laws related to event ticket sales. At the federal
level, these included the Better Online Ticket Sales Act of 2016 and
relevant provisions of the Federal Trade Commission Act. To determine
which states had laws related to ticket resale or disclosure, we reviewed
compilations of state ticketing laws from the National Association of Ticket
Brokers, a secondary ticket seller's website, and a law firm publication,
and we conducted independent research and verification. We reviewed
ticketing-related legislation—selected for its relevance to the approaches
covered in our review—in Connecticut, New York, and Georgia. We
reviewed state government reports and interviewed state officials to get
information on the states' experiences with these laws. We also consulted
foreign government reports to obtain information on relevant laws or
regulations in Canada and the United Kingdom, which have reported
similar consumer protection issues as we reviewed in our report.

To address all of our objectives, we conducted searches of various
databases, such as ProQuest, Academic OneFile, Nexis, Scopus, and the
National Bureau of Economic Research, to identify sources such as peer-
reviewed academic studies; law review articles; news and trade journal
articles; government reports; and hearings and transcripts related to
ticketing issues. We examined summary-level information about each
piece of literature, and from this review, identified articles that were
germane to our report. We generally focused on articles from 2009 and
later. We identified additional articles and reports through citations in
literature we reviewed and from expert recommendations.

For the articles we used to cite empirical findings or to support arguments
on advantages and disadvantages of selected resale restrictions or

Appendix I: Objectives, Scope, and
Methodology

disclosure requirements, we conducted a methodology and soundness review. We eliminated one study on pricing and one study on price caps because we believed the methods were not sufficiently rigorous.

In addition, we identified and reviewed relevant congressional testimony on proposed ticketing legislation. We reviewed the Department of Justice's competitive impact statement and testimonies with regard to the 2010 merger of Ticketmaster and Live Nation. We interviewed staff from the FTC's Bureau of Consumer Protection and Bureau of Economics, the Department of Justice's Antitrust Division, and the New York State Office of the Attorney General, and we conducted a group interview, coordinated by the National Association of Attorneys General, with staff from the offices of the attorney general of Pennsylvania and Texas. We also interviewed representatives of three consumer organizations: Consumer Action, the National Association of Consumer Advocates, and the National Consumers League; four trade associations: the Broadway League, Future of Music Coalition, National Association of Ticket Brokers, and the Recording Academy; as well as four primary ticket sellers, five secondary ticket exchanges and aggregators, one broker, five venue operators, three event promoters (who also operate venues), five artists' managers and booking agents, three major sports leagues, and three academics who have studied the ticket marketplace. These organizations and individuals were selected based on their experience and prominence in the marketplace and to provide a range of perspectives.

We conducted this performance audit from November 2016 to April 2018 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. Our investigative staff agent conducted all related investigative work in accordance with investigative standards prescribed by the Council of the Inspectors General on Integrity and Efficiency.

# Appendix II: GAO Contact and Staff Acknowledgments

| | |
|---|---|
| **GAO Contact** | Michael E. Clements, (202) 512-8678 or clementsm@gao.gov |
| **Staff Acknowledgments** | In addition to the contact named above, Jason Bromberg (Assistant Director), Lisa Reynolds (Analyst in Charge), and Miranda Berry made key contributions to this report. Also contributing were Enyinnaya David Aja, Maurice Belding, JoAnna Berry, Farrah Graham, John Karikari, Barbara Roesmann, Jena Sinkfield, and Tyler Spunaugle. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube.<br>Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts.<br>Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br>Website: https://www.gao.gov/fraudnet/fraudnet.htm<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.

# *Live Nation Settles Suit With Ticketing Start-Up, Buying Its Assets*

https://www.nytimes.com/2018/01/12/business/media/live-nation-songkick.html



Image



Songkick specialized in so-called artist presales — a way of selling batches of advance tickets, often around 8 percent of the inventory for a show, to fans.CreditCreditChad Batka for The New York Times

**By Ben Sisario**

- Jan. 12, 2018
- 
  - 
  - 
  - 
  - 
  - 

Two years ago, Songkick, a ticketing start-up that operated out of a loft in Brooklyn, filed an antitrust suit against Live Nation Entertainment, the colossus of the concert business.

The David-and-Goliath suit included accusations of abuse of market power by Live Nation and its Ticketmaster subsidiary.

But on Friday, less than two weeks before the start of a trial, Live Nation announced that it had settled the suit for $110 million and an additional undisclosed sum to acquire some of Songkick's remaining technology assets and patents.

