## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUICE ENTERTAINMENT, LLC, THOMAS DORFMAN, AND CHRIS BARRETT, <br><br> Plaintiffs, <br><br> vs. <br><br> LIVE NATION ENTERTAINMENT, INC., <br><br> Defendant. | **Hon. Claire C. Cecchi** <br><br> Civil Action No. 11-cv-7318 (CCC)(CLW) <br><br> FINAL PRETRIAL ORDER |

This matter having come before the Court for a pretrial conference pursuant to Fed. R. Civ. P. 16; and Andrew Smith, Esq. having appeared for plaintiffs and Ian S. Marx, Esq. having appeared for defendant; and counsel all having been notified that:

(1)    a jury trial in this matter has been scheduled before Claire C. Cecchi on a date to be set by Her Honor's Chambers; and

(2)    the pretrial submissions detailed in ¶¶ 2, 18 and 19 below are to be submitted no later than **two (2) weeks prior to trial** or they will be deemed waived; and

(3)    a pretrial housekeeping conference is scheduled before Hon. Claire. C. Cecchi on a date to be set by Her Honor's Chambers; and

the following Final Pretrial Order is hereby entered:

**1. JURISDICTION** (Set forth specifically):

    A.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds seventy-five thousand ($75,000), exclusive of interest and costs.

B. Venue is appropriate in this judicial district under 28 U.S.C. § 1391, because Defendant has transactions business within the State of New Jersey and many of the acts and events giving rise to this action occurred within this District.

**2. PENDING/CONTEMPLATED MOTIONS/TRIAL BRIEFS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also set forth the nature of the motion and the return date. If the court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position. NOTE: ALL REMAINING PRE-TRIAL MOTIONS INCLUDING DAUBERT AND IN LIMINE MOTIONS SHALL BE FULLY BRIEFED AND FILED **NO LATER THAN TWO WEEKS PRIOR TO TRIAL.** Only those motions listed herein will be entertained prior to trial.)

A. Plaintiffs' Summary:

Plaintiffs' may file motions *in limine* related to evidence sought to be introduced by Defendant in their pre-trial order and/or move to exclude at trial as evidence is introduced. Plaintiffs plan to introduce expert testimony on damages related to the contract at issue here and hence will oppose any attempt to limit damages and/or the scope of the case to the "Four Triable Issues" as indicated by Defendants below. While the previous summary judgment order was clearly entered erroneously, particularly given the current New Jersey Supreme Court case law on lost profits, Plaintiffs' damages are not related to future lost profits, but rather the profits lost on related to the actual contract at issue. Plaintiffs further plan to introduce transcripts and/or actual recordings and as such will oppose any motion to exclude such evidence. They are clearly relevant and in fact harmful to Defendants' case, and have been and/or can easily be authenticated.

B. Defendants' Summary:

a. If necessary, Live Nation will file a motion *in limine*, to preclude evidence of facts that are not relevant or germane to the four "triable issues" that remain in the case following the Court's Court's Opinion dated May 23, 2019 (the "SJ Opinion"), which disposed almost entirely of Plaintiffs' claims against Live Nation and identified the only "triable issues" that survived Live Nation's motion for summary judgment (the "Four Triable Issues").[1]

---

[1] The Court's SJ Opinion identifies the four triable issues as follows:

- Issue 1 (Count II) -- whether Live Nation engaged in interference with the WME talent agency based on Jason Miller's February 15, 2011 email. *See* SJ Opinion at pp. 6-7 ("whether [Ms. Kirby of WME's] opinion of [Plaintiffs' Agent John] DiMatteo as "flaky"

b. *If necessary, Live Nation may make a motion <u>in limine</u> to preclude Plaintiffs from attempting to introduce any evidence as to damages.*[2]

and having poor marketing performance was colored by Miller's comments [in his February 15, 2011 email] is a disputed fact.").

- Issue 2 (Count II) – whether, as Plaintiff Dorfman alleges, Jason Miller of Live Nation made a threat in a meeting with Plaintiffs on March 3, 2011 and, if so, whether Live Nation carried out the threat. *See* SJ Opinion at p. 7 (finding a triable issue as to whether Mr. Dorfman's recollection of the meeting was accurate and whether, if Mr. Miller made the alleged statements, Live Nation carried through on its "threats.").

- Issue 3 (Count II) -- whether, as Plaintiffs allege, Jason Miller of Live Nation made a threat in a meeting with Plaintiffs on April 22, 2011 (which Plaintiffs secretly recorded) and, if so, whether Live Nation carried out the threat. *See* SJ Opinion at p. 8 (finding that, assuming Plaintiffs can establish the authenticity of the tape recordings, Mr. Miller's statements provide a triable issue with respect to alleged interference).

- Issue 4 (Count III) – whether a February 23, 2011 email from Live Nation's John D'Esposito to Al Dorso, Jr. of SFEM was defamatory. *See* SJ Opinion at pp. 16-17 (finding that while the February 23 email was potentially defamatory, even if it was found to be defamatory, it could support only a claim for "nominal" damages.)