"We are pleased that we were able to resolve this dispute and avoid protracted and costly legal proceedings, while also acquiring valuable assets," Joe Berchtold, the president of Live Nation, said in a joint statement.

# Subscribe to With Interest

Catch up and prep for the week ahead with this newsletter of the most important business insights, delivered Sundays.

SIGN UP

ADVERTISEMENT

Matt Jones, the chief executive of Songkick's parent company, Complete Entertainment Resources Group, thanked employees and artists "who contributed so much to our many successes over the last decade."

Last summer, Songkick sold one of its main businesses, a concert-recommendation app, to the Warner Music Group — owned by one of Songkick's major investors, Access Industries — and later shut down its remaining operations.

- **Unlock more free articles.**
   **Create an account or log in**

Songkick's case hinged on the rights to sell a ticket. The company specialized in so-called artist presales, or selling batches of advance tickets — often around 8 percent of the inventory for a show — to fans. Presales serve, in part, as a way to thwart scalpers.

Songkick contended that Live Nation was interfering in its business by blocking its access to presale tickets and by demanding fees on the sale of tickets that Songkick handled. But Live Nation, which countersued, argued that its contracts with venues gave it the right to determine how those tickets should be sold. Songkick's suit also accused Live Nation of threatening artists not to do business with Songkick.

The case was also punctuated by accusations of corporate espionage by Ticketmaster, and had voluminous court filings showing sometimes embarrassing internal communications among top Live Nation executives.

**Editors' Picks**



25 Years Later, It Turns Out Phoebe Was the Best Friend



11 of Our Best Weekend Reads



The Windswept Scottish Islands Producing Beautiful Artisanal Goods

ADVERTISEMENT

Many in the music industry were skeptical about Songkick's case, and the company lost a number of pretrial motions. But until recently the company was insistent on pursuing its case.

# DOJ is investigating Live Nation for possible antitrust violations

Danette Chavez

4/02/18 10:28am

https://news.avclub.com/doj-is-investigating-live-nation-for-possible-antitrust-1824255557

Photo: Brendan Hoffman (Getty Images)

Eight years after Live Nation joined forced with TicketMaster to create a Voltron of exorbitant service fees, *The New York Times* reports the concert promoter is being investigated for its ruthless business practices.

The Department Of Justice is looking into complaints that Live Nation, which manages some 500 artists, "used its control over concert tours to pressure venues into contracting with its subsidiary, Ticketmaster." Live Nation's biggest competitor, AEG, claims that for shows that were originally booked at its venues in Atlanta, Las Vegas, Minneapolis, and more, the company was pressured to use TicketMaster as a vendor. The claims indicate a "possible violation of antitrust law," according to *The Times*.

In one case, the booking director of Atlanta's Gwinnett Center reached out to Live Nation after a Matchbox 20 show fell through in 2013. The venue had recently switched from TicketMaster to an AEG-controlled ticketing service. "Don't abandon Gwinnett," the director, Dan Markham, wrote in an email to an unnamed Live Nation talent coordinator. "If there's an issue or issues let's address." The response was terse but suggestive: "Issue? Three letters. Can you guess what they are?"

Emails aside, Live Nation insisted "the decision to bypass the center was not punitive. The other venue was managed by Live Nation and simply fit more people." But in 2014, the number of Live Nation tours that hit the Gwinnett was down from four to two. Live

Nation says this shift is "routine," but Markham feels the company was essentially
"[warning] us that they would put us in a literal boycott." <u>AEG provided the DOJ with
the aforementioned emails</u>, which is why Live Nation's antitrust lawyer now says "You
have a disgruntled competitor that is trying to explain their loss around the boogeyman
that there were threats made that nobody can document." AEG's also come under fire
for possible antitrust violations; Ozzy Osbourne filed suit last month against the
company for allegedly trying to prevent him from playing a show at its O2 arena in
London if he didn't also book one at the Staples Center (which AEG also owns).





**0** shares

# Live Nation Dismisses Senators' Call for Investigation of Consent Decree

INDUSTRYLEGALTOP STORY September 6, 2019 Sean Burns 0
Consent Decree1 Department of Justice5 Live Nation525 Sen. Amy Klobuchar1 Sen. Richard Blumenthal2 Ticketmaster624

In an **email sent to Pollstar**, Live Nation dismissed **last week's call by a pair of senators** for a hard look at the company by the Department of Justice (DOJ), accusing competitors of using misinformation related to their business practices and insisting that the DOJ has already been monitoring its compliance without issue. "There is no cause for further investigations or studies," it concluded.