---

[2] With respect to Count II, the Court found that Plaintiffs were barred from seeking lost profits in connection with their narrowly-surviving claim for interference on the basis that the alleged lost profits were "too remote and speculative to meet the legal standard of reasonable certainty." SJ Opinion at p. 20. The Court reiterated this determination in a subsequent, published Opinion and Order dated December 19, 2018, which denied Plaintiffs' motion to seek interlocutory review. Because the only damages Plaintiffs sought were lost profits, there is no evidence or facts that can be adduced concerning damages on Count II.

With respect to Count III, while the Court found that the February 23 email was potentially defamatory, it further found that even if it was found to be defamatory, it could support only a claim for "nominal" damages. Specifically, the Court found that because the email was sent on February 23, 2011 to SFEM, and SFEM subsequently entered into a contract with Plaintiffs on March 7, 2011, the email could not as a matter of law support a claim for "special" damages (which the Court described as compensating Plaintiffs for "specific economic or pecuniary loss"). SJ Opinion at pp. 16-17. The Court also found that Plaintiffs failed to adduce any evidence concerning, and thus to create an issue of fact for trial, concerning "general" damages suffered as a consequence of the alleged defamation (the Court described general damages as "addressing harm that is not capable of precise monetary calculation, including impairment to reputation and standing in the community, along with personal humiliation, mental anguish and suffering to the extent that they flow from the reputational injury.") SJ Opinion at 17. Thus, the Court found that, under the "presumed damages" doctrine, Plaintiffs could proceed to trial on their claim that the February 23 email is defamatory, but they are limited at trial to a recovery of only nominal damages.

c.   *If necessary, Live Nation may make a motion* <u>*in limine*</u> *to preclude Plaintiffs from attempting to introduce as evidence the recordings or transcripts of certain secretly taped conversations.  While Live Nation believes such conversations are not relevant to any surviving triable issues that remain in the case, the recordings and/or transcripts would also be inadmissible because they are inauthentic.*

**3. <u>STIPULATION OF FACTS</u>** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

A. <u>Plaintiffs' Proposed Stipulated Facts</u>

(1)      During all relevant times, Jason Miller and John D'Esposito were employees of the Defendant;

(2)      During all relevant times, Thomas Dorfman worked as a Promoter and Night Club Owner in New Jersey and New York;

(3)      During all relevant times, Chris Barret worked as a DJ and business partner of Thomas Dorfman;

(4)      During all relevant times, Al Dorso, Sr. was the owner and operator of the NJ State Fair;

(5)      The NJ State Fair takes place every year for a limited time on the grounds of the Meadowlands;

(6)      Thomas Dorfman and Chris Barret produced a Latin themed festival at the Meadowlands during the time of the NJ State Fair in 2010 in collaboration with Al Dorso, Sr. and the NJ State Fair;

(7)      During all relevant times, Vito Bruno was the owner/producer of BeatStock and an associate of the Plaintiffs;

(8)      BeatStock is a large scaled live event in the "electronica" genre space, that has continuously operated for over a decade on the East Coast and for over thirty-five (35) years in the live entertainment industry;

(9)      In 2009-2010, John Dimatteo was the owner and operator of Area Events and had a working relationship with Defendant;

(10)      Area Events is an independent promotion and production company;

(11)      In 2009-2010, Defendant and Area Events worked together in producing and promoting shows involving both DJ Tiesto and DJ Steve Angelo;

(12)      During all relevant times, John Dimatteo was an associate of the Plaintiffs;

(13)      Defendant met with John Dimatteo and Vito Bruno in March 2011 to the exclusion of the Plaintiffs;

(14)      Jason Miller wrote to booking agent WME criticizing John Dimatteo's performance at the New Years Eve Event staring DJ Steve Angelo and alleged John Dimatteo owed Defendant money from the event on February 15, 2011;

(15)     On February 22, 2011, John D'Esposito, in a writing directed to Al Dorso, Jr. referred to Thomas Dorfman as, among other things, "the promoter who is trying to weasel into the state fair;"

(16)     On February 23, 2011, John D'Esposito, in a writing directed to Al Dorso, Jr., made several allegations of impropriety against Thomas Dorfman;

(17)     On February 24, 2011, Defendant sought and obtained a meeting with Al Dorso, Sr. to the exclusion of Plaintiffs regarding Plaintiffs' relevant event and the contract between State Fair and the Plaintiff Juice Entertainment;

(18)     The meeting with Al Dorso, Sr. sought by Defendant on February 24, 2011 did in fact take place;

(19)     Plaintiffs and State Fair Event Management ("SFEM") entered into a Contract on March 7, 2011 (the "Contract") giving Plaintiffs the right to stage an EDM event during the 2011 State Fair at the Meadowlands Fair Grounds in East Rutherford, New Jersey (the "Event");

(20)     The Contract specified that the Event would be held on June 25 and 26, 2011;

(21)     The Contract required Plaintiffs to provide SFEM, by March 1, 2011, with "a copy of talent/acts/entertainment" booked for the Event, as well as "copies of all [corresponding] contracts;"