Senators Richard Blumenthol (D-Conn.) and Amy Klobuchar (D-Minn.) urged the DOJ take a look at the live entertainment industry and Live Nation Entertainment's adherence to a 2010 consent decree it agreed to when it merged with Ticketmaster last week in a letter to Makan Delrahim, Assistant Attorney General for the DOJ's Antitrust Division. In a letter, originally reported by *Billboard*, they expressed concern over reports that the industry giant is "flouting the conditions" of that consent decree, and that they "are deeply disturbed by reports that Ticketmaster has violated the behavioral conditions by retaliating against venues that use a competing ticketing platform."

They asked that the Department look into these allegations, and consider whether or not the consent decree should be extended beyond its current expiration date of July 2020.

In its response, Live Nation insisted that it has won clients simply by "providing the best ticketing solution in the industry," rather than any anti-competitive actions. "We do not force anyone into ticketing agreements by leveraging content, and we do not retaliate against venues that choose other ticketing providers."

"Nevertheless, for years now some competitors have found it useful to confuse the issue with misinformation and baseless allegations of consent decree violations," it continued.

Those lines are likely direct reference to an explosive *New York Times report from April of 2018*, which outlined a series of allegations by competitors of retaliatory actions by the company against venues who opted to use ticketing providers besides Ticketmaster. That story was one of several that broke hard against Live Nation in the past year, inviting increased scrutiny from politicians, including the **recent reintroduction of the BOSS act** to regulate online ticket sales – co-sponsored by Sen. Blumenthol.

The increased scrutiny from politicians, Live Nation wrote, is "based on a fundamental misunderstanding of our consent decree and general ticketing industry dynamics."

*Their full response, as published by Pollstar, is included below:*

"Unfortunately, the Senators' letter is based on a fundamental misunderstanding of our consent decree and general ticketing industry dynamics.

"Ticketmaster has been successfully growing its client base over the past decade as a result of continuous innovation and providing the best ticketing solution in the industry. During that period, Live Nation and Ticketmaster have always complied with their obligations under the consent decree. We do not force anyone into ticketing agreements

by leveraging content, and we do not retaliate against venues that choose other ticketing providers.

"Nevertheless, for years now some competitors have found it useful to confuse the issue with misinformation and baseless allegations of consent decree violations. These complaints have been investigated by the Department of Justice pursuant to its broad powers to monitor compliance with the decree.  There is no cause for further investigations or studies."

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JUICE ENTERTAINMENT LLC, THOMAS DORFMAN and CHRIS BARRETT,<br><br>                    Plaintiffs,<br><br>          v.<br><br>LIVE NATION ENTERTAINMENT, INC.,<br><br>                    Defendant. | **Civil Action No. 11-7318-WHW-MCA** |

# Exhibit I

Case 2:11-cv-07318-WHW-CLW    Document 31    Filed 04/18/13    Page 9 of 10 PageID: 317

**EXHIBIT A**
**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

JUICE ENTERTAINMENT, LLC,
THOMAS DORFMAN, AND
CHRIS BARRETT,

                              Plaintiffs,

              vs.

LIVE NATION ENTERTAINMENT, INC.,

                              Defendant.

Civil Action No. 11-07318 (WHW) (SCM)

**AGREEMENT TO BE BOUND BY**
**DISCOVERY CONFIDENTIALITY**
**ORDER**

I, _Richard Barret_ being duly sworn, state that:

1.    My address is _4400 Belment Park Terrace #236_
_Nashville, TN 37215_

2.    My present employer is _Middle Tennessee State University_ and the address of

my present employment is _Professor_ .

3.    My present occupation or job description is _Teach College Courses_

4.    I have carefully read and understood the provisions of the Discovery Confidentiality

Order in this case signed by the Court, and I will comply with all provisions of the

Discovery Confidentiality Order.

5.    I will hold in confidence and not disclose to anyone not qualified under the

Discovery Confidentiality Order any Confidential Material or any words, summaries,

abstracts, or indices of Confidential Information disclosed to me.

9

6.     I will limit use of Confidential Material disclosed to me solely for purpose of this action.

7.     No later than the final conclusion of the case, I will return all Confidential Material and summaries, abstracts, and indices thereof which come into my possession, and documents or things which I have prepared relating thereto, to counsel for the party for whom I was employed or retained.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:

_____