(22)     The SFEM extended the Talent Contract Deadline by 30 days (i.e., to April 1);

(23)     During all relevant times, several offers were sent to artist representatives, including headliners, by or on behalf of the Plaintiffs, to perform at the Plaintiffs' planned event with NJ State Fair pursuant to their Contract;

(24)     During all relevant times, Plaintiffs received formal and informal confirmation of commitment from artists to perform that were not considered "headliners;"

(25)     In early 2011 Plaintiffs added John Dimatteo, an experienced, well-connected, and successful music industry producer, and talent buyer, to their team to assist with booking artists he had strong relationships with, including potential headliners for the Event such as DJ Tiesto, DJ David Guetta, and DJ Steve Angello;

(26)     Plaintiffs relied upon Dimatteo to convey offers to the three talent agencies representing EDM artists—AM Only, Windish, and WME—in an attempt to procure artists to appear at the event;

(27)     Plaintiffs believed that booking at least one of the following three artists—DJ Tiesto, DJ David Guetta or DJ Steve Angello—would have greatly improved the chances for a successful Event;

(28)     On January 26, 2011, Dimatteo sent Tiesto's talent agent, Paul Morris, at the AM Only talent agency, an offer for DJ Tiesto to play at the Event;

(29)     DJ Tiesto did not appear at the Event;

(30)     DJ Tiesto's agent, Paul Morris, never agreed that DJ Tiesto would appear at the Event for $400,000;

(31)     Dimatteo expressed an interest in 20 other artists represented by AM Only, including potential headliner DJ David Guetta;

(32)     On February 16, 2011, Dimatteo sent DJ Guetta's agent Paul Morris an offer for DJ Guetta to play at the Event;

(33)      Paul Morris was eager to confirm the headline offers at this point and sent Dimatteo an email to that effect;

(34)      DJ David Guetta never accepted this offer;

(35)      DJ David Guetta's agent Paul Morris never agreed that DJ Guetta would appear at the Event;

(36)      On or around February 21, 2011, Dimatteo sent talent agent Steve Goodgold, at the Windish Agency, an offer for DJ Steve Angello to play at the Event;

(37)      DJ Steve Angello never accepted the offer from Plaintiffs;

(38)      In addition to the three potential headliners, Dimatteo also made offers to about 30 lesser-known artists represented by WME;

(39)      All of the WME offers expired on February 12, 2011, but discussions with WME continued the following month;

(40)      On February 22, 2011, Dimatteo sent Windish offers for five of its artists and that all of the Windish offers expired on March 1, 2011;

(41)      Of the approximately 57 offers made by Dimatteo to artists represented by AM Only, Windish and WME to play at the Event only one was accepted;

(42)      There was an April 1, 2011 deadline to produce signed contracts with artists and Plaintiffs' Contract was cancelled.

B.  <u>Defendant's Response to Plaintiffs' Proposed Stipulated Facts</u>

*Given that almost all of the proposed stipulated facts are not relevant or germane to the Four Triable Issues identified in the Court's SJ Opinion, and because Plaintiffs have not indicated any willingness to narrow them, Defendant will be unable to stipulate to these facts.*

## 4. **JUDICIAL NOTICE**

A. Plaintiff requests that the Court take judicial notice of the following facts:  None.

B. Defendant objects to the taking of judicial notice for the following reasons:

*N/A.*

## 5. **JUDICIAL NOTICE**

A. Defendant requests that the Court take judicial notice of the following facts:

*None.*

B. Plaintiff objects to the taking of judicial notice for the following reasons: N/A

## 6. **PLAINTIFF'S CONTESTED FACTS** (Stated separately for each defendant. Proof shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof.)

A. Plaintiff intends to prove the following contested facts with regard to liability:

(1)       Plaintiffs were working on the Event well in advance of the signing of the Contract—at this point under the name Deluna Inc.;

(2)       Dimatteo was in charge of booking headliners for the Event;

(3)       Alan Sacks was in charge of booking supporting acts for the Event;

(4)       Dimatteo had a very close relationship with DJ Tiesto and had booked DJ Tiesto many times;

(5)       Dimatteo made significant progress with DJ Tiesto's road manager, Kelly Cobb, and fully expected to book DJ Tiesto for the Event;

(6)       Paul Morris, agent for DJ Tiesto and DJ David Guetta, expressed interest in the Event and solicited offers from Dimatteo;

(7)       Dimatteo reported that Morris was very eager to participate in the Event;

(8)       Defendant wrongly disparaged Plaintiffs to DJ Tiesto, DJ Guetta and Morris and/or otherwise interfered with their relationship;

(9)       DJ Tiesto, DJ Guetta and Morris did not accept Plaintiffs' offer because of Defendant's actions;

(10)      Plaintiffs held advanced discussions with Steve Goodgold of the Windish Agency concerning the details of the appearance of his artist, DJ Steve Angello, at the Event;

(11)      Goodgold was at one point considering the possibility of DJ Angello playing the Las Vegas EDC event on the 24th and then Plaintiffs' Event a day or two later;

(12)      Defendant wrongly disparaged Plaintiffs to DJ Angello and Goodgold and/or otherwise interfered with their relationship;

(13)      DJ Angello and Goodgold did not accept Plaintiffs' offer because of Defendant's actions;

(14)      Afrojack did accept an offer to appear at the Event, but was informed by William Morris on April 5, 2011, after Defendant's interference, that the Event was not happening;

(15)      Defendant pressured agents at WME, AM Only, and/or Windish to withhold artists from the Event;

(16)      Jason Miller's close personal relationship and influence over Sam Kirby of WME was used to keep Joel Zimmerman and WME in check;

(17)      Defendant made defamatory comments about Plaintiffs and their associates to talent agents, Al Dorso, Sr. and Al Dorso, Jr.;

(18)      An example of such defamation was the February 23, 2011 email from John D'Esposito to Al Dorso, Jr.;

(19)      Defendant's desire to be involved in the proposed Event and defamatory comments about Plaintiffs influenced Al Dorso's decision to cancel the Contract;

(20)      Defendant offered to "co-promote" the event with Plaintiff, but Plaintiff refused because they knew such an agreement would not be viable and was only made as a way to get rid of Plaintiffs;

(21)      Defendants were motivated to interfere in the Event out of a desire to take it over for themselves;

(22)     An example of the interference was evidenced by Jason Miller's February 15, 2011 email to WME talent agency;

(23)     A further example of the interference was evidenced by Jason Miller's threat in a meeting with Plaintiffs on March 3, 2011;

(24)     A further example of the interference was evidenced by Jason Miller's threat in a meeting with Plaintiffs on April 22, 2011;

(25)     Plaintiffs did not owe Defendant money;

(26)     DJ Tiesto and DJ Steve Angello could have performed at both the Las Vegas EDC event and Plaintiffs' Event;

(27)     Only a handful of artists in the world could have headlined the Event, and even less were available;

(28)     Defendant, Agents and Venues shared competitor information freely;

(29)     Agents/Managers/Co-Promoters have no power over Defendant in the industry;

(30)     Purchasers and Agents/Managers typically discuss "Production Details" and/or "Logistics" when the artist is willing and able to accept the assignment - these discussions represent more of a "final formality;"

(31)     Jason Miller and D'Esposito, among others, knew the draw and unique importance of booking DJ Tiesto, DJ Guetta and/or DJ Angello to guarantee the Event's success in 2011;

(32)     Defendant was not a major player in EDM events in the relevant timeframe;

(33)     Defendant's offer to co-promote with Plaintiffs, which they now use as a defense to this action, was nothing more than a ploy to run Plaintiffs out of business through use of a pervasive deceptive practice of Defendant;

(34)     Defendant's practice throughout the industry is to structure their deals in a fraudulent and deceptive manner which allows only Defendant to profit, increasing ticket prices, decreasing profits for artists and putting "co-promoters" out of business;

(35)     The deceptive practice includes use of "rebates" and pressure to venues to collect all the profit for Defendant without anyone knowing;

(36)     Defendant can structure their deals as such at least in part because they have a virtual monopoly in the industry, including by controlling ticket sales through their ownership of Ticketmaster, the venues through their ownership of the majority of major venues and access to private financial data of competitors;

(37)     Defendant has a practice of attempting to further control the entire industry by using their deceptive practices, tortious interference and slander to eliminate all competition, as they did with Plaintiffs;

(38)     Defendant is wide-known in their industry for deceptive business strategy/capabilities and public statements;

(39)     The parking lot planned for the Event was not appropriate;

(40)     Defendant's Non-Compete Clauses hold significant power with respect to radius;

(41)     EDM Events were desirable attractions in 2011;

(42)     Defendant's attempts to use drug use as a reason for EMD events not being desirable is incorrect, and ironic given the drug use among Defendant's

(43)     Plaintiffs during all relevant times were willing and able to perform the Contract;

(44)     Plaintiffs had the necessary experience to produce and promote the intended events under the Contract, as well as follow-up/subsequent events;

(45)     Plaintiffs were a major player in EMD events and had the brand and ability to ensure a successful EMD event;

**7. DEFENDANT'S CONTESTED FACTS** (Stated separately for each plaintiff. Proof shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof.)

*As summarized above (see footnote 2), there are four triable issues (the "Four Triable Issues") that remain in the case following the Court's Summary Judgment Order (three concerning Count II and one concerning Count III).  It appears from Plaintiffs' statement of contested facts they intend to prove that they intend to proceed at trial as if the Court's SJ Opinion had not occurred, and that their Complaint remains intact, rather than the narrow components of Counts II and III that survived.  Live Nation believes that the Court will grant its motions, if necessary, to ensure that the presentation of evidence is consistent with the Court's prior rulings. Live Nation believes that it will prevail on a motion for a directed verdict following the close of Plaintiffs' case as Plaintiffs will be unable to adduce sufficient direct evidence to make a case for tortious interference or defamation.  If that motion is denied, Live Nation intends to offer the following facts with respect to its defenses to the Four Triable Issues:*

A. Defendant intends to prove the following contested facts with regard to liability:

   As to Triable Issue 1

- *Jason Miller's February 15, 2011 email to Joel Zimmerman and Samantha Kirby of WME was not sent with the intent to interfere with Plaintiffs' prospective relationship with WME or to disparage Plaintiffs' agent, John DiMatteo.*

- *Mr. Miller's email was sent as part of a dialogue with respect to Live Nation's potential promotion of an event with the performing artist Axwell, a client of WME, and the potential that Live Nation might collaborate with Mr. DiMatteo on that Axwell event.*

- *Mr. Miller was providing true information to Mr. Zimmerman and Ms. Kirby concerning a prior collaboration between Live Nation and Mr. DiMatteo.*

   As to Triable Issues 2 and 3

- *In a meeting on March 3, 2011, Jason Miller did not, as alleged, threaten Plaintiffs that "I'm not going to allow you to get talent unless you partner*

*with us" and that WME is Live Nation's "exclusive agency" from which Plaintiffs "were not getting any talent."*

- *In a meeting on April 22, 2011 (portions of which are alleged to have been surreptitiously recorded by Plaintiffs), Mr. Miller did not threaten Plaintiffs that they were not likely going to be able to book premium talent for their event unless they partnered with Live Nation because "there's just a lot of talent we have, and we've got it."*

- *Mr. Miller does not believe that WME is Live Nation's "exclusive agency."*

- *Mr. Miller never threatened Plaintiffs.*

- *Mr. Miller accurately described Live Nation's industry relationships.*

<u>As to Triable Issue 4</u>

- *The statements in John D'Esposito's email dated February 23, 2011 to Al Dorso, Jr. of SFEM were not false.*

- *The email was not sent with the intention of harming Plaintiffs.*

- *The statements contained in the email reflect information provided to Mr. D'Esposito, which he believed to be true.*

B. Defendant intends to prove the following contested facts with regard to damages: (This statement must include the factual basis for each defense against the plaintiff's claims for damages.)

*As discussed above, based on the Court's prior rulings, Plaintiffs are barred from seeking lost profits on Count II of the Complaint (which is the only damages that have been sought) and are limited to nominal damages on Count III of the Complaint. Again, Plaintiffs' submission appears to ignore these rulings entirely. Nevertheless, given the Court's SJ Opinion, Live Nation is not required, and does not intend, to prove any facts with respect to damages.*

**8.**  **PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only the witnesses and rebuttal witnesses whose names and addresses are listed below will be permitted to testify at trial.)

A. On liability plaintiff intends to call the following witnesses who will testify in accordance with the following summaries, although not necessarily in this order:

(1) Al Dorso Sr. ("Dorso Sr."): Mr. Dorso Sr.'s testimony is expected to be in conformity with his deposition testimony.

(2) John Dimatteo ("Dimatteo"): Mr. Dimatteo's testimony is expected to testimony is expected to be in conformity with his deposition testimony.

(3) Thomas Dorfman ("Dorfman"): Mr. Dorfman's testimony will be in conformity with his deposition testimony.

(4) Chris Barret ("Barret"): Mr. Barret's testimony will be in conformity with his deposition testimony.

(5) Mike Ma ("Ma"): Mr. Ma is expected to testify about Plaintiffs' decision not to co-promote with Defendant, Plaintiffs' discovery of impropriety by Defendant, and Plaintiffs' efforts in identifying and exposing Defendant's conduct, and in an opinion capacity with regard to Defendant's industry scheme relevant here.

(6) John D'Esposito ('D'Esposito): Mr. D'Esposito's testimony is expected to be in conformity with his deposition testimony.

(7) Jason Miller ("Miller"): Mr. Miller's testimony is expected to be in conformity with his deposition testimony.

(8) Mario LaVecchia ("LaVecchia"): Mr. LaVecchia's testimony is expected to be in conformity with his deposition testimony.

(9) Alex Chaykin ("Chaykin"): Mr. Chaykin is expected to testify as a booking agent for Plaintiffs regarding various offers received on their behalf, inlcuding communications with Sam Kirby, and communications with Paul van Dyke after receiving request from headliner of desire to play in outdoor space at the same time as Plaintiffs' offer. Mr. Chaykin is also expected to testify WME's strong support for John Dimatteo (by, including but not limited to, Mr. Zimmerman, Mr. Wiederlight, Mr. Geiger and himself) and the Meadowlands Event of the Plaintiffs in January of 2011 before all of a sudden, cooling off internally (WME) without a clear explanation in February of 2011. Mr. Chaykin will also testify as to the reputation of Mr. John Dimatteo, a very successful booker and event promoter/producer involving headliner DJs during the relevant times.

Plaintiffs reserve the right to call Vito Bruno, Al Dorso, Jr., Wayne Goldberg, Amber Brilliant, Scott Holtz, Jerry Goldman, Jonathan Peters, Jo Zimmerman, Michael Rapino, Kelly Cobb, Alan Sacks, Paul Morris, Steve Goodgold, Caroline Prothero, Ron Vanderveen, Alan Gary, Lou Branchinelli, and/or any witnesses identified in discovery as necessary.

 B. On damages plaintiff intends to call the following witnesses who will testify in accordance with the following summaries, although not necessarily in this order:

  (1) Marianne L. DeMario or someone from her office who can testify as to her expert report on damages.

  (2) Thomas Dorfman ("Dorfman"): Mr. Dorfman's testimony will be in conformity with his deposition testimony.

  (3) Chris Barret ("Barret"): Mr. Barret's testimony will be in conformity with his deposition testimony.

Plaintiffs reserve the right to call Alex Chaykin, Wayne Goldberg, Amber Brilliant, Scott Holtz, Jerry Goldman, Michael Rapino, Jo Zimmerman, Jason Miller, Mario LaVecchia, Al Dorso Sr., Vito Bruno, John Dimatteo and/or any witnesses identified in discovery as necessary.

A. Defendant objects to the following witnesses for the reasons stated:

*Live Nation notes initially that it objects to all witnesses whose testimony is not relevant or germane to the Four Triable Issues.[3]*

*Live Nation objects to all of Plaintiffs' proposed "damages" witnesses, because pursuant to the Court's SJ Opinion, Plaintiffs are barred from recovering lost profits and because they are limited to only nominal damages on their defamation claim.*

*Live Nation objects to all of Plaintiffs' proposed witnesses who were not identified in Plaintiffs' Initial Disclosures pursuant to Rule 26(a), including Wayne Goldberg, Amber Brilliant, Scott Holtz, Jerry Goldman, Alex Chaykin, Michael Rapino, Mike Ma, Caroline Prothero, Ron Vanderveen, Alan Gary and Lou Branchinelli as well as those "reserved to call" witnesses whose testimony is not relevant or germane to the Four Triable Issues (Vito Bruno, Al Dorso, Jr. Jonathan Peters, Jo Zimmerman, Kelly Cobb, Alan Sacks, Paul Morris and Steve Goodgold).*

*Live Nation objects to all of Plaintiffs' proposed witnesses from whom Plaintiffs have not provided a summary of their proposed testimony.*

**9. DEFENDANT'S WITNESSES** (Aside from those called for impeachment purposes, only the witnesses and rebuttal witnesses whose names and addresses are listed below will be permitted to testify at trial.)

A. On liability defendant intends to call the following witnesses who will testify in accordance with the following summaries.

*If Plaintiffs' case survives a motion for directed verdict, Live Nation intends to call Jason Miller, and to the extent necessary, John D'Esposito, who will testify concerning the Four Triable Issues, in conformity with their deposition testimony. Messrs. Miller and D'Esposito may be contacted only through Live Nation's counsel, Ian S. Marx, Greenberg Traurig, LLP, 500 Campus Drive, Florham Park, NJ.*

*Live Nation may call Chris Femiano of Madison Marquette, who would testify as to the truth of the issues discussed in his email to John D'Esposito of February 23, 2011. Madison Marquette's address is: 1300 Ocean Avenue, Asbury Park, New Jersey.*

---

[3] This would include the following liability witnesses: (1), (3), (5), (8), (9),.

B. On damages defendant intends to call the following witnesses who will testify in accordance with the following summaries.

*Given the Court's rulings that bar Plaintiffs from recovering lost profits on Count II of their Complaint and limit their recovery on Count III of the Complaint to nominal damages, Live Nation is not required, and does not intend, to call any witnesses with respect to damages.*

C. Plaintiff objects to the following witnesses for the reasons stated:

Plaintiffs reserve the right to object to witnesses Chris Femiano of Madison Marquette to the extent they were not properly identified in discovery. Plaintiffs also reserve the right to object to the scope and substance of the testimony of all witnesses.

**10. EXPERT AND SPECIALIZED LAY OPINION WITNESSES** (No expert or specialized lay opinion witness offering scientific, technical or other specialized knowledge will be permitted to testify at trial unless listed below. A summary of the expert qualifications and a copy of his/her report must be provided for the Court's review at the pretrial conference. Said summary shall be read into the record at the time he/she takes the stand, and no opposing counsel shall be permitted to question his/her qualifications unless the basis of the objection is set forth herein.)

A. Plaintiff's expert and specialized lay opinion witnesses are:

(1) Marianne L. DeMario ("DeMario"). Ms. DeMario 's Expert Report and CV is attached hereto as Plaintiffs' Attachment 1.

B. Defendant's objections to the qualifications of the plaintiff's experts and specialized lay opinion witnesses are:

*Plaintiffs' damages expert, Marianne DeMario, offered an opinion solely with respect to lost profits. Given the Court's Order barring Plaintiffs from recovering lost profits, Live Nation objects to any testimony Plaintiffs may attempt to offer from Ms. Demario.*

C. Defendant's expert and specialized lay opinion witnesses are:

*None at this time.*

D. Plaintiff's objections to the qualifications of the defendant's experts and specialized lay opinion witnesses are: N/A.

**11. PLAINTIFF'S DEPOSITIONS** (List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy between counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed).

    A. On liability plaintiff intends to read into evidence the following:

        Deposition of Alan Sacks (07-18-13): Pages 8-11; 22; 35-37; 39; 63; 67; 90-93; 105; 112; 118-119; 122; 142; 161-162; 167-168

    B. On damages plaintiff intends to read into evidence the following:

        Deposition of Alan Sacks (07-18-13): Page 35

    C. Defendant objects to the deposition testimony set forth above for the reasons stated:

        *Defendant objects to any deposition testimony being read as to Alan Sacks as he is not a party to this lawsuit, has not been shown to be unavailable for trial and his deposition testimony is inadmissible hearsay. Moreover, as to liability, the testimony is not relevant or germane to the Four Triable Issues. As to damages, pursuant to the Court's SJ Opinion, Plaintiffs are barred from recovering lost profits and because they are limited to only nominal damages on their defamation claim.*

**12. DEFENDANT'S DEPOSITIONS** (List, by page and line, all deposition testimony to be offered into evidence. All irrelevant and redundant matters and all colloquy between counsel must be eliminated, unless ruled relevant. Deposition testimony to be used solely for impeachment purposes need not be listed).

    A. On liability defendant intends to read into evidence the following:

| DEPOSITION | DESIGNATION PAGE/ LINE |
|---|---|
| **Deposition of Christopher Barrett November 19, 2013** | 23:7-8 23:14-24:1 42:21-23 45:20-46:7 82:17-83:15 217:14-19 230:7-10 239:22-240:6 241:4-5 243:15-21 |

14

| | | 273:9-12 |
|---|---|---|
| **Deposition of Thomas Dorfman** **July 18, 2013** | | 29:9-30:10 |
| | | 35:1-6 |
| | | 81:14-83:8 |
| | | 119:4-124:5 |
| | | 124:6-126:2 |
| | | 232:5-11 |
| | | 235:1-236:2 |
| | | 236:16-20 |
| | | 237:4-6 |
| | | 238:16-20 |
| | | 238:25-239:9 |
| | | 260:16-261:1 |

B. On damages defendant intends to read into evidence the following:

*Given the Court's rulings that bar Plaintiffs from recovering lost profits on Count II of their Complaint and limit their recovery on Count III of the Complaint to nominal damages, Live Nation is not required, and does not intend, to read any depositions into evidence with respect to damages.*

C. Plaintiffs object to the deposition testimony set forth above for the reasons stated:

Plaintiffs reserve the right to object to the deposition testimony on any basis, including hearsay, relevancy, form, or any other basis legally cognizable.

## 13. PLAINTIFF'S EXHIBITS

(Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.)

A. Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit):

Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit): Plaintiffs' Exhibit List is attached hereto as Attachment 2.

B. Defendant objects to the introduction of plaintiff's exhibits (set forth number of exhibit and grounds for objection).

> *Plaintiffs' list of proposed Exhibits appears based on intention to proceed at trial as if the Court's SJ Opinion had not occurred, and that their Complaint remains intact, rather than the narrow components of Counts II and III that survived. Live Nation believes that the Court will grant its motions, if necessary, to ensure that the presentation of evidence is consistent with the Court's prior rulings and it objects to the admission into evidence of any documents that are not relevant or germane to the Four Triable Issues, as well as all documents that have not been authenticated, for which no foundation has been laid, and that constitute hearsay, that is not subject to any application exception.*

> *Live Nation's specific objections are noted as follows:*

- o *Live Nation objects to Exhibits 1-13 on the ground that these are deposition transcripts (which Plaintiff apparently intends to use as Exhibits, in whole). Because proposed deposition excerpts are the subject of Section 1, Live Nation objects to Plaintiffs' attempt to offer entire deposition transcripts as evidence. Live Nation further objects to these exhibits as hearsay and irrelevant.*

- o *Live Nation objects to Exhibits 14-20 on the ground that these documents purport to be transcripts of audio recordings of certain conversations. The audio recordings are inauthentic and the transcripts are thus inadmissible, irrelevant and, in some instances, contain hearsay.*

- o *Live Nation objects to Exhibit 24 (Plaintiffs' Complaint) as it is hearsay and irrelevant.*

- o *Live Nation objects to Exhibits 25 (Plaintiffs' Expert Report) as irrelevant, barred by prior Order and hearsay.*

- o *Live Nation objects to Exhibits 123-24, 312-356 and 366-370, on the ground that these documents were produced in discovery by non-parties Windish Agency and William Morris Endeavor, no foundation has been laid, the documents have not been authenticated, they constitute hearsay and because they are irrelevant.*

- o *Live Nation objects to Exhibits 21-23, 31-42, 44-122, 125-311, 357-365, 371-81 on the ground that the documents are irrelevant, constitute hearsay, lack foundation and have not been authenticated.*

- o *Live Nation objects to Exhibits 381-853 on the basis that it is unclear what these documents are, they do not appear to have been produced in discovery, they are not relevant or germane to any triable issues remaining in the case.*

**14. <u>DEFENDANT EXHIBITS</u>**

(Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made.)

In accordance with the Pretrial Scheduling Order, three (3) weeks before the entry of the Final Pretrial Order, counsel for each party shall serve upon all parties copies of all trial exhibits, fully pre-marked with exhibit tabs and numbering to be utilized at trial).

A. Defendant intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each exhibit).

*None at this time.*

B. Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection). Objections shall be provided two weeks before the trial brief is due.

Plaintiff reserve the right to object to the introduction of certain of defendant's exhibits after having an opportunity to review the exhibits. Objections shall be provided two weeks before the trial brief is due.

(COPIES OF EXHIBITS ARE TO BE MADE FOR OPPOSING COUNSEL, AND A BENCH BOOK OF EXHIBITS IS TO BE DELIVERED TO THE JUDGE AT THE START OF TRIAL. IF COUNSEL DESIRES TO DISPLAY EXHIBITS TO THE JURY, SUFFICIENT COPIES SHOULD BE AVAILABLE TO PROVIDE EACH JUROR WITH A COPY; ALTERNATIVELY, ENLARGED PHOTOGRAPHIC OR PROJECTED COPIES MAY BE USED).

**15. <u>PLAINTIFF'S LEGAL ISSUES</u>**

Plaintiffs' will look to prove tortious interference and slander, and will be seeking punitive damages.

**16. <u>DEFENDANT'S LEGAL ISSUES</u>**

*<u>See</u> Paragraph 2 above, which describes the motions Defendant will or may make concerning the legal issues identified therein.*

17. **<u>MISCELLANEOUS</u>**

Set forth any other matters which require action by, or should be brought to the attention of, the Court.

18. **<u>JURY TRIALS</u>**- <u>the following should be submitted to the court **no later than Two (2) weeks prior to trial**</u>:

A. Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2, with citations to authorities and arguments in support of its position on all disputed issues of law.

B. The parties shall confer and agree upon jury instructions and submit them to the court with supporting authorities on two separate wordperfect discs. The first disc will contain the agreed-upon instructions, and the second disc will contain disputed instructions with the parties' alternative proposals

C.    If any hypothetical questions are to be put to an expert witness on direct examination, these shall be submitted to the Judge and to opposing counsel.

D.    Counsel shall jointly submit to the Court a set of proposed <u>voir dire</u> questions as to which the parties are in agreement, not to exceed 30 questions.

E.    Counsel shall jointly submit to the Court a single proposed special verdict sheet on a wordperfect computer disc.

F. The parties shall prepare a joint trial exhibit list containing a description of all exhibits that is divided into two sections. The first section will identify the exhibits for which no objection has been raised, and the second section shall list those exhibits for which one of the parties has made an objection. The exhibits themselves are to be premarked and must include exhibit stickers. The parties must prepare a copy of all exhibits they expect to use for the Judge, Court reporter, and opposing counsel.

19.    **<u>NON-JURY TRIALS</u>** - <u>The following shall be submitted to the Court no later than **Two (2) weeks prior to trial:**</u>

A.    Each side shall submit to the Judge and opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2 with citation to authorities and arguments in support of its position on all disputed issues of law.

B.    Each side shall submit to the Judge and other counsel proposed written findings of fact and conclusions of law. There is reserved to counsel the right to submit additional proposed

findings of fact and conclusions of law during the course of the trial on those matters that cannot reasonably be anticipated.

C.    If any hypothetical questions are to be put to an expert witness on direct examination, these shall be submitted to the Judge and to opposing counsel.

D.    Counsel shall provide the Court with a copy of its proposed findings of fact and conclusions of law on a computer disk in a WordPerfect readable format.

20.   **TRIAL COUNSEL** (List the names of trial counsel for all parties).

A.  Trial Counsel for Plaintiffs: Andrew B. Smith, Esq. (and Kathryn Schwartzstein, Esq.) Smith + Schwartzstein LLC
B.  Trial Counsel for Defendant: Ian S. Marx, Esq. (and Philip R. Sellinger, Esq.) Greenberg Traurig, LLP

21. **BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages shall be tried. The issues of liability and damages SHALL/SHALL NOT be tried separately.)

A. Plaintiffs' Position:  the issues of liability and damages shall not be tried separately.

B.    Defendant's Position:  *there is no need for a trial on damages, given the Court's rulings barring Plaintiffs' from recovering lost profits on Count II of the Complaint and limiting Plaintiffs' recovery on Count III of the Complaint to nominal damages, no trial time will be required for damages.*

22. **ESTIMATED LENGTH OF TRIAL**

A.  Plaintiffs' Estimate:

   Two weeks for liability and one or two days for damages.

B.  Defendants' Estimate:

   *One day for liability and, given the Court's rulings barring Plaintiffs' from recovering lost profits on Count II of the Complaint and limiting Plaintiffs' recovery on Count III of the Complaint to nominal damages, no trial time will be required for damages.*

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE

CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.

/s/ Andrew Smith
_____
(Attorney for Plaintiff)


/s/ Ian Marx
_____
(Attorney for Defendant)

Dated:

s/Cathy L. Waldor 2/28/23
_____

United States Magistrate Judge




(EXHIBIT LIST FOLLOWS)

ACTIVE 46017663v3

20